# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **IKNOOR SINGH**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **No. 1:14-cv-01906-RCL** |
| | ) | |
| **JOHN MCHUGH**, in his official capacity as | ) | |
| Secretary of the United States Army, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff hereby moves for a preliminary injunction barring Defendants from continuing to violate his rights under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb et seq. In support of this motion, Plaintiff relies on the accompanying memorandum of law, the supporting declarations and attached exhibits, and the Verified Complaint for Declaratory and Injunctive Relief.

Plaintiff respectfully asks that this Court issue a preliminary injunction (1) enjoining Defendants from continuing their refusal to consider and act upon Plaintiff's request for a religious exemption until after he enlists, cuts his hair, shaves his beard, and abandons his turban; (2) requiring Defendants to make a decision on Plaintiff's requested religious accommodation within 14 days; and (3) requiring Defendants, should they deny the accommodation, to grant Plaintiff a temporary accommodation and provisional enlistment allowing him to wear and maintain his beard, long hair, and turban, pending the final outcome of this case.

As set forth in the attached memorandum of law, the requested preliminary injunction is proper because Plaintiff is likely to succeed on the merits of his RFRA claim; he is suffering irreparable harm as a result of Defendants' policies and conduct; his injury outweighs the harm, if any, that would be caused to Defendants by an injunction; and the injunction is in the public interest.

Respectfully submitted,

/s/ *Daniel Mach*
Daniel Mach (D.C. Bar No. 461652)
Heather L. Weaver (D.C. Bar No. 495582)
American Civil Liberties Union Foundation
915 15th Street, NW, Suite 600
Washington, DC 20005
Tel. (202) 675-2330
Fax. (202) 546-0738
*dmach@aclu.org*
*hweaver@aclu.org*

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union of the Nation's Capital
4301 Connecticut Avenue, NW, Suite 434
Washington, DC 20008
Tel. (202) 457-0800
Fax (202) 457-0805
*artspitzer@aclu-nca.org*

Manmeet Singh Mehendiratta
UNITED SIKHS
JAF POB 7203
New York, NY 10116
Tel. (646) 315-3909
Fax: (866) 657-6206
*manmeet.Singh@unitedsikhs.org*

November 13, 2014

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **IKNOOR SINGH**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **No.  1:14-cv-01906-RCL** |
| | ) | |
| **JOHN MCHUGH**, in his official capacity as | ) | |
| Secretary of the United States Army, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

# INTRODUCTION

Plaintiff Iknoor Singh has long dreamed of serving his country.  A student at Hofstra University, he decided to enlist in the Reserve Officer Training Corps ("ROTC") to pursue this dream.  ROTC, in the Army's own words, "provides unrivalled leadership training for success in any career field."  Verif. Compl. ¶ 19.  It is also the primary path to becoming a commissioned officer:  "Since its inception, Army ROTC has provided leadership and military training at schools and universities across the country and has commissioned more than a half million Officers.  It is the largest commissioning source in the American military."  *Id.* ¶ 18.  When Mr. Singh inquired about joining ROTC, however, he was told by Defendants that he would be prohibited from enlisting as a Cadet unless he first agreed to abide by all Army regulations and policies, including several that would require him to violate his Sikh religious beliefs. *Id.*  ¶¶ 1-3, 23-39.

As an adherent of the Sikh faith, Mr. Singh believes that he must wear a beard and long hair tucked under a protective turban.  *Id.* ¶¶ 1, 15-16.  Notified by Defendants that, upon enlisting, he would be forced, under the Army's grooming and uniform rules, to immediately cut his hair, shave off his beard, and remove his turban, Mr. Singh sought a religious exemption.  *Id.* ¶ 23. Defendants denied the accommodation, stating that it would undermine readiness, unit cohesion, standards, health, safety, and discipline, *id.* ¶ 24, and declaring, remarkably, "It is not legally permissible . . . to grant religious exceptions to allow a Sikh Cadet to enroll in the ROTC program while maintaining his religious articles."  *Id.* ¶ 27.

When he appealed the determination, Defendants switched tactics, claiming that they may not even entertain an accommodation request from Mr. Singh until after he enlists and complies with the current regulations by, in contravention to his faith, abandoning his religious practices.  *Id.* ¶¶ 33, 38-39.  Defendants' policies substantially burden Mr. Singh's religious

exercise by mandating conduct that is prohibited by his religious beliefs and pressuring him to modify his behavior in violation of his faith. *Id.* ¶¶ 4, 17, 52-53.

In fact, Defendants are not only permitted to accommodate Mr. Singh's religious practices, but under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb et seq., they are *required* to do so unless they can show that the substantial burden imposed on Mr. Singh's religious exercise as a result of their policies is the least restrictive means of furthering a compelling interest. As set forth below, Defendants cannot meet this standard.

While the concerns cited by Defendants – readiness, unit cohesion, standards, health, safety, and discipline – may well be compelling in some contexts, there is no evidence that requiring Mr. Singh to abandon his religious practices to become an ROTC Cadet is necessary to further those interests or is the least restrictive means of doing so. Nor is there evidence that Defendants' policy requiring Mr. Singh to enlist and comply with the objectionable regulations *before* they will even consider his accommodation request is the least restrictive means of furthering a compelling interest.

Indeed, in recent years the Army has granted several active-duty Sikhs grooming and uniform accommodations similar to those sought by Plaintiff, and it has authorized grooming exemptions for adherents of other faiths. *Id.* ¶¶ 41-47. Army regulations also provide a medical exemption to the clean-shaven policy, permit wigs to cover natural baldness, allow women service members to have long hair provided it is securely pinned and neat, and authorize some service members to wear religious headgear. *Id.* ¶ 41. There is no indication that the Army's overall mission has been significantly compromised by these accommodations. *Id.* ¶ 48. Moreover, Defendants have a policy of allowing waivers of Army regulations (including

grooming rules prohibiting tattoos) for potential recruits before or at the time of enlistment, and there is no reason they cannot extend the same practice to Mr. Singh.  *Id.* ¶¶ 45, 49.

Defendants' policy prohibiting Mr. Singh from enlisting as a Cadet in ROTC and obtaining the many benefits of such participation unless he first cuts his hair, shaves his beard, and abandons his turban, as well as their policy requiring him to enlist before seeking an exemption, plainly violate RFRA.  Mr. Singh is thus likely to succeed on the merits of his claim. This ongoing denial of his religious-exercise rights is causing Mr. Singh irreparable harm—harm that greatly outweighs any injury Defendants would suffer from granting the accommodation. The longer Mr. Singh is denied entry to ROTC because of his religious beliefs and practices, the more trainings and field exercises he misses; and if he is not permitted to enlist in ROTC by the end of his sophomore year, Army rules currently prohibit him from ever joining the program. Finally, granting the accommodation via injunction would be in the public interest because the individual, personal religious expression that Mr. Singh seeks to undertake is the very type of core religious exercise that RFRA was intended to protect, and it would ensure that the ROTC does not outright exclude potential Cadets on the basis of their religious practices.

For these reasons, Plaintiff respectfully requests that this Court grant his Motion for a Preliminary Injunction (1) enjoining Defendants from continuing their refusal to consider and act upon Plaintiff's request for a religious exemption until after he enlists, cuts his hair, shaves his beard, and abandons his turban; (2) requiring Defendants to make a decision on Plaintiff's requested religious accommodation within 14 days; and (3) requiring Defendants, should they deny the accommodation, to grant Plaintiff a temporary accommodation and provisional enlistment pending the final outcome of this case.

## STATEMENT OF FACTS

### A.    Mr. Singh's Sikh Faith

Mr. Singh was born into the Sikh religion, which requires followers to maintain five articles of faith to establish and strengthen their devotion and commitment to God.   Verif. Compl. ¶ 15.   Although Mr. Singh believes all of the articles of faith are important, *Kesh* is one of the primary means through which he practices his religion.   *Id.   Kesh* is rooted in the belief that allowing hair to grow naturally is a sign of respect toward the perfection of God's creation. Thus, Mr. Singh does not cut his hair, keeping it long and tucked neatly under his turban, which both protects his hair and serves as the most prominent outward symbol of his Sikh devotion.  *Id.* ¶¶ 15-16.   He also wears a short, well-kempt beard.  *Id.* ¶ 15.   Mr. Singh believes that, according to the *Rehat Maryada* (the Sikh code of conduct), he would be dishonoring and offending God by cutting his hair, shaving off his beard, or abandoning his turban.  *Id.* ¶¶ 15-16.

### B.    The ROTC Program at Hofstra University

"Since its inception, Army ROTC  . . . has commissioned more than a half million Officers" and "is the largest commissioning source in the American military."  *Id.* ¶ 18.  Hofstra students who enlist as Cadets in the program receive a number of benefits.  *Id.*  ROTC offers Hofstra students a direct path into the Army's commissioned ranks:  "The Hofstra Army Reserve Officer's Training Corps (ROTC) program qualifies students for appointment as an officer of the United States Army, Army Reserve or Army National Guard."  *Id.*  Cadets graduate with "commissions as second lieutenants in one of the Army's specialized branches."  *Id.*

ROTC Cadets are also eligible to receive "2, 3, and 4-year scholarships that cover full tuition and fees or room and board"; up to "$1200 annually for books and expenses"; and a "$300-$500 per month tax-exempt spending allowance for contracted Cadets."  *Id.* ¶ 19.  During

the weekly labs, which may be attended only by enlisted Cadets, students "receive training on first aid, land navigation, tactics, marching, and marksmanship." *Id.* They "participate in Physical Training (PT) three days a week in the morning," where they "learn how to conduct PT to the Army standard while increasing their flexibility, endurance, muscular strength, and aerobic capacity." *Id.* And "[i]n addition to the classroom and lab instruction and PT, Cadets participate in one Field Training Exercise (FTX) over a weekend per semester." *Id*. The FTX provides "more in-depth training on subjects covered in class and lab" and gives students the "opportunity to go to a rifle marksmanship range, rappel, and train with Cadets from neighboring schools." *Id.*

While Defendants allow freshmen and sophomores who are not enlisted as ROTC Cadets to audit Hofstra's military-science courses, these students do not receive credit for their studies, and juniors and seniors may not audit the courses at all. *Id.* ¶ 20. In addition, unenlisted students who audit the courses are ineligible for scholarship funds, spending allowances, PT, lab and FTX trainings, an Army commission, and other ROTC benefits. *Id.* To participate in these activities and receive all ROTC benefits, students must enlist as Cadets no later than the end of their sophomore academic year. *Id.* ¶ 21. This appears to be required to ensure that Cadets complete the minimum training necessary for a second-lieutenant commission prior to graduation. *Id.* Freshmen and sophomore recruits have the option of becoming "contracted" Cadets or "non-contracted" Cadets. *Id.* Contracted Cadets are eligible for scholarships. *Id.* In order to continue in the program past their sophomore year, Cadets must contract with ROTC. *Id.*

Once a student has enlisted as a contracted or non-contracted ROTC Cadet, he is required to comply immediately with all Army regulations and policies, including those governing grooming and uniforms. *Id.* ¶ 22. Under Army rules, men's hair "must present a tapered

appearance" and, when combed, may "not fall over the ears or eyebrows, or touch the collar, except for the closely cut hair at the back of the neck."   A.R. 670-1 ch. 3-2(a)(2), Wear & Appearance of Army Uniforms & Insignia (Sept. 15, 2014) (describing acceptable male haircuts), *available at* http://www.apd.army.mil/pdffiles/r670_1.pdf.   In addition, men must "keep their face clean-shaven when in uniform, or in civilian clothes on duty."   *Id.* ch. 3-2(a)(2)(b).  Finally, "[o]nly uniforms, accessories, and insignia prescribed in this regulation, or in the common table of allowance (CTA), or as approved by Headquarters, Department of the Army (HQDA), will be worn by personnel in the U.S. Army."   *Id.* ch. 1-5(b).  A Cadet's failure to follow these rules "may result in adverse administrative action and/or charges."   *Id.* ch. 3-2 (noting that "[t]his paragraph is punitive with regard to Soldiers").

### C. Mr. Singh's Efforts to Obtain a Religious Accommodation Allowing Him to Enlist in ROTC

Mr. Singh has long dreamed of serving his country and intends to enlist as a contracted Cadet in the ROTC program operated by Defendants at Hofstra University.  Verif. Compl.  ¶ 23. However, although Mr. Singh is otherwise fully qualified to become an ROTC Cadet, *id.* ¶ 14, Defendants will not allow him to enlist unless he agrees to comply with these rules by removing the turban he currently wears every day, cutting his hair, and shaving his beard immediately upon enlistment.   *Id.* ¶ 23.

In April 2013, Mr. Singh attended an ROTC open house at Hofstra, where he met with ROTC officials and asked about an accommodation that would allow him to both participate in the program and follow his faith.   *Id.* ¶ 23.   Wil Massidas, a retired Army official and the enrollment officer for Hofstra's ROTC program, told Mr. Singh that he would take the request "up the chain."   *Id.*   On May 9, 2013, Mr. Massidas wrote in an email to Mr. Singh that "ROTC will not be able to accommodate your religious practice."   *Id.* ¶ 24; Singh Decl. ¶ 2, Ex. 1.  Mr.

Massidas stated that, while "[t]he Army, whenever possible, make[s] all attempts to accommodate religious practices and belief," it will not do so when an accommodation "has an adverse impact on readiness, unit cohesion, standards, health, safety, or discipline." *Id.*; Verif. Compl. ¶ 24. He did not explain how permitting Mr. Singh to keep his articles of faith would negatively affect these considerations. *See id.* He advised Mr. Singh to contact the then-ROTC Commander, Lieutenant Colonel David Daniel, for "further clarification." *Id.*; Singh Decl. ¶ 2, Ex. 1.

In June 2013, UNITED SIKHS sent a letter on behalf of Mr. Singh to Lt. Col. Daniel urging him to reverse his decision and approve the religious exemption. Verif. Compl. ¶ 25; Singh Decl. ¶ 3, Ex. 2. Lt. Col. Daniel denied the request via email on August 16, 2013, stating:

> Regrettably, the contracting of Cadets into the ROTC Program who cannot comply with the wear and appearance and personal grooming standards of Army Regulation (AR) 670-1 is not permitted under AR 145-1, and I nor U.S. Army Cadet Command (USACC) have the authority to grant exceptions to this policy for religious accommodations. . . . Wearing a turban and keeping one's hari [sic] and/or beard unshorn does not comply with AR 670-1 and AR 600-20 . . . [R]eligious items and grooming practices that do not meet the standards of AR 670-1 will not be accommodated, and requests for accommodation will not be entertained.

*Id.* ¶ 4, Ex. 3. Lt. Col. Daniel further warned Mr. Singh that "exceptions to this policy are extremely limited" and are generally granted "on a case-by-case basis by the Deputy Chief of Staff for the Army" only "where the Soldier possesses a specific skill that is vital to national security interests." *Id.*

Lt. Col. Daniel also stated that "[ad]hering to a religion[,] the practices of which make it impossible for the Cadet to comply with AR 670-1 and 600-20[,] is a fact that will bar the commissioning of the Cadet." *Id.* He explained, "It is not legally permissible under AR 145-1 to grant religious exceptions to allow a Sikh Cadet to enroll in the ROTC program while maintaining his religious articles." *Id.*

Lt. Col. Daniel suggested that Mr. Singh instead audit ROTC courses. *Id.* In an effort to limit the distance by which he has fallen behind in his military education and training, Mr. Singh has, in fact, audited the ROTC course since his freshman year. *Id.* ¶ 20. However, he will not be permitted to do so after his sophomore year. *Id.* And as Lt. Col. Daniel explained to him via email: "[A]s an auditing student, you will not be issued uniforms or equipment, will not be attending PT or field training and finally, you will not participate in Labs . . . Auditing means that you are not fully enrolled in the program and will not be allowed to progress into or audit the advanced course classes." *Id.*; Singh Decl. ¶ 6, Ex. 5.

Mr. Singh asked how to appeal the decision. *See id.* ¶ 4, Ex. 3; Verif. Compl. ¶ 29. On November 4, 2013, Lt. Col. Daniel responded, directing Mr. Singh to submit "[a] simple letter with [his] signature explaining what [he was] asking for – basically an exception to uniform policy that would allow [him] accommodation to wear [his] articles of faith while in uniform during training to become an Army officer." *Id.*; Singh Decl. ¶ 7, Ex. 6.

On November 11, 2013, Mr. Singh submitted his appeal letter to Lt. Col. Daniel. *Id.* ¶ 8, Ex. 7; Verif. Compl. ¶ 30. In the letter, he noted that several other Sikhs have received accommodations to serve in the U.S. Army with their articles of faith intact and stated his belief that he would be able to perform all of the duties of an ROTC Cadet while wearing unshorn hair, a beard, and a turban. *Id.*

In January 2014, new Department of Defense ("DoD") regulations governing religious accommodations in the military took effect. *See id.* ¶ 31; *see generally* DoDI 1300.17. The regulations clarified that non-conforming grooming and appearance practices require a waiver from military policies and that "such practices are subject to consideration for accommodation when the request is based on religious beliefs." *Id.* § 4(f)(1)(b). Under the revised regulations,

waiver requests must be forwarded to the Secretary of the Army, who "may delegate authority to resolve these requests no lower than" the Army's Deputy Chief of Staff, G-1. *Id.* § 4(f)(2)(a). In making a determination, the Secretary or Deputy Chief of Staff must assess the accommodation request under RFRA's strict-scrutiny legal standard, which is expressly incorporated into the new regulations. *Id.* § (4)(e)(1). The final review must take place within 30 days. *Id.* § (5)(b)(2). Notwithstanding these new regulations, Mr. Singh's appeal was not elevated to the Secretary of the Army or Deputy Chief of Staff; instead, his accommodation request was re-directed to the U.S. Army Cadet Command Judge Advocate General's Office. Verif. Compl. ¶ 30; Singh Decl. ¶ 9, Ex. 8.

In April 2014, Mr. Singh received a memorandum stating that his accommodation request had again been denied. *Id.* ¶ 10, Ex. 9; Verif. Compl. ¶ 33. In the memorandum, which was dated February 28, 2014, Major General Jefferey A. Smith ruled that "ROTC units should not permit a student to enroll (contracted or non-contract) unless the student is willing to comply with Army policies, including AR 670-1. This includes enrolling in any 'conditional' status." Singh Decl. ¶ 10, Ex. 9. The memorandum further stated that "[s]tudents who are not enrolled as Cadets in the program may not apply for a religious accommodation" and that "[a]ny ROTC cadet who applies for a religious accommodation must comply with Army Policy unless and until the request is approved." *Id.*

With the implementation of the new regulations progressing, UNITED SIKHS joined the American Civil Liberties Union to send a final letter on Mr. Singh's behalf describing in detail how the Army's refusal to accommodate Mr. Singh violates RFRA and the DoD's own regulations, which incorporate the RFRA standard. Verif. Compl. ¶ 34; Weaver Decl. ¶ 2, Ex. 1. The letter was sent on August 5, 2014, to Defendant Lt. Gen. McConville, Maj. Gen. Smith, and

Defendant Lt. Col. Cederman.  *Id.*  The letter renewed Mr. Singh's request for an accommodation and notified Defendants that Mr. Singh would consider filing a lawsuit if the decision were not reversed.  *See id.*  Because Mr. Singh's sophomore year was about to start, the letter asked for a response by August 20, 2014.  *Id.*

Though Mr. Singh's counsel contacted Defendants several times to seek a response to his letter, Mr. Singh did not receive a reply until October 21, 2014.  *See id.* ¶¶ 5-12, Exs. 4-11.  In a letter to Mr. Singh's counsel, Defendant Lt. Gen. McConville wrote:

> I am unable to approve or deny a waiver of Army uniform and grooming policy for Mr. Singh because prospective cadets, applicants and enlistees are not subject to the Army's uniform and grooming policy and, as such, I am not in a position to grant or disapprove a waiver of a policy that does not apply to Mr. Singh.  If Mr. Singh displays a willingness to comply with AR 670-1, he may be processed for enrollment in the ROTC program. Once enrolled, he can request a religious accommodation according to the procedure in AR 600-20.

*Id.* ¶ 12, Ex. 11.

In his letter, Lt. Gen. McConville made clear that, as soon as Mr. Singh formally enlists, he will be immediately required to comply with Army regulations by shaving his beard, cutting his hair, and removing his turban and that he must agree to do so in order to enlist:  "In accordance with Army policy, a cadet who submits a religious accommodation request must comply with the Army's uniform and grooming policy unless and until the request is approved."  *See id.*

Defendants' refusal to accommodate Mr. Singh's religious exercise and their demand that he enlist and comply with all rules before seeking an exemption subject him to substantial pressure to abandon his religious practices and violate his religious beliefs so that he may become an ROTC Cadet.  Verif. Compl. ¶¶ 4, 17.  If granted, the exemption requested by Mr. Singh will be implemented in a neat and conservative manner.  *Id.* ¶ 50.  It will not interfere with

the safe and effective operation of military equipment or use of protective clothing, pose a health or safety hazard to him, or otherwise impair his ability to carry out his ROTC duties. *Id.* But for Defendants' refusal to grant him a religious exemption from Army grooming and uniform regulations, Mr. Singh already would have enlisted as a contracted Cadet in Hofstra's ROTC program. *Id.* Upon confirmation that he will be granted an exemption and will be permitted to participate in ROTC with his beard, long hair, and turban, Mr. Singh intends to immediately enlist as a contracted Cadet. *Id.*

### D.     Army Grooming and Uniform Exemptions

The Army has provided a number of exceptions and accommodations to its grooming and uniform rules. Service members may, for example, seek a medical exemption to rules requiring members to be clean-shaven. *See* A.R. 670-1 ch. 3-2(a)(2)(b), *available at* http://www.apd.army.mil/pdffiles/r670_1.pdf. Exceptions for wigs and hairpieces to "cover natural baldness or physical disfiguration caused by accident or medical procedure" are also authorized. *Id.* ch. 3-2(a)(2)(c). In addition, female service members are permitted to wear long hair that "extends beyond the lower edge of the collar" provided that the hair is "neatly and inconspicuously fastened or pinned above the lower edge of the collar." *Id.* ch. 3-2(a)(3)(c). And Army Regulations expressly allow for certain types of religious headgear. *See* A.R. 600-20 ch. 5-6(h)(4)(g), *available at* http://www.apd.army.mil/pdffiles/r600_20.pdf.

The Army also has granted a number of specific religious exemptions to its grooming and dress regulations, including for Sikhs. Verif. Compl. ¶ 42. Major Kamalejeet Singh Kalsi, an active-duty physician, is permitted to maintain a full-length beard, which he keeps neatly groomed, and unshorn hair, which he wears under his turban. *Id.* ¶ 43. His turban has been modified to ensure that it does not interfere with any military or emergency equipment—the

same type of turban that Plaintiff would wear if he were granted an accommodation.  *Id.*  With these religious accommodations, Maj. Kalsi was deployed to Afghanistan, where he earned the Bronze Star Medal for resuscitating two injured soldiers.  *Id.*  Simranpreet Singh Lamba, a combat medic, and Captain Tejdeep Singh Rattan also received religious accommodations to keep their articles of faith while serving.  *Id.* ¶ 44.

Rabbi Jacob Goldstein, a colonel in the Army Reserve Chaplain Corps, and 1st Lieutenant Rabbi Menachem Stern also have been permitted to serve while wearing beards.  *Id.* ¶ 45.  Stern was granted a waiver from Army grooming regulations in 2011 after he sued, challenging Defendants' policy prohibiting him from enlisting due to his non-conforming religious practice.  *Id.*; *see also id.* ¶ 46 (detailing other religious accommodations granted to service members).  And the Army has authorized members of its Junior ROTC program, which enrolls high-school students, to wear religious headgear such as hijabs and turbans.  *Id.* ¶ 47.

In addition to the pre-enlistment waiver granted to Rabbi Stern, the Army grants morality waivers, medical waivers, and other types of waivers to prospective recruits who would otherwise be ineligible for service.  *Id.* ¶ 49.  For example, ROTC regulations expressly allow potential recruits to seek a waiver from rules barring enlistment by students convicted of felonies and other crimes, such as sexually related offenses, larceny, or perjury.  A.R. 145-1 ch. 3-3(e).  And grooming waivers have been granted to prospective Army recruits with impermissible tattoos.  Verif. Compl. ¶ 49.

## ARGUMENT

To obtain a preliminary injunction in this case, Mr. Singh "'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public

interest.'" *Gordon v. Holder*, 721 F.3d 638, 643-44 (D.C. Cir. 2013) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).   As explained below, Mr. Singh meets these requirements.

## I.   MR. SINGH IS LIKELY TO SUCCEED ON THE MERITS OF HIS RFRA CLAIM.

In 1993, Congress enacted the Religious Freedom Restoration Act, which prohibits "all Federal law, and the implementation of that law, whether statutory or otherwise" from imposing a substantial burden on a person's religious exercise unless the "application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C § 2000bb-1.   The religious-liberty statute applies to every "branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States," 42 U.S.C. § 2000bb–3(a), including the DoD and all branches of the military.   *See, e.g.*, H.R. Rep. No. 103–88 (1993), U.S. Code Cong. & Admin. News 1993, p. 1892 ("Pursuant to the Religious Freedom Restoration Act, the courts must review claims of prisoners and military personnel under the compelling governmental interest test."); S. Rep. No. 103–111 (1993), U.S. Code Cong. & Admin. News 1993, pp. 1892, 1899 ("Under the unitary standard set forth in the act, courts will review the free exercise claims of military personnel under the compelling governmental interest test.").

Thus, in *Rigdon v. Perry*, 962 F. Supp. 150, 162 (D.D.C. 1997), this Court held that the Army had violated RFRA by barring military chaplains from encouraging congregants to contact Congress regarding certain legislation.   *Cf. Veitch v. Danzig*, 135 F. Supp. 2d 32, 35 (D.D.C. 2001) (opining that "[i]f, as plaintiff contends, this controversy is centered upon a religious orthodoxy mandated by the Navy—even one officially sanctioned as appropriate for a military

population of diverse religious beliefs—plaintiff's First Amendment claims are by no means insubstantial" and pointing to RFRA as a potential source of relief).   And, recognizing its obligation to comply with RFRA, the DoD incorporated RFRA's strict-scrutiny standard earlier this year into its own religious-accommodation instructions.   *See* Instruction No. 1300.17 § 4e(1) (eff. Jan. 22, 2014) (affirming that "[t]he DoD places a high value on the rights of members of the Military Services to observe the tenets of their respective religions . . . [and] protects the civil liberties of its personnel and the public to the greatest extent possible, consistent with military requirements").   Defendants' policy prohibiting Mr. Singh from enlisting and participating in ROTC while maintaining his articles of faith runs afoul of RFRA's religious-liberty protections.

A.   **Mr. Singh's Sincere Religious Exercise Is Substantially Burdened by the Army's Grooming and Uniform Regulations and Defendants' Demand That He Enlist in ROTC Before Seeking an Accommodation.**

Courts have repeatedly recognized that government restrictions on grooming and religious headgear impose a substantial burden on sincerely held religious beliefs and their concomitant religious practices.   *See e.g.*, *Couch v. Jabe*, 679 F.3d 197, 200 (4th Cir. 2012) (finding that prison's no-beard policy substantially burdened Muslim prisoner's religious exercise); *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 265-66 (5th Cir. 2010) (holding that public school's rule requiring Native American student to wear his long hair in a bun or braided and tucked inside his shirt imposed a substantial burden on his religious exercise); *Smith v. Ozmint*, 578 F.3d 246, 250-51 (4th Cir. 2009) (ruling that prison policy mandating close-cropped haircuts substantially burdened Rastafarian prisoner's religious practice); *Warsoldier v. Woodford*, 418 F.3d 989, 996 (9th Cir. 2005) (finding that Native American's religious exercise was substantially burdened by prison's hair-length restriction); *Ali v. Stephens*, NO. 9:09–CV–52, 2014 WL 5355529, at *7 (E.D. Tex.) (Sept. 26, 2014)

(recognizing substantial burden where prison rules prevented Muslim plaintiff from "wearing a fist-length beard and wearing his Kufi at all times"); *Morgan v. City of New York*, No. 12-cv-704, 2014 WL 3407714, at *8 (E.D.N.Y. July 10, 2014) (holding that Rastafarian plaintiff's religious exercise was substantially burdened by removal of his turban for 20 to 30 minutes when he was transferred to police station after his arrest); *Benning v. Georgia*, 864 F. Supp. 2d 1358, 1365 (M.D. Ga. 2012) (determining that prisoner's religious exercise was substantially burdened when policies restricting facial hair conflicted with his sincere belief that Jewish law forbade him from shaving his earlocks); *Hundal v. Lackner*, No. EDCV 08-00543-CAS, 2011 WL 1935734, at *5-6 (C.D. Cal. Apr. 12, 2011) (noting that prisoner had alleged facts sufficient to show a substantial burden where prison rules barred beards longer than one-half inch, and plaintiff had stated "that cutting his beard is against the tenets of his Sikh religion"); *Singh v. Goord*, 520 F. Supp. 2d 487, 503 (S.D.N.Y. 2007) (holding that removal of Sikh prisoner's turban during outside transport substantially burdened his religious exercise "[b]ecause plaintiff sincerely believes he is required to wear his turban at all times"); *Gartrell v. Ashcroft*, 191 F. Supp. 2d 23, 25-26 (D.D.C. 2002) (ruling, under RFRA, that federal Bureau of Prisons policy of placing prisoners in Virginia facilities that mandated "hair short, in military-style fashion, and prohibit[ed] all inmates from wearing beards" imposed substantial burden on Muslim and Rastafarian litigants whose religious beliefs forbade shaving off beards or cutting hair); *see also, e.g., Potter v. District of Columbia*, 558 F.3d 542, 546, 551 (D.C. Cir. 2009) (upholding grant of summary judgment in favor of Muslim firefighters' challenge to beard restrictions where plaintiffs had met their burden under RFRA, but defendants did not); *cf. Tagore v. United States*, 735 F.3d 324, 330-32 (5th Cir. 2013) (holding that RFRA's substantial-burden requirement was "not a serious hurdle" where Sikh federal employee "gave up her job rather than wear a shorter-

bladed kirpan" and "risked violating federal law when she entered the Leland building while wearing" her article of faith).

Here, too, the government's grooming and uniform restrictions impose a substantial burden on Mr. Singh's religious exercise. As the Supreme Court has explained, "[w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists." *Thomas v. Review Bd. of Ind. Employ't Sec. Div.* 450 U.S. 707, 717-18 (1981). And "[w]hile the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial." *Id.* at 718.

In *Thomas,* accordingly, the Court held that the religious exercise of a Jehovah's Witness was substantially burdened by the State's denial of unemployment benefits because he had voluntarily quit his job at a manufacturing plant after the factory began producing weapons in violation of his religious beliefs. *Id.* at 717–18. Similarly, in *Sherbert v. Verner*, 374 U.S. 398, 403-04 (1963), the Supreme Court found that the state had substantially burdened the plaintiff's religious exercise by denying her unemployment benefits after she refused to work on Saturdays, in accordance with the tenets of her faith. The Court reasoned that "the pressure upon [the plaintiff] to forego that practice is unmistakable" because the government's action "forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." *Id.* at 404.

Mr. Singh sincerely believes that he must maintain a beard and unshorn hair and wear a turban. Verif. Compl. ¶¶ 15-16. ROTC is an important and unique government program: It

serves as the largest commissioning source in the U.S. military; and it provides members with a variety of valuable benefits, financial and otherwise. *See id.* ¶ 18-19.  Defendants' demand that he cut his hair, shave his beard, and abandon his turban to enlist and participate in ROTC, or merely to seek an accommodation, "puts undue pressure on [him] to alter [his] behavior and to violate [his] beliefs in order to obtain government benefits, thereby imposing a substantial burden on religious exercise."  *See Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007).

### B.   Defendants' Imposition of a Substantial Burden on Mr. Singh is Not Justified by a Compelling Governmental Interest.

Because Mr. Singh has "effectively demonstrated that [his] sincere exercise of religion was substantially burdened," it falls to Defendants to "demonstrate that the application of the burden to [Mr. Singh] would, more likely than not, be justified by the asserted compelling interests."  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006); *Roman Catholic Archbishop of Wash. v. Sebelius*, No. 13–1441 (ABJ), 2013 WL 6729515, at *9 (D.D.C. 2013) (holding that, under RFRA, once substantial burden is demonstrated, onus shifts to government to "show that the law or regulation is the least restrictive means to further a compelling interest").  Defendants cannot satisfy this burden.

The Supreme Court has instructed that, under this prong of RFRA, a "categorical approach" offering generalized assertions of compelling interests "cannot carry the day."  *O Centro Espirita*, 546 U.S. at 430-32.  Rather, "[u]nder the more focused inquiry required by RFRA and the compelling interest test . . . RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened."  *Id.* at 430-431; *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2779

17

(2014) (noting that the governmental interest cannot be "couched in very broad terms" but must be "focused" on the particular claimant whose interest is substantially burdened); *Kaemmerling v. Lappin*, 553 F.3d 669, 682 (D.C. Cir. 2008) ("We must look beyond the 'broadly formulated interests justifying the general applicability' of the statute to examine the interests the government seeks to promote as applied to [the plaintiff] 'and the impediment to those objectives' that would flow from granting him a specific exemption.") (quoting *O Centro Espirita*, 546 U.S. at 431); *Westchester Day Sch.*, 504 F.3d at 353 (explaining that, under strict scrutiny, the government "must show a compelling interest in imposing the burden on religious exercise in the particular case at hand, not a compelling interest in general").

Applying this standard in *O Centro Espirita*, the Court rejected the government's argument that, because the controlled substance "hosacea" was a dangerous drug and could negatively affect the public health and safety, there was compelling interest in enforcing a ban against a Christian Spiritist sect that used the drug in sacramental rites.  546 U.S. at 432-33.  The Court noted that the Controlled Substances Act "itself contemplates that exempting certain people from its requirements would be 'consistent with the public health and safety'" and highlighted one exemption, in particular, that allowed for the religious use of a similar Schedule I drug, peyote, by Native Americans.  *Id.* at 432-33.  The government's asserted compelling interest was deemed insufficient because "'[i]t is established in our strict scrutiny jurisprudence that 'a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.'"  *Id.* at 433 (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 547 (1993)).

The *O Centro Espirita* Court also rejected the government's claim that enforcement of the hosacea ban against the sect was necessary to "honor[] international obligations and [to]

maintain[] the leadership position of the United States in the international war on drugs." *Id.* at 438 ("We do not doubt the validity of these interests, any more than we doubt the general interest in promoting public health and safety by enforcing the Controlled Substances Act, but under RFRA invocation of such general interests, standing alone, is not enough."). And the Court likewise rebuffed the argument that the "Controlled Substances Act will be 'necessarily . . . undercut' if the Act is not uniformly applied, without regard to burdens on religious exercise," concluding that "[t]he well-established peyote exception also fatally undermines the Government's broader contention that the Controlled Substances Act establishes a closed regulatory system that admits of no exceptions under RFRA." *Id.* at 434.

As in *O Centro Espirita*, Defendants' asserted interests here are too generalized and broad.  To be sure, readiness, unit cohesion, standards, health, safety, and discipline may constitute compelling interests, at least in some circumstances.  But even affording Defendants some deference because of the military context, they have offered no evidence that preventing Mr. Singh from enlisting and participating in ROTC while respecting his religious beliefs is even justified by, much less necessary to further, any of these interests.  *See, e.g.*, *Rigdon*, 962 F. Supp. at 162 ("A politically-disinterested military, good order and discipline, and the protection of service members' rights to participate in the political process are compelling governmental interests, but the defendants have not shown how these interests are in any way furthered by the restriction on the speech of military chaplains."); *see also, e.g.*, *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 472 (5th Cir. 2014*)* (noting that, under RFRA, federal government's "general statements of its interests are not sufficient to demonstrate a compelling governmental interest") (internal quotation marks omitted).

Like the provision of the Controlled Substances Act at issue in *O Centro Espritia*, the very grooming and uniform rules from which Defendants have denied Mr. Singh an exemption are not universally applied.  The Army provides medical exemptions to rules requiring members to be clean-shaven.  A.R. 670-1 ch. 3-2(a)(2)(b).  Defendants allow wigs to cover natural baldness, and women are permitted have long hair.  *Id.* ch. 3-2(a)(2)(c), 3-2(a)(3)(c).  And the Army has already granted religious exemptions to its grooming and dress regulations, including, notably, for Sikhs.  Verif. Compl. ¶¶ 42-46.  Moreover, contrary to its position here that enlistment must precede consideration of an exemption, the Army has approved waivers from various regulations for prospective service members, including waivers from ROTC enlistment requirements barring felony offenders, waivers from grooming rules prohibiting tattoos and, in the case of 1st Lt. Rabbi Stern, beards.  *See* Verif. Compl. ¶¶ 45, 49.

There is no evidence that these existing exemptions and practices have significantly harmed the Army's ability to carry out its mission.[1]  Rather, they illustrate that the grooming and uniform regulations that Defendants seek to enforce against Mr. Singh "are underinclusive to a substantial extent with respect to each of the interests . . . asserted."  *See Church of Lukumi*, 508 U.S. at 547.  Defendants' failure to prohibit conduct similar to the religious activities in which Mr. Singh seeks to engage belies any claim that the burden they have imposed on his religious exercise is justified by, or necessary to further, any compelling interests.  *See, e.g.*, *id.* at 546-47

---

[1] On the contrary, the Supreme Court has already recognized the value of a diverse military, at least with respect to race:  "To fulfill its mission, the military 'must be selective in admissions for training and education for the officer corps, *and* it must train and educate a highly qualified, racially diverse officer corps in a racially diverse educational setting.'" *Grutter v. Bollinger*, 539 U.S. 306, 331 (2003) (quoting amicus brief of "high-ranking retired officers and civilian leaders of the United States military").  As the Court noted, "[a]t present, 'the military cannot achieve an officer corps that is both highly qualified and racially diverse unless the service academies and the ROTC used [*sic*] limited race-conscious recruiting and admissions policies.'" *Id.* (quoting amicus brief).

(holding that, where the government bans religiously motivated conduct but fails to restrict "conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling"); *McAllen*, 764 F.3d at 472-73 ("Where a regulation already provides an exception from the law for a particular group, the government will have a higher burden in showing that the law, as applied, furthers the compelling interest."); *cf. Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999) ("The Department's decision to allow officers to wear beards for medical reasons undoubtedly undermines the Department's interest in fostering a uniform appearance through its 'no-beard' policy.") (Alito, J.).

    **C.**    **Defendants' Policy Prohibiting Mr. Singh From Enlisting Unless He Abandons His Articles of Faith Is Not the Least Restrictive Means of Furthering a Compelling Governmental Interest.**

RFRA's "least-restrictive-means standard is exceptionally demanding." *Hobby Lobby,* 134 S. Ct. at 2780. As the Fifth Circuit recently explained, "[t]he very existence of a government-sanctioned exception to a regulatory scheme that is purported to be the least restrictive means can, in fact, demonstrate that other, less-restrictive alternatives could exist." *McAllen*, 764 F.3d at 475, 479-80 (holding that federal government did not meet its "high" burden of proving that complete ban on possession of eagle feathers was the least restrictive means of achieving identified interests). To that end, the Supreme Court rejected the government's claim earlier this year that the application of challenged healthcare regulations to a for-profit, closely held corporation complied with RFRA, finding that "HHS has not shown that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties in these cases." *Hobby Lobby,* 134 S. Ct. at 2782. The Court explained: "HHS itself has demonstrated that it has at its disposal an approach that is

less restrictive . . . . HHS has already established an accommodation for nonprofit organizations with religious objections." *Id.* at 2782.

Accordingly, even if Defendants could show that the substantial burden imposed on Mr. Singh is justified by, and furthers, a compelling interest, the existing exceptions, accommodations, and pre-enlistment waivers make clear that Defendants' policies requiring Mr. Singh to abide by all grooming and uniform regulations in order to enlist as an ROTC Cadet and seek an accommodation are not the least restrictive means of achieving that interest.  The Army could consider other options to facilitate an accommodation.  *See, e.g., Potter,* 558 F.3d at 547-50 (holding that a requirement for firefighters to be clean-shaven was not narrowly tailored under RFRA because bearded plaintiffs could be redeployed into areas where they could use the breathing apparatuses that worked with beards).  At a minimum, for example, Defendants could grant Mr. Singh the same accommodations authorized for the Sikh soldiers identified above, and it could do so via the same waiver process used to enlist prospective recruits who are not in compliance with various Army regulations.  Yet, despite the very heavy burden they must meet under RFRA, Defendants have offered no evidence demonstrating that these accommodations cannot be extended to Mr. Singh, or even have been considered.  *See, e.g., Warsoldier*, 418 at F.3d 1000 (holding that prison officials had failed the least-restrictive-means of RLUIPA's identical strict-scrutiny standard where they did not "set forth detailed evidence, tailored to the situation before the court, that identifies the failings in the alternatives advanced by the prisoner") (internal quotation marks omitted).

## II.   MR. SINGH EASILY MEETS THE REMAINING REQUIREMENTS FOR A PRELIMIANRY INJUNCTION.

### A.   Mr. Singh Has Suffered, and Continues to Suffer, Irreparable Harm as a Result of Defendants' Policies.

The harm suffered by Mr. Singh is concrete and ongoing.  As long as Defendants continue to deny Mr. Singh a religious accommodation, he will continue to face substantial pressure to violate his religious beliefs in order to enlist in ROTC.  That pressure grows even more intense as he continues to miss lab- and field-training exercises and as the end of his sophomore year (after which he will become ineligible for ROTC) approaches. The imposition of this substantial burden is impermissible under RFRA because Defendants' policies do not withstand strict scrutiny for the reasons discussed above.  Where "First Amendment interests [are] either threatened or in fact being impaired at the time relief [is] sought," the ongoing or threatened "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *See Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 2002) ("Limitations on the free exercise of religion inflict irreparable injury."); *see also Am. Freedom Defense Initiative v. WMATA*, 898 F. Supp. 2d 73, 84 (D.D.C. 2012) (finding irreparable harm and granting preliminary injunction because plaintiffs had demonstrated that their First Amendment interests were threated or impaired in light of court's conclusion that defendant "did not fashion its [advertising] restriction narrowly to serve its compelling interest as actually necessary").

While this case does not technically involve a First Amendment claim, this reasoning has been extended by this Court and others to cover violations of RFRA.  In *Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 129 (D.D.C. 2012), for example, this Court

ruled that, because "the plaintiffs ha[d] established a strong likelihood of success on the merits of their RFRA claim," they would "suffer irreparable harm absent the issuance of a preliminary injunction."  Citing *Elrod*, the Court explained, "By extension, the same is true of rights afforded under the RFRA, which covers the same types of rights as those protected under the Free Exercise Clause of the First Amendment."  *Id; see also, e.g.*, *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 995 (10th Cir. 2004), *aff'd, O Centro Espirita*, 546 U.S. 418 ("[The plaintiff] would certainly suffer an irreparable harm, assuming of course that it is likely to succeed on the merits of its RFRA claim."); *Eternal Word Television Network, Inc. v. Secretary, U.S. Dept. of Health & Human Servs.*, 756 F.3d 1339, 1350 (11th Cir. 2014) ("Even though the Religious Freedom Restoration Act created a statutory rule, it is a response to the decision of the Supreme Court about the Free Exercise Clause of the First Amendment. The statutory promise the Act embodies is necessarily intertwined with the constitutional promise of the Free Exercise Clause."); *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013), *cert. denied, Burwell v. Korte*, 134 S. Ct. 2903 (2014) (applying the *Elrod* standard to RFRA claims); *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (finding irreparable injury in federal prisoner's RFRA challenge to prison's prohibition of visits with his pastor, and noting that "courts have held that a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA"); *cf. Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (holding that *Elrod*'s irreparable injury reasoning "applies with equal force to the violation of RLUIPA rights because RLUIPA enforces First Amendment freedoms, and the statute requires courts to construe it broadly to protect religious exercise'"); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("[A]lthough the plaintiff's free exercise claim is statutory rather than constitutional, the denial of the plaintiff's right to the free exercise of his religious beliefs is a

harm that cannot be adequately compensated monetarily. Courts have persuasively found that irreparable harm accompanies a substantial burden on an individual's rights to the free exercise of religion under RFRA.") (internal citations omitted).

Defendants' effort to circumvent RFRA by demanding that Mr. Singh first enlist before seeking an accommodation does not avoid or otherwise lessen the injury.  Quite the contrary—Mr. Singh's irreparable injury would be compounded were he to enlist in ROTC and then seek an accommodation because, as Defendants have emphasized, once Mr. Singh formally enlists, he will be required to comply with all grooming and uniform rules "unless and until" his request is granted or be subject to all applicable disciplinary action.  *See* Verif. Compl. ¶¶ 33, 39.

The law should not, and does not, compel Mr. Singh to actively violate his faith by shaving off his beard, cutting his hair, and abandoning his turban in order to seek the relief to which he is legally entitled from the Army or this Court.  *See, e.g.*, *Koster v. Sharp*, 303 F. Supp. 837, 844 (E.D. Pa. 1969) (holding that a conscientious objector was not required to "commit[] a military crime by disobeying an order and facing the possibility of imprisonment, as well as having to bear the stigma and attendant prejudices that attach to one dishonorably discharged from the armed forces" before he could assert a claim for violation of his constitutional rights); *cf., e.g.,*, *Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (holding that a prisoner need not suffer physical injury before obtaining relief because "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief") (internal quotations omitted); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) ("One does not have to await the consummation of threatened injury to obtain preventative relief."); *Ord v. District of Columbia*, 587 F.3d 1136, 1147-48 (D.C. Cir. 2009) ("'[I]f a plaintiff has been placed 'between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he

believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding,' he has suffered an injury sufficient to establish standing to seek declaratory relief without 'first expos[ing] himself to actual arrest or prosecution.'") (quoting *Steffel v. Thompson*, 415 U.S. 452, 462 (1974)).  Defendants' policy requiring Mr. Singh to enlist and violate his faith before seeking an exemption causes irreparable injury and is an independent violation of RFRA.

**B.**      **The Irreparable Injury Suffered by Mr. Singh Far Outweighs Any Injury an Injunction Might Cause to Defendants.**

Mr. Singh suffers a violation of his core religious-exercise rights every day that he is denied a religious accommodation.  Moreover, he is missing trainings, lab exercises, and other activities, as well as the full scholarship for which he would be eligible as a contracted ROTC Cadet.  If he is not permitted to enlist by the end of his sophomore year, Army rules will prohibit him from enlisting at all because there must be sufficient time for him to complete his officer training prior to graduation.  The injuries he is suffering as a result of Defendants' policies are substantial and, as discussed above, irreparable.

By contrast, Defendants would suffer absolutely no injury from this Court's order that they make a decision regarding Mr. Singh's accommodation without first requiring him to enlist, shave his beard, cut his hair, and remove his turban.  Defendants already consider and grant waivers to prospective Army recruits before or at the time of enlistment in similar contexts. Further, should the Army deny Mr. Singh's accommodation, a preliminary injunction ordering Defendants to grant him a temporary waiver and provisional enlistment, pending the final outcome of this case, would have minimal, if any, impact on the ROTC program.  As the successful implementation of other non-religious and religious exceptions to grooming and

uniform rules indicates, such practices pose no risk to the military's mission.  Accordingly, the balance of harms weighs in favor Mr. Singh.

### C.      Granting the Preliminary Injunction Will Serve the Public Interest.

Granting Mr. Singh a preliminary injunction in this case will serve the public interest. Although RFRA's protections are statutory, safeguarding freedom of religion is at the very core of the Constitution, and the public's interest in upholding these principles is paramount.  *See, e.g.*, *O Centro Espirita*, 389 F.3d at 1011 ("It [the district court] also noted that by issuing the injunction, the public's interest in the protection of religious freedoms would be furthered. The district court's ruling is appropriate in light of Congress' implicit RFRA determination that the harm prevented and public interest served by protecting a citizen's free exercise of religion must be given controlling weight, barring the government's proof, by specific evidence, that its interests are more compelling."); *United States v. Secretary, Fla. Dep't. of Corr.*, No. 12–22958–CIV, 2013 WL 6697786, at *15 (S.D. Fla. Dec. 6, 2013) (holding, in RLUIPA case, that "[a]n injunction that vindicates religious freedoms protected by federal law is in the public interest"); *cf., e.g.*, *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *accord Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 459 n.9 (5th Cir. 2014); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

Further, as the Army itself recognizes, the public benefits greatly from a diverse, open military.  *See  About  Diversity*,  Army  Diversity:  Strength  in  Diversity, http://www.armydiversity.army.mil/adoAbout/index.html (last visited Sept. 4, 2014) (noting that "a diverse Army benefits us all"); *see also* note 1, *supra.*  Excluding practicing Sikh students

such as Mr. Singh from joining ROTC, the Army's primary source of commissioned officers, undermines these values and causes harm to the Army's overall mission.  *See id.*

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Court issue a preliminary injunction (1) enjoining Defendants from continuing their refusal to consider and act upon Plaintiff's request for a religious exemption until after he enlists, cuts his hair, shaves his beard, and abandons his turban; (2) requiring Defendants to make a decision on Plaintiff's requested religious accommodation within 14 days; and (3) requiring Defendants, should they deny the accommodation, to grant Plaintiff a temporary accommodation and provisional enlistment allowing him to wear and maintain his beard, long hair, and turban, pending the final outcome of this case.

Respectfully submitted,

/s/ *Daniel Mach*
Daniel Mach (D.C. Bar No. 461652)
Heather L. Weaver (D.C. Bar No. 495582)
American Civil Liberties Union Foundation
915 15th Street, NW, Suite 600
Washington, DC 20005
Tel. (202) 675-2330
Fax. (202) 546-0738
*dmach@aclu.org*
*hweaver@aclu.org*

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union of the Nation's Capital
4301 Connecticut Avenue, NW, Suite 434
Washington, DC 20008
Tel. (202) 457-0800
Fax (202) 457-0805
*artspitzer@aclu-nca.org*

Manmeet Singh Mehendiratta
UNITED SIKHS
JAF POB 7203

New York, NY 10116
Tel. (646) 315-3909
Fax: (866) 657-6206
*manmeet.Singh@unitedsikhs.org*

November 13, 2014

**CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2014, I electronically filed the foregoing document and supporting declarations with the Clerk of the Court using the ECF system; enclosed all documents with the Verified Complaint for Declaratory and Injunctive Relief and summons being served on each defendant and the U.S. Attorney General by certified U.S. mail with return receipts request; and had all documents hand-delivered with the Complaint and summons to the U.S. Attorney for the District of Columbia.

/s/ *Daniel Mach*
Daniel Mach (D.C. Bar No. 461652)