## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                            )
IKNOOR SINGH,                               )
                                            )
         **Plaintiff,**           )
                                            )
         **v.**                   )     **Civil Action No. 1:14-cv-01906 (ABJ)**
                                            )
JOHN MCHUGH, et al.,                        )
                                            )
                                            )
         **Defendants.**          )
_____)

### MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

      Defendants, John McHugh, Lieutenant General ("LTG") James McConville, Brigadier General ("BG") Peggy Coombs, and Lieutenant Colonel ("LTC") Daniel Cederman, in their official capacities and through undersigned counsel, respectfully move to dismiss, pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) because Plaintiff cannot establish that the Army's decision substantially burdens his religious practice.  Defendants also move for dismissal, in part, under Rule 12(b)(1) for any claim seeking a judicially ordered enlistment into the Army as such a request is nonjusticiable.  Alternatively, Defendants move for summary judgment under Rule 56 on all of Plaintiff's claims.

                                   Respectfully Submitted,

                                   RONALD C. MACHEN JR.
                                   D.C. Bar #447889
                                   United States Attorney
                                   for the District of Columbia

                                   DANIEL F. VAN HORN
                                   D.C. Bar #924092
                                   Chief, Civil Division

BY: _____/s/_____
WAYNE H. WILLIAMS
Special Assistant U.S.  Attorney
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 252-2574
wayne.williams@usdoj.gov

OF COUNSEL
Major David M. O'Dea
Military Personnel Branch
U.S. Army Litigation Division
9275 Gunston Road
Fort Belvoir, VA 22060

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| **IKNOOR SINGH,** | ) |
|  | ) |
| **Plaintiff,** | ) |
|  | ) |
| **v.** | ) |
|  | ) |
| **JOHN MCHUGH, et al.,** | ) |
|  | ) |
|  | ) |
| **Defendants.** | ) |

_____)

Civil Action No. 1:14-cv-01906 (ABJ)

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

Defendants, John McHugh, Lieutenant General ("LTG") James McConville, Brigadier General ("BG") Peggy Coombs, and Lieutenant Colonel ("LTC") Daniel Cederman, in their official capacities and through undersigned counsel, respectfully move to dismiss, pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) because Plaintiff cannot establish that the Army's decision substantially burdens his religious practice.  Defendants also move (sometimes collectively referred to as the "Army") for dismissal, in part, under Rule 12(b)(1) for any claim seeking a judicially ordered enlistment into the Army as such a request is nonjusticiable. Alternatively, Defendants move for summary judgment under Rule 56 on all of Plaintiff's claims. [1]

## INTRODUCTION

_____

[1]      Citations to the Administrative Record will be denoted as "AR ___."  Defendants' Exhibits will be cited as "Def. Ex. [Exhibit designation]."  Defendant's Regulatory Appendix will be cited as "A[bates stamp numbering]."

Since the filing of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction (ECF No. 16), the Court has consolidated the preliminary injunction and merits of this case.  Min. Order, ECF No. 22.  In this filing, Defendants provide updated Exhibits, a Regulatory Appendix, and a consolidated Administrative Record.  Bates stamp numbering and exhibit designation in these documents remain consistent with Defendants' prior filings (ECF No. 16-1, 16-2).

Plaintiff filed his Verified Complaint for Declaratory and Injunctive Relief on November 12, 2014, (Verified Compl., ECF No. 1 ("Compl.")) and his Motion for Preliminary Injunction the following day.  Pl. Mot. Prelim. Inj., ECF No. 3.  In his Request for Relief, Plaintiff asked that the Court: (1) issue a declaratory judgment that the Army's refusal to grant Plaintiff a grooming exception violates the Religious Freedom Restoration Act ("RFRA"); (2) issue a preliminary injunction that would require the Army to allow Plaintiff a temporary accommodation to maintain his beard and long hair, and to wear his turban, and to provisionally enlist him, pending the final outcome of the case; (3) issue a permanent injunction that would enjoin the Army from enforcing the Army's uniform and personal grooming standards against Plaintiff, and an order requiring the Army to allow Plaintiff to participate fully in the Reserve Officer Training Corps ("ROTC") while wearing his long hair, beard, and turban; and (4) issue an order awarding attorney fees.  Compl., *Request for Relief*.

On November 20, 2014, the Defendants, through counsel, filed a Notice pursuant to the Court's November 18, 2014 Minute Order, noting that the Army would not at that time grant Plaintiff's request for a temporary accommodation.  Def. Notice, ECF No. 13.  Although Defendants did not grant a temporary accommodation, the Army subsequently agreed to process Plaintiff's request for accommodation.  LTG McConville Decl., ¶ 5, ECF No. 16-1 (Def. Ex. A).

On December 8, 2014, the Defendants filed their Opposition to Plaintiff's Motion for Preliminary Injunction.  Def. Opp'n to Pl's Prelim. Inj., ECF No. 16.  On December 22, 2014 the Army notified the Court of the Army's decision to deny Plaintiff's request for religious accommodation.  Def. Notice of Agency Decision, ECF No. 18.  On 22 December 2014, the Court notified the parties that the Court would consolidate the preliminary injunction with merits briefing.  Min. Order, ECF No. 22.  On December 24, 2014, the Court entered the present briefing

2

schedule.  Order, ECF No. 20.

## SUMMARY OF THE ARGUMENT

Plaintiff's challenge to the Army's decision to deny him a religious based grooming accommodation to wear unshorn hair, a beard, and turban while performing military officer training is should be denied.  As a threshold matter, Plaintiff's claims should be dismissed because he is unable to show how, as a civilian, his religious practice is substantially burdened by the United States Army.  Furthermore, Plaintiff's request for a judicially ordered enlistment into the United States Army is beyond the jurisdiction of this Court based on long standing notions of non-justiciability that recognize that decisions regarding the composition of the military are reserved to military authorities.

Alternatively, Defendants are entitled to summary judgment on Plaintiff's RFRA claims because RFRA does not displace the substantial deference that should be given to Army leaders in this context.  Plaintiff seeks to impose by judicial order a requirement that the Army fundamentally change how it trains prospective officers.  He seeks to set aside long standing historical training practices that instill discipline, esprit de corps, pride, and ultimately create a more efficient Army that is capable of responding to the defensive needs of the Nation.  Here the Army is not imposing a novel concept in military affairs, but merely continuing a long standing practice of enforcing uniform standards to develop discipline and build teams.  The Supreme Court has repeatedly recognized that deference is due to military judgments made regarding the training and development of the fighting force.

The Army considered Plaintiff's request for accommodation and determined that Plaintiff's accommodation request cannot be granted.  Relying on experience, expertise, and battle tested principles of discipline, subordination of one's self, team building, pride, and values

3

development, the Army has determined that granting Plaintiff's exception would undermine the

Army's effectiveness.  The judgments made regarding Plaintiff's accommodation request should

be respected and upheld.

## STATEMENT OF FACTS

Defendants respectfully refer the Court to Defendants' Statement of Facts with references

to the administrative record, which is filed simultaneously herewith.

## REGULATORY BACKGROUND

### A.      Framework for Accommodation of Religious Practice in the United States Army

"The Department of Defense places a high value on the rights of members of the Military

Services to observe tenets of their respective religions or to observe no religion at all."  Department

of Defense Instruction, ("DODI") 1300.17 ¶ 4.a; (A003).  The Department of Defense

promulgated DODI 1300.17 to provide guidance on the "policy, procedures, and responsibilities

for the accommodation of religious practices in the military services."  *Id*., ¶ 1.b.; (A002).  The

policy provides that accommodation requests will be timely processed and approved unless they

would "adversely affect mission accomplishment, including military readiness, unit cohesion,

good order and discipline, health and safety, or any other military requirement."  *Id*., ¶ 4.e; (A004).

Citing the Religious Freedom Restoration Act ("RFRA"), the DODI provides that a service

member's request for an accommodation from a policy, practice, or duty that substantially burdens

his religion will be denied only when the military policy, practice, or duty:  (1) furthers a

compelling governmental interest; and (2) is the least restrictive means for furthering that

compelling governmental interest.  *Id*., ¶ 4.e.1; (A004).  If the Service policy or practice for which

the service member requests an accommodation does not substantially burden a service member's

exercise of religion, it should not be evaluated under this higher standard.  *Id*., ¶ 4.e.2; (A004).

Generally, intermediate commanders may resolve requests for accommodation that do not require a waiver of service policies that concern the wear of uniforms, the wear of religious apparel, or for policies prescribing grooming, appearance, and body art standards.  DODI 1300.17, ¶ 4.f.1; (A004-005).  If a waiver to a uniform, grooming, or appearance policy is required, the request must be forwarded to the Secretary of the Military Department concerned.  *Id*., ¶ 4.f.2; (A005).  For the Army, the authority to decide whether or not to grant such a waiver has been delegated to the Deputy Chief of Staff, G-1, but cannot be further delegated  *Id*., ¶ 4.f.2; (A005).

Any request for a religious accommodation of a uniform, grooming or appearance standard, is considered on a case-by-case basis.  *Id*., ¶ 4.i; (A005).  Each request must be assessed on its "unique facts; the nature of the requested accommodation; the effect of approval or denial on the [s]ervice member's exercise of religion, and the effect of approval or denial on mission accomplishment."  *Id*.  The Department of Defense policy cautions that "careful consideration of the effect if any . . . on any compelling governmental interest" that may be caused by either an approved or disapproved request for religious accommodation is essential.  *Id*., ¶ 4.h; (A005).  Specifically, the policy identifies considerations unique to the military, due to its nature as a specialized community that must be evaluated prior to deciding whether to grant or deny a religious based accommodation.  *Id*.  These unique considerations include the understanding that the military is "governed by a discipline separate from that of the rest of society" and that "the importance of uniformity and adhering to standards, of putting unit before one's self, is more significant" than may be experienced in the rest of society.  *Id*.

The DODI outlines procedures for the review of an accommodation request and provides five factors commanders should consider when determining whether to grant a religious

5

accommodation.  These factors  are: (1) the importance of military requirements in terms of

mission accomplishment, including military readiness, unit cohesion, good order, discipline,

health, and safety (referred to as "military necessity"); (2) the religious importance of the

accommodation to the requestor; (3) the cumulative impact of repeated accommodations of a

similar nature; (4) alternative means available to meet the requested accommodation; and (5)

previous treatment of the same or similar requests, including treatment of similar requests made

for other than religious reasons.  DODI 1300.17, Encl. ¶ 1 (a)-(e); (A008).

The Department of Defense defined additional specific factors to consider when evaluating

religious accommodation requests regarding grooming (i.e. hair length and styles, fingernail

standards).  These factors are considered to determine if the accommodation would: (1) impair the

safe and effective operation of weapons, military equipment, or machinery; (2) pose a health or

safety hazard; (3) interfere with the wear or proper function of special or protective clothing or

equipment; and (4) otherwise impair discipline, morale, unit cohesion, or accomplishment of the

unit mission.  *Id.*, Encl., ¶ 10; (A010).

The Army implemented the DODI and promulgated its regulatory guidance on religious

accommodation in two separate publications, Army Reg. 670-1; (A012-A018), and Army Reg.

600-20; (A020-A098).  Army Reg. 670-1 details the Army's grooming policy and requires males

to be clean-shaven, though a neatly trimmed mustache is permitted.  Army Regulation 670-1,

*Wear and Appearance of Army Uniforms and Insignia* (Sep. 15, 2014) ("Army Reg. 670-1"), ¶

3-2(a)(2)(b); (A015).  Although exceptions may be granted for medical conditions aggravated by

shaving, any exceptions remain in place only for the time required for the medical condition to

heal.  *Id.*  With respect to male haircuts, the hair must be neatly groomed and present a

conservative appearance.  *Id.*, ¶ 3-2(a)(2); (A015).  Hair must not fall over the ears or eyebrows

and sideburns are not permitted to extend below the bottom of the opening of the ear. *Id.*, figures 3-1, 3-2 (providing a diagram of approved male hair styling); (A017-A018). Hairstyles that interfere with the proper wear of headgear or the wear of any protective equipment are prohibited. *Id.*, ¶ 3-2(a)(1)(a) (A014). Additionally, hairstyles that pose a safety or health hazard are not authorized. *Id.*

A soldier may wear religious headgear, in certain circumstances. Army Regulation 600-20 permits the wear of religious headgear, while in uniform, if the headgear meets the following criteria: (1) the religious headgear is subdued in color; (2) the religious headgear is of a style and size that can be completely covered by standard military headgear; (3) the religious headgear bears no writing, symbols, or pictures; (4) wear of the religious headgear does not interfere with the wear or proper functioning of protective clothing or equipment; (5) religious headgear that meets these criteria is authorized irrespective of the faith group from which it originates; and (6) religious headgear will not be worn in place of military headgear under circumstances when the wear of military headgear is required. Army Regulation 600-20, *Army Command Policy* (Nov. 6, 2014) ("Army Reg. 600-20"), ¶ 5-6g; (A024). If the wear of religious headgear does not meet the standards of Army Reg. 600-20, the headgear is not authorized in uniform, unless a religious accommodation is granted in accordance with the procedures set forth in Army Reg. 600-20. *Id.*, ¶ 5-6; (A024).

Army Regulation 600-20 further outlines both the Army's policy and procedures for requesting a religious accommodation. *See* Army Reg. 600-20, ¶ 5-6; (A022-026). Recognizing and valuing the rights of its soldiers to practice and observe the tenets of their respective faiths (or lack thereof), the Army's policy is to accommodate a religious practice, unless the accommodation would have an "adverse impact on unit readiness, individual readiness, unit cohesion, morale,

7

good order discipline, safety, and/or health." *Id.*, ¶ 5-6(a); (A022). Collectively, these military considerations are referred to as "military necessity." *Id.* Because each request for an accommodation is unique and different military necessity factors may be involved, each accommodation request must be assessed on a case by case basis. *Id.* During such an individual assessment, the effect that an approval or denial of accommodation would have on a soldier's exercise of religion must be balanced with the military necessity factors. *Id.*; *see also* DODI 1300.17, ¶ 4.i.; (A005). Accordingly, if a contemplated accommodation would adversely affect military necessity, it may be denied. Even if an accommodation is granted, military necessity may require the accommodation to be modified or rescinded, at any time. *See* Army Reg. 600-20, ¶5-6(a); (A022) (noting that "[a]ccommodation of a [s]oldier's religious practices must be examined against military necessity and cannot be guaranteed at all times.").

Prior to applying for a religious accommodation, each applicant must acknowledge that he has been informed of the Army's accommodation policy. *Id.*, ¶ 5-6(d); (A022). A soldier will submit his request for religious accommodation to his immediate commander. *Id.*, ¶ 5-6(i)(2); (A025). The nature of the religious accommodation requested dictates the level of command authorized to decide whether to grant the accommodation. *See id.*, ¶ 5-6(i)(1)-(2); (A025). If the requested accommodation does not require a waiver of the Army's uniform, grooming, or personal appearance regulations, the immediate commander may approve the request. Army Reg. 600-20, ¶ 5-6(i)(2); (A025). If approved, the commander will issue a written notice of the accommodation. *Id.*, ¶ 5-6(i)(4); (A025). If a commander disapproves a request, the soldier may appeal the disapproval to his higher commanders and as necessary the Deputy Chief of Staff, G-1. *Id.*, ¶ 5-6(i)(5); (A025).

If the requested religious accommodation would require a waiver of Army policy

pertaining to the wear and appearance of the uniform, personal appearance, and personal grooming standards, it may only be acted upon by the Secretary of the Army or his designee.  In this case the Deputy Chief of Staff, G-1 is the designated decision maker. Army Reg. 600-20, ¶ 5-6(i)(1); (A025).  In these circumstances, each command level of the requesting soldier's chain of command will neither approve nor deny his request, but must forward the request with a recommendation whether or not the request should be approved.  *Id*.  These recommendations will accompany the request to the Deputy Chief of Staff, G-1 for his decision.  *Id*.

### B.     The Army Reserve Officer Training Corps

The mission of the Reserve Officers' Training Corps ("ROTC") is to produce commissioned officers in the quality, quantity, and academic disciplines necessary to meet Army requirements.  Army Regulation 145-1, *Senior Reserve Officers' Training Program: Organization Administration and Training* (Sept. 6, 2011) ("Army Reg 145-1"), ¶ 1-5(a); (A037).  The objectives of the ROTC program are to attract, motivate, and prepare selected students for service as commissioned officers, by developing leadership, strong character, and appreciation for national security.  *Id.*, ¶ 1-6; (A037).  That mission extends to the Hofstra ROTC program which is structured to recruit, retain, and ultimately commission future Second Lieutenants in the U.S. Army.  During this process the Hofstra ROTC program develops mentally, physically, and emotionally prepared leaders.  LTC Cederman Decl., ¶ 4 (Def. Ex. B).

ROTC classes include "participating students" and "enrolled cadets."  Enrolled cadets attend military training outside of the classroom, are required to wear military uniforms during this training, and are subject to the Army's grooming standard when participating in ROTC functions.  *See* Army Reg. 145-1, ¶ 4-5; (A067).  Participating students (non-enrolled) are limited to attending ROTC classroom instruction, but are not authorized to wear uniforms nor are they subject to the

Army's grooming standards.  CC Pam., ¶ 2-1(a); (A109 ).  To become an enrolled cadet, a student

must sign the Cadet Command Form 139-R, *Cadet Application and Enrollment Record* (July 29,

2014) ("CC Form 139-R").  CC Pam., ¶ 2-8; (A113).  Participating students are those students who

choose not to or are ineligible to sign the CC Form 139-R.  *Id.*, ¶ 2-1(a); (A113).

      Enrolled cadets are either contracted or non-contracted.  *Id.*, ¶ 2-1(a); (A109).  Contracted

cadets must enlist in the Army Reserve by signing an Enlistment/Renlistment Document,

Department of Defense Form ("DD Form") 4, and are therefore members of the Army.  *See* Army

Reg. 145-1, ¶ 3-42; (A060).  Non-contracted cadets do not sign the DD Form 4, and are not

members of the Army.

      All enrolled cadets in ROTC generally follow one of two programs: The Four-Year

Program or the Two-Year Program.  The Four Year Program consists of a Basic Course and an

Advanced Course; while the Two Year Program consists of the Leader's Training Course, held

during the summer between sophomore and junior year of college and the Advanced Course.  *See*

Army Reg. 145-1, ¶¶ 5-6 -5-7; (A069); LTC Cederman Decl. ¶ 5 (Def. Ex B).  The Basic Course is

generally conducted during the first two years of undergraduate education (called Military Science

("MS") I and MSII years), while the Advanced Course generally begins in the third and fourth

years of undergraduate education (MSIII and MSIV years).  Army Reg. 145-1, ¶ 5-7(b);

(A069-070).  Both the Basic Course and the Advanced Course include classroom instruction, a

leadership laboratory (where military skills are taught), physical training, and field training

exercises. Army Reg., 145-1, ¶ 5-2; (A069); LTC Cederman Decl. ¶ 5 (Def. Ex. B).  Students who

were participating students and new students to the ROTC program who did not complete the

Basic Course may participate in the Two-Year Program.  To complete the Two-Year program,

these students must attend the Leader's Training Course (also called "Basic Camp") the summer

before their junior year in place of the Basic Course.  Army Reg., 145-1, ¶ 5-6; (A069).  The

Leader's Training Course is a substitute for the Basic Course, and allows an enrolled cadet to make

up the training opportunities he missed by not completing the Basic Course during the regular

academic year.

Regardless of whether an enrolled cadet is in the Four Year Program or the Two Year

Program, the cadet must sign an enlistment agreement and become a contracted cadet before he is

eligible to participate in the Advanced Course.  *See*, *id*., ¶¶ 3-40, 3-41, 3-42 (A060).  Cadets must

compete for a contract.  *See* LTC Cederman Decl. ¶ 9-11 (Def. Ex. B).  If offered a contract, the

student must sign an enlistment contract and becomes both a contracted cadet and a member of the

U.S. Army Reserve with a military service obligation.  *See* Army Reg., 145-1, ¶ 3-42; (A060).

Furthermore, a contracted cadet agrees to accept a commission in the Army if one is offered upon

completion of the program and graduation from college.  DA Form 597, *Army Senior Reserve*

*Officers' Training Corps (ROTC) Nonscholarship Cadet Contract*, ¶ 4(a); (A229).  While in

school, contracted cadets  receive a monthly stipend for service, and can be subject to enlisted

service if they fail to complete ROTC requirements.  *Id*., ¶ (1)(a); (A227); *id*., ¶5(a); (A230).

## ARGUMENT

### A.  Standard of Review

#### 1.  Motion to Dismiss Pursuant to Rule 12(b)(6)

Defendants move to dismiss the Complaint, pursuant to Federal Rule of Civil Procedure

12(b)(6), in its entirety for failure to state a claim upon which relief may be granted.  Under this

Rule, "the tenet that a court must accept as true all of the allegations contained in a complaint is

inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009).   A complaint may be dismissed if it fails to state sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Id*. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Aktieselskabet v. Fame Jeans, Inc.*, 525 F.3d 8, 16-17 (D.C. Cir. 2008); *In re Sealed Case*, 494 F.3d 139, 145 (D.C. Cir. 2007) (citing *Twombly*).

A complaint is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  This amounts to a "two-pronged approach" under which a court first identifies the factual allegations entitled to an assumption of truth, and then determines "whether they plausibly give rise to an entitlement to relief."  *Id*. at 664.  The Court must construe factual allegations in the complaint in the light most favorable to Plaintiff.  *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (citing *Kowal v. MCI Commc'ns Corp*., 16 F.3d 1271, 1276 (D.C. Cir. 1994)).  However, the court need not accept any inference or conclusory allegations that are unsupported by the facts pleaded in the complaint.  *Kowal*, 16 F.3d at 1276.  Moreover, the Court need not "accept legal conclusions cast in the form of factual allegations."  *Id*.  In deciding a Rule 12(b)(6) motion, the Court may consider materials outside the pleadings as the D.C. Circuit has allowed the Court to also consider "any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice."  *EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624 (D.C. Cir. 1997).

### 2.      Motion to Dismiss Pursuant to Rule 12(b)(1)

Defendants also move to dismiss Plaintiff's claim for enlistment in the Army pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.  The party invoking federal jurisdiction bears the burden of establishing its existence, and the Court must

determine whether it has jurisdiction before addressing the merits of a claim.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95, 104 (1998).

Federal courts are courts of limited jurisdiction and must dismiss claims over which they lack subject matter jurisdiction.  *Runkle v. Gonzales*, 391 F. Supp. 2d 210, 219-20 (D.D.C. 2005). The party seeking to invoke the jurisdiction of a federal court bears the burden of establishing the court's subject matter jurisdiction.  *Id*. at 220; *see U.S. Ecology, Inc. v. Dep't of the Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000).  Thus, Federal Rule of Civil Procedure 12(b)(1) requires dismissal of claims where the Court "lack[s] jurisdiction over the subject matter."  Fed. R. Civ. P. 12(b)(1).  A Rule 12(b)(1) motion to dismiss for lack of jurisdiction may be presented as a facial or factual challenge.  "A facial challenge attacks the factual allegations of the complaint that are contained on the face of the complaint, while a factual challenge is addressed to the underlying facts contained in the complaint."  *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 20 (D.D.C. 2003) (internal quotations and citations omitted).

The Plaintiff bears the responsibility of establishing the factual predicates of jurisdiction by a preponderance of evidence.  *Erby v. United States*, 424 F. Supp. 2d 180, 187 (D.D.C. 2006). The Court need not accept factual inferences drawn by the Plaintiff if those inferences are not supported by facts alleged in the complaint, nor must the Court accept the Plaintiff's legal conclusions.  *See Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  Federal Courts may dismiss nonjusticiable questions pursuant to Rule 12(b)(1).  *See Schneider v. Kissinger*, 412 F.3d 190, 191 (D.C. Cir. 2005) (affirming the trial Court's dismissal of a nonjusticiable question pursuant to Rule 12(b)(1)).

3.      **Summary Judgment**

To the extent that the Court must consider the administrative record in addition to the face of the Complaint, Defendants move, in the alternative, for summary judgment pursuant to Federal Rule of Civil Procedure 56.  A party is entitled to summary judgment where the administrative record demonstrates "that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

B.      **Plaintiff's RFRA Claim Should be Dismissed Under Rule 12(b)(6) Because Army Regulations do not Substantially Burden his Religious Expression**

The Army moves to dismiss Plaintiff claim pursuant to Rule 12(b)(6) as he cannot establish that the Army's regulations substantially burden his religious expression.  The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, allows the government to "substantially burden a person's exercise of religion" if "it demonstrates that application of the burden to the person . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(a)-(b).

A plaintiff establishes a prima facie claim under RFRA by proving the following three elements: (1) a substantial burden imposed by the federal government on a (2) sincere (3) exercise of religion.  *See Priests for Life v. United States HHS*, 772 F.3d 229, 244 (D.C. Cir. Nov. 2014). To prevail, Plaintiff must demonstrate that the Army's grooming regulation "substantially burdens" his religious expression.  *See Priests for Life 2014*, 772 F.3d at 244; *Kaemmerling v. Lappin*, 553 F.3d 669, 677-78 (D.C. Cir. 2008).  After a plaintiff establishes a prima facie claim under RFRA, the burden shifts to the government to demonstrate that application of the burden to the claimant "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1(b); *Gonzales v.*

*O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 428 (2006).

Plaintiff desires to join ROTC, and is not a member of the Army.  The Army did not conscript him into service; nor is it in any way coercing him into entering military service.  Instead, Plaintiff affirmatively aims to place himself in a position, as a cadet or, eventually a military officer, where the Army's grooming standard will apply to him.  Thus, he may not be able to engage in the full range of activities, including religious practices, that he would be able to perform if he remained a civilian.  The Court should hold that the Army does not "substantially burden" an applicant's religious expression for purposes of RFRA merely because it cannot guarantee, at the outset, that Plaintiff will be able to engage in all of his desired religious practices.  *Cf. United States v. Lee*, 455 U.S. 252, 261 (1982) ("When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.").

The Ninth Circuit's decision in *Navajo Nation v. United States Forest Service*, supports this interpretation of the statute.  535 F.3d 1058 (9th Cir. 2008) (en banc).  In *Navajo Nation*, a group of Native Americans challenged the Forest Service's decision to use recycled wastewater to make artificial snow on a mountain (for use as a ski resort) that the plaintiffs considered sacred.  535 F.3d at 1062-63.  The Court concluded that it need not consider whether the Forest Service satisfied the compelling interest test, because the plaintiffs failed to show that the government's actions substantially burdened their religious exercise.  *Id*. at 1063-64.  Specifically, the Court found that, "[u]nder RFRA, a 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit

15

(*Sherbert*[2]) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*[3])." *Id.* at 1070.  The Court held that "[a]ny burden imposed on the exercise of religion short of that described by *Sherbert* and *Yoder* is not a "substantial burden" within the meaning of RFRA and does not require the application of the compelling interest test set forth in those two cases." *Id.*; *cf. also Kaemmerling*, 553 F.3d at 678 (stating that the government substantially burdens religion if a person must choose between a government benefit and practicing her religion).

Enrollment in ROTC and commissioning as an Army officer are materially different from the type of government benefits that were denied in *Sherbert*, 374 U.S. at 403-04, and *Thomas v. Review Bd. of Ind. Employ't Sec. Div.*, 450 U.S. 707, 717-18 (1981).  Although, generally, the "loss of a [government] job opportunity for failure to compromise one's convictions states a constitutional claim,"  *Rutan v. Republican Party*, 497 U.S. 62, 76-77 (1990), *see also Torcaso v. Watkins*, 367 U.S. 488 (1961),  there is no constitutional or statutory right to serve in the Army or receive a military commission.  *See Maier v. Orr*, 754 F.2d 973, 980 (Fed. Cir. 1985) ("No one has an individual right, constitutional or otherwise, to enlist in the armed forces, the composition of those forces being within the purview of the Congress and the military."); *see also Orloff v. Willoughby,* 345 U.S. 83, 90 (1953).  Contracting in an officer training program is manifestly different than obtaining employment in the state or federal civil service, or entitlement to state unemployment benefits, and courts have not held that military service is entitled to the same protection as these government jobs.

 The Army's grooming regulation does not apply to civilians, and it does not apply to

---

2       *Sherbert v. Verner*, 374 U.S. 398 (1963).

3       *Wisconsin v. Yoder*, 406 U.S. 205 (1972).

Plaintiff outside the military.  Thus, the harm, if any, only occurs as a result of Plaintiff's desire to join the Army.  Plaintiff's argument that he faces a substantial burden to his free exercise of religion is misguided because he is willfully attempting to insert himself into a position (that he is not entitled to without conditions) that would consequently subject him to the Army's grooming policy.  Plaintiff's ability to "opt-out" and fully ameliorate the potential burden that military service may bring to his religious practice shows that there is in fact no substantial burden on his religious practice.  *See Priests for Life v. United States HHS*, 772 F.3d at 237 ("we conclude that the challenged regulations do not impose a substantial burden on Plaintiffs' religious exercise under RFRA.  All Plaintiffs must do to opt out is express what they believe and seek what they want via a letter or two-page form.").

Plaintiff's circumstance differs materially from that of a current service member seeking a religious based grooming accommodation.  A service member cannot simply opt-out by walking away from the military, but outright refusal to comply with the grooming policy could subject him to punishment under the Uniform Code of Military Justice.  DODI 1300.17, ¶ 4.b; (A004).  Here the Army is not substantially burdening Plaintiff's exercise of his religion because he is not a member of the Army.  Plaintiff has been and remains free as a civilian to keep his unshorn hair, beard, and turban in accordance with his faith.  Accordingly, his RFRA claim should be dismissed.

## C.   <u>Plaintiff's Request for Enlistment in the Army is Nonjusticiable and Should be Dismissed Under Rule 12(b)(1)</u>

Plaintiff's request that the Court provisionally enlist him into the Army is nonjusticiable and should be dismissed pursuant to Rule 12(b)(1).  Plaintiff expressly asks that this Court grant him a provisional enlistment into the Army.  Compl., *Request for Relief*.  The requested relief extends beyond enrollment as a cadet in ROTC, and is nonjusticiable.  The request for an

enlistment into the Army does not account for the fact that the Army chooses to contract only certain cadets following a competitive process that identifies those with the highest officer potential after those individuals have been found to meet various ROTC enlistment criteria.  LTC Cederman Decl., ¶¶ 5, 7, 8; (Def. Ex. B).  A Court directed enlistment would supplant the Army's ability to make professional judgments regarding the composition of military forces, and enters areas that are far afield of judicial competency.

The "primary business of armies and navies [is] to fight or be ready to fight wars should the occasion arise." *Rostker v. Goldberg*, 453 U.S. 57, 70 (1981).  "The responsibility for determining how best our Armed Forces shall attend to that business rests with Congress and with the President." *Id.* at 71 (internal citations omitted); *see* U.S. Const. Art. I, § 8, Art. II § 2.  Courts have accordingly been circumspect in reviewing claims that challenge the "complex,  subtle, and professional decisions as to the composition, training, equipping, and control of [this  nation's] military force." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973).

As the Supreme Court recognized long ago: "[J]udges are not given the task of running the Army. . . .  Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters." *Orloff v. Willoughby*, 345 U.S. 83, 93-94 (1953).  The Supreme Court has further observed that "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan*, 413 U.S. at 10.

In *Orloff*, for example, the Army declined to commission a physician as an officer after he refused on Fifth Amendment grounds to complete a required "loyalty certificate."  *Orloff*, 345 U.S. at 84-86 (noting that the plaintiff would not answer a question regarding his

18

association with organizations that the Attorney General had designated as subversive).  The

plaintiff sought a court order either commissioning him in the Army or releasing him from

military service.   *Id.*  The Supreme Court initially observed that the plaintiff "appears to be

under the misconception that a commission is not only a matter of right, but is to be had upon his

own terms." *Id.* at 90.  The Court recognized that the plaintiff plainly has the right not to answer

questions that might incriminate him, but the legal question presented was much different.  *Id.*

at 91-92.

As Justice Jackson, writing for the Court, framed the issue:  "[T]he question is whether

[the petitioner] can at the same time take the position that to tell the truth about himself might

incriminate him and that even so the President must appoint him to a post of honor and trust. We

have no hesitation in answering that question 'No.'"  *Id.* at 91.  The Court concluded that

"[w]hether [the petitioner] deserves appointment is not for judges to say and it would be idle, or

worse, to remand this case to the lower courts on any question concerning his claim to a

commission."  *Id.* at 92.  The Supreme Court thus recognized in *Orloff* that courts should not

interfere with the criteria established by the Army for commissioning individuals into service.

*See id.* at 91 ("It is obvious that the commissioning of officers in the army is a matter of discretion

within the province of the President as Commander in Chief.")  The Supreme Court further

explained that "[w]hatever control courts have exerted over tenure or compensation under an

appointment, they have never assumed by any process to control the appointing power in civilian

or military positions."  *Id.* at 90.  The Court thus flatly rejected the plaintiff's request for a court

order commissioning him in the Army.  *Id.* at 92.  The Court was equally clear that it would not

inject itself into the military's assignment process.  *Id.*, at 92-93.

19

The Ninth Circuit also applied this principle in a case similar to the one presented here.  In *Khalsa v. Weinberger*, a member of the Sikh religion who grew his facial hair for religious reasons sued the Army for refusing to process his enlistment application because he could not comply with a prior version of the Army's appearance regulations.  779 F.2d 1393, 1394 (9th Cir. 1986).  The district court dismissed the complaint for lack of jurisdiction.  *Id.* at 1394-95.  In affirming the decision, the Ninth Circuit observed that the Army "reviewed the problem and concluded that allowing exemptions for numerous [religious] groups would adversely affect the Army's discipline, morale, esprit de corps, and public image."  *Id.* at 1395.  The Ninth Circuit concluded that the Secretary of the Army, rather than judges, should be the arbiter of how Army personnel groom themselves.  *Id.* at 1400.  In reaching this conclusion, the Ninth Circuit emphasized that "Mr. Khalsa is free to dress and groom himself as he pleases," but that he "is not free to join the military if he cannot comply with military rules."  *Id.* at 1401.

Other circuits have similarly concluded that courts should refrain from passing judgment on the criteria the Army establishes for service.  In *West v. Brown*, for example, the plaintiff challenged an Army regulation that prohibited unwed parents from enlisting. 558 F.2d 757 (5th Cir. 1977).  The plaintiff alleged that the regulation infringed upon her "fundamental right" to marry and the right to rear children.  *Id.* at 759.  The Fifth Circuit affirmed the district court's order dismissing the plaintiff's constitutional claims as nonjusticiable.  *Id.*  In doing so, the Fifth Circuit stated that its review of the unwed parent regulation "would entail a sizable leap into an area in which the only compass is accumulated military experience."  *Id.* at 761; s*ee also Lindeau v. Alexander*, 663 F.2d 68, 71 (10th Cir. 1981) (same).

The D.C. Circuit's decision in *Kreis v. Sec'y of Air Force*, is also instructive.  866 F.2d 1508 (D.C. Cir. 1989).  There, an Air Force major sought a retroactive promotion that he believed

20

the Secretary had improperly denied to him.  *Id.* at 1511.  The Court noted, however, that "[t]he Constitution vests the complex, subtle, and professional decisions as to the composition . . . and control of a military force exclusively in the legislative and executive branches."  *Id.* (quoting *Gilligan*, 413 U.S. at 10).  The D.C. Circuit held that the plaintiff's "request for retroactive promotion falls squarely within the realm of nonjusticiable military personnel decisions."  *Id.*  The Court thus recognized that the political branches have exclusive control over the composition of the armed forces, including which officers are promoted.  *Id.*

Although, these cases did not directly address RFRA claims, they counsel that courts should avoid judicial intervention in determining who should be allowed to join the military, and they all conclude that decisions on whether a person can enlist or commission into the military are nonjusticiable.  Accordingly, Plaintiff's request for a provisional enlistment should be denied.

Ultimately the Army should be permitted to assess whether an officer candidate is qualified to begin formalized officer training.  Contracting into ROTC or "enlisting" is a substantial step for a cadet.  Contracted cadets formally join the United States Army Reserve, draw pay for service, and agree to a military service obligation.  *See* DA "Form 597 (A227-31).  Significantly, a contracted cadet is extended the opportunity to receive an Army officer commission upon successful completion of the ROTC course of instruction and commissioning requirements.  *Id.*  A judicial decision requiring Plaintiff's enlistment into ROTC would place him into the United States Army and squarely on the path towards a commission.  *Id.*  Such a decision would supplant the professional judgments properly left to the military regarding Plaintiff's qualifications to serve, and would reach far beyond normal bounds of judicial competency.

Defendants do not suggest that this Court should abdicate its responsibility "to inquire whether an action of a military agency conforms to the law, or is instead arbitrary, capricious, or

contrary to the statutes and regulations governing that agency." *Dilley v. Alexander*, 603 F.2d 914, 920 (D.C. Cir. 1979).  "[T]he doctrine of nonreviewability of military decisions has undergone considerable modification [since *Orloff*], as courts have evinced increased willingness to review military actions alleged to contravene express constitutional, statutory, or regulatory requirements." *Blevins v. Orr*, 721 F.2d 1419, 1421-22 (D.C. Cir. 1983).  But it is important to appreciate the scope of the relief sought by Plaintiff.  He ostensibly seeks a writ of mandamus ordering his enlistment into the Army, a request for judicial intervention order that a multitude of courts have determined they are ill-equipped to entertain.

### D.  Defendants are Entitled to Summary Judgment on Plaintiff's RFRA Claim

#### 1.  The Army's Professional Judgments Regarding how Best to Cultivate Future Officers are Owed Deference

The Army's judgments regarding how to develop its officer corps and build an effective fighting force are owed deference.  The context of this case is unique because it directly reviews an Army decision that uniquely implicates military judgments regarding the composition and training of military officers.  In the Army's professional judgment, as articulated in LTG McConville's decision, the Army's grooming policy is an *essential component* of officer development in the Reserve Officer Training Corps.  Agency Decision; (AR 3-4).  The development of credible and capable officers requires that cadets are "inculcated into the Army and its values, training methods, and traditions in a way that is reflective of what their future Soldiers will expect of them[.]" *Id*. at 1-2.  The policy also "allows a strong team identity to be forged, distinguishes service members from the civilian population, reinforces notions of selfless service, and provides a routine that instills discipline[.]" *Id*. at 1.  The Army views the development of its officer corps as paramount to maintaining a force that is capable of providing for the Nation's defense.  *Id*. at 2-4.  The

composition of the Army and training of the force is an area where case law, the text of RFRA, and its corresponding legislative history, articulate that substantial deference is owed to the experience and expertise of military professionals.

a.    *Long Standing Judicial Deference to Military Judgments*

As the Supreme Court recognized long ago: "[J]udges are not given the task of running the Army. . . .  Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters." *Orloff v. Willoughby*, 345 U.S. 83, 93-94 (1953).  The Supreme Court has further observed that "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan*, 413 U.S. at 10.

The Army "is, by necessity, a specialized society separate from civilian society" that mandates strict discipline and obedience from its personnel.  *Parker v. Levy*, 417 U.S. 733, 743 (1974); *Comm. for GI Rights v. Callaway*, 518 F.2d 466, 474 (D.C. Cir. 1975).  For more than a century courts have recognized that the military "is not a deliberative body.  It is the executive arm. Its law is that of obedience.  No question can be left open as to the right to command in the officer, or the duty of obedience in the soldier." *In re Grimley* 137 U.S. 147, 153 (1890).  The military is thus "not constructed along democratic lines and military activities cannot be governed by democratic procedures." *Greer v. Spock*, 424 U.S. 828, 843-44 (1976) (Powell, J., concurring). "In the civilian life of a democracy many command few; in the military, however, this is reversed, for military necessity makes demands on its personnel without counterpart in civilian life." *Chappell v. Wallace*, 462 U.S. 296, 300 (1983).

Courts have respected that "[t]he responsibility for determining how best our Armed Forces shall attend to that business rests with Congress and with the President." *Rostker v.*

23

*Goldberg*, 453 U.S. 57, 70 (1981) (internal citations omitted); *see* U.S. Const. Art. I, § 8, Art. II § 2.  Courts have accordingly been circumspect in reviewing claims that challenge the "complex, subtle, and professional decisions as to the *composition, training, equipping, and control* of a military force [that] are essentially professional military judgments[.]"  *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) (emphasis added).

Courts have consistently followed this view, deferring to military decisions that relate to the composition, training, equipping and control of the military.  *See Hartmann v. Stone*, 68 F.3d 973, 984 (6th Cir. 1995) (noting that the court has consistently deferred to the military); s*ee also Goldman v. Weinberger*, 475 U.S. 503, 89 L. Ed. 2d 478, 106 S. Ct. 1310 (1986) (military not required to allow a service member to wear a yarmulke; result reversed by 10 U.S.C. § 774 (1988)); *Chappell v. Wallace*, 462 U.S. 296, 76 L. Ed. 2d 586, 103 S. Ct. 2362 (1983) (service members cannot bring *Bivens* type actions); *Brown v. Glines*, 444 U.S. 348, 62 L. Ed. 2d 540, 100 S. Ct. 594 (1980) (Air Force regulation limiting the right to circulate petitions is Constitutional); *Greer v. Spock*, 424 U.S. 828, 47 L. Ed. 2d 505, 96 S. Ct. 1211 (1976) (prohibition of political speeches and protests on military bases found Constitutional); *Schlesinger v. Councilman*, 420 U.S. 738, 43 L. Ed. 2d 591, 95 S. Ct. 1300 (1975) (right of federal courts to review military conviction limited in scope); *Burns v. Wilson*, 346 U.S. 137, 97 L. Ed. 1508, 73 S. Ct. 1045 (1953) (scope of review of military habeas petitions is narrower than in the civilian context).

The Supreme Court has applied these principles in a case similar to this one.  In *Goldman v. Weinberger*, the plaintiff was an Orthodox Jew and ordained rabbi.  475 U.S. 503, 504 (1986)  He served in the Air Force as a psychologist.  *Id*. at 505.  After several years of wearing his yarmulke while in uniform, the Air Force ordered him to cease wearing it because it conflicted with an Air Force regulation that prohibited personnel from wearing "headgear" while indoors.  *Id*.  The

24

plaintiff filed suit and alleged that the Air Force's appearance regulation violated his First Amendment right to exercise his religious beliefs. *Id.* at 506. The district court agreed with the plaintiff and permanently enjoined the Air Force from applying its regulation to him. *See Goldman v. Secretary of Defense*, 530 F. Supp. 12 (D.D.C. 1981). On appeal, the D.C. Circuit reversed and vacated the injunction. *See Goldman v. Secretary of Defense*, 734 F.2d 1531 (D.C. Cir. 1984). The D.C. Circuit held that the Air Force's regulation served the legitimate military needs of discipline, obedience, and uniformity, and that the regulations accommodated the plaintiff to an appropriate degree. *Id.* at 1536.

The Supreme Court granted the plaintiff's petition for a writ of certiorari, and affirmed the D.C. Circuit's decision. *Goldman*, 475 U.S. at 510. The Supreme Court initially observed that its "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Id*. at 507. The Court stated that "when evaluating whether military needs justify a particular restriction on religiously motivated conduct, courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Id.* Indeed, the Court recognized that "[j]udicial deference [to the military] is at its apogee" when "rules and regulations for their governance [are] challenged." *Id* (internal citation and quotations omitted).

The Supreme Court ultimately held that, using this standard of review, the Air Force could constitutionally order the plaintiff to remove his yarmulke. *Id.* at 510. The Court recognized that "[t]he essence of military service is the subordination of the desires and interests of the individual to the needs of the service," and that "to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps." *Id.* The Supreme Court was unwilling to

25

supplant the Air Force's professional judgment on this military matter with its own.  *Id.* (noting "courts [are] ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have").  The Court concluded by writing:  "Quite obviously, to the extent the regulations do not permit the wearing of religious apparel such as a yarmulke, a practice described by [plaintiff] as silent devotion akin to prayer, military life may be more objectionable for [plaintiff] and probably others.  But the First Amendment does not require the military to accommodate such practices in the face of its view that they would detract from" the military's legitimate interests.[4]  *Id.*

      b.    *RFRA Does not Displace Deference to Military Judgments*

"In enacting RFRA, Congress intended to incorporate the standard governing free exercise claims that prevailed before the Supreme Court's decision in *Employment Division v. Smith*." *Rasul v. Myers*, 563 F.3d 527, 532 (D.C. Cir. 2009); *Holy Land Foundation v. Ashcroft*, 333 F.3d 156, 166-67 (D.C. Cir. 2003).  "The aim was to restore what, in Congress's view, is the free exercise right the Constitution guaranteed – in both substance and scope."  *Rasul*, 563 F.3d at 532. Thus, "Congress legislated against the background of precedent" that was in place prior to the Supreme Court's decision in *Smith.  Id.*  The Supreme Court's decision in *Goldman* is plainly one such decision.  *See Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005) (discussing *Goldman*); *see also Lebron v. Rumsfeld*, 670 F.3d 540, 559 (4th Cir. 2012) (noting that "Congress passed RFRA to overturn the [*Smith*] decision in the civilian context, locating the statute in Title 42 along with other civilian civil rights, and failing to include the exceptions or discretionary authority that only

---

4      By statute, military personnel are now authorized to wear "item[s] of religious apparel" while in uniform unless the item would interfere with the member's military duties or if it is not neat and conservative.  However, the Secretary concerned determines what apparel interferes with military duties or is considered neat and conservative. *See* 10 U.S.C. § 774(a)-(b).

four years before Congress deemed so necessary to achieving the same result in the military

context" when it statutorily overrode the decision in *Goldman*); *see also A.A. v. Needville Indep.*

*Sch. Dist.*, 611 F.3d 248, 269 (5th Cir. 2010) (analyzing *Goldman* and noting the importance of

context in compelling interest analysis).

The text of RFRA confirms that the statute does not displace the traditional deference

courts show to the military, as exemplified by *Goldman*.  In rebuking the holding of *Employment*

*Division v. Smith*, Congress declared in RFRA that "the compelling interest test as set forth in prior

Federal court rulings is a workable test for striking sensible balances between religious liberty and

competing prior governmental interests."  42 U.S.C. § 2000bb(a)(5).  Thus, RFRA was never

intended to, and did not in fact, alter the standard of review applied by the Supreme Court in

*Goldman* to cases involving the military.  *Id.*

As the Senate Report for RFRA recognized:  "Under the unitary standard set forth in the

act, courts will review the free exercise claims of military personnel under the compelling

governmental interest test.  The committee is confident that the bill will not adversely impair the

ability of the U.S. military to maintain good order, discipline, and security."  *See* S. Rep. 103-111

(July 27, 1993).  The Senate Committee continued:  "The courts have always recognized the

compelling nature of the military's interest in these objectives in the regulations of our armed

services.  Likewise, the courts have always extended to military authorities significant deference in

effectuating these interests.  *The committee intends and expects that such deference will continue*

*under this bill*."  *Id.* (emphasis added).

The House Committee expressed its expectation that courts would continue to give

deference to military decisions, subsequent to enactment of the Act.  *See* H.R. Rep. 103-88 (May

11, 1993).  Specifically, the House Committee "recognize[d] that religious liberty claims in the

context of prisons and the military present far different problems for the operation of those institutions than they do in civilian settings." *Id.* The House Report stated that "seemingly reasonable regulations based upon speculation, exaggerated fears or thoughtless policies cannot stand" but observed that ensuring "discipline in our armed forces [has] been recognized as [a] governmental interest[] of the highest order." *Id.*

The Supreme Court's decision in *Cutter v. Wilkinson* is also informative. There, the Supreme Court addressed the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), a companion statute to RFRA that specifically imposes the compelling interest test on prisons. *Cutter*, 544 U.S. at 722-23. The Supreme Court observed that "[w]hile the Act adopts a 'compelling government interest' standard, *context matters* in the application of that standard." *Id.* (emphasis added). "Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions," and "[t]hey anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline[.]" *Id.* This Court should apply no less deference to the experience and expertise of Army commanders.

Certainly not all military decisions will fall squarely into the spectrum of affairs that are deserving of such deference. *See Hartmann v. Stone*, 68 F.3d 973, 984-85 (6th Cir. 1995) (finding that military policies regarding management of installation based child care facilities were not deserving of deference). However, in this case the Army's decision is rooted in complex professional military judgments about how to train and maintain the development of the officer corps, and the management of good order, discipline, and morale of the force as a whole. *See id.*; *see also Gilligan v. Morgan*, 413 U.S. 1, 10 (1973).

28

LTG McConville succinctly summarized the Army's decision, and the complex

professional judgments that were made based on the unique context of this case, when he wrote:

> Uniformity is a primary way the Army builds an effective fighting force.  It allows
> a strong team identity to be forged, distinguishes service members from the civilian
> population, reinforces notions of selfless service, and provides a routine that instills
> discipline in Soldiers and leaders, while connecting the Army to its past in a visible
> way.  As Army ROTC is the primary means of generating the officer leaders of the
> Army, it is important that Cadets are inculcated into the Army and its values,
> training methods, and traditions in a way that is reflective of what their future
> Soldiers will expect of them.  Soldiers within the Army expect that their officers
> will scrupulously follow regulations, and provide a model of uniform dress,
> appearance and grooming standards.  Permitting an obvious deviation from these
> standards in an officer training program would, in the eyes of the Soldiers whom
> Cadets are being trained to lead, damage the esteem and credibility of ROTC and
> the officer corps in general.

Agency Decision; (AR1).  LTG McConville's judgments involving the training of officers and

chosen means of inculcating values, discipline, and esprit de corps within the Army are precisely

the type of leadership judgments that Congress intended courts to afford "significant deference in

effectuating" after RFRA.  *See* S. Rep. 103-111 (July 27, 1993).

Plaintiff would have this Court substitute its judgment for that of the Army officers who

applied their experiences regarding how best to effectuate good order, discipline, and security

within the ranks.  Plaintiff seeks this relief, despite the fact that courts have consistently recognized

a clear lack of judicial competency regarding matters of military training.  *See Gilligan*, 413 U.S.

at 10 ("it is difficult to conceive of an area of governmental activity in which the courts have less

competence.").

The Army's decision is grounded in multiple rationales based on long standing principles

of military training for which courts have historically provided deference and RFRA has not

displaced.  *See Bitterman v. Sec'y of Def.*, 553 F. Supp. 719, 724 (D.D.C. 1982) (the "Court agrees

with the considered judgment of professional military officials, prompted by *generations of*

*experience in war and peace*") (emphasis added); s*ee* S. Rep. 103-111 (July 27, 1993) ("The committee is confident that the bill will not adversely impair the ability of the U.S. military to maintain good order, discipline, and security. . .  The committee intends and expects that such deference will continue under this bill.").

The Army is not endeavoring to do anything novel by continuing to use uniformity as a means of building a fighting spirit, discipline and attention to detail.  In 1950, S.L.A. Marshall, the Army's historian for World War II, with the input of General Dwight D. Eisenhower and the direction of General George C. Marshall, wrote a treatise on military leadership entitled *The Armed Forces Officer*.  Department of Defense, p. i.  *The Armed Forces Officer* (2006), available http://www.dtic.mil/doctrine/education/armedforcesofficer.pdf.  S.L.A. Marshall eloquently wrote of the importance of uniformity to the development of military forces and individual soldiers:

> [W]e need to look once again at what happens to the individual when he puts on the uniform.  The basis of his life changes in broad and fundamental ways.  His legal status is changed; the extent and intensity of his obligations are magnified.  He puts aside the banner of individualism for that of obedience.  Yet in the words of Chester Barnard: "Scarcely a man, I think, who has felt the annihilation of his personality in some organized system, has not also felt that the same system belonged to him because of his own free will he chose to make it so."

S.L.A. Marshall, *The Armed Forces Officer* (1950), p. 159, available at https://www.au.af. mil/au/awc awcgate/usmchist/officer.txt.

This observation is not foreign to this Court.  For example, in *Bitterman* the court took "judicial notice of the historical fact that following the resounding defeat of our green, inexperienced, and inadequately trained force at the Kasserine Pass in North Africa in 1942, General Eisenhower relieved General Fredendall and put General Patton in command of the II Corps."  *Bitterman* 553 F. Supp at 724.  According to General Eisenhower "General Patton's

buoyant leadership and strict insistence upon discipline rapidly rejuvenated the II Corps and

brought it up to fighting pitch." *Id*. at 724.  The Court goes on to quote General Patton on the

importance of military uniforms to discipline:

> It is human to resent being told what to wear and how to wear it.  Insistence on strict
> compliance with uniform regulations breaks down the barrier of resentment to
> discipline, possibly more than anything else.  If men strictly obey the regulations
> about wearing the uniform, they can be held truly disciplined men.  Discipline is the
> backbone of all military operations.

*Id*. at 724 fn.5.

General Marshall's, General Eisenhower's, and General Patton's views that a defeated

force can be resurrected via an emphasis on strict discipline, attention to detail, and uniformity

demonstrate the value, historically, that the military ascribes to these principles.  Like the decision

made here, application of these principles involves "the complex, subtle, and professional

decisions as to the *composition, training, equipping, and control* of a military force [that] are

essentially professional military judgments[.]"  *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)

(emphasis added).

Consistent with the view that substantial deference is due the Army, the Sixth Circuit

observed in *Hartman v. Stone*:

> The military exists to preserve the security of the United States, and in doing so it
> protects the freedoms of the citizenry.  It does so by ensuring that it is prepared to
> do what armed forces have done throughout recorded history, make war on the
> enemy.  This function has required courts to defer to Army judgment on many
> aspects of internal operations, *including the proper scope of uniformity, discipline
> and morale*. The military can force soldiers to wear certain clothes, subject them to
> a different system of justice, and use equipment that is not only lethal to those on
> the business end, but far more dangerous to the user than would be tolerated in a
> civilian context.  All of these factors are, either directly or indirectly, crucial to the
> military's central mission of effective combat.  Clearly the wearing of a yarmulke
> has little to do with battlefield competence. Nonetheless, the military considers the
> maintenance of uniformity and the discipline it engenders to be a necessary
> ingredient of its preparedness, and *the courts do not look any further*.

31

*Hartmann v. Stone*, 68 F.3d 973, 984-85 (6th Cir. 1995) (emphasis added).

Thus to the extent that the Army's decision in this case is reviewed pursuant to RFRA, the decision should be afforded substantial deference.

### 2. The Army's Decision Meets Strict Scrutiny

The Army's decision is permissible under RFRA because it furthers compelling governmental interests and is the least restrictive means.

a. *The Government's Compelling Interests in Maintaining an Effective Army*

The Army's decision to deny Plaintiff's request for a grooming accommodation while in an officer training program furthers compelling interests in maintaining a credible officer corps and an effective fighting force that is capable of meeting the Nation's defensive needs.  The enforcement of uniform standards in ROTC is fundamental to Plaintiff's development as an officer, and thereby the effective function of the Army.  The interest in maintaining an effective Army by developing a disciplined, well trained, credible, cohesively bonded, and reliable corps of officers in ROTC is undeniably compelling, and furthered by the Army's decision here for the following reasons.  *See Bitterman v. Secretary of Defense*, 553 F. Supp. 719, 725 (D.D.C. 1982) (["t]here is no doubt that the effective functioning and maintenance of the Air Force is a substantial compelling governmental interest"); *see also Rigdon v. Perry*, 962 F. Supp. 150, 162 (D.D.C. 1997) ("A politically-disinterested military, good order and discipline, and the protection of service members' rights to participate in the political process are compelling governmental interests"); *see also* H.R. Rep. 103-88 (May 11, 1993) ("discipline in our armed forces [has] been recognized as [a] governmental interest[] of the highest order.").

32

First, uniforms are a primary means by which the Army takes individuals and forges them into soldiers who will put mission accomplishment before personal wants.  Agency Decision; (AR2).  Wear of the uniform serves as a reminder that the essence of military service "'is subordination of the desires and interest of the individual to the needs of the service.'"  *See Goldman*, 475 U.S. at 507 (quoting *Orloff v. Willoughby*, 345 U.S. 83, 92 (1953)).  "This subrogation of individual desires is critical to mission success because only members of the Armed Forces can be ordered to place their lives in peril anywhere at any time."  Agency Decision; (AR5).  Uniformity in ROTC provides a tangible reminder to cadets that "they put aside certain personal freedoms when they joined the Army, and that they have assumed special obligations inherent in the Army's mission."  Agency Decision; (AR2).

Second, an emphasis in ROTC on Army uniform standards cultivates discipline that will be sustained in combat.  Agency Decision; (AR 4).  As General Patton observed, "[d]iscipline is the backbone of all military operations."  Harry H. Semmes*, Portrait of Patton* (Appleton-Century Press) (1955) (as quoted in *Bitterman v. Sec'y of Def.*, 553 F. Supp.2d 719, 724 fn.5 (D.D.C. 1982)).  The Army expects that "its Soldiers and officers . . . instinctively comply with military standards of conduct and promptly obey lawful orders."  Agency Decision; (AR4).  The Army must infuse cadets with a disciplined character that as officers will not wither in combat, and will allow them to lead and sustain their soldiers.  Agency Decision; (AR3-5).  This is a difficult task as discipline alone "cannot be taught on battlefields" and "the habit of immediate compliance with military procedures and order must be virtually reflex with no time for debate or reflection." *Chappell v. Wallace*, 462 U.S. 296, 300 (1983).  To impress sustainable discipline within soldiers, military culture drills discipline on a daily basis.  By maintaining "smartness of appearance and action; cleanliness and maintenance of dress, maintenance of equipment, cleanliness of quarters;

33

deference to senior Soldiers and officers; and mutual respect between senior and subordinate personnel" discipline is cultivated.  Agency Decision; (AR4).  The enforcement of grooming standard in ROTC is a critical component of learning discipline that would be undercut by granting Plaintiff's accommodation.

Third, an emphasis on grooming standards in ROTC contributes to a credible officer corps that is principally connected to the soldiers it will lead.  Agency Decision; (AR5).  It is critical to remember that eventually, "Cadets will be expected to hold their Soldiers to the Army's standards by using inspections as a means of quickly and unambiguously identifying small problems before they become major leadership concerns that detract from mission accomplishment."  Agency Decision; (AR4).  An emphasis on grooming standards in training not only provides a "readily available means of instilling the practice of inspection and compliance that not only sharpens [the inspected] Soldiers" but also the leaders.  *Id*.  This practice also keeps ROTC cadets connected to the soldiers they will lead and ensures that they are "inculcated into the Army and its values, training methods, and traditions in a way that is reflective of what their future Soldiers will expect of them[.]" Agency Decision; (AR1-2).  If ROTC becomes disconnected from the Army writ large by embracing substantial deviations from Army's standards, the credibility of officers who originate from it will suffer.  Agency Decision; (AR2).

Fourth, the wearing of a common uniform also assists in building strong teams in ROTC and allows a nationwide pool of cadets to easily converge as officers in the larger Army. Uniformity builds teams by "provid[ing] visual evidence of mutual experience[.]"  Agency Decision; (AR3).  Uniforms also further team development by emphasizing "the professional equality of all military people[.]"  Agency Decision; (AR2).  "As individual ROTC Cadets eventually converge and train with their peers from other ROTC programs at the Leaders' Training

34

Course and the Leader Development and Assessment Course, an emphasis on consistent nationwide standards and uniformity allows them to develop cohesive teams." Agency Decision; (AR3). This in turn "facilitates more focused training, and ultimately a stronger officer corps." *Id*.

Fifth, Plaintiff's health and safety would be negatively impacted by allowing him to wear a beard and unshorn hair in ROTC. Agency Decision; (AR6). Facial hair very simply degrades the ability to obtain a proper seal on the masks used to protect soldiers in chemical and biological environments. *See* Alex G. Pappas Decl. ¶ 10; (Def. Exh. P). In September 2009, an Army study concluded that facial hair degrades the effectiveness of Army protective masks to unacceptable levels. *Id*. There is no question that the safety of service members is a compelling interest. *Sherwood v. Brown*, 619 F.2d 47, 48 (9th Cir. 1980). Plaintiff's "degraded ability to seal a protective mask in training would not only subject [him] to risk during training, but, were [he] to enter the military service" he would be "untrained in the proper wear and function of" protective equipment and thereby place his unit and his soldiers at risk. Agency Decision; (AR6).

(1)     *Limited Exceptions to the Appearance Policy do not Undermine the Army's Compelling Interest*

The Army's use of medical profiles as exceptions to its grooming policy has not undermined its ability to assert its compelling interests as furthered by uniformity. Compl. ¶ 41-46. The Secretary of the Army has been granted wide statutory authority to dictate the qualification and procedures for determining who is medically fit to serve in the Army. 10 U.S.C. § 1216 (b) (granting the Secretary "all powers, functions, and duties incident to the determination" of "the fitness for active duty of any member of an armed force under his jurisdiction."). Pursuant to his authority, the Secretary has identified in regulation those conditions that are potentially medically disqualifying and thereby may require separation from the military. Army Reg. 40-501,

35

¶¶ 3-3, 3-4; (A257).  If a disqualifying condition is identified, medical doctors evaluate the patient

on an individual basis and assess if the condition:

    a.  Significantly limit[s] or interfere[s] with the Soldier's performance of their
    duties;

    b.  May compromise or aggravate the Soldier's health or well-being if they were to
    remain in the military Service.  This may involve dependence on certain
    medications, appliances, severe dietary restrictions, or frequent special treatments,
    or a requirement for frequent clinical monitoring;

    c.  May compromise the health or well-being of other Soldiers;

    d.  May prejudice the best interests of the Government if the individual were to
    remain in the military Service.

Army Reg. 40-501, ¶ 3-1; (A256-A257).

If a condition is permanent in nature and interferes with military duties, a soldier will be

referred to a medical evaluation board ("MEB") which documents "all of the Soldier's medical

problems and physical limitations" and then a physical evaluation board which then "will make the

determination of fitness or unfitness."  Army Reg. 40-501, ¶ 3-4 (the PEB "will consider the

results of the MEB, as well as the requirements of the Soldier's MOS [military occupational

specialty], in determining fitness."); (A257).

Rather than separating soldiers who develop temporary medical conditions that render

them unable to perform duty, military commanders work with health care providers while medical

conditions are treated.  Disqualifying medical conditions that have not fully stabilized or are in the

process of being treated do not require referral to the MEB and PEB process, but are managed by

the health care providers by issuance of temporary profiles which *recommend* to the soldier's

commander reasonable limitations on the soldier's activities based on his medical condition.  *See*

Army Reg. 40-501, ¶ 7-4b-c (A261), ¶ 7-3e ("In this respect, profiling officers must consider the

36

effect of their *recommendations* upon the Soldier's ability to perform duty.  Profiles must be realistic.  All profiles and assignment limitations must be specific, and written in lay terms."); (A260), ¶ 7-4e(1)-(2) (ultimately, the "[d]etermination of individual assignment or duties to be performed is a commander's decision."); (A260-A261), ¶ 7-12 ("Commanders and personnel officers are responsible for necessary personnel actions including . . . the assignment of the individual to military duties commensurate with the individual's physical profile and recorded assignment limitations."); (A267); *see also* Department of the Army Form 3349, Block 19-23 (showing action by commander on physical profiles) *Physical Profile* (Feb. 2004) ("DA Form 3349"); (A272).

By regulations, a skin disorder that "requires frequent medical care, or interferes with the satisfactory performance of military duty" is cause for referral to a medical evaluation board. Army Reg. 40-501, ¶ 3-38af; (A259).  Like other temporary medical conditions, a soldier with Pseudofolliculitis (the condition that generally results in a "shaving profile") can be temporarily profiled while that condition is being treated.  Army Reg. 40-501, ¶ 7-3e(5); (A261).  Profiles generally limit hair growth to 1/8th inch (to a maximum of 1/4 inch), specify how often the soldier will be required to shave, and prohibit styling of the facial hair.  Technical Bulletin 287, ¶ 8d, *Preudofolliculitis of the Beard and Acne Keloidalis Nuchae* (Sep. 1, 2000) ("TB 287"); (A246). Critically, commanders retain the ability to dictate the assignment and duties of the profiled individual and can require a soldier to shave in the event of "exposure to a toxic environment[.]" TB 287, ¶ 9c; (A246).  A permanent profile for Pseudofolliculitis can be issued by a panel of three doctors for a persistent medical condition, however such a permanent profile remains subject to command reevaluation, while further degradation of the skin condition could form a basis for

medical separation if it requires frequent care or interferes with the performance of military duty. TB 287, ¶ 9b(2); (A246); *see also* Army Reg. 40-501, ¶  3-38af; (A259).

There is no wholesale exception to the Army's grooming standard for medical conditions that permits a soldier to so substantially deviate from the grooming standard in the way Plaintiff requests.  *See* Compl. *Request for Relief* (Plaintiff seeks to wear unshorn hair, an unshorn beard, and a turban in uniform).  Plaintiff's reliance on *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 439 (2006) to argue that the Army has forfeited its compelling interest is misguided.  In *O Centro* the plaintiffs sought an exception similar to one previously granted by the government in a different circumstance. *see O Centro,* 546 U.S. 418, 439 (2006) (noting the Government's practice of permitting native Americans to use peyote, a hallucinogen, for religious reasons fatally undermined its categorical refusal to grant a religious exception for use of another hallucinogen).  The Army's medical exception allows only for a slight, and imperceptible, deviation from the facial hair standard up to an eighth of an inch. TB 287, ¶ 8(d); (A246).  Plaintiff seeks an exception for a fully unshorn beard and unshorn hair.  Simply put, Plaintiff's requested exceptions go far beyond the exception that the Army grants.

The limited exceptions to the grooming policy that the Army has granted do not undermine its compelling interests in maintain strict grooming standards.  Indeed these exceptions are generally limited in temporal scope and contain their own standard that facial hair be no longer than an eighth of an inch.  Thus the rationale of *O Centro* is of minimal applicability.  The Army's balance of the medical needs of its soldiers with its compelling interest in maintaining strict grooming standard is not inapposite to one another.  Thus, these limited exceptions do not compel a finding that Plaintiff should be permitted to enter and serve in the Army in contravention of the Army's decision and his claim should be dismissed.

(2)     *Plaintiff's Accommodation Request is Different Than Other Approved Religious Accommodations*

The fact that the Army has permitted a handful of religious based grooming exceptions for other soldiers shows that *O Centro* has little applicability because the Army is not taking a categorical approach[5] to the consideration of religious based grooming accommodations.  *See O Centro*, 546 U.S. at 439 (noting that "the well-established peyote exception also fatally undermines the Government's broader contention that the Controlled Substances Act establishes *a closed regulatory system that admits of no exceptions* under RFRA.")(emphasis added).  Instead the Army's regulation is clear that cases of religious accommodation, including grooming, are to be "assessed on a case by-case."  Army Reg. 600-20, ¶ 5-6a; (A022).

Plaintiff's request for accommodation in order to train in ROTC and stated desire to serve as an officer in the Military Intelligence Branch is materially different from the facts and circumstances of the approved religious accommodation exceptions he has cited.  Compl. ¶ 14.  In the cases he cites, individuals with particularized skills entered service in the Special Branches within the Army including the Army Medical Department and Chaplain Corps.  Pl. Mot. Prelim. Inj., ECF No. 3, at 11-12; Compl. ¶ 42-26.  The Special Branches are "a grouping of branches and officers primarily concerned with providing combat Service support and/or administration to the Army as a whole but managed separately from combat Service support branches."  Department of the Army Pamphlet 600-3, Section II Terms – Special Branches, *Commissioned Officer Professional Development and Career Management* (Dec. 3, 2014) ("DA Pam. 600-3"); (A306).

---

[5]     *O Centro* certainly favors case by case consideration of RFRA claims, but it did not close the door on a categorical approach which refuses, in limited contexts, to grant any religious accommodation exceptions.  Instead the Court explicitly reserved that "[w]e do not doubt that there may be instances in which a need for uniformity precludes the recognition of exceptions to generally applicable laws under RFRA.*"  Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006).

The Special Branches include the Army Medical Department, Judge Advocate General's Corps, and the Chaplains Corps. *See* 10 U.S.C. § 3064.

In contrast, Plaintiff seeks to serve in the Military Intelligence Branch, a basic branch of the Army that directly "support[s] commanders and staffs in gaining situational understanding of threats, terrain and weather, and civil considerations." *See* DA Pam. 600-3, ¶ 25-1; (A277); s*ee also* 10 U.S.C. § 3063 (identifying by statute the traditional basic branches of the Army). Though all basic and Special Branch officers are subject to the same uniform standard, the Special Branches are professionally focused in technical areas, and its officers generally *cannot serve as military commanders outside of the Special Branches*. *See* 10 U.S.C. § 3579 ("a commissioned officer of the Army Medical Department is not entitled to exercise command because of his rank, except within the Army Medical Department" – exception subject to approval by the Secretary of the Army); 10 U.S.C. § 3581 ("A chaplain has rank without command."); ¶ 39-1 ("The Chaplain Corps is a special branch of the Army whose mission is to provide for the comprehensive religious support to the Army across the spectrum of operations"); ¶ 40-1 (noting the Army Medical Department "is a special branch of the Army whose mission is to provide health services for the Army"); (A285-304). The clear difference between service in the Special Branches and service in Military Intelligence is a major distinction which renders Plaintiff's reliance on those exceptions misplaced.

Furthermore, it bears emphasis that the Army now is operating in a very different environment than when it granted the exceptions that Plaintiff cites. Agency Decision, (noting the prior "exceptions were granted after consideration of the requests on a case by case basis based on the military necessity factors that existed at the time."); (AR6). LTG McConville highlighted that the Army is now downsizing after years of protracted conflict with large scale deployments.

40

Emphasizing this point, he writes that "at a time when the Army is now culling the force and returning many good Soldiers back to civilian life after nearly thirteen years at war, emphasis on the consistent and even handed application of standards is now even more important."  Agency Decision; (AR5).

        b.    *The Army's Decision is the Least Restrictive Means of Furthering the Government's Compelling Interest*

The government is not required to "refute every conceivable option" to prove that a law is narrowly tailored.  *Hamilton v. Schriro*, 74 F.3d 1545, 1556 (8th Cir. 1996); *see also Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 188-89 (1979) (Blackmun, J., concurring) ("A judge would be unimaginative indeed if he could not come up with something a little less 'drastic' or a little less 'restrictive' in almost any situation, and thereby enable himself to strike legislation down.").   Nor is the Government required "to do the impossible—refute each and every conceivable alternative regulation scheme" because the "scrutiny of federal laws under RFRA is not 'strict in theory, but fatal in fact.'"  *United States v. Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 507 (1980)).

Under RFRA "the government's burden is two-fold:  it must support its choice of regulation, and it must refute the alternative schemes offered by the challenger, but it must do both through the evidence presented in the record."  *Wilgus* at 1289.  However, "[a] statute that asks whether a regulation is the least restrictive means of achieving an end is not an open-ended invitation to the judicial imagination."  *Id.*

The case *of Bitterman v. Secretary of Defense*, 553 F. Supp. 719, 720 (D.D.C. 1982), is instructive for the Court in understanding the least restrictive means analysis[6] in a case involving

---

[6]      *Bitterman* preceded RFRA and *Employment Division, Dept. of Human Resources of Ore. v. Smith*, 494 U.S.

military uniformity.  Plaintiff in *Bitterman* sought to wear a yarmulke with his uniform in violation of Air Force appearance policy.  *Id.*  The Government conceded that plaintiff's yarmulke would not interfere with his assigned duties.  *Id.* at 721.  In evaluating his claim under a compelling interest analysis, the court first determined that "the effective functioning and maintenance of the Air Force is a substantial compelling governmental interest" while also finding that the factors of "motivation, image, morale, discipline and esprit de corps, are essential to the efficient functioning and operation of the Air Force," and "also constitute a substantial compelling government interest."  *Id.* at 724.

The court also determined that "departures from the [Air Force's uniformity standards] would adversely affect the promotion of teamwork, counteract pride and motivation, and undermine discipline and morale, all to the detriment of the substantial compelling governmental interest of maintaining an efficient Air Force."  *Id.* at 725.  But as the regulation applies to all personnel within the Air Force "it becomes clear that there is no less restrictive means to promote and maintain uniformity among Air Force personnel, thereby furthering teamwork, motivation, discipline, esprit de corps and image than by across-the-board enforcement of [Air Force's uniformity standards]."  *Id.*  The court continued that it "is unable to formulate a less restrictive way to promote the five factors considered essential to the proper maintenance of the Air Force."  *Id.* at 726.

The logic of *Bitterman* applies equally to this case.  The Army obviously has the same compelling governmental interest in efficient function as the Air Force.  Motivation, discipline and esprit de corps via uniformity remain essential to the efficient function of the Army as well.  Here

---

872 (1990) and applied a compelling interest and least restrict means analysis and so it remains viable law.  See *United States v. Wilgus*, 638 F.3d 1274, 1288 (10th Cir. 2011) ([t]he legislative history of RFRA reveals that, in answering the least restrictive means question, courts are to look to free exercise cases decided prior to *Smith*.").

it is also apparent, there is no less restrictive means to promote and maintain teamwork, motivation, discipline, esprit de corps and image, within the context of an officer development program.

The Army cannot decide now that it will simply find Plaintiff a branch within the organization, at the point of commissioning, where his accommodation may have some potentially lesser impact on the military necessity factors.  First, the Army has determined that granting such an accommodation in the context of Plaintiff's ROTC officer training would fundamentally change his training to a degree that he would be less qualified to lead.  Second, ROTC branch assignments "must be made according to the needs of the Army" based on the "branch/specialty strength requirements" of the Army.  Army Reg. 145-1, ¶ 6-19; (A075).  The Army cannot project precisely what needs it will have to address with the pool of available ROTC officers in 2017.  ROTC commissions officers for the *general needs* of the Army.  *See* Army Reg. 145-1, ¶ 6-19 (emphasis added).  While personal preference is taken into account, it is very possible that Plaintiff's desire to be an military intelligence officer may not be granted because the Army's mission must come first.  *Id.*

Due to ever changing mission requirements the Army must retain flexibility in its development and maintenance of an effective fighting force.  Accordingly, the Army cannot guarantee Plaintiff's assignment in a particular occupational specialty, unit, location, or duty location. *See Lindenau v. Alexander*, 663 F.2d 68, 71 (10th Cir. 1981) ("Military regulations must be considered in the light of military exigencies, must be geared to meet the imperative needs of mobilization and national vigilance -- when there is no time for 'litigious interruption'") (internal citation and quotation omitted).  There are simply too many variables for the Army to take into

43

account in order to guarantee future accommodation based on the multiple years that in takes to complete ROTC.

Finally, there remains the fact that "facial hair significantly degrades the protection factor of all approved protective masks" used by the United States Army when tested with minimal hair growth. *See* Alex G. Pappas Decl. ¶ 10 (most subject had hair growth less than 1/4 inch); (Def. Exh. P). "Indeed, no military protective mask obtained the minimal required PF [protective factor] for bearded subjects." *Id.*; (Def. Exh. P). The fact remains Plaintiff would subject himself, his fellow soldiers, and his unit to greater risk by virtue of his wearing a beard in an environment with chemical or biological weapons.

The Army has tested two masks that met the required protective factor for bearded subjects (the M53 mask with Powered Air Purifying Respirator ("PAPR") configuration, and the M52 mask). Neither mask is approved for military use. *Id.* at ¶ 10; (Def. Exh. P). To the extent that Plaintiff asserts that the Army should be required to provide him specialized non-standard equipment[7] to accommodate his religious practice, it is important to note that the Army must operate under notions of interchangeability of people and equipment. As LTG McConville succinctly observed:

---

[7]       Though the Court of Appeals for the District of Columbia has reviewed and upheld invalidation of a fire department grooming policy under RFRA when the policy was supported solely based on safety concerns, no federal Court has ever reviewed or invalidated a military grooming policy under RFRA. *See Potter v. District of Columbia*, 558 F.3d 542, 551 (D.C. Cir. 2009) (affirming district Court's invalidation of a fire department facial hair policy due to the availability of protective gear that could work with facial hair). Undoubtedly a federal court can fairly assess under RFRA the objectively determinable question of "whether bearded firefighters can safely operate using negative pressure protection systems (APRs) in a tight-fitting mask, and whether they need to be able to do so[.]" *Potter v. District of Columbia*, 2007 U.S. Dist. LEXIS 72507, 16 (D.D.C. Sept. 28, 2007). However, the Court should not apply the template of Potter in this case because context matters. *See Cutter*, 544 U.S. at 722-23. The training, and equipping needs of 490,000 active duty and 552,200 reserve personnel are very different than a local fire department in size and scope because the Army must have the flexibility to meet on short notice worldwide mission requirements, which include the need for battlefield resupply and redistribution of equipment. *See* ECF No. 18-1 at 6 (noting the Army operates on a premise of interchangeable equipment to provide flexibility to meet its mission); *see* "Carl Levin and Howard P. 'Buck' McKeon National Defense Authorization Act for Fiscal Year 2015'' (Pub. L. No. 113-291, Dec. 19, 2014) (setting the Army's authorized end strength for fiscal year 2015 in §§ 401, 411).

> As the Army operates on a premise of interchangeable parts, we strive to ensure that military equipment is capable of being used by the widest group of personnel so that if military exigencies arise, equipment can be transferred laterally.  It simply is not feasible to provide [Plaintiff] a special protective mask without undermining the Army's need for flexibility to meet operational contingencies.

Agency Decision; (AR6).

## **CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' motion, and dismiss this case with prejudice.

Respectfully Submitted,

RONALD C. MACHEN JR.
D.C. Bar #447889
United States Attorney
for the District of Columbia

DANIEL F. VAN HORN
D.C. Bar #924092
Chief, Civil Division

BY: _____/s/_____
WAYNE H. WILLIAMS
Special Assistant U.S.  Attorney
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 252-2574
wayne.williams@usdoj.gov

OF COUNSEL
Major David M. O'Dea
Military Personnel Branch
U.S. Army Litigation Division
9275 Gunston Road
Fort Belvoir, VA 22060