# REGULATORY APPENDIX INDEX
## Singh v. McHugh et al.
# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA
## Case No. # 1:14-CV-01906

| TAB | DOCUMENT | DATE | PAGE |
|-----|----------|------|------|
| 1. | Department of Defense Instruction 1300.17, *Accommodation of Religious Practices Within the Military Services* | January 22, 2014 | A001 – A010 |
| 2. | Excerpt from Army Regulation 670-1, *Wear and Appearance of Army Uniform and Insignia* | Sept. 15, 2014 | A011-A018 |
| 3. | Excerpt from Army Regulation 600-20, *Army Command Policy* | November 6, 2014 | A019-A026 |
| 4. | Army Regulation 145-1, *Senior Reserve Officers' Training Corps Program:  Organization, Administration and Training* | Sept. 6, 2011 | A027-A098 |
| 5. | Cadet Command Pam 145-4, *Enrollment and Disenrollment Criteria, Policy and Procedures* | Sept. 12, 2011 | A099-A225 |
| 6. | Department of Army Form 597, *Army Senior Reserve Officers' Training Corps (ROTC) Nonscholarship Cadet Contract* | July 2005 | A226-A231 |
| 7. | Cadet Command Form 139-R, *Cadet Application and Enrollment Record* | July 29, 2014 | A232-A238 |
| 8. | Department of Army Technical Bulletin, *Preudofolliculitis of the Beard and Acne Kaloidalis Nuchae* | Sept. 1, 2000 | A239-A252 |
| 9. | Excerpt from Army Regulation 40-501, *Standards of Medical Fitness* | August 4, 2011 | A253-A270 |
| 10. | Department of Army Form 3349, *Physical Profile* | February 2004 | A271-A273 |
| 11. | Excerpt from Department of Army Pamphlet 600-3, *Commissioned Officer Professional Development and Career Management* | December 3, 2014 | A274-A306 |

# REGULATORY APPENDIX INDEX
## *Singh v. McHugh et al.*
## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
## *Case No. # 1:14-CV-01906*

12.   *Army Regulation 600-100, Army Leadership*          March 8, 2007          A307-A330

Singh v. McHugh et al.

(Department of Defense Instruction 1300.17)



# Department of Defense
# **INSTRUCTION**

**NUMBER** 1300.17
February 10, 2009
*Incorporating Change 1, Effective January 22, 2014*

USD(P&R)

SUBJECT:  Accommodation of Religious Practices Within the Military Services

References:  (a)  DoD Directive 1300.17, "Accommodation of Religious Practices Within the Military Services," February 3, 1988 (hereby cancelled)
(b)  DoD Directive 5124.02, "Under Secretary of Defense for Personnel and Readiness (USD(P&R))," June 23, 2008
(c)  *DoD Instruction 1000.29 "DoD Civil Liberties Program," May 17, 2012*
(d)  *Public Law 112-239, "National Defense Authorization Act for Fiscal Year 2013," December 18, 2012, as amended*
(e)  *Section 2000bb-1 of Title 42, United States Code*
(f)  *DoD Instruction 5025.01, "DoD Directives Program," September 26, 2012, as amended*
(g)  Section 774 and chapter 47 of title 10, United States Code

1.  <u>PURPOSE</u>.  This Instruction:

a.  Reissues Reference (a) as a DoD Instruction in accordance with the authority in Reference (b).

b.  Prescribes policy, procedures, and responsibilities for the accommodation of religious practices in the Military Services.

2.  <u>APPLICABILITY AND SCOPE</u>

a.  This Instruction applies to OSD, the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff and the Joint Staff, the Combatant Commands, the Office of the Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the ~~Department of Defense~~ *DoD* ~~(hereafter referred to collectively as the "DoD Components")~~.

b.  The policies, *procedures, and definitions* prescribed herein apply solely to the accommodation of religious practices in the Military Services and in no other context.

A002

3. DEFINITIONS

a. Neat and Conservative.  In the context of wearing a military uniform, "neat and conservative" items of religious apparel are those that:

(1)  Are discreet, tidy, and not dissonant or showy in style, size, design, brightness, or color.

(2)  Do not replace or interfere with the proper wear of any authorized article of the uniform.

(3)  Are not temporarily or permanently affixed or appended to any authorized article of the uniform.

b. Religious Apparel.  Articles of clothing worn as part of the doctrinal or traditional observance of the religious faith practiced by the member. ~~Hair and grooming practices required or observed by religious groups are not included within the meaning of religious apparel. Jewelry bearing religious inscriptions or otherwise indicating affiliation or belief is subject to existing Service uniform regulations under the same standard that applies to jewelry that is not of a religious nature.~~

*c. Grooming and Appearance.  Grooming and appearance practices, including hair, required or observed by religious groups.*

*d. Religious Body Art.  Temporary or permanent tattoos, piercings through the skin or body part, or other modifications to the body that are of a religious nature.*

*e. Substantially Burden.  In general, significantly interfering with the exercise of religion as opposed to minimally interfering with the exercise of religion.*

*f. Exercise of Religion.  Includes any religious practice(s), whether or not compelled by, or central to, a system of religious belief.*

*g. Compelling Governmental Interest.  In the DoD, a military requirement that is essential to accomplishment of the military mission.*

4. POLICY.  ~~The U.S. Constitution proscribes Congress from enacting any law prohibiting the free exercise of religion.~~  *It is DoD policy that:*

*a.* ~~The Department of Defense~~ *The DoD* places a high value on the rights of members of the Military Services to observe the tenets of their respective religions *or to observe no religion at all.  It protects the civil liberties of its personnel and the public to the greatest extent possible, consistent with its military requirements, in accordance with DoD Instruction (DoDI) 1000.29 (Reference (c)).*

*DoDI 1300.17, February 10, 2009*

*b.  In accordance with section 533(a)(1) of Public Law 112-239 (Reference (d)), as amended, unless it could have an adverse impact on military readiness, unit cohesion, and good order and discipline, the Military Departments will accommodate individual expressions of sincerely held beliefs (conscience, moral principles, or religious beliefs) of Service members in accordance with the policies and procedures in this instruction.  This does not preclude disciplinary or administrative action for conduct by a Service member requesting religious accommodation that is proscribed by Chapter 47 of Title 10, United States Code (the Uniform Code of Military Justice), including actions and speech that threaten good order and discipline.*

*c.  DoD has a compelling government interest in mission accomplishment, including the elements of mission accomplishment such as military readiness, unit cohesion, good order, discipline, health, and safety, on both the individual and unit levels.  An essential part of unit cohesion is establishing and maintaining uniform military grooming and appearance standards.*

*d.  In so far as practicable, a Service member's expression of sincerely held beliefs (conscience, moral principles, or religious beliefs) may not be used as the basis of any adverse personnel action, discrimination, or denial of promotion, schooling, training, or assignment.*

*e.*  ~~It is DoD policy that r~~*R*equests for religious accommodation ~~shall~~ *will* be resolved in a timely manner and ~~should~~ *will* be approved when accommodation would not adversely affect mission accomplishment, including military readiness, unit cohesion, good order, discipline, *health and safety,* or any other military requirement.  For requests for religious accommodation when accommodation would adversely affect mission accomplishment:

*(1)  In accordance with section 2000bb-1 of Title 42, United States Code (Reference (e)), requests for religious accommodation from a military policy, practice, or duty that substantially burdens a Service member's exercise of religion may be denied only when the military policy, practice, or duty:*

*(a)  Furthers a compelling governmental interest.*

*(b)  Is the least restrictive means of furthering that compelling governmental interest.*

*(2)  Requests for religious accommodation from a military policy, practice, or duty that does **not** substantially burden a Service member's exercise of religion should not be evaluated under the standard established in paragraph 4e(1).  Under these circumstances, the needs of the requesting Service member are balanced against the needs of mission accomplishment.  Only if it is determined that the needs of mission accomplishment outweigh the needs of the Service member may the request be denied.*

*f.  Requests for accommodation of religious practices will be resolved as follows:*

*(1)  Immediate commanders may resolve requests for accommodation of religious practices that do not require a waiver of Military Department or Service policies regarding the*

*wearing of military uniforms, the wearing of religious apparel, or Service grooming, appearance, or body art standards.*

> *(a)  Jewelry bearing religious inscriptions or otherwise indicating affiliation or belief is subject to existing Service uniform regulations under the same standard that applies to jewelry that is not of a religious nature.*

> *(b)  Grooming and appearance practices are not included within the definition of religious apparel; however, such practices are subject to consideration for accommodation when the request is based on religious beliefs.*

> *(2)  Requests that **do** require such a waiver will be forwarded to the Secretary of the Military Department concerned (known in this issuance as the "Secretary concerned") for decision.  The Secretary concerned may delegate authority to resolve these requests no lower than:*

> > *(a)  Army:  Deputy Chief of Staff, G-1.*

> > *(b)  Air Force:  Deputy Chief of Staff for Manpower, Personnel, and Services.*

> > *(c)  Navy:  Chief of Naval Personnel and Deputy Commandant, Manpower and Reserve Affairs.*

*g.  Service members submitting requests for accommodation of religious practices will comply with the policy, practice, or duty from which they are requesting accommodation, including refraining from beginning unauthorized grooming and appearance practices, wearing unauthorized apparel, or applying unauthorized body art, unless and until the request is approved.*

*h.  In resolving requests for accommodation of religious practices, careful consideration of the effect, if any, of approval or disapproval on any compelling governmental interest is essential.  Because the military is a specialized community within the United States, governed by a discipline separate from that of the rest of society, the importance of uniformity and adhering to standards, of putting unit before self, is more significant and needs to be carefully evaluated when considering each request for accommodation of religious practices.  It is particularly important to consider the effect on unit cohesion.*

*i.  All requests for accommodation of religious practices will be assessed on a case-by-case basis.  Each request must be considered based on its unique facts; the nature of the requested religious accommodation; the effect of approval or denial on the Service member's exercise of religion; and the effect of approval or denial on mission accomplishment, including unit cohesion.*

*j.  Service members whose requests for accommodation of religious practices are approved will be informed of the specific elements of that approval.  Specific elements will include that such approval does not apply for their entire military service commitment and that, at the*

*DoDI 1300.17, February 10, 2009*

*discretion of the Secretary concerned, new requests for the same accommodation are necessary upon new assignment, transfer of duty stations, or other significant change in circumstances, including deployment.*

5. <u>RESPONSIBILITIES</u>

   a. ~~Principal Deputy Under Secretary of Defense for Personnel and Readiness~~ *Assistant Secretary of Defense for Readiness and Force Management*.  The ~~Principal Deputy Under Secretary of Defense for Personnel and Readiness~~ *Assistant Secretary of Defense for Readiness and Force Management*, under the authority, direction, and control of the Under Secretary of Defense for Personnel and Readiness, shall be responsible for the administration of this Instruction and may issue guidance implementing this Instruction, as appropriate.

   b. <u>Secretaries of the Military Departments</u>.  The Secretaries of the Military Departments shall issue appropriate implementing documents and administer the rules thereunder within their respective Departments consistently with this Instruction.  *This includes:*

      *(1)  Designation of appropriate approval and disapproval authority.*

      *(2)  Final review will take place within 30 days for cases arising within the United States and within 60 days for all other cases, with strict limitations on exceptions for exigent circumstances.*

6. <u>PROCEDURES</u>.  The enclosure contains procedures for accommodating religious practices in the Military Services.

7. <u>RELEASABILITY</u>.  *Unlimited*.  This Instruction is approved for public release and is available on the Internet from the DoD Issuances Web Site at http://www.dtic.mil/whs/directives.

8. <u>EFFECTIVE DATE</u>.  This Instruction ~~is effective immediately.~~*:*

   *a.  Is effective February 10, 2009.*

   *b.  Must be reissued, cancelled, or certified current within 5 years of its publication to be considered current in accordance with DoDI 5025.01 (Reference (f)).*

*DoDI 1300.17, February 10, 2009*

 *c.  Will expire effective January 22, 2024 and be removed from the DoD Issuances Website if it hasn't been reissued or cancelled in accordance with Reference (f).*

Michael L. Dominguez
Acting Under Secretary of Defense
(Personnel and Readiness)

Enclosure
 Procedures

DoDI 1300.17, February 10, 2009

ENCLOSURE

PROCEDURES

1.  In accordance with rules prescribed by the Secretary of the Military Department of the individual making the request for accommodation *of a religious practice*, military commanders should consider the following factors, in addition to any other factors deemed appropriate, when determining whether to grant a request ~~for the accommodation of religious practices~~, as addressed in section 4 of the front matter of this Instruction:

   a.  The importance of military requirements in terms of mission accomplishment, *including* military readiness, unit cohesion, *good order*, ~~standards, and~~ discipline, *health, and safety*.

   b.  The religious importance of the accommodation to the requester.

   c.  The cumulative impact of repeated accommodations of a similar nature.

   d.  Alternative means available to meet the requested accommodation.

   e.  Previous treatment of the same or similar requests, including treatment of similar requests made for other than religious reasons.

   *f.  If a waiver of current Service policy is required to approve a request, the decision authority rests with the Secretary concerned, delegable only to levels defined in paragraph 4b above the signature of this instruction.*

2.  The factors described in this enclosure are intended to promote standard procedures for resolving difficult questions involving the accommodation of religious practices.  In view of the different mission requirements of each command, individual consideration of specific requests for accommodation is necessary.

3.  When *a* request for accommodation ~~are~~ *is* not ~~in the best interest of the unit~~ *approved*, and continued tension between the unit's requirements and the individual's religious ~~beliefs~~ *practices* is apparent, administrative actions should be considered.  ~~Those~~ *Based on the needs of the Military Service, administrative* action *that* may *be considered* include ~~but not limited to,~~ assignment, reassignment, reclassification, or separation. ~~Nothing in this Instruction precludes action under chapter 47 of title 10, United States code (Reference (c)), in the appropriate circumstances.~~

4.  The guidance in this Instruction shall be used by the Military Departments in the development of implementing documents on the exercise of command discretion concerning the accommodation of religious practices.

*DoDI 1300.17, February 10, 2009*

    a.  Worship practices, holy days, and Sabbath or similar religious observance requests ~~shall~~ *will* be accommodated *to the extent possible consistent with mission accomplishment*. ~~except when precluded by military necessity.~~

    b.  Religious beliefs shall be included as a factor for consideration when granting separate rations.

    c.  Religious beliefs shall be considered as a factor for the waiver of required medical practices, subject to military requirements *including* ~~and~~ medical risks to the unit.

    d.  Familiarization with religious accommodation policies shall be included in the training curricula for command, judge advocate, chaplain, and other appropriate career fields or assignments.

    e.  Applicants for commissioning, enlistment, and reenlistment shall be advised of their Military Department's specific religious accommodation policies.

5.  In accordance with section 774 of Reference (~~e~~*g*), members of the Military Services may wear items of religious apparel while in uniform, except where the items would interfere with the performance of military duties or the item is not neat and conservative.  The Military Departments shall prescribe regulations on the wear of such items.  Factors used to determine if an item of religious apparel interferes with military duties include, but are not limited to, whether or not the item:

    a.  Impairs the safe and effective operation of weapons, military equipment, or machinery.

    b.  Poses a health or safety hazard to the Service member wearing the religious apparel and/or others.

    c.  Interferes with the wear or proper function of special or protective clothing or equipment (e.g., helmets, flak jackets, flight suits, camouflaged uniforms, ~~gas~~ *protective* masks, wet suits, and crash and rescue equipment).

    d.  Otherwise impairs the accomplishment of the military mission.

6.  Religious items or articles not visible or otherwise apparent may be worn with the uniform provided they shall not interfere with the performance of the member's military duties, as discussed in paragraph 5 of this enclosure, or interfere with the proper wearing of any authorized article of the uniform.

7.  A complete ban on wearing any visible items of religious apparel may be appropriate under circumstances in which the Service member's duties, the military mission, or the maintenance of discipline require absolute uniformity.  For example, members may be prohibited from wearing visible religious apparel while wearing historical or ceremonial uniforms; participating in review formations, parades, honor or color guards, and similar ceremonial details and functions.

*DoDI 1300.17, February 10, 2009*

8.  The standards in paragraphs 5, 6, and 7 of this enclosure are intended to serve as a basis for determining *whether* a member's ~~entitlement~~ *request* to wear religious apparel with the uniform *should be approved*.  For example, unless prohibited by paragraph 5, 6, or 7 of this enclosure, a Jewish yarmulke may be worn with the uniform whenever a military cap, hat, or other headgear is not prescribed.  A yarmulke may also be worn underneath military headgear as long as it does not interfere with the proper wearing, functioning, or appearance of the prescribed headgear, under paragraph 6 of this enclosure.

9.  Notwithstanding any other provision in this Instruction, chaplains may wear any required religious apparel or accouterments with the uniform while conducting worship services and during the performance of rites and rituals associated with their religious faith.

10. ~~The authority to approve the wearing of an item of religious apparel with the uniform, under the guidelines of this Instruction, shall be exercised at the command level specified by each Military Department.  Denials of requests to wear religious apparel shall be subject to review at the Service Headquarters level.  Final review shall occur within 30 days following the date of initial denial for cases arising in the United States, and within 60 days for all other cases. Exceptions to these deadlines shall be limited to exigent circumstances.  Service members shall be obliged to comply with orders prohibiting wearing questionable items of religious apparel pending review of such orders under regulations issued by the Secretaries of the Military Departments.~~ *In evaluating religious accommodation requests for the wear of body art, whether or not the body art is neat and conservative, and the location of the body art, as it relates to being visible while wearing the military uniform, should be considered.  When evaluating religious accommodation requests regarding grooming (e.g., hair length and styles) and body art, factors to consider include whether approving the accommodation would:*

   *a.  Impair the safe and effective operation of weapons, military equipment, or machinery.*

   *b.  Pose a health or safety hazard.*

   *c.  Interfere with the wear or proper function of special or protective clothing or equipment.*

   *d.  Otherwise impair discipline, morale, unit cohesion, or accomplishment of the unit mission.*

11.  Nothing in this guidance or in the Military Department documents authorized by section 4 of this enclosure (except when expressly provided therein) shall be interpreted as requiring a specific form of accommodation in individual circumstances.

Singh v. McHugh et al.

(Army Regulation 670-1)

**Army Regulation 670–1**

Uniform and Insignia

# Wear and Appearance of Army Uniforms and Insignia

**Headquarters**
**Department of the Army**
**Washington, DC**
**15 September 2014**

## UNCLASSIFIED

A012

Headquarters
Department of the Army
Washington, DC
15 September 2014

*Army Regulation 670–1

Effective 15 September 2014

Uniform and Insignia

# Wear and Appearance of Army Uniforms and Insignia

By Order of the Secretary of the Army:

RAYMOND T. ODIERNO
*General, United States Army*
*Chief of Staff*

Official:

GERALD B. O'KEEFE
*Administrative Assistant to the*
*Secretary of the Army*

**History.** This publication is an administrative revision. The portions affected by this administrative revision are listed in the summary of change.

**Summary.** This regulation prescribes Department of the Army policy for proper wear and appearance of Army uniforms and insignia, as worn by officers and enlisted personnel of the Active Army and the U.S. Army Reserve, as well as by former Soldiers.

**Applicability.** This regulation applies to the Active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve, unless otherwise stated. In addition, it applies to the Reserve Officers' Training Corps and the Corps of Cadets, United States Military Academy, only when their respective uniform regulations do not include sufficient guidance or instruction. It does not apply to the Chief of Staff of the Army, or former Chiefs of Staff of the Army, each of whom may prescribe his or her own uniform. Portions of this regulation are punitive. Violation of the specific prohibitions and requirements of specific portions by Soldiers may result in adverse administrative and/or charges under the Uniform Code of Military Justice.

**Proponent and exception authority.** The proponent of this regulation is the Deputy Chief of Staff, G–1. The proponent has the authority to approve exceptions or waivers to this regulation that are consistent with controlling law and regulations. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or its direct reporting unit or field operating agency in the grade of colonel or the civilian equivalent. Activities may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include formal review by the activity's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25-30 for specific guidance.

**Army internal control process.** This regulation contains internal control provisions in accordance with AR 11-2 and identifies key internal controls that must be evaluated (see appendix B).

**Supplementation.** Supplementation of this regulation and establishment of command and local forms are prohibited without prior approval from the Deputy Chief of Staff, G–1 (DAPE–ZA) (Uniform Policy), 300 Army Pentagon, Washington, DC 22310-0300.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to Deputy Chief of Staff, G–1 (DAPE–ZA) (Uniform Policy), 300 Army Pentagon, Washington, DC 22310-0300.

**Distribution.** This publication is available in electronic media only and is intended for command levels A, B, C, D, and E for the Active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve.

## Contents (Listed by paragraph and page number)

**Chapter 1**
**Introduction,** *page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Responsibilities • 1–4, *page 1*
Statutory Authority • 1–5, *page 1*
Recommending changes to Army uniforms • 1–6, *page 1*

*This regulation supersedes AR 670–1, dated 31 March 2014.

AR 670–1 • 15 September 2014

i

**UNCLASSIFIED**

where forms are available. Commercially purchased items that are authorized for wear in lieu of military-issued items must conform to the basic specification of the military-issued item, unless otherwise specified in this regulation.

(1) All Army uniforms, uniform items, and heraldic items procured by the Defense Logistics Agency Troop Support and sold in the MCS are produced in accordance with appropriate military specifications and are authorized for wear. However, in those MCS with multi-Service support agreements, some items are sold that are authorized for wear by members of other Services, but not by Army personnel. Soldiers are responsible for verifying with their chain of command which items are authorized for wear by Army personnel. Uniform items with defects in workmanship or material should be returned to the MCS for replacement or repair.

(2) Optional uniforms and other uniform clothing items sold in the MCS, in exchanges, or by commercial sources will contain a label, stamp, or certificate issued by the textile technology team at the Natick Soldier Center. Components of some optional uniforms (such as men's commercial white shirts, studs, and cuff links) are not included in the UQCP.

(3) All heraldic items purchased from an exchange, MCS, or commercial source will contain a hallmark or label certifying that the item was produced in accordance with the appropriate military specification by a manufacturer certified by TIOH, Department of the Army.

(4) All individuals purchasing uniform or insignia items from commercial sources must ensure that the items conform to the requirements in paragraph 2–7*a*(1) through (3).

*b.* All enlisted personnel will—

(1) Maintain their clothing bag items and any supplemental clothing items they are issued, as prescribed in AR 700–84 or CTA 50–900.

(2) Ensure that their uniforms and insignia conform to this regulation and DA Pam 670–1.

*c.* All officers will—

(1) Procure and maintain the uniforms and accessories appropriate to their assigned duties. See DA Pam 670–1.

(2) Ensure that their uniforms and insignia conform to this regulation and in DA Pam 670–1.


# Chapter 3
# Appearance and Grooming Policies

## 3–1. Personal appearance policies

*a.* Soldiers will present a professional image at all times and will continue to set the example in military presence, both on and off duty. Pride in appearance includes Soldiers' physical fitness and adherence to acceptable weight standards in accordance with AR 600–9.

*b.* A vital ingredient of the Army's strength and military effectiveness is the pride and self discipline that American Soldiers bring to their Service through a conservative military image. It is the responsibility of commanders to ensure that military personnel under their command present a neat and soldierly appearance. Therefore, in the absence of specific procedures or guidelines, commanders must determine a Soldier's compliance with standards in this regulation.

*c.* The Army uniform regulations for standards of personal appearance and grooming are as specific as is practicable in order to establish the parameters with which Soldiers must comply.

*d.* Portions of this chapter are punitive. Violation of the specific prohibitions and requirements set forth in this chapter may result in adverse administrative action and/or charges under the provision of the UCMJ.

## 3–2. Hair and fingernail standards and grooming policies

Note: This paragraph is punitive with regard to Soldiers. Violation by Soldiers may result in adverse administrative action and/or charges under the provisions of the UCMJ.

*a. Hair.*

(1) *General.* The requirement for hair grooming standards is necessary to maintain uniformity within a military population. Many hairstyles are acceptable, as long as they are neat and conservative. It is the responsibility of leaders at all levels to exercise good judgment when enforcing Army policy. All Soldiers will comply with hair, fingernail, and grooming policies while in any military uniform, or in civilian clothes on duty.

*(a)* Leaders will judge the appropriateness of a particular hairstyle by the guidance in this chapter and by the ability to wear all types of headgear (such as beret, patrol cap, or service cap/hat) and any protective equipment (such as protective mask or combat helmet) properly. Hairstyles (including bulk and length of hair) that do not allow Soldiers to wear any headgear properly, or that interfere with the proper wear of any protective equipment, are prohibited. Headgear will fit snugly and comfortably, without bulging or distortion from the intended shape of the headgear and without excessive gaps. Hairstyles that pose a health or safety hazard are not authorized.

*(b)* Extreme, eccentric, or faddish haircuts or hairstyles are not authorized. If Soldiers use dyes, tints, or bleaches, they must choose a natural hair color. Colors that detract from a professional military appearance are prohibited. Therefore, Soldiers must avoid using colors that result in an extreme appearance. Applied hair colors that are

prohibited include, but are not limited to, purple, blue, pink, green, orange, bright (fire-engine) red, and fluorescent or neon colors. It is the responsibility of leaders to use good judgment in determining if applied colors are acceptable, based upon the overall effect on a Soldier's appearance.

*(c)* Soldiers who have a texture of hair that does not part naturally may cut a part into the hair or style the hair with one part. The part will be one straight line, not slanted or curved, and will fall in the area where the Soldier would normally part the hair. Soldiers will not shape or cut designs into their hair or scalp.

(2) *Male haircuts.* The hair on top of the head must be neatly groomed. The length and bulk of the hair may not be excessive and must present a neat and conservative appearance. The hair must present a tapered appearance. A tapered appearance is one where the outline of the Soldier's hair conforms to the shape of the head (see scalp line in figure 3–1), curving inward to the natural termination point at the base of the neck. When the hair is combed, it will not fall over the ears or eyebrows, or touch the collar, except for the closely cut hair at the back of the neck. The block-cut fullness in the back is permitted to a moderate degree, as long as the tapered look is maintained. Males are not authorized to wear braids, cornrows, twists, dreadlocks, or locks while in uniform or in civilian clothes on duty. Haircuts with a single, untapered patch of hair on the top of the head (not consistent with natural hair loss) are considered eccentric and are not authorized. Examples include, but are not limited to, when the head is shaved around a strip of hair down the center of the head (mohawk), around a u-shaped hair area (horseshoe), or around a patch of hair on the front top of the head (tear drop). Hair that is completely shaved or trimmed closely to the scalp is authorized. (See figs 3–1 and 3–2.)

*(a) Sideburns.* Sideburns are hair grown in front of the ear and below the point where the top portion of the ear attaches to the head. Sideburns will not extend below the bottom of the opening of the ear (see line A of fig 3–1). Sideburns will not be styled to taper, flair, or come to a point. The length of the individual hairs of the sideburn will not exceed 1/8 inch when fully extended.

*(b) Facial hair.* Males will keep their face clean-shaven when in uniform, or in civilian clothes on duty. Mustaches are permitted. If worn, males will keep mustaches neatly trimmed, tapered, and tidy. Mustaches will not present a chopped off or bushy appearance, and no portion of the mustache will cover the upper lip line, extend sideways beyond a vertical line drawn upward from the corners of the mouth (see lines C and D of fig 3–1), or extend above a parallel line at the lowest portion of the nose (see line B of fig 3–1). Handlebar mustaches, goatees, and beards are not authorized. If appropriate medical authority allows beard growth, the maximum length authorized for medical treatment must be specific. For example, "The length of the beard cannot exceed 1/4 inch" (see Training Bulletin Medical (TB Med) 287). Soldiers will keep the growth trimmed to the level specified by the appropriate medical authority, but are not authorized to shape the hair growth (examples include, but are not limited to goatees, "Fu Manchu," or handlebar mustaches).

*(c) Wigs and hairpieces.* Males are prohibited from wearing wigs or hairpieces while in uniform, or in civilian clothes on duty, except to cover natural baldness or physical disfiguration caused by accident or medical procedure. When worn, wigs or hairpieces will conform to the standard haircut criteria, as stated within this regulation.

(3) *Female haircuts and hairstyles.* The illustrations provided in figure 3–3 are intended only to clarify language regarding authorized hair lengths and bulks. The requirements for hair regulations are to maintain uniformity within a military population for female Soldiers while in uniform, or in civilian clothes on duty, unless otherwise specified. Female hairstyles may not be eccentric or faddish and will present a conservative, professional appearance. For the purpose of these regulations, female hairstyles are organized into three basic categories: short length, medium length, and long length hair.

*(a) Short length.* Short hair is defined as hair length that extends no more than 1 inch from the scalp (excluding bangs). Hair may be no shorter than 1/4 inch from the scalp (unless due to medical condition or injury), but may be evenly tapered to the scalp within 2 inches of the hair line edges. Bangs, if worn, will not fall below the eyebrows, may not interfere with the wear of all headgear, must lie neatly against the head, and not be visible underneath the front of the headgear. The width of the bangs may extend to the hairline at the temple.

*(b) Medium length.* Medium hair is defined as hair length that does not extend beyond the lower edge of the collar (in all uniforms), and extends more than 1 inch from the scalp. Medium hair may fall naturally in uniform, and is not required to be secured. When worn loose, graduated hair styles are acceptable, but the length, as measured from the end of the total hair length to the base of the collar, may not exceed 1 inch difference in length, from the front to the back. Layered hairstyles are also authorized, so long as each hair's length, as measured from the scalp to the hair's end, is generally the same length giving a tapered appearance. The regulations for the wear of bangs detailed in paragraph 3–2*a*(a), apply. No portion of the bulk of the hair, as measured from the scalp, will exceed 2 inches.

*(c) Long length.* Long hair is defined as hair length that extends beyond the lower edge of the collar. Long hair will be neatly and inconspicuously fastened or pinned above the lower edge of the collar (except when worn in accordance with para 3–2*a*(j)), except that bangs may be worn. The regulations for the wear of bangs detailed in paragraph 3–2*a*(3)(a) apply. No portion of the bulk of the hair, as measured from the scalp as styled, will exceed 2 inches (except a bun, which is worn on the back of the head and may extend a maximum of 3 1/2 inches from the scalp and be no wider than the width of the head).

*(d) Additional hairstyle guidelines.* Faddish and exaggerated styles, to include shaved portions of the scalp other

than the neckline, designs cut in the hair, unsecured ponytails (except during physical training), and unbalanced or lopsided hairstyles are prohibited. Hair will be styled so as not to interfere with the proper wear of all uniform headgear. All headgear will fit snugly and comfortably around the largest part of the head without bulging or distortion from the intended shape of the headgear and without excessive gaps. When headgear is worn, hair should not protrude at distinct angles from under the edges. Hairstyles that do not allow the headgear to be worn in this manner are prohibited. Examples of hairstyles considered to be faddish or exaggerated and thus not authorized for wear while in uniform or in civilian clothes on duty include, but are not limited to hair sculpting (eccentric texture or directional flow of any hairstyle to include spiking); buns with loose hair extending at the end; hair styles with severe angles or designs; and loose unsecured hair (not to include bangs) when medium and long hair are worn up.

(e) *Devices.* Hair holding devices are authorized only for the purpose of securing the hair. Soldiers will not place hair holding devices in the hair for decorative purposes. All hair holding devices must be plain and of a color as close to the Soldier's hair as is possible or clear. Authorized devices include, but are not limited to, small plain scrunchies (elastic hair bands covered with material), barrettes, combs, pins, clips, rubber bands, and hair/head bands. Such devices should conform to the natural shape of the head. Devices that are conspicuous, excessive, or decorative are prohibited. Some examples of prohibited devices include, but are not limited to: large, lacy scrunchies; beads, bows, or claw or alligator clips; clips, pins, or barrettes with butterflies, flowers, sparkles, gems, or scalloped edges; and bows made from hairpieces. Foreign material (for example, beads and decorative items) will not be used in the hair. Soldiers may not wear hairnets unless they are required for health or safety reasons, or in the performance of duties (such as those in a dining facility). No other type of hair covering is authorized in lieu of the hairnet. The commander will provide the hairnet at no cost to the Soldier.

(f) *Braids, cornrows, and twists.* Medium and long hair may be styled with braids, cornrows, or twists (see glossary for definitions). Each braid, cornrow, or twist will be of uniform dimension, have a diameter no greater than 1/2 inch, and present a neat, professional, and well-groomed appearance. Each must have the same approximate size of spacing between the braids, cornrows, or twists. Each hairstyle may be worn against the scalp or loose (free-hanging). When worn loose, such hairstyles must be worn per medium hair length guidelines or secured to the head in the same manner as described for medium or long length hair styles. Ends must be secured inconspicuously. When multiple loose braids or twists are worn, they must encompass the whole head. When braids, twists, or cornrows are not worn loosely and instead worn close to the scalp, they may stop at one consistent location of the head and must follow the natural direction of the hair when worn back, which is either in general straight lines following the shape of the head or flowing with the natural direction of the hair when worn back with one primary part in the hair (see para 3–2a(1)(c)). Hairstyles may not be styled with designs, sharply curved lines, or zigzag lines. Only one distinctive style (braided, rolled, or twisted) may be worn at one time. Braids, cornrows, or twists that distinctly protrude (up or out) from the head are not authorized.

(g) *Dreadlocks or locks.* Any style of dreadlock or lock (against the scalp or free-hanging) is not authorized (see glossary for definition).

(h) *Hair extensions.* Hair extensions are authorized. Extensions must have the same general appearance as the individual's natural hair and otherwise conform to this regulation.

(i) *Wigs.* Wigs, if worn in uniform or in civilian clothes on duty, must look natural and conform to this regulation. Wigs are not authorized to cover up unauthorized hairstyles.

(j) *Physical training.* Long length hair, as defined in paragraph 3–2a(3)(c), may be worn in a pony tail during physical training. A single pony tail centered on the back of the head is authorized in physical fitness uniforms only when within the scope of physical training, except when considered a safety hazard. The pony tail is not required to be worn above the collar. When hair securing devices are worn, they will comply with the guidelines set in paragraph 3–2a(3)(e). Hairstyles otherwise authorized in this chapter (such as braids and twists) may also be worn in a pony tail during physical training.

(k) *Physical training in utility uniforms.* Pony tails are authorized using guidelines set forth in paragraph 3–2a(3)(j), while conducting physical training in utility uniforms. However, if the helmet is worn during physical training, hair must be secured using guidelines in paragraph 3–2a(3)(a) through (k).

*b. Cosmetics.*

(1) Standards regarding cosmetics are necessary to maintain uniformity and to avoid an extreme or unprofessional appearance. Males are prohibited from wearing cosmetics, except when medically prescribed. Females are authorized to wear cosmetics with all uniforms, provided they are applied modestly and conservatively, and that they complement both the Soldier's complexion and the uniform. Leaders at all levels must exercise good judgment when interpreting and enforcing this policy.

(2) Eccentric, exaggerated, or faddish cosmetic styles and colors, to include makeup designed to cover tattoos, are inappropriate with the uniform and are prohibited. Permanent makeup, such as eyebrow or eyeliner, is authorized as long as the makeup conforms to the standards outlined above. Eyelash extensions are not authorized unless medically prescribed.

(3) Females will not wear shades of lipstick that distinctly contrast with the natural color of their lips, that detract from the uniform, or that are faddish, eccentric, or exaggerated.

(4) Females will comply with the cosmetics policy while in any military uniform or while in civilian clothes on duty.

*c. Fingernails.* All personnel will keep fingernails clean and neatly trimmed. Males will keep nails trimmed so as not to extend beyond the fingertip unless medically required and are not authorized to wear nail polish. Females will not exceed a nail length of ¼ inch as measured from the tip of the finger. Females will trim nails shorter if the commander determines that the longer length detracts from a professional appearance, presents a safety concern, or interferes with the performance of duties. Females may only wear clear polish when in uniform or while in civilian clothes on duty. Females may wear clear acrylic nails, provided they have a natural appearance and conform to Army standards.

*d. Hygiene and body grooming.* Soldiers will maintain good personal hygiene and grooming on a daily basis and wear the uniform so as not to detract from their overall military appearance.



**Figure 3–1. Male Grooming Standards**



**NOT an authorized hair style "Tear Drop"**
Head is shaved all the way around the patch of hair

Front of head

Bottom of Opening of Ear

**NOT an authorized hair style**
No even graduation at the hairline on the lower portion of the head and side burns extend below the bottom opening of the ear and are pointed.

**NOT an authorized hair style "Landing Strip or Mohawk"**
Head is shaved all the way around the strip of hair.

Typical "high and tight" extends out to this line.

Front of head

**NOT an authorized hair style "Horse shoe"**
Head is shaved all the way around the "U" shaped hair area.

Figure 3–2. Prohibited Male Haircuts

Singh v. McHugh et al.

(Army Regulation 600-20)

**Army Regulation 600–20**

**Personnel–General**

# Army Command Policy

**Headquarters**
**Department of the Army**
**Washington, DC**
**6 November 2014**

**UNCLASSIFIED**

A020

**Headquarters**
**Department of the Army**
**Washington, DC**
**6 November 2014**

**\*Army Regulation 600–20**

**Effective 6 November 2014**

Personnel–General

# Army Command Policy

By Order of the Secretary of the Army:

RAYMOND T. ODIERNO
*General, United States Army*
*Chief of Staff*

Official:

GERALD B. O'KEEFE
*Administrative Assistant to the*
*Secretary of the Army*

**History.** This publication is an administrative revision. The portions affected by this administrative revision are listed in the summary of change.

**Summary.** This regulation implements DODI 1300.17, DODI 1325.06; DODI 5240.06; DODI 5240.22, DODI 5240.26; and DODD 1350.2. Also, it prescribes the policy and responsibility of command, which includes readiness and resiliency of the force military and personal discipline and conduct, the Army Equal Opportunity Program, Prevention of Sexual Harassment, and the Army Sexual Assault Prevention and Response Program and the Sexual Harassment/Assault Response and Prevention Program (formerly the Prevention of Sexual Harassment and the Army Sexual Assault Prevention and Response Programs).

**Applicability.** This regulation applies to the Active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve, unless otherwise stated. During mobilization, the proponent may modify chapters and policies contained in this regulation provided that the modification is coordinated with

and concurred in by the Administrative Assistant to the Secretary of the Army and that the modification itself is disseminated through the Administrative Assistant to the Secretary of the Army. Chapters 6 and 7 and appendixes E and F apply to Army National Guard Soldiers when on Active Duty Title 10, for 30 days or more, and in all other cases, Army National Guard Soldiers are governed by NGR 600–21 and NGR 600–22. Portions of this regulation that proscribe specific conduct are punitive, and violations of these provisions may subject offenders to nonjudicial or judicial action under the Uniform Code of Military Justice. The equal opportunity terms found in the glossary are applicable only to uniformed personnel. AR 690–600 contains similar terms that are applicable to Department of Defense civilians.

**Proponent and exception authority.** The proponent of this regulation is the Deputy Chief of Staff, G–1. The proponent has the authority to approve exceptions or waivers to this regulation that are consistent with controlling law and regulations. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or its direct reporting unit or field operating agency, in the grade of colonel or the civilian equivalent. Activities may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include formal review by the activity's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25–30 for specific guidance.

**Army internal control process.** This regulation does not contain management control provisions.

**Supplementation.** Supplementation of this regulation and establishment of command and local forms are prohibited without prior approval from the Deputy Chief of Staff, G–1 (DAPE–MP), 300 Army Pentagon, Washington, DC 20310–0300.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to the Deputy Chief of Staff, G–1 (DAPE–MP), 300 Army Pentagon, Washington, DC 20310–0300.

**Committee management.** AR 15–1 requires the proponent to justify establishing/continuing committee(s), coordinate draft publications, and coordinate changes in committee status with the U.S. Army Resources and Programs Agency, Department of the Army Committee Management Office (AARP–ZA), 9301 Chapek Road, Building 1458, Fort Belvoir, VA 22060–5527. Further, if it is determined that an established "group" identified within this regulation, later takes on the characteristics of a committee, as found in the AR 15–1, then the proponent will follow all AR 15–1 requirements for establishing and continuing the group as a committee.

**Distribution.** Distribution of this publication is available in electronic media only and is intended for command levels A, B, C, D, and E for the Active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve.

---

\*This regulation supersedes AR 600–20, dated 18 March 2008.

legal document that can change a court mandated custodial arrangement, nor can it interfere with a natural parent's right to custody of his/her children. The main evidence that Soldiers have made adequate arrangements for the care of their dependent Family members will be the execution of DA Form 5305 with its attendant documents listed below—

(1) DA Form 5841, special power of attorney or other legal documents designating escort, temporary, and primary guardian(s) (unsigned until the Soldier is deployed).

(2) Notarized DA Form 5840 from person(s) named in power of attorney.

(3) Completed DD Form 1172–2 for each Family member.

(4) Completed DD Form 2558 (unsigned until deployment) or proof of other adequate financial arrangements for care of Family members.

(5) Letters of instructions containing additional pertinent information for escorts, temporary or long-term guardians (see DA Form 5840).

(6) Completed DA Form 7667.

(7) Copies of any child custody orders or marital separation agreements currently in effect that impact upon the custody of a Soldier's minor children.

(8) Completed DA Form 7666 under appropriate circumstances, or proof of notice and/or reasonable efforts having been made to obtain consent to the Family care plan from all parties having a legal interest in the custody and care of the minor children.

*o.* Commanders will encourage Soldiers to consult with a legal assistance attorney about having a will prepared. The Family care plan does not require a will, and Soldiers will not be ordered to obtain a will. When a will is prepared, it will not be retained in the unit files. Soldiers will be encouraged but not required to ensure that information regarding the location of a Soldier's will is contained in the Family care plan.

*p.* The AA commanders will continue to use the Family Care Counseling Report (SIDPERS AAA-338) until such time as the Defense Integrated Military Human Resources System comes on line.

*q.* Maximum feasible testing of the validity and durability of Family care plans will be accomplished (for example, during exercises, alerts, Pre-Deployment processing, mobilization, deployment, AT, and other unit activities) to ensure information in a Soldier's DA Form 5305 is accurate, current, and executable. Family care plans found to be invalid during the above testing will be revised/recertified within 30 days of the finding. For ARNG and RC Soldiers, it will be revised/recertified within 60 days unless mobilization mission requirements preclude authorizing that amount of time.

## 5–6. Accommodating religious practices

*a.* The Army places a high value on the rights of its Soldiers to observe tenets of their respective religions or to observe no religion at all. In accordance with Sections 2000bb through 2000bb-4, Title 42, United States Code (42 USC 2000bb - 2000bb-4) and DODI 1300.17, the Army will approve requests for accommodation of religious practices unless accommodation will have an adverse impact on unit readiness, individual readiness, unit cohesion, morale, good order, discipline, safety, and/or health. As used in this regulation, these factors will be referred to individually and collectively as "military necessity." All requests for accommodation of religious practices will be assessed on a case-by-case basis. Each request must be considered based on its unique facts; the nature of the requested religious accommodation; the effect of approval or denial on the Soldier's exercise of religion; and the effect of approval or denial on military necessity. Accommodation of a Soldier's religious practices must be examined against military necessity and cannot be guaranteed at all times.

*b.* The ASA (M&RA) will oversee the implementation and execution of this paragraph to ensure compliance with DOD and Army policy.

*c.* The DCS, G–1 will develop policy on the accommodation of religious practices within the Army.

*d.* The following will ensure that every enlisted (to include reenlistment), warrant, cadet, and commissioned officer applicant is informed of the Army's religious accommodation policy as set forth in this regulation and, furthermore, that applicants acknowledge in writing that they have been so informed:

(1) The CG, U.S. Army Recruiting Command (for initial enlisted and AMEDD officer accessions).

(2) The CG, TRADOC (for all ROTC cadets, WO candidates, and officer candidates).

(3) The Judge Advocate General (for all judge advocate officer accessions).

(4) The Chief of Chaplains (for all chaplain officer accessions).

(5) Superintendent, USMA (for all USMA cadet applicants).

*e.* The Chief of Chaplains will serve as advisor to the DCS, G–1 on matters pertaining to religious accommodation and formulate and disseminate education and training programs regarding religious traditions and practices within the Army.

*f.* The CG, TRADOC will ensure that training on the provisions of this chapter is provided for commanders, chaplains, and judge advocates.

*g.* Unit commanders will approve or disapprove requests for accommodation of religious practices which do not require a waiver of Army policy on uniform wear, appearance, and/or grooming. If a commander determines partial or

complete denial is appropriate, he/she will prepare a memorandum specifying the basis for denial and provide a copy of the memorandum to the Soldier. Commanders who rescind a previously approved religious accommodation will prepare a memorandum specifying the basis for rescission and provide a copy of the memorandum to the Soldier. Denial or rescission must be based upon one or more of the criteria discussed in paragraph 5–6*a*.

*h.* Requests for religious accommodation generally fall into five major areas:

(1) *Worship practices.* Some religious groups have worship requirements that conflict with the Soldier's normal availability for duty; for example worship on days other than Saturday or Sunday, a 25-hour Sabbath, or special holy days or periods. These will be accommodated except when precluded by military necessity. If the time required for religious worship falls within normal duty hours or duty rosters, the Soldier may request exception from those hours and rosters. The Soldier, however, must be prepared to perform alternative duty or duty hours. Commanders may grant ordinary leave as an option to Soldiers who desire to observe lengthy holy periods or days.

(2) *Dietary practices.* Some faith groups have religious tenets that prohibit the eating of specific foods, or prescribe a certain manner in which food must be prepared. A Soldier with a conflict between the diet provided by the Army and that required by religious practice may request an exception to policy to ration separately. Religious belief is grounds for granting such an exception. The Soldier may also request permission to take personal supplemental rations when in a field or combat environment.

(3) *Medical practices.*

*(a)* Some religious practices conflict with normal Army medical procedures. These practices include beliefs in self-care, and prohibitions against immunizations, blood transfusions, or surgery.

*(b)* A Soldier whose religious tenets involve self-care may request accommodation for non-emergency or non-life-threatening illness or injury. Medical treatment may be deferred pending a decision on whether or not to accommodate the Soldier's religious practices; however, the unit and MTF commanders will consider the time constraints for the Soldier to recuperate without military medical care when determining whether or not to grant the request for accommodation.

*(c)* Soldiers who refuse to submit (or whose court-appointed guardian or other legal representative objects) to recommended medical treatment because of religious objections will be referred to an ad hoc committee established by the medical commander. The composition of and procedures followed by this committee are at the discretion of that commander, except that the committee must include a chaplain and be chaired by a medical corps officer. In addition, all committee members must be officers or full-time employees of the Federal Government.

*(d)* The medical board's report will include the following information:

*1.* Proposed treatment required to relieve the incapacity and aid the Soldier's return to duty status, and expectation to perform such treatment.

*2.* The need for the medical care refused by the Soldier.

*3.* Reasonableness of the Soldier's refusal to undergo treatment. (The risks ordinarily associated with the proposed treatment, the Soldier's age, general physical condition, and the reasons for refusing treatment will be considered and articulated in this report.)

*4.* Evidence that the Soldier was given the opportunity to appear before the board in person; submit a written statement; or submit written statements from a member of his or her faith group. If circumstances do not permit the Soldier to appear in person or submit a written statement (or both), or the Soldier declines to appear in person or submit a written statement; then the board will include this information in the report.

*5.* Soldiers believed incompetent will be aided by an appointed representative who may appear on their behalf. The representative need not be legally qualified. Rationale for the determination of incompetency will be included in the report. All Soldiers referred to committee will have the right to a representative.

*6.* The Army's concern is with the possible effects of accommodation on the Soldier's health and ability to carry out assigned tasks, the health of others, and the military medical system. If the examining board finds that the proposed medical care is needed based on any of these concerns, then the Soldier must be informed and given the opportunity to accept the prescribed medical care. If the Soldier still refuses the medical treatment commander will forward the medical board proceedings to TSG, who will approve or disapprove the medical board proceedings and return them to the MTF commander.

*7.* TSG will provide a copy of this determination to Office Deputy Chief of Staff, G–1, (DAPE–MPC), Washington, DC 20310–0300.

*8.* If TSG approves the medical board proceedings, the Soldier is again given the opportunity to accept the treatment. If the Soldier refuses, the MTF refers the matter to the Soldier's special court-martial convening authority for action as that authority deems appropriate.

*9.* In emergency situations the MTF may order, or the attending physician may take, immediate steps in accordance with local MTF policy to save a Soldier's life regardless of religious practices or objections.

*(e)* Immunization requirements for Soldiers are described in AR 40–562. Soldiers whose religious practices conflict with immunization requirements may request an exemption through command channels to TSG.

*1.* Requests for religious exemption must include name, rank, MOS/branch, the name of the recognized religious group, date of the applicant's affiliation, a description of the religious tenet or belief contrary to immunization, and

supporting certification signed by an authorized personal religious counselor. The counselor attests that the applicant is an active member in good standing of the religious group, adheres to tenets consistent with the espoused religious beliefs, and the religious group has a tenet or belief opposing immunizations.

*2.* A military chaplain must counsel the applicant and recommend approval or denial of the exemption request by endorsement. The chaplain should attempt to ascertain the validity of the Servicemember's request. The chaplain's endorsement should address the above issues to the greatest extent possible based on their counseling and knowledge of the individual and the individual's religion.

*3.* A military physician must counsel the applicant. The physician should ensure that the applicant is making an informed decision and should address, at a minimum, the following:

*a.* Specific information about the diseases concerned;

*b.* Specific vaccine information including benefits and risks; and

*c.* Potential risks of infection incurred by unimmunized individuals.

*4.* The applicant's commander must counsel the applicant and recommend approval or denial of the exemption request. The commander must counsel that noncompliance with immunization requirements may adversely impact deployability, assignment, or international travel, and that the exemption may be revoked under imminent risk conditions. The commander, in making his or her recommendation, should consider the potential impact on the factors of military necessity described in paragraph 5–6a.

*5.* Commanders will forward exemption requests through command channels to TSG.

*6.* Religious exemptions may be revoked in the case of an imminent risk of exposure to a disease for which an immunization is available.

(4) *Wear and appearance of the uniform.* Religious jewelry, apparel, or articles (hereafter referred to as religious items) may be worn while in uniform if they are "neat and conservative." Except as noted in the following paragraphs, wear of religious items that do not meet the standards of AR 670–1 is not authorized unless a religious accommodation is granted in accordance with the procedures of paragraph 5–6i.

*(a)* In accordance with 10 USC 774, Soldiers may wear items of religious apparel while in uniform, except where the items would interfere with the performance of military duties or the items are not neat and conservative.

*(b)* For religious accommodation purposes only, neat and conservative items of religious apparel are those that: (1) are discreet, tidy, and not dissonant or showy in style, size, design, brightness, or color; (2) Do not replace or interfere with the proper wear of any authorized article of the uniform; (3) Are not temporarily or permanently affixed or appended to any authorized article of the uniform.

*(c)* Factors used to determine if an item of religious apparel interferes with military duties include, but are not limited to, whether or not the item: (1) Impairs the safe and effective operation of weapons, military equipment, or machinery; (2) Poses a health or safety hazard to the Soldier wearing the religious apparel and/or others; (3) Interferes with the wear or proper function of special or protective clothing or equipment; (4) Otherwise impairs the accomplishment of the military mission.

*(d)* Wear of religious items that are not visible or apparent when in duty uniform is authorized, provided they do not interfere with the performance of the Soldier's military duties or interfere with the proper wearing of any authorized article of the uniform. Examples of such items include (but are not limited to) religious jewelry worn under the duty uniform or copies of religious symbols or writing carried by the individual in wallets or pockets. Wear of religious items that are visible or apparent are governed by the standards of AR 670–1.

*(e)* Religious jewelry (for example, that is visible or apparent) when in duty uniform is authorized if it meets the standards for wear of jewelry in AR 670–1. Jewelry bearing religious symbols or worn for religious reasons will not be singled out; all wear and appearance standards will apply equally to religious and non-religious jewelry.

*(f)* Religious items that do not meet the standards of AR 670–1 may be worn by Soldiers in uniform while they are present at a worship service, rite, or other ritual distinct to a faith or denominational group. Commanders may, for operational or safety reasons, limit the wear of non-subdued items of religious apparel during services conducted in the field based on military necessity.

*(g)* Religious headgear may be worn while in uniform if the headgear meets the following criteria:

*1.* The religious headgear is subdued in color (generally black, brown, green, dark or Navy blue, or a combination of these colors).

*2.* The religious headgear is of a style and size that can be completely covered by standard military headgear.

*3.* The religious headgear bears no writing, symbols, or pictures.

*4.* Wear of the religious headgear does not interfere with the wear or proper functioning of protective clothing or equipment.

*5.* Religious headgear that meets these criteria is authorized irrespective of the faith group from which it originates.

*6.* Religious headgear will not be worn in place of military headgear under circumstances when the wear of military headgear is required (for example, when the Soldier is outside or required to wear headgear indoors for a special purpose).

*(h)* Chaplains may wear religious attire as described in AR 670–1, CTA 50–909, and AR 165–1 in the performance

of religious services and other official duties as required. Commanders may not prohibit chaplains from wearing those religious symbols that are part of the chaplain's duty uniform.

*(i)* Physical training uniforms present a particular problem for Soldiers of both genders and many religious faiths, due to concerns about modesty. Such concerns are not only religious, but at times are based in social or regional perspectives. Differences in physiology and physical comfort levels between individual Soldiers also affect wear of the PT uniform. Commanders have the authority to prescribe uniformity in PT formations. They will, however, consider the factors noted above if doing so.

(5) *Grooming practices.* The Army's grooming standards are contained in AR 670–1. Religious-based exceptions to policy previously given Soldiers under the provisions of this regulation prior to 1 January 1986 continue in effect as long as the affected Soldiers remain otherwise qualified for retention. However, Soldiers previously granted authority to wear unshorn hair, unshorn beard, or permanent religious jewelry prior to 1 January 1986 will not be assigned PCS or TDY out of CONUS due to health and safety considerations.

*i.* Requests for accommodation.

(1) Requests for religious accommodation of wear and appearance of the uniform, personal appearance, and personal grooming practices of AR 670–1 may only be approved or disapproved by the SecArmy or the designee. All other command levels will neither approve nor deny the religious accommodation request but will make recommendations as to whether the request should be approved or denied and forward through command levels to the DCS, G-1. Soldiers requesting an accommodation must continue to comply with AR 670–1 until the religious accommodation request is approved.

(2) Soldiers will submit requests for religious accommodation to their immediate commander. Except as listed in paragraph 5–6*i*(1), the commander may approve the request either informally or formally (in writing) or disapprove it. Commanders will respond to requests for religious accommodation within 10 working days of receipt.

(3) If a commander approves a request informally the issue is closed, except that the commander will assist the Soldier in completing those actions necessary to the accommodation (for example, obtaining permission to ration separately or adjusting the unit duty roster).

(4) If the commander approves a request formally, the commander will provide the Soldier with written notice of the accommodation. The accommodation will then remain in effect unless revoked, in writing, by the commander who originally granted it (due to changed conditions); by a subsequent commander of that unit; by a commander of a gaining unit if the Soldier is transferred; or by a higher commander. If the accommodation is revoked, the written notice of revocation accompanied by a copy of the original accommodation will constitute an appeal and will be forwarded through command channels in accordance with the routing described in paragraph 5–6*i*5.

(5) If the commander disapproves the request, he or she will afford the Soldier the opportunity to appeal the disapproval. This appeal will be done by means of a memorandum from the Soldier through each level of command (to specifically include the ACOM, ASCC, or DRU) to the DCS, G–1 (DAPE–MPC). At a minimum, the memorandum will include: the name, rank, social security number, unit, and MOS of the Soldier; the nature of the accommodation requested; the religious basis for the request; and endorsements by commander(s). Enclosures will accompany the memorandum. Mandatory enclosures are a memorandum from a chaplain and a copy of the legal review. Optional enclosures include statements by peers or officials of the Soldier's faith group, copies of religious writings, statements, doctrinal declarations bearing on the Soldier's request, documents pertaining to the character of the Soldier's service, and (if appropriate) a statement from the Soldier explaining in more detail the nature of the request.

(6) The assigned unit chaplain, or other chaplain determined by the senior chaplain present, will interview the Soldier concerning the request for accommodation. A memorandum stating that this interview has occurred will accompany the request for appeal. This memorandum will address the religious basis and sincerity of the Soldier's request. The chaplain is not required to recommend approval or disapproval, but may do so if desired. Memoranda from other chaplains may accompany the appeal as optional attachments, but do not meet the requirement for interview by the assigned unit chaplain or one determined by the senior chaplain present.

(7) Evidence of legal review will be in accordance with local staff judge advocate (SJA) procedures. A legal advisor will review the appeal packet for legal sufficiency and may make a recommendation for disposition of the appeal. The review will also state whether the appeal memorandum and enclosures are complete within the provisions of this regulation.

(8) If a commander at any level approves the request for accommodation, written approval will be returned to the Soldier through channels. If the commander disapproves it, the packet will be so endorsed and forwarded to the next level of command.

(9) If all levels of command disapprove the request for accommodation, the packet will be forwarded to the DCS, G–1 (DAPE–MPC) for final decision.

(10) The decision of DCS, G–1 will be transmitted through channels to the Soldier requesting accommodation within 30 days after receipt of the request. Appeals to decisions by the DCS, G–1 will not be entertained. Religious accommodations granted by the DCS, G–1 may only be revoked by the DCS, G–1.

(11) Appeals to denials of accommodation will reach the DCS, G–1 within 30 days after the Soldier submits the appeal (60 days OCONUS).

(12) A religious accommodation application that has been considered and disapproved by the DCS, G–1 will not be reconsidered. However, an applicant may submit second and later formal applications to his or her unit commander. These applications will be considered only if—

*(a)* They are not based upon substantially the same grounds, or

*(b)* They are not supported by substantially the same evidence as a previously disapproved application.

*(c)* When a second or later formal application is received, the unit commander will forward the application and any documents submitted with it to the headquarters of the applicant's SPCMCA. At this headquarters the religious accommodation application will receive a legal review to determine whether it is substantially the same as a previous application disapproved by the DCS, G–1. After the legal review and opinion, the command is authorized to return to a applicant, without action, any second or later application under this regulation when review reveals that it is substantially the same as a religious accommodation request previously denied by the DCS, G–1.

(13) Soldiers whose appeals are denied may request separation from the Army under the provisions of AR 635–200. Commissioned or WOs who request separation for reasons of religious accommodation will follow the application for release from AD as prescribed in AR 600–8–24 (for other than RA), or apply for an unqualified resignation as outlined in AR 600–8–24 (for RA). All personnel separated or discharged from the U.S. Army because of conflict between their religious practices and military requirements will be subject to recoupment of Federal funds as outlined in referenced regulations.

*j.* Nothing in this regulation will be construed to limit the authority of commanders to enforce standards by means of all applicable provisions of the UCMJ while requests and appeals are being processed. Soldiers are obligated to adhere to orders and standards set by their immediate commanders.

## 5–7. Prohibition of military labor unions

*a. Incompatibility with military Service.*

(1) Soldiers must be prepared to fight and if necessary, place their own personal safety in jeopardy in order to defend the Constitution of the United States and their fellow citizens. Therefore, discipline and prompt obedience to the lawful orders of seniors are essential and time-honored elements of the American military tradition. From the earliest Articles of War, laws and regulations have prohibited conduct detrimental to the military chain of command and lawful military authority.

(2) Unionization of the Army is incompatible with the military chain of command. It would undermine the role, authority, and position of the commander. It would impair the morale and readiness of the Army. Therefore, Soldiers will not take part in conventional labor-management negotiation or collective bargaining with their military and civilian seniors. Nor will they take part in strikes, slowdown, picketing, or other traditional forms of job actions.

(3) Circumstances that could constitute a threat to the ability of the Army to perform its mission are not comparable to circumstances that could constitute a threat to the ability of Federal civilian agencies to perform their functions.

*b. Responsibilities.* Senior commanders will report activities prohibited by this regulation immediately to DCS, G–1 (DAPE–HR–S), Washington, DC 20310–0300. Reports will be made by priority message and information copies will be sent to intermediate commanders.

*c. Prohibited activities.*

(1) *Enrollment and membership.*

*(a)* A member of the Army, knowing of the activities of a particular military labor organization may not—

*1.* Join or maintain membership in such an organization.

*2.* Attempt to enroll another member of the Armed Forces as a member of such an organization.

*(b)* No person on a military installation, and no member of the Armed Forces, may enroll in a military labor organization or solicit or accept dues or fees for such an organization from any member of the Armed Forces.

(2) *Negotiation or bargaining.*

*(a)* No person on a military installation, and no member of the Armed Forces, may negotiate or bargain, or attempt through any coercive act to negotiate or bargain with any civilian officer, or employee, or any member of the Armed Forces on behalf of members of the Armed Forces concerning the terms or conditions of service of such members.

*(b)* No member of the Armed Forces and no civilian officer, or employee, may negotiate or bargain on behalf of the U.S. Government concerning the terms or conditions of military Service of members of the Armed Forces with any persons who represents or purports to represent members of the Armed Forces.

(3) *Strikes or other concerted labor actions.*

*(a)* No person on a military installation, and no member of the Armed Forces may organize or attempt to organize, or participate in, any strike, picketing, march, demonstration, or other similar form of concerted action involving members of the Armed Forces that is directed against the Government of the United States and that is intended to induce any civilian officer or employee, or any member of the Armed Forces to—

*1.* Negotiate or bargain with any person about the terms or conditions of service of any member of the Armed Forces.

*2.* Recognize any military labor organization as a representative of individual members of the Armed Forces in

Singh v. McHugh et al.

(Army Regulation 145-1)

Army Regulation 145–1

Reserve Officers' Training Corps

# Senior Reserve Officers' Training Corps Program: Organization, Administration, and Training

Rapid Action Revision (RAR) Issue Date: 6 September 2011

Headquarters
Department of the Army
Washington, DC
22 July 1996

## UNCLASSIFIED

A028

# *SUMMARY of CHANGE*

AR 145–1
Senior Reserve Officers' Training Corps Program: Organization, Administration, and Training

This rapid action revision, dated 6 September 2011--

o  Implements the Don't Ask, Don't Tell Repeal Act of 2010 by deleting all references to barring entry or continued enrollment in the Senior Reserve Officers' Training Corps Program for homosexual conduct and glossary entries concerning homosexual acts (deleted para 3-3*b*(2), rescinded paras 3-3*f* and 3-43*a*(17)).

o  Makes administrative changes (app A: corrected publications and forms titles; obsolete publications and forms marked; added Web site addresses; glossary: deleted unused acronyms and corrected titles/abbreviations as prescribed by Army Records Management and Declassification Agency).

A029

**Headquarters**
**Department of the Army**
Washington, DC
**22 July 1996**

*Army Regulation 145–1

Effective 22 August 1996

Reserve Officers' Training Corps

# Senior Reserve Officers' Training Corps Program: Organization, Administration, and Training

By Order of the Secretary of the Army:

RAYMOND T. ODIERNO
*General, United States Army*
*Chief of Staff*

Official:

*Joyce E. Morrow*
JOYCE E. MORROW
*Administrative Assistant to the*
*Secretary of the Army*

**History.** This publication is a rapid action revision (RAR). This RAR is effective 20 September 2011. The portions affected by this RAR are listed in the summary of change.

**Summary.** This change implements policy to provide four methods for Reserve Officers' Training Corps disestablishment (voluntary, contract, Effective Management Program, and Program Efficiency Closures).

**Applicability.** This regulation applies to the active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve, unless otherwise stated. It also applies to the program presented at college-level institutions and at the college-level element of military junior colleges. Unless specifically stated, the provisions of this regulation are binding upon the ROTCCC, field commanders, and cadets, but not upon HQDA.

**Proponent and exception authority.** The proponent of this regulation is Deputy Chief of Staff for Personnel. The proponent has the authority to approve exceptions or waivers to this regulation that are consistent with controlling law and regulations. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or its direct reporting unit or field operating agency, in the grade of colonel or the civilian equivalent. Activities may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include formal review by the activity's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25-30 for specific guidance.

**Army management control process.** This regulation contains internal controls provisions in accordance with AR 11-2, but it does not identify key management controls that must be evaluated.

**Supplementation.** Supplementation of this regulation and establishment of command and local forms are prohibited without prior approval from HQDA (DAPE–MPO), WASH DC 20310-0300.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to HQDA (TAPC-OPD-C), Alexandria, VA 22332-0413.

**Distribution.** This regulation is available in electronic media only and is intended for command levels B, C, D, and E for the active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve.

---

## Contents (Listed by paragraph and page number)

**Chapter 1**
**Introduction,** *page 1*

*Section 1*
*General, page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Responsibilities • 1–4, *page 1*
Mission • 1–5, *page 2*
Objectives • 1–6, *page 2*

---

*This regulation supersedes AR 145–1, 21 January 1987. This edition publishes a rapid action revision of AR 145–1.

A030

**UNCLASSIFIED**

**Contents—Continued**

Textbooks • 1–7, *page 2*
Pilot programs • 1–8, *page 2*

*Section II*
*Recruiting, page 2*
Recruiting responsibilities • 1–9, *page 2*
Publicity and recruiting • 1–10, *page 2*
Orientation and observation visits • 1–11, *page 3*

*Section III*
*Mobilization, page 3*
Reserve Officers' Training Corps detachments during mobilization • 1–12, *page 3*
Reserve Officers' Training Corps programs during mobilization • 1–13, *page 3*
Cadre during mobilization • 1–14, *page 3*
Senior Reserve Officers' Training Corps cadets during mobilization • 1–15, *page 3*
Special Reserve Officers' Training Corps programs • 1–16, *page 3*

*Section IV*
*Army Advisory Panel on Reserve Officers' Training Corps Affairs, page 4*
Purpose of the panel • 1–17, *page 4*
Renewal and recharter of the panel • 1–18, *page 4*
Membership • 1–19, *page 4*
Meeting procedures • 1–20, *page 5*
Administrative support for the Appointment Advisory Panel • 1–21, *page 5*
Reports • 1–22, *page 6*
Antitrust and conflict of interest statutes • 1–23, *page 6*

**Chapter 2**
**Unit Organization and Administration,** *page 6*

*Section I*
*Organization, page 6*
Educational institutions • 2–1, *page 6*
Department of Military Science • 2–2, *page 7*

*Section II*
*Establishing Units, page 7*
Army relationship with host institutions • 2–3, *page 7*
Requirements for establishing units • 2–4, *page 7*
Application procedures • 2–5, *page 8*
Responsibility and accountability for Government property • 2–6, *page 8*
Amendment of DA Form 918 • 2–7, *page 8*

*Section III*
*Unit Disestablishment, page 8*
Disestablishment Categories • 2–8, *page 8*
Voluntary closure • 2–9, *page 9*
Contract closure • 2–10, *page 9*
Program efficiency closure • 2–11, *page 9*
Effective Management Program closure • 2–12, *page 9*

*Section IV*
*Military Personnel on Reserve Officers' Training Corps Duty, page 10*
Assignment to Senior Reserve Officers' Training Corps duty • 2–13, *page 10*
Orientation of professor of military science and instructors • 2–14, *page 10*
Conduct of other-than-prescribed instruction and off-duty employment • 2–15, *page 10*

**Contents—Continued**

Enrollment in academic courses • 2–16, *page 10*
Relief from Reserve Officers' Training Corps duty • 2–17, *page 11*
Use of active duty/full-time National Guard duty personnel on campus • 2–18, *page 11*
Acceptance by Reserve Officers' Training Corps staff members of payment or other benefits offered by schools • 2–19, *page 11*

**Chapter 3**
**Student Administration,** *page 12*

*Section I*
*Enrollment, page 12*
Enrollment obligation • 3–1, *page 12*
Responsibilities • 3–2, *page 12*
Ineligibles • 3–3, *page 12*
Enrollment requirements • 3–4, *page 13*
Academic status • 3–5, *page 13*
Age • 3–6, *page 14*
Character • 3–7, *page 14*
Citizenship • 3–8, *page 14*
Dependents • 3–9, *page 14*
Medical qualifications • 3–10, *page 15*
English language aptitude • 3–11, *page 15*
Requirements for the advanced course and the basic camp • 3–12, *page 15*
Cross-enrollment • 3–13, *page 15*
Eligibility of members of the U.S. Armed Forces • 3–14, *page 15*
Enlistment in the United States Military Academy • 3–15, *page 16*
Reenrollment • 3–16, *page 16*
Army Reserve Officers' Training Corps/Selected Reserve Simultaneous Membership Program • 3–17, *page 16*

*Section II*
*Medical Examinations, page 17*
Responsibilities for medical examinations • 3–18, *page 17*
Timeframe for examinations • 3–19, *page 17*
Medical fitness standards • 3–20, *page 18*
Examiners • 3–21, *page 18*
Reports • 3–22, *page 18*
Review of medical examinations • 3–23, *page 18*
Medical waivers • 3–24, *page 19*
Temporary medical disqualification (less pregnancy) • 3–25, *page 19*

*Section III*
*Reserve Officers' Training Corps Participating Students, page 19*
General • 3–26, *page 19*
Auditing students • 3–27, *page 20*
Conditional students • 3–28, *page 20*
Alien students • 3–29, *page 21*
Enrollment of Reserve Officers' Training Corps alien and conditional students • 3–30, *page 21*

*Section IV*
*Reserve Officers' Training Corps Scholarship Programs, page 21*
Introduction • 3–31, *page 21*
Responsibilities for the scholarship program • 3–32, *page 22*
Publicity for the scholarship program • 3–33, *page 22*
Eligibility for scholarships • 3–34, *page 22*
Scholarship certificates • 3–35, *page 23*

A032

**Contents—Continued**

Financial assistance authorization • 3–36, *page 23*
Mandatory requirements • 3–37, *page 23*
Leave of absence for scholarship cadets • 3–38, *page 23*
Termination of scholarship and disenrollment • 3–39, *page 24*

*Section V*
*Contract and Agreement, page 25*
Nonscholarship cadet • 3–40, *page 25*
Scholarship cadet • 3–41, *page 25*
DD Form 4-series • 3–42, *page 25*

*Section VI*
*Disenrollment, Discharge, Separation, Transfer, and Leave of Absence, page 25*
Disenrollment • 3–43, *page 25*
Discharge and separation from the United States Army Reserve • 3–44, *page 26*
Processing Army National Guard and United States Army Reserve Simultaneous Membership Program participants
  for discharge to accept a commission • 3–45, *page 27*
Transfer to another school • 3–46, *page 27*
Interservice transfers • 3–47, *page 28*
Leave of absence for nonscholarship cadets • 3–48, *page 28*

*Section VII*
*Insurance, Medical, and Related Benefits, page 28*
General • 3–49, *page 28*
Sources of medical care • 3–50, *page 29*

*Section VIII*
*Entitlements, page 29*
Subsistence allowance • 3–51, *page 29*
Pay at camp • 3–52, *page 29*
Travel entitlements • 3–53, *page 29*

*Section IX*
*Air Transportation, page 30*
Authorization • 3–54, *page 30*
Space available travel • 3–55, *page 30*
Release from claim for injury or death • 3–56, *page 30*

**Chapter 4**
**Uniform and Insignia,** *page 31*
Authority • 4–1, *page 31*
Special rates for commutation in lieu of uniform • 4–2, *page 32*
Authorized uniforms • 4–3, *page 32*
Optional items for wear • 4–4, *page 32*
Wearing of the uniform • 4–5, *page 32*
Authorized items for wear • 4–6, *page 32*

**Chapter 5**
**Training,** *page 33*
Mission • 5–1, *page 33*
Training and education • 5–2, *page 33*
Inspection • 5–3, *page 33*
Military Qualification Standard I System • 5–4, *page 33*
Placement credit for previous training • 5–5, *page 34*
Basic camp • 5–6, *page 34*
Advanced camp • 5–7, *page 34*

**Contents—Continued**

Attendance • 5–8, *page 35*
Cadet professional development training • 5–9, *page 35*
Medical examination • 5–10, *page 35*
Medical care • 5–11, *page 35*
Subsistence • 5–12, *page 35*
Transportation • 5–13, *page 36*

**Chapter 6**
**Commissioning of Reserve Officers' Training Corps Graduates,** *page 36*

*Section I*
*General Commissioning, page 36*
Scope • 6–1, *page 36*
Appointing authority • 6–2, *page 36*
Revocation authority • 6–3, *page 36*
Term of appointment • 6–4, *page 36*
Grade and date of rank • 6–5, *page 36*
Initial branch assignment and appointment action • 6–6, *page 37*
Withdrawal of application • 6–7, *page 37*
Eligibility • 6–8, *page 37*
Designation as a distinguished military student • 6–9, *page 37*
Designation as a distinguished military graduate • 6–10, *page 38*
Commissioning of Reserve Officers' Training Corps graduates • 6–11, *page 38*
Appointment in the Reserve of the Army with assignment to the United States Army Reserve • 6–12, *page 39*
Appointment in the regular Army • 6–13, *page 39*
Processing United States Army Reserve and Army National Guard Simultaneous Membership Program for
  commissioning • 6–14, *page 39*

*Section II*
*The Early Commissioning Program, page 39*
Eligibility for appointment • 6–15, *page 39*
Administrative control of Early Commissioning Program • 6–16, *page 40*
The Completion Cadet Program eligibility • 6–17, *page 40*
Administration of the Completion Cadet Program • 6–18, *page 40*

*Section III*
*Branch Assignment of Reserve Officers' Training Corps Cadets, page 40*
Branch selection factors • 6–19, *page 40*
Requirements for Army Nurse Corps and Army Medical Specialist Corps • 6–20, *page 41*
Requirements for aviation training • 6–21, *page 41*
Requirements for field artillery • 6–22, *page 41*
Requirements for military intelligence • 6–23, *page 41*
Request for change in branch assignment • 6–24, *page 42*

*Section IV*
*Delay From Active Duty, page 42*
General • 6–25, *page 42*
Responsibility • 6–26, *page 42*
Leave • 6–27, *page 42*
Dual Baccalaureate and Master's Degree Programs • 6–28, *page 43*
Graduate study • 6–29, *page 43*

*Section V*
*Release of Reserve Officers' Training Corps Graduates to Another Service, page 44*
Basic policy • 6–30, *page 44*
Appointment in the U.S. Coast Guard • 6–31, *page 44*

AR 145–1 • 22 July 1996                                        v

**Contents—Continued**

Appointment in the Regular Marine Corps • 6–32, *page 44*
National Oceanic and Atmospheric Administration • 6–33, *page 44*
Appointment in the U.S. Air Force or U.S. Marine Corps (other than Regular Marine Corps) • 6–34, *page 44*

**Appendixes**

**A.**   References, *page 46*

**B.**   Statement of Joint Reserve Officers' Training Corps Policies, *page 51*

**Table List**

Table 3–1: Medical Requirements for Reserve Officers' Training Corps, *page 30*
Table 5–1: Placement Credit, *page 34*

**Figure List**

Figure 6–1: Sample format of agreement in connection with release to the NOAA., *page 45*

**Glossary**

**Index**

# Chapter 1
# Introduction

## Section I
## General

### 1–1. Purpose
This regulation prescribes policies and general procedures for administering the Army's Senior Reserve Officers' Training Corps (SROTC) Program. Except as an implementation of statue or otherwise prohibited, waivers and exceptions to the provisions of this regulation will be forwarded through command channels to Headquarters, Department of the Army (HQDA) proponent, HQDA (DAPE–MPO). The Commanding General, U.S. Army Reserve Officers' Training Corps Cadet Command (CG, ROTCC) will provide detailed procedures for the day-to-day operation of the Reserve Officers' Training Corps (ROTC) Program.

### 1–2. References
Required and related publications and prescribed and referenced forms are listed in appendix A.

### 1–3. Explanation of abbreviations and terms
Abbreviations and special terms used in this regulation are explained in the glossary.

### 1–4. Responsibilities
Overall responsibilities are listed below. Specific responsibilities are given in the chapters.

*a.* The Chief of Staff, U.S. Army will supervise and control the Army ROTC Program.

*b.* The Deputy Chief of Staff for Personnel (DCSPER) has HQDA responsibility for the plans, policies, and programs of the SROTC Program, and to process waivers and exceptions that are not specifically prohibited by statue or this regulation.

*c.* The Deputy Chief of Staff for Operations and Plans (DCSOPS) has HQDA responsibilities for training (plans, policies, and programs) associated with the SROTC Program.

*d.* HQDA, U.S. Total Army Personnel Command (PERSCOM), will provide administrative guidance and assistance to the ROTC community.

*e.* The Commanding General, U.S. Army Training and Doctrine Command (CG, TRADOC) has managerial and operational responsibilities except as retained by HQDA, for the ROTC Program and will supervise the publication of textbooks for use in ROTC instruction. The CG, TRADOC, will program and budget for Installation and Mission Support to CG, ROTCCC to include summer camp at Fort Knox, KY. The Commanding General, U.S. Army Forces Command (CG, FORSCOM), Commanding General, U.S. Army Pacific Command (CG, USAPACOM) and Commanding General, U.S. Army Information Systems Command (CG, ISC) will program and budget for summer encampments.

*f.* The CG, ROTCCC, will command, manage, and operate the ROTC Program within provisions of this regulation and local directives. In addition, the CG, ROTCCC, will provide the necessary input to the DCSPER and PERSCOM in managing the ROTC Program.

*g.* The ROTC region commanders will ensure that sufficient numbers of qualified cadets are recruited, selected, motivated, trained, retained, evaluated, accessioned and commissioned to meet objectives of the U.S. Army in the disciplines provided by DCSPER. They will also negotiate ROTC issues with academic institutions consistent with the policies established by higher headquarters. Regional jurisdictions will be established by CG, ROTCCC, to facilitate mission accomplishment, span of control, and prudent management of resources. The ROTC regions are—

(1) U.S. Army First ROTC Region, Fort Bragg, NC 28307-5000 (UIC: W3W4AA).

(2) U.S. Army Second ROTC Region, Fort Knox, KY 40121-5610 (UIC: W3W5AA).

(3) U.S. Army Third ROTC Region, Fort Riley, KS 66442-6700 (UIC: W3W6AA).

(4) U.S. Army Fourth ROTC Region, Fort Lewis, WA 98433-7100 (UIC: W3W7AA).

*h.* The region commanders can delegate the authority for the following action to the brigade commanders. The brigade commanders will—

(1) Command the military personnel assigned to ROTC battalions in their brigade area. (Brigade areas are established by the region commanders).

(2) Conduct inspections and provide program quality control for the battalions under their control.

(3) Act as the region commander's representative in negotiation of ROTC issues with academic institutions.

(4) Implement the region commander's policy and guidance to recruit, select, motivate, train, retain, evaluate, access and commission a sufficient number of qualified cadets to meet region missions.

*i.* Professors of Military Science (PMS) are the key to the success of the ROTC Program. They will—

(1) Structure and manage the Military Science (MS) Program to blend the philosophies of the host academic institution with the needs of the Army.

(2) Command the military personnel assigned to the Department of Military Science (ROTC detachment). All personnel assigned to ROTC at the host institution and any extension center will be assigned to this department. They will be directly under the control of the PMS in all matters related to their military status and assigned duties.

(3) Ensure that the ROTC Program is properly administered as prescribed by applicable statues, DOD Directives, Army regulations, programs, objectives, and policies.

## 1–5. Mission

*a.* The overall mission of the Army ROTC Program is to produce commissioned officers in the quality, quantity, and academic disciplines necessary to meet active Army and reserve component requirements. The DCSPER will furnish the CG, ROTCCC an annual production mission. The mission will cover 5 fiscal years.

*b.* Army branch proponents will review academic discipline requirements as needed. These requirements will be the basis for the ROTC academic discipline mission and branch process. The objective is to produce officers in academic disciplines that correlate with the specialty needs of the Army.

## 1–6. Objectives

*a.* The objectives of the ROTC Program are to—

(1) Attract, motivate, and prepare selected students to serve as commissioned officers in the regular Army (RA), Army National Guard (ARNG), and the U.S. Army Reserve (USAR).

(2) Provide ROTC cadets with the basic concepts and principles of military art and science.

(3) Develop the following attributes in the cadets—

*(a)* Leadership.

*(b)* A strong sense of personal integrity, honor, and responsibility.

*(c)* An appreciation for national security.

*b.* Attainment of the ROTC objectives establishes a sound basis for future professional development and effective performance as commissioned officers in the U.S. Army.

## 1–7. Textbooks

Reserve Officers' Training Corps manuals and other publications authorized by the Department of the Army (DA) are the only official publications prescribed for use in ROTC training. The CG, TRADOC, is authorized to make available unofficial publications to supplement ROTC instruction and will prescribe procedures and funding limits to purchase commercial textbooks when appropriate.

## 1–8. Pilot programs

The CG, TRADOC, may authorize test cases or pilot programs in the SROTC. In so doing, the CG, TRADOC, may grant exceptions to any provision of this regulation not required by statute or DODD.

## Section II
## Recruiting

## 1–9. Recruiting responsibilities

*a.* The DCSPER will—

(1) Determine the qualitative and quantitative requirements for officers to be commissioned through the ROTC Program.

(2) Establish the annual production mission using the program budget end strength.

*b.* The CG, ROTCCC will—

(1) Conduct market analysis and devise programs to penetrate the market.

(2) Establish specific qualitative and quantitative production missions for each region.

(3) Assign, monitor, and adjust production missions among ROTC regions.

(4) Develop, budget, and serve as contract representative for all national publicity and advertising.

(5) Administer national programs to support and assist enrollment efforts.

(6) Program and manage appropriated funds allocated in support of the SROTC Program.

## 1–10. Publicity and recruiting

*a.* Funds appropriated for national ROTC publicity will be managed by the CG, ROTCCC. These funds will be used to provide information and recruiting messages over mass media and to produce materials to enhance the PMS recruiting effort.

*b.* The CG, ROTCCC will develop recruiting programs and incentives which permit ROTCCC to attract and enroll the numbers of quality cadets required to meet the officer production mission assigned by ODCSPER.

### 1–11. Orientation and observation visits

*a.* Visits by ROTC applicants and cadets at military installations for observation and orientation as prescribed by the CG, ROTCCC, are encouraged to promote interest and to gain favorable public relations benefits.

*b.* Cadets and designated applicants for membership in the SROTC program may be furnished transportation-in-kind or transportation request, subsistence-in-kind, and quarters-in-kind at the military installation, if available. Necessary medical care, including hospitalization, may also be given while attending or traveling to or from the installation.

### Section III
### Mobilization

### 1–12. Reserve Officers' Training Corps detachments during mobilization

Under full or total mobilization, the Secretary of the Army (SA) may withdraw the ROTC detachments without giving prior notice to the academic institution. The establishment of new SROTC detachments will not be authorized after full mobilization has been declared.

### 1–13. Reserve Officers' Training Corps programs during mobilization

Under a partial mobilization, ROTC commissioning policies remain the same as in peacetime. During a full or total mobilization the following policies will be implemented at the direction of DCSPER:

*a. Military colleges and institutions.* ROTC programs will continue at an accelerated rate as directed.

*b. Military junior colleges.* ROTC training at the 2-year military schools will remain the same.

*c. Nonmilitary colleges and institutions.* ROTC programs will be suspended on full mobilization.

### 1–14. Cadre during mobilization

The active component cadre will be available for reassignment within TRADOC. Personnel excess to TRADOC requirements will be reported to PERSCOM for reassignment. active Guard-Reserve Cadre will be mobilized in accordance with policies established by DOD and HQDA.

### 1–15. Senior Reserve Officers' Training Corps cadets during mobilization

*a. Military colleges and institutions.* All military science (MS IV) cadets who have successfully completed advanced camp will be commissioned and directed to attend the proper officers basic course (OBC). The CG, ROTCCC, will determine the OBC scheduling and the branch and specialty designation of cadets. Bulk allocations by specialty will be furnished by the CG, PERSCOM, per ODCSPER guidance.

*b. Military junior colleges.* Only commissioned graduates are subject to immediate call to active duty without completing a baccalaureate degree.

*c. Nonmilitary colleges and institutions.* On full mobilization, ROTC programs will be suspended. The cadre will be available for reassignment within TRADOC. Personnel excess to TRADOC requirements will be reported to PERSCOM for reassignment.

(1) If M-Day occurs during the summer, ROTC cadets who have completed the ROTC advanced camp will be recalled to their school by the PMS and commissioned immediately after receiving instructions from HQDA. If M-Day occurs during the school year, cadets who have completed ROTC advanced camp will be commissioned as soon as possible.

(2) Reserve Officers' Training Corps cadets under contract (any cadet who has signed an ROTC contract) who have not completed the advanced camp will, immediately after receiving instructions from HQDA, be called to the Officer Candidate School (OCS). Mobilization policies and procedures for the OCS are contained in AR 351–5. Those contract students who have completed basic camp or MS II training will enter directly into the OCS with appropriate follow-on OBC. All other contact students will be called to active duty immediately as enlisted reservists to attend training. If they complete basic training and demonstrate officer potential, they may be offered the OCS option.

### 1–16. Special Reserve Officers' Training Corps programs

*a.* Simultaneous Membership Program (SMP) participants are cadets who are assigned to the ARNG and USAR units according to NGR 600–100, AR 600–200, AR 135–91 or AR 601–210. They do not mobilize with their units under full or partial mobilization. The SMP participants will be mobilized with the ROTC Program as outlined in paragraph 1–15, above.

*b.* Officers already commissioned under the Early Commissioning Program (ECP), who have completed OBC and are assigned to troop units, will be mobilized with their units. The ECP officers who have not joined a unit, will be called to active duty and programmed for OBC by the CG, U.S. Army Reserve Personnel Center (ARPERCEN) in coordination with the CG, PERSCOM and CG, ROTCCC.

*c.* Those officers who are in an educational delay (ED) program may be called to active duty during full or partial mobilization and programmed for OBC by ARPERCEN in coordination with TRADOC. Those officers in the delay program who are pursuing an advanced professional degree that is required for assignment to a special branch, will continue in the delay program until completion of their training or until participation in the program is terminated earlier by the SA or the individual. Provisions for the administration of these programs during mobilization are addressed in AR 601–25.

## Section IV
## Army Advisory Panel on Reserve Officers' Training Corps Affairs

### 1–17. Purpose of the panel
The advisory appointment panel (AAP) on ROTC Affairs provide for a continuous exchange of views between ROTCCC, HQDA, and the academic community.

### 1–18. Renewal and recharter of the panel
The AAP must be renewed and rechartered every 2 years. The CG, ROTCCC, will submit a request with the supporting documentation required under AR 15–1, paragraph 3–2*a*(2) to continue the AAP through HQDA (DAPE–MPO), WASH DC 20310-0300, to HQDA (SAAA–PP), WASH DC 20310-0105, at least 90 days before the current charter expires. The request will include a copy of the update charter.

### 1–19. Membership
*a.* All 18 members of the AAP will be civilians who are not Federal Government employees. Selection will be made by the SA. Each year during the summer meeting, the members will select a new chairperson.

*b.* Membership will be drawn from the following sources:

(1) One each from the national educational associations as shown below:

*(a)* American Council on Education.

*(b)* Association of American Colleges.

*(c)* National Association of State Universities and Land Grant Colleges.

*(d)* Association of American Universities.

*(e)* Association of Military Colleges and Schools of the United States.

*(f)* American Association of State Colleges and Universities.

(2) One each from the four ROTC regions. Representatives will be a qualified faculty member or administrator from an ROTC host institution in the region. ROTCCC will solicit nominations from the ROTC regions for these positions.

(3) Five nationally prominent members-at-large. ROTCCC will solicit nominations from DA and ROTC regions for these positions.

(4) Three members drawn from the faculty-at-large. ROTCCC will solicit nominations from ROTC regions for these positions.

*c.* All members of the AAP will be appointed as consultants serving without compensation. Initial appointment is valid for 1 year. AAP members selected for retention on the panel may be appointed for an additional 2 year term but will be validated by HQDA annually. AAP membership is limited to a 2 year term with a maximum of 6 years from the date of original appointment.

*d.* The CG, ROTCCC, will make the actual appointment after AAP nominees have been approved by HQDA (SAAA–PP). If the members are not full time officers or employees of the Federal Government, TRADOC CPO will appoint the advisory committee as consultants.

*e.* All civilian personnel office actions, except actual appointment, will be completed prior to submission through HQDA (DAPE–MPO), WASH DC 20310-0300, to HQDA (SAAA–PP), WASH DC 20310-0105.

*f.* The following information packet will be sent through HQDA (DAPE–MPO) to HQDA (SAAA–PP):

(1) SF 171 (Application for Federal Employment).

(2) Request for appointment of consultant or expert and renewal of appointment of consultant or expert using format shown for SD Form 108, found in AR 15–1, appendix E.

(3) Waiver of compensation statement that the appointee is aware of and agrees to serve as a member without pay.

(4) DD Form 1555 (Confidential Statement of Affiliations and Financial Interest).

(5) SF 85 (Questionnaire for Nonsensitive Positions).

(6) Letter of recommendation from the national educational association for members nominated to fill one of the six positions in *b*(1) above.

*g.* The annual reappointment of AAP members as consultants will require ROTCCC to submit a renewal of appointment of consultant or expert using the format for SD Form 108–l, found in AR 15–1, appendix E, SF 173 (Job Qualification Statement) (when accompanied by a comprehensive resume), and waiver of compensation statement.

*h.* The term of appointment for an AAP member is specified in the memorandum granting formal appointment approval.

*i.* USAROTCC will inform HQDA DAPE–MPO of all pending vacancies on the AAP 90 calendar days before the date of the expected vacancy. ODCSPER will forward information to SAAA–PP.

## 1–20. Meeting procedures

*a. Calling of meetings.* The AAP will meet as required, but not less than once each year. The CG, ROTCCC, in consultation with ODCSPER, DAPE–MPO and Office of the Assistant Secretary of the Army (Manpower and Reserve Affairs) (OASA (M&RA)), will plan schedules and agendas for meetings. The agenda will list the issues to be considered at each meeting. Copies of the agenda and the report of the previous meeting will be distributed to the committee members before the meeting date. An information copy of correspondence forwarded directly to AAP members will be given to the appropriate ROTC region commander.

*b. Notice of meetings.* Notice of each AAP meeting will be published in the Federal Register at least 15 days before the date of the meeting. Request for publication of notice in the Federal Register will be typed double spaced, in original and three copies. The CG, ROTCCC, will sign all copies of the request. Requests will be sent directly to HQDA (DAIM–AP), ALEX, VA 22332-0302, to arrive no later than 25 calendar days before the meeting date. An information copy will be sent to HQDA, (DAPE–MPO), WASH DC 20310-0300. Each notice will be accompanied by a letter of transmittal containing the following statement: "In order to comply with public law and General Services Administration regulations, this notice must be published in the Federal Register no later than (enter a date that is at least 15 days before the meeting date, excluding both the date of announcement and meeting date)."

*c. Public participation.* Under the Federal Advisory Committee Act, all AAP meetings will be open to the public since the panel does not deal with matters that are specifically exempt from public disclosure per AR 15–1, appendix H. Any meeting that is open to the public will be held and conducted as follows:

(1) Meetings will be held at times and places that are reasonably accessible to the public.

(2) The size of the meeting room will be governed by the size of the AAP, other participants, the number of members of the public who might reasonably be expected to attend, and available resources and facilities.

(3) Members of the public will be permitted to file a written statement with the committee before or after meetings.

(4) Interested persons will be permitted to present oral statements at meetings. The AAP may also establish procedures requiring such persons to obtain advanced approval for participation and the extent to which members of the public may actively participate in AAP meetings.

*d. Report of Appointment Advisory Panel meetings.* The CG, ROTCCC, will ensure that a report is kept for each AAP meeting. The report will include the following information:

(1) The time and place of the meeting.

(2) A list of AAP members and other official participants at the meeting.

(3) A complete and accurate description of issues discussed and conclusions reached.

(4) Copies of all reports received, issued, or approved by the AAP.

(5) The extent to which the meeting was open to the public.

(6) The extent of public participation, including a list of persons presenting oral or written statements, and a synopsis of the statements.

(7) An estimate of the number of public representatives who attended the meeting.

(8) Certification by the chairperson of the AAP as to the accuracy of the report.

*e. Control of Appointment Advisory Panel meetings.* Panel members will attend all AAP meetings. Any member may adjourn any AAP meeting when he or she determines adjournment to be in the public interest. The USAROTCC will provide an officer to work with the AAP as necessary to conduct committee business.

*f. Access to documents.* AAP records, reports, transcripts, minutes, appendixes, work papers, drafts, studies, agenda or other documents will be available through ROTCCC for public inspection and copying. The ROTCCC will make copies of transcripts of AAP meetings available to any person, at actual cost of duplication.

## 1–21. Administrative support for the Appointment Advisory Panel

*a. Support services.* The ROTCCC will provide all administrative, logistical, and other support necessary for the AAP to perform its functions.

*b. Appointment Advisory Panel records.* The ROTCCC will keep records that show AAP expenses for members in the categories below. These records will be open to audit and examination.

(1) Travel and per diem cost.

(2) Meals and associated costs (AAP hosted activities, not individual meals paid through per diem).

(3) Facility rental or leasing costs.

## 1–22. Reports

*a. Management reports provided by the Commanding General, U.S. Army Reserve Officers' Training Corps Cadet Command .*

(1) *Comprehensive review.* HQDA (SAAA–PP) will issue annual instructions for this review. The purpose of the comprehensive review is to determine if the AAP is carrying out its purpose, if its responsibilities should be revised, or if it should be abolished. The results of the review are included in the annual report required by the Federal Advisory Committee Act.

(2) *Annual report.* ROTCCC will prepare an annual report on the AAP as of 31 December each year. This report is included in the annual SAAA–PP report submitted to Congress. Separate instructions will be issued each year for this report.

(3) *Other reports.* Other management reports may be required to support requests from Congress, the Office of Management and Budget, or the Office of the Secretary of Defense.

*b. Appointment Advisory Panel reports provided by the U.S. Army Reserve Officers' Training Corps Cadet Command.* The ROTCCC will compile and formalize the report of each AAP meeting. This report, after review by HQDA and certification by the AAP chairperson, will be provided to individual AAP members, HQDA, ROTC regions, individual PMS, and the Library of Congress.

(1) The Federal Advisory Committee Act requires that subject to the Freedom of Information Act, at least eight copies of the report of the AAP meeting plus any other studies or reports produced must be provided to the Library of Congress.

(2) Ten copies of all such minutes and reports will be submitted to SAAA–PP through HQDA channels after they have been prepared as a final AAP document.

## 1–23. Antitrust and conflict of interest statutes

The activities of the AAP and its membership are subject to antitrust laws. The standards of conduct, stated in AR 600–50, apply to AAP members even though these members are not paid fo their service. Each AAP member will be thoroughly briefed on these standards by an officer of the Judge Advocate General's Corps or other competent individual designated by CG, ROTCCC.

# Chapter 2
# Unit Organization and Administration

## Section I
## Organization

## 2–1. Educational institutions

The SROTC Program is conducted at three types of schools.

*a. Civilian colleges.* These are schools that grant baccalaureate or graduate degrees and are not operated on a military basis.

*b. Military colleges.* These are institutions that meet the following criteria:

(1) Grant baccalaureate degrees.

(2) Require a course in military training during the undergraduate course for all undergraduate students who are physically fit, except those listed below.

(a) Foreign nationals.

(b) Students who are not liable for induction because they have completed active training and service honorably.

(c) Students who are excused by the proper institutional authority and approved by PMS.

(d) Females who elect not to participate in ROTC.

(3) Organize cadets into a corps of cadets under military discipline.

(4) Require all members of the corps (including members enrolled in the ROTC) to be in uniform when on campus.

(5) Have as objectives the development of the student's character through military training and the regulation of conduct according to principles of military discipline.

(6) Meet military standards similar to those maintained at the service academies.

*c. Military junior colleges.* These are military schools that provide high school and junior college education. These schools do not grant baccalaureate degrees but meet all other requirements of military colleges. They administer both the Junior (per AR 145–2) and SROTC programs.

*d. There are three types of Reserve Officers' Training Corps programs.*

(1) A host battalion will have a formal agreement between the SA and the academic institution. Host battalions are assigned a PMS, staffed to instruct and recruit cadets; and provide for their own administrative and logistical support.

(2) An Extension Center will have a formal agreement between the CG, ROTCCC, and the university or college. Extension centers are assigned an assistant PMS or officer in charge and are staffed to instruct and recruit cadets. These centers receive their administrative and logistical support from their host ROTC battalion. Extention centers to include any cross-enrolled schools are mission separately from hosts battalion.

(3) A cross-enrolled school have an agreement (formal or informal) with a host or extension center that allows for the transfer of academic credit. Cadre will not be assigned to cross-enrolled schools. The enrollment and production of cross-enrolled schools will be included with their host or extension center.

## 2–2. Department of Military Science

*a.* All ROTC activities and functions at an institution are grouped under and organized into the Department of Military Science. In institutional matters, the designated administrative official has the same control over the Department of Military Science as with other departments in the school. At the discretion of the school authorities, the Department of Military Science may be grouped with the Department of Aerospace Studies and/or Department of Naval Science, if present, into a single large academic division. The division will be headed by a person designated by the head of the school as stated in the Joint ROTC policies. (See app B.)

*b.* At any institution where military training is required under institutional regulations or statutory provisions, the following matters are regarded as being within jurisdiction of the school and/or State authorities:

(1) The exemption of individual students from enrollment in ROTC or required military training courses because the students have received or are undergoing equivalent military training.

(2) The determination of what constitutes equivalent military training as a basis for excusing students from the required course of military training and from enrollment in the ROTC. The limits established in chapter 5 for placing students with prior ROTC or active duty in the armed services in military science class may be used as a guide in making this determination.

## Section II
## Establishing Units

### 2–3. Army relationship with host institutions

*a.* The Army SROTC program is a cooperative effort, contractually agreed to between the Army and host institution, to provide junior officer leadership training in the interest of national security. The Army cooperates with host schools to produce well-educated young men and women with leadership potential for civilian enterprise and national defense.

*b.* The Army is willing to receive valid criticism, regardless of source, to maintain a working program. The right of orderly campus dissent is recognized. However, anti-ROTC activities that degrade and distort the Army image will not be ignored. When a host institution does not support the ROTC Program, consideration will be given to disestablishment.

### 2–4. Requirements for establishing units

*a.* To be eligible for a SROTC unit the school must—

(1) Be a military junior college or 4-year degree granting college or university.

(2) Be fully accredited by the appropriate regional or nationally recognized professional accrediting association.

(3) Have an enrollment large enough to ensure that officer production requirements can be met.

(4) Agree to—

*(a)* Establish a Department of Military Science as an academic and administrative department and designate the senior Army cadre member as PMS.

*(b)* Adopt, as part of the school's curriculum, the program of instruction for the SROTC Program.

*(c)* Require each cadet enrolled in any ROTC course to devote the number of hours to military instruction that is prescribed by the program of instruction.

*(d)* Provide adequate facilities for conducting a SROTC program. Facilities should be equal to the facilities provided to other departments or other elements of the school.

*(e)* Provide secretarial support, janitorial and grounds upkeep, printing and publication support, communication services, and other required support in the same manner that is provided to other departments.

*(f)* Grant academic credit for successful completion of courses offered by the Department of Military Science.

*(g)* Schedule military classes so that they will be as convenient for the students to attend as other classes at the same educational level.

*(h)* Include a representative of the Department of Military Science, designated by the PMS, on all faculty committees that directly affect the Department of Military Science.

*(i)* Provide adequate storage and issue facilities, at no cost to the Army, for all Government property provided for the ROTC program. Adequate facilities will consist of safe, well-lighted, dry, heated, ventilated areas. The facilities will have: office space, shelving, bins, clothing racks, and cabinets; suitable storage space for arms and ammunition, if required by contract. Arms and ammunition storage should be more secure than property storage; (for additional

information, see AR 190–11), bars or heavy metal mesh screen on all windows; reinforced doors fitted with cylinder locks; physical separation from facilities occupied by any other department of the school or other Government agency.

(5) Comply with the following requirements:

*(a)* There will be no discrimination in admissions based on race, sex (unless the school is a single sex school in its overall admissions policy), color, national origin, or religion.

*(b)* The senior commissioned officer of the ROTC unit at the school will be given the academic rank of professor and chairperson of the Department of Military Science.

*b.* Not used.

## 2–5. Application procedures

If an institution agrees to the provisions in paragraph 2–4, the school authorities may apply for an ROTC unit by submitting DA Form 918 (Application for Establishment of an Army Senior Reserve Officers' Training Corps Unit) and DA Form 918A (Agreement for Establishment and Maintenance of an Army Senior Reserve Officers' Training Corps Unit) to the appropriate region commander. After actions on the application have been completed, the school will be notified. When an application is approved, the agreement will be countersigned by the Secretary of the Army or his or her representative. The original of the DA Form 918A will be retained on file by PERSCOM. Signed copies will be sent to the CG, ROTCCC for distribution to the appropriate region commander, the head of the school, and the PMS. Requests for DA Form 918 and DA Form 918B should be sent to HQDA (TAPC–OPP–P), Alexandria, VA 22332–0418.

## 2–6. Responsibility and accountability for Government property

*a.* Host institution authorities may request the Army to assume responsibility and accountability for Government property issued for the ROTC Program. Request will be made by submitting five copies of DA Form 918A to the region commander. The region commander will send the forms to the CG, ROTCCC, who will send the completed forms through HQDA (DAPE–MPO) to CG, PERSCOM, ATTN: TAPC–OPP–P, 200 Stovall Street, Alexandria, VA 22332-0418.

*b.* School authorities may, subject to approval of HQDA, elect to maintain accountability and responsibility for Government property issued for the ROTC program by complying with the following requirements:

(1) Appoint a representative from the school as the military property custodian. The representative will requisition, receive, stock, and account for Government property issued to the school. The property custodian will also transact property matters on behalf of the school.

(2) Conform to the Army regulations related to issue, care, use, safekeeping, turn-in and accounting for Government property that is issued to the school.

(3) Comply with the provisions of law and Army regulations pertaining to furnishing a bond to cover the value of Government property issued to the school except uniforms, expendable articles, and supplies expended in operation, maintenance, and instruction.

## 2–7. Amendment of DA Form 918

*a.* Minor changes in DA Form 918 and 918A may be requested by the school by submitting five copies of DA Form 918B (Amendment to Application and Agreement for Establishment of Army Reserve Officers' Training Corps Unit) to the region commander. The forms will be sent through ROTCCC, ATTN: ATCC–RR, Ft Monroe, VA 23651-5000 to HQDA (DAPE–MPO), WASH DC 20310–0300 to PERSCOM (TAPC–OPP–P), 200 Stovall Street, Alexandria, VA 22332-0418.

*b.* When completing an amendment on DA Form 918B, the proposed new paragraphs or subprograms, as changed or added, will be typed in their entirety.

*c.* On approval, and once countersigned by the SA or his or her representative, distribution of the signed copies will be made as for original submission.

## Section III
## Unit Disestablishment

## 2–8. Disestablishment Categories

Reserve Officers' Training Corps units (hosts and extension centers) are disestablished through one of the following four procedures:

*a.* Voluntary closure.

*b.* Contract closure.

*c.* Program Efficiency closure.

*d.* Effective Management Program closure.

## 2–9. Voluntary closure

Institution authorities who desire to close the ROTC unit will notify the region commander in writing through the PMS. The request will be sent through CG, USACC, to HQDA (DAPE-MPO). One academic year's notice to the region commander is required prior to final closure. This time requirement can be waived by the region commander if contracted cadets can be cross enrolled with a nearby ROTC unit in order to complete commissioning requirements.

## 2–10. Contract closure

a. Host units may be closed for a violation of contract provisions established by DA Form 918 (Application for Establishment of an Army Senior Reserve Officers' Training Corps Unit) and DA Form 918A (Agreement for Establishment and Maintenance of an Army Senior Reserve Officers' Training Corps Unit). Extension centers may be closed for violation of requirements provided by the extension center agreement DA Form 918A. One academic year's notice to the university president is required prior to final closure. This time requirement can be waived if the academic institution and the Army both agree and if contracted cadets can be cross-enrolled with a nearby ROTC unit in order to complete commissioning requirements.

b. Approval authority for host unit closure or downgrade is the Secretary of the Army or his designee. Approval authority for extension center closure is the Commanding General, USACC, with the concurrence of the Assistant Secretary of the Army (Manpower & Reserve Affairs).

## 2–11. Program efficiency closure

a. Host units may be closed or downgraded or extension centers may be closed when the Army's need for officer accessions is decreased or the Army's resources are insufficient to support the number of ROTC units in existence.

b. The CG, USACC, will establish and publish specific procedures for determining closures in a separate memorandum. Approval authority for host closure or downgrade is the Secretary of the Army or his designee. Approval authority for extension center closure or downgrade is the CG, USACC, with the concurrence of the Assistant Secretary of the Army (Manpower & Reserve Affairs). One academic year's notice to the university president is required prior to final closure.

## 2–12. Effective Management Program closure

a. The purpose of the Effective Management Program is to provide assistance to marginal units. Officer production from each ROTC unit shall be adequate to justify the investment of resources. The Effective Management Program implements DODD 1215.8.

b. ROTC units that do not meet the requirements below may be placed into the Effective Management Program and are subject to closure. Each school must:

(1) Maintain sufficient enrollment in Military Science classes to meet or exceed officer production requirements (normally 15 officers for a host program and 10 officers for an extension center).

(2) Maintain the criteria for establishment outlined in Section II.

(3) Support the program to the degree that the unit will merit a rating of satisfactory on the formal inspection.

(4) Be cost-effective in operating the program.

c. The PMS will give the school president a copy of the verified enrollment report as soon as possible after the publication of the College ROTC Enrollment Report. The school president will be advised of the implications of the enrollment and officer production trends as they relate to unit establishment and closure standards. Enrollment and officer production estimates are calculated as follows:

(1) An ROTC unit's officer production is computed on a fiscal year basis (I October through 30 September) and published in the opening SROTC Enrollment Report (RSC MILPC-22).

(2) Future officer production estimates for an ROTC unit are based on estimated unit enrollment adjusted for the unit's historical retention percentage.

d. Viability is the measure of the value a unit provides to the army. Viability includes:

(1) Quality of the officers produced, including academic degrees, specialties, and grade point averages.

(2) The cost of maintaining the unit.

(3) The kinds (hard to recruit categories) of officers produced, including minority graduates to meet Army commissioning requirements.

(4) The number of officers produced by the unit.

(5) The number and location of units in the metropolitan area or State concerned.

e. When a unit falls below the established standards, the unit will be placed on the EMP.

(1) The CG, USACC, will send a letter to institution officials advising them that the ROTC unit will be placed on the Effective Management Program effective the beginning of the next school year.

(2) The Under Secretary of Defense for Personnel and Readiness (USD(P&R)) and the Assistant Secretary of the Army (Manpower and Reserve Affairs) (ASA(M&RA)) will be advised when an ROTC unit is placed on the EMP.

(3) An ROTC unit will remain on the EMP for a minimum of two years. While under this program, Cadet Command will take positive steps to assist the unit to increase viability.

(4) If improvement in enrollment, retention, and quality has not been made during the EMP period, the CG, USACC, may take the following actions:

(a) Request HQDA close or downgrade a host unit.

(b) With the concurrence of the ASA(M&RA), an extension center will be notified in writing that the ROTC unit will close.

f. Closure or downgrade of host units will be accomplished as prescribed below:

(1) The CG, USACC, will provide the rationale for host unit closure or downgrade through the DCSPER to the SA for approval.

(2) The host unit may be closed fully or downgraded to extension center status, as appropriate based on production potential and viability.

(3) Upon approval, the institution will be informed that its ROTC unit will be closed or downgraded to extension center status at the end of the next academic year. The letter notifying the school of the action will be signed by the ASA(M&RA). The ASA(M&RA) will notify the USD(P&R), and the Chief Legislative Liaison will notify appropriate members of Congress of the decision. Public Affairs offices will prepare appropriate press releases.

(4) Cadet Command will develop a transition plan that includes the following:

(a) Program change milestone.

(b) Disposition of students participating in ROTC. As a minimum, contracted students will be given the opportunity to complete commissioning requirements.

(c) Reassignment of remaining cadre.

(d) Disposition of Government property.

(e) Settlement of any financial obligations.

(5) The CG, USACC, will provide HQDA (DAPE-MPO) a copy of the transition plan and a final disposition report.

g. Closure of extension centers will follow the procedures below:

(1) The CG, USACC, will provide the rationale for unit extension center closure through the DCSPER to the ASA(M&RA) for concurrence.

(2) Upon approval, the institution will be informed that its ROTC unit will be closed at the end of the next academic year. The letter notifying the school of the approved change will be signed by the CG, USACC.

**Section IV**
**Military Personnel on Reserve Officers' Training Corps Duty**

## 2–13. Assignment to Senior Reserve Officers' Training Corps duty

a. The CG, PERSCOM, will nominate commissioned officers for assignment to SROTC. The ROTCCC, in conjunction with PERSCOM will periodically convene a board to select officers for assignment as PMS.

b. The selection criteria for assigning noncommissioned officers to ROTC duty is contained in AR 614–200, chapter 8.

c. Officers will not be assigned to a school without prior approval from the authorities of that school.

d. DA Pam 600–8, paragraph 3–37, contains detailed guidance for processing applications for assignment of enlisted personnel to ROTC duty.

## 2–14. Orientation of professor of military science and instructors

It is essential that the PMS and ROTC instructor personnel be briefed as soon as practical after reporting for duty. An orientation program for newly assigned ROTC personnel will be conducted according to directives issued by the CG, ROTCCC.

## 2–15. Conduct of other-than-prescribed instruction and off-duty employment

Personnel assigned to ROTC duty may be authorized to conduct academic courses or perform other services, with or without compensation, at the school with the permission of the region commander when specifically requested by the school. Such instruction or service constitutes off-duty employment and must not interfere with the full and effective performance of military duties. Duty hours may not be adjusted for the sole purpose of permitting off-duty employment, including the conduct of non-ROTC instruction, per AR 600–50. All personnel assigned to ROTC duty must have the prior written consent of the ROTC region commander to engage in off-duty employment.

## 2–16. Enrollment in academic courses

Officer and enlisted personnel of ROTC instructor groups may enroll in courses offered by the institution when the courses will not interfere with the performance of their military duties. They should be encouraged to enroll in one of

the disciplines listed as shortage discipline by HQDA. Before personnel enroll in courses, they must obtain permission from the PMS. For tuition assistance information, see AR 621–5.

## 2–17. Relief from Reserve Officers' Training Corps duty

*a.* Except as otherwise provided by law or regulation, an individual assigned to ROTC duty at a school may be removed from those duties based on: relief for cause, reassignment at the request of the school authorities, or as otherwise provided by law or Army regulation.

(1) Relief for cause results when the region commander determines that the member's actions, or failure to act, discredits the ROTC Program. An Officer Evaluation Report or Noncommissioned Officers Evaluation Report based on relief for cause will be issued according to AR 623–105, paragraph 5–18 or AR 623–205, chapter 2. Any Soldier so relieved will not be reassigned to ROTC duties elsewhere.

(2) Reassignment at the request of school authorities may result from a written request by governing authorities of the school when the region commander determines that relief for cause is not justified. The individual will not be permitted to remain at the school following such a request. A permanent change of station (PCS) Officer Evaluation Report or Noncommissioned Officers Evaluation Report will be prepared rather than one based on relief for cause. Normally, the individual will not be considered for reassignment to ROTC duties at another school. When a reservist in a stabilized tour (for example, active Guard Reserve (AGR) is being considered for reassignment under this provision, prior coordination with the Office of the Chief of Army Reserve (OCAR) or National Guard Bureau (NGB), as appropriate, is required.

*b.* A Soldier may be voluntarily released from ROTC duty by sending a fully documented request for reassignment with accompanying endorsement by the proper ROTC region commander as follows:

(1) For active duty personnel, a request for reassignment as an exception to stabilization will be sent to the appropriate career management division at PERSCOM. Information copies will be sent to the Commander, U.S. Army ROTC Cadet Command, ATTN: ATCC–PM, Ft Monroe, VA 23651-5000.

(2) For Army National Guard of the United States AGR personnel, the request will be sent through the Commander, U.S. Army ROTC Cadet Command, ATTN: CC–ZR–ARNG, Ft Monroe, VA 23651-5000 to the Commander, GUARDPERCEN, ATTN: NGB–ARP–P, WASH DC 22180-2500.

(3) For USAR AGR personnel, the request will be sent through Commander, U.S. Army ROTC Cadet Command, ATTN: ATCC–ZR–USAR, Ft Monroe, VA 23651-5000 to the Commander, Full Time Support Management Center, ATTN: DARP–ARO, 9700 Page Blvd, St. Louis, MO 63132-5200.

## 2–18. Use of active duty/full-time National Guard duty personnel on campus

Region commanders will notify the PMS when possible of Army personnel on active duty, active duty for training, or full time National Guard duty who are on campus to engage in academic study or other duty. The PMS is authorized to request limited assistance from those personnel on a mutually agreeable basis on behalf of the ROTC Program for making informal student contacts or for other activities for which the officer may be particularly suited. The PMS will respect the Soldier's student or other duty status. The Soldiers are encouraged to volunteer their services to the extent such involvement will not interfere with their primary mission.

## 2–19. Acceptance by Reserve Officers' Training Corps staff members of payment or other benefits offered by schools

*a.* Reserve Officers' Training Corps staff members may accept only the following payments or other benefits from a school:

(1) Reasonable compensation or other benefits from services to the school by military staff members of the ROTC unit during their nonduty hours (such as coach for an athletic team, parking lot attendant, assistant military custodian, commandant of cadets, and assistant commandant of cadets), provided they have region commander's approval and the services are not part of the member's regularly assigned military duties, and do not interfere with the customary or regular employment of local civilians in their art, trade or profession. Duty hours for ROTC staff members of an ROTC unit may not vary from the duty hours of the unit simply to permit members to qualify for compensation for services rendered to a school during the duty hours of the ROTC unit. The provisions of paragraph 2–18 apply.

(2) Housing, if reasonable rental is paid. If housing is accepted by a member from a school at other than a reasonable rental (for example, without charge) the housing shall be considered furnished on behalf of the U.S. and the member will not be entitled to basic allowance for quarters.

(3) Reimbursement by the school for expenses incurred for services that the member performed at the school's request. Although these services are clearly beyond the scope of the member's regularly assigned military duties, he or she might have been expected to perform these services because of the member's position, such as hosting a social function for visiting dignitaries or conducting off campus workshops for faculty or students. Itemized bills for these expenses shall be presented to the school. When practical, arrangements will be made for the school to be billed for these expenses so they may be paid directly by the school. Under no circumstances may a commuted or fixed allowance be accepted from the school to meet these expenses.

(4) The following, is offered on the same basis to civilian members of the institution staff or faculty:

*(a)* Enrollment in courses by the member or any member of his or her immediate family.

*(b)* Tickets to institution sponsored activities.

*(c)* Parking privileges.

*(d)* Books and other supplies and materials from the school bookstore.

*(e)* Library privileges, either without charge or at a reduced rate.

*b.* Region commanders will require annual fiscal-year reports from detachments on persons receiving stipends, fees, or benefits, together with specific descriptions of compensations or other benefits and justification for their receipt. Reports of noncompliance with this regulation and the corrective action taken will be submitted individually through command channels to HQDA, (DAPE–MPO).

# Chapter 3
# Student Administration

## Section I
## Enrollment

### 3–1. Enrollment obligation

*a.* Enrollment in ROTC is voluntary for students attending civilian colleges and universities. The school may require qualified students to complete a portion or all of the basic course.

*b.* Students attending military colleges or military junior colleges, except as cited in paragraph 2–1*b*(2)*(a)* through-*(d)*, are required to enroll in the ROTC Program in addition to their academic program.

### 3–2. Responsibilities

*a.* The CG, ROTCCC will establish enrollment objectives and quotas for planning purposes based on production mission set by HQDA.

*b.* The PMS will verify each applicant's eligibility for the SROTC Program before enrolling the applicant using the criteria stated in this chapter and current directives.

### 3–3. Ineligibles

*a.* All categories of ineligibles who meet the requirements set by the school authorities may take Army ROTC classes for all 4 years for academic credit only. Participation in other ROTC programs is further limited by their status as auditing students as specified in paragraph 3–27. Specific grades and grade point averages (GPA) awarded to these students are according to the policies set by the school authorities.

*b.* The following students are ineligible for enrollment in the basic or advanced course:

(1) Conscientious objectors, as defined in AR 600–43. Cadets who formalize their conviction in such beliefs after enrollment in the advanced course or the ROTC Scholarship Program will apply for disenrollment from ROTC and will be considered for discharge from USAR under AR 600–43. The CG, TRADOC, is the approving authority 1–A–O and 1–O status for ROTC cadets applying objector status. Those applications not considered appropriate for approval will be forwarded to the Department of the Army Conscientious Objector Review Board for a final determination. A copy of all approved cases will be forwarded to Department of the Army Conscientious Objector Review Board as well for centralized filing of all cases, approved or disapproved. Scholarship students may be required to repay all or part of their scholarship financial assistance. The only conscientious objectors permitted to enroll in SROTC are—

*(a)* Alien students enrolled in the basic course.

*(b)* Students required by the school to take military training who are enrolled in the basic course. Students who have previously been conscientious objectors must, before enrollment, furnish a letter stating that they no longer have convictions that preclude them from bearing arms and participating in full military service with the U.S. Army.

(2) *Deleted.*

(3) A student who has a pre-trial diversion for a felony, any civil conviction, an adverse adjudication, or any type of court-martial conviction even though the record may have been sealed or expunged, unless a waiver is granted. These students excluding scholarship students) may be permitted to participate in the basic course without a waiver, but must have obtained a waiver prior to attending basic camp or enrolling in the advanced course. No waiver will be required for minor traffic offenses resulting in a fine of $250 or less, except when the applicant has accumulated six or more such offenses during any 12 month period. Waivers are not required for disciplinary actions in connection with the provisions of the Uniform Code of Military Justice (UCMJ), Article 15. Such disciplinary actions will be considered when evaluating the applicant's character. In requesting a waiver, the student must list all the above proceedings, whether by military or civilian courts.

(4) A student who has been discharged from any branch of the armed forces with a waivable or nonwaivable disqualifying reenlistment code or with one of the following types of discharge:

*(a)* Dishonorable.

*(b)* Bad conduct.

*(c)* Undesirable.

*(d)* Under other than honorable conditions.

*(e)* General or honorable if the reason and authority for separation preclude reentry into military service under AR 601–210 without a waiver.

(5) A student who is a commissioned officer, a former officer or who has a certificate of eligibility for appointment as a commissioned officer.

(6) A student who will have 10 years or more of active Federal service at the time of commissioning.

(7) A student who does not meet the enrollment requirements as defined in paragraphs 3–5 through 3–11.

(8) A student who has demonstrated a pattern of misconduct consisting of discreditable involvement with civil or military authorities or who has committed a serious military or civilian offense, whether it resulted in trial or conviction or not if a punitive discharge would be authorized for the same or a closely related offense under the Manual for Courts Martial (1984). Waivers may be granted by CG, ROTCCC.

(9) Any applicant for entrance into the SROTC Program (to include former cadets, prior servicemembers, and current servicemembers) who has previously tested positive for tetrahydrocannabinol or cocaine use by a DOD certified drug testing laboratory using procedures established by the Assistant Secretary of Defense for Health Affairs, is permanently ineligible for the SROTC commissioning program. Those who have tested positive for alcohol under DOD criteria to include prior service and current servicemembers who have undergone or undergoing rehabilitation are also permanently ineligible for the SROTC commissioning program.

*c.* The region commanders may approve waivers of applicants previously separated for hardship or compassionate reasons when the hardship, for which the discharge or release from active duty as granted, no longer exists provided the student does not have a nonwaivable disqualifying reenlistment code. All other applications for waiver of a disqualifying reenlistment code will be submitted through channels to the CG, PERSCOM (TAPC–OPP–P), for determination.

*d.* Except as provided in *e* and *f,* below.

(1) Applicant's record does not indicate the offense has recurred or is likely to recur.

(2) Applicant has good potential as an officer.

(3) Current personal conduct and character of the applicant are above reproach moreover. Since the offense, the applicant must have shown that he or she can meet the requirements of good citizenship.

*e.* Request for waiver of a conviction for offenses listed below, that are supported by intermediate commanders, will be sent through channels to CG, ROTCCC, for determination. Waiver approval authority will not be delegated; however, disapproval authority may be exercised at each command level. A waiver request disapproved by any intermediate commander need not be sent to higher authority. The supporting recommendations at each command level and appropriate comments as shown below will be included.

(1) Felony under local or Federal law or an offense punishable under the UCMJ by dishonorable discharge or confinement for more than 1 year. For the purpose of this regulation, offenses involving possession, manufacture, use, sale, distribution, or the intent to sell or distribute and controlled substance as listed or defined in 21 USC 812 are treated as felonies, regardless of the classification by local authorities.

(2) A conviction that resulted in a sentence of confinement in a prison, stockade, or detention area, or in a sentence to hard labor. Later proceedings that delete or alter an initial determination of guilt (for example, pardon, expungement, amnesty, commutation, set aside and suspension) do not eradicate the conviction for the purpose of this paragraph. However, convictions overturned or successfully appealed are not convictions for the purpose of this paragraph if the appropriate officials state in writing that no further proceedings (such as retrial) are pending or being considered.

(3) A conviction involving bigamy, contributing to the delinquency of a minor or moral turpitude (which includes any sexually related offense or dishonesty, such as larceny or perjury).

*f. Rescinded.*

## 3–4. Enrollment requirements

To qualify for enrollment in the SROTC Program, applicants must meet the requirements in paragraphs 3–5 through 3–11.

## 3–5. Academic status

*a.* Students must be enrolled in and attending full time at a regular course of instruction at a school participating in the SROTC Program. At military colleges and civilian schools, the course of instruction must lead to a baccalaureate or advanced degree in a recognized field that is compatible with the student's participation in the ROTC Program.

Nursing and other medical specialty students must be enrolled in a program accredited by an agency recognized by the U.S. Secretary of Education. There are no restrictions on the student's major (except for scholarship cadets).

*b.* Request for exceptions to the 'enrolled in and attending full-time' requirements may be submitted by graduate students only. Requests will be sent to the CG, ROTCCC, for determination on a case-by-case basis. Recommendations at each command level and proper comments regarding justification for exception will be included.

### 3–6. Age
Requirements for scholarship applicants are contained in paragraph 3–34. Requirements for nonscholarship applicants are listed below.

*a. Minimum.* Applicants must be at least 17 years old to enroll in the advanced course. Applicants under 18 years old and those who are minors for the purpose of executing contracts under the laws of the State which has jurisdiction where the school is located (even if older than 18) require parental consent for enrolling in the advanced course.

*b. Maximum.* Applicants must be young enough that they will not be 30 years old or older at the projected time of commissioning.

*c. Waiver.* CG, ROTCCC, is the waiver authority for age at the projected time of commissioning. Applicants must have demonstrated exceptional ability and be recommended by the region commander. Region commanders are authorized to approve waivers for applicants who will be between 30 and 32 years old at the projected time of commissioning. Applicants who are to be appointed after their 33rd birthday, should be advised that they may not be able to qualify for retirement pay under 10 USC 1331 although they may be able to qualify for retired pay under 10 USC 3911 if they have served on active duty for 20 years at least 10 years of which has been served as a commissioned officer.

### 3–7. Character
Applicants must be of good moral character, as normally substantiated by no record of disciplinary problems or civil convictions. Applicants who have been convicted of an offense that would normally evidence lack of good moral character when the conviction has not been waived under paragraph 3–3b(3) are not eligible for enrollment under the provisions of this paragraph.

### 3–8. Citizenship
Students must be citizens of the United States (except as provided in para 3–29). Students born in the United States must submit to the PMS a valid birth certificate for citizenship verification. Students born outside the United States must submit a statement notarized by any commissioned officer qualified under Article 136, UCMJ to act as a notary or a Notary Public verifying citizenship as indicated below.

*a. Citizenship by naturalization.* The following statement will be submitted: "I have this date seen the original certificate of naturalization or certified copy of court order establishing citizenship, stating that (name of applicant) was admitted to the United States by the court of. "

*b. Citizen through naturalization of parents.* The following statement will be submitted: "I have this date seen the original certificate of citizenship, issued to (name) by the Immigration and Naturalization Service, Department of Justice, stating that (name of applicant) acquired citizenship on."

*c. Citizenship through birth abroad of parents who are citizens of the United States.* The following statement will be submitted: "I have this date seen the original or certified copy of (one of the items shown in (1) through (5) below."

(1) INS Form N–560 (Department of Justice Immigration and Naturalization Service).

(2) Department of State Form 1350 (Certificate of Birth Abroad of a Citizen of the United States of America).

(3) FS Form 240 (Report of Birth, Child Born Abroad of American Parent or Parents).

(4) FS Form 545 (Certification of Birth Abroad of a Citizen of the United States of America).

(5) Unexpired fully valid U.S. Passport, issued in the name of the applicant.

### 3–9. Dependents
*a. Criteria for determining eligibility.*

(1) The applicant must have no more than three dependents. Region commander may grant waiver for a married applicant requesting a waiver.

(2) An unmarried applicant who has one or more dependents under 18 years old is disqualified, except as provided in (3), below. No waiver is authorized.

(3) A divorced or sole parent applicant may be processed for enrollment without waiver when the child or children of such applicant have been placed in the custody of the other parent, or adult relative or legal guardian by court order, if the applicant is not required to provide child support. If the applicant is required to provide child support, a dependency waiver is required. The region commander has the authority to grant the waiver. In both cases, the applicant must sign a statement of understanding that he or she will be disenrolled if custody of the child or children is regained while the applicant is enrolled in ROTC. DA Form 3286–69 (Statement for Enlistment-Parts I thru IV) will be

used as a guide. An exception to the disenrollment may be granted only in extraordinary circumstances such as the death of the legal guardian, or adult having custody of the child or children.

(4) An applicant with a spouse in a military component of any armed service (excluding members of the Individual Ready Reserve (IRR)) who has one or more dependents under 18 years old is disqualified. No waiver is authorized.

(5) Husband and wife teams who have one or more dependents under 18 years old are disqualified from enrollment in ROTC as a team. No waiver is authorized. Either the husband or wife may enroll without a waiver subject to other provisions of this paragraph.

*b. Change in status.* Once an applicant has enrolled in the ROTC Program, a change in the status or number of his or her dependents does not constitute cause for disenrollment, and does not require a waiver. However, if the number, status, or circumstances of a cadet's dependents adversely affects the cadet's performance of duty to the extent that the cadet fails to fulfill the terms of the ROTC contract he or she may be processed for disenrollment under paragraph 3–43*a*(7) or (16).

*c. Pregnant students.* Cadets who become pregnant during the course will not involuntarily disenrolled solely because of pregnancy.

### 3–10. Medical qualifications
Section II of this chapter outlines medical qualifications for entering the SROTC Program.

### 3–11. English language aptitude
All applicants must be proficient in the English language. Cadets whose primary language is not English will be given the English Comprehension Level Test (ECLT) before enrolling in MS III. (See para 6–8*e*.)

### 3–12. Requirements for the advanced course and the basic camp
In addition to the general requirements for enrollment, a student enrolled in the advanced course or for the basic camp must meet the following requirements:

*a. Academic and Reserve Officers' Training Corps status (10 USC 2104).* The student must meet the following requirements:

(1) Have an established cumulative GPA of 2.0 or better on a 4.0 system. Exception: Entering freshman at an Military Junior College (MJC) and prior service enlistees who were participants in the Army College Fund Veteran's Educational Assistance Program (VEAP) and are entering freshman as follows:

*(a)* MJC freshman—2.0 cumulative high school GPA and a scholastic aptitude test score of 850 or an American college test score of 17.

*(b)* Prior service—score of 110 or higher on the general technical aptitude area of the Army Classification Battery.

(2) Be enrolled in and attending as a full-time student (according to the school's criteria) a recognized course of instruction producing a baccalaureate degree, advanced degree, or an advanced education program at a fully accredited 4-year degree granting institution or at a fully accredited associate degree granting institution that has been recognized as having established formal linkage with a fully accredited 4-year degree granting institution.

(3) Have satisfactorily completed the ROTC basic course, or received credit on the basis of other previous military training or service (see chap 5), or satisfactorily completed basic camp.

*b. Scholastic aptitude.* Academic potential.

*c. Officer potential.* The student must possess qualifications for becoming an effective Army officer. Leadership potential will be emphasized as an important factor in selection for the advanced course. Applicants must possess officer-like qualifications as evidenced by their appearance, record, personality, scholarship, extracurricular activities, and aptitude for military training.

### 3–13. Cross-enrollment
*a.* Students at institutions where Army ROTC is not available will be encouraged to enroll as ROTC cadets at host institutions or extension centers.

*b.* A student may be enrolled from an institution that does not have an Army ROTC program provided—

(1) The student meets all the eligibility requirements.

(2) Officials of both institutions concur in the student's enrollment.

(3) The institution where the Army ROTC is not available is a fully accredited school that has an approved formal or informal cross-enrollment agreement.

### 3–14. Eligibility of members of the U.S. Armed Forces
*a.* The following personnel are not eligible for enrollment in the SROTC Program (basic and advanced courses):

(1) Members of the active components of the U.S. Armed Forces.

(2) Former commissioned officers of any component of the U.S. Armed Forces.

(3) Officers of the Public Health Service or National Oceanic and Atmospheric Administration.

*b.* The following personnel are not eligible for enrollment or conditional enrollment in the advanced course:

(1) Warrant officers of the reserve components of the U.S. Armed Forces.

(2) Enlisted members of the reserve components of the U.S. Armed Forces except those fully qualified to participate in the SMP or those who have enlisted in USAR Control Group (ROTC).

*c.* The following personnel are eligible for enrollment in the basic course:

(1) Warrant officers of the reserve component of the U.S. Armed Forces not on active duty (nonscholarship only).

(2) Enlisted members of the reserve component of the U.S. Armed Forces not on active duty. Provisions of paragraph 3–17*d* below apply.

*d.* The following personnel are eligible for enrollment in the advanced course:

(1) Former warrant officers of the active or reserve components of the U.S. Armed Forces.

(2) Enlisted members of the ARNG or USAR not on active duty if enrolled under paragraph 3–17.

(3) Former active duty Soldiers who have completed basic training or equivalent.

## 3–15. Enlistment in the United States Military Academy

*a.* Except as provided in paragraph 3–17, enlistment in the USAR with assignment to USAR Control Group (ROTC) is a requirement for enrollment in the advanced course or in the scholarship program. Such enlistment will be made in the grade of cadet. Cadets will retain this grade as an enlisted grade in the USAR (separate from any grade held in the corps of cadets at the school) regardless of any prior military service performed or grade advancement policies applicable to enlisted status. This assignment is for control purposes only and entitlements for reserve forces do not apply. Upon transfer to other than USAR Control Group (ROTC), applicable grade determination policies govern. When ordering a cadet to active duty, AR 135–210, chapter 1, will apply.

*b.* Enlistment of cadets under 17 years old is not authorized. Cadets under 18 years old require parental consent (10 USC 2104).

## 3–16. Reenrollment

*a.* A cadet disenrolled from either the basic course or the advanced course may be reenrolled in the ROTC Program as provided below. Since disenrollment terminates a scholarship, reenrollment under this paragraph does not reinstate a scholarship that existed before disenrollment. Former cadets are ineligible for reenrollment if—

(1) They have satisfactorily completed all portions of the program. Such applicants should be advised that they may apply for a direct commission under AR 135–100.

(2) They were disenrolled for any of the reasons given in paragraphs 3–43*a*(8) through (16).

(3) The time between disenrollment and reenrollment is more than 3 years. Waiver may be granted for those disenrolled cadets who subsequently served on active duty and whose service is sufficiently meritorious to warrant an honorable discharge. For these, the total of the time between disenrollment and enlistment plus the time between discharge from active duty and reenrollment may not exceed 3 years. Only the period of active duty may be waived. In addition, all other enrollment eligibility requirements of this chapter must be met. Approval authority is the Commander, ROTCCC.

*b.* Basic course graduates who are not ineligible under *a* above may be reenrolled in the program without restrictions, provided they meet the requirements for initial enrollment at the time of reenrollment.

*c.* Advanced course cadets, previously disenrolled from the program, who are not ineligible under paragraph *a* above may be reenrolled in the advanced program provided they meet the following requirements:

(1) They meet the commissioning requirements and all the requirements for the original enrollment in the advanced course.

(2) In cases involving prior disenrollment for medical condition, financial, personal hardship or academic deficiency, documentary evidence will be furnished by the applicant specifying that the disenrollment cause has been corrected.

(3) The applicant has some portion of the advanced course remaining. If any of the incomplete portion is within the advanced camp, the applicant must take the entire advanced camp. If any of the incomplete portion is MS III or MS IV material, the applicant must fulfill all military science requirements and cannot take less than one full quarter or semester of subject matter to complete the course.

(4) The student must not have less than one semester or quarter and not more than 2 years of academic requirements remaining. Those who are pursuing a 5-year degree may not have more than 3 years of academics remaining.

(5) The applicant's cumulative academic grade point average is not less than 2.0 on a 4.0 grade point system or its equivalent at the time of reenrollment.

(6) When directed by the region commander on the recommendation of the PMS, the applicant agrees to retake specified parts of the completed advanced course in addition to the incomplete part.

## 3–17. Army Reserve Officers' Training Corps/Selected Reserve Simultaneous Membership Program

*a.* The SMP policies and procedures applicable to the USAR are contained in AR 601–210. The SMP policies and procedures applicable to the ARNG are contained in NGR 600–100, chapter 13 and NGR 600–200, table 2–1.1.

Release from Reserve Components Troop Program Unit for unsatisfactory performance or participation may be cause for disenrollment from the commissioning program.

*b.* Enlisted members of the ARNG or the USAR who are assigned to troop program units and have been selected to participate in the SMP may enroll in the advanced course provided they are at least academic sophomores and are otherwise qualified. Enlisted members of the ARNG or the USAR are not eligible to participate in the advanced course of the SROTC program except as a fully qualified SMP participants. The SMP participants must be U.S. citizens. Conditional enrollment is not authorized.

*c.* Cadets in the advanced course who have been selected to participate in the SMP will be assigned to troop units of the ARNG or USAR.

*d.* Cadets who complete the ROTC course of instruction and are members of the ARNG or USAR and who are later appointed as officers through the ROTC will not be—

(1) Credited with reserve component service when computing length of service for any purpose for the period while enrolled in the advanced ROTC course (10 USC 2106(c)).

(2) Credited with reserve component service in computing entitlements to basic pay for the period while enrolled in either the basic or advanced ROTC course (37 USC 205(d)).

*e.* All ROTC advanced course (MS III and IV) cadets (except regular 2-year, 3-year, and 4-year scholarship cadets) may request participation in the SMP. Allocations will be established by HQDA and managed by Continental United States Army Commanders/The Adjutant General's. Both the PMS and the unit commander must concur in the placement of the SMP candidate. The SMP is mandatory for those scholarship cadets awarded a Guaranteed Reserve Forces Duty or Reserve Forces Duty scholarship. Cadets at MJC have an option to become or not become an SMP troop program unit member. All other USAR scholarship recipients must be transferred to USAR Control Group (ROTC) according to AR 601–210 or NGR 600–100, chapter 13. Paragraph *d* above also applies to scholarship cadets in the SMP.

## Section II
## Medical Examinations

### 3–18. Responsibilities for medical examinations

*a.* The Department of Defense Medical Examination Review Board (DODMERB) schedules and reviews examinations for the initial enrollment into the 4-year ROTC Scholarship Program. In addition, DODMERB is the authority for final review and determination of medical fitness for 2-year and 3-year scholarship applicants.

*b.* The Commanding General, U.S. Army Health Services Command (CG, HSC) will conduct and review medical examinations for all other ROTC cadets and applicants.

*c.* Major overseas Army commanders will assume the same responsibilities as CG, HSC, for all applicants and cadets within their jurisdiction.

*d.* The CG, ROTCCC will—

(1) Ensure that only those applicants who are medically qualified are enrolled in the ROTC Program.

(2) Review, process, and approve or disapprove medical waivers, as appropriate.

### 3–19. Timeframe for examinations

*a.* Medical examinations for applicants will be completed as stated below:

(2) Basic course applicants (MS I and MS II) for scholarship must be examined within 1 year before enrollment.

(2) Advanced course applicants (MS III and MS IV) must be examined 1 year before enrollment (for applicants eligible to enroll without attendance at basic camp). The 3-year and 4-year scholarship recipients will not be required to take another medical examination before enrolling in the advanced course. The same medical examination that qualified a candidate for the scholarship program and basic camp will remain valid for entry into the advanced course if it is not more than 5 years old. The applicant must attest annually to the fact that there has been no change in his or her physical condition since the last physical.

(3) Advanced camp attendees will be examined—

*(a)* Immediately upon arrival.

*(b)* Before the camp terminates for any cadet who suffered injury or illness while at camp and as a result was denied the opportunity to complete camp.

*b.* Medical examinations for commissionees will be completed as stated below.

(1) The advanced camp medical examination will qualify a cadet for commissioning except for those cadets who do not complete commissioning requirements within 24 months examination date. These cadets must take another examination before commissioning.

(2) Cadets, who become pregnant or are determined to be pregnant after this examination must have another medical examination for commissioning 6 weeks after the pregnancy is over, unless precluded by medical conditions.

**3–20. Medical fitness standards**

*a.* Medical fitness standards for ROTC cadets and applicants are contained in table 3–1. The following special provisions apply:

(1) Examinations for initial enrollment in the 4-year scholarship program will be according to AR 40–29. Standards discussed in AR 40–501, chapter 2 as applicable to scholarship applicants will be used to determine a cadet's medical fitness for an ROTC scholarship. All cadets must meet the advanced course medical fitness standards for appointment.

(2) Waivers for enrollment or camp attendance will continue to be valid at the time of appointment in the USAR, providing the waiver was not for a temporary disqualifying condition (see para 3–25.)

(3) Regardless of the branch in which the ROTC training was administered, cadets must meet the requirements of AR 40–501, paragraphs 5–17 and 5–18 for branching any combat arms branch.

(4) Prior service personnel must meet the weight standards of AR 600–9 at time of entry into the ROTC advanced course and continuously thereafter, through commissioning.

(5) Cadets will be tested for Human Immunodeficiency Virus (HIV) during the precommissioning process (normally advanced camp) or as otherwise directed. Cadets found to be positive for HIV will be disenrolled at the end of the current academic term and discharged from the USAR Control Group (ROTC). Scholarship cadets will be considered in breach of contract, however, they will not be required to repay scholarship benefits received prior to the medical disqualification.

(6) All cadets will be administered precommissioning drug and alcohol screening test at advanced camp. Those cadets with positive results will be disenrolled. Scholarship cadets with positive results will be considered in breach of contract. Cadets will be discharged from the USAR Control Group (USAR) either or serve on active duty.

*b.* The decision on medical waivers for retention and a ppointment as a commissioned officer will be made by the CG, ROTCCC, after recommendation by the command surgeon.

**3–21. Examiners**

*a.* Applicants for enrollment in the basic course as a nonscholarship participant may be examined by any qualified physician.

*b.* For all other required medical examinations the CG, HSC, and major overseas commanders will designate examiners according to the order of priority listed below, using the most economical to the Government. Regardless of the examiner or facility designated, each applicant, other than nonscholarship basic course applicants, will be tested according to AR 40–501, at a facility designated by the CG, ROTCCC, prior to enrollment. (See AR 40–29 for initial enrollment in the 4-year ROTC Scholarship Program.)

(1) Physicians of Army medical treatment facilities.

(2) Physicians of medical treatment facilities of other Armed Forces and Military Entrance Processing Stations when staffing and facilities permit.

(3) Medical officers of reserve components of the Army not on active duty.

(4) Medical officers of reserve component of other armed Forces, not on active duty, when available. These officers may serve as members of mobile medical teams.

(5) Physicians at medical treatment facilities of other Government agencies on a reimbursable basis according to AR 40–3.

(6) Civilian physicians of existing facilities at the school when arrangements can be made with the institutional authorities. When required, fees will be paid under schedules prescribed in AR 40–330.

(7) Other civilian physicians when Government facilities are not available. Fees will be paid according to schedules in AR 40–330.

**3–22. Reports**

Forms (reports) and the number of copies required for the various medical examinations are listed in table 3–1. Disposition and preparation will be as prescribed by the CG, ROTCCC.

**3–23. Review of medical examinations**

*a.* The U.S. Army Medical Center (MEDCEN) or the Medical Department Activity (MEDDAC) commander in the geographic area responsible to support the ROTC activity is the reviewing authority for all ROTC medical examinations except as indicated in (1) through (3) below. Provisions of AR 40–501 apply. SF 88 (Report of Medical Examination) and SF 93 (Report of Medical History) will be reviewed and returned to the PMS within 10 days after receipt. For those cadets found disqualified, the reviewing authority will make a recommendation, that may or may not be sustained by the waiver approval authority.

(1) The Director, DODMERB is the reviewing authority and will determine medical fitness for entry into the 2-, 3- and 4-year ROTC Scholarship Program. The CG, ROTCCC is the medical waiver authority. (For exception, see subpara (3) below.)

(2) MEDCEN or MEDDAC commanders reviewing questionable or controversial cases will send those cases to the

Commander, U.S. Health Services Command, ATTN: HSCL–C, Ft Sam Houston, TX 78234-6200, for recommendation. In addition to the most recent medical examination, copies of all medical examinations will be sent to the CG, HSC.

(3) The Commander, U.S. Army Aeromedical Center, Ft Rucker, AL 36362-5333, will determine if the cadet is medically qualified to enter the flight training program. All flight physicals given to ROTC cadets will be sent to this activity.

*b.* Reports of medical examinations involving cadets in the categories listed in (1) and (2) below who are applying for enrollment or continuation in the advanced course will be sent by the region commander to the CG, ROTCCC following review by the proper MEDCEN or MEDDAC.

(1) Applicants who are drawing disability compensation from the Veterans' Administration or any other Federal, State, or local agency. The report of medical examination will be submitted even if the applicant waives the compensation.

(2) Applicants who were previously discharged from any of the armed forces, including a reserve component, because of medical disability or medical disqualification, even though they currently meet prescribed standards.

### 3–24. Medical waivers

*a.* Medical fitness standards prescribed in AR 40–501, chapter 2, will be used to determine a cadet's or student's medical fitness for enrollment, continuation in the advanced course, and appointment. Requests for waivers will be considered under AR 40–501, chapter 1, and this paragraph. Disqualification's under AR 40–501, paragraph 2–30*m* will not be waived. Medical conditions that are disqualifying for flight instruction under AR 40–501, chapter 4, will not be waived.

*b.* The CG, ROTCCC may grant (authority may not be delegated) waivers only when the medical condition or physical defect—

(1) Is static in nature or, for prior service applicants, no longer exists.

(2) Will not preclude satisfactory completion of ROTC training (including camp training).

(3) Will not be complicated or aggravated by ROTC training or by military training and duty after appointment.

*c.* Medical fitness standards applicable at the time of enrollment in the advanced course will apply to any later medical examination, including examination for appointment.

*d.* If no waiver is granted, a cadet enrolled in the SROTC Program who is found medically disqualified (except as specified in para 3–25) will be disenrolled.

*e.* When a waiver is granted, the appropriate medical condition or physical defect, date of waiver, and identification of approving headquarters will be recorded on SF 88 and DA Form 61 (Application for Appointment).

*f.* The request for waiver of medical fitness to participate in the ROTC Scholarship Program or to be appointed a scholarship cadet will be sent to the CG, ROTCCC, after review by appropriate MEDCEN or MEDDAC.

### 3–25. Temporary medical disqualification (less pregnancy)

*a.* A temporary or remedial disqualifying medical condition will not prevent the enrollment of a cadet in the advanced course or cause disenrollment of a cadet already enrolled. The cadet will be expected to meet the medical fitness standards prescribed in AR 40–501, chapter 2, within 6 months after the date of examination. A cadet may participate in camp training if approved by the appropriate authority. For changes in medical status occurring after enrollment in a 6-month recovery period may be authorized for cadets with temporary disqualification.

*b.* While at advanced camp, a cadet with a temporary medical disqualification may request permission that the camp commander permit him or her to remain at camp, provided a determination is made by the ROTCCC Medical Waiver Review (MWRB) that the cadet does not possess one or more medical condition(s) that might endanger others or compromise his or her own well-being.

*c.* A cadet who does not meet prescribed medical standards, when no waiver is granted, will be returned home from advanced camp, as soon as possible.

*d.* Under no conditions will individual referred to in *a* or *b* above be disenrolled in the ROTC program until final decision is received from the ROTCCC MWRB or as approved by the CG, ROTCCC.

## Section III
## Reserve Officers' Training Corps Participating Students

### 3–26. General

*a.* Reserve Officers' Training Corps participating students are students who participate in military science courses but are not fully enrolled in ROTC. They are divided into three categories: auditing students, conditional students, and alien students. Students who are ineligible or become ineligible for enrollment as an ROTC cadet may, if desired by school authorities and approved by the PMS, participate in the ROTC program in one of the above categories provided—

(1) They are not authorized access to classified instructional material.

(2) They are in good standing and attending school full time.

(3) There is no loss in effectiveness of military instruction.

(4) Such participation is not otherwise prohibited by law, DODD or AR.

*b.* ROTC participating students are ineligible for—

(1) Subsistence allowance. (See para 3–30*b*.)

(2) Participation in the ROTC Scholarship Program.

(3) Commissioning credit, except immigrant alien students. Conditional students will be given credit for that part of the course successfully completed upon change to enrolled status. (See para 3–30*a*.)

*c.* ROTC students completing the course of instruction in a nonenrolled status are ineligible for appointment as commissioned officers. Although immigrant aliens may be authorized to participate in the SROTC Program, if properly qualified, they must be advised that—

(1) Current DOD Policy requires U.S. citizenship to be eligible for a security clearance.

(2) Effective 1 January l988, HQDA policy requires the possession of a SECRET security clearance, based on a National Agency Check (NAC) to be eligible for appointment.

(3) These two requirements must be met by graduation date.

(4) Participants who do not meet these requirements by graduation will not be retained as a participating member of the ROTC program. (No waiver of these requirements will be granted.) Immigrant alien graduates who have otherwise fulfilled commissioning requirements may apply for direct commissioning once DOD requirements are met. Only conditional students and participating immigrant alien students may be presented a DA Form 134 (Military Training Certificate Reserve Officers' Training Corps) after successfully completing all or part of the SROTC Program. When the student is issued the certificate it will be annotated to reflect that the certificate does not entitle the student to a commission.

*d.* No student, except those in the alien student category, will be authorized to wear the ROTC uniform if denied enrollment into the ROTC because of failure to sign the loyalty oath.

*e.* Applicability of academic credit and other school policies concerning participation in the ROTC program for these categories will be determined by school authorities.

*f.* An immigrant alien who is also a member of the reserve components is not eligible to enroll in the advanced course or to participate in the program in such a status.

### 3–27. Auditing students

*a.* Any student may audit courses in the ROTC program if approved by the PMS and school authorities. This authority is granted to permit the PMS to cooperate with the school in accommodating a student's request for limited participation in the program.

*b.* In addition to other restrictions in this section, auditing students will not—

(1) Participate in drill, marching, leadership laboratories, field training exercises, voluntary programs, or attend basic or advanced camp.

(2) Be issued or wear the uniform.

(3) Receive credit toward commissioning or enlisted grade status through audit of ROTC courses, or issued a DA Form 134 for having audited the course.

### 3–28. Conditional students

*a.* Conditional students are those who complete part I of DA Form 597 (Army Senior Reserve Officers' Training Corps (ROTC) Nonscholarship Cadet Contract) but do not complete the DD Form 4 series (Enlistment/Reenlistment Document-Armed Forces of the United States). Conditional students in this paragraph refers only to those described in (1) and (2) below. It does not include alien students, or students trying to decide whether they desire to join ROTC and later strive for a commission. Credit toward commissioning cannot be awarded to students who are not officially enrolled as cadets. The category of conditional students include—

(1) Applicants for enrollment in the ROTC Program whose eligibility based on medical, academic, or other criteria has not been finally determined or for whom a waiver request is pending. Students enrolled before being placed in this category will not be disenrolled solely on the basis of a pending request for waiver.

(2) Students who are ineligible or become ineligible for enrollment but whose participation in all aspects of the year of instruction involved has been approved by the PMS or higher authority.

*b.* Conditional status must be resolved within a 12-month period from its inception.

*c.* The school will not receive commutation in lieu of uniform for conditional students (see AR 700–84, chap 10), nor will they be furnished Government-issued uniforms. Uniforms for conditional students may be purchased by the school or the student. Conditional students may wear the Army green or utility uniform while pursuing a course for which regular enrolled cadets are permitted to wear the uniform.

*d.* Conditional students are not authorized to attend the basic camp or advanced camp until their conditional status is

resolved. If directed by ROTCCC, an individual may attend advanced camp for further evaluation of an unresolved medical condition by camp MWRB.

## 3–29. Alien students

*a. Eligibility.* An alien student may voluntarily enroll in the basic course or attend basic camp and may participate in the advanced course. active recruitment of nonimmigrant aliens will be avoided. Each alien applicant must meet the following requirements:

(1) Possess proper papers establishing his or her status as an immigrant, refugee, or nonimmigrant alien. (See *b* , below.)

(2) Be enrolled in and attending full-time a regular course of instruction at a school where SROTC is available.

(3) Be recommended by the proper school authority.

(4) Be recommended by the PMS.

(5) Meet the medical fitness requirements in Section II. Expenses incurred by an applicant because of these requirements are not reimbursable by the Government.

(6) Complete the basic course or basic camp satisfactorily before he or she may be considered for participation in the advanced course.

*b. Additional criteria.* The following additional requirements apply to specific categories:

(1) Immigrants, regardless of their country of origin, who have been lawfully admitted for permanent residence in the United States must have in their possession JUST Form I–151 (Alien Registration Receipt Card) and be approved for enrollment/participation by the region commander.

(2) Refugees will be treated as immigrants for the purpose of this regulation. Refugees still in parole conditional entry or voluntary departure status, regardless of their country of origin, must—

*(a)* Be approved for enrollment/participation.

*(b)* Have in their possession JUST Form I–94 (Arrival-Departure Record) bearing an immigration and Naturalization Service Stamp reading: Refugee Conditional Entry', or be Cuban nationals who have in their possession JUST Form I–94.

*(c)* Have confirmation in writing from the Immigration and Naturalization Service that they are refugees and meet the requirements of either *c* or *d* , below.

(3) Nonimmigrant aliens must be approved for enrollment or participation by cadet command. Nonimmigrant aliens must—

*(a)* Have in their possession JUST Form I–94.

*(b)* Provide certification that their government has no objection to their receiving SROTC instruction or have their JUST Form I–94 stamped "paroled indefinitely" or "indefinite voluntary departure".

*c. Citizenship.* The immigrant alien student will be informed that participation in the advanced course will not result in appointment as an officer. Should the student attain citizenship before graduating and be qualified in all other areas, he or she must elect to enroll in the advanced course or be released from the program.

*d. Status termination.* Alien students may be disenrolled from the basic course or dismissed from participation in the advanced course for any reason listed in section VI, if deemed appropriate.

## 3–30. Enrollment of Reserve Officers' Training Corps alien and conditional students

*a.* The ROTC students who overcome the obstacles or difficulties that prevented their enrollment or caused their disenrollment and who are otherwise qualified may enroll in the appropriate course. See paragraph 3–16 concerning reenrollment. Once enrolled, the cadet will be given credit for the portions of the course(s) that were successfully completed.

*b.* Conditional students are eligible to receive subsistence allowance when their conditional status is changed to enrolled status. Retroactive pay is authorized from the date the cadet actually began advanced training. Students who began the advanced course as immigrant alien students, are not authorized to receive retroactive subsistence allowance. Date of enlistment, for the purpose of this paragraph, is the date on which all criteria for enrollment are met, including selection and completion of Part II, DA Form 597 and DD Form 4-series.

## Section IV
## Reserve Officers' Training Corps Scholarship Programs

## 3–31. Introduction

The Army ROTC Scholarship Program provides financial assistance to those students who have demonstrated academic excellence and leadership potential. The U.S. Army Scholarship Program's purpose is to provide for the education and training of highly qualified and motivated young men and women who have a strong commitment to military service as commissioned officers. The number of cadets in the scholarship program at any one time is limited by law (10 USC 2107).

A056

**3–32. Responsibilities for the scholarship program**

*a.* The DCSPER will—

(1) Develop scholarship policies.

(2) Approve selection criteria and academic discipline targeting.

(3) Approve scholarship allocations by type (2-year, 3-year, and 4-year).

*b.* The CG, ROTCCC will—

(1) Administer the ROTC Scholarship Program in accordance with approved HQDA policies.

(2) Recommend scholarship allocations.

(3) Annually review and analyze the ROTC Scholarship Program to assure scholarships are allocated in the most effective manner. The CG, ROTCCC may extend scholarship benefits for up to an additional year for students enrolled in an academic program, which requires more than 4 academic years for completion of the baccalaureate degree requirement, including elective requirements of the SROTC.

(4) Prepare and disseminate the administrative instructions, information and application packets.

(5) Determine scholarship allocation by type (2-year, 3-year, and 4-year).

(6) Supervise the selection cycles, to include processing and selecting all ROTC scholarship recipients.

(7) Provide national publicity.

(8) Maintain liaison with OCONUS major commanders as required to provide assistance in administering the scholarship program to prospective applicants living overseas.

*c.* A student eligibility for extended financial assistance and subsistence allowance payments. Extension of financial assistance and subsistence allowance payments may be approved for students enrolled in baccalaureate degree programs that require a 5th academic year and summer sessions.

(1) The Secretary of the Army (or its designee) shall determine hich baccalaureate degree programs will be approved extended entitlements. The policy will include, but not limited to, the following conditions:

*(a)* The average length of enrollment required by all students to complete a specified program at a specified institution.

*(b)* The amount of effective credit granted ROTC courses towards degree requirements in a specified program at a specified institution.

*(c)* Validated personnel requirements for accessing graduates with specified degrees.

(2) Extended entitlements may be approved—

*(a)* For courses required for completion of the baccalaureate degree for approved programs, including elective requirements of the ROTC Program.

*(b)* On a case-by-case basis for nonscholarship students admitted to the advanced program and for students with 4-year scholarships in progress.

(3) Extended entitlements may not be approved for—

*(a)* Any courses other than those required for completion of the baccalaureate degree for approved programs and elective requirements of the ROTC course.

*(b)* The purpose of requiring extra courses for particular warfare skills or military career specialities.

*(c)* Students who require extra course work because of academic deficiency or failure.

*(d)* Creation of a 5-year scholarship as such, except in the unusual circumstances whereby an institution prescribes a 5-year baccalaureate degree requirement for a program that also meets the criteria in subparagraph *c*(1) above.

(4) The Secretary of the Army (or its designee) shall ensure that students who accept extended scholarship entitlements execute amended contracts that extend their active duty service commitment for a period of time equivalent to the length of the entitlement extension.

**3–33. Publicity for the scholarship program**

National and local publicity campaigns will be held to create and maintain interest by qualified high school students, on campus and Green to Gold Soldiers for the ROTC Scholarship Program. Information will be provided on application deadlines, and how to apply for a scholarship.

**3–34. Eligibility for scholarships**

*a.* To be eligible to receive or retain an Army ROTC scholarship, the student must meet the following requirements (10 USC 2107):

(1) Be a citizen of the United States.

(2) Enlist in the ARNG or USAR for a period of 8 years.

(3) Be at least 17 years old by 1 October of the year of enrollment as a scholarship cadet if enrolled in the fall. Other than fall enrollees must be at least 17 years old by the time of enrollment as a scholarship cadet. No waivers are authorized.

(4) Be under 25 years old by 30 June of the calendar year in which eligible for appointment. An extension of up to 4 years may be granted to prior service applicants if the applicant will be under 29 years old by 30 June of the calendar

year that he or she is eligible for appointment. The length of extension may not exceed the actual period of active duty service.

(5) Be of good moral character as evidenced by home, community, and school activities.

(6) Exhibit a strong desire to obtain a commission and pursue a military career in the Army.

(7) Possess potential to become an effective Army officer. Leadership potential will be emphasized as a very important factor for selection and continuation of a scholarship. Applicants must possess officer potential as evidenced by—

*(a)* Appearance.

*(b)* Personality.

*(c)* Academic excellence.

*(d)* Extracurricular activities.

*(e)* Physical fitness.

(8) Be medically qualified, under the standards of AR 40–501.

(9) Be selected for award according to procedures prescribed by CG, ROTCCC.

(10) Sign an agreement meeting the requirements of 10 USC 2107 and 10 USC 2005.

(11) Not be ineligible for enrollment under paragraph 3–3.

(12) Execute the loyalty oath.

*b.* The PMS will immediately initiate a request for a NAC with request for Secret personnel security clearance on enrollment of a scholarship cadet. The clearance, based on this request, will suffice for the cadet's commissioning upon graduation. If a student has been the subject of a previous Entrance National Agency Check (ENTNAC) or NAC and has not had a break in Federal service of more than 12 months from the date of the investigation to the time of enrollment in the scholarship program, a new NAC is not authorized. Although a Secret clearance is not a prerequisite to award a scholarship, students must obtain a Secret clearance within 180 days of the award in order to retain the scholarship status. Extensions not to exceed an additional 90 days may be granted by the region commander. Extensions in excess of 90 days must be approved by the CG, ROTCCC. Scholarship cadets who receive a Letter of Intent to Deny Security Clearance from the Commander, U.S. Army Central Personnel Security Clearance Facility will be processed for termination of scholarship according to paragraph 3–39 and disenrollment under paragraph 3–43*a*(16).

### 3–35. Scholarship certificates
An Army ROTC scholarship certificate will be presented to each fully qualified scholarship recipient. The CG, ROTCCC will prepare and distribute certificates to the PMS for presentation.

### 3–36. Financial assistance authorization
*a.* Region commanders will arrange financial assistance payments for academic instruction for scholarship cadets. The PMS will arrange for an educational service agreement with the institution according to the Department of Defense Federal Acquisition Regulation Supplement subparagraph 37.73. Financial assistance determined and the provisions to be used for payment will be provided by the CG, ROTCCC.

*b.* All ROTC scholarship cadets are authorized subsistence allowance at the rate stated in the Department of Defense Military Pay and Allowances Entitlements Manual (DODPM) 80401. The subsistence allowance will begin on the date that the cadet enters the first term of college work under the scholarship contract or on the date the cadet meets all requirements for and is appointed as a scholarship cadet, whichever is later. In no event, will a scholarship student receive an allowance for more than 10 months in any academic school year. A subsistence allowance will not be paid for more than 20 months in the basic course and 20 months in the advanced course. An additional 10 months of subsistence pay may be authorized to scholarship cadets who have an approved extension of scholarship benefits.

### 3–37. Mandatory requirements
*a.* Scholarship cadets will receive ROTC training on the same basis as nonscholarship cadets. However, 3-year or 4-year scholarship cadets are not required to take another medical examination or complete additional contracts for enrollment in the advance course. They will be administered achievement or qualification tests required of other cadets enrolling in the advanced course.

*b.* The 3-year scholarship recipients who, upon contracting of the scholarship, are not enrolled in SROTC and have not completed MS I or received ROTC placement credit, must compress MS I and MS II during the first year that the scholarship is in effect.

*c.* All scholarship cadets are required to successfully complete one semester or quarter of college instruction in a major Indo-European or Asian language, other than the language which they normally speak.

### 3–38. Leave of absence for scholarship cadets
*a.* A cadet who requests a leave of absence or who otherwise extends his or her period of enrollment beyond the 8-year period of enlistment, must voluntarily extend the enlistment by an amount of time equal to the period of the extended enrollment or leave of absence (LOA). The PMS will ensure that the cadet still meets enrollment criteria and

A058

eligibility requirements specified in Section I of this chapter. An LOA from ROTC training for a semester or more, may be granted to a scholarship cadet by the CG, ROTCCC, unless subordinate level approval is authorized for one or more of the reasons below.

(1) The region commander may approve an LOA, not to exceed 1 year continuous absence when—

(a) The cadet needs more than the normally required time to devote to studies to complete degree requirements.

(b) The normal period for completion of degree requirements is extended because of minor academic deficiencies, addition of another course, or for similar reasons.

(2) The PMS may authorize an LOA when—

(a) The cadet enrolls in an academic curriculum requiring 5 years for completion, not to exceed 1 year continuous study.

(b) The cadet has a medical condition (illness, pregnancy, injury, or convalescence). This authorization will be for one semester or quarter only. An LOA request that requires more than one academic term will be sent through command channels to the CG, ROTCCC, for determination. The request will include all medical examinations the cadet has received as a scholarship applicant or cadet including the ROTC entrance examination and any other medical documents.

(c) A scholarship cadet indicates an insincere commitment to military science. The LOA will be for two semesters or quarters as an interim measure to allow the PMS to request a final determination from the CG, ROTCCC. The final determination may result in termination of scholarship or a requirement for a board action per AR 15–6.

(d) A cadet is pending administrative action (such as termination requests or disenrollment boards). This will be for one semester only. Cadets will not be allowed to continue in military science or receive credit for commissioning during this period. A letter to this effect will be given to the cadet and a copy placed in his or her file.

(e) Cadets who attend basic camp after their freshman year and are awarded a 2-year scholarship. This will be for 1 year to ensure academic alignment with MS III. A copy of the approved LOA will be sent to CG, ROTCCC, ATTN: ATCC–PS (Basic Camp), Ft Monroe, VA 23651-5000 for inclusion in the cadet's file.

(f) Special reasons exist that are not covered above, not to exceed one semester or quarter. If additional time is needed, the request will be forwarded to the region commander for evaluation.

b. Any request for LOA or other delay in commissioning will require a review of the cadet's continued eligibility for appointment.

c. No compensation or allowance will be paid to the cadet while in an LOA status. An LOA will not affect the period of an Army ROTC scholarship or benefits authorized.

d. An LOA should not be granted to any MS III cadet that interferes with normal attendance at advanced camp, except for cases of individual hardship or medical preclusion from completion of advanced camp.

## 3–39. Termination of scholarship and disenrollment

a. The CG, ROTCCC, is the approving authority for termination of scholarship and/or disenrollment. See paragraph 3–39c for the exception pertaining to 4-year scholarship winners discharged early from active duty. A scholarship will be terminated and the cadet disenrolled for any of the reasons listed in paragraph 3–43. The 4-year scholarship students can be disenrolled at their own request during MS I only.

b. When a 2-year, 3-year or 4 year active duty scholarship is terminated for personal hardship, the cadet will be considered for return to active duty in his or her enlisted status if requested by the cadet. The CG, ROTCCC, and the CG, PERSCOM will assist these cadets in returning to active duty in the grade and military occupational specialty (MOS) they held at the time of separation, if at least 1 year remained on the original active duty enlistment contract and the cadet is otherwise eligible for active duty. A copy of the prior active duty contract, DD Form 4-series and the DD Form 214 (Certificate of Release or Discharge from Active Duty) will be required to substantiate the request.

c. AR 635–200, chapter 16, provides for early discharge of enlisted Soldiers from the active Army for the purpose of entering an Army Senior ROTC scholarship or nonscholarship program to pursue a baccalaureate degree. Those personnel discharged early to enter the ROTC program, who subsequently fail to fulfill the program commitment will be processed as follows:

(1) MS I cadets scholarship recipients. A board will be appointed to determine if the individual's discharge from the Regular Army should be revoked and the individual ordered to active duty to complete the remaining active duty obligation for failure to fulfill the condition for which the early discharge was granted. Excepted are individuals who, because of hardship reasons that develop during their MS I year may request (in writing) to return to active duty. This will be forwarded to the Commander, ROTCCC ATTN: ATCC–PC citing the circumstances. In such cases, an informal investigating officer's report is sufficient. If appropriate, cadet command will coordinate with the appropriate career branch at PERSCOM to confirm the individual's return to active duty and determine specific duty assignment.

(2) ROTC obligated cadets will be administered in accordance with paragraph 3–43, below.

## Section V
## Contract and Agreement

### 3–40. Nonscholarship cadet
a. DA Form 597 will be completed by nonscholarship students enrolling in the ROTC advanced course (MS III). Completion by the student and the PMS or assistant professor of military science (together with the completion of DD Form 4-series) and execution of the loyalty oath (except students enrolled under para 3–29) enrolls the student in the advanced course. If the student is a minor, parental consent is required for completion of DA Form 597. Additionally, students who are less than age 18 years cannot enlist without parental consent.

b. Former scholarship cadets who desire reenrollment must repay all financial assistance expended on their behalf prior to reenrollment in addition to meeting all the above stated reenrollment criteria. The PMS will not conditionally contract any former scholarship cadets until they ensure that repayment has been made and that all other reenrollment criteria are met.

### 3–41. Scholarship cadet
DA Form 597–3 (Army Senior Reserve Officers' Training Corps Scholarship Cadet Contract) must be completed by the ROTC scholarship recipient in the same manner as the DA Form 597 is completed by the nonscholarship advanced course cadet. Preparation and disposition of the form will be the same. Scholarship students must, without exception, execute the loyalty oath.

### 3–42. DD Form 4-series
a. Except for cadets who are enrolled in the advanced course under paragraph 3–17, DD Form 4-series will be completed by the student and the PMS. This is a prerequisite to enrollment in the advanced course (MS III) or scholarship program. Those cadets who are conditionally enrolled (para 3–28) need not complete the DD Form 4-series. The forms will be completed on the same date that the enrollment is confirmed (part IV of DA Form 597 or DA Form 597–3).

b. If the student meets one of the following criteria, they must also complete DD Forms 1966/1 through 1966/8 (Record of Military Processing Armed Forces of the United States), DA Form 4824–R (Addendum to Certificate and Acknowledgment of Service Requirements), DA Form 3540 for all personnel applying for participation in the Reserve Officer Training Program (ROTC)/Simultaneous Membership Program (SMP), DD Form 3540/1 or NGB Form 594–1 as applicable.

(1) The student has enlisted in an Army Troop Program Unit (TPU) of the USAR under Enlistment Option 9–55 for the Army ROTC/Selected Reserve SMP.

(2) The student is a member of USAR Control Group (ROTC) who subsequently transferred to a TPU.

(3) The student is a member of USAR or TPU ARNG and is selected to participate in ROTC/SMP.

## Section VI
## Disenrollment, Discharge, Separation, Transfer, and Leave of Absence

### 3–43. Disenrollment
a. A nonscholarship cadet may be disenrolled by the PMS. A scholarship cadet may be disenrolled only by the CG, ROTCCC. (For exception, see (3) below.) Disenrollment authority does not include the discharge authority for SMP participants. Nonscholarship and scholarship cadets will be disenrolled for the following reasons:

(1) To receive an appointment or enter an officer training program other than ROTC. The release must be approved by the region commander or higher headquarters.

(2) To receive training under Army Medical Department programs such as Health Professional Scholarship Programs and United States Uniform Health Services.

(3) At their own request, if they are nonscholarship basic course cadets. The 4-year scholarship cadets may be disenrolled at their own request during the MS I only. (See para 3–39.)

(4) Because of withdrawal or dismissal from the academic institution. A former cadet may be reenrolled if he or she enters a school that offers ROTC, provided that he or she meets the reenrollment criteria in paragraph 3–16.

(5) Medical disqualification (to include pregnancy if complications exist) when determined and approved by HQ, ROTCCC, or higher authority. A medical condition that precludes appointment will be cause for disenrollment.

(6) Failure to maintain a minimum semester or quarter cumulative academic GPA of 2.0 on a 4.0 scale or higher if required by the school and at least a 3.0 on a 4.0 scale or equivalent semester or quarter and cumulative average in all ROTC courses.

(7) Personal hardship as specified in AR 635–200, chapter 6.

(8) Failure to meet the same requirements of the Army Weight Control Program and the Army Physical Fitness test as required of active duty Soldiers prior to the end of the last school term of the MS III year.

(9) For being an approved conscientious objector.

(10) For being dismissed from advanced camp, receiving a recommendation not to receive credit for advanced camp or withdrawal from advanced camp for reasons other than breach of contract. If breach of contract is involved, (see (16) below).

(11) It is discovered that a fact or condition exists that will bar a cadet for appointment as a commissioned officer, to include a positive urinalysis for drug and alcohol abuse. When a cadet is under charges, in confinement or under investigation, HQDA (TAPC–OPP–P) will be notified immediately if the cadet is an MS IV and a accession file was evaluated by HQDA ROTC Selection Board.

(12) Misconduct, demonstrated by disorderly or disrespectful conduct in the ROTC classroom or during training, or other misconduct that substantially interferes with the ROTC mission, including participation in unlawful demonstrations against the ROTC, illegal interference with rights of other ROTC students, or similar acts.

(13) Inaptitude for military service as demonstrated by lack of general adaptability, skill, hardiness, ability to learn, or leadership abilities.

(14) Undesirable character demonstrated by cheating on examinations, stealing, unlawful possession, use, distribution, manufacture, sale (including attempts) of any controlled substances, as listed or defined in 21 USC 812, discreditable incidents with civil or university authorities, falsifying academic records or any forms of academic dishonesty, failure to pay just debts, or similar acts. Such acts may also be characterized as misconduct.

(15) Indifferent attitude or lack of interest in military training as evidenced by frequent absences from military science classes or drill, an established pattern of shirking, failure to successfully complete an established weight control program, or similar acts.

(16) Breach of contract (including formerly used term willful evasion). (*Note:* Breach is defined as any act, performance or nonperformance on the part of a student that breaches the terms of the contract regardless of whether the act, performance or nonperformance was done with specific intent to breach the contract or whether the student knew that the act, performance or nonperformance breaches the contract).

(17) *Rescinded.*

*b.* A board of officers will be appointed by the PMS, the brigade commander, or the region commander according to the formal procedures outlined in AR 15–6, as modified by this regulation (see AR 15–6, para 1–1) and guidance from the CG, ROTCCC, to consider the case of each cadet considered for disenrollment under subparagraph *a*(13) through (16) above, or when deemed necessary. Additionally, in cases where a board of officers is not appointed, the PMS will appoint an investigating officer to inquire into the case of any scholarship or advanced course cadet being considered for disenrollment, to include voluntary disenrollment or disenrollment to join another officer procurement program. Disenrollment for medical reasons will be referred to CG, ROTCCC for review and approval. The appointing authority will determine whether the formal or informal procedures of AR 15–6 will be used. However, in every case, the student concerned has the right to appear personally before the board or officer conducting the investigation. The cadet is entitled to be assisted in the preparation of the hearing by any reasonable available military officer (who need not be an attorney) or may hire civilian counsel at his or her own expense. However, the counsel may not represent the cadet at the hearing, although counsel may be available to give advice. At least one school official will be permitted to observe any hearings that may arise from the appointment of such board or investigation. Notwithstanding any provision of AR 15–6, cadets who are the subject of disenrollment action are not entitled to counsel at Government expense. The requirement for appointment of a board of officers or investigating officers is waived if the student subject to disenrollment action voluntarily waives in writing) his or her right to such board review within 10 days of notification of pending disenrollment.

*c.* Cadets undergoing board or investigative action will be placed on LOA when the cadet is notified of the board of investigative hearing which will suspend tuition and subsistence payments pending outcome of the board or investigation. The ROTC contract will be annotated to show the date and reason for disenrollment or discharge.

*d.* A cadet disenrolled under *b* above will not be authorized to participate in ROTC training as a conditional student or permitted to audit the course, unless school policy authorizes such participation.

*e.* A cadet who is involuntarily ordered to active duty for breach of his or her contract will be so ordered within 60 days after they would normally complete baccalaureate degree requirements, provided the cadet continues to pursue a baccalaureate degree at the school where they are enrolled in the ROTC or the school where the cadet has agreed to pursue such degree, if the school where he or she is enrolled does not offer that degree. If not academically enrolled, the cadet will be ordered to active duty 60 days from date of notification of active duty. Graduate students may not be ordered to active duty until they complete the academic year in which they are enrolled, or disenroll from the school, whichever occurs first.

## 3–44. Discharge and separation from the United States Army Reserve

*a.* The CG, ROTCCC, is the only authority for discharge of scholarship cadets. The PMS, brigade commander or the region commander is the authority for discharging nonscholarship cadets (for exceptions see para 3–43.) ROTC cadets normally will be honorably discharged on the date of disenrollment from the ROTC program, except those ordered to active duty under the terms of their ROTC contract. Procedures governing disenrolled SMP participants are outlined in

AR 601–210 and NGR 600–200. The authority to issue an other than honorable discharge will not be delegated below region headquarters.

*b.* Cadets assigned to USAR Control Group (ROTC) may be discharged or separated for the convenience of the Government for any of the reasons listed below.

(1) Failure to obtain parental consent, if required, to enroll in the advanced course. Students who enlist in the USAR under this section, but are unable to obtain parental consent to their ROTC contract or service obligation, if required, may be separated and discharged upon their request. (See AR 135–178.)

(2) To accept appointment as a commissioned officer. The effective date of discharge will be the day before commissioning.

(3) Termination of a 4-year scholarship. The 4-year scholarship cadets whose status is terminated during the first year may be discharged without disenrollment from the ROTC. (Membership in the USAR is not a requirement for enrollment in the basic course as a nonscholarship cadet.)

*c.* Upon disenrollment from the ROTC, a cadet assigned to Control Group (ROTC), who is not ordered to active duty or pending such an order and has previously completed a basic training course conducted by a U.S. Armed Force, will be transferred to the IRR if the military service obligation has not been met. A cadet assigned to Control Group (ROTC) who is not ordered to active duty or pending such an order and has no previous military service, or who has not completed a basic training course, will be discharged. The effective date of discharge or transfer will be the date of disenrollment from the ROTC.

*d.* Except for SMP participants, cadets who are members of the ARNG or USAR at the time of enrollment in the advanced course or scholarship program, will be discharged and will then enlist in the USAR in the grade of cadet. The PMS will provide the appropriate State adjutant general or USAR commander with a copy of the agreement as soon as possible after the enrollment. Upon receipt of the copy of the ROTC enlistment agreement, the authorities cited in AR 135–178, chapter 1 will issue the discharge.

*e.* Cadets called to active duty for breach of the terms of their ROTC contract will serve periods of active duty as specified in their contract. (See AR 135–210, chap 1, sec III). Members of the SMP who were in the ROTC control group prior to joining a troop program unit may be returned to the ROTC control group for the purpose of call to active duty if found to be in breach of their contract.

*f.* A cadet who requests disenrollment from the ROTC and discharge from the USAR by reason of being a conscientious objector will submit an application for discharge on DA Form 4187 (Personnel Action) to the CG, ROTCCC, for approval. The cadet will not be discharged or disenrolled until receipt of final determination. If the application for discharge is disapproved, the PMS will continue the cadet in the program, advising him or her that to receive an appointment as a commissioned officer they must furnish an affidavit withdrawing conscientious objection. If the cadet refuses to furnish the affidavit or to accept appointment when tendered, they may be deemed to have breached the terms of their contract and may be ordered to active duty in his or her reserve enlisted status according to paragraph 3–43*e*.

## 3–45. Processing Army National Guard and United States Army Reserve Simultaneous Membership Program participants for discharge to accept a commission

Although the PMS is authorized to order discharge of enlisted members of the USAR assigned to USAR Control Group (ROTC) for them to accept a commission, the PMS does not have that authority for SMP participants assigned to USAR or ARNG units. The discharge authority for ARNG Soldiers is the proper State adjutant general and for USAR Soldiers is the CG, ARPERCEN. The PMS must coordinate with the appropriate authorities to ensure the Soldiers are discharged effective the day preceding their commissioning. (See AR 135–178, para 3–4*b* and NGR 600–200).

## 3–46. Transfer to another school

*a.* Under the terms of the contract (DA Form 597 or DA Form 597–3), a cadet transferring to another school agrees to enroll in the ROTC Program of the gaining school. The transfer will be accomplished as prescribed by the CG, ROTCCC.

*b.* If, after compliance with *a* above, the cadet transfers to a school that does not have an ROTC unit, cross-enrollment cannot be accomplished, and there is no voluntary breach of contracts the cadet will be disenrolled. A cadet assigned to the USAR Control Group (ROTC) will be—

(1) Honorably discharged if the cadet has not completed a basic training course conducted by U.S. Armed Forces.

(2) Transferred to the IRR if the cadet completed a basic training course during previous military service.

*c.* A cadet transferring to a school that does not have an ROTC unit without complying with the procedures in paragraph *a* above, or following disapproval of a request for transfer, is in breach of contract and the action may constitute a voluntary breach of contract. Cadets who transfer without authorization will be processed for disenrollment and possible order to active duty.

**3–47. Interservice transfers**

Cadets disenrolled for purpose of this paragraph will be subject to the investigation provisions of paragraph 3–43b. These options do not apply to ROTC/SMP participants or scholarship cadets.

*a. Army/Air Force.*

(1) Interservice transfer of ROTC students will be limited to justifiable cases. The request for transfer to an Air Force unit must include an endorsement from the Professor of Aerospace Studies of the unit to which transfer is requested, which contains a statement that tentative approval of the transfer depends on the approval of Army authorities. Scholarship students may not transfer after entering the sophomore year.

(2) In case of a request for transfer to an Army ROTC unit, the PMS will consider the effect the transfer will have on enrollment objectives and existing Army-Air Force relations. Credit may be granted for Air Force ROTC courses completed, except that the cadet must attend the Army ROTC advanced camp. The CG, ROTCCC, may grant a waiver for attending the Army ROTC advanced camp. However, if the student has terminated affiliation with the Air Force, ROTC placement credit may be given for the period of Air Force training only as provided in table 5–1.

*b. Army/Navy.* Transfers between Army and Navy ROTC units are not authorized. If the student has terminated his or her affiliation with the Navy, ROTC credits may be given for periods of Naval training only as provided in table 5–1.

*c. Enlistment in the U.S. Marine Corps Reserve.* The PMS may disenroll an ROTC basic course cadet (MS I only if scholarship) for enlistment in the USMCR for the Platoon Leadership Course program. The PMS may approve request for disenrollment from nonscholarship advanced course cadets for this purpose. Request from scholarship cadets (MS II and the advanced course) will be sent through channels to CG, ROTCCC, for final action.

**3–48. Leave of absence for nonscholarship cadets**

*a.* The region commander is the approving authority for leave of absence. Approval authority may be delegated as necessary. Any request for LOA or other delay in commissioning will require a review of the cadet's continued eligibility for appointment.

*b.* A cadet who requests an LOA or who otherwise extends his or her period of enrollment beyond the 8-year period of enlistment must voluntarily extend the enlistment by an amount equal to the period of extended enrollment or LOA.

*c.* No compensation or allowance will be paid to the cadet while in a LOA status. An LOA will not affect the period of benefits authorized.

*d.* Cadets who attend basic camp after their freshman year and are awarded a 2-year scholarship will be placed on an LOA for a year to ensure academic alignment with MS III.

*e.* Upon notification of disenrollment action cadet may be placed in LOA status pending board decision.

**Section VII**
**Insurance, Medical, and Related Benefits**

**3–49. General**

*a.* Army medical treatment facilities (subject to the availability of space, facilities and capabilities of the professional staff) are authorized to provide in-patient care to ROTC cadets and students who are injured or become ill while participating in Army sponsored sports, recreational, or training activities. Hospitalization will be provided only on a temporary basis until other arrangements can be made. Care will be provided without charge. Cadets may also be given medical examinations and immunizations when considered necessary by the medical facility commander concerned. See AR 40–3, paragraph 4–51.

*b.* Applicant for membership is a student enrolled (but not contracted) during a semester or other enrollment term, in a course that is a part of SROTC instruction at an educational institution. An applicant for membership in or a member of the SROTC Program who suffers an injury, disease, illness, disability or death incurred in the line of duty, while engaged in any authorized ROTC training or performing authorized travel to or from the training site, may be eligible to receive medical care coverage and compensation benefits from either (or both) of the Department of Labor or the Veteran's Administration (VA). This includes ROTC training on campus, off campus and at ROTC camps. The training must be distinguished as training and not active duty for training. Claims must be processed through these agencies to document that the injury, illness, disability, or death was incurred in the line of duty. In general, claims for temporary injuries, disease, or illness should be submitted to the Department of Labor and claims for permanent disability or death should be submitted to the VA for consideration.

*c.* An ROTC cadet or applicant who suffers disease or injury under conditions described in *b* above will receive necessary medical and hospital care promptly. The U.S. medical officers and hospitals will be used if services are available and their use is practical. When such officers or hospitals are not available or their use is impractical, private physicians and hospitals may be used.

*d.* Expenses incurred by a military department in providing hospitalization, medical and surgical care, or in connection with a funeral and burial of an eligible person, may, under certain circumstances, be reimbursed by the Secretary of Labor out of the Employees' Compensation Fund. However, reimbursement will not be made for any

hospitalization, medical or surgical care provided to a student by a military department in a facility of a military department.

### 3–50. Sources of medical care

Injured students who are eligible to receive medical treatment are authorized medical care from the following sources:

*a.* The U.S. Public Health Service hospitals or physicians where available.

*b.* Army, Navy, Air Force, or VA medical treatment facilities subject to the availability of space, facilities and the capabilities of the professional staff.

### Section VIII
### Entitlements

### 3–51. Subsistence allowance

All cadets enrolled in the advanced course are entitled to the subsistence allowance authorized by law. The allowance will start on the day the cadet starts the advanced course, which is the same as the effective date of the advanced course contract. The subsistence allowance will continue until the cadet has met all requirements for commissioning or has been disenrolled, except as provided below or by other law, regulation or directive. In no event, will any cadet receive subsistence allowance for more than 10 months of any academic year or the actual duration of the academic year, whichever is shorter.

*a.* A conditional cadet who participates in the advanced course pending decision by the proper authorities will not be paid subsistence allowance until found qualified for enrollment and actually enrolled. Cadets are entitled to subsistence allowance only upon application, selection and enrollment in the advanced course. No cadet will be paid subsistence allowance for any period that the cadet was not participating in the advanced course.

*b.* Cadets attending schools that operate a normal (non accelerated) academic calendar will not be paid subsistence for summer camp training, regardless of when they attend camp. However, if the cadet's academic class is continued past the opening date of the camp, he or she will continue to receive subsistence allowance for that period.

*c.* Schools that operate an accelerated program, cadets who participate in ROTC training during the normal vacation period, may be paid except as in paragraph *a* above. However, payment of subsistence allowance for that authorized portion of training conducted during the normal summer vacation period will not be made until the cadet has resumed ROTC training the following academic school year.

*d.* Advanced course ROTC cadets and basic course scholarship cadets who are enrolled in 'cooperative courses' may receive credit and subsistence allowance for ROTC training during that part of their academic course while away from school, provided they continue to perform the minimum required training through correspondence courses, or other means satisfactory to the PMS. Cadets enrolled in programs sponsored by the school, which include study at foreign education institutions or study on an overseas campus of the ROTC institution, may perform ROTC training and receive subsistence allowance under the same basis. Since cooperative programs generally involve more than 4 years of study, a LOA from the ROTC may be granted to the cadet while away from the school. No compensation is approved or allowance are accrued while the cadet is in an LOA status.

*e.* The cost of Government meals furnished without charge during field training exercises will be deducted according to DODPM paragraph 80401.

### 3–52. Pay at camp

Pay for attendance at ROTC Advanced Camp, Nurse Summer Training Program, Cadet Troop Leadership Training or Basic Camp will be made at the rate prescribed by law for cadets at the U.S. Military Academy (DODPM part 8, chap 4).

### 3–53. Travel entitlements

*a.* Travel under orders as a cadet and travel to home or abode upon discharge from a camp for cadets or commissionees not ordered to immediate active duty is authorized as follows:

(1) Transportation and subsistence-in-kind, or mileage allowance according to the Joint Federal Travel Regulation (JFTR), paragraph U7150–F.

(2) Official travel outside Continental United States.

*(a)* Official travel requiring transportation outside the continental limits of the United States will be by Government transportation when possible. Arrangements will be made by contacting the commanding officer, port of embarkation from which water or air transportation would be furnished; transportation officer of the nearest military post, camp, or station; the U.S. Military Attache of the country in which residing.

*(b)* If Government transportation is not available from an overseas location, a statement to this effect must be secured from the transportation officer where the request was made, supporting the claim. Receipts for commercial cost of travel performed will be obtained to submit for reimbursement. Travel pay for necessary land travel performed at personal expense outside the United States will be computed according to the JFTR.

*b.* In addition to subparagraph *a* above, 4-year scholarship recipients, 2- and 3-year active duty scholarship recipients and MJC scholarship recipients (attending the MJC for the first time as college freshman) are authorized one time travel entitlements from their home of record to the school for the purpose of enlisting in the USAR Control Group (ROTC) and to obtain the academic degree shown in the contract. (See JFTR, para U7150–F3). All scholarship cadets are entitled to return travel to their home of record on discharge from USAR Control Group (ROTC) if they are not ordered to immediate active duty, except those cadets who remain at the school after such discharge to continue their education (JFTR, U7150–F3).

## Section IX
## Air Transportation

### 3–54. Authorization

*a.* Authorities to approve and disapprove extended flights for ROTC cadets, and local and extended flights for civilian dignitaries directly concerned with ROTC activities is the CG, ROTCCC, and appropriate overseas commanders. The PMS or camp commander may approve local flights when at field training, or ROTC summer training programs on approval of the Field Training Commander; or during a school year provided—

(1) Aircraft is on an extended flight and the travel has received prior approval by the appropriate military designee.

(2) Students are undergoing formal ROTC and academic training during a school term, and the flight is in connection with this training (except ROTC teams for competition).

(3) Students are uniform.

*b.* Civilian dignitaries directly concerned with ROTC activities are authorized military air transportation when, in the judgment of the commander, such flights are in the interest of the ROTC and related activities and prior approval has been given.

*c.* Approved requests requiring aviation resource not available to the commander, will be sent with full justification as to the need and purpose. Requests will be submitted through channels to the Service Transportation Chief concerned.

### 3–55. Space available travel

*a.* Space available travel on nonmilitary air command Airlift Service Industrial Fund aircraft for advanced course cadets and scholarship cadets (both basic and advanced) is authorized for travel within CONUS for periods when school is not in session or for other purposes when cadets are on official absence from school upon presenting a document bearing the signature of the PMS in charge of the ROTC Program at the civilian educational institution. The document will identify the individual by name as being in one of the above criteria.

*b.* Cadets will be offered space available travel, but will not compete for available space with other eligible travelers such as active duty and retired members. They should, therefore, be encouraged to travel via commercial modes of transportation.

### 3–56. Release from claim for injury or death

Civilian dignitaries are not required to sign a release from claim for injury or death before flying in a military aircraft.

**Table 3–1**
**Medical Requirements for Reserve Officers' Training Corps**

| Administrative requirements | Enrollment in basic course | | | For enrollment in advanced course [1] | Cadets between MS–III and MS–IV | ROTC scholarship cadets | Enrolled in 5-year academic course | Eligible for appointment upon completion of camp | General | For assignment to "Combat Arms" |
| | ROTC cadets | ROTC scholarship cadets | For attendance at basic camp | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Medical fitness standards: [2] | Student medically fit to participate in ROTC program. [3] | AR 40–501, chapter 5. [4] | AR 40–501, chapter 2. | AR 40–501, chapter 2. | AR 40–501, chapter 2. | AR 40–501, chapter 2. | AR 40–501, chapter 2. | AR 40–501, chapter 2. | Standards applicable at time of enrollment in advanced course will apply, including waivers granted. | AR 40–501, chapter 2 to include paragraphs 5–17 and 5–19. |

**Table 3–1**
**Medical Requirements for Reserve Officers' Training Corps—Continued**

| Administrative requirements | Enrollment in basic course | | | For enrollment in advanced course [1] | Cadets between MS–III and MS–IV | ROTC scholarship cadets | Enrolled in 5-year academic course | Eligible for appointment upon completion of camp | General | For assignment to "Combat Arms" |
|---|---|---|---|---|---|---|---|---|---|---|
| | ROTC cadets | ROTC scholarship cadets | For attendance at basic camp | | | | | | | |
| Scope of Examination: | Extensive enough to insure compliance with above standard. | Type B, AR 40–501. | Type A, AR 40–501. | Type A, AR 40–501. | Type A, AR 40–501. | Type B, AR 40–501. | Type A, AR 40–501. [8] | Type A, AR 40–501. [8] | Type A, AR 40–501. | Type A, AR 40–501 and paragraphs 5–17 and 5–19. |
| When required: | Within 1 year prior to enrollment. | As scheduled. | Within 1 year prior to reporting for camp. Screening exam upon arrival. | Within 1 year prior to enrollment. | Immediately upon arrival at camp. | As scheduled. | Immediately upon arrival at camp. | By 1 Feb prior to opening of camp. | Examinations taken at advanced camp vaild for 18 months. | |
| Responsibility: | Expenses borne by applicant. | DOD-MERB for qualification. | Region commanders. | Region commanders. | Region commanders. | Region commanders. | Region commanders. | Region commanders. | Region commanders. | Region commanders. |
| Reports and forms required. | Statement from physician DA Form 3425–R. [6] | 1 Cy SF 88. 1 Cy SF 93. | 1 Cy SF 88. 1 Cy SF 93. | 1 Cy SF 88. 1 Cy SF 93. | 1 Cy SF 88. 1 Cy SF 93 & DA Form 2453–R. [7] | 1 Cy SF 88. 1 Cy SF 93. | 1 Cy SF 88. 1 Cy SF 93 & DA Form 2453–R. [7] | 2 Cy SF 88. 2 Cy SF 93 & DA Form 2453–R. [5,7] | 2 Cy SF 88. 2 Cy SF 93. | 2 Cy SF 88. 2 Cy SF 93. |

Notes:

[1] Not required for 3, 4, or 5 year scholarship cadets.

[2] Cadets under 18 years of age will be given appropriate consideration for height and weight, commensurate with their age.

[3] A program not more strenuous than a college physical education program.

[4] For height and weight, all applicants must meet the standards of AR 600–9.

[5] If examination is conducted subsequent to camp, 4 copies of SF 88 and 2 copies of SF 93 will be required.

[6] DA Form 3425–R—Medical Fitness Statement for Enrollment in Basic Course, Senior ROTC or medical records from the school indicating student is medically qualified for the basic course training.

[7] DA Form 2453–R—State,emt of Health and Medical Examination.

[8] Includes Sickle Cell Test, Immunizations, HIV Testing, and Drugs and Alcohol Testing.

# Chapter 4
# Uniform and Insignia

## 4–1. Authority

a.  Each cadet and alien student authorized to participate in the advanced course may be furnished an issue-in-kind or cadet-type-uniform. The authority for issue-in-kind uniforms to cadets is CTA 50–900. Schools that provide a cadet-type uniform or desire to purchase issue-type uniforms from Army or commercial sources may be authorized to do so in place of receiving Army-issued uniforms. The operating policies and procedures concerning the supply of issue uniforms to schools are outlined in AR 700–84, chapters 9 and 10.

b.  All uniforms purchased with commutation funds (see AR 700–84) may, at the discretion of the school, become the property of the cadet who is commissioned. Alien student uniforms will be retained by the school. School authorities may authorize other cadets who are not commissioned to retain their cadet-type uniforms. Uniform items issued to the institution (issue-in-kind) are Government property and may not be retained by cadets, except as

authorized by AR 700–84. Cadets who have worn the uniform for 2 years may purchase clothing items at time of commissioning according to AR 700–84, chapter 9.

## 4–2. Special rates for commutation in lieu of uniform

*a.* To qualify for commutation in lieu of uniform the school must—

(1) Organize and maintain a self-contained corps of cadets within the undergraduate school body.

(2) Require all members of the corps to be in proper uniform at all times while on the campus.

(3) House all members of the corps in barracks separate from nonmembers of the corps. This requirement may be waived for female students, married students, and graduate students who are not billeted with the corps of cadets.

(4) Require all members of the corps to be constantly under military discipline on a 24-hour-per-day, 7-day-a-week basis. This requirement may be waived for female students, married students, and graduate students who are not billeted with the corps of cadets.

(5) Require all physically qualified members of the corps to be enrolled in the basic course, except the following:

*(a)* Alien students.

*(b)* Persons whose enrollment is precluded by other provisions of this regulation.

*(c)* Certain categories of students who are specifically excused by administrative (board of trustees) decisions.

*b.* Only those members of the corps of cadets satisfying the above requirements and who are enrolled in the ROTC will be entitled to the special rate of commutation in lieu of uniform. Military colleges may enroll qualified cadets in ROTC who for various reasons are not required to be members of the corps of cadets. They will receive only the standard commutation rate.

## 4–3. Authorized uniforms

The following uniforms are authorized for wear by ROTC cadets:

*a. Cadet-type uniform.* Schools that are authorized commutation in lieu of issue-in-kind uniforms may adopt a uniform of any type or color they desire, provided there is no conflict with any provisions of law or regulation.

*b. Issue-type uniform.* The issue-type uniform is identical to that issued to enlisted Soldiers or is so similar in design and fabric that one cannot be distinguished from the other. CTA 50–900 provides the basis for issue and AR 700–84 prescribes the procedures for requisitioning these uniforms.

*c. Simultaneous Membership Program cadets.* Clothing that has been provided to the SMP participants by the ARNG or USAR unit will not be issued at the ROTC unit. Clothing items will be furnished by the commander of the ARNG or USAR unit to which he or she is assigned according to CTA 50–900. This does not apply to clothing items worn as outer garments on which the ROTC shoulder sleeve insignia has been or will be sewn.

## 4–4. Optional items for wear

The CG, ROTCCC, may authorize cadets to wear optional uniform items that have been authorized for wear by active duty personnel. Optional items to be purchased with appropriated funds will be determined by the CG, ROTCCC.

## 4–5. Wearing of the uniform

Unless otherwise specified by the CG, ROTCCC, wear and appearance of the uniform will be as stated in AR 670–1. The Army ROTC uniform will not be worn outside of the United States and its possessions, except by specific authority. ROTC cadets may wear the issue uniform within the United States and it possessions when—

*a.* Assembled for the purpose of military instruction.

*b.* Engaged in the military instruction of a cadet corps or similar organization.

*c.* Traveling to and from the school where enrolled.

*d.* Visiting a military station for participation in military drills or exercise.

*e.* At other functions authorized by the PMS.

## 4–6. Authorized items for wear

*a.* Only insignia prescribed by the CG, ROTCCC, or approved in writing by the Institute of Heraldry, are authorized for wear on the ROTC uniform.

*b.* The PMS should direct correspondence through the proper ROTC region and the CG, ROTCCC, to The Institute of Heraldry, U.S. Army, Cameron Station, Alexandria, VA 22314-5050, when requesting approval or information concerning distinctive insignia (including how to wear it) or other uniform accessories. At least 90 days should be allowed for reply.

*c.* Insignia and uniforms purchased by the school or the cadet must be purchased from sources that sell items made according to specifications. The Institute of Heraldry will supply a list of certified manufacturers.

*d.* The following are the only "sew on" items authorized for wear on the ROTC uniform:

(1) Distinctive Cadet Command shoulder sleeve insignia.

(2) Distinctive institutional shoulder sleeve insignia.

(3) Airborne Badge, Air Assault Badge, Combat Infantry Badge, Expert Infantry Badge, Combat Field Medical Badge, and Expert Field Medical Badge or Ranger tab.

(4) The name tape and U.S. Army distinguishing tape on fatigue and battle dress uniforms only.

*e.* A distinctive shoulder sleeve and shoulder loop insignia (metal and enamel type) will be designed by The Institute of Heraldry on request. Information about the institution, including historical background, school colors, motto, mascot, and similar information must be submitted with the request.

*f.* The CG, ROTCCC, is authorized to prescribe the awarding and wearing of cadet awards. Headquarters, Cadet Command, will publish the criteria in a separate publication.


# Chapter 5
# Training

## 5–1. Mission
The training mission is to develop leaders through comprehensive on-campus and off-campus training and education programs.

## 5–2. Training and education
*a.* DCSOPS has overall responsibility for developing and announcing training policy. The CG, ROTCCC, is responsible for planning, conducting, and evaluating in detail the ROTC training and education programs.

*b.* A curriculum developed under the ROTC Program is not restricted to classroom teaching. Programs goals and learning objectives must be met in a variety of methods. A program will include a curriculum that provides for other than classroom instruction. Field training is a necessary supplement to classroom instruction. All instruction must meet the following requirements:

(1) Provide stated learning objectives.

(2) Is adopted by the host school as part of its curriculum.

(3) Is within the guidance of the program of instruction published by the CG, ROTCCC.

*c.* The ROTC curriculum should accomplish program objectives that will be most appropriate to the host institution's curriculum. The ROTC curriculum should receive the same degree of program support as other elements of the curriculum.

*d.* Standards of physical fitness will be established for cadets. Individual programs outside of normal academic hours will be conducted, when required, to attain desired results.

*e.* Wearing the uniform and executing close order drill are considered necessary parts of ROTC leadership development. They will be integrated into the military science part of the curriculum.

## 5–3. Inspection
*a.* All SROTC cadet battalions will be formally inspected by the region headquarters every 3 years. Cadet battalions/extension centers on formal evaluation status will be inspected more frequently. These inspections will be the basis for—

(1) Evaluating the efficiency of the battalion and the quality of ROTC training conducted.

(2) Determining if the battalion is accomplishing the objectives of the ROTC Program.

(3) Determining if schools are eligible to receive the special rates of commutation in lieu of uniform. See AR 700–84, chapters 9 and 10.

(4) Ensuring that each military college meets the eligibility criteria to be designated as a military college.

*b.* Schools listed in AR 700–84, table 10–1, will be inspected annually to validate eligibility to receive the special rates of commutation in lieu of uniform.

*c.* The Inspector General (IG) assistance visits will focus on issues rather than units. The scope and content are determined by the detailed IG commander.

## 5–4. Military Qualification Standard I System
*a.* The CG, ROTCCC, serves as the functional proponent responsible for the execution of the ROTC Program, overwatches the military qualifications standards (MQS)–I, and coordinates for the CG, TRADOC, the implementation of MQS–I.

*b.* MQS–I, the precommissioning component for the MQS System, provides the knowledge and educational background that is required of an officer to begin military service. It serves as the basis for all future military training and consists of critical military skills, professional knowledge subjects, and professional military education requirements. The goal of MQS–I training, coupled with the student's educational degree, is to produce a well-rounded functional officer.

## 5–5. Placement credit for previous training

*a.* Cadets may be given placement credit by the PMS for prior military training toward completing Army ROTC courses, other than camp training. Authorized maximum placement credit is shown in table 5–1.

*b.* Placement credit may be granted for substantially equivalent training. Each case will be judged individually so that the best interests of both the cadet and the service may be achieved.

*c.* Applicants for the SROTC Program will not receive placement credit for any part of the advanced course on the basis of duty in the Armed Forces.

*d.* Academic credit for prior military education and training will be determined by the school.

**Table 5–1**
**Placement Credit**

| Previous training | Credit for placement in SROTC |
| --- | --- |
| Active or reserve component service as an enlisted person or warrant officer in the U.S. Army, Navy, Air Force, Marine Corps, or Coast Guard: | |
| Army basic training or equivalent in (including USMC PLC) other Services Attendance at a service academy (Army, Navy, Air Force, Coast Guard, or Merchant Marine): | MS I and MS II |
| 1 year | MS I |
| 2 year | MS I and MS II |
| Senior ROTC (Army, Navy, Air Force) training: | |
| MS, NS, or AS I | MS I |
| MS, NS, or AS II | MS I and MS II |
| MS, NS, or AS III | MS I and MS II |
| MS, NS, or AS IV | MS I and MS II |
| Junior ROTC (Army, Navy, Air Force, or Marine Corps) or NDCC training: | |
| 1 year | None |
| 2 years | As determined by PMS, but not to exceed MS I |
| 3 or 4 years | MS I minimum; MS II maximum. Actual credit to be determined by PMS |

## 5–6. Basic camp

*a.* ROTC Basic Camp is required for all applicants who have not completed or received credit for completing MS I and MS II. It is designed to bring students to a level of military training that will qualify them for enrollment in the advanced course. Nursing majors can elect not to attend basic camp. A training program is provided on-campus to meet the MQS–I required for these nurse majors.

*b.* Training will be rugged and intensive. Special emphasis will be placed on physical conditioning and practical hands-on work. To the maximum extent, all training will be conducted outdoors and will consist of exercises that permit the student to be an active participant. Classroom-type instruction will be held to a minimum.

*c.* Practical training in leadership will be stressed throughout the camp period. To develop initiative and leadership and to ensure practical experience, students will be rotated in positions of responsibility of command.

*d.* Applicants for basic camp must undergo the same medical examination that is required for enrollment in the advanced course. The medical examination must have been completed and reviewed within 1 year before reporting to basic camp. On reporting to camp, a screening examination will be given to detect any interim illness, pregnancy, or injury.

*e.* Qualified applicants who successfully complete ROTC Basic Camp or the 4-semester Nurse Training Program will be given credit for the ROTC Basic Course.

## 5–7. Advanced camp

*a.* The advanced camp mission is to train cadets to leadership and Army standards and evaluate their officer leadership potential. The Advanced Camp Program of Instruction is determined by the CG, ROTCCC. Special emphasis is placed on technical and tactical skills and leadership development.

*b.* The advanced camp is a mandatory training program that supplements the campus training with practical experience in a field training environment. The advanced camp is conducted as part of the advanced course, normally

between MS III and MS IV years. Special emphasis will be placed on leadership training. Successful advanced course completion is a prerequisite for appointment. The Nurse Summer Training Program (NSTP) may be substituted for the standard camp for cadets with a nursing academic major. The NSTP will equate to ROTC advanced camp to complete and satisfy the statutory field training requirements for ROTC cadets (10 USC 2104).

### 5–8. Attendance

*a.* Each advanced course cadet is required to satisfactorily complete the ROTC Advanced Camp, or the Nurse Summer Program as a requirement for completing the advanced course and appointment as a commissioned officer. Cadets who complete the NSTP and subsequently change majors (from nursing) will be required to attend advanced camp.

*b.* Attendance at the advanced camp may be waived by the CG, ROTCCC, for transfer cadets who have completed another service's completion equivalent.

### 5–9. Cadet professional development training

The ROTC cadet professional development training (CPDT) is comprised of cadet training in Army School and with active Army and reserve components units. The CPDT program supplements the campus training with practical experiences and additional skill identifier awarding courses. The CPDT is made up of two sub-programs: Practical Field Training, and Cadet Troop Leader Training (CTLT).

*a.* Practical field training includes training in: Basic Airborne; Air Assault; Jungle Warfare Orientation; Northern Warfare Orientation; Master Fitness Trainer; and Russian Language Training. Priority of selection for these limited positions will go to contracted cadets.

*b.* The CTLT program is training with active Army and reserve components units. MS III cadets will be assigned to junior leader positions with Army units. Upon acceptance of a CTLT assignment, successful completion of the assignment is required for commissioning.

### 5–10. Medical examination

*a.* Medical examination for advanced camp, and the NSTP, will be administered as provided in chapter 3, section II. Any physical that is valid for entry to the advanced course will remain valid until attendance at advanced camp. All cadets will be given a physical examination at advanced camp that will remain valid for 24 hours unless there is a known change in the physical condition of the cadet. The cadet must take a copy of their physical examination for entry to the advanced course to advanced camp to facilitate evaluation of the advanced camp physical.

*b.* The Sickle Cell Test, HIV accessions screening, and drug and alcohol testing is a part of the advanced camp physical.

*c.* Once the cadet is determined to be physically qualified, the SF 88 will be stamped to indicate that the individual is qualified for Ranger, Airborne, Air Assault Training or commissioning, as appropriate.

*d.* Applicants for basic camp must undergo the same medical examination that is required for enrollment in the advanced course. The medical examination must have been completed and reviewed within 1 year before reporting to basic camp. On reporting to camp, a screening examination will be given to detect any interim illness, pregnancy, or injury.

### 5–11. Medical care

Members of the ROTC may be treated for an injury or disease occurring not in the line-of-duty only in Army medical treatment facilities and only in the following circumstances:

*a.* During the period of attendance at ROTC camps, cadets may be admitted to Army medical treatment facilities at such camps at no cost to the cadet.

*b.* A member of an ROTC camp may be retained in or admitted to an Army medical treatment facility under the following conditions:

(1) He or she is hospitalized at the end of camp, or before their departure from camp.

(2) He or she is in need of hospitalization because of a disability incurred not in line-of-duty and is medically unable to withstand transportation to their home for the time being.

*c.* Charges for such care will be at appropriate pay-patient rate. The medical treatment facility concerned will collect charges for such care at appropriate pay patient rate from the patient.

*d.* Members of the ROTC who will require hospitalization for a prolonged period will be transferred to a civilian medical facility as soon as they become transportable.

### 5–12. Subsistence

Cadets attending camp, including nonenrolled students authorized to attend camp, will subsist under the field ration issue system or Army Ration Credit System prescribed in AR 30–1, and other DA directives. Current DA instructions concerning adjustment of ration components to meet local conditions are applicable to camps.

**5–13. Transportation**

*a. Authority.*

(1) Cadets will be authorized to proceed, at Government expense, to the designated camp from home (place where cadet normally lives when not in school) or school and return to either home or school.

(2) When home is located outside CONUS (OCONUS), the cadet will normally attend the camp nearest the debarkation point in CONUS, which would normally serve the appropriate OCONUS place of residence. Orders directing OCONUS travel (AR 310–10, app a, format 405) will cite the appropriation. The orders will also provide that if the cadet is delayed awaiting further transportation at the aerial port, he or she will be furnished headquarters (JFTR, para U7150F).

(3) Requests for travel exceptions will be submitted to the region commander in whose area the cadet will be traveling.

*b. Travel allowance.*

(1) ROTC members who attend advanced camp will be paid travel allowances at the rate prescribed in JFTR, paragraph U7150F, for land travel performed at their expense from the place from which authorized to travel and for return travel.

(2) A return travel allowance is not due until the close of camp. The ROTC advanced camp commander may authorize the payment of travel allowance to a cadet who is dismissed or withdraw from camp, if the commander determines that such advanced payment is for the good of the Service. However, the camp commander may authorize the withholding of travel allowance until the camp ends if the commander determined this to be necessary. Cadets who are returned to their home from camps because of being physically disqualified will be paid travel allowances for the return trip before departure from camp. If a student is hospitalized at the end of camp in a hospital other than where the camp is located, they may be paid travel allowance for the official distance from the hospital to the place from which authorized to proceed to camp.


# Chapter 6
# Commissioning of Reserve Officers' Training Corps Graduates

## Section I
## General Commissioning

### 6–1. Scope
This chapter prescribes policies and procedures for appointing ROTC cadets as commissioned officers in the U.S. Army. It applies to graduates of both the 2-year and 4-year ROTC Programs, including Distinguished Military Students (DMS) and scholarship cadets, graduates of military junior colleges, and alien immigrant students.

### 6–2. Appointing authority
Region commanders are authorized to tender appointments as commissioned officers in the U.S. Army, by direction of the President, to ROTC graduates who complete their commissioning requirements at schools within their geographical region who are otherwise eligible for appointment. A cadet who attends advanced camp after graduation may be tendered an appointment by the commander in whose region the school is located even though the camp is in another region. A cadet who is pregnant at the time of graduation may be tendered their appointment at the end of the 6th week following the end of her pregnancy by the commander in whose region her school is located although she resides in another region.

### 6–3. Revocation authority
Region commanders will revoke any other than Regular Army appointment orders for cadets whose appointment was void because one or more of the nonwaivable appointment criteria were not met at the time of appointment as long as the officer has not entered on active duty. Nonwaivable appointment criteria pertain to requirements prescribed by statute or regulations implementing a statute that may not be waived, for example, minimum age or valid enrollment in and completion of ROTC. If the cadet was commissioned RA or has entered on active duty, the recommendation for revocation of appointment orders must be sent to PERSCOM (see AR 635–100).

### 6–4. Term of appointment
Appointments made under this chapter will be for an indefinite term.

### 6–5. Grade and date of rank
*a.* All ROTC graduates commissioned under this chapter will be appointed in the grade of second lieutenant. As an exception, those officers assigned to any corps of the Army Medical Department may be appointed in a higher grade consistent with constructive credit awarded according to AR 135–101. Appointments in a higher grade will not be

made without prior approval of The Surgeon General and receipt of a verified copy of DA Form 5074–1–R (Record of Award of Entry Grade Credit (Health Services Officer)) from The Surgeon General .

*b.* The date of rank for ROTC cadets commissioned in May or June will be the same as the graduation date of the U.S. Military Academy in the same year. The date of rank for all other ROTC commissionees will be the date that they executed the oath of office.

## 6–6. Initial branch assignment and appointment action

*a.* All ROTC cadets who have been selected for active duty will be assigned branches by the CG, PERSCOM. Cadets who apply for RA and are selected, will be appointed in the RA. All other cadets will be appointed in the reserve of the Army with assignment to the USAR or, for cadets who have been appointed in the National Guard of a State and have been federally recognized, to the Army National Guard of the United States. (See NGR 600–100.)

*b.* All ROTC cadets who are granted an educational delay from active duty under AR 601–25 will be given an appointment in the USAR and assigned a branch by the CG, PERSCOM. Request for participation in the Educational Delay Program from cadets intending to pursue graduate studies in law and medical related fields will be approved by the Office of the Judge Advocate General or the Office of the Surgeon General, as appropriate, in concert with the CG, PERSCOM.

*c.* Cadets who are not considered for the RA, considered but not selected for the RA, or whose RA appointment is delayed for any reason will, if otherwise qualified, be appointed in the reserve of the Army with assignment to the USAR. This will be done when considering their requests for an initial period of active duty or active duty training.

*d.* ROTC scholarship recipients designated for Reserve Forces Duty (RFD) will be assigned to troop program units. When unit assignment is known prior to appointment, assignment orders will be published by the appointing authority.

*e.* Cadets appointed in the Reserve of the Army with assignment to the USAR for educational delay will be assigned to the CG, ARPERCEN, by the region commander for administrative control. They will be reported to the CG, PERSCOM, by the CG, ARPERCEN, as outlined in the annual HQDA Letter of Instruction. This will be done before preparing orders for their initial active duty or RFD period.

## 6–7. Withdrawal of application

Final responsibility to commission cadets rests with the region commander. If the facts and/or circumstances that existed when the cadet submitted the Application for Appointment Packet change and in the opinion of the region commander, the cadet is not ready to receive or be offered a commission, the region commander may withdraw the appointment packet or make necessary changes that would be in the best interest of the Army.

## 6–8. Eligibility

To be eligible for appointment, ROTC cadets must, at a minimum, meet the following requirements:

*a. Age.* Have reached their 18th but not their 30th birthday by the date the appointment is accepted. The maximum age limit may be waived by the CG, ROTCC. A waiver granted for enrollment or continuance in the ROTC Program is also a waiver for appointment. However, no waiver will operate to create a violation of statute.

*b. Character.* Be of good moral character and possess officer-like qualifications as evidenced by appearance, personality, scholarship, and extracurricular activities. A waiver granted for enrollment or continuance in the ROTC Program is also a waiver for appointment provided such waiver does not create a violation of applicable statutes, or AR 601–100.

*c. Citizenship.* Be a citizen of the United States.

*d. Education.* Have achieved a cumulative GPA of 2.0 on a 4.0 scale or its equivalent and possess a baccalaureate degree conferred by an accredited 4-year degree granting institution. Exceptions to this requirement are identified in Section II, the Completion Cadet Program and the Early Commissioning Program.

*e. English language aptitude.* Each cadet who does not speak English as his or her primary language, must be able to achieve at least 90 on the ECLT and DLI skill rating of 2+ in comprehension and 2 in speaking. Waivers are not authorized.

*f. Medical fitness.* Meet the medical fitness standards that apply at the time of enrollment in the advanced course. All ROTC cadets must meet the height and weight standards established in standards established in AR 600–9 at the time of commissioning.

*g. Military training.* Have successfully completed the course of military training as prescribed by law and SROTC regulations and the required advanced camp training.

*h. Physical fitness.* At the time of commissioning, meet minimum Army physical fitness standards.

*i. Recommendation.* Be recommended for appointment by the PMS.

*j. Personnel security eligibility.* Prior to appointment, cadets must possess a secret personnel security clearance based on a NAC.

## 6–9. Designation as a distinguished military student

*a. Requirements.* A distinguished military student (DMS) must—

(1) Possess outstanding qualities of leadership and high moral character.

(2) Have exhibited a definite aptitude for and interest in the military service.

(3) Have attained a military science standing in the upper third of the ROTC class and be ranked in the upper third of the order-of-merit list (OML) as established by the PMS. Cadets must also attain an overall standing in the upper half their university or college class. Cadets must complete advanced camp before they can be included in the PMS OML. Cadets who complete advanced camp after graduation or completion of MS IV, will be integrated into the OML using current ROTCCC guidance. Extension centers that conduct a separate program from the host institution are authorized a separate OML.

(4) Having attained an overall academic standing in the upper half of his or her university or college class. Demonstrated aptitude and outstanding potential as well as interest in the military service, will be weighed considerations. Academic standing may be waived for cadets in the upper 10 percent (scholarship students included) of their ROTC class. In those instances where the cadet is not in the upper half of his class scholastically, but has been designated a DMS as an exception, the PMS will attach a letter of explanation to the to the cadet's application for appointment.

(5) Have demonstrated initiative and leadership capacities through his or her participation and achievements in campus and civic activities. Nonparticipation in such activities should not operate against the cadet's interest when heavy course loads and gainful employment in financing expenses of the college education have denied him or her the opportunity to engage in extracurricular activities.

*b. Selection.* The PMS will designate cadets from host institutions and cadets from extension centers, if appropriate, who meet the qualifications of paragraph *a* above as DMS. No more than one-third of the total number eligible will be designated DMS. Designation will be made as follows:

(1) Cadets who satisfactorily complete advanced camp will be designated not later than 20 days after beginning of the school year. Addition or withdrawal of designations may be made during the current school year. Cadets should attain all minimum qualifying scores at camp before designation.

(2) MS IV cadets who qualify under paragraph *a* above, but did not attend advanced camp between MS III and MS IV, may be designated DMS following successful completion of advance camp.

## 6–10. Designation as a distinguished military graduate

*a.* A distinguished military graduate (DMG) is a DMS who—

(1) Has maintained the scholastic standards listed in paragraph 6–9*a*(3)(4) between the time of designation as a DMS and date of graduation, and

(2) Has successfully completed the advanced course, including training at ROTC advanced camp, and

(3) Has graduated with a baccalaureate degree or has a statement from the head of the institution that all requirements for a baccalaureate degree have been completed and that the degree will be conferred at the next regular commencement, and

(4) Is designated a DMG by the PMS. Cadets who attend camp after completion of MS IV, may be designated DMG upon PMS reappraisal of the cadet's qualifications under paragraph *a* above. Designation will be reported immediately to CG, PERSCOM, in such cases by the PMS.

*b.* The designation as a DMG will occur and bear the date upon which full and complete graduation occurs, or the date of the statement from the head of the institution in the case of other than end-year students who come within the intent of paragraph *a*(3) above, or the date of camp completion in the case of a cadet who attends advanced camp after completion of MS IV and graduation. The term 'graduation' in this connection includes academic graduation, or completion of requirements for graduation as evidenced by statement from the appropriate school official, successful completion of the advanced course (ROTC), and training at the advanced camp. Nothing herein will be construed to permit advanced or retroactive designation.

*c.* Distinguished military students who successfully complete the advanced course prior to graduation, will not be designated DMG until all of the requisites in paragraph *a* above have been fulfilled. Ordinarily, designation will be accomplished by the PMS however, when academic graduation is from a recognized institution not having an ROTC Battalion, the designation will be accomplished by the region commander in whose geographical area the school is located. In either event, the designator will ensure that the designee has maintained the requisite high standards during the interim between completion of their ROTC training and their academic graduation.

## 6–11. Commissioning of Reserve Officers' Training Corps graduates

*a.* An ROTC graduate who is tendered an appointment becomes a commissioned officer after taking the oath of office and signing DA Form 71 (Oath of Office-Military Personnel). This constitutes acceptance of appointment (10 USC 591 (USAR) and 5 USC 3331).

*b.* The oath of office will be administered by a commissioned officer. The oath of office will not be presented before the effective date of appointment. Failure to execute the oath of office will cause the tender of appointment to be withdrawn.

**6–12. Appointment in the Reserve of the Army with assignment to the United States Army Reserve**

*a.* In addition to meeting the basic commissioning requirements, all cadets who desire appointment in the Reserve of the Army with assignment to the USAR must meet the following criteria:

(1) Be a U.S. citizen and possess a secret security clearance.

(2) Possess a baccalaureate degree granted by an accredited college or university. This requirement may be waived only as indicated below.

*(a)* The applicant may request a waiver when the degree has been withheld by the school (waivable by the region commander).

*(b)* The applicant has met all requirements, but the degree is being withheld for presentation at normal commencement exercise (waivable by PMS).

*(c)* The cadet has been accepted for or is enrolled in an approved medical, osteopathic, dental, or veterinary school, provided he or she has completed 4 years of college (waivable by the CG, ROTCCC). The applicant must request formal delay from entry on active duty under AR 601–25.

*(d)* Commissioned under the ECP (Sec II).

*(e)* Cadets who are cross-enrolled or attending extension centers of nonaccredited schools that are in the process of being accredited (waivable by the region commander).

*b.* The following guidance pertains to waivers:

(1) Basic degree requirements are not waivable for cadets assigned to the AMEDD branches. Any cadet who is commissioned under the authority of this regulation, assigned to an AMEDD branch and is later determined to be without the required baccalaureate degree will be deemed to have an invalid appointment and reassigned to a branch for which he or she is qualified.

(2) Request for waivers may be considered only when unusual circumstances warrant. (See AR 135–101). Such requests will be sent through channels to CG, ROTCCC, for approval. When failure to satisfy degree requirements is discovered after commissioning, the request will be sent to CG, PERSCOM, (TAPC–OPP–P) for final action.

**6–13. Appointment in the regular Army**

*a.* Appointment authorities and the PMS will be given the names of the cadets under their supervision who have been selected for RA appointment. Only those cadets selected according to AR 601–100 and this regulation, will be appointed as RA officers.

*b.* ROTC cadets who are selected for RA appointment, but the appointment is not available, will be tendered appointment in the Reserve of the Army with assignment to the USAR. Nonselection for the RA does not preclude a cadet from applying later under another RA procurement program. A DMS who declines selection for an RA appointment may ask to be reconsidered for appointment at any time before the date of the DMG designation. Cadets not selected for RA appointment will be processed for appointment in the Reserve of the Army with assignment to the USAR.

*c.* In addition to meeting the basic commissioning requirements outlined in paragraph 6–8, all ROTC graduates seeking appointment in the RA must be U.S. citizens, have taken necessary action to initiate a secret security clearance and possess or will receive a baccalaureate degree at the time of appointment in the RA. Additionally, all cadets seeking appointment in the RA, must meet the general eligibility requirements of AR 601–100.

**6–14. Processing United States Army Reserve and Army National Guard Simultaneous Membership Program for commissioning**

The PMS is authorized to order discharge of enlisted members of the USAR assigned to USAR Control Group (ROTC) so they may be commissioned. However, he/she may not discharge SMP assigned to USAR or ARNG units. The discharge authority for ARNG Soldiers is the appropriate State AG and for USAR Soldiers is the Cdr, ARPERCEN. The PMS must coordinate with the appropriate authorities to ensure the Soldiers are discharged effective the day preceding their commissioning. (See AR 135–178, para 3–4*b*).

**Section II**
**The Early Commissioning Program**

**6–15. Eligibility for appointment**

*a.* The ROTC graduates may be commissioned under the provisions of the Early Commissioning Program provided they are graduates of a MJC. The only exception is for those cadets who have been selected for Reserve Forces Duty by the DA/ROTC Selection Board. Acceptance of an early commission terminates cadet status. Subsistence or further scholarship benefits will not be authorized.

*b.* The MJC graduates are eligible for appointment under the ECP provided they meet the following criteria:

(1) Have completed all ROTC requirements.

(2) Have less than 36 months remaining to complete baccalaureate degree requirements after being commissioned.

(3) Must have an official letter of acceptance to an accredited baccalaureate degree granting 4-year institution.

(4) MJC graduates commissioned under the provisions of the ECP will join an ARNG or USAR unit if available. The PMS will assist each cadet in obtaining vacancy.

*c.* Those cadets selected for reserve forces duty are eligible for appointment provided—

(1) They have a letter of acceptance from a reserve component unit which identifies a specific unit officer vacancy. This letter must be attached to a completed DA Form 4651–R (Request for Reserve Component Assignment or Attachment).

(2) The letter and DA Form 4651–R be endorsed through the RC chain of command. The unit vacancy must be verified by the state Military Personnel Office for ARNG units or the major U.S. Army Reserve Command for units.

(3) The completed DA Form 4651–R becomes the PMS' authorization to process the cadet's record to the region headquarters for preparation of the commissioning packet under ECP. The letter of acceptance and DA Form 4651–R will be included in the commission packet forwarded to the region headquarters.

## 6–16. Administrative control of Early Commissioning Program

Cadets who are commissioned under the provisions of ECP will be administered by the CG, ARPERCEN. ARPERCEN will coordinate with the State Adjutant General for ECP officers located in ARNG units and the major U.S. Army Reserve Command for ECP officers located in USAR units. For those officers assigned to a Reserve Component Unit the PMS will inform the RC chain of command of an officer who is failing to maintain academic standards.

## 6–17. The Completion Cadet Program eligibility

*a.* All cadets must maintain academic progress to ensure the simultaneous granting of a baccalaureate degree and commission. Those cadets who do not graduate upon completion of all ROTC requirements will be identified as completion cadets. The cadet will remain a completion cadet until receipt of a degree and will be commissioned upon graduation. Completion cadets will not be eligible for subsistence allowance. Cadets graduating from military junior colleges or selected for RFD according to paragraph 6–15*c* of this regulation will be commissioned under the provisions of the Early Commissioning Program.

*b.* SMP cadets who are not commissioned after completing all ROTC requirements except graduation, may continue their SMP status with their RC TPU. The SMP cadets must remain satisfactory participants in their TPU but may remain in a completion cadet status no more than 24 months.

*c.* Completion cadets who fail to meet requirements outlined within this regulation and the ROTC contract, may be considered for disenrollment, discharge and/or recoupment action.

## 6–18. Administration of the Completion Cadet Program

*a.* The PMS will retain complete administrative control of the cadet and will ensure that the cadet—

(1) Maintains monthly contact with the PMS, and provides current address and telephone number. The PMS will be kept informed of status changes.

(2) Participates in an Army Physical Fitness Training (APFT) Program with the ROTC Bn on a regular basis. An APFT will be administered with a height/weight verification at least semiannually per FM 21–20 and AR 600–9 respectively. Cadets who fail minimum APFT standards and fail to maintain proper height/weight standards, will be placed on appropriate remedial training and weight control programs.

*b.* The PMS will develop an academic work plan to ensure the cadet will graduate with a baccalaureate degree at the earliest possible time. Completion cadets must graduate within 24 months of achieving completion status. Waivers may be granted by the CG, ROTCCC, for one additional year but the cadet must graduate within 36 months.

## Section III
## Branch Assignment of Reserve Officers' Training Corps Cadets

## 6–19. Branch selection factors

Branch assignments must be made according to the needs of the Army. Consideration will be given to the cadet's area of academic specialty. Army policy is to assign graduating cadets to a branch and specialty code based on the following:

*a.* Army branch/specialty strength requirements.

*b.* Academic disciplines.

*c.* Personal preference.

*d.* Recommendation of PMS.

*e.* Demonstrated performance and potential.

*f.* Prior military experience.

*g.* Other experience.

*h.* Sex.

**6–20. Requirements for Army Nurse Corps and Army Medical Specialist Corps**

A cadet applying for RA or USAR appointment with assignment in the ANC or AMSC must meet certain professional requirements as stated in paragraphs *a* or *b* below or apply for an ED under AR 601–25 (category B). While these requirements must be met in order for the commissionee to be assigned to AMSC or ANC, failure to meet the requirements will not preclude appointment in or assignment to another branch in which the student is qualified, after completion of ROTC advanced camp.

*a. Army Nurse Corps.* The applicant must—

(1) Possess a baccalaureate of science degree in nursing from a program accredited by an agency recognized by the U.S. Secretary of Education and acceptable to the Department of the Army.

(2) Complete the National Council Licenser for Registered Nurses prior to entry on active duty.

*b. Army Medical Specialist Corps.*

(1) *Dietitian section.* An applicant must—

(a) Have a baccalaureate degree from an accredited college or university in a coordinated undergraduate program in dietetics (CUP Program) or have a baccalaureate degree in a program that has been followed by a Dietetic Internship approved by the American Dietetic Association.

(b) Be eligible for membership in the American Dietetic Association.

(2) *Physical therapist section.* An applicant must—

(a) Have a baccalaureate degree in physical therapy, basic master's degree in physical therapy, or a certificate in physical therapy with a baccalaureate degree in another area of study. Degrees or certificates are obtained by completing a physical therapy program accredited by the American Physical Therapy Association.

(b) Be eligible for membership in the American Physical Therapy Association.

(3) *Occupational therapist section.* An applicant must—

(a) Have a baccalaureate degree in occupational therapy, or basic master's degree in occupational therapy, or a certificate on occupational therapy with a baccalaureate degree in another area of study. The degree or certificate program must be approved by the American Occupational Therapy Association.

(b) Be eligible for membership in the American Occupational Therapy Association. *Note:* Applicants selected for assignment or detail to AMSC must successfully complete either the American Dietetic Association Registry Examination, the American Occupational Therapy National Registry Examination, or the state license examination in physical therapy prior to actual accession into the corps.

**6–21. Requirements for aviation training**

*a. Eligibility.* ROTC cadets are eligible for entry in all aviation specialties provided the prerequisites outlined in AR 611–110 are met. The region commander will ensure that the following requirements are met:

(1) Cadets must attain a minimum of 90 on the revised Flight Aptitude Selection Test.

(2) Cadets must be medically qualified. Once cadets reach the required score on the Flight Adjutant Screening Test, a Class 1A flight physical must be taken. This may be done with the medical examination that is required for commissioning. The flight physical must be completed, reviewed and approved by the Aviation Center before the cadet applies for aviation training.

*b. Submission of application.* All ROTC cadets desiring one of the aviation specialties must show it as their first choice on DA Form 61 (Application for Appointment), DA Form 7011–R (ROTC Cadet Evaluation and Management Worksheet) and DA Form 7010–R (ROTC Cadet Assession Management Profile). This will be treated as a formal application for flight training. Any prior training or experience should be shown on both forms. In addition, the following forms are necessary:

(1) DA Form 6256 (Alternate Flight Aptitude Selection Test, (AFAST) Battery Scoring Worksheet).

(2) SF 88 (Report of Medical Examination). Original showing Class 1A Flight Physical. The form must have the stamp of the Army Aeromedical Center, Ft Rucker, AL.

(3) SF 93 (Report of Medical History).

(4) A statement indicating acceptance by any Reserve or National Guard unit authorized aviators if requesting Reserve forces duty.

**6–22. Requirements for field artillery**

In addition to meeting the basic commissioning requirements outlined in section I, all officers assigned to FA must be the subject of a favorable background investigation. Region commanders will submit a request for background investigation to the Defense Investigative Service (DIS) according to AR 604–10 immediately upon notification that the cadet has been branch assigned FA. Officers will not be detained from attending OBC pending the completion of the background investigation.

**6–23. Requirements for military intelligence**

*a. Eligibility.* The region commander will ensure that applicants desiring assignment to MI meet the prerequisites

outlined in AR 611–101, in addition to the other commissioning requirements. Waivers of MI prerequisites will be processed under the provisions of AR 611–101. Prior waivers for enrollment or retention in ROTC are not sufficient. Security requirements for MI necessitate a stricter waiver policy than for commissioning in other branches. ROTC cadets married to foreign nationals (other than citizens of Canada, Australia, New Zealand or the United Kingdom), are not eligible for assignment to the MI Branch or access to special compartmented information (SCI). These individuals may request transfer to the MI Branch at a later date after their spouses become U.S. citizens.

*b. Personnel security eligibility.* In addition to meeting the basic commissioning requirements outlined in section I, all ROTC cadets assigned to MI, must be eligible for Top Secret personnel security clearance and access to SCI as a result of a Special Background Investigation (SBI). Region commanders will submit a request for SBI to the DIS immediately upon notification that the case has been assigned to the MI Branch. Appointment into MI may be made prior to favorable determination of the cadet's eligibility for access to SCI. If the cadet cannot be favorably cleared for access to such information a branch change will be made by the CG, PERSCOM, or CG, ARPERCEN. Officers assigned to MI must have a SBI initiated 120 days before reporting to OBC or they will not be allowed to attend.

*c. Adjudication.*

(1) Upon completing the SBI, the DIS will forward the investigative file to the Central Clearance Facility (CCF) for a determination of the cadet's eligibility for assignment to the MI Branch and access to SCI.

(2) The CCF will advise PERSCOM, ARPERCEN, the regional commanders, and current active duty unit if appropriate, of the eligibility determination. The correct address is determined by the information contained on the DD Form 1879 (Request for Personnel Security Investigation) pertaining to component and commission date.

(3) If the CCF determines that a cadet is ineligible for assignment to the MI Branch, the regional commander will immediately notify the CG, PERSCOM or ARPERCEN and request a new branch assignment.

(4) If the investigative file contains serious derogatory information, the CCF may forward the file to the regional commander for review of retention in the ROTC Program and/or commissioning.

## 6–24. Request for change in branch assignment

*a. For active duty selectees.* A change in branch assignment will only be made by CG, PERSCOM. The requests will be submitted in writing through the proper ROTC channels to PERSCOM. The request should state reason and show complete justification for change. Only those cases with exceptional circumstances should be sent to PERSCOM (TAPC–OPP–P).

*b. For reserve forces duty selectees.* Since branch assignments are made based on unit requirements, only those request for branch changes based on a unit requirement will be considered. The request should be submitted through the PMS and unit commander to the CG, ARPERCEN, ATTN: DARP–OPL, St. Louis, MO 63132-5200.

## Section IV
## Delay From Active Duty

## 6–25. General

This section provides guidance on leave options available to graduating cadets. It also outlines the various programs where ROTC graduates, after receiving a commission may pursue an academic program beyond the normal 4-year baccalaureate degree requirement.

## 6–26. Responsibility

ROTC graduates who are granted educational delays will be administered by the CG, ARPERCEN. Each PMS will monitor the officers on their campus to ensure physical fitness, maintenance of weight standards and personal conduct. The PMS is authorized to take the proper action when these requirements are not met.

## 6–27. Leave

All ROTC graduates who have been ordered to active duty are authorized to take either advanced leave or excess leave (AR 630–5, chap 5).

*a. Advanced leave.* Any advanced leave granted will be chargeable leave not to exceed 30 days. While in an advanced leave status, commissionees will receive pay and allowances. Leave is also accrued while in this status.

*b. Excess leave.* ROTC graduates who are ordered to active duty within 30 days after graduation day, may request up to 30 days excess leave. This is leave, without pay, not to exceed 30 days, granted on request. Those graduates entering active duty after graduation day cannot be granted excess leave which would allow the total number of days between graduation and active duty to exceed 30 days. Acceptance of excess leave prevents the graduate from receiving pay and allowances and accruing leave during this period. In addition, there is no entitlement to physical disability retired pay should the member incur a physical disability while in an excess leave status. Officers on excess leave are eligible to receive all other benefits. Time accrued while in excess leave status is considered active Federal commissioned service and accrues for promotion eligibility, longevity and retirement.

**6–28. Dual Baccalaureate and Master's Degree Programs**

The following procedures will apply to cadets enrolling in a 5-year dual baccalaureate degree program or a 5- or 6-year college course of instruction, such as Engineering, Science, or Architecture, leading to a master's degree:

*a. Commissioning.* When the cadet has earned a baccalaureate degree or its equivalent and has successfully completed the ROTC Advanced Course Program, he or she will be appointed a second lieutenant in the USAR. The officer will be assigned to the USAR Control Group (OADO) at ARPERCEN and will remain under such control until ordered to active duty following completion of his or her approved academic program.

*b. Regular Army designees.* The RA designees will accept an interim appointment in the USAR as outlined in paragraph 6–12 *a* above. After completing the requirements for an approved academic program, the designee will be appointed in the RA, if otherwise qualified, before entering on active duty. (AR 601–25 does not apply). Cadets will not apply for Category A Educational Delay, and will under no circumstances be transferred to USAR Control Group (OADO) during this period.

**6–29. Graduate study**

*a.* Senior year (MS IV) cadets may apply for the following graduate study programs at the Army's expense:

(1) *Army Medical Department programs.* Delay of entry on active duty as a Reserve Officer, to complete graduate study in one of the health profession programs will be processed according to AR 601–25. Qualified cadets may apply for graduate study under the following health profession programs:

(a) U.S. Army Health Professions Scholarship Program (AR 601–141). The areas of study available are medical and osteopathy.

(b) Uniform Services University of the Health Sciences School of Medicine (AR 601–130).

(2) *Army Reserve Officers' Training Corps Fellowships.* Scholarship cadets and DMS may apply for award of an Army ROTC Fellowship. The top 5 percent of cadets appointed in the RA are eligible for an ROTC Fellowship award. They may be selected to attend graduate school to obtain a master's degree at the Army's expense with full pay and allowances. Selectees may attend graduate school during the 4th through 10th years of commissioned service if their duty performance and potential are equal to other officers applying for graduate school. ROTC cadets granted a Category A educational delay of entry on active duty to attend graduate school under AR 601–25 are not eligible for graduate school under the top 5 percent program after entry on active duty.

(3) *The National/International scholarships, fellowships, or grants.* ROTC graduates who have been appointed in the RA are eligible to receive national level scholarships, fellowships, or grants under AR 621–7. Those selected will participate in such study while serving on active duty with full pay and allowance. Reserve appointees will attend while in an educational delay status at their own expense.

(4) *Scientific and engineering graduate school.* This is a fully funded advanced degree program for a limited number of ROTC graduates who have accepted appointment in the RA. Selections are made before graduation. Selectees may attend graduate school to obtain a master's degree under AR 621–1 during the 4th through 10th years of commissioned service provided their duty performance and potential is equal to other officers applying for graduate school.

(5) *Technical Enrichment Program.* This is a fully funded advanced degree program for selected students. Selectees may attend graduate school to obtain a master's degree according to AR 621–1 immediately after obtaining a baccalaureate degree and commissioning. Selection for this program will be made by the CG, PERSCOM, following graduate study programs.

*b.* Senior year (MS IV) cadets may apply for the graduate study programs listed below at their own expense. Participation in such programs does not guarantee that the participant will be assigned to the branch for which the program is named.

(1) *Chaplains Branch Program.* Individuals who attend graduate theological schools must meet the criteria of AR 135–100, chapter 3. Cadets who apply for RA commissions are ineligible for this program.

(2) *Judge Advocate General's Corps Program.* Any qualified cadet may apply for legal study in an educational delay status.

(3) *Other graduate study programs.* Cadets, other than RA applicants, may apply under AR 601–25 for up to 2 years of graduate study as a reserve officer in an educational delay status to obtain a master's degree. RA designees and scholarship cadets will apply under AR 601–100.

*c.* Active duty service obligation. Generally, neither a precommissioning active duty obligation nor the obligation incurred through participation in a graduate study program will be served during the period of graduate study. The obligations incurred under a particular graduate study program (to include payback of existing obligation) will be determined by the policies that are in effect at the time of entry into the graduate program. These obligations may be in addition to the obligations incurred under the ROTC Scholarship Program.

*d.* Approval of an educational delay to earn a doctorate will be granted only as an exception to policy. Request will only be considered by HQDA for study in a field that the Army has a valid requirement for a junior officer with a doctoral degree.

A078

**Section V**
**Release of Reserve Officers' Training Corps Graduates to Another Service**

**6–30. Basic policy**
ROTC graduates will not normally be released from the terms of their contracts for appointment in another Service. The release, if granted, will be conditional on acceptance by the requesting Service. The release will not be effective before the cadet completes the Army ROTC Program. However, the release should occur before requirements for a baccalaureate degree are completed. Scholarship students will not be released to other Services.

**6–31. Appointment in the U.S. Coast Guard**
A cadet's request for release for appointment in the U.S. Coast Guard will be processed the same as a request for appointment in the National Oceanic and Atmospheric Administration (NOAA).

**6–32. Appointment in the Regular Marine Corps**
  *a. Eligibility.* Qualified Army ROTC cadets may apply for appointment as second lieutenants in the Regular Marine Corps provided they meet the following requirements:
  (1) Be designated a DMS or DMG. This may be waived in exceptional cases by the Commandant of the Marine Corps.
  (2) Have completed all academic and military training requirements for commissioning by the projected release date.
  (3) Have reached the 20th birthday, but not the 25th on 1 July of the calendar year in which he or she is to be appointed.
  (4) Meet physical qualification requirements prescribed by the Manual of Medical Department, United States Navy. (These parallel the requirements of an Army medical examination for "profile 1").
  *b. Selection.* Applicants will be considered by a selection board held at Headquarters, U.S. Marine Corps.
  *c. Reserve status.*
  (1) The fact that a cadet has applied for appointment in the Marine Corps will not delay the processing of his or her application as a Reserve Officer of the Army. ROTC cadets who have an application pending, may accept appointment in the Reserve of the Army with assignment to the USAR when offered.
  (2) The applicant will, upon written request, be granted a delay in reporting for active duty, pending tender of appointment in the regular Marine Corps. He or she will be discharged from the USAR effective the day preceding the date that the appointment in the regular Marine Corps is accepted. The discharge will not be made any earlier than the day before the date of acceptance of appointment in the regular Marine Corps. Any Army active duty orders issued will be revoked.
  (3) An ROTC graduate who has accepted an appointment and has entered on active duty will apply for interservice transfer under AR 614–120.

**6–33. National Oceanic and Atmospheric Administration**
  *a.* Request for release from the ROTC Program and service commitment in order to apply for appointment in the NOAA will be sent to the CG, PERSCOM, for final action. This should be done after the requirements for appointment as a second lieutenant in the Reserve of the Army with assignment in the USAR have been completed. Appropriate recommendations will be made by the PMS and region commander. The request will include as an enclosure, a completed copy of the letter of agreement shown in figure 6–1.
  *b.* By signing this agreement, the cadet agrees to serve at least 8 years on active duty as a commissioned officer in the NOAA. If the 8-year obligation cannot be fulfilled, he or she will be required to fulfill the remainder of the service obligation incurred under the ROTC Program. (See fig 6–1).

**6–34. Appointment in the U.S. Air Force or U.S. Marine Corps (other than Regular Marine Corps)**
Graduating Army ROTC cadets may be released from the Army to accept appointment in a component of the USAF or USMC if one of the following criteria is met:
  *a.* The cadet has served 12 months or more of active duty in the Service concerned.
  *b.* One or both of the cadet's parents are currently on active duty or a retired member of that Service.
  *c.* The cadet's spouse is a member of that Service.

*(Letterhead)*

*(Date)*

SUBJECT:   Agreement in Connection with Release for Appointment in the National Oceanic and Atmospheric Administration

THRU:   Commander
      U.S. Army ROTC Cadet Command
      ATTN: ATCC–PC
      Fort Monroe, VA 23651–5000

TO:   Commander
      U.S. Total Amy Personnel Command
      ATTN: TAPC–OPP–P
      200 Stovall Street
      Alexandria, VA 22332–108

To Whom It May Concern:

    If my request for appointment in the National Oceanic and Atmospheric Administration (NOAA) is approved, I understand and agree that if I do not serve on active duty as a commissioned officer with that service for at least 8 years, I will, when separated, fulfill the obligation of my Reserve Officers' Training Corps (ROTC) contract.

    I understand my ROTC contract requires me to accept appointment as a commissioned officer in the Reserve of the Army with assignment to the U.S. Army Reserve when separated from the NOAA, if I am qualified, and an appointment is tendered.

    I also understand that if I am separated from the NOAA before completing 3 years of active duty, I may be required to serve on active duty for any additional time which, when added to the period I served on active duty as a commissioned officer in the NOAA, equals 3 years.

    If this request is approved and I am appointed in the NOAA, I will remain a member of and satisfactorily participate in the Ready Reserve until the 8th anniversary of the date of my appointment in the NOAA.

Sincerely,

*(Cadet's Signature)*

I have witnessed the execution of the above agreement by the above-named person, who is a member of the Army Reserve Officers' Training Corps.

*(Signature of witnessing officer)*

**Figure 6–1. Sample format of agreement in connection with release to the NOAA.**

## Appendix A
## References

### Section I
### Required Publications

**AR 15–1 (corrected title)**
Boards, Commissions, and Committees-Committee Management (Cited in paras 1–18, 1–19, and 1–20.)

**AR 15–6**
Procedures for Investigating Officers and Boards of Officers (Cited in paras 3–38 and 3–43.)

**AR 40–3**
Medical, Dental, and Veterinary Care (Cited in paras 3–21 and 3–49.)

**AR 40–29 (corrected title)**
Medical Examination of Applicants for US Services Academies, Reserve Officer Training Corp (ROTC) Scholarship Programs, Including 2– and 3–Year College Scholarship Programs (CSP), and the USUHS (Cited in paras 3–20 and 3–21.)

**AR 40–330 (obsolete)**
Raters' Codes and Expenses and Performance Reporting System (Cited in paras 3–21.)

**AR 40–501**
Standards of Medical Fitness (Cited in paras 3–20, 3–21, 3–23, 3–24, 3–25, 3–34, and table 3–1.)

**AR 135–91 (corrected title)**
Service Obligations, Methods of Fulfillment, Participation Requirements and Enforcement Procedures (Cited in para 1–16.)

**AR 135–100**
Appointment of Commissioned and Warrant Officers of the Army (Cited in paras 3–16 and 6–29.)

**AR 135–101**
Appointment of Reserve Commissioned Officers for Assignment to Army Medical Department Branches (Cited in paras 6–5*a* and 6–12.)

**AR 135–178 (corrected title)**
Enlisted Administrative Separations (Cited in paras 3–44, 3–45, and 6–14.)

**AR 135–210 (corrected title)**
Order to Active Duty as Individuals for Other Than A Presidential Selected (Cited in paras 3–15 and 3–44.)

**AR 310–10 (obsolete)**
Military Orders (Cited in para 5–13.)

**AR 351–5 (obsolete)**
United States Army Officer Candidate School (Cited in para 1–15.)

**AR 600–9**
The Army Weight Control Program (Cited in paras 3–20, 6–8, 6–18, and table 3–1.)

**AR 600–43**
Conscientious Objection (Cited in para 3–3.)

**AR 600–50 (obsolete)**
Standards of Conduct for Department of the Army Personnel (Cited in paras 1–23 and 2–15.)

**AR 600–200 (obsolete)**
Enlisted Personnel Management System (Cited in para 1–16.)

**AR 601–25 (corrected title)**
Delay in Reporting for and Exemption from Active Duty, Initial Active Duty for Training, and Reserve Forces Duty (Cited in paras 1–16, 6–6, 6–12, 6–20, 6–28, and 6–29.)

**AR 601–100**
Appointment of Commissioned and Warrant Officers in the Regular Army (Cited in paras 6–8, 6–13, and 6–29.)

**AR 601–210 (corrected title)**
Active and Reserve Components Enlistment Program (Cited in paras 1–16, 3–3, 3–17, and 3–44.)

**AR 604–10 (obsolete)**
Military Personnel Security Program (Cited in para 6–22.)

**AR 611–101 (obsolete)**
Personnel Selection and Classification, Commissioned Officer Classification System (Cited in para 6–23.)

**AR 611–110**
Selection and Training of Army Aviation Officers (Cited in para 6–21.)

**AR 614–120**
Interservice Transfer of Army Commissioned Officers on the Active Duty List (Cited in para 6–32.)

**AR 614–200 (corrected title)**
Enlisted Assignments and Utilization Management (Cited in para 2–13.)

**AR 621–5**
Army Continuing Education System (ACES) (Cited in para 2–16.)

**AR 621–7 (corrected title)**
Army Fellowships and Scholarships (Cited in para 6–25.)

**AR 623–105 (obsolete)**
Officer Evaluation Reporting System (Cited in para 2–20.)

**AR 623–205 (obsolete)**
Enlisted Evaluation Reporting System (Cited in para 2–20.)

**AR 635–100 (obsolete)**
Officer Personnel (Cited in paras 3–3 and 6–3.)

**AR 635–200 (corrected title)**
Active Duty Enlisted Administrative Separations (Cited in paras 3–39 and 3–43.)

**AR 670–1**
Wear and Appearance of Army Uniforms and Insignia (Cited in para 4–5.)

**AR 700–84**
Issue and Sale of Personal Clothing (Cited in paras 2–14, 3–28, 4–1, 4–3, and 5–3.)

**DA Pam 600–8**
Management and Administrative Procedures (Cited in para 2–14.)

**JFTR (Web site added)**
Joint Federal Travel Regulation (Cited in paras 3–53 and 5–13.) Available at http://www.defensetravel.dod.mil/

**NGR 600–100 (Web site added)**
Commissioned Officers—Federal Recognition and Related Personnel Activities (Cited in para 1–16, 3–17, and 6–6.) (Available at http://www.ngbpdc.ngb.army.mil/default.htm.)

**NGR 600–200 (Web site added)**
Enlisted Personnel Management (Cited in paras 3–17, 3–44, and 3–45.) (Available at http://www.ngbpdc.ngb.army.mil/default.htm.)

## Section II
## Related Publications

A related publication is a source of additional information. The user does not have to read a related publication to understand this regulation. DOD publications are available at http://www.dtic.mil/whs/directives. United States Codes are available at http://www.gpoaccess.gov/uscode/index.html.

**AR 30–1 (obsolete)**
The Army Food Service Program

**AR 135–155**
Promotion of Commissioned Officers and Warrant Officers Other Than General Officers

**AR 145–2 (corrected title)**
Organization, Administration, Operation, and Support

**AR 190–11**
Physical Security of Arms, Ammunition, and Explosives

**AR 200–1 (corrected title)**
Environmental Protection and Enhancement

**AR 600–20**
Army Command Policy

**AR 601–130 (obsolete)**
Officer Procurement Program of the Army Medical Department

**AR 601–141 (corrected title)**
U.S. Army Health Professions Scholarship, Financial Assistance, and Active Duty Health Professions Loan Repayment Programs

**AR 621–1**
Training of Military Personnel at Civilian Institutions

**AR 630–5 (obsolete)**
Leave and Passes

**10 USC 591**
US Code - Notes

**10 USC 1331**
Reference to chapter 1223

**10 USC 2005**
Advanced education assistance: active duty agreement; reimbursement requirements

**10 USC 2104**
Advanced training; eligibility for

**10 USC 2107**
Financial Assistance Program for Specially Selected Members

**10 USC 3911**
Twenty Years or More: Regular or Reserve Commissioned Officers

**10 USC 12731**
Claims Appeals Board Decision

**21 USC 812**
Schedules of Controlled Substances

**21 USC 2106(c)**
Advanced Training; Commission on Completion

**37 USC 205(d)**
Computation: service creditable

**AR 601–141**
U.S. Army Health Professions Scholarship, Financial Assistance, and Active Duty Health Professions Loan Repayment Programs

**AR 601–141**
U.S. Army Health Professions Scholarship, Financial Assistance, and Active Duty Health Professions Loan Repayment Programs

**AR 621–1**
Training of Military Personnel at Civilian Institutions

**Section III**
**Prescribed Forms**
Unless otherwise indicated, DA forms are available on the APD Web site (http://www.apd.army.mil).

**DA Form 134**
Military Training Certificate Reserve Officers' Training Corps (Prescribed in paras 3–26 and 3–27.)

**DA Form 597**
Army Senior Reserve Officers' Training Corps Student Contract (Prescribed in paras 3–28, 3–30, 3–40, 3–41, 3–42, and 3–46.)

**DA Form 597–3**
Army Senior Reserve Officers' Training Corps (ROTC) Scholarship Cadet Contract (Prescribed in paras 3–41, 3–42, and 3–46.)

**DA Form 918**
Application for Establishment of an Army Senior Reserve Officers' Training Corps Unit (Prescribed in paras 2–5, 2–7, and 2–10.)

**DA Form 918A**
Agreement for Establishment and Maintenance of an Army Senior Reserve Officers' Training Corps Unit (Prescribed in paras 2–5, 2–6 and 2–7, and 2–10.)

**DA Form 918B**
Amendment to Application and Agreement for Establishment of an Army Reserve Officers' Training Corps Unit (Prescribed in paras 2–5 and 2–7.)

**DA Form 2453–R**
Statement of Health and Medical Examination (Prescribed in table 3–1.)

**DA Form 3425–R**
Medical Fitness Statement for Enrollment in Basic Course, Senior ROTC (Prescribed in table 3–1.)

**DA Form 7010–R**
ROTC Cadet Assession Management Profile (Prescribed in para 6–21.)

**DA Form 7011–R**
ROTC Cadet Evaluation and Management Worksheet (Prescribed in para 6–21.)

## Section IV
## Referenced Forms
Unless otherwise indicated, DA forms are available on the APD Web site (http://www.apd.army.mil). DD Forms are available on the OSD Web site (http://www.dtic.mil/whs/directives/infomgt/forms/formsprogram.htm). Standard Forms (SF) are available on the GSA Web site (http://www.gsa.gov).

**DA Form 61**
Application for Appointment

**DA Form 71**
Oath of Office-Military Personnel

**DA Form 3286–69 (obsolete)**
Statement of Understanding for Persons Having Depending in the Custody of Another

**DA Form 4187**
Personnel Action

**DA Form 4651**
Request for Reserve Component Assignment for Attachment

**DA Form 5074–1–R**
Record of Award of Entry Grade Credit (Health Services Officers)

**DA Form 6256**
Alternate Flight Aptitude Selection Test (AFAST) Battery Scoring Worksheet

**DD Form 4 (corrected title)**
Enlistment/Reenlistment Document-Armed Forces of the United States

**DD Form 214**
Certificate of Release of Discharge from Active Duty

**DD Form 1966**
Record of Military Processing Armed Forces of the United States

**SF 85 (corrected title)**
Questionnaire for Non-Sensitive Positions

**SF 88 (obsolete)**
Report of Medical Examination

**SF 93 (obsolete)**
Report of Medical History

**SF 171 (obosolete)**
Personnel Qualification Statement

**SF 173 (obsolete)**
Job Qualification Statement

**FS Form 240 (corrected title) (Web site added)**
Foreign Service: Consular Report of Birth Abroad (http://www.travel.state.gov.)

**FS Form 545 (corrected title) (Web site added)**
Foreign Service: Certificate of Birth Abroad of a Citizen of the United States of America (http://www.travel.state.gov.)

**INS Form N–560 (Web site added)**
Department of Justice Immigration and Naturalization Service, Certificate of Citizenship (http://www.usimmigrationsupport.org.)

**Department of State Form 1350 (Web site added)**
Certificate of Birth Abroad of a Citizen of United States of America (http://www.state.gov.)

**Department of State Form I–94 (Web site added)**
Arrival-Departure Record (http://www.usimmigrationsupport.org.)

**Department of Justice Form I–151 (Web site added)**
Alien Registration Receipt Card (http://www.usimmigrationsupport.org.)

**SD Form 108 (obsolete)**
Request for Appointment of Consultant or Expert

**SD 108–1 (obsolete)**
Renewal of Appointment of Consultant or Expert


# Appendix B
# Statement of Joint Reserve Officers' Training Corps Policies

**B–1.**
To insure harmonious relations and minimize requirements for institutional support of the Reserve Officers' Training Corps, Departments of the Army, Navy, and Air Force agree that to the extent desired by the authorities of any institution that—

*a.* Facilities and services provided by the school will be shared and used in common by the local department of military science, naval science, and air science, insofar as compatible with efficiency, economy, and the essential requirements of each department; and insofar as such action does not abrogate existing agreements between the institution and any of the departments.

*b.* United States property issued for use in connection with institutional ROTC programs will be stored, handled, and used in common to the extent permitted by law, regulations, and existing agreements with institutions, when such action will promote economy and efficiency and will lessen the burden on the institution.

*c.* Similar local administrative operations will be performed in common by and for the departments, to the extent compatible with economy, efficiency, and the requirements peculiar to each department.

*d.* The officers in charge of ROTC units at an institution will collaborate in all ROTC public information activities that originate locally, including those involved in the stimulation of ROTC enrollment, to the extent necessary to insure full and effective presentation of the features and advantages of each service and its program, and to avoid undue emphasis on any one service.

*e.* Use of instructors for cross-service instruction is, to the extent feasible, highly desirable.

*f.* To the full extent permitted by the ROTC curriculums prescribed by the Department of the Army, Navy, and Air Force, the training of members of the respective ROTC programs will be conducted in common when such action will promote economy or efficiency.

**B–2.**
Not used.

A086

## Glossary

### Section I
### Abbreviations

**AAP**
advisory appointment panel

**AGR**
Active Guard Reserve

**AMEDD**
Army Medical Department

**AMSC**
Army Medical Specialist Corps

**APFT**
Army Physical Fitness Training

**AR**
Army regulation

**ARNG**
Army National Guard

**ARNGUS**
Army National Guard of the United States

**ARPERCEN**
Army Reserve Personnel Center

**CCF**
Central Clearance Facility

**CG**
Commanding General

**CONUS**
continental United States

**CPDT**
cadet professional development training

**CTLT**
Cadet Troop Leader Training

**DA**
Department of the Army

**DCSOPS**
Deputy Chief of Staff for Operations and Plans

**DCSPER**
Deputy Chief of Staff for Personnel

**DIS**
Defense Investigative Service

**DMG**
distinguished military graduate

**DMS**
distinguished military student

**DOD**
Department of Defense

**DODD**
Department of Defense Directive

**DODMERB**
Department of Defense Medical Examination Review Board

**DODPM**
Department of Defense Military Pay and Allowances Entitlements Manual

**ECLT**
English Comprehension Level Test

**ECP**
Early Commissioning Program

**ED**
educational delay

**EMP**
educational delay

**ENTNAC**
entrance national agency check

**FORSCOM**
Forces Command

**GPA**
grade point average

**HQDA**
Headquarters, Department of the Army

**HIV**
human immunodeficiency virus

**HSC**
Health Services Command

**IRR**
individual ready reserve

**JFTR**
Joint Federal Travel Regulation

**LOA**
leave or absence

**MEDCEN**
U.S. Medical Center

**MEDDAC**
Medical Department Activity

A088

**MI**
military intelligence

**MJC**
military junior college

**MQS**
military qualifications standards

**MWRB**
Medical Waiver Review

**MS**
military science

**NAC**
national agency check

**NGB**
National Guard Bureau

**NGR**
National Guard Regulation

**NOAA**
National Oceanic and Atmospheric Administration

**NSTP**
Nurse Summer Training Program

**OASA (M&RA)**
Office of the Assistant Secretary of the Army (Manpower and Reserve Affairs)

**OBC**
officer basic course

**OCAR**
Office of the Chief of Army Reserve

**OCONUS**
outside the continental United States

**OCS**
Officer Candidate School

**ODCSPER**
Office of the Deputy Chief of Staff for Personnel

**OML**
order of merit list

**PERSCOM**
personnel command

**PMS**
professor of military science

**RA**
regular Army

**RFD**
reserve forces duty

**ROTC**
Reserve Officers' Training Corps

**ROTCCC**
U.S. Army Reserve Officers' Training Corps Cadet Command

**SA**
Secretary of the Army

**SBI**
special background investigation

**SCI**
special compartmented information

**SMP**
Simultaneous Membership Program

**SROTC**
Senior Reserve Officers' Training Corps

**TPU**
troop program unit

**TRADOC**
U.S. Army Training and Doctrine Command

**UCMJ**
Uniform Code of Military Justice

**USACC**
United States Army Cadet Command

**USAR**
United States Army Reserve

**USC**
United States Code

**USMA**
United States Military Academy

**VA**
Veterans Administration

**VEAP**
Veterans Education and Assistance Program

**Section II**
**Terms**

**Academic term**
The period of time into which the education institution divides the academic year for the purpose of instruction.

**Academic year**
Two consecutive semesters or three consecutive quarters, during which a student is expected to complete one-forth of

the requirements for a baccalaureate degree under a 4-year college curriculum or one-fifth of the requirements under a 5-year curriculum.

**Acceleration**
Two military science classes of the same skill level taken in the same semester or quarter, for example, MS 301 and 302.

**Advanced camp**
Required field training period conducted at a military installation. Advanced camp is a part of the advanced course that is usually attended between MS III and MS IV.

**Advanced course**
The last 2 years of the Senior ROTC Program (MS III and MS IV) including advanced camp. This is normally pursued by the cadet during the junior and senior years in college. For MJC cadets, the Advanced Course includes freshman and sophomore years.

**Army Reserve Officers' Training Corps Fellowship Program**
Graduate study at Government expense that is available to the top 5-percent of scholarship cadets and nonscholarship DMG who are selected for RA appointment.

**Auditing student**
A student who is attending military science classes for academic credit only or for personal enlightenment. Auditing students are not enrolled in the ROTC commissioning program and will not receive credit towards commissioning.

**Basic camp**
The 6-week ROTC training course conducted at a military installation, normally attended before the applicant's junior academic year and a prerequisite to enrollment in the 2-year ROTC program.

**Basic course**
The 2-year senior ROTC primary course of study (MS I and MS II), normally pursued by the cadet during freshman and sophomore years in college.

**Branch material**
A course of instruction designed to prepare the cadet for appointment as a commissioned officer in a specific branch of the Army. A branch material detachment may offer training in one or more specific branches.

**Breach**
Any conduct on the part of a student that breaches the terms of the contract regardless of whether the conduct was done with specific intent to breach the contract or whether the student knew that the conduct breached the contract.

**Cadet**
A term that applies to all enrolled members of the ROTC Program, including alien students enrolled in MS I or MS II. As a grade of rank, this term applies only to advanced course and scholarship cadets.

**Cadet-type uniform**
The uniform for the ROTC cadets of a school, that is so distinctive in design or fabric that it cannot be confused with the Army issue type uniform.

**Compression**
Two military science classes of different skill levels taken in the same semester or quarter, for example, MS 102 and 201.

**Conditional student**
A student who would like to enroll in the ROTC Program but is ineligible because of a temporary, correctable or waivable condition. Enrolled students may be placed in this category pending final determination of eligibility. If the condition is not corrected or waived within 12 months, the student will become a nonenrolled auditing student.

**Department of Military Science**
The academic department of an educational institution which administers the Army ROTC activities at the institution. The ROTC detachment is the operating element.

AR 145–1 • 22 July 1996

**Dependent**

A person who has one of the following relationships to the applicant or member:

*a. Spouse.* A lawful husband or wife. This does not include a common law spouse unless recognition has been adjudged by a civil court.

*b. Child.* An unmarried person less than 18 years old who has one of the following relationships to the applicant or member.

(1) Legitimate child.

(2) Adopted child whose adoption has been legally completed.

(3) A legitimate stepchild.

(4) An illegitimate child of a male member or applicant whose paternity has been judicially determined or an illegitimate child of record of a female member or applicant who has been judicially directed to support the child.

(5) An illegitimate child of a male applicant or member whose paternity has not been judicially determined, or an illegitimate child of record of a female member, (a) who resides with or in a home provided by the member, and (b) who is and continues to be dependent upon the member for over 50 percent of his or her support.

(6) An illegitimate child of the spouse of an applicant or member (that is, the member's stepchild) (a) who resides with or in a home provided by the member or the parent who is the spouse of the member, and (b) who is and continues to be dependent upon the member for over 50 percent of his or her support.

**Distinguished military graduate**

An ROTC graduate who has maintained a distinguished military student status throughout MS IV.

**Distinguished military student**

An MS IV cadet who has attained a military science standing in the upper third of his or her ROTC class and ranked as such in the order of merit list established by the PMS.

**Early Commissioning Program**

A program that requires ROTC cadets of MJC, or those accepted into Reserve Forces Duty per paragraph 6–15 who have completed all ROTC requirements except that of obtaining a baccalaureate degree to be commissioned.

**English Comprehension Level Test**

A general English test which measures student proficiency in listening and reading comprehension skills, but not in speaking and writing skills. It serves as an instrument for screening candidates in need of English language training and also serves as the final indicator of the language proficiency level attained after a period of language training has been accomplished.

**Extended flights**

Flights originating at an Army airfield, Air Force base, 'P' airfield, or any other airfield whose use has been approved by competent authority. The primary purpose is to provide quick transportation for cadets to visit military installations for orientations and observation of military operations, personnel and equipment, or to participate in competitive meets.

**Four-year Senior Reserve Officers' Training Corps Program**

Consists of the on-campus basic course (MS I and MS II) or one of the following as a substitute for the basic course: prior service, 3 years of JROTC, on-campus summer compression, or basic training as a member of the reserve components. The basic course or its equivalent is then followed by the on-campus advanced course.

**Full mobilization**

Expansion of the active Armed Forces resulting from action by Congress and the President to mobilize all units in the approved force structure including reserve components, all individual reservists and the material resources needed for their support.

**Full-time student**

A student who is enrolled in sufficient academic courses to attain sophomore, junior and senior academic status at the end of each appropriate one academic year increment. This includes any ROTC class that may be part of, or in addition to those courses required for a baccalaureate degree.

**General military science**

A program of ROTC instruction designed to prepare a cadet for appointment as a commissioned officer in any branch of the Army for which otherwise qualified.

**Immigrant**
An alien who has been lawfully admitted to the United States for permanent residence.

**Issue-type uniform (issue-in-kind or issue uniform)**
A uniform identical with that issued to enlisted members of the active Army or so similar in design that one cannot be readily distinguished from the other.

**Local flights**
Flights originating and terminating at an Army airfield, Air Force base, or "P" airfield within the boundaries of the local flying area as designated by competent authority.

**Military property custodian**
Agent of a school who maintains accountability and responsibility for Army property. He or she is authorized to requisition, receive, store, issue, account for, and perform administrative functions required in connection with using Government property furnished the institution by the Army or the Air Force, or both, in connection with ROTC training. The agent may be military or civilian.

**M-Day**
The day the Secretary of Defense directs a mobilization based on a decision by the President, the Congress, or both. All mobilization planning (such as alert, movement, transportation, and deployment) is based on this date.

**Military science**
The curriculum that constitutes the Senior ROTC Program.

**Minor**
A student under 18 years old unless the state where the cadet is or will be enrolled has set legal majority at a later age.

**Minority**
Minority is based on the law of the State in which the cadet is or will be enrolled, rather than the student's state of legal residence.

**Misconduct**
Includes but is not limited to misrepresentation (that is, failure to reveal a physical, mental or moral disqualifying factor), drug abuse, alcohol abuse, criminal conduct, and moral or professional dereliction.

**Mobilization**
The act of preparing for war or other emergencies through assembling and organizing national resources. It is the process by which the Armed Forces, or part of them, are brought to a state of readiness for war or other national emergency. This may include assembling and organizing personnel. Supplies, and materiel for call to active duty of reserve components personnel or units, extension of terms of service, and other actions necessary to convert to a wartime posture.

**"P"field**
A civil airport designated as such which permits use by transient military aircraft.

**Partial mobilization**
Expansion of the active Armed Forces (short of full mobilization) as a result of action by Congress or the President to mobilize Reserve Component units/or individual reservists to meet all or part of the requirements of a particular contingency and/or incident to hostilities. Units mobilized to meet the requirements of a partial mobilization are ordered to active duty at their authorized strength.

**Professor of military science**
The academic and military position title of the senior commissioned Army officer assigned to duty with a Senior ROTC detachment.

**Property officer, Army Reserve Officers' Training Corps**
An active duty commissioned officer, warrant officer, or Department of the Army civilian employee designated by the PMS to maintain and account for prescribed records of supplies and equipment provided by the Army for an ROTC unit at a school where the Army has assumed property accountability.

**Refugee**
An alien who has fled his home or country to establish residence elsewhere and who has been granted refugee status by the appropriate Federal officials (normally the INS). Refugees will be treated as immigrants for the purpose of this regulation.

**Region commander**
The commanding general of a United States Army ROTC Region who is responsible for the operation, training, and administering the ROTC program within his or her geographical area.

**Required Reserve Officers' Training Corps training**
ROTC instruction that all eligible students must pursue because of an institutional or State requirement.

**Reserve Officers' Training Corps consortium**
An informal agreement between the Army and host institution officials, normally in a metropolitan area, where two or more Army ROTC host institutions are within reasonable proximity. It is desirable that the host institution interchange academic courses and credits without emoluments, and equal course credit be awarded among all institutions within the consortium; however, this is not mandatory. An ROTC cross-enrolled school may function within a consortium.

**Reserve Officers' Training Corps Extension Center**
A 4-year school generally located more than 50 miles or 1 hour's driving time from the host institution.

**Reserve Officers' Training Corps Host Institution**
A 4-year college, university, or institution, or a 2-year military junior college that has concluded a contract with the Secretary of the Army to provide military science instruction.

**Reserve Officers' Training Corps participation students**
Academically enrolled students participating in military science classes in an ROTC nonenrolled status.

**Scholarship cadet**
A student enrolled in ROTC who has been awarded a scholarship under the Army ROTC Financial Assistance Program (10 USC 2107).

**School identification code**
A six-digit identifying number assigned for ROTC reporting purposes to each institution with an ROTC unit, showing the FICE school code.

**Senior Reserve Officers' Training Corps Program**
The ROTC Program presented at college level institutions and at the college level element of Military Junior Colleges.

**Simultaneous Membership Program**
A program that enables ROTC cadets to participate in ARNG and USAR unit paid drills while enrolled in the ROTC Advanced Course.

**Student**
A person who is enrolled in and attends a regular course of instruction full time at an institution. At class military college and class civilian college schools the course of instruction must lead to a degree in a recognized academic field. Persons enrolled in a 'cooperative' program are included.

**Subsistence allowance**
Money paid by the Army in lieu of rations for each cadet enrolled in the advanced course and for each scholarship cadet enrolled in the basic or advanced course.

**Total mobilization**
Expansion of the active Army Forces by organization and/or additional units or personnel beyond the existing approved active and Reserve structures.

**Two-year Reserve Officers' Training Corps Program**
A complete Senior ROTC Program of the same status as the 4-year program. A student will attend the 6-week Basic Camp, followed by the on-campus Advanced Course.

**Section III**
**Special Abbreviations and Terms**
This section contains no entries.

# Index

This index is organized alphabetically by topic and by subtopic within a topic. Topics and subtopics are identified by paragraph number.

**Administrative support for AAP,, 1–21**
**Advanced camp,, 5–6**
**Age,, 3–6**
**Alien students,, 3–29**
**Amendment of DA Form 918, 2–7**
**Antitrust and conflict of interest statues,, 1–23**
**Application procedures,, 2–5**
**Appointment authority,, 6–2**
**Appointment in the Regular Army,, 6–13**
**Army Advisory Panel on ROTC Affairs, Purpose of the Panel,, 1–17**
**Army relationship with host institutions,, 2–3**
**Assignment to ROTC Duty,, 2–14**
**Authorized uniforms,, 4–3**

**Basic camp,, 5–5**
**Branch assignment selection factors,, 6–19**

**Commissioning of ROTC graduates,, 6–11**
**Conditional students,, 3–28**

**Department of Military Science,, 2–2**
**Designation as a Distinguished Military Student (DMS),, 6–9**
**Designation as a Distinguished Military Graduate (DMG),, 6–10**
**Discharge and separation from the USAR,, 3–44**
**Disenrollment,, 3–43**
**Dual Baccalaureate and Master's Degree Program,, 6–28**

**Early Commissioning Program eligibility for appointment,, 6–15**
**Educational institutions,, 2–1**
**Eligibility,, 3–34**
**Eligibility of members of the U.S. Armed Forces,, 3–14**
**English language aptitude,, 3–11**
**Enrollment for**
  Obligation,, 3–1
  Officer production,, 2–9
  Requirements,, 3–4
  Alien and conditional students,, 3–30

**Financial assistance authorizations,, 3–36**

**Grade and date of rank,, 6–5**

**Ineligibles,, 3–3**
**Initial branch assignment and appointment action,, 6–6**
**Insurance, Medical, and Related Benefits,, 3–49**

**Leave of absence,, 3–38**
**Leave of absence for nonscholarship cadets,, 3–48**

**Mandatory Requirements,, 3–37**
**Medical fitness standards,, 3–20**
**Medical Waivers,, 3–24**
**Meeting procedures,, 1–20**
**Membership,, 1–19**
**Mission,, 1–5**
**Mobilization**
  ROTC Detachments,, 1–12
  ROTC programs,, 1–13

AR 145–1 • 22 July 1996

Cadre,, 1–14
  SROTC cadets,, 1–15
  Special ROTC programs,, 1–16

**Nonscholarship cadets,, 3–40**

**Orientation of PMS and instructors,, 2–15**

**Pay at camp,, 3–52**
**Purpose,, 1–1**

**Release of ROTC Graduates to Another Service**
  Basic Policy,, 6–30
**Requirements for the advanced course and basic camp,, 3–12**
**Relief form ROTC duty,, 2–18**
**Renewal and recharter of the panel,, 1–18**
**Reenrollment,, 3–16**
**Responsibilities for**
  Medical examinations,, 3–18
  Recruiting,, 1–9
  Scholarship Programs,, 3–32
**Retention criteria,, 2–8**
**Reports,, 1–22**
**Requirements for establishing units,, 2–4**

**Scholarship cadet,, 3–41**
**Subsistence allowance,, 3–51**

**Termination of scholarship and disenrollment,, 3–39**
**Training and education,, 5–2**
**Travel entitlements,, 3–53**
**Textbook,, 1–7**
**Temporary medical disqualification (less pregnancy),, 3–25**

**Viability standards,, 2–10**

**Wearing of the uniform,, 4–5**

**UNCLASSIFIED**

Singh v. McHugh et al.

(Cadet Command Pam 145-4)

**CC PAM 145-4**
**Enrollment, Retention and Disenrollment Criteria, Policy and Procedures**

**Original Document Date:** *10/16/00*

**Revision Date:** *9/12/11*

**Summary:**

This pamphlet provides Gold Standards PMS guidance for enrollment, retention, and disenrollment of Cadets.

**Applicability.**  The provisions of this pamphlet apply to students enrolled in or seeking enrollment in the SROTC Basic and Advanced Courses.

**Supplementation.**  Proponent for this pamphlet is U.S. Army ROTC Cadet Command, ATTN: ATCC-PA-C. Supplementation of this pamphlet is prohibited.

**Forms.**  R forms at the back of this regulation are for local reproduction. Have them printed through your forms management officer.

**Suggested Improvements.**  The proponent for this pamphlet is the Office of the Deputy Chief of Staff, G1, ATCC-PA-C. Send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publication and Blank Forms) through channels to Commander, U.S. Army Cadet Command, ATTN: ATCC-PAC, Fort Knox, KY  40121-5123.

**Table Of Contents**

**Chapter 1, Introduction**

| | |
|---|---|
| 1-1 | Purpose |
| 1-2 | References |
| 1-3 | Responsibilities |

**Chapter 2, Enrollment and/or Contracting Procedures**
**Section I, Participating Students (Not Cadets)**

| | |
|---|---|
| 2-1 | General |
| 2-2 | Eligible Participating Students |
| 2-3 | Ineligible Participating Students (Permanently) |
| 2-4 | Ineligible Participating Students (Without Waiver/Exception to Policy) |
| 2-5 | Auditing Students |
| 2-6 | Non-Immigrant Alien Students |
| 2-7 | Military College Students |

A100

**Chapter 2**
**Section II, Cadets**

| 2-8 | General |
|-----|---------|
| 2-9 | Contracted Cadets |
| 2-10 | Non-Contracted Cadets |
| 2-11 | Eligibility of Members of the U.S. Armed Forces |

**Chapter 2**
**Section III, Non-Scholarship Basic Course Enrollment Responsibilities**

| 2-12 | General |
|------|---------|
| 2-13 | Battalion Commander/PMS Responsibilities |
| 2-14 | Enrollment Eligibility Officer (EEO) Responsibilities |
| 2-15 | Student Responsibilities |

**Chapter 2**
**Section IV, Non-Scholarship Basic Course Enrollment Eligibility Requirement**

| 2-16 | General |
|------|---------|
| 2-17 | Student Commitment |
| 2-18 | Academic Status |
| 2-19 | Age |
| 2-20 | Character |
| 2-21 | Citizenship |
| 2-22 | Dependents |
| 2-23 | Medical Qualification |
| 2-24 | English Language Aptitude |

**Chapter 2**
**Section V, Contracting Responsibilities**

| 2-25 | General |
|------|---------|
| 2-26 | Battalion Commander/PMS Responsibilities |
| 2-27 | Enrollment Eligibility Officer (EEO) Responsibilities |
| 2-28 | Student Responsibilities |

**Chapter 2**
**Section VI, Contracting Eligibility Requirements**

| 2-29 | General |
|------|---------|
| 2-30 | Officer Potential |

A101

| 2-31 | **Student Commitment** |
|------|------------------------|
| 2-32 | **Credit/Satisfaction of the Basic Course in order to Contract** |
| 2-33 | **Academic Status** |
| 2-34 | **Age** |
| 2-35 | **Character** |
| 2-36 | **Civil Convictions or Adverse Adjudication or Disposition** |
| 2-37 | **Self-Admitted Use of Drugs and/or Chemical Substances** |
| 2-38 | **Reenlistment (RE) Codes** |
| 2-39 | **Citizenship** |
| 2-40 | **Dependents** |
| 2-41 | **Medical Qualifications** |

**Chapter 2**
**Section VI, Contracting Eligibility Requirements (continued)**

| 2-42 | **Drug and HIV Testing** |
|------|--------------------------|
| 2-43 | **Weight/Body Fat Standard**s |
| 2-44 | **Physical Fitness Testing** |
| 2-45 | **English Language Aptitude** |
| 2-46 | **Acceleration or Compression** |
| 2-47 | **Previous Enrollment in Officer Candidate-Type Training Program** |
| 2-48 | **Veterans Administration (VA) Disability Compensation** |
| 2-49 | **Responsibilities for Medical Qualification** |
| 2-50 | **Medical Examinations** |
| 2-51 | **Medical Examination Forms (Reports)** |
| 2-52 | **Review of Medical Examinations** |
| 2-53 | **Validity Periods of Medical Examinations** |
| 2-54 | **Temporary Medical Disqualification** |

**Chapter 2**
**Section VII, Contract Agreement**

| 2-55 | **Dental Exam Requirements** |
|------|------------------------------|
| 2-56 | **Non-Scholarship Cadets** |
| 2-57 | **Scholarship Cadets** |
| 2-58 | **DD Form 4-Series** |

**Chapter 2**
**Section VIII, Other Contracting Options**

A102

| 2-59 | Simultaneous Membership Program (SMP) |
| 2-60 | Members and Formers Members of the Armed Services |
| 2-61 | Alternative Entry Option (AEO) |
| 2-62 | Conditional Contracting |
| 2-63 | Senior Military College (SMC) Students |

**Chapter 2**
**Section IX, Re-enrollment**

| 2-64 | Re-Enrollment |
| 2-65 | Re-Enrollment Eligibility |

**Chapter 3, Waiver Requests for Contracting**
**Section I, Processing Waiver Requests**

| 3-1 | General |
| 3-2 | Civil Convictions or Adverse Adjudication Dispositions |
| 3-3 | Self-Admitted Use of Drugs and/or Chemical Substance |
| 3-4 | Age Waivers for Non-Scholarship Cadets |
| 3-5 | Reenlistment Code Waivers |
| 3-6 | Dependency Waivers |
| 3-7 | Medical Waivers |
| 3-8 | Medical Determinations for Contracted Cadets |
| 3-9 | After-the-fact Waiver Request |
| 3-10 | Reconsideration of Disapproved Waiver Requests |

**Chapter 3**
**Section II, Waiver Request Preparation/Processing**

| 3-11 | General |
| 3-12 | Preparation |
| 3-13 | Cadet Action Request (CC FM 131-R) |
| 3-14 | Transcripts |
| 3-15 | Planned Academic Worksheet (CC FM 104-R) |
| 3-16 | DD 214 |
| 3-17 | SMP Documentation |

**Chapter 4, Retention Procedures**
**Section I, Responsibilities**

| 4-1 | General |
| 4-2 | Battalion Commander/PMS Responsibilities |

| 4-3 | **Student Responsibilities** |
|---|---|

**Chapter 4**
**Section II, Leave of Absence**

| 4-4 | **Leave of Absence (LOA)** |
|---|---|

**Chapter 4**
**Section III, Probation**

| 4-5 | **Probations** |
|---|---|

**Chapter 4**
**Section IV, Scholarship Termination**

| 4-6 | **Scholarship Termination with Retention as a Non-Scholarship Cadet** |
|---|---|

**Chapter 4**
**Section V, Administrative Suspension**

| 4-7 | **Administrative Suspension (of Scholarship Benefits)** |
|---|---|

**Chapter 4**
**Section VI, Non-Scholarship Extension of Subsistence Allowance**

| 4-8 | **Non-Scholarship Extension of Subsistence** |
|---|---|

**Chapter 4**
**Section VII, Counseling Requirements**

| 4-9 | **Scholarship Cadets** |
|---|---|
| 4-10 | **Non-Scholarship Contracted Cadets** |
| 4-11 | **Non-Contracted Basic Course Cadets** |
| 4-12 | **Other Counseling Requirements** |

**Chapter 4**
**Section VIII, Retention Disqualifications**

| 4-13 | **General** |
|---|---|
| 4-14 | **Age** |
| 4-15 | **Academic Standards** |
| 4-16 | **Use of Drugs and/or Chemical Substances** |
| 4-17 | **Civil Conviction or Adverse Adjudication/Disposition** |
| 4-18 | **Medical** |
| 4-19 | Deleted |
| 4-20 | **Conscientious Objector** |

A104

**Chapter 4**
**Section IX, Completion Cadet Program - CCP**

| 4-21 | Cadet Command Policies |
|------|------------------------|
| 4-22 | CCP Goals |
| 4-23 | CCP Responsibilities |
| 4-24 | Administration of the Program |

**Chapter 5, Health Benefits and Cadet Liability Coverage**

| 5-1 | General |
|-----|---------|
| 5-2 | Basic Policy |
| 5-3 | Department of Labor (DOL) Claims |
| 5-4 | Department of Veterans Affairs Claims |

**Chapter 6, Disenrollment Procedures**

| 6-1 | General |
|------|---------|
| 6-2 | Battalion Commander/PMS Actions when AR 145-1 requires Disenrollment |
| 6-3 | Determination of Disenrollment Procedures |
| 6-4 | Appointment of Formal Board/IO |
| 6-5 | Actions Taken Prior to Formal Board/IO |
| 6-6 | Investigating Officer (IO) (Informal) |
| 6-7 | Formal Board Proceedings |
| 6-8 | Report of Proceedings |
| 6-9 | Appointing Authority Actions After Receiving Report of Proceedings |
| 6-10 | Processing Completed Disenrollment Actions |
| 6-11 | Waiver of Board Procedures |
| 6-12 | Special Situations |
| 6-13 | Recoupment or Order to Active Duty |
| 6-14 | Procedures Prior To Discharge |

**Appendices**

|   | Abbreviations |
|---|---------------|
| A | References |
| B | Approval Authority/Flow of Cadet Actions |
| C | Preparation and Processing of Cadet Forms |
| D | List of Typical Minor Traffic Offenses |
| E | Instructions for Standardization of the ROTC Cadet 201 File |

A105

| F | **Supplemental Disenrollment Guide For ROTC Cadet Conscientious Objector Applications** |
|---|---|
| G | **Supplemental Disenrollment Guide For ROTC Cadet Personal Hardships** |

**Figures**

| 2-1 | **Medical Fitness Statement (Physicians Statement (DA Form 3425-R))** |
|---|---|
| 2-2 | **Statement of Health and Medical Examination (Cadets Statement (DA Fm 2453-R))** |
| 2-3 | **Initial Entry Weight Table for Males** |
| 2-4 | **Initial Entry Weight Table for Females** |
| 4-1 | **Sample Memorandum of Understanding - CCP** |
| 5-1 | **ROTC Cadet Health Benefits Matrix** |
| 5-2 | **Federal Employees Notice of Traumatic Injury and Claim for Continuation of Pay/Compensation (Form CA-1)** |
| 5-3 | **Notice of Occupational Disease and Claim for Compensation** |
| 5-4 | **Health Insurance Claim Form (OWCP-1500)** |
| 5-5 | **Injury/Illness Type and Source Codes** |
| 5-6 | **Line of Duty Statement** |
| 6-1 | **Sample Notification/Acknowledgment and Waiver of Rights Memorandum** |
| 6-2 | **Sample Appointment Memorandum** |
| 6-3 | **Sample Notification of Respondent to a Board of Officers/Investigating Officer Memorandum** |
| 6-4 | **Findings and Recommendations Worksheet** |
| 6-5 | **Checklists/PMS Guidance for Disenrollment Actions** |
| 6-6 | **Required Format for Disenrollment Record** |
| 6-7 | **Suggested script for procedures without Recorder** |
| 6-8 | **Suggested script for procedures with Recorder** |
| 6-9 | **Checklist for Non-Scholarship Waiver of Rights Disenrollments** |
| 6-10 | **Sample Disenrollment Reason Codes** |

A106

**Figures (continued)**

| 6-11 | Sample Memorandums for PMS to Disenroll/Discharge Non-Scholarship Cadets:<br>Sample 1:  PMS Non-Scholarship Decision Memorandum For Record<br>Sample 2:  PMS Non-Scholarship Disenrollment Notification<br>Sample 3:  PMS Non-Scholarship Disenrollment Notification/SMP-USAR<br>Sample 4:  PMS Non-Scholarship Disenrollment Notification/SMP-ARNG<br>Sample 5:  PMS Non-Scholarship Disenrollment Notification/Cadet Currently on Active Duty<br>Sample 6:  PMS Non-Scholarship Disenrollment Notification/Cadet Discharged from SMP but Order Assigns To AHRC-Fort Knox Control Group and not ROTC Control Group<br>Sample 7:  PMS Non-Scholarship Disenrollment Notification/Cadet not SMP but has Prior Service<br>Sample 8:  Sample Discharge Order Format<br>Sample 9:  Sample IRR Reassignment Order Format |
| --- | --- |

A107

## Chapter 1 - Introduction `TOC`

### 1-1. Purpose `TOC`

Provide guidance for the Battalion Commander/PMS to use in the management of Cadets, and processing Cadet actions for enrollment, retention, and disenrollment.

### 1-2. References `TOC`

**Appendix A** contains the required and related publications.

### 1-3. Responsibilities `TOC`

a.  Commander, US Army Cadet Command responsibilities are stated in **AR 145-1**.

b.  Brigade Commanders are responsible for--

   (1) Ensuring the Battalion Commanders/PMS complies with the requirements and procedures addressed in this publication and taking corrective action as required on deficiencies noted.

   (2) Ensuring the enrollment eligibility criteria is applied to students enrolling in the Senior ROTC Program, and for monitoring the retention of Cadets.

   (3) Monitoring the quality and consistency of Cadet Actions submitted by the Battalion Commander/PMS.

   (4) Returning any incomplete or improperly documented request for Cadet Action to the Battalion Commander/PMS, as appropriate.

   (5) Taking final action or forwarding Cadet Actions which are complete, properly justified, and in the best interest the US Army, to Cadet Command, as appropriate.

c. Battalion Commanders/PMS are responsible for-

   (1)  Verifying the eligibility of students who are seeking entry into the Basic Course and contracting in the ROTC Program.

   (2)  Verifying the continuing eligibility of Cadets enrolled and/or in the ROTC Program.

   (3)  Appointing an enrollment eligibility officer and an alternate to be responsible for determining each student's eligibility for enrollment/contracting and retention.

   (4)  Ensuring requests for waivers and exceptions to policy pertaining to enrollment or retention are:

      (a)  Initiated as soon as the requirement becomes known.

      (b)  Initiated by the Cadet concerned.

A108

(c) Fully justified, properly documented and administratively correct before being forwarded for consideration. Battalion Commanders/PMS will ensure that Cadet quality standards are applied to each request for waiver submitted for approval.

(d)  Disapproved and returned to the student if not in the best interest of the ROTC Program. However, if the student desires to submit a waiver for medical disqualification, even though the Battalion Commander/ PMS and medical authority do not support the request, it will be forwarded to Headquarters, Cadet Command (HQCC), with appropriate recommendations for a final determination.

(5)  Conditionally contracting only those Non-Scholarship Cadets whose eligibility, based on medical or other criteria, is waivable and still pending.

## Chapter 2 - Enrollment and/or Contracting Procedures TOC

### Section I, Participating Students (Not Cadets)
### 2-1  General  TOC

a.  Participating students are those who choose not to or are ineligible to sign the **CC Form 139-R**, Cadet Enrollment Record, and therefore are not enrolled Cadets. They are divided into the categories below. All categories of participating students who meet the requirements set by the school authorities may take Army ROTC classes for all 4 years. Participation in other than classroom instruction is not authorized. Specific grades and grade point averages (GPA) awarded to these students are according to the policies set by the school authorities.

b.  Participating students may participate in the ROTC program in one of the categories provided:

(1)  They are not authorized access to classified instructional material.

(2)  They are in good standing and attending school full time.

(3)  Such participation is not otherwise prohibited by law, DOD Directive or Army Regulation.

c.  Participating students are ineligible for:

(1)  Subsistence allowance;

(2)  Participation in the ROTC Scholarship Programs;

(3)  Commissioning credit, except immigrant alien or refugee students or eligible students who are taking ROTC for academic credit only, may be given credit for the part of the course successfully completed upon enrollment and/or contracting in SROTC. Submit requests for commissioning credit to Cadet Command for final determination.

(4)  Participating students completing the ROTC course of instruction in a non-enrolled status are ineligible for appointment as commissioned officers.

A109

**2-2.  Eligible Participating Students.**  **TOC**  Students taking ROTC for academic credit but are not seeking a commission; however, at some point in the future could qualify for enrollment/contracting.

**2-3.  Ineligible Participating Students (Permanent).**  **TOC**  Students taking ROTC for academic credit, but are permanently ineligible for commissioning. The following students are ineligible for enrollment or contracting in the ROTC Program.  No waiver is authorized.

a.  A person who is a conscientious objector, as defined in **AR 600-43**.  Students who have previously claimed conscientious objector status but no longer have convictions that preclude them from bearing arms and participating in full military service with the U.S. Army are eligible if they furnish a signed affidavit to that effect prior to enrollment/contracting.

b.  A person who has previously tested positive for tetrahydrocannabinol or cocaine use by a DOD certified drug testing laboratory using procedures established by the Assistant Secretary of Defense for Health Affairs.

c.  A person with a permanently disqualifying medical condition.

d.  A person with a conviction of a misdemeanor or felony crime of Domestic Violence or a person who has been convicted of any offense listed in **AR 27-10**, Chapter 24.

e.  A person who is a commissioned officer, a former officer of any component of the U.S. Armed Forces, or an individual who has a certificate of eligibility for appointment as a commissioned officer.

f.  Members of the U.S. Armed Forces serving on active duty, unless participating in a program approved by the Department of the Army.

g.  Officers of the Public Health Service or National Oceanic and Atmospheric Administration.

h.  Warrant officers of the Reserve Components of the U.S. Armed Forces.

i.  Enlisted members of the Reserve Components of the U.S. Armed Forces not participating in the Simultaneous Membership Program (SMP).

j.  This list of ineligible students is not all-inclusive. Address questions to your Cadet Command POC, Cadet Actions and Standards Division, ATCC-PA-C, DCS, G-1.

**2-4.  Ineligible Participating Students (without Waiver/Exception).**  **TOC**  The following categories of students are ineligible for contracting unless a waiver/exception to policy is granted:

a.  A person who will have **10** years or more of active duty service at the time of commissioning.  (Requests for exception to policy in extraordinary cases will be forwarded to the CG, Cadet Command.)

b.  A person who has been discharged from any branch of the armed forces with a waivable or non-waivable disqualifying reenlistment code or with one of the following types of discharge:

A110

(1)  Dishonorable

(2)  Bad conduct

(3)  Undesirable

(4) Other Than Honorable conditions

(5)  General or honorable if the reason and authority for separation preclude reentry into military service under **AR 601-210**.

c.  Approval authority for reenlistment code waivers is CG, Army Human Resources Command (OPMD/AHRC-OPD-A)-Fort Knox, KY.  (**Exception**:  *"CG, HQCC, may approve those involving Chapter 16 discharge to participate in ROTC, hardship, compassionate cases or medical disqualifications that have been resolved, provided the student was separated with a waivable RE Code as stated in* **AR 601-210**)." **TOC**

d.  A person who has a pre-trial diversion for a felony; any civil conviction; an adverse adjudication; or any type of court-martial conviction, even though the record may have been sealed or expunged.  These students (excluding scholarship students) may be permitted to participant in the Basic Course without a waiver, but must have obtained a waiver prior to attending LTC or contracting in the ROTC Program.

(1)  No waiver will be required for minor traffic offenses resulting in a fine of $250 or less, except when the applicant has accumulated six or more such offenses during any **12**-**month** period.

(2)  Waivers are not required for disciplinary actions in connection with the provisions of the Uniform Code of Military Justice (UCMJ), Article 15.  Such disciplinary actions will be considered when evaluating the applicant's character.

e.  A person with a conviction for offenses listed below who is supported by intermediate commanders, will be sent through channels to CG, USACC, for determination. Waiver approval authority will not be delegated; however, disapproval authority may be exercised at each command level. A waiver requested disapproved by any intermediate commander need not be sent to higher authority. The supporting recommendations at each command level and appropriate comments as shown below will be included.

(1)  A person convicted of a felony under local or Federal law or an offense punishable under the UCMJ by dishonorable discharge or confinement for more than 1 year. For the purpose of this regulation, offenses involving possession, manufacture, use, sale, distribution, or the intent to sell or distribute any controlled substance as listed or defined in 21 USC 812 are treated as felonies, regardless of the classification by local authorities.

(2)  A person with a conviction that resulted in a sentence of confinement in a prison, stockade, or detention area, or in a sentence to hard labor. Later proceedings that delete or alter an initial determination of guilt (for example, pardon, expunction, amnesty, commutation, set aside and suspension) do not eradicate the conviction for the purpose of this Paragraph. However, convictions overturned or successfully appealed are not convictions for the purpose of this Paragraph if the appropriate

A111

officials state in writing that no further proceedings (such as retrial) are pending or being considered.

(3)  A person with a conviction involving bigamy, contributing to the delinquency of a minor or moral turpitude (which includes any sexually related offense or dishonesty, such as larceny or perjury).

f.  In requesting a waiver, the student must list all the above proceedings, whether by military or civilian courts.

g.  Except as provided in subparagraphs a, b, and e above, the CG, USACC, may delegate approval authority to subordinate commanders for offenses/convictions under military or civil codes, provided the --

(1)  Applicants record does not indicate the offense has recurred or is likely to recur.

(2)  Applicant has good potential as an officer.

(3)  Current personal conduct and character of the applicant are above reproach. Since the offense, the applicant must have shown that he or she can meet the requirements of good citizenship.

h.  A person who has a potentially correctable disqualifying medical condition.

**2-5.  Auditing Students.**  TOC  Students not receiving academic credit for ROTC. Any student may audit courses in the ROTC program if approved by the Battalion Commander/PMS and school authorities. Authority is granted to permit the PMS to cooperate with the school in accommodating a student's request for limited participation in the program.

a.  Participation of auditing students is limited to classroom participation only.

b.  Battalion Commanders/PMS are not authorized to allow auditing students to participate in any commissioning program activities. Auditing students will not

(1)  Participate in drill, marching, leadership laboratories, field training exercises, voluntary programs, or attend LTC or LDAC.

(2)  Be issued or wear the uniform.

(3)  Receive credit toward commissioning or enlisted grade status through audit of ROTC courses, or be issued a **DA Form 134** for having audited the course.

**2-6.  Non-immigrant Alien Students.**  TOC  Non-immigrants are students who are not normally seeking citizenship or commissioning.

a. Battalion Commanders/PMS will avoid the active recruitment of non-immigrant alien students.

b. Requests for approval of the participation of non-immigrant alien students must be forwarded by the Battalion Commander/PMS to Headquarters, Cadet Command, ATTN: ATCC-PA-C. The request must originate from the student concerned, using **ROTC CC**

A112

**Form 131-E**. Each request supported by the Battalion Commander/PMS will contain a statement in the forwarding endorsement that the student meets all requirements for entry as stated in Section IV and this Paragraph.

c. Non-immigrant aliens must--

    (1)  Be recommended for participation by the Battalion Commander/PMS and approved by Cadet Command.

    (2)  Have **Department of Justice Form I-94** in their possession.

    (3)  Provide certification that their government has no objection to their receiving Senior ROTC instruction or have their **Department of Justice Form I-94** stamped "Paroled indefinitely" or "indefinite voluntary departure".

    (4)  Be registered for and attending a full-time regular course of instruction at a school where SROTC is available.

    (5)  Be recommended by the proper school authority.

    (6)  Satisfactorily complete the Basic Course or LTC before being considered for participation in the Advanced Course.

    (7)  The Battalion Commander/PMS may dismiss non-immigrant aliens from the Basic or Advanced Course for reasons listed in **Chapter 6**, if deemed appropriate.

**2-7. Military College Students**. `TOC`  For Military Junior College (MJC) students and Senior Military College (SMC) students who have not completed the **CC Form 139-R**, although military colleges refer to the students as Cadets, for ROTC purposes, if they have not signed the **CC Form 139-R** , they are classified as participating students.

**Section II, Cadets**

**2-8. General**. `TOC` Cadets are students who have been determined eligible for enrollment in the SROTC program and have signed the **CC Form 139-R** .  In order for a student to be classified as enrolled in SROTC, appropriate sections of the **CC Form 139-R** must be completed and signed.  Cadets must either be registered for and taking a military science class for academic/ROTC credit or attending Leaders Training Course (LTC).  Cadets enrolled in ROTC are divided into two categories, non-contracted and contracted Cadets.

**2-9. Contracted Cadets**. `TOC` Contracted Cadets are students who have signed the **CC Form 139-R** , **DA FM 597**/**597-3**, as applicable, and the **DD FM 4 Series**.  Contracted Cadets are enrolled in the SROTC program as Non-Scholarship Cadets or as scholarship Cadets.  Completion Cadets are contracted Cadets.  Cadets are required to sign the Loyalty Oath on the **CC Form 139-R** at the time of contracting.

**2-10. Non-Contracted Cadets**. `TOC` Non-contracted Cadets are students who have completed and signed the **CC Form 139-R**, but have not completed/signed the **DA FM 597**/**597-3** or the **DD FM 4 Series**.  The non-contracted Cadet category includes students with a scholarship award pending contracting, advanced designee scholarship

A113

awardees, immigrant aliens/refugees, and Non-Scholarship conditional Cadets who have completed and signed the **CC Form 139-R** and **DA FM 597**.

a.  Immigrant and refugee students.

(1)  An immigrant is an alien who has been lawfully admitted to the United States for permanent residence.  A refugee is an alien who has fled his home or country to establish residence elsewhere and who has been granted refugee status by the appropriate Federal officials (normally the INS).  Refugees will be treated as immigrants for the purpose of this regulation.

(2)  Eligible immigrant and refugee students will use **ROTC CC Form 131-R** to request approval to enroll or participate in the ROTC Program.  The student will submit the form to the Battalion Commander/PMS for approval/disapproval action.  The Battalion Commander/PMS will verify that the immigrant alien/refugee meets all requirements for entry based on the criteria on the **CC Form 139-R**.  Alien students are ineligible to enroll in the Advanced Course if they are a member of a Reserve Component of the U.S. Armed Forces regardless of whether such enlistment in the Reserve Component is prior to or subsequent to such participation in the ROTC Program.  Individuals enrolled as SMP applicants must be U.S. citizens.

(3)  The following additional requirements apply to immigrant aliens and refugees:

(a)  Immigrants, regardless of their country of origin, who have been lawfully admitted for permanent residence in the U.S. must have in their possession Department of Justice Form I-151 (Alien Registration Receipt Card) or Department of Justice Form I-551 (Alien Registration Receipt Card).  **TOC**

(b)  Refugees, still in a parole, conditional entry or voluntary departure status, regardless of the country of origin must--

(i)  Have in their possession Department of Justice Form I-94 (Arrival-Departure Record) bearing an Immigration and Naturalization Service stamp reading: "Refugee-Conditional Entry", or-

(ii)  Be Cuban nationals who have in their possession Department of Justice Form I-94, or-

(iii)  Have confirmation in writing from the Immigration and Naturalization Service that they are refugees.

(4)  Although immigrant aliens may be authorized to participate in the SROTC program if properly qualified, they must be advised that:

(a)  Current Department of Defense policy requires U.S. citizenship to be eligible for a security clearance.

(b)  Effective 1 January 1988, Department of the Army policy required the possession of Secret security clearance based on a National Agency Check (NAC) to be eligible to be commissioned.

(c)  The above two requirements must be met by graduation date.

A114

(d)  Those participating who do not meet these requirements by graduation will not be retained as a participating member of the ROTC program. (No waivers of these requirements will be granted.)

(e)  Immigrant alien or refugee graduates who did not meet the DOD requirements but have otherwise fulfilled commissioning requirements may apply for direct commissioning once they meet the DOD requirements.

(f)  Immigrant aliens or refugees may be presented a DA Form 134 (Military Training Certificate Reserve Officers Training Corps) after successfully completing all or part of the SROTC program. When issued the certificate it will be annotated to reflect that the certificate does not entitle the student to a commission.

(g)  Immigrant aliens or refugees who subsequently meet the above requirements and are contracted; are not authorized to receive retroactive subsistence allowance. The date of enlistment will be the date on which all criteria for contracting are met, including selection and completion of Part II,  **DA FM 597** and the **DD FM 4 Series**.

b.  Non-Scholarship Conditional Cadets.   **TOC**

(1)  Non-Scholarship students seeking to contract in the ROTC Program whose eligibility, based on a waivable condition such as medical or other criteria, has not been finally determined, or for who a waiver request is pending final decision, may be allowed to participate conditionally, if Part II of  **DA FM 597** is signed (and the student is otherwise qualified). The student cannot complete **DD FM 4 Series** forms until fully qualified. Those two documents will be completed and signed at the time the student is fully qualified for contracting. The DD 4s will not be backdated under any circumstances.

(2)  Conditional status does not include alien students or students trying to decide whether they desire to join ROTC and later strive for a commission.

(3)  Waiver requests for a disqualifying condition will be initiated by the student and processed by the Battalion Commander/PMS as early as possible in the enrollment/conditional contracting process to enable a timely decision.  A student's conditional status must be resolved within a twelve (12) month period; failure to resolve the conditional status will cause the student to revert to participating student status without entitlement to commissioning credit for contracting.

(a)  If subsequently determined qualified, or granted a waiver, the conditional students may be officially enrolled by completing Part V of the **DA FM 597** and completion of the **DD FM 4 Series** forms. Retroactive subsistence allowance is authorized from the date the Cadet began advanced training, provided the date of the **DA FM 597** and the date the Cadet began training are the same. However, students who began the ROTC Program as alien students are not authorized to receive retroactive subsistence allowance. The Battalion Commander/PMS will reflect in Part IV of  **DA FM 597** the effective date of entitlement to subsistence allowance as the date the Cadet began advanced training (date cannot precede the signed date of Cadet in Part II of **DA FM 597**).

(b)  If determined unqualified, or if the requested waiver is disapproved, the students status will change from that of conditional student to that of participating

*Page 16 of 126*

A115

student. The student will not be entitled to receive commissioning credit or enlisted grade credit for the period enrolled as a conditional student.

(c) Conditional students are not authorized to attend LDAC until their conditional status is resolved.

(4) Students will not be allowed to conditionally contract if they have:

(a) A disqualifying condition for which a waiver is not authorized, e.g., overweight.

(b) A permanently disqualifying medical condition.

(c) Not completed the periods of supervised probation or deferred or suspended civil conviction sentence.

(d) Elected terminal leave in conjunction with their separation from active duty UP **AR 635-200**, Chapter 16, and have not yet been separated. This provision prevents dual status from occurring for purposes of longevity or compensation which is specifically prohibited by law.

(e) Been disenrolled from ROTC. See **Section VIII** below for guidance concerning re-enrollment of disenrolled Cadets.

## 2-11. Eligibility of Members of the U.S. Armed Forces  TOC

a. The following individuals are eligible for enrollment in the Basic Course (Non-Scholarship only), but will not be credited with Reserve Component service when computing length of service for any purpose or entitlements to basic pay for the period while enrolled in the Basic Course:

(1) Warrant officers of the Reserve Component of the U.S. Armed Forces not on active duty.

(2) Enlisted member of the Reserve Component of the U.S. Armed Forces not on active duty.

b. The following individuals are eligible for enrollment and contracting in the ROTC Program:

(1) Former warrant officers of the Active or Reserve Components of the U.S. Armed Forces.

(2) Enlisted members of the ARNG or USAR not on active duty who are fully qualified to participate in the SMP.

(3) Former active duty Soldiers who have completed Basic Training or equivalent.

## Section III, Non-Scholarship Basic Course Enrollment Responsibilities

## 2-12. General.  TOC   In order to enroll a student in the Basic Course, the Battalion Commander/PMS and the enrollment eligibility officer must ensure that the student meets all eligibility criteria. Enrollment in the Basic Course is the act of completing and signing

A116

the **CC Form 139-R**, except the Loyalty Oath, and other necessary documents as stated below.  Signing the Loyalty Oath is optional for enrollment in the Basic Course, but is required for contracting.

**2-13. Battalion Commander/PMS Responsibilities.** `TOC` Battalion Commander/PMS are responsible for:

a.  Certifying any placement credit given to the student.

b.  Reviewing all requests for waiver of enrollment criteria submitted by a student and making a prompt determination to forward the request to the appropriate approval authority prior to contracting. All waiver requests forwarded for approval by the Battalion Commander/PMS will contain the rationale for the favorable recommendation.

c.  Monitoring and verifying actions and activities of the enrollment eligibility officer (EEO).

**2-14. Enrollment Eligibility Officer (EEO) Responsibilities.** `TOC` The EEOs are responsible for--

a.  Ensuring that the student applying for enrollment in the ROTC Program meets all eligibility criteria prior to enrollment or submits an appropriate request for waiver prior to contracting. The EEO will provide the student with administrative guidance and assistance in preparation and submission of waiver request and will monitor the request until a final determination is made by the appropriate approval authority.

b.  Reviewing all items applicable to the student on **CC Form 139-R** and completing for each student applying for enrollment.

c.  Verifying that the student is fully qualified for enrollment and retention in the ROTC Program by signing and dating Part II of **CC Form 139-R**, and filing this and associated documents in the Cadets file for permanent retention.

d.  Reviewing all forms completed by the student for accuracy and completeness, as well as any supporting documentation provided.

e.  Ensuring that the student properly enrolls in the ROTC course of instruction through the institution.

f.  Briefing the student on government sponsored benefits for ROTC Cadets prior to enrollment.

g.  Identifying USAR and ARNG members in the Basic Course for possible subsequent participation in the Simultaneous Membership Program (SMP).

**2-15. Student Responsibilities.** `TOC` Students enrolling in the ROTC Basic Course are responsible for:

a. Providing documentation to verify U. S. citizenship (see Para **2-39**).

b. Providing documentation to verify medical qualification (see Para **2-49**).

c. Completing all forms required for enrollment, to include:

A117

(1)  **CC Form 139-R**, Cadet Enrollment Record (signing the Loyalty Oath is required prior to contracting).

(2)  **CC Form 136-R**, Briefing on Government Sponsored Benefits for ROTC Cadets.

(3) **CC Form 137-R**,  Authorization for Access to Student Records.

d. Obtaining the signature of a parent or guardian on applicable forms, if a minor.

e.  Personally initiating any waiver requests required for contracting in the ROTC Program, with the assistance of cadre.

f.  Registering for and attending the appropriate ROTC course of instruction.

**Section IV, Non-Scholarship Basic Course Enrollment Eligibility Requirements**

**2-16.  General**. `TOC`  In order to be eligible for enrollment in the Basic Course, the student must meet the applicable requirements stated in **AR 145-1** and in this section.

**2-17.  Student Commitment**. `TOC` Students must be willing to complete all pertinent items of **CC Form 139-R** and to discuss their responses to the statements contained in those items, i.e., Statement Concerning Civil Convictions, Substance Abuse, Conscientious Objector Status, and Religious Accommodation when appropriate.  Waivers must be obtained prior to contracting for criteria that renders the Cadet ineligible.  Signing the Loyalty Oath is optional for Basic Course non-contracted Cadets.

**2-18.  Academic Status** `TOC`

a.  Be registered and attending full time a regular course of instruction at a school participating in the SROTC program.  At military colleges and civilian schools, the course of instruction must lead to a baccalaureate or advanced degree in a recognized field that is compatible with the student's participation in the ROTC program.  Nursing and other medical specialty students must be enrolled in a program accredited by an agency recognized by the U.S. Secretary of Education.  There are no restrictions on the students major (except for scholarship Cadets).

b.  Requests for exception to the enrolled in and attending full time requirements may be submitted by graduate students, completion Cadets, and last semester MS IV Cadets. Requests will be sent to the CG, USACC, for determination on a case-by-case basis. Recommendations at each command level and proper comments regarding justification for exception will be included.

A118

**2-19.  Age** TOC

a.  Requirements for scholarship applicants are contained in **CC Reg 145-1**.

b.  Requirements for Non-Scholarship applicants are listed below.

(1)  Minimum.  Applicants must be at least 17 years old to contract in the ROTC Program. Applicants under 18 years old and those who are minors for the purpose of executing contracts under the laws of the state which has jurisdiction where the school is located (even if they are older than 18) require parental consent for contracting.

(2)  Maximum.  Applicants must be young enough that they will not be 39 years old or older at the projected time of commissioning.

(3)  Waivers.  There is no longer a waiver requirement for Non-Scholarship Cadets thru the age of 34 year at the projected time of commissioning. The Brigade Commander is the waiver authority for applicants who will be between 35 and 39 years of age at the projected time of commissioning. Waivers must be approved prior to fully contracting the Cadet. See **Chapter 3** for waiver processing procedures.

(4)  Applicants who are to be appointed after their 39th birthday should be advised that they may not be able to qualify for retirement pay under 10 USC 1331, although they may be able to qualify for retirement pay under 10 USC 3911 if they have served on active duty for 20 years, at least 10 years of which have been served as a commissioned officer.

**2-20.  Character** TOC

a.  Be of good moral character, as normally substantiated by no record of disciplinary problems or civil convictions.  Applicants who have been convicted or admit to a waivable offense must be granted a waiver prior to contracting.  See **Chapter 3** waiver processing procedures.

b.  Students with misdemeanor or felony domestic violence conviction are ineligible for enrollment in the Basic Course and/or contracting.

**2-21.  Citizenship**. TOC  Students must be a U.S. Citizen and meet the citizenship eligibility requirements in Paragraph **2-39** below prior to contracting. Exceptions may be granted for immigrant alien/refugee students who desire to voluntarily participate in the Basic Course or Advanced Course.

**2-22.  Dependents.** TOC  Meet the dependency eligibility requirements in Paragraph **2-40** below or be granted a waiver prior to contracting.  See **Chapter 3** for waiver processing procedures.

**2-23.  Medical Qualification** TOC

a.  Be medically qualified to ensure that their health and well-being will not be compromised by participation in the ROTC Program in accordance with **AR 145-1** and this pamphlet.  Applicants must be physically capable of participating in the ROTC program. Medical examination must be of sufficient scope to permit the examiner to state without

qualification that the individual's health and well-being will not be compromised by participation in the ROTC program, i.e., a program not more physically strenuous than a normal college physical education program.

    1.  Applicants for enrollment in the Basic Course as non-contracted Cadets are responsible for furnishing the EEO the prescribed statement as to their physical capability to participate in the ROTC Program.

    2.  The **DA Form 3425-R** (Medical Fitness Statement for Enrollment in Basic Course, Senior ROTC)(Figure 2-1) must be completed by a physician.

    3.  Equivalent medical records/statements in lieu of a completed **DA Form 3425-R** are acceptable.

    4.  Any expense incidental to such a medical examination will be borne by the applicant.

    b.  Must provide name, address, and phone number of his/her dentist and sign a statement acknowledging that his/her civilian dental records contain descriptive profiles, bite wing x-rays, orthodontic profiles or dental x-rays.

**2-24.  English Language Aptitude.** `TOC`  Guidance for the English Comprehension Level (ECL) test is provided by HQCC, Directorate of Leader Development (DOLD).  Refer questions and/or requests for exception to DOLD.

**Section V, Contracting Responsibilities**

**2-25.  General.** `TOC`  To preclude erroneous contracting of Cadets, it is essential that the Battalion Commander/PMS and the EEO verify the eligibility of each student prior to contracting.

**2-26. Battalion Commander/PMS Responsibilities** `TOC`

The Battalion Commander/PMS is responsible for:

a.  Reviewing the activities of the EEO to ensure that all students processed for enrollment by the EEO are eligible for contracting and enlistment.

b.  Determining if the student qualifies for placement credit, if applicable.

c.  Signing **DD FM 4/1 and 4/2** and **DA FM 597** after the EEO confirms eligibility of the student for contracting and enlistment.

d.  Completing the appropriate portions of **CC Form 131-E** or **CC Form 131-R** (Cadet Action Request) prior to the forwarding of a recommendation for approval to higher headquarters.  The Battalion Commander/PMS will also ensure that the packet is administratively complete and correct with sufficient copies prior to submission.

e.  Acting on waivers within his/her authority.

**2-27.  EEO Responsibilities.** `TOC`  The EEO is responsible for:

a.  Ensuring that all students meet contracting eligibility criteria.

b.  Completing the checklist portion of **CC Form 139-R**, Cadet Enrollment Record, for each student or re-verifying the criteria, if a Basic Course Cadet is contracting into the ROTC Program.  Based on direct student responses, the EEO reviews each response for accuracy and takes appropriate action when a student is determined to have a disqualifying response.

c.  Reviewing all required forms submitted by the student for accuracy and completeness. Initiating follow-up action and inform the student if any information provided renders the student ineligible for contracting and requires a waiver.  Assisting the student in the preparation of a waiver request, should the student desire to submit such a request and monitor until a final decision is made.

d.  Briefing the student on government sponsored benefits using **CC Form 136-R**.

e.  Ensuring that Cadets who complete the Basic Course at the end of one school year, and who are fully qualified for and desire to contract early are given the opportunity to contract and enlist at the end of the school year in which they satisfactorily complete Basic Course requirements.  **TOC**

f.  Prepare **DD FM 4/1 and 4/2** and Cadet contract, **DA FM 597**/**597-3** for PMS/APMS to use in contracting Cadets.

   (1)  **DD FM 4 Series** forms will be prepared IAW the instructions a **Appendix C** and dated the day that the student takes his/her oath.

   (2)  The Cadet contract will be prepared IAW the instructions at **Appendix C**.

   (3)  Cadets whose eligibility has not been finally determined or who are pending waiver determination of a waivable condition may be conditionally contracted. However, fully contracting or enlisting these individuals in ROTC is prohibited until that determination or action has been favorably completed.  (See Paragraph **2-61** below for additional guidance on conditional contracting).

g.  Ensuring that the student is registered for and attending the appropriate ROTC course of instruction.

h.  Identifying USAR/ARNG members as possible SMP participants.

i.  Briefing the student as to the length of military service obligation (MSO) upon being appointed as an officer.

j.  Reviewing/explaining the other options for contracting available to students.  (Other contracting options are outlined in **Section VIII** below).

k.  Establish and maintain the **ROTC Cadet 201 File** IAW instructions in **Appendix E**. Use the ROTC Cadet 201 File Worksheets (**CC Form 201-R**), to separate sections in the file.

l.  Initiate a National Agency Check (NAC) once the Cadet is fully contracted.

**2-28.  Student Responsibilities**.  **TOC**  Contracting students are responsible for:

A121

a.  Providing documentation to verify U.S. citizenship.

b.  Providing documentation to verify medical qualification.

c.  Meeting the weight standards prescribed in **AR 40-501** or **AR 600-9** for prior service members, as appropriate.  No waiver is authorized.

d.  Providing **DD Form 214** (applicable only to prior service applicants), if applicable.

e.  Completing and signing all forms required for contracting, to include:

   (1)  **DD FM 4/1 and 4/2** (Enlistment Document, Armed Forces of the United States).

   (2)  **DA FM 597**/**597-3** (Army Senior Reserve Officer Training Corps Student Contract).

   (3)  Acknowledgment on briefing on government sponsored benefits for ROTC Cadets, **CC Form 136-R**.

   (4)  Authorization for access to student records, **CC Form 137-R**.

   (5)  **CC Form 104-R**, Planned Academic Worksheet.

f.  Personally initiating any request for waiver of contracting eligibility requirements.

**Section VI, Contracting Eligibility Requirements**

**2-29.  General**  `TOC`

a.  To be eligible for contracting as a Non-Scholarship Cadet, the student must meet the applicable requirements for Basic Course Cadets, as well as the requirements stated in this section.  Contracting criteria for scholarship Cadets is contained in **CC Reg 145-1**.

b.  **Section I** for a list of ineligibles for enrollment/contracting. Refer any questionable cases to the HQCC POC.

**2-30.  Officer Potential.**  `TOC`  The student must possess qualifications for becoming an effective Army officer.  Leadership potential will be emphasized as an important factor in selection for contracting in the ROTC Program.  Applicants must possess officer-like qualifications as evidenced by their appearance, record, personality, scholarship, extracurricular activities, and aptitude for military training.

**2-31.  Student Commitment.**  `TOC`  Contracting students must be willing to complete (including signature and date) the statements on **CC Form 139-R** pertaining to criminal proceedings, conscientious objector status, substance abuse, and sign the loyalty oath. They must be willing to discuss their responses to the statements, when appropriate.

**2-32.  Credit/Satisfaction of the Basic Course in Order to Contract in the ROTC Program.**  `TOC`  The student must comply with one of the following provisions to be eligible for contracting in the ROTC Program.

A122

a.  Satisfactorily complete the ROTC Basic Course (see **CC Reg 145-3**).

b.  Receive placement credit instead of the Basic Course on the basis of other training or service (see **AR 145-1**, Chapter 5).

c.  Satisfactorily complete ROTC LTC (see **CC Reg 145-5**).

d.  Enroll in the Advanced Course under the Alternate Entry Option Program (see **Section VIII**).

## 2-33.  Academic Status  `TOC`

a.  Academic criteria for scholarship students are outlined in **CC Reg 145-1**.

b.  Academic standing.

   (1)  Students contracting will be academically and militarily (ROTC) aligned, whenever practical, and maintain such alignment at the time of contracting to ensure concurrent granting of a baccalaureate degree and commissioning.  (The goal is for the Cadet to complete MS I during the freshman year, MS II during the sophomore year, MS III during the junior year, and MS IV during the senior year.)

   (2)  Students at a four-year baccalaureate degree granting institution must be academically aligned at the time of contracting.  The only exceptions are those students enrolled in a Military Junior College (MJC) or exceptions personally approved by HQCC.

   (3)  Students at two-year colleges, other than a military junior college (MJC), or who are pursuing an Associate Degree are ineligible for contracting in the ROTC Program.

   (4)  Students must be registered for and attending as a full-time student (according to the schools criteria) a recognized course of instruction producing a baccalaureate degree, advanced degree, or an advanced education program at a fully accredited 4-year degree granting institution or at a fully accredited associate degree granting institution that has been recognized as having established linkage with a fully accredited 4-year degree granting institution.  Cadets must be pursuing a baccalaureate or advanced degree in a recognized academic field of study, or an Advanced Education Program (for Cadets who already possess a baccalaureate degree) throughout the period of ROTC enrollment.  Required ROTC courses may be counted toward full-time student status, if the academic institution recognizes the course on the transcript.

   (5)  There are no restrictions as to the students major for Non-Scholarship Cadets.  However, any change of major requires approval from the battalion commander/PMS.  See **CC Reg 145-1** for major restrictions for scholarship Cadets.

      (a)  Course work which results in an incomplete will not be counted toward full-time status until a grade for that course is assigned.  The incomplete must be changed to reflect a grade based on the school policy.

      (b)  Graduate students may request exception to the full-time enrollment and attendance requirements.  Requests for exception will be submitted to HQCC in

A123

accordance with guidance in **Chapter 3**.  An acceptance letter from the school they desire to attend to be included in the request.

(c)  Cumulative grade point average (CGPA).

(1)  See **CC Reg 145-1** for GPA criteria concerning scholarship Cadets.

(2)  Non-Scholarship Cadets must have an established cumulative GPA of **2.0** or better on a 4.0 system for contracting, or the equivalent on another scale. (School Registrar Office should be consulted for conversion scale if other than a 4.00 scale is used.) Students must have a cumulative college GPA that strongly indicates the ability to meet academic requirements for graduation.

(3)  A waiver request for CGPA will not be supported for contracting in the ROTC Program.  Therefore, a student must possess at least a **2.00** CGPA or higher for contracting in the ROTC Program.

(4)  Students who do not possess at least a college **2.00** CGPA are not authorized to conditionally contract in the ROTC Program, attend LDAC or attend LTC.  **TOC**

(5)  Military Junior Colleges (MJC) freshmen must have a minimum **2.00** cumulative high school GPA on a 4.00 scale on their high school transcripts and a Scholastic Aptitude Test (SAT) score of **850** or an American College Test (ACT) score of **17**.

(6) Prior service MJC freshmen must have a minimum **2.00** cumulative high school GPA and a SAT score or **850** or an ACT score of **17**. If a SAT or ACT score is not available, must have a score of 110 or higher on the General Technical (GT) aptitude area of the Army Classification Battery.

(7)  The following is the proper method for computing cumulative GPA within ROTC:

(a)  If the student has not yet established a GPA at the institution where he/she is enrolling, the Battalion Commander/PMS must ensure all hours accepted by the gaining school are used to compute a CGPA for contracting purposes. The CGPA must be at least **2.00**. The number of hours accepted in transfer determines the students academic standing (freshman, sophomore, junior, senior).  This entrance GPA remains valid until the end of the enrolled school term at which time the GPA established by the current school will be recognized as the official GPA.

(b)  Once the GPA has been established, the institutions procedure for computing the GPA applies to all further actions involving the student in ROTC activities, LTC, scholarship actions, waivers, and commissioning.

c.  Nursing student applicants must be enrolled in and attending a nursing program accredited by an agency recognized by the U.S. Secretary of Education and acceptable to DA.  Engineering students must be enrolled in and attending an academically accredited program.

A124

**2-34.  Age** `TOC`

a.  Scholarship student age criteria is outlined in **AR 145-1**, Chapter 3 and **CC Reg 145-1**.  Age criteria specified for scholarship applicants is statutory.  No waiver/exception is authorized.

b.  Non-Scholarship age criteria is contained in Paragraph **2-19** above.  Cadets must meet age requirements or be granted an age waiver prior to contracting.

c.  Non-Scholarship Cadets contracting in the ROTC Program must be no more than 34 years of age at the projected time of commissioning.  Age waivers will be supported for students over 34 years of age for those applicants with outstanding qualifications. The physical demands placed on junior officers require that applicants who request age waivers must have demonstrated exceptional ability in leadership, physical fitness, and endurance.  Age waiver requests for students who will be 35 or older at the time of commissioning must be forwarded to the Brigade Commander. See **Chapter 3** for guidance on submission of age waiver requests.

d.  Non-Scholarship Cadets may be conditionally contracted while pending waiver decision. Advise the student that waiver approval is not guaranteed.

**2-35.  Character** `TOC`

a.  Students must be of good moral character as evidenced by having no record of disciplinary problems or civil convictions, unless waived by the appropriate authority, for contracting in the ROTC Program.

b.  Scholarship applicants must be fully eligible at the time of contracting; therefore requests for waiver must be approved by the appropriate authority prior to contracting.

c.  Non-Scholarship Cadets may be conditionally contracted while awaiting a request for waiver.  (See Paragraph **2-50** below for guidance on conditional contracting of Non-Scholarship Cadets.).

**2-36.  Civil Convictions or Adverse Adjudication or Disposition** `TOC`

a.  Eligibility criteria are addressed in **AR 145-1**, Chapter 3 and in this Paragraph.

   (1)  Waiver procedures for civil convictions or adverse adjudication/disposition are outlined in **Chapter 3**.

   (2)  Applicants for contracting must disclose any arrests, charges, or detention by authorities even if the charge was subsequently dismissed, set aside, sealed or expunged from the record.  Failure by the applicant to do so, even if so advised by parents or counsel, may result in disenrollment.

   (3)  Students with misdemeanor or felony domestic violence convictions, or sexually related convictions listed in **AR 27-10**, **Chapter 24**, are ineligible for enrollment, contracting or retention.  No waiver is authorized.  Under no circumstances will a waiver or exception to policy be considered (see **Section I, Ineligibles**).

A125

(4)  A student is ineligible for contracting and/or retention as a contracted Cadet or attendance at LTC for the following, unless a waiver is granted--

(a)  Pre-trial diversion for any felony, civil conviction, adverse adjudication or any type of court martial conviction (even though the record may have been sealed or expunged).

(b)  Alcohol-related driving offenses for any accident or traffic citation involving alcohol that results in an arrest, charges, or adverse adjudication for Driving Under the Influence (DUI), Driving While Intoxicated (DWI), Driving After Consuming Alcohol, etc.  Later court proceedings or action that results in deletion or alteration of the initial offense does not alleviate the requirement for a waiver (e.g., DWI offense that is subsequently reduced to a lesser conviction such as reckless driving, dismissal, set aside, sealed, expunged, etc).  The Commanding General, Cadet Command or his designee is the approval authority for all alcohol-related driving offenses, regardless of the monetary value imposed.

(c)  When in doubt, submit a waiver request.  Waiver requests for Non-Scholarship Basic Course students may be delayed until the individual is otherwise eligible prior to contracting.  **TOC**

(5)  A waiver is not required for a student (**Exception**:  see **Para (4)(b)** above.)

(a)  If arrest did not result in referral of charges.

(b)  If charges were dismissed without a conviction or other adverse disposition (see Paragraph for the definition of other adverse disposition).

(c)  If convicted of a minor traffic violation such as listed in **AR 601-210,** Para 4-8, for which a fine or forfeiture **is less than $250**, even if the student is also required to attend a traffic school or perform some type of community service, or results in loss or suspension of drivers license.

(d)  If an applicant/Cadet has been found guilty of a minor traffic offense and the fine (to exclude court costs) is less than **$250**, a waiver is not required except when the applicant has accumulated **6** or more such offenses during **1** year.

(e)  If no fine is imposed, but the court either directs or offers the student to attend a drivers safety course (traffic school) in lieu of the fine.

(f)  The list of typical minor traffic offenses listed in **AR 601-210** is a guide.  Treat the offenses as minor traffic offenses despite their classification under State law and whether the determination is deemed a conviction or adjudication under State law.

(6)  A waiver is required when a minor traffic conviction--

(a)  Results in a fine **$250 or over** (excluding court costs), even if reduced with the requirement that the student take a defensive driving or perform some type of community service.

A126

(b) Results in other adverse adjudication within a twelve (12) month period, for six (6) or more minor traffic offenses (excluding parking violations) where the fine is **$100** or more per offense.

(c)  Results in other adverse disposition during the previous three (3) years, for ten (10) or more minor traffic offenses (excluding parking violations) where the fine is **$100** or more per offense.

(d)  Results in the fine being more or less than **$250**, but a sentence of jail time was imposed, even if suspended.

(**NOTE**:  *The CG, Cadet Command is approval authority for all convictions that result in a sentence of confinement in a prison, stockade, or detention area, or in a sentence to hard labor.  Later proceedings that delete or alter an initial determination of guilt (for example, pardon, expungement, amnesty, commutation, set aside and suspension/probation) do not eradicate the conviction for the purpose of waiver submission.  However, convictions overturned or successfully appealed are not considered convictions if the appropriate officials state in writing that no further proceedings (such as retrial) are pending or being considered.  (See* **AR 145-1***, Chapter 3.)*  **TOC**

(7)  A waiver is required for a student

(a)  Found guilty by a court of law.

(b)  Who makes an admission of guilt by formal entry of a plea or by payment of a fine or forfeiture in lieu of appearance before a court of law.

(c)  Even when the record of initial conviction or adverse adjudication is subsequently

(i)  Expunged.

(ii)  Sealed.

(iii)  Set aside.

(iv)  Dismissed.

(v) Reopened to change original findings or pleas.

(d) Who is the recipient of an "other adverse disposition".  The term other adverse disposition means that a judge, jury, district attorney, juvenile administrator, or other authorized juvenile or criminal justice agency, after reviewing the circumstances surrounding the arrest, placed the individual into a diversionary or similar program with or without the individuals agreement.  This includes attendance at a traffic school in lieu of appearance in a traffic court or fine being imposed by a court and the fine amount is not stipulated or is over $250.00.  Also included is disposition of cases by an overseas commander when an act or offense was committed on an overseas military installation, housing area, or other U.S. controlled or leased facility and was handled at that or higher command level. (**Examples:**  Shoplifting in the PX and installation commander withdraws PX privileges; early return of dependent due to misconduct).  If the student did not

enter a plea of guilty or nolo contendre, or was indicted, but the case was nolo prosequi, the individual is deemed to have committed acts alleged in the petition or complaint and has an other adverse disposition, if he or she is required or enters into an agreement with the court or the state or federal authority to:

(1)  Serve probation for any period

(2)  Serve confinement

(3)  Pay restitution

(4)  Pay a fine

(5)  Forfeit a bond that closes a case

(6)  Attend classes or seminars

(7)  Perform community service or perform any other similar acts

(8)  Comply with other conditions based upon an arrest for criminal misconduct

b.  Except in exceptional cases, a waiver will NOT be supported for

(1)  Students convicted for offenses listed in Paragraph **2-3** above.

(2)  Students sentenced to periods of supervised probation or given deferred or suspended sentences, and whose periods of probation, suspension or deferment have not yet expired.  (Exceptions may be processed if the sentence is unconditionally suspended and any probation is unsupervised and unconditional).  `TOC`

(3)  Students convicted for offenses involving bigamy, contributing to the delinquency of a minor or moral turpitude (which includes any sexually related offenses) and dishonesty such as larceny or perjury if committed after the age of majority.  However, battalion commanders/PMS may submit a waiver for consideration on students who, as minors, received adverse juvenile adjudication or convictions for such offenses, if the student acknowledges the adjudication or conviction during the enrollment screening process.  Decisions on these waiver requests will be based on the student's age at the time since the offense, and the individuals achievements since the offense.

(4)  Students who have more than two convictions of any type.  (If two different offenses occurred as a result of a single action, then it will be counted as one offense).

(5)  Students who are convicted of driving while intoxicated, driving while under the influence of alcohol, or driving while ability was impaired if the student possesses less than a cumulative GPA of **2.5** on a 4.0 scale.

c.  If there is a question about whether or not an individual requires a waiver in this category, Battalion Commander/PMS should contact Headquarters, Cadet Command, Cadet Actions and Standards Division, for guidance or interpretation.  If necessary, Headquarters Cadet Command personnel will contact the Command Staff Judge Advocate for a legal opinion.

*Page 29 of 126*

A128

d.  Each request for waiver of civil conviction must contain the required documentation IAW the Support Documentation for Cadet Actions Matrix (see **Appendix B**).

## 2-37.  Self-admitted Use of Drugs and/or Chemical Substances  **TOC**

a.  Eligibility criteria is addressed in **AR 145-1**, Chapter 3.

b.  Self-admission of drug and/or chemical substance usage, which is not medically disqualifying, may be given waiver consideration as stated below --

> (1)  Students who admit to limited experimental use, which occurred over six months prior to enrollment, may be enrolled without a waiver, unless medically disqualified by DODMERB.  However, such students will be advised that any future use will result in disenrollment.

> (2)  Students who admit to limited, experimental and/or recent use (i.e., within the last six months) are ineligible without waiver.

> (3)  Students who admit to frequent and/or habitual use prior to entry into the program are ineligible without a waiver.

> (4)  After enrollment in the ROTC Program any use of illicit drugs or chemical substances requires a waiver and it is generally not supported.

> (5)  Students who are medically disqualified UP **AR 40-501**, Paragraph 2-34, are ineligible for enrollment without waiver.

> (6) As a matter of policy, favorable consideration will not be given to requests for waiver in cases of long-term drug or chemical substance usage.

> (7) Drug testing requirements for ROTC applicants/Cadets is completed at LDAC, unless otherwise authorized by Cadet Command.

> (8) Waiver procedures for use of drugs and/or chemical substances are outlined in **Chapter 3**.

## 2-38.  Reenlistment (RE) Codes  **TOC**

a.  Eligibility criteria are addressed in **AR 601-210**, **AR 145-1**, Chapter 3 and in this Paragraph.

b.  If a waiver is required IAW **AR 601-210**, refer to the waiver procedures outlined in Chapter 3.

c.  Applicants for contracting must clearly identify the circumstances and specific reasons for the disqualifying RE code.  If UCMJ action was involved, those offenses must be discussed and considered as part of the Battalion Commander/PMS recommendation.

d.  RE code for qualitative management separations require a waiver.  Qualitative management type separations pertain to individuals discharged for-- **TOC**

A129

(1)  Civil court convictions.

(2)  Concealment of arrest record.

(3)  DA bar to reenlistment.

(4)  Personality disorder.

(5)  Failure to meet Army weight control standards.

(6)  Fraudulent entry.

(7)  Rehabilitation failure.

(8)  For the good of the service.

(9)  Misconduct.

(10)  Unsatisfactory trainee performance (entry level status) and/or conduct (Trainee Discharge Program).

(11)  An applicant who has a disqualifying RE code that was assigned as a result of a hardship separation UP **AR 635-200**, Chapter 6, must present evidence of the removal of the hardship condition.  This evidence will be in the form of a statement from the dependent or family member whose previous condition served as basis for the hardship separation.  In cases where that person may have deceased, an affidavit from the student will serve this purpose.  This statement must cite the nature of the previous hardship and the manner in which the hardship was removed.  The HQ/Cadet Command has the authority to approve waivers for hardship or compassionate separation imposed RE codes when such condition no longer exists.

e.  If the disqualifying RE code resulted from medical reasons, the applicant must clearly and completely state the reasons and produce an **SF 88** and **SF 93** stating the condition. Examining and reviewing physician statements must address the condition(s) that resulted in the disqualifying RE code.  A copy of the disqualifying medical examination, or Medical Waiver Review Board results and current medical examination showing the condition no longer exits are also needed.

## 2-39.  Citizenship   <span>TOC</span>

a.  Citizenship criteria apply to all contracted Cadets, both scholarship and Non-Scholarship. This is a statutory requirement. No waivers/exceptions are authorized. Cadets who hold dual citizenship must be advised that, when requested, they will be required to provide a statement to the OPM investigator, or the adjudicative authority, expressing their willingness to renounce dual citizenship. Failure to do so may result in denial of a security clearance, which is a prerequisite for commissioning, and will result in disenrollment.

b.  Citizenship. Scholarship applicants must be U.S. citizens or U.S. nationals prior to contracting as a scholarship Cadets. "U.S. nationals" are persons born in American Samoa and Swains Island.

A130

c.  Students born in the United States must submit to the EEO a valid birth certificate for citizenship verification.

  (1)  A copy of the student's birth certificate will be reproduced and retained in the Cadet's file as evidence of citizenship.  Documents not reproducible by law may be verified by the EEO or battalion commander/PMS using an MFR containing the essential information from the document.

  (2)  Information concerning vital statistics such as obtaining a birth certificate may be found at internet address **http://vitalrec.com/birth.html**.  This will assist students in obtaining required verification documents that are not readily available.

d.  Students born outside the United States must submit to the EEO a statement notarized by any commissioned officer qualified under Article 136, UCMJ to act as a notary or a Notary Public verifying citizenship as indicated below.

  (1)  Citizenship by naturalization.  The following statement will be submitted:  I have this date seen the original certificate of naturalization or certified copy of court order establishing citizenship, stating that (name of applicant) was admitted to the United States by court of (name of court) at (place of court) on (date).

  (2)  Citizen through naturalization of parents.  The following statement will be submitted:  I have this date seen the original certificate of citizenship, issued to (name) by the Immigration and Naturalization Service, Department of Justice, stating that (name of applicant) acquired citizenship on (date).  **TOC**

  (3)  Citizenship through birth abroad of parents who are citizens of the United States. The following statement will be submitted:  I have this date seen the original or certified copy of (one of the items shown in (a) through (e) below).

    (a)  **INS Form N-560** (Department of Justice Immigration and Naturalization Service).

    (b)  **Department of State Form 1350** (Certificate of Birth Abroad of a Citizen of the United States of America).

    (c)  **FS Form 240** (Report of Birth, Child Born Abroad of American Parent or Parents).

    (d)  **FS Form 545** (Report of Birth, Child Born Abroad of American Parent or Parents).

    (e)  Unexpired fully valid U.S. Passport, issued in the name of the applicant.

e.  Immigrant alien and refugee students may be authorized to participate in the Advanced Course and to attend LDAC if approved by the Battalion Commander/PMS or HQCC.

A131

**2-40.  Dependents** `TOC`

a.  Eligibility criteria for dependency is addressed in this Paragraph.  It applies to all contracting Cadets, both scholarship and Non-Scholarship.

b.  Scholarship Cadets must be fully qualified at the time of contracting; therefore must have an approved waiver by the proper authority prior to contracting.

c.  Non-Scholarship Cadets may be conditionally contracted while waiver request is pending final decision.  See **Chapter 3** for guidance on submission of dependency waiver requests.

d.  Criteria for determining eligibility.

   (1)  The applicant must have no more than three dependents.  Commander, Cadet Command, may grant a waiver for a married applicant requesting a waiver.

   (2)  An unmarried applicant who has one or more dependents under **18** years old is disqualified, except as provided in (3) below.  No waiver is authorized.

   (3)  A divorced or sole parent applicant may be processed for enrollment without waiver when the child or children of such applicant have been placed in the custody of the other parent, adult relative, or legal guardian by court order, if the applicant is not required to provide child support.  If the applicant is required to provide child support, a dependency waiver is required.  The CG, Cadet Command, has the authority to grant the waiver.  In both cases, the applicant must sign a statement of understanding that he or she will be disenrolled if custody of the child or children is regained while the applicant is enrolled in ROTC.  **DA Form 3286-69** (Statement for Enlistment-Parts I thru IV) will be used as a guide.  An exception to the disenrollment may be granted only in extraordinary circumstances, such as the death of the legal guardian, or adult having custody of the child or children.

   (4)  An applicant with a spouse in a military component of any armed service (excluding members of the Individual Ready Reserve (IRR)) who has one or more dependents under **18** years old is disqualified.  No waiver is authorized.

   (5)  Husband and wife teams who have one or more dependents under **18** years old are disqualified from enrollment in ROTC as a team.  No waiver is authorized.  Either the husband or wife may enroll without a waiver subject to other provisions of this Paragraph.  `TOC`

e.  Change in status.  Once an applicant has contracted in the ROTC program, a change in the status or number of his or her dependents does not constitute cause for disenrollment, and does not require a waiver.  However, if the number, status, or circumstances or a Cadets dependents adversely affects the Cadets performance of duty to the extent that the Cadet fails to fulfill the terms of the ROTC contract, he or she may be processed for disenrollment under **AR 145-1**, Paragraph 3-43a(7) or (16).

f.  Pregnancy.  Pregnant applicants are ineligible to contract, but regain eligibility at the end of the pregnancy, once medically cleared.  Contracted Cadets who become pregnant

A132

during the course will not be involuntarily disenrolled solely because of pregnancy (see Paragraph 2-40e above for additional information).

## 2-41.  Medical Qualifications  **TOC**

**General.**  This section provides guidance on medical examinations for contracting and retention in the ROTC program until commissioning.

a.  All contracting students must meet the medical fitness standards prescribed in **AR 40-501**, chapter 2, for contracting and retention.

b.  Waivers may be requested for medical disqualification.  Procedures for submission of waiver requests are in **Chapter 3**.

c.  Non-Scholarship Cadets may be conditionally contracted pending decision of a waivable medical condition.

## 2-42.  Drug and HIV Testing  **TOC**

Drug and HIV testing will be conducted according to commissioning requirements at a time and place designated by the CG, Cadet Command.  Paragraph **4-16** contains procedures for on-campus drug screenings for contracted Cadets.

## 2-43.  Weight/Body Fat Standards  **TOC**

a.  Both scholarship and Non-Scholarship students must meet the weight and/or Army body fat standards as stated below prior to contracting.  There are no waivers for contracting an overweight applicant, scholarship or Non-Scholarship.

(1) All non-prior service students must meet the weight or body fat standards as shown in **Figures 2-3** through **2-4** for entry into the program.

(2) Prior service students (to include active and prior Reserve or National Guard members) must meet the weight/body fat standard prescribed in **AR 600-9**, Table 1 or **Appendix B**, prior to contracting.  Since this regulation provides for a body fat content determination, it will be used for prior service students who do not meet the screening table weight standards.

(3) All students acknowledge, upon contracting, that they will be required to meet the same weight standards of **AR 600-9** and the physical fitness standard prescribed by HQCC.

(a)  Cadets who have signed the **Jun 95** contract will meet screening weight or body fat percentage required by the Army Weight Control Program prior to the end of the last school term of their Military Science III year, and continuously thereafter or be subject to disenrollment IAW the ROTC contract.

(b)  Cadets who have signed the **Jul 02** contract will meet the screening weight or body fat percentage required by the Army Weight Control Program each year, prior to attendance at LDAC, and continuously thereafter or be subject to disenrollment IAW the terms of the contract.

A133

**2-44. Physical Fitness Testing** `TOC`

a.  Scholarship applicants.  Refer to **CC Reg 145-1** for policy and procedures for contracting scholarship Cadets.

b.  Four year progression Cadets must meet the initial entry physical fitness standards of 50/50/50, throughout the first semester of their freshmen year (MSL I) and must meet the minimum AR 350-1 standards of 60/60/60 before scholarship benefits are authorized for second semester freshmen year (MSL I).  Acceleration Cadets must meet the current Army Physical Fitness standards of 60/60/60 at the time of contracting.

c. All other applicants.  Administer the APFT.  A passing score is required for contracting (180 with a minimum of 60 points in each event).

d.  Contracted Cadets (scholarship and Non-Scholarship) must maintain the Active Duty APFT standards as follows

> (1)  Cadets who signed the **Jul 02** contract will meet and maintain the APFT each year, prior to attendance at LDAC, and continuously thereafter or be subject to disenrollment.

> (2)  Cadets who signed the **Jun 95** contract will meet and maintain the APFT standards prior to the end of the last school term of their MS III year, and continuously thereafter or be subject to disenrollment.

**2-45. English Language Aptitude.** `TOC` Guidance for the English Comprehension Level (ECL) test is provided by HQCC, Directorate of Leader Development (DOLD).

**2-46. Acceleration or Compression.** `TOC` Questions and/or exceptions concerning compression and acceleration will be submitted to HQCC, Directorate of Leader Development (DOLD).  See guidance in **Cadet Command Reg 145-3**, Pre-commissioning Training and Leadership Development.

**2-47. Previous Enrollment in Officer Candidate-Type Training Program.** `TOC` The Battalion Commander/PMS must have the recommendation of the officer-in-charge of the previous training contained on **DD Form 785** (Record of Disenrollment from Officer-Candidate Type Training).  This recommendation need not be favorable, but must be considered by the Battalion Commander/PMS prior to authorizing enrollment.  The completed **DD Form 785** will be retained in the student's Military Personnel Record Jacket (MPRJ) throughout the period of enrollment in the ROTC Program and attached in support of any required waiver correspondence initiated by the student.

**2-48. Veterans Administration (VA) Disability Compensation.** `TOC` Students who were previously separated from any of the Armed Forces, including a Reserve Component, because of a medical disability or medical disqualification, or who are drawing disability compensation from the Veterans Administration or any other federal, state or local agency, are ineligible for enrollment until their medical qualification has been approved by the Commanding General, U.S. Army Cadet Command IAW **AR 145-1**.  The request for review will include the same documents as a request for medical waiver outlined in chapter 3.  An individual receiving disability compensation need not surrender this compensation to contract in the ROTC Program.  However, the individual will be required

A134

to waive such compensation for any periods for which military pay and compensation is received.  These periods include:  drill periods with reserve units, any active duty training periods as a reservist, attendance at ROTC Camps  (LTC and LDAC), and Cadet Troop Leader Training (CTLT).  Any Cadet enrolling in the ROTC Program with enlistment in the USAR Control Group (ROTC) or who is a member of a Troop Program Unit and is receiving VA compensation is required to submit a completed **VA Form 21-8951-2** to their Veterans Administration Regional Office.  The Cadet must elect to waive VA benefits in order to receive pay and allowances for any training period such as stated above.

## 2-49.  Responsibilities for Medical Qualification **TOC**

a.  The Department of Defense Medical Examination Review Board (DODMERB) schedules examinations for contracting Cadets into the 4-year ROTC Scholarship Program.  In addition, DODMERB is the authority for final review and determination of medical fitness for all ROTC applicants (scholarship and Non-Scholarship).

b.  The Commanding General, U.S. Army Medical Command (CG, USAMEDCOM) will conduct medical examinations if a Concorde exam site has not been established in the area of the battalion.

c.  Major overseas Army commanders will assume the same responsibilities as CG, USAMEDCOM, for all applicants within their jurisdiction.

d.  Battalions will not schedule interested scholarship applicants or nonscholarship prospects for DODMERB physicals who exceed AR 40-501 standards by 50 pounds or more.  The Army recognizes that some collegiate level athletes who are desirable applicants may not meet standard height/weight due to expectations of their sport, e.g., football players.  In such cases, AR 600-9 body fat measurements may be used at the discretion of the PMS.  This exception is intended only for student athletes' participating in inter-collegiate sports programs; this exception does not apply to any other applicants.  If a prospect meets taping requirements, they may be sent for a DODMERB physical examination.

e.  The Battalion Commander/PMS is responsible for--

   (1) Maintaining coordination with appropriate medical activities and medical centers to ensure that medical examinations are accomplished as required.  Also, the Battalion Commander/PMS is to process requests for medical waivers, as appropriate.  (See **Chapter 3** for guidance on submission of waiver requests.)

   (2)  Ensuring that only applicants who meet the medical fitness requirements are contracted and continued in the ROTC program or are offered an appointment as an officer.

   (3)  Submitting a request for medical determination to HQCC, ATTN: ATCC-PA-C if there is any change in a Cadet's health that may preclude his/her appointment as an officer.

   (4)  Obtaining a completed **DA Form 2453-R** (Statement of Medical and Health Examination) (**Figure 2-2**) on each Cadet prior to LDAC attendance.  This form verifies there has been no subsequent change in medical condition since contracting.  This form and documentation in support of any medical status change must be included in the Cadet's LDAC medical records. A Cadet who states that there has been

A135

a significant change will be required to provide all operative reports, evaluations and consultations pertaining to the change for review by the supporting MEDDAC to verify the Cadet's qualification to attend camp.  If appropriate, further medical examination and/or determination by HQCC may be required.

(5) Forwarding requests for medical determination for ROTC Cadets to Headquarters, Cadet Command, who may have a possible disqualifying medical condition.  The Cadet Command Surgeon is the only authority for determining continuance in/or disenrollment from the ROTC Program due to medical reasons.

## 2-50.  Medical Examinations  `TOC`

a.  Medical examinations for SROTC applicants/Cadets will be completed as stated below.

(1) Scholarship and Non-Scholarship applicants.  The date of the qualified medical examination must be no older than **2 years** at the time of contracting.  Three and 4-year scholarship recipients will not be required to take another physical examination before entering the Advanced Course.

(2) Cadets.  Cadets must attest upon contracting and annually (during yearly counseling) that there has been no change in his/her physical condition since the last required ROTC qualification physical.

(3) LTC attendees.  Applicants for LTC must undergo the same medical examination that is required for contracting in the Advanced Course.  The date of the qualified medical examination must be no older than 2 years at the time of contracting.

(4) LDAC attendees.

(a)  Immediately upon arrival.

(b)  Before LDAC terminates for any Cadet who suffered injury or illness while at camp and as a result and was denied the opportunity to complete camp.

(5) Commissionees.  The LDAC medical examination will qualify a Cadet for commissioning.  If the medical condition changes prior to commissioning (including Cadets who become pregnant), a medical determination must be submitted to HQCC for a final decision on medical qualification.  After the pregnancy (upon release from physician) submit a request for medical determination for commissioning eligibility.

b.  Cadets who attend voluntary training at any specialty school must have valid medical examination that qualifies them for the specific school, e.g., Airborne School, etc.

## 2-51.  Medical Examination Forms (Reports)  `TOC`

a.  Medical examination forms--

(1) **DD 2351**

(2) **DD 2808**

b.  Medical history forms

A136

(1) **DD 2492**

(2) **DD 2807-1**

c.  Disposition.  The Battalion Commander/PMS will retain the Cadets medical records until the Cadet is commissioned or enrollment is otherwise terminated.  He/she will ensure that the confidentiality of health records is preserved.  Records will be disposed of as follows:

(1) At the time a Cadet is commissioned, the original medical forms listed above (which determine medical fitness for appointment) will be included in the Cadets Military Personnel Records Jacket (MPRJ) and waiver related correspondence, if any, will be attached together for filing in the Official Military Personnel File (OMPF).

(2) As prescribed in **AR 25-400-2**, (145), under other circumstances.

A137

**2-52.  Review of Medical Examinations**  `TOC`

a.  The **Director, DODMERB, U.S. Air Force Academy, Colorado Springs, CO 80840-6518**, is the reviewing agency for medical examinations for entry into the ROTC program. DODMERB is not the certifying authority for changes in medical status following initial DODMERB certification.  Once initially certified by DODMERB, Cadet Command becomes the reviewing and re-certifying waiver approval authority for all medical actions through commissioning.

b.  The **Commander, U.S. Army Aeromedical Center, Ft. Rucker, AL 36362-5333** will determine if the Cadet is medically qualified to enter the Flight Training Program.  All flight physicals given to ROTC Cadets will be sent to this activity.

c.  Medical examinations involving applicants or Cadets in the categories listed below will be forwarded to **HQCC, ATTN: ATCC-PA-C** for final determination regarding contracting or retention in the ROTC program--

   (1)  Applicants who are drawing disability compensation from the Department of Veterans Affairs (VA) or any other federal, state or local agency and Cadets whose compensation begins after contracting, require a waiver from HQCC.  The medical examination will be submitted even if the individual waives the compensation.  See **Section VI**, Veterans Administration (VA) Disability Compensation, for more information concerning Cadets/students drawing disability compensation.

   (2)  Applicants who were previously discharged from any of the Armed Forces, including a Reserve Components, because of medical disability or medical disqualification, even though they currently meet prescribed standards.

d.  Medical waiver approval authority is the CG, Cadet Command. Waivers may be requested for waivable medical disqualifications. See **Chapter 3** of this pamphlet for procedures for submission of waiver requests.

**2-53.  Validity Periods of Medical Examinations**  `TOC`

a.  Medical examinations are valid for the purpose and the periods stated below.  (The validity period begins from the date the initial examination was begun.)--

   (1)  Medical Examination-Contracting.  Two years for contracting in ROTC.  Once contracted the medical examination remains valid until attendance at LDAC, provided there is no change in Cadets medical status.

   (2)  Medical Examination-Commissioning (conducted at LDAC).  Valid for up to two years from the date of the LDAC examination.  The Command Surgeon may extend a commissioning PE by approximately one year for the purpose of commissioning.  A copy of the commissioning PE and a statement of present health signed by the Cadet must accompany the CC Form 131-R requesting the extension.  The CC Form 131-R must indicate the anticipated date of commissioning.

   (3)  Medical Examination-Diving Training.  Valid for **18** months for entry into diving training (MOS 00B) and entry into training for aviation classes.

A138

(4)  Medical Examination-Aviation.  Valid for **18** months for entry all classes of aviation.

(5)  Medical Examination-Ranger training, air assault, and Special Forces training. Valid for two years for entry into above training.

(6)  Medical Examination-Airborne.  Valid for five years for entry into airborne training, provided the medical examination was qualified and the Cadet completes a **DA FM 3081** (Statement of Exemption) within 4 months prior to attending airborne school. (This form is attached to the original medical exam.)

## 2-54.  Temporary Medical Disqualification  `TOC`

a.  A temporary or remedial disqualifying medical condition (except overweight or pregnancy) will not prevent the conditional contracting of a Non-Scholarship Cadet.  The Cadet must meet the medical fitness standards of **AR 40-501**, Chapter 2, within 12 months from the inception of the disqualifying medical condition.

b.  A Cadet may participate in camp training if approved by the waiver approval authority (CG, USACC).

## Section VII, Contract Agreement

## 2-55.  Dental Exam Requirements  `TOC`

a.  Dental exams performed by a dentist are no longer required as part of the scholarship and Non-Scholarship medical exams due to a change in OSD policy in 2002.

b.  Dental films for casualty identification purposes are required for all participants in the ROTC program who must use government-owned or government contracted transportation.  The PMS is to ensure the Cadet's dental records contain sufficient documentation to aid forensic identification.

(1)  ROTC Cadets must provide name, address, and phone number of his/her dentist and sign a statement acknowledging that his/her civilian dental records contain descriptive profiles, bite wing x-rays, orthodontic profiles or dental x-rays.

(2)  ROTC students not pursuing commissioning credit (ineligibles, academic credit only, etc.) are not permitted to participate in other than classroom activities. However, if these students are transported using government owned or government contracted transportation, they must have a dental record for identification purposes. In such circumstances, these students must provide the name, address, and phone number of his/her dentist and sign a statement acknowledging that his/her civilian dental records contain descriptive profiles, bite wing x-rays, orthodontic profiles or dental x-rays.

c.  In addition to the above, DNA is obtained as part of the commissioning physical at LDAC.

## 2-56.  Non-Scholarship Cadets  `TOC`

a.  **DA FM 597** may be completed by Non-Scholarship students IAW preparation instructions at **Appendix C**, (**Exception:** immigrant aliens or refugees) once determined fully qualified by completion of the **CC Form 139-R**, Cadet Enrollment Record. Completion by the student and the Battalion Commander/PMS or the Assistant PMS, together with the completion of **DD FM 4 Series**, and execution of the loyalty oath, contracts the student in the Advanced Course, or as an MS II, as authorized by HQDA.  If the student is a minor, parental consent is required for completion of **DA FM 597**. Additionally, students who are less than **18** years of age cannot enlist without parental consent.

b.  Former scholarship Cadets who desire re-enrollment as a Non-Scholarship Cadet must repay all previous ROTC financial assistance debts expended on their behalf, prior to contracting (**Exception:** *Cadets disenrolled without obligation, e.g., 4-YR MS I Cadets, etc.*), in addition to meeting all other re-enrollment criteria.  The Battalion Commander/PMS will not conditionally contract or fully contract any former scholarship Cadets until they ensure that repayment of previous scholarship funds expended has been made.  Requests for exception will be forwarded to the CG, USACC, for consideration.

## 2-57.  Scholarship Cadets  `TOC`

a.  **DA Form 597-3** (Army Senior Reserve Officers Training Corps Scholarship Cadet Contract) must be completed by SROTC scholarship recipients IAW the preparation instructions at **Appendix C**, once determined fully qualified by completion of the **CC Form 139-R**, Cadet Enrollment Record.  Completion by the student and the Battalion Commander/PMS or the Assistant PMS, together with the completion of **DD FM 4 Series**, and execution of the loyalty oath, contracts the student in the SROTC scholarship program.  If the student is a minor, parental consent is required for completion of **DA FM 597**.  Additionally, students who are less than 18 years of age cannot enlist without parental consent.

b.  Former scholarship Cadets who desire re-enrollment as a scholarship Cadet must repay all financial assistance expended on their behalf prior to contracting, in addition to meeting all the above stated re-enrollment criteria.  The Battalion Commander/PMS will not conditionally contract or fully contract any former scholarship Cadets until they ensure that repayment has been made and all other re-enrollment criteria are met.  Requests for exception will be forwarded to the CG, USACC, for consideration.

c.  Scholarship Cadets may not be conditionally contracted.

## 2-58.  DD Form 4-Series  `TOC`

a.  Except for students contracted in the SROTC program as SMP Cadets, the **DD FM 4 Series** will be completed by the student and the Battalion Commander/PMS or the Assistant PMS.  This is a prerequisite to contracting in the Non-Scholarship or scholarship program.  Those Cadets who are conditionally contracted do not complete the **DD FM 4 Series**.  The forms will be completed on the same date that contracting is confirmed (Part IV of **DA FM 597** or **DA Form 597-3**).

b.  If the student meets one of the following criteria, they must also complete **DD Forms 1966/1** through 1966/8 (Record of Military Processing Armed Forces of the United States), **DA Form 3540** (Certificate and Acknowledgement of U.S. Army Reserve Service

A140

Requirements and Methods of Fulfillment), **DA Form 4824-R** (Addendum to Certificate and Acknowledgement of Service Requirements), or **NGB Form 594-1**, as applicable.

(1)  The student has enlisted in an Army Troop Program Unit (TPU) of the USAR under Enlistment Option 9-H for the Army ROTC/Selected Reserve SMP.

(2)  The student is a member of USAR Control Group (ROTC) who subsequently transferred to a TPU.

(3)  The student is a member of USAR or TPU ARNG and is selected to participate in ROTC/SMP.

## Section VIII, Other Contracting Options

## 2-59.  Simultaneous Membership Program (SMP) TOC

a.  The SMP policies and procedures applicable to the USAR are contained in **AR 601-210**, Chapter 9. The SMP policies and procedures applicable to the ARNG are contained in NGB Regulation **600-100** and **600-200**.  See **CC Reg 145-1** for guidance concerning scholarship SMP programs.

b.  Enlisted members of the USAR or ARNG who are assigned to troop program units and have been selected to participate in the SMP may contract in ROTC (MS II/MS III, as applicable ) provided they are advancing academic sophomores or juniors, or are attending an MJC, if otherwise qualified.

c.  Enlisted members of the USAR or ARNG are not eligible to participate in the ROTC Program of the SROTC Program unless they are fully qualified SMP participants.  SMP participants must be U.S. citizens.

d.  Conditional contracting is authorized for SMP participants.  Troop Program Unit (TPU) members who wish to conditionally participate as SMP applicants in the SROTC Non-Scholarship programs are subject to the following:

(1)  The conditional status must be resolved within one academic year or the SMP applicant must be disenrolled from the program until he/she can fully qualify for the program.

(2)  The enlisted TPU member must sign a written agreement stating that he/she agrees that: TOC

(a)  As a conditional SMP participant, he/she is not entitled to retroactive subsistence allowance, unlike non-SMP conditionally enrolled Non-Scholarship Cadets, for the period participating in the SROTC Program in a conditional status.

(b)  He/she acknowledges the conditional status must be resolved within one academic year or such status will be terminated.  Further, he/she will not be allowed to continue in the SROTC Program until the disqualifying conditional is resolved and the Cadet becomes fully qualified and eligible to reenter under the current re-enrollment criteria.

A141

(c)  He/she understands the time spent in the SROTC Program as a conditional SMP participant is creditable toward meeting military science requirements for commissioning.

(d) He/she also understands that the conditional status will be creditable toward commissioning requirements and for length of USAR or ARNG service (10 USC 21-6(c) or for pay purposes (37 USC 205(d)) once he/she is commissioned.

e.  Release from Reserve Components Troop Program Unit for unsatisfactory performance or participation may be cause for disenrollment from the commissioning program.

## 2-60.  Members and Former Members of the Armed Services 

a. Eligibility of prior service members will be determined by a review of the applicant's **DD Form 214** (Report of Separation from Active Duty) or **DD Form 220** (Active Duty Report) for those Reserve Component unit members who satisfy the ROTC Basic Course requirements by having completed Basic Training in an active duty status. **DD Form 214** must show the reason and authority for separation and the reenlistment eligibility (RE) code.  The **DD Form 220** does not contain an RE code; it is used to show completion of training for Reserve Component members.

b.  Certain members and former members of the armed services are ineligible for contracting.  See **Section II**, Ineligibles, above, for additional information.

c.  Warrant officers and enlisted members of a Reserve Component of the Armed Forces including the Individual Ready Reserve (IRR) may not be contracted in the Non-Scholarship or scholarship programs until separated from such status, with the exception of those enlisted members of Army Reserve Components who are participating in the Simultaneous Membership Program (SMP) or the Reserve Components ROTC Scholarship Program.  A USAR Warrant Officer may vacate his/her Reserve Warrant appointment by enlisting as a reservist for service in either the ARNGUS or USAR (such action automatically vacates the warrant appointment per **AR 135-175**, Paragraph 5-1d).

(1)  An individual will not be allowed to contract or join an SMP unit until it is verified that he/she is eligible (see Paragraph **2-44** above for SMP participation).

(2)  Battalion commanders/PMS do not have the authority to discharge members of the ARNG or USAR for contracting in the Non-Scholarship or scholarship program. ARNG and USAR soldiers who execute a USAR enlistment upon contracting in ROTC with assignment to USAR Control Group (ROTC) per **AR 145-1**, Paragraph 3-44d, will be discharged from their current ARNG or USAR enlistment agreements upon receipt of the copy of the ROTC enlistment agreement by the appropriate discharge authority cited in **AR 135-178**, Paragraph 1-25.  The Battalion Commander/PMS is required to provide the appropriate state adjutant general or USAR commander with a copy of the enlistment agreement as soon as possible after contracting.

d.  Chapter 16 Discharges (Green to Gold) <span>TOC</span>

In accordance with **AR 635-200**, Paragraph 16-2b, individuals enlisted in the U S. Army may be discharged to contract in the ROTC Program if they--

(1)  Are pursuing a baccalaureate or higher degree.

A142

(2)  Have completed at least 2 years of AD, if on their initial enlistment, as well as 3 months of AD for every 1 month of specialized training received (for example, MOS or language) as of the date of discharge. Soldiers on their second and subsequent enlistment must have completed 3 months of AD for every 1 month of the most recent specialized training received. Waiver of the service obligation for training may be granted by Human Resource Command, ATTN: KNOX-HRC-EPF-A, 1600 Spearhead Division Avenue, Fort Knox, Kentucky  40122, on a case-by-case basis.

(3)  Not be under suspension of favorable personnel actions per **AR 600-8-2.**

(4)  Meet ROTC procurement medical fitness standards (see **AR 40-29** and **AR 40-501**), specified academic and administrative criteria (see **AR 145-1**), and any other prerequisites for ROTC enrollment prescribed by **AR 145-1** or established by the U.S. Army ROTC Cadet Command.

(5)  Provide a statement from an admissions official of the school they desire to attend indicating acceptance for enrollment and specifying the registration date for the pertinent school term.

(6)  Provide a statement from the Professor of Military Science (PMS) at the school they desire to attend indicating acceptance for ROTC participation. The PMS statement will also verify that the Soldier is qualified for the ROTC program and that academic and administrative waivers, if any, have been granted.

(7)  Scholarship winners must provide a copy of the HQ ROTC Cadet Command notification of award of the scholarship. Soldiers who are conditional scholarship winners must furnish documentary evidence from HQ ROTC Cadet Command that they are fully qualified prior to requesting discharge. Scholarship recipients require no further review or documentation to qualify for discharge. **TOC**

(8)  Unless a 3- or 4-year scholarship winner, have satisfactorily completed or received credit for at least 2 years of college work.

(9)  Before approving discharge under this section, the separation authority (see **AR 635-200**, Para 1–19) will ensure that the Soldier

(a)  Meets the criteria stipulated in **AR 635-200**, Para 16c(1).

(b)  Has served honorably and possesses officer attributes (such as, leadership potential, exemplary conduct, and appearance).

(c)  Understands that the discharge is contingent upon enlistment in the USAR in the grade of Cadet for assignment to the USAR Control Group (ROTC) and execution of the ROTC student contract (scholarship or Non-Scholarship).

(d)  Has been counseled that breaching the terms of the USAR enlistment contract or ROTC student contact will subject him/her to involuntary order to AD to complete the contractual obligation and, if a scholarship Cadet, may require repayment of scholarship benefits received in lieu of AD.

e.  Discharge will be effective the day preceding enlistment in the appropriate branch of the Armed Forces as stated in **AR 635-200**, Para 16–2a and b, above, and the day

preceding enlistment in the USAR as stated in c, above. Discharge documents will not be delivered to the Soldier until verification is made that such enlistment has taken place. For a, b, and c, above, discharge normally will not take place more than 30 days before the starting date of the school term or officer training program for which the Soldier has been accepted. TOC

f.  The service of Soldiers discharged under this Paragraph will be characterized as honorable.

g.  Breaching the terms of the USAR enlistment contract and/or ROTC student contract will subject him/her to involuntary order to active duty to complete contractual obligation, and, if a scholarship Cadet, may be require repayment of scholarship benefits received in lieu of active duty.

h. If they are determined to be ineligible or fail to enroll in school/ROTC, they may be returned to active duty to fulfill their service commitment.

i. There is no guarantee to serve on active duty upon commissioning.

j. The Chiefs, Personnel Service Companies/Centers and Transition Points/Activities, are responsible for ensuring that-- TOC

    (1) Discharge orders reflect the effective date of discharge as the day preceding enlistment in the USAR Control Group (ROTC). Discharge documents are not to be delivered to the Soldier until the verification is made that such enlistment has taken place.

    (2) Discharge is not normally more than 30 days before the starting date of the school term for which the Soldier has been selected. Terminal leave is not authorized.

    (3) Item 9, **DD Form 214**, properly reflects USAR Control Group (ROTC).

    (4) Disposition of the Military Personnel Records packet and accompanying documents is in accordance with **DA PAM 600-8-11**, Appendix C, Table D-9, Rule 7.

    (5) Enlistment in the USAR Control Group (ROTC) is accomplished in accordance with **AR 145-1**, Paragraph 3-15. In regard to the enlistment document, **DD Form 4**, the following entries are required:

        (a) Item 8, pay grade is "CADET".

        (b) Items 8, 8c, 13a, and 14a annex (es), delete "annex (es)" and enter "**DA FM 597**" for Non-Scholarship Cadets or "**DA Form 597-3**" for scholarship Cadets.

        (c) Item 8b, Remarks. Enter "Authority: **AR 145-1**, USAR Control Group (ROTC)". For those released early from active duty to enter the ROTC Program, enter also the remark "Early release, **AR 635-200**, Chapter 16, original expiration term of service (ETS) was (and list the date)." TOC

k. Soldiers who are released erroneously without meeting the eligibility requirements or fail to enroll in school/ROTC will be returned to active duty. All records on the individual will be forwarded to Headquarters, Cadet Command, for a final determination. The PMS

A144

will include a detailed memorandum citing the reason(s) the Soldier was determined ineligible or failed to enroll.

l. Soldiers released for 4-Year Green to Gold scholarships and in MS I desiring disenrollment are subject to an Investigating Officer's (IO) Report. The PMS will convene IO to determine the facts and forward the findings and recommendations to HQ, Cadet Command. These Cadets may be returned to active duty to fulfill their previous service commitment, be ordered to active duty in accordance with the Cadet contract, or be required to repay the scholarship funds expended on their behalf.

### 2-61. Alternative Entry Option (AEO) **TOC**

a. This option allows for the contracting of Non-Scholarship students who desire to contract in the ROTC Program, but who have not completed the Basic Course, LTC or have not received placement credit for the Basic Course.

b. Non-Scholarship students may be contracted under this program, if otherwise qualified under the following criteria:

    (1) Possess a cumulative GPA of 2.00 or higher on a 4.00 scale, or equivalent.

    (2) Are academically aligned and progressing toward the award of a baccalaureate degree at a degree granting institution.

    (3) Possess extracurricular, athletic and leadership experience that demonstrates high potential for future success as a commissioned officer.

c. Alien students are not eligible for this entry option.

d. Students contracted under this option will also sign a **DA Form 597-1** (Acknowledgement of Understanding-Non-Scholarship Two Year Program) in which they agree to attend LTC upon completion of MS III and LDAC upon completion of MS IV. Attendance at both camps in one summer is not authorized.

e. Battalion commanders/PMS will ensure that students contracted under this option are scheduled for LTC early to ensure sufficient quotas are available.

f. Scholarship students and MJC students are not authorized to contract under this option per HQDA policy.

### 2-62. Conditional Contracting of Non-Scholarship Cadets **TOC** (see Para **2-58** above for conditional contracting of SMP students).

a. Conditional Cadets are those who complete Part II of the **DA FM 597** (Army Senior Reserve Officers Training Corps (ROTC) Non-Scholarship Cadet Contract), but do not complete the **DD FM 4 Series** (Enlistment/Reenlistment Document-Armed Forces of the United States). Non-Scholarship students seeking to contract in the ROTC Program whose eligibility based on a waivable condition such as medical or other criteria that has not been finally determined, or for who a waiver request is pending final decision, may be allowed to participate conditionally, if Part II of **DA FM 597** is signed (and the student is otherwise qualified). The student cannot complete **DD Form 4/1 and 4/2** until fully qualified.

Those two documents will be completed and signed at the time the student is fully qualified for contracting.  The DD 4s will not be backdated under any circumstances.

b.  Waiver requests for a disqualifying condition will be initiated by the student and processed by the Battalion Commander/PMS as early as possible in the enrollment/conditional contracting process to enable a timely decision.  A students conditional status must be resolved within a twelve (12)-month period; failure to resolve the conditional status will cause the student to revert to auditing status without entitlement to commissioning credit for enrollment in the ROTC Program.  (This category does not include alien students or students trying to decide whether they desire to join ROTC and later strive for a commission.)

(1)  If subsequently determined qualified, or granted a waiver, the conditional students may be officially enrolled by completing Part V of the **DA FM 597** and completion of the **DD FM 4 Series** forms.  Retroactive subsistence allowance is authorized from the date the Cadet began advanced training, provided the date of the **DA FM 597** and the date the Cadet began training are the same.  However, students who began the Advanced Course as alien students are not authorized to receive retroactive subsistence allowance.  The Battalion Commander/PMS will reflect in Part IV of **DA FM 597** the effective date of entitlement to subsistence allowance as the date the Cadet began advanced training and signed Part I of **DA FM 597** (it cannot precede the signed date).  **TOC**

(2)  If determined unqualified, or if the requested waiver is disapproved, the students status will change from that of conditional student to that of participating student.  The student will not be entitled to receive commissioning credit or enlisted grade credit for the period enrolled as an auditing (conditional) student.

(3)  Conditional students are not authorized to attend LDAC until their conditional status is resolved.

c.  Students will not be allowed to conditionally contract if they have:

(1) A disqualifying condition for which a waiver is not authorized, e.g., overweight.

(2) A permanently disqualifying medical condition.

(3) Not completed the periods of supervised probation or deferred or suspended civil conviction sentence.

(4) Elected terminal leave in conjunction with their separation from active duty UP **AR 635-200**, Chapter 16, and have not yet been separated.  This provision prevents dual status from occurring for purposes of longevity or compensation which is specifically prohibited by law.

(5) Been disenrolled from ROTC.  See **Section IX** below for guidance concerning re-enrollment of disenrolled Cadets.

## 2-63.  Senior Military College (SMC) Students   **TOC**

a.  Students at senior military colleges are allowed (where participation in the ROTC Program is mandatory) to contract up until the last school term of their MS IV year as Advanced Course Cadets.

b.  Senior military college students who are so contracted must meet all other eligibility criteria for contracting and commissioning.  These students will attend LDAC upon completion of their MS IV year and will be commissioned upon completion of LDAC.

c.  Battalion commanders/PMS at senior military colleges are authorized to contract qualified Cadets, including those transferring from another service ROTC program, into the Advanced Course under the following conditions:

  (1)  Cadets cannot be obligated to another service ROTC program.

  (2)  Must have at least one academic year remaining to complete the Army ROTC Advanced Course program.

  (3)  The CG, CC, may waive the condition in (2) above in exceptional cases submitted through command channels, if circumstances warrant consideration after the first semester of the senior year.

  (4)  Attendance at LDAC is mandatory.  No waiver is authorized.

d.  This provision does not change the Advanced Course placement credit restrictions specified in **AR 145-1**, Chapter 5.

**Section IX, Re-enrollment**

**2-64.  Re-enrollment.**   **TOC**  Students who have previously been disenrolled may be reenrolled in the ROTC Program provided that they meet all of the following criteria:

a.  Have not been disenrolled for more than three years from the ROTC Program.

b.  Still meet the original eligibility criteria except for the two academic years remaining requirement.

c.  Provide documentary evidence that the reason for disenrollment has been corrected in cases involving a medical condition, financial or personnel hardship or academic deficiency.

d.  Have at least one semester/term of the Advanced Course remaining to complete.  If any of the uncompleted portion is within LDAC, the student must retake the entire LDAC.

e.  Have not less than one semester/term and not more than two years of academic requirements remaining, except those who were pursuing a five-year program may not have more than three years remaining.

f.  Have a cumulative GPA of at least **2.00** and a 4.00 scale, or equivalent if on a different scale.

g.  If a disenrolled and otherwise eligible scholarship Cadet, must have completely satisfied the contractual obligation, specifically full repayment of financial assistance expended or active duty service.

A147

**2-65.  Re-enrollment Eligibility.**  `TOC`  Although former Cadets may meet all of the requirements stated above, they are still considered ineligible for re-enrollment in the ROTC Program if they have any one of the following disqualifications:

a.  Have satisfactorily completed all portions of the ROTC Program.  No waiver is authorized.  Applicants may apply for a direct commission under the provisions of **AR 135-100**.

b.  Were disenrolled as a result of a board action for failure to satisfactorily complete LDAC.

c.  Were disenrolled for failure to maintain the requirements for enrollment.

d.  Were disenrolled as a conscientious objector under the provisions of **AR 145-1**, Chapter 3.

e.  Discovery or admission of a fact or condition existing that bars the Cadet from appointment as an officer.

f.  The time lapse from disenrollment to the time of requested re-enrollment is more than **3** years.  Waiver may be granted for those disenrolled Cadets who subsequently served on active duty and were granted an honorable discharge.  For these, the total time between disenrollment and enlistment plus the time between discharge from active duty and re-enrollment may not exceed 3 years; only the period of active duty may be waived.  In addition, all other enrollment eligibility requirements of **AR 145-1**, Chapter 3 and in this section must be met.

g.  Were disenrolled for deficiencies in ROTC subjects or performance (**AR 145-1**, Chapter 3).  `TOC`

h.  Have failed to make full satisfaction of the contractual obligation.  No waiver is authorized.

i.  Were disenrolled for substantiated misconduct.  As used herein, misconduct includes, but is not limited to, misrepresentation (i.e., failure to reveal a physical, mental or moral disqualifying factor), failure to complete the program due to separation because of drug use, drug or drug Paraphernalia possession or sale, alcohol abuse, criminal conduct, civil confinement, unsuccessful completion of an established weight control program and moral or professional dereliction (**AR 145-1**, Paragraph 3-43a).

j.  Were disenrolled as a result of board action for the categories listed in **AR 145-1**, subparagraphs 3-43 (13) through (17).  No waiver is authorized.

k.  Former obligated scholarship Cadets who desire re-enrollment must repay all financial assistance expended on their behalf prior to contracting, in addition to meeting all of the above stated re-enrollment criteria.  The Battalion Commander/PMS will not conditionally contract or fully contract any former obligated scholarship Cadets until they ensure that repayment has been made and all other re-enrollment criteria are met.  Requests for exception to this policy will be forwarded to the CG, USACC, for consideration.

## Chapter 3 - Waiver Requests for Contracting  `TOC`

A148

**Section I**

**3-1.  General** `TOC`

a.  Scholarship applicants must be fully qualified at the time of contracting; therefore a waiver for any disqualifying condition must be approved prior to contracting.

b.  Non-Scholarship Cadets who have attended the Basic Course should have an approved waiver prior to contracting; however, if this is not feasible, Cadet may be conditionally contracted while pending waiver decision.  Advise the student that waiver approval is not guaranteed.

c.  The more common types of waiver requests are discussed in this section.  Other types of waiver requests may be submitted for consideration, provided they do not involve any nonwaivable restrictions.  All requests must be accompanied by documentation appropriate to the request and contain sufficient information with which to make a sound and prudent decision.

d.  Data pertaining to completed waiver requests will be annotated on **CC Form 139-R** and will be retained in the Cadets MPRJ until graduation.  The battalion will make appropriate entries in the Cadet Data Base within five working days of receipt of waiver decision.

**3-2.  Civil Convictions or Adverse Adjudication Dispositions** `TOC`

a.  See Chapter 2, **Section VI**, of this pamphlet to determine eligibility requirements and if a waiver is required for civil conviction or adverse adjudication or disposition.  Use **AR 601-210** as a guide in determining whether a waiver is required.

b.  The approval authority for granting civil conviction waivers is as follows

(1)  The CG, Cadet Command, is the approval authority for granting a waiver of a civil conviction for offenses listed in **AR 145-1**, Para 3-3e(1) through 3-3e(3).  Refer to **AR 601-210**, Para 4-11, for a listing of typical felony offenses.  Waiver authority cannot be further delegated.

(2)  The CG, Cadet Command, or his designee, is the approval authority for alcohol-related driving offenses (refer to Para **2-36a(4)(b)**).

c.  Headquarters, Cadet Command, is the approval authority for granting a waiver of a misdemeanor civil conviction.  Refer to **AR 601-210**, Chapter 4, for a list of typical misdemeanor offenses.

d.  Battalion Commander/PMS is the approval authority for minor non-traffic offenses with fines less than $250.00. Offenses with fines over $250.00 must be forwarded to the Brigade Commander for approval. Refer to **AR 601-210** for a listing of typical minor traffic and minor non-traffic offenses.

e.  A student is ineligible for contracting and/or retention as a contracted Cadet or attendance at LTC who has a pre-trial diversion for any felony, civil conviction, adverse

A149

adjudication or any type of court martial conviction (even though the record has been sealed or expunged), unless a waiver is granted. **TOC**

f.  If the Cadet receives a civil conviction, etc., after contracting, a waiver, with documentation, must also be submitted to the proper approval authority. In addition, immediately forward **DA Form 5248-R** (Report of Unfavorable Information for Security) to HQCC Security Branch if credible derogatory information is found after the SF 86 has been submitted to OPM.

g.  Each request for waiver of civil conviction, etc., must contain the required documentation and approval by the proper approval authority IAW the Support Documentation for Cadet Actions and Approval Authority matrixes at **Appendix B**.

h.  Preparation of the required forms and documentation for waiver submission is outlined in **Section II** below and **Appendix C**.

### 3-3.  Self-Admitted Use of Drugs and/or Chemical Substances **TOC**

a.  See Chapter 2, **Section VI** of this pamphlet to determine eligibility requirements and if a waiver is required for self-admitted use of drugs and/or chemical substances.

b.  Waiver requests for Non-Scholarship Basic Course Cadets may be delayed until the individual is otherwise eligible to enter the Advanced Course, i.e., prior to contracting.

c.  If the Cadet admits to use of drugs and/or chemical substances after contracting, a waiver along with documentation must also be submitted to the proper approval authority.

d.  Each request for waiver must contain the required documentation and approval by the proper approval authority IAW the Support Documentation for Cadet Actions and the Approval Authority matrixes at **Appendix B**.

### 3-4.  Age Waivers for Non-Scholarship Cadets **TOC**

a.  Age limitations for scholarship Cadets are statutory and therefore, not waivable. (See **CC Regulation 145-1**, for scholarship age restrictions).

b.  See Chapter 2, **Section VI** above to determine eligibility requirements and if a waiver is required for Non-Scholarship Cadets.

c.  For individuals over age 34, the Battalion Commander/PMS will forward their personal recommendation for approval to the Brigade Commander.

d.  If the Cadet falls behind in his/her academic progression after contracting in the ROTC program and becomes ineligible for commissioning a waiver, along with documentation, must also be submitted to the proper approval authority.

e.  Each request for waiver must contain the required documentation and approved by the proper approval authority IAW the Support Documentation for Cadet Actions and Approval Authority matrixes at **Appendix B**.

f.  The battalion will receive the approval or disapproval memorandum from Cadet Command via email.

A150

g.  Preparation of the required forms and documentation for waiver submission is outlined in **Section II** below and **Appendix C**.

## 3-5.  Reenlistment Code Waivers **TOC**

a.  See Chapter 2, **Section VI** above to determine eligibility requirements and if a waiver is required.

b.  HQDA retains approval authority for all RE code waiver requests (**Exception**:  *CG, HQCC, may approve those involving Chapter 16 discharge to participate in ROTC, hardship, compassionate cases, or medical separations that have been resolved, provided the student was separated with a waivable RE Code as stated in* **AR 601-210**).  Prior service personnel released early to attend school who received SPD Code KCF, MCF, KCA, or KGX may join ROTC without a RE Code waiver.

c.  Each request for waiver must contain the required documentation and approved by the proper approval authority IAW the Support Documentation for Cadet Actions and Approval Authority matrixes at **Appendix B**.

d.  The battalion will receive the approval or disapproval memorandum from Cadet Command via email.

e.  Preparation of the required forms and documentation for waiver submission is outlined in **Section II** below and **Appendix C**.

## 3-6.  Dependency Waivers  **TOC**

a.  See Chapter 2, **Section VI** above to determine eligibility requirements and if a waiver is required.

b.  The Commander, Cadet Command is the approval/ disapproval authority for dependency waivers.

c.  Waiver requests for Basic Course Non-Scholarship Cadets may be delayed until the individual is otherwise eligible to enter the Advanced Course, i.e., prior to contracting.

d.  If the Cadet regains custody of dependents after contracting in the ROTC program, disenrollment may be appropriate.  If there are extenuating circumstances, submit an exception to policy request along with documentation to the proper approval authority.

e.  Each request for waiver must contain the required documentation and approved by the proper approval authority IAW the Support Documentation for Cadet Actions and Approval Authority matrixes at **Appendix B**.

f.  Preparation of the required forms and documentation for waiver submission is outlined in **Section II** below and **Appendix C**.  **TOC**

g.  The battalion will receive the approval or disapproval memorandum from Cadet Command via email.

h.  Other documents required are --

A151

(1)  A statement by the spouse or guardian that the dependents for whom responsibility is exercised will not suffer hardship from loss of care, supervision, or financial support, if appropriate. (An ex-spouse is not required to make this statement.)

(2)  Divorce decree and court record showing physical custody of minor children. In this regard, the standards stated in **AR 601-210**, Para 2-10d. Cadre will not advise, imply or assist an applicant in regards to surrendering custody of children. They only will state what the contracting standard is, what disqualifying conditions are, and what waiver request procedure the student must use if the applicant desires to submit a request for dependency waiver.

i.  Refer to **AR 145-1**, Chapter 3 for additional information on dependency waivers.

### 3-7.  Medical Waivers  TOC

a.  Medical fitness standards prescribed in the appropriate chapters of **AR 40-501** will be adhered to in determining a Cadets/applicants medical fitness for contracting.  Requests for waiver will be considered under the provisions of **AR 40-501**, chapter 1, and this Paragraph.

b.  Commanding General, U.S. Army ROTC Cadet Command, retains approval for all requests for waiver of medical disqualifications.

c.  A request for waiver of a medical fitness standard will be signed by the Cadet/applicant.  The Battalion Commander/PMS is responsible for administrative action such as advising the Cadet that the request for waiver may be made, preparing the request, adding an appropriate recommendation, and forwarding to Headquarters, Cadet Command, for a final decision.

d.  Supporting documentation requirements for submission of waiver request are stated in the Support Documentation for Cadet Actions matrix, **Appendix B**.

e.  The Commanding General, Cadet Command, may grant the waiver if the medical condition or physical defect -

(1)  Is static in nature or no longer exists.

(2)  Will not preclude satisfactory completion of ROTC training (including camp training).

(3) Will not be complicated or aggravated by ROTC training or by military training after appointment.

f.  Medical waivers granted are valid until the time of appointment provided the condition has not worsened and the waiver is within limitations described in **AR 40-501**, Paragraph 1-6c.

g.  If the request is approved, the decision made by Cadet Command will be faxed to the battalion.  If disapproved, the battalion will receive the disapproval memorandum from Cadet Command via email.

h.  If the request for waiver of the medical disqualification is denied by Cadet Command, the applicant will not be contracted.

i.  The applicants/Cadets failure to disclose a medical condition or medical information on his/her medical history form is grounds for waiver denial.

### 3-8.  Medical Determinations for Contracted Cadets   **TOC**

a.  Commanding General, USACC, is the approval authority for requests for medical determinations.

b.  Supporting documentation requirements submission of a medical determination are stated in the Support Documentation for Cadet Actions matrix, **Appendix B.**  When submitting a request for medical determination, **CC FM 131-R** must be used and the Cadet is required to sign and date Blocks 18 and 19 of the form.

c.  If the request is approved, the decision made by Cadet Command will be faxed to the battalion.  If disapproved, the battalion will receive a disapproval memorandum from Cadet Command via email.

### 3-9.  After-the-fact Waiver Request   **TOC**

a.  Requests for waiver of disqualifying conditions that existed at the time of the contracting, but were not discovered until after enrollment will be submitted as soon as possible after discovery.

b.  A complete explanation of the reasons for failure to recognize the need for waiver action prior to enrollment will be furnished by the Battalion Commander/PMS in the forwarding documents.  Based upon the particular circumstances of the case, appropriate inquiry will be initiated by the Battalion Commander/PMS to determine if failure to disclose on the part of the student was a factor.  If such an inquiry was conducted, the results will be included with the request for waiver if no failure to disclose was found.  In those cases where failure to disclose is a factor, the waiver request will be disapproved and appropriate disenrollment proceedings will be initiated as provided for in **Chapter 6** of this pamphlet.

c.  Battalion Commander/PMS will address action(s) taken to preclude future after-the-fact waivers requests from their battalions.

### 3-10.  Reconsideration of Disapproved Waiver Requests   **TOC**

a.  A request for reconsideration of a disapproved waiver request may be submitted only if the Battalion Commander/PMS furnishes-

  (1)  Strong additional evidence of the outstanding qualification of the student.

  (2)  An explanation to the approval authority as to why the additional supporting documentation was not furnished as part of the initial request.

b.  Requests for reconsideration must be personally endorsed by the Brigade Commander.

A153

c.  Cadet Command battalion cadre will not forward disapproved waiver requests outside of Cadet Command channels nor will they counsel or advise students to use other than channels for reconsideration of their request.

**Section II, Waiver Request Preparation/Processing**

**3-11.  General** TOC

a.  Waiver requests must be fully documented and properly prepared in order to reduce the administrative workload at each level of review and facilitate the decision making process.  The decision authority must have the most complete and accurate information available upon which to base a decision.  Improperly prepared waiver request impedes that process; they will be returned, without action, by the next level to the originator for correction.  The approval authority for each type of waiver or exception to policy to student enrollment or retention in the program depends on the specific action.  However, disapproval authority may be exercised at each command level.  A waiver request disapproved by any intermediate commander need not be sent to a higher authority.

b.  The matrixes at **Appendix B** lists the forms/documentation required for waiver submission and the approval authority level.

c.  All waiver requests originating from a Cadet enrolled at an partnership school will be submitted through the host battalion to higher headquarters.

d.  The Battalion Commander/PMS will ensure that the request for waiver or exception to policy is complete, correct and properly supported by the documents or other evidence pertinent to the request.  The EEO will assist the Battalion Commander/PMS in this review.

e.  If a contracted Cadet becomes disqualified for retention and submits a request for waiver, the battalion commander will not disenroll the Cadet until a final decision is made. The Cadet may be placed on LOA or administrative suspension of scholarship benefits pending the outcome as appropriate.

f.  Students must have a current cumulative GPA of **2.5** on a scale of 4.0 in order to be favorably considered for waiver.  In exceptional retention cases, this may be lowered to **2.2**.

g.  All queries pertaining to actions will be directed to the appropriate Brigade staff.  Only Brigades will communicate directly with Headquarters, Cadet Command on cases.

h.  Unless otherwise specified, disapproval authority for waiver or exception to policy requests is at each level of the chain of command.

i. Waiver requests for Basic Course Non-Scholarship students may be delayed until the student is otherwise eligible to contract into the Advanced Course, i.e., prior to contracting.

**3-12.  Preparation** TOC

a.  Each request for waiver for contracting must include documentation annotated in **Appendix B** and processed IAW **Appendix C** (see Paragraph 3-13 below)."

A154

b.  Additional documentation may be included if it applies to specific requests.

**3-13.  Cadet Action Request (ROTC CC Form 131-R or CC Form 131-E)** TOC

a.  Cadet Action Request will be used to initiate and transmit all requests for Cadet waivers and exceptions to policy.  The form contains information concerning the Cadet's request and a justification.  The Cadet is responsible for the submission of supporting documents pertinent to the request not otherwise contained in the Cadets MPRJ or other official file of which the Battalion Commander/PMS has custody.  The Battalion Commander/PMS will indicate his/her recommendation on the **ROTC CC Form 131-R** or **CC Form 131-E,** as applicable, justification for the recommendation, and certifies by signature the accuracy and completeness of the request.  The Battalion Commander/PMS is responsible for ensuring that the request for waiver or exception is properly completed and that all required supporting documents are enclosed prior to submission to through channels to Headquarters, Cadet Command.

b.  **CC FM 131-R**, will also be used by the Battalion Commander/PMS when seeking a medical waiver or other enrollment eligibility determination from higher headquarters.  In cases of medical determinations, the Cadet is required to sign and date blocks 18 and 19 of **131-R**.

c.

   (1) **Appendixes C-5** and **C-8** contain a complete discussion and instructions for using the **CC Form 131-R** and **CC Form 131-E**.

   (2)  As stated in **Appendix C-8**, the **CC Form 131-E** is used for electronic submission of the following Cadet actions:

      (a)  Non-immigrant alien participation (see Para **2-6**);

      (b)  Non-Scholarship age waivers (see Para **2-34**c);

      (c)  Dependency waivers (Para **2-40**)

      (d)  Self-admitted drug use (Para **2-37**);

      (e)  Misdemeanor civil conviction waivers; excluding those in Paragraphs **2-4**e(1) thru (3)-these actions will be submitted in paper copy with supporting documentation.

      (f)  Requests for termination of scholarship benefits (Para **4-6**).

      (g)  Reenlistment Code 3 when released from active duty to participate in an officer producing program.

   (3)  The **CC Form 131-R** (paper copy) will be used for submission of all other Cadet action requests.

   (4)  **Appendix B**, Approval Authority/Flow of Cadet Actions & Supporting Documentation for Cadet Actions, provides the flow, approval authority, and required documentation for Cadet actions.

*Page 56 of 126*

A155

## 3-14.  Transcripts  TOC

a.  Transcripts may be either on a prescribed university form or printout from a registrars screen.  If the transcript is on anything other than a prescribed university form, the PMS will authenticate as a school official/representative.

b.  A current and complete transcript of all college credits and courses taken will accompany each request for waiver, exception to policy or determination for retention or enrollment.  This includes copies of transcripts of other institutions attended if the student has attended institutions other than the one currently enrolled in. Transcripts from other academic institutions are not required if the current school transcript has transfer credits posted.  The current semester GPA as well as the cumulative GPA must be indicated on the most recent transcript submitted.

c.  Transcripts submitted with Cadet actions must be certified or provided by an appropriate university official. It may be submitted on a institution transcript form, a registrar terminal screen display printout or other appropriate format recognized by the institution.  Transcripts provided by the school are acceptable without verification signature if prepared by the registrar on a formatted school transcript form.  Certification by a school official is required in all cases where a terminal screen display transcript printout is used (PMS may authenticate the computer printout transcript as a school official).  Requests received without the student transcript or with uncertified transcript will be returned by the receiving headquarters without action.

## 3-15.  Planned Academic Worksheet Program (CC FM 104-R)  TOC

a.  **CC FM 104-R** (Planned Academic Worksheet) must be completed prior to contracting any Cadet except for MS I four-year scholarship Cadets who must complete the worksheet during the first school term enrolled.  he initial enrollment worksheet must establish that the Cadet is academically aligned at enrollment.  The worksheet must be revised (if necessary) for each contracted Cadet at least annually.  The worksheet must be authenticated by an appropriate school academic official (academic advisor/counselor) when completed or revised.  The Battalion Commander/PMS will review the worksheet with the Cadet each school term to monitor alignment/mission set and academic progress. This review will be noted on Cadet counseling records.  The most current worksheet will be enclosed with Cadet action requests as required in **Appendix B**.  All items of the worksheet must be completed or NA indicated when the entry is not applicable to the Cadets academic program.

b.  For the form to be considered in supporting a Cadet action, it must be signed and dated by the student as well as an appropriate school official, (e.g., registrar, academic counselor, department head, dean, or other official).  Due to academic schedule or catalogue changes, conflicting academic requirements or other circumstances, a student's initial planned academic worksheet may change.  If a student falls into that category, he/she will initiate a changed worksheet within 30 days to the Battalion Commander/PMS. An appropriate institutional representative will re-certify it.

A156

c.  The statement of understanding, which appears on the reverse side of **CC FM 104-R**, must be completed by the student and Battalion Commander/ PMS after the completion of the worksheet portion in order for the form to be considered valid.

d.  The completed **CC FM 104-R** will be maintained as a part of the Cadets MPRJ.

e.  **Appendix C** contains complete information on the correct preparation of **CC FM 104-R**.

## 3-16.  DD Form 214   **TOC**

a.  The latest **DD Form 214** applicable to a prior service Cadet must be submitted with Cadet action requests as indicated in **Appendix B**.  It must contain (legibly) the reason and authority for separation and the reenlistment eligibility (RE) code.  If this information is absent, or is illegible, it will be the responsibility of the applicant to correspond with the appropriate service to obtain the needed information prior to submission for a waiver. Students who are in a reserve component and have completed Basic Training as a member of a reserve component will include a copy of **DD Form 220**.

b.  If telephonic information has been received to provide missing elements of **DD 214** but written confirmation has not been received, then the student will enter the pertinent information, the date received, and the name of the source as part of the justification on **CC FM 131-R** or **CC FM 131-E**, if applicable.  Hard copy confirmation will be forwarded as soon it is received.

c.  The Battalion Commander/PMS must also resolve any reserve duty obligation the student may have as indicated in Block 12i of **DD Form 214**, and address those obligations under SMP documentation.

## 3-17.  SMP Documentation   **TOC**

For students who are members of USAR or ARNG units, and who do not intend to become SMP participants but require a waiver, the Battalion Commander/PMS must request clearance from the reserve component by submission of **DD Form 368** (Request for Discharge or Clearance from Reserve Component) to the appropriate State AG or USAR commander.  A copy of clearance must be attached to the request.  Should the requested waiver be approved, the battalion commander/ PMS will complete the discharge action by resubmission of the **DD Form 368** to the respective reserve component headquarters with Part III of the form completed.

## Chapter 4 - Retention Procedures   **TOC**

### Section I, Responsibilities

**4-1. General**.  **TOC**  To ensure Cadet retention standards are being met for continued enrollment in the ROTC program, it is essential that the Battalion Commander/PMS and EEO monitor, counsel and re-verify each Cadets eligibility on a regular basis.

**4-2.  Battalion Commander/PMS Responsibilities**.  **TOC**  The Battalion Commander/PMS is responsible for:

a.  Annually verifying the eligibility of contracted Cadets to continue in the ROTC Program.

A157

b.  Ensuring that the Cadet continues to meet the required height/weight standard or is placed on an acceptable weight control program.  (See **AR 600-9**).

c.  Ensuring Cadets attain the minimum APFT score per Army standard or is placed in a suitable remedial PT program (see **AR 350-15**).

d.  All Cadets (scholarship and Non-Scholarship) must maintain the physical requirements as follows:

> (1) Cadets who have signed the **Jun 95** contract will meet the Army Physical Fitness Test (APFT) and height/weight standard prior to the end of the last school term of their Military Science III year, and continuously thereafter or be subject to disenrollment IAW the ROTC contract.

> (2) Cadets who have signed the **Jul 02** contract will meet the Army Physical Fitness Test (APFT) and height/weight standard each year, prior to attendance at LDAC, and continuously thereafter or be subject to disenrollment IAW the terms of the contract.

e.  Maintaining an effective and well-documented Cadet counseling program.

f.  Taking prompt action in accordance with the procedures stated in this Pamphlet when informed of any changes that affect the retention of any student enrolled in the ROTC Program.

g.  Ensuring Cadets are promptly notified of any changes in retention criteria.

h.  Monitoring the academic progress of contracted Cadets toward baccalaureate degree completion.  Additionally, Cadets academic progress will be reviewed at the beginning and end of each semester/term to ensure their contractual academic standards have been met as stated in Paragraph **4-3** below.

i.  Determining if the Cadet is failing to maintain acceptable standards for retention in the program as a result of the review or monitoring and, as appropriate, counsel the Cadet and/or initiate probation, termination, disenrollment or other appropriate administrative action.

j.  Advising Cadets that as a contracted ROTC Cadet they are ineligible for enlistment in any service until properly released from their ROTC contractual obligation and discharged from the USAR Control Group (ROTC).

**4-3.  Student Responsibilities**.  `TOC` The student is responsible for:

a.  Meeting eligibility criteria for retention in the ROTC Program.

b.  Immediately notifying the Battalion Commander/PMS of any changes or developments that could affect the Cadets retention as a contracted Cadet, such as arrest, incident with institutional authorities, academic difficulties or the discovery of a medical problem.

c.  Meeting all of the academic and contractual standards listed below or notifying the Battalion Commander/PMS when a change occurs:

A158

(1)  Maintaining a full-time student status (normally **12** or more semester/quarter hours per academic term).

(2)  Making satisfactory academic progress toward the award of a baccalaureate degree in a specified major at the normal projected time for the student.

(3)  Earning passing grades in all subjects.

(4)  Promptly resolving all incomplete grades received.

(5)  Maintaining a semester/quarter and cumulative academic GPA of **2.0** on a 4.0 scale, or the equivalent if the university uses other than a 4.0 scale.

(6)  Maintaining a term/cumulative GPA of **2.0** on a 4.0 scale in ROTC courses, or the equivalent if the university uses other than a 4.0 scale.

(7)  Attaining the height/weight standards established in **AR 600-9**.  See Paragraph **2-43** above for weight/body fat standards under different Cadet contracts.

(8)  Attaining at least the minimum passing standard on the Army Physical Fitness Test (APFT).

See Paragraph **2-43** above for weight/body fat standards under different Cadet contracts.

(9)  Maintaining satisfactory progress toward completing all Professional Military Education (PME) requirements, which includes the Enhanced Skills Training Program (ESTP).  Refer to **CC Regulation 145-3** for exemption.

**Section II, Leave of Absence (LOA)**

## 4-4.  Leave of Absence (LOA) TOC

a.  An LOA is used to temporarily discontinue the Cadets participation in ROTC.  No compensation or allowance will be paid to a Cadet while in LOA status.  An LOA will not affect the period of benefits authorized.

b.  A Cadet who is absent from any part of military instruction will be required, according to the practice of the university, to make up the instruction missed before being credited with completing either the Basic or Advanced Course.

c.  A Cadet requesting an LOA for bona fide reasons stated below must make the request in writing, using **CC Form 131-R**.  The Cadet must give a full justification for the request and provide supporting documentation as appropriate.  The justification must clearly state the beginning and ending dates of the LOA being requested.

d.  When Cadets are placed on LOA,  appropriate university officials will be notified in writing of the commencement and termination of periods of LOA.

e.  Cadets in LOA status will be required to keep the Battalion Commander/PMS notified of their current address and telephone number at all times.  This requirement will be placed in the LOA notification to the Cadet.

A159

f.  Changes to the Cadet Data Base which reflect the initiation of or ending of an LOA will be made promptly as changes occur in order to ensure the accuracy of the Cadets enrollment status.

g.  Battalion Commander/PMS must place a scholarship Cadet on LOA when requesting disenrollment pending resolution of the request regardless of whether or not the Cadet is academically aligned.  The LOA places the Cadet in a nonparticipating status, which suspends all scholarship benefits and subsistence payments.  **TOC**

h.  The Battalion Commander/PMS will administratively suspend payment of scholarship benefits only without placing the Cadet on LOA, when requesting the termination of scholarship status and retention of the Cadet in Non-Scholarship status.  In such cases payment of subsistence allowance would continue provided the Cadet continues participating in the course of instruction and is enrolled in the Advanced Course. (See Paragraph **4-7** below.)

i.  A Cadet is not to be placed on LOA based on the Cadets own desire to terminate the ROTC scholarship.  Rather, subsequent to a breach of contract, the Cadet is to be placed on LOA until a final determination is made.

j.  An LOA from ROTC training for a semester or more may be granted by the Brigade Commander, unless subparagraphs (1) through (7) below indicate that the Battalion Commander/PMS may authorize an LOA under the provisions of **AR 145-1**, Chapter 3.

   (1)  The Cadet needs more than the normally required time to devote to studies to complete degree requirements.  **TOC**

   (2)  The normal period for degree requirements is extended because of minor academic difficulties, addition of another course or for similar reasons.  (The Battalion Commander/PMS may authorize an LOA for one semester or equivalent.)
   (3)  The Cadet enrolls in an academic curriculum requiring five years for completion.  (The Battalion Commander/PMS may authorize LOA for one semester or equivalent.)

   (4)  LOA for medical reasons (illness, pregnancy, injury or convalescence from illness) may be authorized by the Battalion Commander/PMS for one academic term.  An LOA for medical reasons which is expected to, or does, interfere with full performance of duty for **over 45** days should be initiated for one semester/term and appropriate medical information sent to HQ Cadet Command for a medical evaluation to determine if the Cadet should be retained or disenrolled.  If the medical condition is resolved and his doctor allows the Cadet to fully participate in **less than 45** days, a medical determination action by Cadet Command is not required.  If a second LOA is needed for medical determination it will be forwarded to HQ Cadet Command.  The request will include all medical examinations the Cadet has undergone to include ROTC entrance examination and any other medical documents.

   (5)  Cadets who are obligated scholarship students (MS II, III and IV) and who indicate an insincere commitment toward military science instruction and ROTC training will be placed on a LOA by the Battalion Commander/PMS for one academic term as an interim measure in order to forward a request for final determination which may result in a requirement to initiate disenrollment action.  If the action is not completed within the LOA period, the battalion commander will extend the LOA for a

*Page 61 of 126*

A160

second term.  The Battalion Commander/PMS will recommend the termination of obligated Cadets based on the minimum of four documented adverse/negative counseling sessions during a single semester/quarter.  These documented counseling sessions must be submitted with the requested termination/disenrollment.

(6)  The Battalion Commander/PMS may place Cadets involuntarily on LOA for one academic term pending administrative action (i.e., disenrollment action).  If the action is not completed within the LOA period the Battalion Commander/PMS will extend the LOA for a second term.  **TOC**

(7)  Special reasons not covered by the above categories. (These require Brigade Commander Approval). This includes study abroad. {See **Cadet Command Reg 145-1**, Paragraph 2-7, Foreign Study, and **AR 145-1**, Paragraph 3-51(d).).

k.  The Brigade Commander may authorize a leave of absence not to exceed a total period of 2 years for students who are enrolled in internship, off-campus studies (to include study years abroad) or other academic studies required by the academic institution to obtain a baccalaureate degree.

l.  A one-year LOA may be granted to Cadets enrolled in a five-year academic program, including work-study (cooperative) programs.  The Battalion Commander/PMS may adjust the LOA period to accommodate the Cadets academic program.

(1)  The Cadet who starts ROTC training at the beginning of the freshman year will take his/her LOA during or after the Basic Course, but before enrolling in MS III.

(2)  In cooperative programs, the leave of absence may be during the periods when the Cadet is engaged in training or employment away from the academic institution.

m.  Guidelines for the evaluation of LOA:

(1)  LOA normally will not be granted in lieu of probation but may be appropriate to allow for academic realignment as a result of misalignment following probationary status.

(2)  When an LOA is requested and the transcript indicates probation is appropriate, approval of the LOA is to be contingent upon the Cadet being placed in a probationary status when he/she returns to the ROTC Program.  **TOC**

(3)  LOA can be granted for temporary medical conditions provided the condition can be resolved within the specified period (**NTE 6 months**) and prior to continued participation in ROTC.  If the medical condition is not of a temporary nature, forward a request for medical determination to Headquarters, Cadet Command for medical review and final determination before the Cadet returns to the ROTC program.

(4)  When approving an LOA, the commissioning age of the Cadet will be verified to ensure the statutory age requirement is met because of the delay in the commissioning date (scholarship Cadets must be under **31 years of age on 31 December** of the year in which they are to be commissioned).

(5)  Normally the maximum length for an LOA is one year, unless special circumstances are involved (e.g., service on a church mission, internship, off campus

*Page 62 of 126*

A161

studies, etc.).  Generally, a Cadet is lost to the ROTC program if an extended LOA (over one year) is granted.

n.  Any request for LOA or other delay in commissioning date will require a review of the Cadets continued eligibility for appointment.  If the request is approved, the change in commissioning date will be reported in the Cadet Data Base immediately upon receipt of the approval.  If the LOA extends beyond a Cadets **8-year** period of enlistment, the Cadet must voluntarily extend the enlistment by an amount equal to the period of the extended enlistment or LOA.  Extensions of enlistment will be executed IAW **AR 601-280** and documentation will be filed in the Cadets file with the **DD FM 4 Series** documents.  **TOC**

o.  Cadets on LOA will not be allowed to participate in ROTC training or military science class and will not be required to attend formations, drills, APFT, weigh-ins or other ROTC activities.  These Cadets will not receive commissioning credit for the period while on LOA and will not be afforded financial assistance (if a scholarship Cadet) or subsistence allowance.  The Battalion Commander/PMS will ensure that a Cadet placed on LOA is informed of the above in writing and that a copy of that memorandum is placed in the Cadets file.

p.  While students in a completion status are not subject to LOA provisions, they are under Battalion Commander/PMS control.  Completion students requiring delays to complete commissioning requirements will be closely monitored.

**Section III, Probation**

**4-5.  Probation**  **TOC**

a.  The PMS may use probation as a retention tool for Non-Scholarship Cadets. Use the provisions of Paragraph **4-7** (Administrative Suspension-Forfeiture of Scholarship Benefits) for scholarship Cadets.  Probation is a warning to the Cadet when the terms of the contractual agreement are not met.  All Cadet entitlements will continue during the period of probation.

b.  In exceptional cases, probation may be used for scholarship Cadets who do not meet retention standards due to mitigating circumstances beyond the Cadets ability to influence.  These cases will be very rare. Scholarship Cadets who fail to meet scholarship retention standards IAW their contract and regulations will have his or her scholarship benefits immediately suspended.  If the PMS decides to use probation (rather than administrative suspension), inform the Brigade Commander of the decision and the rationale.

c.  A Cadets first priority is academics. Extracurricular participation in ROTC activities, such as Ranger Challenge or Cadet leadership positions, which adversely affect their academic proficiency and progress will not be sanctioned.  The following policy does not preclude a Cadet from participating in training activities designed as part of the overall Program of Instruction (POI) where rotation through various tactical leadership positions is part of the training objective. The purpose is to protect the Cadet from over zealous cadre and to instill in the Cadet a sense of accountability and self-discipline vice using ROTC as an excuse for not making satisfactory grades.  Cadre will avoid overusing and abusing the indispensable Cadet leader who silently struggles to make the grades and earn a degree while relying on him to do more and more for the Cadet battalion.

A162

d.  Cadets under probation are discouraged from participating in extracurricular activities (e.g., Ranger Challenge or other similar non-mandatory POI activities); however, battalion commanders may, in justifiable circumstances and without imposition on the Cadets academic time, permit a Cadet to participate in only one such activity until such time as the Cadet is removed from probationary status.

e.  Below are some reasons for using probation (not all inclusive) --   `TOC`

    (1)  Current school term and/or cumulative academic GPA falls below **2.0** on a 4.0 scale or its equivalent; or the ROTC school term/or cumulative GPA falls below **2.0** on a 4.0 scale or the equivalent.

    (2)  Failure to maintain full-time academic status as determined by the university.

    (3)  Progress toward a degree falls below that normally required for graduation at the scheduled time without sufficient cause or justification. (**NOTE**:  *This should be verified in writing from the respective department head, student academic advisor or other comparable university representative.*)

    (4)  Failure to meet the APFT and/or height/weight standards (see Paragraph **2-44** for contractual requirements).

    (5)  Misconduct such as civil convictions (e.g., Minor in Possession of alcohol, discreditable incidents with authorities, etc.

f.  Non-Scholarship Cadets.

    (1)  The PMS has the authority to grant first, second, and third probations for Non-Scholarship Cadets.

    (2)  The Brigade Commander is the approval authority for greater than three (3) probations and when the cumulative academic GPA falls below **2.0** on a 4.0 scale or its equivalent. The Brigade Commander will evaluate each request on a case-by-case basis.  This authority may not be further delegated.

    (3)  If a request for probation is disapproved by the Brigade Commander, the PMS will initiate disenrollment action IAW **Chapter 6** of this Pamphlet.

    (4)  Update CCIMS within 5 working days.

g.  The PMS will use the following guidance when placing a Cadet on probation:   `TOC`

    (1)  Complete a **CC FM 131-R**, Cadet Action Request, providing the reason and the specific school term the Cadet is being placed on probation.  Retain the form, with supporting documentation (e.g., transcript, PT records, etc.), in the Cadets file.

    (2)  Notify the Cadet in writing that-

        (a)  Probation is a warning, the specific reason for probation, and the specific school term;

A163

(b)  Continued participation in the ROTC program is required and subsistence allowance will continue; however, failure to correct the deficiency and meet the retention standards could result in initiation of disenrollment action.

h.  Scholarship Cadets.  Probation will not normally be used for scholarship Cadets.  See Paragraph **4-7** below for guidance concerning scholarship Cadets who fail to meet retention standards.  In very rare cases, if the probation tool is used for scholarship Cadets, rather than administrative suspension, the PMS will inform the Brigade Commander of the decision and rationale.

**Section IV, Termination of Scholarship**

**4-6.  Termination of Scholarship with Retention as Non-Scholarship Cadet** `TOC`

a.  Cadet Command is the approving authority for termination of scholarship.

b.  If administrative suspension (probation is not normally used for scholarship Cadets) is not appropriate, the Battalion Commander/PMS will request termination of scholarship with retention in a Non-Scholarship status, if qualified under the scholarship contract and has not received all scholarship benefits.  The Cadet will not be required to reimburse scholarship funds received if the ROTC program is successfully completed and a commission is accepted, if offered.  Scholarship benefits will be discontinued at this time, but the Cadet will receive subsistence allowance. Upon appointment, the Cadet will assume the same active duty commitment as other scholarship Cadets.

c.  In order to initiate the termination of the scholarship but retain as a Non-Scholarship Cadet, the Battalion Commander/PMS will -- `TOC`

(1)  Place the Cadet in an administrative suspension status (see Para **4-7** below) and notify the Cadet formally of the action being taken, the reason(s) and his/her status in the program.

(2)  Notify the institution of the suspension of the Cadets scholarship benefits.

(3)  Submit the request to HQCC for final decision.  If the Cadet subsequently fails to meet Non-Scholarship criteria, disenrollment action will be submitted to HQCC IAW **Chapter 6** below.  The Cadet will not be disenrolled/discharged without HQCC decision.

(4)  Cadets with an approved scholarship termination and retention in a Non-Scholarship status will not sign a Non-Scholarship contract. They remain governed by the terms and conditions of the scholarship contract.

**Section V, Administrative Suspension (forfeiture of scholarship benefits)**

**4-7.  Administrative Suspension** `TOC`

a.  Administrative suspension is the **forfeiture** of scholarship benefits for Cadets not maintaining retention standards (e.g., academic/ROTC GPA, APFT and/or height failure, misconduct, etc).  This is the preferred <u>retention tool to be used (rather than probation)</u>.  Scholarship Cadets who fail to meet scholarship retention standards IAW their contract and regulations will have his or her scholarship benefits immediately suspended.  While on

*Page 65 of 126*

A164

an administrative suspension, the Cadet is required to continue participation in the ROTC program under the scholarship contract and will receive payment of subsistence allowance.

b.  In exceptional cases, probation may be used for those scholarship Cadets who do not meet retention standards due mitigating circumstances beyond the Cadets ability to influence.  Probation, in lieu of administrative suspension, will be very rare.  In these rare cases, if the PMS decides to use the probation tool, the Brigade Commander must be informed of the decision and the rationale.

c.  Administrative suspension will be used as follows:

  (1)  Short-term deficiencies. Deficiencies that can be corrected within the current school term, e.g., if a Cadet fails an APFT / Weight standards during the school term or fails to meet academic standards on the mid-term transcript.  The PMS will immediately place the Cadet on administrative suspension.

    (a)  If the Cadet is able to correct the deficiency/problem that caused the administrative suspension within the same school term, at the PMS discretion, the administrative suspension may be lifted and scholarship benefits paid for that term. The Cadet must be in full compliance with the terms of the scholarship contract and other regulatory requirements by the last day of the school term in which administrative suspension was used.

    (b)  Retroactive payment of scholarship benefits **is not** authorized for Cadets who subsequently correct deficiencies after the school term ends (e.g., during the following school term).  Failure to update the Cadet Database is not a reason to pay retroactive benefits.

  (2)  End of school term deficiencies.  The PMS will review and evaluate the Cadets overall performance at the end of each school term to determine whether to use administrative suspension, to request scholarship termination, or initiate disenrollment action.  Cadets placed on administrative suspension during the end-of-term review/evaluation **will not** be authorized scholarship benefits for the following full term.  **TOC**

d.  Below are reasons (not all inclusive) for using the administrative suspension tool:

  (1)  Failure of the Army Physical Fitness Test (APFT) or height & weight standard (see Paragraph **2-44** for contractual requirements concerning APFT and height/weight standards).

  (2)  Failure to maintain academic/ROTC standards.

  (3)  Failure to maintain full-time academic status as determined by the university.

  (4)  Progress toward a degree falls below that normally required for graduation at the scheduled time without sufficient cause or justification.  (**NOTE**:  *This should be verified in writing from the respective department head, student academic advisor or other comparable university representative.*)

  (5)  Misconduct (e.g., such as Minor in Possession of Alcohol, discrediting incidents with authorities, etc).

(6)  When requests for scholarship termination (with retention as a Non-Scholarship) or retention waivers (e.g., civil conviction, self-admitted drug use, etc.) are pending decision.

e.  The PMS will use the following guidance when placing a Cadet on administrative suspension:  **TOC**

(1)  Complete a **CC FM 131-R**, Cadet Action Request, providing the reason and the specific school term the Cadet is being placed on administrative suspension.  Retain the form, with supporting documentation (e.g., transcript, PT records, etc.), in the Cadets file.

(2)  Notify the Cadet in writing that--

(a)  Scholarship benefits are being withheld (forfeited), the reason, and the specific school term;

(b)  Continued participation in the ROTC program is required and subsistence allowance will continue;

(c)  Failure to correct the deficiency will result in continued forfeiture of scholarship benefits, termination of scholarship, or initiation of disenrollment action.

(3)  Notify the university in which the Cadet is enrolled of the specific school term for which the scholarship benefits are being forfeited.

**Section VI, Non-Scholarship Extension of Subsistence Allowance**

**4.8  Non-Scholarship Extension of Subsistence Allowance**  **TOC**

a.  Non-Scholarship MS IV Cadets who are pursuing an undergraduate degree that requires in excess of four academic years to complete the baccalaureate degree requirement are eligible to request consideration for extended subsistence allowance for up to **10** months.  Extended subsistence allowance may be approved for courses needed for completion of the baccalaureate degree programs that require a fifth academic year or a combination of a part of a fifth academic year.  Requests must be submitted to Headquarters, Cadet Command (ATCC-PA-C), no later than **30 day**s after the start of the last school term of MS IV and must include the following documentation:

(1)  **Cadet Command Form 131-R**, Cadet Action Request

(2)  Current transcripts (including the fall semester)

(3)  Updated completed copy of the **Cadet Command Form 104-R** (Planned Academic Program Worksheet)

(4)  Extract from the university's catalog, the undergraduate five-year degree program course schedule and required curriculum for degree requirements.  Course descriptions are not necessary.

A166

b.  Cadets who are granted a Non-Scholarship extension of subsistence allowance must currently be, and continue to be, a full-time student enrolled in the Army ROTC program, maintain at least a **2.0** on a 4.0 scale (or equivalent) term and cumulative grade point average in academic courses, at least a 2.**0** on a 4.0 scale (or equivalent) term or cumulative grade point average in ROTC courses, and meet all other contractual requirements.

c.  The PMS must structure an MS V program of ROTC on campus classroom training.  The Cadet must continue participation in order to continue to be eligible for the subsistence allowance.  **TOC**

d.  Requests for Non-Scholarship extension of subsistence allowance **WILL NOT** be approved for:

    (1)  Any courses other than those required for completion of the baccalaureate degree.

    (2)  The purpose of requiring extra course work because of academic deficiency or failure.

    (3)  Cadet who require extra course work because of academic deficiency or failure.

e.   After-the-fact or retroactive requests are NOT authorized.

**Section VII, Counseling Requirements**

**4-9.  Scholarship Cadets**  **TOC**

a.  The Battalion Commander/PMS (and, when appropriate or necessary, assisted by the Cadets ROTC instructor) will counsel each scholarship Cadet

    (1)  At the time of contracting, to ensure that the student understands

        (a)  That by accepting the terms of the scholarship contract, he/she clearly understands that scholarship benefits are granted in return for the Cadets obligation of military service, as an officer, in the case of successful completion of the contract requirements, or as an enlisted soldier, if the contractual requirements are not fulfilled by the Cadet.  (**NOTE**:  *Statute and DOD directive grant authority to the Secretary of the Army to order Cadets found in breach to active duty for a period specified by law and the Cadets contract.  40% If the terms of the agreement are not fulfilled, the Cadet, if eligible for enlistment, may be ordered to active duty.  The choice of disenrollment options remains at the discretion of the Secretary of the Army (or his designated representative.)*

        (b)  The requirements of **AR 145-1** to retain the scholarship and the consequences of failing to satisfy those requirements.

        (c)  The academic probation process (as described in Paragraph **4-5** above).

        (d)  The ROTC curriculum, to include PME.

        (e)  That the students military service obligation is eight (8) years.

A167

(f)  That acceptance into another officer training program (e.g. USMA) is not authorized unless approved by Headquarters, Cadet Command.

(g)  That the termination of the contract at the Cadets own request after entering the obligation point (first class of MS II) is not authorized.  The contract is a legal and binding agreement, which requires the student to fulfill the terms therein.

(2)  At least once each semester/term while on scholarship.

(3)  Whenever a significant accomplishment or deficiency is noted.

(4)  Prior to submitting a request for termination or probation to Brigade headquarters.

(5)  When the Cadet requests LOA.

(6)  Upon disenrollment.

b.  Document the counseling:  **TOC**

(1)  The academic progress of all Cadets must be monitored.  Documented counseling sessions must begin immediately upon the outset of academic deficiencies and continued until correction has been effected or decision to initiate termination proceeding has been made.  After formal counseling, the Cadet will be notified of the resulting probation action in writing.  The notice will include the cause for the probation, the period of probation and the consequences of failure to correct the deficiencies noted.  A copy of this memorandum of notification will be placed in the Cadets file.  Cadets on probation will be counseled frequently (not less than once per month) and a complete summary record made of the counseling session.  If the Cadet fails to correct the deficiency by the end of the following academic term, the Battalion Commander/PMS will initiate the action outlined in Paragraph **4-2**h above.  **Chapter 6** contains additional information concerning termination of scholarships and disenrollment of scholarship students.

(2)  All required counseling will be recorded on **DA Form 4856-R** or other appropriate counseling statement form (or verified and acknowledged memorandum for record) and maintained in the Cadets MPRJ.

(3)  All Cadet counseling will be signed by the Battalion Commander/PMS or other official administering the counseling and will be acknowledged in writing by the Cadet and dated.  Should the Cadet refuse to sign or be reasonably unavailable, the Battalion Commander/PMS will so annotate the counseling form.

## 4-10.  Non-Scholarship Contracted Cadets  **TOC**

a.  A cadre member will counsel each Non-Scholarship Advanced Course student.

(1)  At the time of contracting to ensure that the student understands:

(a)  That through acceptance of the terms of the contract he/she promises to complete the program and serve as an officer if afforded an appointment.  Inform the student that failure to complete the program and accept an appointment, if

*Page 69 of 126*

A168

resulting from the Cadets voluntary breach of contract, renders the Cadet liable, at the discretion of the Secretary of the Army or his designated representative, to be ordered to active duty as an enlisted soldier in the grade of Private (EI) for two years as stated in statute, directive, and in the Cadets contract.

(b)  The requirements of **AR 145-1** to remain enrolled in the Advanced Course, and the consequences of failure to satisfy those requirements.  **TOC**

(c)  The academic probation process.

(d)  The ROTC curriculum, to include the PME requirement.

(e)  That the military service obligation is eight (8) years.

(2)  At least once each semester/term.

(3)  Upon disenrollment.

(4)  Whenever a significant accomplishment or deficiency is noted.

(5)  When the Cadet requests or is placed on LOA.

b.  All required counseling will be recorded on **DA Form 4856-R** or other appropriate counseling record, or memorandum for record and maintained in the Cadets MPRJ.  Such counseling records will be verified by the cadre member's signature and date and will be acknowledge by the Cadet in writing and dated.  Should the Cadet refuse to sign or be reasonably unavailable, the cadre member will so annotate the counseling form.

## 4-11. Non-Contracted Basic Course Cadets  **TOC**

a.  A cadre member will counsel each non-contracted Basic Course Cadet:

(1)  At least once each semester/term.

(2)  Whenever a significant accomplishment or deficiency is noted.

b.  Counseling of Non-Scholarship Basic Course Cadets should cover such items as-

(1)  The requirements in **AR 145-1** for enrollment in the Advanced Course

(2)  The ROTC curriculum, to include PME requirements.

(3)  The terms of the ROTC contract.

(4)  Available scholarship options.

(5)  An appraisal of the student's officer potential.

(6)  Any condition which would require the student to submit a waiver prior to enrollment in the Advanced Course.

(7)  That the military service obligation is eight (8) years.

A169

c.  Documenting the counseling.

   (1)  All required counseling will be recorded on **DA Form 4856-R**, other appropriate counseling form or on a memorandum for record and maintained in the Cadets MPRJ.

   (2)  All counseling will be verified by the signature of the cadre member administering the counseling and will be acknowledged by the student in writing and dated.  Should a student refuse to acknowledge the counseling or not be reasonably available to sign the form, the cadre member will so note on the counseling document.

**4-12.  Other Counseling Requirements**  `TOC`

Documented counseling is also required when a student:

a.  Elects to drop ROTC (not authorized after the obligation point is attained).

b.  Is given placement credit.

c.  Is seeking to participate in any of the special options outlined in Chapter 2, **Section VIII** above.

d.  Enters an institution as a transfer scholarship student.

e.  Plans to change his/her graduation date or requests to change academic major.

**Section VIII, Retention Disqualifications**

**4-13.  General**  `TOC`

a.  Contracted Cadets are disqualified for retention in ROTC without waiver for reasons outlined in the remainder of this section (not all inclusive)--

b.  Cadets are expected to maintain officer-like conduct while enrolled in ROTC.  Failure to maintain retention standards and/or obtain a waiver, if required, will result in termination of scholarship, and/or disenrollment IAW with **Chapter 6** of this pamphlet.

c.  Waivers for retention will be supported on a case-by-case basis.  See **Chapter 3** for guidance on submission of waiver requests.

**4-14.  Age**  `TOC`

a.  Students who exceed the maximum age limits because of slow academic progress, leave of absence, or other deferments to their initial projected commissioning dates are subject to disenrollment or, if a scholarship Cadet, termination with retention as a Non-Scholarship Cadet.

**4-15.  Academic Standards**  `TOC`

If the Cadet fails to meet the academic standards listed in the contractual agreement during any semester/term following contracting, the Battalion Commander/PMS will-

A170

a.  Place the Cadet on probation IAW the provisions of Paragraph **4-5** above.

b.  Notify the Cadet in writing that he/she has been placed on probation.  The memorandum will describe the deficiency, the length of the probation, steps, which the Cadet is to take to correct the deficiency during the probationary period and the possible consequences of failure to overcome the deficiency.

c.  If the Cadet fails to correct the deficiency during the probationary period, the Battalion Commander/PMS must consider whether retention of the Cadets scholarship is prudent, or if scholarship termination would be appropriate.

## 4-16.  Use of Drugs and/or Chemical Substances  **TOC**

a.  Cadets are ineligible for retention without waiver if they:

(1) Admit to frequent or recent use of drugs and/or chemical substances, possession of narcotics Paraphernalia, sale of said substances and/or Paraphernalia or of having referred persons to others for the purpose of obtaining illegal drugs, chemical substances or Paraphernalia.

(2)  Are convicted in a court of law or are found by university officials through a disciplinary hearing to have possession of, used, sold, or referred others for sale of drugs, chemical substances and/or drug Paraphernalia.

(3)  Are medically disqualified for dependency under the provisions of **AR 40-501**, Paragraph 2-35.

b.  In addition to LDAC urinalysis testing, drug screenings may be administered by the PMS for illegal drugs on contracted Cadets.  Use **AR 600-85** as a guide or procedures outlined in the Cadet Command Well Being Program.

(1)  This tool should be used very judiciously and only in cases where there is significant, credible evidence a contracted Cadet has breached the terms of his or her contract.  The urinalysis will be conducted at a local contracted facility.  If there are current arrangements with local military installations, Army national Guard/Reserve, or USAREC units to test contracted Cadets on a case-by-case basis, then continue to use these arrangements.  **TOC**

(2)  Brigade commanders must review and approve all requests for on-campus drug screening prior to testing. PMSs requesting drug tests should schedule testing from the Pembroke Occupational Health website (**www.edrugtest.com**).  The website requires a userid and password.  Please contact your Brigade representative for a password to enter the system.  The website will provide the PMS with a local test site and results.  POC at USACC can be reached at **(757) 788-3835**.

(3)  If the Cadet refuses to submit to testing or test positive from such screening, disenrollment procedures may be initiated IAW **Chapter 6** of this pamphlet.

## 4-17.  Civil Conviction or Adverse Adjudication/Disposition  **TOC**

a.  Contracted Cadets who are apprehended, placed under charges, confined or incarcerated, placed under investigation, fined, convicted, or otherwise subject to criminal

A171

proceedings by civilian or military authorities after the completion of **CC Form 139-R** (Cadet Enrollment Record) and prior to commissioning must advise the Battalion Commander/PMS to determine if a waiver is necessary.

b.  If an MS IV Cadet and an accession file has been evaluated by HQDA ROTC Selection Board, HQDA, TAPC-OPP-P will be notified immediately by submission of **CC Form 131-R** with supporting documentation.

Concealment of such information is grounds for disenrollment and denial of commission. This action serves only as a flagging action and is not to be misconstrued as a waiver request.

## 4-18.  Medical  TOC

a.  As soon as a potentially medical disqualifying condition concerning a contracted Cadet becomes known, the Battalion Commander/PMS will either seek

(1)  Retention of a Cadet through the Cadets request for waiver of the disqualifying condition, or

(2)  Disenrollment by initiation of appropriate action with accompanying medical documentation.

b.  Requests for medical determination will be forwarded directly to Headquarters, Cadet Command for final decision.

c.  Depending on the nature of the medical problem, the Battalion Commander/PMS may place the Cadet on LOA or administrative suspension pending the final determination from Headquarters, Cadet Command.  All Cadets have the right to request a waiver.  The Battalion Commander/PMS will take no final action to disenroll a Cadet with a potential medical disqualification who desires a waiver until notified in writing from Headquarters, Cadet Command, irrespective of civilian or local medical opinion/findings received. However, if a Non-Scholarship Cadet has been determined medically disqualified by the reviewing authority and the Cadet does not desire a medical waiver, the Battalion Commander/PMS has the authority to disenroll the Cadet.  Before disenrollment can be implemented, an investigating officer (IO) must be appointed to verify the facts IAW **Chapter 6**.  In some cases, if the Battalion Commander/PMS prefers, a request for medical determination may be submitted to Headquarters, Cadet Command IAW **6-14**b in lieu of an IO, which is acceptable.  TOC

d.  Cadets who fail to meet prescribed height/weight standards will be placed in a weight control program as recommended by appropriate medical personnel and monitored for compliance and documented IAW **AR 600-9**, Paragraph 21.  Disenrollment action will be initiated on those Cadets who fail to achieve the standard after entry into bona fide weight control program.

## 4-19. Deleted.

## 4-20.  Conscientious Objector.  TOC  Conscientious objector status will be grounds for disenrollment from ROTC.  The battalion commander will refer to **AR 600-43**, **AR 145-1**, Chapter 3, and **Chapter 6** of this pamphlet for guidance on handling conscientious objector status applications.

A172

**Section IX, Completion Cadet Program - CCP**

**4-21.  Cadet Command Policies**  `TOC`

a.  Cadet Commands goal is to achieve academic alignment for all ROTC Cadets at 4-year institutions. The Command rule is "no degree - no commission." The PMS is responsible for justifying the decision to accept a non-aligned Cadet.

b.  Cadets who complete all commissioning requirements, including required Professional Military Education (PME) courses, but have not completed requirements for their degree will be placed in completion status.

c.  Completion status is limited to a maximum of 24 months or as stipulated on the Cadets Planned Academic Program Worksheet, **CC Form 104-R**. Completion Cadets are not eligible for subsistence allowance.

d.  A Cadet who has not completed all PME requirements will not be designated a completion Cadet. The Cadet will be designated as MSVI and identified in CCIMS IAW the CCIMS Users Manual. SMP completion Cadets who are not commissioned after completing all ROTC requirements except graduation may continue their SMP status with their Reserve Component (RC) unit. All SMPs must remain satisfactory participants in their RC unit.

e.  Completion Cadets who maintain eligibility will be accessed based on their projected graduation date and commissioned upon graduation.

**4-22. CCP Goals**  `TOC`

a.  Provide procedures to manage Completion Cadets toward the earliest completion of their degree requirements.

b.  Minimize the time for a Completion Cadet to receive a commission upon graduation and for Cadet files to appear before the ROTC Accession Board.

c.  Ensure Cadets remain technically proficient until they are accessed, commissioned, and attend OBC.

**4-23. CCP Responsibilities**  `TOC`

a.  Commander, Cadet Command will--

　　(1)  Utilize CCIMS to monitor the status of Completion Cadets.

　　(2)  Initiate inquiries or requirements for corrective action when unusual circumstances appear to exist, e.g., large number of CCPs, excessive time in CCP status, incorrect information, and/or changes in status.

b.  Professor of Military Science will--

　　(1)  Retain control of completion Cadets in accordance with the regulatory guidance in **AR 145-1** and this CC PAM.

A173

(2) Manage the files of all completion Cadets and record all counseling sessions on **DA Form 4856-R** (General Counseling Form).  `TOC`

(3) Execute an MOU with the Completion Cadet (**Figure 4-1**) which outlines requirements and responsibilities until graduation and accession.

(4) Update CCIMS with the date the Cadet enters Completion Cadet status within **5** working days.

(5) Utilize **CC Form 104-R** to monitor the academic progress of the Cadet. Emphasis should be placed upon planning academic requirements, monitoring the current/cumulative grade point average, and ensuring Cadets maintain full-time student status. Counseling will be recorded on **DA Form 4856-R**.

(6) Assist the Completion Cadet with accession packet and other Cadet records/administrative requirements.

(7) Ensure technical proficiency and professional development by allowing Completion Cadet participation in selected ROTC BN training and social activities. Training opportunities may include APFT, professional development, and technical proficiency maintenance courses completed in a non-field environment, i.e., non-hazardous on-campus training.

(8) Continue to monitor SMP Completion Cadets with RC TPUs to ensure SMPs are satisfactory participants in unit training. Keep the RC CDR apprised of the Completion Cadets status.

(9) Initiate appropriate administrative procedures for Completion Cadets who fail to comply with the regulatory and contractual requirements and Completion Cadet MOU. A breach of the contract or failure to comply with the MOU will be cause for board or investigative officer action in accordance with **AR 145-1** and Chapter 6 of this Pamphlet. Such action could result in adverse action as outlined in the Cadet contract, to include being ordered to AD in an enlisted status in accordance with **AR 135-210** or requirement to repay scholarship funds expended, if applicable.

c. Completion Cadet will-- `TOC`

(1)  Complete and sign an MOU (**Figure 4-1**) with the PMS prior to the beginning of Completion Cadet status (the date when the Cadet completes all MS requirements but is not eligible to be commissioned).

(2)  Meet with the PMS monthly, or as directed by the PMS, to provide a status report on academic progress toward degree completion, provide update on address and telephone changes, and prepare/submit all Cadet records as required.  Monitor and correspond as necessary to all official correspondence by utilizing their current AKO account.

(3)  Participate in a record APFT and height/weight verification semiannually and remedial APFT and weight control programs as determined by the Battalion Commander/PMS.

A174

(4)  Maintain full-time student status and a minimum semester/quarter cumulative academic grade point average of **2.0 on a 4.0 scale** or equivalent.

(5)  Participate in refresher/remedial professional development and technical proficiency requirements identified within the ROTC Program of Instruction necessary to successfully complete OBC.

(6) Submit a request for transfer in writing to the PMS in accordance with the Cadet contract, if transferring to another school.

## 4-24. Administration of the Completion Cadet Program  **TOC**

a.  An ROTC Cadet will achieve Completion Cadet status when the Cadet has met all MS requirements (to include PME) to be commissioned but has not completed those academic requirements necessary to graduate.

b.  The PMS and Cadet will initiate and sign the MOU at **Figure 4-1**. At that time, the PMS will outline the Completion Cadets responsibilities to-

(1)  Meet with the PMS on a monthly basis or as directed by the PMS.

(2)  Maintain academic progress as reflected on ROTC **CC Form 104-R**. Academic plan must reflect graduation at the earliest possible time, but within **24** calendar months.

(3)  Participate in a record APFT and height/weight verification at least semiannually.

(4)  Update the Cadet record.

(5)  Continue professional development through participation in the ROTC BN Program of Instruction (POI).  **TOC**

c.  When updates or status changes occur, they will be posted in CCIMS within **5** working days of the change. A current copy of the Cadet Record Brief will be maintained in the Completion Cadet file to assist in updating CCIMS. Notify the Accessions Division, USACC, if a change occurs that will affect accession/graduation.

d.  As the Completion Cadet approaches completion of his/her academic requirements, the PMS will initiate the administrative requirements to commission the Cadet upon graduation. In addition, the PMS will assist the Completion Cadet in preparing the accession packet.

e.  Completion Cadets who have not graduated within **24** calendar months may require a board be conducted to determine whether the Cadet is in breach of his/her contract. A one-year extension of completion Cadet status can be requested if the PMS determines or board, if conducted, finds the failure to graduate is due to circumstances beyond the Cadets control. The PMS has the authority to grant the extension.

f.  Completion Cadets who desire to transfer to another 4-year institution to complete their undergraduate requirements must request transfer in writing in accordance with current regulatory guidance.  The PMS will forward the Completion Cadets file, by transmittal letter, to the gaining PMS of the ROTC program at the new institution.  The gaining PMS will be responsible for managing the Completion Cadet until graduation and

A175

the accession process is complete.  If the Completion Cadet transfers to a school without an Army ROTC program, the Completion Cadet will be required to maintain contact with the PMS at the closest Army ROTC program to the new institution.  The Completion Cadet and the gaining PMS will initiate a new MOU.

A176

## Chapter 5 - Health Benefits and Cadet Liability Coverage  TOC

**5-1.  General.** TOC The policies and procedures for Cadet health benefit and liability coverage are outlined in this chapter, **AR 145-1**, Chapter 3, and **PAM CA-550**, Federal Injury Compensation.

## 5-2.  Basic Policy TOC

a.  All applicants for enrollment and Cadets who suffer injury and/or illness while participating in authorized, scheduled and supervised training or instruction in the SROTC Program are eligible for coverage under the Federal Employees' Compensation Act through the Office of Workers' Compensation Programs (OWCP) and/or through the Department of Veterans' Affairs (VA).  Applicants for enrollment or Cadets traveling to or from scheduled training in government or government procured transportation, or traveling in response to government issued orders are also eligible for the above coverage. Coverage under FECA is authorized for injury or illness incurred under the above circumstances whose nature is temporary and is processed by the Department of Labor (DOL).  Claims in cases of death or permanent disability are submitted to the Department of Veterans' Affairs. (see **Figure 5-1** (**CC FM 136-R**), ROTC Cadet Health Benefits Matrix, for additional briefing information.)

b.  The term enrolled Cadets is defined as those Cadets who have completed and signed the **CC Form 139-R** and/or contracted Cadets (either scholarship or  Non-Scholarship). Applicants for enrollment (membership) are defined as those Cadets who have been conditionally contracted IAW **AR 145-1**, military college Advanced Course Cadets who have signed the loyalty oath, and LTC attendees.

c.  Auditing students as defined in **AR 145-1**, other participating students with a non-waivable disqualification for entry into the ROTC Program and non-enrolled students are not eligible for this coverage. The training discussed above may be conducted on or off campus, to include LTC, LDAC, NSTP, and Cadet Professional Development Training (e.g., Airborne, Northern Warfare Training, CTLT, Air Assault).

## 5-3.  Department of Labor (DOL) Claims TOC

a.  When injury or illness occurs to a student/Cadet in the cases stated above, it is the responsibility of the individual concerned to immediately advise the Battalion Commander/PMS or cadre.  It is the responsibility of the Battalion Commander/PMS or cadre to assist the student/Cadet in submitting a **Form CA-1**, Federal Employee's Notice of Traumatic Injury and Claim for Continuation of Pay/Compensation , or a **Form CA-2**, Notice of Occupational Disease and Claim for Compensation.

b.  The applicable form must be completed by the student/Cadet, with the assistance of the responsible cadre, expeditiously but in no case can it be **more than 30** days subsequent to the injury or illness. Failure to submit the appropriate form within the stated suspense may result in the loss of compensation rights and the denial of the claim by the Department of Labor.  In those cases where the student/Cadet is incapacitated and physically unable to complete the form, someone should complete it on the student/Cadet's behalf.  This can be a parent, spouse, or Battalion Commander/PMS or other cadre member. The form, regardless of the source of the report, must contain the

A177

original signature of the person giving notice of the claim (either the student/Cadet or his/her agent in cases of incapacitation).  **TOC**

(1)  **Form CA-1** (injury claims).  A sample form is at **Figure 5-2**.  The form, which contains specific instructions and notes, should be reviewed by the Cadet prior to completion.  The Cadet must ensure that items **1 through 15** are fully and accurately completed.  The description of the cause of the injury in **Item 13** and nature of the injury in **Item 14** should contain concise but complete descriptions as to preclude the necessity of obvious follow-on questions, which will delay processing.  If the injury was witnessed, Item 16 should be completed.  The cadre should include a line of duty statement before submission directly to DOL.

(2)  **Form CA-2** (illness claims).  A sample form is at **Figure 5-3**. The Cadet is responsible for the completion of Items 1 through 18 on this form.  The instructions, which accompany **Form CA-2**, give specific guidelines as to the statement of illness, which the Cadet is required to make, and the medical report from the attending physician. Cadets submitting **Form CA-2** need to follow these instructions in order to facilitate processing of the claim.

(3)  Forms.  All required forms may be obtained through your support installation.  DOL forms may also be obtained through your local civilian personnel office or the local Department of Labor office or the following internet address: **http://www.dol.gov/dol/esa/public/regs/compliance/ owcp/forms.htm**. Injury/illness type and source codes required on the forms can be found at **Figure 5-4** or Publication **CA-810**, Injury Compensation for Federal Employees which can be located at site: **http://www.dol.gov/dol/esa/welcome.html**, click on **OWCP**, then click on **Division of Federal Employees Compensation**.

c.  Upon completion of the claimant's (Cadet's) portion and signature, the **Form CA-1**/**Form CA-2** is given to the Battalion Commander/PMS for review, and a line-of-duty statement (sample at **Figure 5-5**).  If applicable items on the form are blank or improperly completed, or if required statements are missing or incomplete, the battalion commander/ PMS will assist the Cadet in correcting the deficiency. The PMS review will utilize the supervisor's guidelines listed in the instruction pages, which are a part of **Form CA-1** and **Form CA-2**.

d.  **Form CA-16**.  If the Cadet requires additional medical treatment, the Battalion Commander/PMS will initiate and complete the front of **Form CA-16**, Authorization for Examination and/or Treatment.  For other than emergency care, this form must be obtained before treatment is provided.  Retroactive authorization is allowable only in the case of emergency care.  This form will be expeditiously provided to the Cadet and hand carried to the attending physician/medical facility.  Instruction pages also accompany this form in guiding its proper preparation by the battalion commander/ PMS (as employee's supervisor) and the attending physician.  The attending physician will complete the reverse side of **CA-16** and, will return it to the Battalion Commander/PMS.  The physician's report on Part B may be submitted in narrative format and attached as a separate sheet with the form.  **CA-16** is valid for sixty days after issuance, unless a shorter period is later determined by OWCP.  Additionally the Battalion Commander/PMS will ensure that the Cadet also takes Form OWCP-1500a with the **CA-16** to the attending physician or medical facility.  This form is used in obtaining payment in injury and illness cases and all bills (less those from hospitals and pharmacies) must be signed and stamped by the physician on this form.  The physician's original signature must appear on both the **CA-16** and the OWCP-1500a. (**NOTE**:  *OWCP-1500a is also known as HCFA-1500).*

A178

e.  Upon compilation of the above forms and review by the Battalion Commander/PMS, the forms will be forwarded by the Battalion Commander/PMS directly to **US Department of Labor, Office of Workers Compensation Program, 1240 E. 9th Street, Room 851, Cleveland, OH 44199**.  On the lower left hand side of the envelope, type: **"DO NOT OPEN IN MAIL ROOM."**.  A copy of the **CA-1** or **CA-2** should be provided to the Cadet Command Safety Manager.  To be considered for payment, bills must be submitted to OWCP within one year after the end of the calendar year in which the expense was incurred or the service provided.  **CA-16** is a controlled form and must be obtained through your local civilian personnel office or the local DOL office.  `TOC`

f.  Once the claim is received by OWCP they will notify the Cadet directly of the receipt of the claim and whether it has been accepted for compensation.  OWCP will also directly query the Cadet if additional information or documentation is required.  Cadets must respond to OWCP whenever queried concerning injury and illness claims.  Failure to do so will jeopardize the Cadet's right to compensation.  All cadre will familiarize himself or herself with **PAM CA-550**, Federal Injury Compensation (Rev Jan 99).  This pamphlet provides detailed information on the processing of injury and illness claims under FECA. It contains answers to questions often asked about FECA and describes the basic provisions of FECA in simple language.  A copy of this Pam can be located at **http://www.dol.gov/dol/esa/welcome.html**, click on OWCP, then click on Division of Federal Employees Compensation.  For a status of claims that have been submitted to DOL, call **(216) 357-5100**, the general help line number for OWCP claims.

g.  Emergency treatment in military medical facilities.  Emergency care for Cadets injured or becoming ill while participating in Army ROTC authorized scheduled and supervised training may be sought from military medical facilities.  Such care should be sought only if the military medical facility is the most proximate to the training site.  Follow-on care is not authorized for Cadets (less those authorized through appropriate enrollment in

DEERS).  Subsequent treatment will be authorized and sought through civilian physicians and medical facilities by initiation of claims and authorization forms under FECA as described above.

## 5-4.  Department of Veterans' Affairs (VA) Claims   `TOC`

a.  Cadets who are permanently disabled as a result of authorized scheduled and supervised training, or during authorized travel to and from, are eligible for compensation through the Department of Veterans' Affairs.  This includes treatment in Department of Veterans Affairs medical facilities.  Department of Veterans Affairs compensation also applies in case of death.  SROTC Cadets engaged in authorized military training qualify as veterans for disabilities and death benefits by statute, Title 38, U.S. Code, Section 101.

b.  Compensation is sought in disabling and death cases through the submission by the Cadet or his/her agent of **VA Form 21-526**, Veteran's Application for Compensation or Pension.  This form is submitted by the Cadet or agent directly to the Department of Veterans' Affairs regional office.  Cadre will assist the Cadet or agent for the Cadet in making such a claim by ensuring that they have available for the Cadet in making such a claim by ensuring that they have available for submission with the **VA Form 21-526** all pertinent medical records as well as accident/injury/illness reports, order assigning the Cadet to training, or training schedule as appropriate.  Additionally a cover memorandum from the Battalion Commander/PMS to the regional Department of Veterans Affairs office

A179

will assist the Cadet in obtaining compensation.  **VA Form 21-526** can be downloaded from the following site:  **http://www.vba.va.gov/pubs/candpforms.htm**.

c.  n case of death, if the Cadet has had prior active duty service or was a member of the Guard of Reserve, the Cadets agent should contact the local VA office.  The local office will contact the Regional VA to determine if the deceased Cadet qualifies for VA death benefits.

## Chapter 6 - Disenrollment Procedures  `TOC`

**6-1. General**  `TOC`  **(**Please see **Appendix B** for disenrollment approval authority and flow of action.)

a.  When disenrollment is required.

   (1)  **AR 145-1** requires initiation of Cadet disenrollment actions for breach of contract and other criteria listed in Paras 3-43a(1)-(17).  See Para **6-5** for guidance concerning scholarship termination with retention as a Non-Scholarship Cadet.

   (2)  Sound leadership and mentoring may help avoid the requirement to initiate disenrollment.  Therefore battalion cadre should closely monitor Cadet grades, attendance, and interest.  However, cadre should rely on the procedures within this pamphlet when disenrollment action is necessary.

b.  References.  The following references apply to Cadet disenrollments.  Appointing authority, board members and investigating officer (IO) will read applicable Army references prior to actions relating to disenrollment--

   (1)  **AR 145-1**.  Reserve Officers Training Corps Program: Organization, Administration, and Training.

   (2)  **AR 15-6**.  Procedures for IOs and Boards of Officers.

   (3)  **AR 635-200**.  Enlisted Personnel, Ch 6

   (4)  **AR 600-43**.  Conscientious Objection.

   (5)  **DOD Directive 1215.8**

c.  Disenrollment checklists.  Disenrollment actions forwarded to Cadet Command must comply with the checklists at **Figure 6-5** and **Figure 6-6**.  **Figure 6-6, Checklist/Required Format for Disenrollment (boards/IOs/waiver of rights), must be completed and forwarded to Cadet Command with each disenrollment action.**  Any disenrollment actions that fail to comply with these figures may be returned for correction.  If waiver of board proceedings is elected by the Cadet, the PMS will only complete Part I of the Checklist at **Figure 6-5**.  `TOC`

d.  More than One Basis for Disenrollment.  In cases where there is more than one basis for disenrollment, each basis should be listed in the notification memorandum and investigated.  This helps ensure that the disenrollment authority may take final disenrollment action under the appropriate disenrollment provisions in **AR 145-1**.  Boards and IOs should coordinate with the office of the Cadet Command Judge Advocate in

A180

determining appropriate procedures in disenrollments, especially when more than one basis for disenrollment exists.  Complete investigation ensures that disenrollment authority may take appropriate action if one basis for disenrollment is legally deficient or otherwise inappropriate.

e.  Dispute of debt.  At the time of notification of disenrollment, all scholarship Cadets must be informed of the exact amount of scholarship benefits that Cadet Command has paid for their advanced educational assistance and that such amount is considered a debt to the U.S. Government.  They must also be notified that they have the opportunity to dispute the amount and validity of the debt during the disenrollment proceedings and if repayment is subsequently required, they may appeal to the Department of the Army, Deputy Chief of Staff G-1.

f.  Relationship between this chapter and **AR 15-6**.  In cases where **AR 15-6** conflicts with this chapter, boards and IOs will follow the procedures of this chapter.  Specific modifications to **AR 15-6** are-- `TOC`

(1)  In addition to situations defined in **AR 15-6**, Para 1-3b (2), a military exigency exists when no field grade officer is assigned to or available at the battalion conducting the disenrollment board.

(2)  Appointing authorities will use Paragraph **6-3** to determine whether to use informal IO or formal board procedures. `TOC`

(3)  In addition to individuals listed in **AR 15-6**, Para 2-1, the Battalion Commander/PMS may appoint a formal board.

(4)  Investigating officers using informal procedures will use **DA Form 1574** for the report of proceedings.

(5)  Investigating officers using informal procedures will provide Cadets with an opportunity for an in person or face-to-face meeting.

(6)  Cadets subject to informal procedures shall be afforded the same rights to counsel as a respondent to a formal board.

(7)  Investigating Officer/Board President will use the scripts at **Figure 6-7** or **6-8** when conducting the proceedings. The transcripts of proceedings should be a typed summary of proceedings and testimony unless sworn statements were used.

## 6-2.  Battalion Cdr/PMS Actions When Disenrollment is Required `TOC`

a.  Identify the basis for action. The Battalion Commander/PMS identifies one or more bases for disenrollment as listed in **AR 145-1**, Paragraph 3-43a to include any breach of contract not specifically listed in **AR 145-1**.

b.  Notify the Cadet.  The Battalion Commander/PMS notifies the Cadet in writing of his/her intention to initiate disenrollment action and places the Cadet on LOA in order to suspend scholarship benefits/subsistence.  A sample format of the notification/acknowledgment memorandum and Addendum to Part II, Agreement of Cadet Contract offering the Cadet the active duty option, is at **Figure 6-1** and **Figure 6-1a**. **Figure 6-5** contains specific guidance, PMS Guidance - Preparation of Disenrollment

A181

Correspondence, in preparation of the notification/acknowledgment memorandum to the Cadet. At a minimum, the notification memorandum must include the following:

(1)  The specific reason(s) and regulatory basis (i.e., subparagraph in **AR 145-1**, Paragraph 3-43a, for disenrollment action;

(2)  If a scholarship Cadet, the specific dollar amount of funds expended on the Cadets behalf in the form of scholarship assistance (obtain the amount of scholarship funds expended from Cadet Command, RMD, e-mail: **CADETPAYCDTCM@usaac.army.mil**. When requesting the amount, include Cadet's name, SSN, school fice code and Cadet's current status, e.g., "F" status, etc.);

(3)  That the Cadet may dispute the amount and validity of the debt by presenting evidence on the matter during the disenrollment hearing;  and

(4)  That if disenrolled, the Cadet may appeal the debt by forwarding a written appeal to the Commander, U.S. Army Cadet Command within 14 days of notification that the disenrollment action has been approved, unless the Cadet waived his/her rights to a hearing.  The Commander, U.S. Army Cadet Command will forward the appeal to Army G-1, if appropriate.

c.  Provide information to the Cadet.  The Battalion Commander/PMS will enclose the following with the notification/acknowledgment:

(1)  A copy of all documentary evidence that supports the disenrollment action.

(2)  A Privacy Act Release Statement (**CC FM 133-R**).  **TOC**

(3)  The Special Active Duty Provision (SADP) Statement of Understanding (**CC FM 213-R**) providing the Cadet the opportunity to be expeditiously ordered to active duty (normally within 30 days) in fulfillment of the Cadet contractual agreement.

(4)  The Addendum to Part II, Agreement of Cadet Contract (**Figure 6-1a**).  This Agreement provides the Cadet the option to be ordered to active duty, if eligible, (within **60 days** after the current projected graduation date, or dismissal/withdrawal from the school in which enrolled, whichever occurs first) in fulfillment of the Cadet contractual obligation.

d.  Notification procedures.

(1)  General. These notification procedures apply whenever this chapter requires that cadre provide notice or rebuttal opportunities to a Cadet.  When a Cadet fails to respond to a required notification, such failure does not justify failing to provide the Cadet with subsequent notifications required by this regulation.  Therefore, if the Cadet fails to respond to notification of initiation of disenrollment, the Battalion Commander/PMS or IO must nonetheless provide notification to the Cadet of his opportunity to appear before the board and the Battalion Commander/PMS must ensure that the Cadet is provided an opportunity to rebut the findings and recommendations upon completion of the investigation.

A182

(2)  Service of process should be accomplished by direct delivery or by certified mail, return receipt requested, to the Cadet's last known mailing address.  When practicable, personal delivery is preferred.  **TOC**

(3)  Alternate addresses.  Should the Postal Service fail to make delivery because the Cadet no longer resides at the mailing address used, the Battalion Commander/PMS forward the notification to the Cadet's home of record/address listed when the Cadet enrolled/contracted, and/or all known addresses previously provided by the Cadet.

(4)  Non-Delivery.  Should reasonable efforts fail to result in documented delivery to the Cadet, the Battalion Commander/PMS should complete an MFR to record exactly what attempts were made to ensure delivery and the results of those attempts.  As indicated above, failure of a Cadet to respond to a required notification does not justify failing to provide the Cadet with subsequent opportunities to respond or provide rebuttal when required during or following these disenrollment procedures.  (2) Alternate Addresses.  Report of Proceedings 11c(2)Please make the following change as soon as possible to **CC Pam 145-4**.

e.  Waiver of board proceedings.  If the Cadet responds to the notification and elects to waive the right to a hearing, and does not dispute the scholarship debt, the procedures of Para **6-11** of this chapter apply and the Battalion Commander/PMS need not appoint an IO or board.

f.  Appoint IO or board.  The Battalion Commander/PMS will appoint a board of officers or IO IAW Para **6-4**, below if:

(1)  After **10** working days of the acknowledged receipt by the Cadet or a member of his/her family at the Cadet's address, the acknowledgment memorandum is not received by the Battalion Commander/PMS, or

(2)  The notification/acknowledgment memo is undeliverable.

## 6-3.  Determination of Disenrollment Procedures  **TOC**

If the Cadet does not waive his/her right to a hearing and/or, if scholarship Cadet disputes the debt, the Battalion Commander/PMS will use the following Paragraphs to determine disenrollment procedures:

a.  Investigating Officers (IOs).  The Battalion Commander/PMS will appoint an investigating officer (IO) to conduct an informal investigation for cases which fall under **AR 145-1**, Paragraphs 3-43a (1) through (12).

**EXCEPTION**:  Disenrollment under **AR 145-1**, Paras 3-43a (3), (5), (7) and (9) will be processed IAW Para **6-12**, below.  (Ensure Cadet is notified and placed on LOA IAW **AR 145-1**, Para 3-43c.)

b.  Formal boards.  The Battalion Commander/PMS must establish a formal board when there is reason to believe that a contracted Cadet--  **TOC**

(1)  Lacks the aptitude for military service (**AR 145-1**, Para 3-43a(13)).

(2)  Possesses undesirable character traits (**AR 145-1**, Para 3-43a(14)).

A183

(3)  Is indifferent to or has a lack of interest in military training (**AR 145-1**, Para 3-43a(15)).

(4)  Is in breach of the terms (includes willful evasion) of an Army ROTC student contract (**AR 145-1**, Para 3-43a(16)).

## 6-4.  Appointment of Formal Board/IO  `TOC`

a.  Appointment memo.  Use the sample appointment memorandum, **Figure 6-2** to appoint a board of officers or an investigating officer.  The Battalion Commander/PMS is normally the appointing authority, unless the Battalion Commander/PMS may be called as a witness or is impartial due to past involvement with the Cadet.  Brigade commanders may appoint a board or an IO; however, such cases are exceptions to the norm.

b.  Board composition.  A board may be comprised of one, three or more (i.e., uneven) commissioned officers as voting members.  Reserve officers will be either in an Active Duty or Active Reserve status.  Army National Guard officers will not be appointed to disenrollment boards unless they also possess a USAR commission and are in Active Duty or Active Reserve Status.  The Battalion Commander/PMS may not appoint himself/herself to the board.  Under no circumstances will civilian institutional representatives or faculty members be appointed to a board of officers.  Contract cadre may not be appointed to boards.  `TOC`

c.  Recorder.  While not required, a nonvoting recorder should be designated, especially if a single member board is appointed.  In any event, a recorder must be a commissioned officer.

d.  Board president.  The board president shall be a field grade officer unless the appointing authority determines that this is not practical due to military exigencies (see Para **6-1**f(1)).  If this determination is made, it will be made in writing and included in the file.

e.  Oral Appointments.  Although, in rare instances, appointments may be verbal due to time constraints, an appointment memorandum as required by **AR 15-6**, Paragraph 2-1b, must be issued in writing as soon as practical thereafter.

## 6-5.  Actions Taken Prior To Formal Board/IO  `TOC`

a.  Notify the Cadet.  The investigating officer, junior member of the board, or recorder is responsible for preparing a Cadet notification memorandum which shall comply with **Figure 6-3**.  This notice informs the Cadet-respondent of the time, place and exact purpose(s) of the board or investigation.

b.  Notification procedures.  The investigating officer, junior member of the board, or recorder will utilize the methods listed under   "Notification Procedures" at Para **6-2**d, above and will sign the notification.  The Cadet-respondent should receive this notice at least 5 working days in advance of the first session of any board.  Proof of delivery, along with a copy of the notice, will be included in the report of proceedings.  All reasonable efforts should be made to ensure that the Cadet is given actual notice of the impending board action or investigation.  If the Cadet-respondent requests a delay for good cause, at

least one reasonably short (e.g., **2-5** days) delay should be granted and documented in the file.

c.  Distribute information to board members/others.  Ensure that all records and documents regarding the case are furnished, when appropriate, to the members of the board and, subject to security requirements, to any named Cadet-respondent or his/her counsel. **TOC**

d.  Notify witnesses.  Provide 5-day minimum written notice to the Cadet-respondent's witnesses, and all others concerned (including, when appropriate, members of the board) of the date, hour, and exact place of convening.

e.  Secure witnesses.  Arrange to have witnesses present at the hearing who are to testify in person (including witnesses desired by the Cadet-respondent) and a reporter and interpreter, if required.  At least one university representative (an administrator or faculty member appointed by the institution) will be permitted to observe any hearings that may arise from the investigation.  The invitation and acceptance/declination must be included

in the file. Should the representative decline the invitation, no other review by the institution is required, except that cadre should honor any specific request for review of the completed file.

f.  Secure location.  Obtain a suitable room for the hearing, and see that it is in order.  Procure requisite stationery and other supplies to include electrical recording device if one is necessary.

g.  FOR SCHOLARSHIP CADETS:  Request **DA Form 5315-R**, U.S. Army Advanced Education Financial Assistance Record from Cadet Command, RMD, Pay Operations Division via e-mail address: **CADETPAYCDTCM@usaac.army.mil** Include Cadet's name, SSN, contract date, current status, school FICE code, and an ROTC POC.

## 6-6.  Investigating Officer (IO) (Informal).  **TOC**

Informal investigations will be conducted IAW **AR 15-6**, Chapter 4 and this Paragraph.

a.  Interview the Cadet.  The IO will afford Cadet the opportunity to appear personally before the IO.  At a minimum, the IO will inquire of the Cadet whether the Cadet disputes the basis for disenrollment and whether the Cadet disputes the amount and validity of any applicable scholarship debt.

b.  Obtain evidence.

(1)  Standard.  The proceedings will be conducted to obtain the best evidence reasonably available.  Investigating officers will use **AR 15-6**, Paras 3-4 and 3-6, in determining whether evidence is proper and admissible.

(2)  Required evidence.  Evidence must be obtained to support disenrollment or retention, as appropriate, and to support recommendations regarding call to active duty, recoupment of scholarship funds, or waiver.  At a minimum, evidence must be included to support the findings and recommendations required in Para **6-8**, below.

A185

c.  Take/summarize testimony.  All testimony will be summarized in writing (**DA Form 2823** should be used) and witnesses will be sworn when practical.  Witnesses will be informed prior to making a statement if testimony is to be recorded.

d.  Invite a university representative.  IOs will invite a university representative to attend any hearings (note: a hearing is not required but may be provided) or to review the record of proceedings.

e.  Counsel.  Cadets are entitled to the same right to counsel as stated below in Para **6-7**b.  **TOC**

f.  Manner of investigation.  As long as the requirements at Paras a through e above are satisfied, the IO may conduct the investigation in any manner which is most efficient to determine the facts.  For example, an investigation into failing to meet PT standards may be as simple as reviewing the PT card and counseling statements, gathering required documents of **Figure 6-6** and talking to the Cadet. However, if the Cadet presents matters for consideration, the IO shall document and address each issue.  The IO shall document that he or she inquired whether the Cadet disputed the grounds for disenrollment and whether the Cadet disputed the amount or validity of any scholarship debt and the bases for such dispute.

g.  Report.  After completion of the investigation, the IO will complete the report of proceedings IAW Para **6-8** below.

## 6-7.  Formal Board Proceedings.  **TOC**

The following procedures apply to formal boards.  Formal boards will be conducted IAW **AR 15-6**, Ch 5 as modified here.  All board members will read **AR 15-6** prior to the board convening. (Informal investigations shall follow procedures in Para **6-6** above.)

a.  Advise Cadet of rights.  The Cadet-respondent is entitled to be present at all open sessions of the board.  As a preliminary matter, the president should advise the Cadet of the following rights and document doing so in the report of proceedings.

   (1)  Examine and object to the introduction of any real or documentary evidence.

   (2)  Cross-examine and object to the testimony of government witnesses.

   (3)  Call witnesses and otherwise introduce evidence.

   (4)  Testify as a witness, and that no adverse inference may be drawn from the exercise of the privilege against self-incrimination or election not to testify.  **DA Form 3881** (Rights Warning Procedure/Waiver Certificate) should be used (**AR 15-6**, Para 3-6c(5)).  If the Cadet refuses to answer a question, the basis for refusal must be noted for the record.

   (5)  Challenge/object to any board member.  However, the president makes final determination in this regard.

   (6)  Dispute the amount or validity of the scholarship debt as listed on the **DA Form 5315-R**.

A186

b.  Right to counsel.  In addition to the rights above, the board president will remind the Cadet of the right to counsel, as follows:

(1)  Cadets are entitled to any reasonably available military officer to serve as counsel. Cadets may also hire their own civilian counsel.  They are not entitled to representation by a JAG officer or a civilian counsel at military expense.  `TOC`

(2)  Counsel is entitled to be present at all open sessions of the board; but is not allowed to speak/introduce evidence or make statements during proceedings.

(3)  If the Cadet-respondent waives the right to counsel that fact must be recorded in the board proceedings.

(4)  Counsel will be given a reasonable opportunity to consult with the Cadet-respondent.  Reasonable opportunity does not include consulting before or after each and every question or statement.

c.  University representative.  Invite a university representative to attend the proceedings or to review the record of proceedings, if not in attendance.

d.  Evidence.

(1) Standard.  The proceedings will be conducted to obtain the best evidence reasonably available.  Boards will use **AR 15-6**, Para 3-4 and 3-6 in determining whether evidence is proper or admissible.  `TOC`

(2) Required evidence.  Evidence must be obtained to support disenrollment or retention, as appropriate, and to support recommendations regarding call to active duty, recoupment of scholarship funds, or waiver. At a minimum, evidence must be included to support the findings and recommendations required in Para **6-8** below.

e.  Cadet's presence.  The Cadet should be present at the hearing; however, if after proper notice, he/she does not appear for the hearing, the board of officers may proceed with the hearing and make findings and recommendations in the Cadet's absence.  If the board is held in the Cadets absence, all efforts to secure the Cadets presence and reason for absence (if known) must be made part of the record.

f.  Testimony.

(1)  A Privacy Act Statement, **ROTC CC Form 133-R**, will be furnished to and signed by the Cadet respondent prior to making statements or giving testimony.  A copy of the statement will be enclosed with the report of proceedings.  The statement may also be provided orally; however, the officer who provided the statement will prepare a memo to that effect for inclusion into the report of proceedings.

(2)  During the board proceeding, witness statements should be under oath and be elicited by questions and answers.  These statements shall be summarized and included in the report required by the appointing authority (a tape or video recorder may be used for that purpose; however, witnesses will be informed prior to being taped).

A187

g.  Report.  At the completion of board proceedings, the board president (or recorder, if appointed) will prepare the report of proceedings IAW Para **6-8** below.

## 6-8.  Report of Proceedings  `TOC`

a.  Findings and recommendations.  Findings and recommendations must be supported by the facts contained in the record, and will not be based upon personal knowledge not documented in the report of proceedings.

(1)  Findings.  A finding is a statement of fact or conclusion based on the evidence of record.  Findings must be supported by substantial evidence and that evidence must be of greater weight than the evidence that would support another conclusion.  The findings will be stated in a form that gives a coherent and clear recital of the facts established by the evidence and should relate to and must be sufficient to support the recommendation.  Findings should be arranged in a logical order.  The board or investigating officer must establish and make the following findings.  The board or IO may also make additional findings as appropriate:  That the Cadet--

(a)  Did/Did not enter into a valid Army Senior Reserve Officers' Training Corps (ROTC) Cadet Contract () **DA FM 597**/**597-3**).

(b)  Did/Did not receive advanced educational assistance in the form of ROTC scholarship monies from the U.S. Government in the amount of $_____.  Such educational assistance constitutes a valid debt to the U.S. Government.

(c)  Did/Did not voluntarily fail to complete the requirements of the ROTC Cadet Contract.  Voluntary failure was/was not found in that the Cadet did/did not (reasons).  `TOC`

(d)  (IF APPLICABLE) Due to misconduct, Did/Did not fail to complete the requirements of the ROTC Cadet Contract in that, because of misconduct the Cadet no longer remains eligible for enrollment in the required military training.

(1)  If the board or investigating officer enters a finding of misconduct in **Para (d)** above, the board or investigating officer must also enter findings that--

(a)  The Cadet exhibited the following behavior that constitutes misconduct, e.g., stealing, use/possession of drugs, etc.; and

(b)  The behavior described above Does/Does not qualify as misconduct under 10 USC 2005(a) (3) that warrants recoupment of financial assistance expended by the U.S. Government.

(2)  Recommendations. Recommendations must be appropriate to and warranted by the findings.  Based on the above required findings, the board or IO must recommend that the Cadet--

(a)  Should/Should not be retained in ROTC as a scholarship Cadet.

(b)  Should/Should not be retained in ROTC as a Non-Scholarship Cadet.

A188

(c)  Should/Should not be disenrolled from ROTC UP **AR 145-1**, Paras 3-43(a) ( ) and/or ( ).

(d)  Should/Should not be released from the ROTC contractual obligation.

(e)  Should/Should not be ordered to active duty in an enlisted status for a period of ( ) years (see contract for active duty obligation).  **TOC**

(f)  Should/Should not be ordered to repay his or her valid debt to the U.S. Government comprised of advanced educational assistance received in the form of scholarship benefits.  If not, provide reasons for concluding that the Cadet should not be ordered to repay monies expended for advanced educational assistance.

b.  Recoupment/active duty.  For disenrollments UP **AR 145-1**, Para 3-43a (4), (6) and (8) through (17), recoupment or call to active duty is generally appropriate. Recommendation not to repay or be ordered to active duty will be the exception and must

be thoroughly documented with complete written justification for supporting waiver. The following reasons are unacceptable for not requiring recoupment or active duty, as appropriate --

(1)  Discontinuation of military career objective.

(2)  Other offers of employment.

(3)  Academic failure deemed willful on the part of the Cadet.

(4)  Withdrawal from school or ROTC.

(5)  Failure to maintain APFT/height/weight standards.

(6)  Breach of contract (including voluntary breach).

(7)  Inaptitude for MS/indifferent attitude.

(8)  Misconduct.

c.  Disenrollments UP **AR 145-1**, Para 3-43a (2), (3), (5) and (7) do not normally call for recoupment or active duty, except for failure to disclose a fact or condition that will be processed in accordance with Para **6-12** below.

d.  Procedures.  Processing for recoupment or order to active duty will be IAW **6-13** below.

e.  Minority Report.  A board composed of more than one officer arrives at its findings and recommendations by voting.  A majority vote of the voting members present makes the determinations on the questions before the board (note quorum must be present for votes UP **AR 15-6**).  A minority report may be prepared by any member who disagrees with the majority's decision (**AR 15-6**, Para 3-13).  **TOC**

f.  Final Board action.

*Page 90 of 126*

(1)  **DA Form 1574**.  The report of the proceedings of an investigating officer or a board of officers shall be prepared on the current edition of **DA Form 1574**.  Enclosed or attached to the **DA Form 1574** will be items in order as listed in **Figure 6-6**.

(a)  The record will be clear and legible.

(b)  Erasures, insertions, and other changes will be initialed by the investigating officer, the recorder or another member of the board officers.

(c)  Additional pages will be numbered at the bottom, and a reasonable margin will be left at the top, bottom and sides of each page.

(2)  Approval Authority.  For approval authority of disenrollment proceedings, see **Appendix B.**

## 6-9.  Appointing Authority Actions After Receiving Report of Proceedings  `TOC`

a.  Review.  The appointing authority will review the proceedings to ensure they comply with **Figures 6-5** and **6-6** prior to taking any action.

b.  Concur or modify.  The battalion commander/ PMS (or other appointing authority) will specifically indicate whether each recommendation concerning disenrollment, recoupment, and/or call to active are approved on **DA Form 1574** or an attached sheet.  The appointing authority will explain the basis for any non-concurrence.

c.  Forward to Cadet for rebuttal.  After the above action, the Battalion Commander/PMS will forward a copy of the record to the Cadet giving him/her an opportunity to rebut the findings and recommendations IAW **AR 15-6**, Paragraph 1-8c.  `TOC`

(1)  Notification of rebuttal rights.  The Battalion Commander/PMS must use the same procedures to notify the Cadet of his/her rebuttal rights as listed under "Notification Procedures" at Para **6-2**d, above.  A Cadet's failure to respond to earlier notifications during the disenrollment process does not justify failure to make reasonable efforts to provide the Cadet with an opportunity to rebut the board findings and recommendations.

(2)  In all cases, the Battalion Commander/PMS will include a record of the Cadet's rebuttal notice and any rebuttal received as an exhibit to the **DA Form 1574**.

d.  Complete **DA Form 1574**.  The Battalion Commander/PMS (or other appointing authority) will record his/her action as final approval authority on **DA Form 1574**, Section VIII (provided the Battalion Commander/PMS was not a witness.  If the Battalion Commander/PMS was a witness, the board must be forwarded to the next echelon for approval authority.  The appointing authority will review the rebuttal (if any) prior to completing this section and forwarding his/her recommendation(s) for approval and final action as required below.

A190

**6-10.  Processing Completed Disenrollment Actions** `TOC`

a.  Completed board actions (IOs and formal) whether recommending retention or disenrollment, will be processed for approval as follows:

(1)  Non-Scholarship Cadets.  The Battalion Commander/PMS will forward the appropriate copies of the board proceedings to Headquarters, Cadet Command for final decision IAW **App B**, Approval Authority/Flow of Cadet Actions and Supporting Documentation for Cadet Actions matrixes.

(2)  Scholarship Cadets.  The Battalion Commander/PMS will forward the appropriate copies of the board proceedings to Headquarters, Cadet Command for final decision IAW **App B**, Approval Authority/Flow of Cadet Actions and Supporting Documentation for Cadet Actions matrixes.  (**NOTE**:  *All disenrollment determinations concerning scholarship Cadets are made by Cadet Command.  In these cases, the appointing authority's actions serve as a recommendation.)*

(3)  SMP Cadets.  If the Cadet meets the CGs criteria for involuntary call to AD, forward through proper channels to Headquarters, Cadet Command, for a final decision.  In all cases ensure SMP disenrollment actions clearly reflect the Cadet's status with his/her unit and contain a **DA 4824-R** or **NGB 594-1**, as applicable.

b.  Administrative matters.  Payment of subsistence allowance will be stopped on the date the Cadet is placed on leave of absence pending disenrollment action.  The Cadet Data Base will be updated to reflect the LOA action.  The disenrollment information will also be updated in the Cadet Data Base within **5** working days once the final disenrollment decision is received

c.  Cadet disposition after boards.  `TOC`

(1)  A Cadet pending disenrollment will not be authorized to participate in ROTC as a conditional student, or be permitted to audit the course, except in instances where the institutional policy authorizes such participation.

(2)  Cadet disposition will be based on the approved recommendations in Paragraph **6-8**a(2) above.  If Active Duty is not ordered, Non-Scholarship Cadets will:

(a)  If non-prior service, be discharged upon disenrollment.  Effective date of discharge will be the date of disenrollment from ROTC.

(b)  If prior service, be transferred to the IRR.

(c)  If SMP participant, remain obligated to complete their Military Service Obligation (MSO) with their Reserve/NG unit upon disenrollment from the ROTC program.  If a scholarship Cadet, also required to repay scholarship funds expended on their behalf.

(3)  Scholarship Cadets subject to recoupment will be processed IAW Para **6-13** below.

(4)  Any scholarship or Non-Scholarship Cadet under consideration for call to active duty will not be discharged from ROTC until determination has been received from Headquarters, Cadet Command.  If it is determined that the Cadet will be ordered to

A191

active duty, the Cadet will not be discharged, and appropriate active duty orders will be issued by Cadet Command.

(5) Call to active duty will be processed in accordance with **AR 135-210** and Para **6-13** below.

**6-11.  Waiver of Board Procedures**.  **TOC**  The following procedure serves as an alternative method for disenrollment of scholarship and Non-Scholarship ROTC Cadets. Under this procedure Cadets who are being disenrolled may waive their right to a board of officers or appointment of an investigating officer as required by directives and regulations (see **Figure 6-1** for sample memorandum).

a.  No university official participation is required.

b.  **Cadet Statements With Waiver.**  If the Cadet submits statements with the response to notification, Battalion Commander/PMS will review and determine if a board of officers

or an investigating officer should be appointed.  If a scholarship Cadet disputes the debt during the waiver process, an I.O. or formal board, as appropriate, must be convened to investigate the facts of the case, and make recommendations concerning disenrollment and the validity of the debt.

c.  **Actions following Cadet waiver of board procedures.**  If the Cadet responds to the notification and elects to waive the right to a hearing, the following applies

(1)  The Battalion Commander/PMS will forward the **CC Form 131-R** with appropriate documentation through channels to HQCC for final decision IAW **Appendix B.**.

(2)  Non-Scholarship Cadets.  HQCC is the disenrollment authority for all Non-Scholarship Cadets who meet the CGs criteria for involuntary call to AD - MS II, MS IIIs, MSIV, MSV, MSVI, and Completion Cadets.  The Battalion Commander/PMS is the disenrollment approval authority for Non-Scholarship MS II and MS III SMP Cadets only.  **TOC**

d.  Copies of the disenrollment action will be retained in the Cadet's file for two (2) years. Legal review of these cases is not required.  If Active Duty is not ordered, the following applies --

-- If a non-prior service Cadet, the Battalion Commander/PMS will disenroll/discharge the Cadet with no further obligation.

-- If a member of the SMP, the Battalion Commander/PMS will release to the control of ARNG unit or USAR TPU for fulfillment of current enlistment obligation and any outstanding statutory obligation, if appropriate.

-- If prior service (non-SMP), the Cadet will be transferred by Battalion Commander/PMS to the IRR for completion of the contractual and any remaining statutory military service obligation (MSO).

e.  "If the Cadet (whether scholarship or Non-Scholarship) elects and is eligible for the Active Duty option or the Special Active Duty Provision (**SADP) option**, forward the disenrollment action directly from the battalion to Cadet Command IAW **App B**.  If Active

Duty is appropriate, a copy of the orders will be furnished to the Battalion Commander/PMS once issued."

f. **Action by higher HQ**.  If the case is determined administratively or legally insufficient, the file will be returned to the battalion commander/ PMS for corrective action which may include appointment of a board or an investigating officer or retention of the Cadet in the program as appropriate.

g. **Revocation of waiver.**  If the Cadet elects to appear before an investigating officer or a board of officers as appropriate, or if, having previously waived the right to a hearing by a board or an investigating officer, subsequently elects to appear before a board or investigating officer, as appropriate, prior to a final decision being made, the action will be processed in accordance with Para **6-3**.

## 6-12.  Special Situations   TOC

a. Medical disenrollments.  Medically disqualified Cadets are handled as follows:

(1) Scholarship Cadets.  Battalion Commander/PMS will forward the **CC FM 131-R** (ensuring blocks 18 and 19 are signed and dated by the Cadet if the Cadet is contracted) when requesting a medical determination/waiver to HQ, Cadet Command. (Appointment of I.O. or board of officers is not required for disenrollments.)

(a)  If the Cadet Command Surgeon determines that the Cadet is medically disqualified and not eligible for waiver, and there is no failure to disclose, the Cadet will be disenrolled.

(b)  Failure to disclose.  If the Cadet Command Surgeon, or other staff or cadre, determine that the Cadet may have failed to disclose a pre-existing medical condition on his or her entrance physical or at the time of contracting, the Battalion Commander/PMS will appoint a formal board and follow the disenrollment procedures applicable to misconduct.  The board will make specific findings to support or refute the failure to disclose and will specifically make a determination whether any failure to disclose constituted misconduct.  Whether the findings support or refute failure to disclose, the board will make recommendation on recoupment in accordance with Paras **6-8**a(2) & b above.

(c)  Recoupment/AD.  Cadets disenrolled for medical disqualification will not be ordered to active duty or recommended for recoupment, except as directed above. Recoupment would be proper if the medical condition resulted from an act of misconduct, however in that case the disenrollment will not be processed as a medical disqualification.

(2)  Non-Scholarship Cadets.  The Battalion Commander will submit a request for medical determination to Headquarters, Cadet Command.  The Cadet Command Surgeon is the reviewing/decision authority concerning medical qualification. Appointment of an IO or board is not required.

b. Conscientious Objector.

(1)  **AR 600-43**.  The requirements of **AR 600-43** must be strictly followed for Conscientious Objector disenrollments.  Note that **AR 600-43** imposes special board notification and other procedures not contained in this pamphlet.  Any deviation from

*Page 94 of 126*

A193

the **AR 600-43** requirements will cause the record to be returned for corrective action, because deviations are generally unacceptable to the DA Conscientious Objector Review Board.

(2)  If a contracted Cadet makes a request for conscientious objector status, the Battalion Commander/PMS will:

(a)  Immediately place the Cadet on LOA.

(b)  Instruct the Cadet to submit an application for discharge/conscientious objector status on **DA Form 4187** in accordance with **AR 600-43**, Chapter 2.

(c)  Arrange for the Cadet to be interviewed by a military chaplain and a military contracted psychiatrist regarding the application and obtain their professional opinions in writing.  **TOC**

(d)  Appoint an investigating officer UP **AR 15-6** to conduct a hearing in accordance with **AR 600-43**, Paragraph 2-5, to determine if the declaration of conscientious objection is bona fide, and make appropriate recommendations.

(e)  Submit the findings of the investigating officer, the Cadets completed **DA Form 4187**, chaplain and psychiatric evaluation, and appropriate Cadet records through Brigade to Headquarters, Cadet Command.  The Battalion Commander/PMS will ensure that the application is administratively correct in accordance with **AR 600-43** (to include the required number of copies) prior to endorsing the request and forwarding to Brigade headquarters.  If the Cadet making the application is a scholarship Cadet, the Battalion Commander/PMS will also include a completed **CC FM 131-R** requesting scholarship termination.

(3)  Cadets whose request for conscientious objector status is approved will be disenrolled and are ineligible for any further or future participation in the ROTC Program.  Waivers for this ineligibility are not authorized.

(4)  Recoupment/AD.  Cadets disenrolled for Conscientious Objector status will not be ordered to active duty; however recoupment of scholarship benefits is normally appropriate.  Any recommendation to waive recoupment must be specifically explained in the findings and recommendations.

c.  Personal hardship/dependency.  **TOC**

(1)  **AR 635-200**.  Personal Hardship or Dependency.  These individuals will be processed under the provisions of **AR 635-200**, Chapter 6.

(2)  Recoupment/AD.  Scholarship Cadets who have not reached their obligation point (MS II class) may withdraw from the program or be disenrolled by the Battalion Commander/PMS without initiation of disenrollment procedures.  If 4-yr, MS I scholarship Cadets are disenrolled prior to entering the first class of MS II, repayment of scholarship funds expended are not required. (**EXCEPTION**:  *Four-year Green-to-Gold scholarship Cadets are obligated from the first class of MS I year*.)

d.  Disenrollment at Cadet's own request.

A194

(1)  Non-Scholarship basic course Cadets.  Battalion Commanders may disenroll these Cadets upon their request by updating Cadet Data Base.

(2)  Scholarship Cadets who have not reached their obligation point may withdraw from the program or be disenrolled from the ROTC program by the Battalion Commander/PMS without initiation of disenrollment procedures.  **EXCEPTION**:  *Four-Year Green-to-Gold scholarship Cadets are obligated from the first class of MS I year.*

(3) Obligated Cadets may not withdraw at their own request without obligation except as specified in this chapter.

e.  USMA Appointments.  Cadets who accept USMA appointments are viewed as accessing into the Army and, as such, must request release for the specific purpose of entering USMA, which disenrollment authorities will generally approve.  However, such approval does not relieve the student of the service obligation incurred under any ROTC scholarship contract.  Should the Cadet fail to complete the USMA program, accept a commission when tendered, or serve the ROTC service obligation, the Cadet will be obligated to satisfy his or her contractual obligation through either active enlisted service or repayment of all scholarship financial assistance.  **TOC**

f.  See Para **6-14** below for procedures prior to disenrollment/discharge of Cadets.

## 6-13.  Recoupment or Order to Active Duty  **TOC**

a.  Scholarship Cadets.

(1)  Once the disenrollment procedures are approved by Headquarters, Cadet Command, action will be taken to notify the Cadet of the final results and his/her obligation IAW appropriate regulations.  SMP scholarship Cadets are required to repay scholarship funds expended on their behalf, in addition to completing the military service obligation in their unit.

(2)  Scholarship Cadets will not be disenrolled or discharged without directive from Headquarters, Cadet Command.

b.  Non-Scholarship Cadets.  Once disenrollment procedures are approved by the appropriate approval authority (Headquarters, Cadet Command, for Cadets who elect a hearing; see Para **6-11**c(2) above for Cadets who waive their rights to a hearing), the following guidance applies --

(1)  If Cadet is subject to active duty, Headquarters, Cadet Command will issue orders placing the Cadet on active duty UP **AR 135-210**.

(2)  When the disenrollment authority approves disenrollment without active duty for Non-Scholarship Cadets, the Battalion Commander/PMS will discharge the Cadet if BT or IADT has not been completed.  Effective date of discharge will be the date of disenrollment from ROTC.  Cadets who have completed BT/IADT will be transferred to the IRR.  SMP participants remain obligated to complete their Military Service Obligation (MSO) with their Reserve Component unit upon disenrollment from the ROTC program.  If the Cadet meets the CG's criteria, he/she may be involuntarily ordered to active duty IAW the terms of the contractual agreement.

**6-14.  Procedures Prior To Discharge**. TOC

Cadets will not be disenrolled/discharged without authorization from appropriate authority. In any instance, whether board, IO or waiver of board procedures are used, the Battalion Commander/PMS will ensure

a.  Cadet Data Base is updated within 5 working days after receipt of decision by disenrollment authority, termination authorization control number, reason for and date of disenrollment, etc.

b.  All issued uniform and equipment items are recovered.

c.  Discharge order is mailed to Cadet.

d.  **DD Form 785**, along with a copy of the **CC Form 139-R**, is prepared and retained in the Cadet's ROTC **Cadet 201 File**.


OFFICIAL:

//original signed//
GREGORY J. DYEKMAN
Colonel, GS
Chief of Staff

//original signed//
JAMES M. MCDONALD
Major General, US Army
Commanding


/s/
LEVEN R. PRESSLEY-SANDERS
Colonel, GS
Office of the Deputy Chief of Staff, G1


DISTRIBUTION:

Brigade Commanders
Battalion Commander/PMS, Senior ROTC Host Battalions
OIC, Senior ROTC Partnership Schools

A196

## Abbreviations   TOC

| ACRONYM | DESCRIPTION |
|---|---|
| AEO | Alternative Entry Option |
| AHRC-Fort Knox | Total Army Personnel Command |
| AIDS | Acquired Immunodeficiency Syndrome |
| APMS | Assistant Professor of Military Science |
| APFT | Army Physical Fitness Test |
| ARNG | Army National Guard |
| ARPERCEN | Army Reserve Personnel Center |
| CGPA | Cumulative Grade Point Average |
| CORB | Conscientious Objector Review Board |
| CTLT | Cadet Troop Leader Training |
| DCC | Deputy Camp Commander |
| DENTAC | Army Medical Department Dental Activity |
| DFAS-D | Defense Finance and Accounting Service Denver Center |
| DODMERB | Department of Defense Medical Examination Review Board |
| ECL | English Comprehension Level |
| EEO | Enrollment Eligibility Office |
| FECA | Federal Employees Compensation Act |
| GPA | Grade Point Average |
| HIV | Human Immunodeficiency Virus |
| IO | Investigating Officer |
| IRR | Individual Ready Reserve |
| ITO | Immediate Training Officer |
| LOA | Leave of Absence |
| MEDCEN | Army Medical Department Medical Center |
| MEDDAC | Army Medical Department Medical Activity |
| MJC | Military Junior College |
| MOS | Military Occupational Specialty |
| MPRJ | Military Personnel Records Jacket |
| MSO | Military Junior College |
| MS | Medical Waiver Review Board |
| OBC | Officer Basic Course |
| OSB | Officer Selection Battery |
| OWCP | Office of Workers Compensation Program |
| PE | Physical Examination |
| PMS | Professional Military Science |
| RE | Reenlistment Eligibility |
| RMD | Resource Management Division |
| ROTC | Reserve Officers Training Corps |
| SIR | Senior Institutional Representative |
| SMP | Simultaneous Membership Program |
| SROTC | Senior Reserve Officers Training Corps |
| STO | Senior Training Officer |

A197

## Abbreviations 

**(continued)**

| ACRONYM | DESCRIPTION |
|---------|-------------|
| THC | Cannabis (Marijuana/Hashish) |
| TPU | Troop Program Unit |
| USAR | United States Army Reserve |
| VA | Department of Veterans Affairs |

A198

## Appendix A   TOC

**References**

Required and Related Publications

**AR 15-6**
Procedures for Investigating Officers and Boards of Officers

**AR 25-400-2**
The Modern Army Recordkeeping System (MARKS)

**AR 40-3**
Medical, Dental, and Veterinary Care

**AR 40-29**
Medical Examination of Applicants for United States Service Academies, Reserve Officers Training Corps Scholarship Programs, including the Air Force, Army and Navy Two- and Three-Year College Scholarship Program (CS), and the Uniformed Services University of the Health Sciences (USUHS).

**AR 40-330**
Rated Codes and General Policies for Army Medical Department Activities

**AR 40-501**
Standards of Medical Fitness

**AR 135-91**
Service Obligations, Methods of Fulfillment, Participation, Requirements, and Enforcement Procedures

**AR 135-175**
Separation of Officers

**AR 135-178**
Separation of Enlisted Personnel

**AR 140-10**
Army Reserve:  Assignments, Attachments, Details, and Transfers

**AR 145-1**
Senior Reserve Officers Training Corps Program:  Organization, Administration and Training

**AR 335-15**
Management Information Control System

A199

## Appendix A `TOC`

**References (continued):**

**AR 350-1**
Army Training and Education

**AR 600-8-2**
Suspension of Favorable Personnel Actions (Flags)

**AR 600-9**
The Army Weight Control Program

**AR 600-43**
Conscientious Objection

**AR 600-110**
Identification, Surveillance, and Administration of Personnel Infected with Human Immunodeficiency Virus (HIV)

**AR 601-210**
Regular Army and Army Reserve Enlistment Program

**AR 601-280**
Army Reenlistment Program

**AR 621-5**
Army Continuing Education System (ACES)

**AR 635-100**
Officer Personnel

**AR 635-200**
Enlisted Personnel

**NGR 600-200**
Enlisted Personnel Management

**Cadet Command Reg 145-1**
Army ROTC Scholarship Policy, Administration, and Procedures Instructions

**Cadet Command Reg 145-3**
Reserve Officers Training Corps Precommissioning Training and Leadership Development

**Cadet Command Reg 145-5**
U.S. Army ROTC LTC

A200

## Appendix B  TOC

**Approval Authority/Flow of Cadet Actions (October, 2007)**
**Cadet Actions and Standards Division**

| TYPE OF CADET ACTION | Bn | Bn to Bde | Bn thru Bde to Rgn | Bn thru Bde/Rgn to CC | Bn to CC |
|---|---|---|---|---|---|
| *Age Waivers Non-Scholarship (35 thru 39)(Electronic)* | | X | | | |
| | | | | | |
| *Immigrant Alien Participation* | X | | | | |
| *Non-Immigrant Alien Participation (Electronic)* | | | | X | |
| | | | | | |
| *Civil Conviction-Minor Non-Traffic:* | | | | | |
| - fine less than $250 (minus court cost) | X | | | | |
| - fine over $250 | | | X | | |
| *Civil Conviction-Minor Traffic Fine Over $250* | | | X | | |
| *Civil Conviction-Misdemeanors-No Jail/Confinement - (Electronic)* | | | | X | |
| | | | | | |
| *Civil Conviction - Offenses addressed in AR 145-1, 3-3e. Multiple misdemeanors and alcohol/drug-related driving offenses - accident/traffic citations involving alcohol that results in arrest, charges or adverse adjudication. (Alteration of initial offense due to later court proceedings does not alleviate the requirement for waiver submission.)* | | | | X | |
| | | | | | |
| *Self-Admitted Drug Use:* | | | | | |
| -Limited, experimental use (6 times or less) of marijuana within 6 mos of contracting-Bn Cdr. | X | | | | |
| -All others-CG, CC (Electronic) | | | | X | |
| | | | | | |
| *Re-enlistment (RE) Codes:* | | | | X | |
| -Compassionate/Hardship | | | X | | |
| -All Others-CG, CC | | | | X | |
| | | | | | |
| *Re-enrollment* | | | | X | |
| | | | | | |
| *Dependency Waivers(Electronic):* | | | | | |
| - Dual Military/Dual ROTC | | | | X | |
| - Non-Custodial parent (child support only) | | | | X | |
| - **Sole parent (SEE NOTE BELOW) | | | | X | |
| | | | | | |
| *Exceptions to Policy-AR 145-1:* | | | | | |
| - AFS-10 yrs or more | | | | X | |
| - Less than full-time status (last semester/quarter only) | | | | X | |
| - Extension of Stipend | | | | X | |
| | | | | | |
| *Medical Waivers (Non-Contracted)* | | | | | X |
| | | | | | |
| *Scholarship Disenrollment Boards* | | | | X* | X* |
| *Scholarship Waiver of Rights* | | | | X* | X* |
| | | | | | |
| *Non-Scholarship Disenrollment Boards* | | | | X* | X* |
| *Non-Scholarship Waiver of Rights* | | | | X* | X* |
| (For *all* Cadets that meet the criteria for involuntary call to AD, the CG, CC is the disenrollment authority. The criteria is *all* MS III, MS IV, MS V, MS VI and completion Cadets.) | | | | | |

**Appendix B**  TOC

**Approval Authority/Flow of Cadet Actions (October, 2007) (continued)**
**Cadet Actions and Standards Division**

| TYPE OF CADET ACTION | Bn | Bn to Bde | Bn thru Bde to Rgn | Bn thru Bde/Rgn to CC | Bn to CC |
|---|---|---|---|---|---|
| *Non-Scholarship Waiver of Rights SMP Cadets--(PMS is approval authority for MS II and MS III SMP Cadets only.)* | X | | | | |
| | | | | | |
| *Administrative Suspension (Scholarship Cadets)* | X | | | | |
| | | | | | |
| *Scholarship Termination w/Retention (Electronic)* | | | | X | |
| | | | | | |
| *Leaves of Absence* | X | X | X | | |
| | | | | | |
| *Probations - 1 - 3  (for Non-Scholarship Cadets)* | X | | | | |
| *Probations - Greater than 3 (for Non-Scholarship Cadets)* | | X | X | | |
| | | | | | |
| *If the PMS recommends involuntary call to AD, disenrollments must be forwarded through the chain of command for endorsement, recommendation and justification for approval (line-thru endorsements are unacceptable).  **SCHOLARSHIP AND NON-SCHOLARSHIP**:  If the AD option or SADP is chosen, forward the disenrollment directly from Bn to CC. | | | | | |
| | | | | | |
| **Waivers will not be granted for an applicant who has one or more dependents under 18 years old, unless the dependent child has been placed in the custody of the other parent, or adult relative or legal guardian by court order. | | | | | |
| | | | | | |
| **NOTE**:  *AT THE DISCREATION OF THE RGN CDR, ANY CADET ACTION MAY FLOW THROU BDE AND /OR RGN. DISAPPROVAL AUTHORITY MAY BE EXERCISED AT EACH COMMAND LEVEL.  DISAPPROVED WAIVER REQUEST NEED NOT BE SENT TO HIGHER AUTHORITY.* | | | | | |

A202

## Appendix B (continued) TOC

### Support Documentation for Cadet Actions (December, 2006)

| TYPE OF ACTOINS AND SUPPORTING DOCUMENTS REQUIRED BY CADET COMMAND | Note 1 CC 131-E | Note 2 CC 131-R | Note 3 DA 785 | Note 4 DD 214 / 220 | CC 104-R | Tran-scri-pt | Cou-rt Doc | Affida-vit | Entran-ce Physic-al & Med Recs | Finc-l Stm-t | CC 139-R | Note 5 DA 5248-R | Chklst Items As Appl |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **AGE** (Non-Scholarship>34)(Electronic) | X | | | | F | F | | | | | F | | |
| | | | | | | | | | | | | | |
| **NON-IMMIGRANT ALIEN*** (Electronic) | X | | | | | | | | | | F | | |
| *Civil Convictions:* | | | | | | | | | | | | | |
| **MISDEMEANORS-NO JAIL/CONFINEMENT** (Electronic) | X | | | | F | F | F | F | | | F | | |
| **MISDEMEANORS-JAIL/CONFINEMENT** | | X | | | X | X | X | | | | X | X | |
| **FELONIES**-more serious offense | | X | | | X | X | X | | | | X | X | |
| **ALCOHOLIC/DRUG RELATED DRIVING OFFENSES--** Accident/Traffic Citation involving alcohol that results in arrest, charges, or adverse adjudication. (Alteration of initial offense due to later court proceedings DOES NOT alleviate requirement for waiver submission.) | | X | | | X | X | X | | | | X | X | |
| | | | | | | | | | | | | | |
| **SELF-ADMITTED DRUG USE** (Electronic) -- Limited/experimental use of marijuana (<6 times within 6 months of contracting) - PMS authority. **All others - CG, CC.** | X | | | | | | | | | | F | | |
| | | | | | | | | | | | | | |
| **RE-ENLISTMENT CODE** | | X | | | X | | X | | IF APPL | | | | |
| | | | | | | | | | | | | | |
| **RE-ENROLLMENT** | | X | X | | X | X | | | | | X | | |
| | | | | | | | | | | | | | |
| **DEPENDENCY**** **(Electronic)** | X | | | | F | F | X | | | F | F | | |
| Dual Military/Dual ROTC | | | | | | | | | | | | | |
| Non-Custodial Parent (Child Support Only) | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **EXCEPTIONS POLICY** | | X | | IF APPL | X | X | IF APPL | | IF APPL | IF APPL | X | | |
| AFS 10 yrs. Or more | | | | | | | | | | | | | |
| Less than full-time status (last semester/quarter only) | | | | | | | | | | | | | |
| Extension of Stipend | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **MEDICAL DETERMINATIONS** (Contracted) | | X | | | | | | | X | | | | |
| **MEDICAL WAIVERS** (Non-Contracted) | | X | | | | | | | X | | | | |
| | | | | | | | | | | | | | |
| **DISENROLLMENT BOARDS** | (Refer to Chapter 6, Figure 6-6, Checklist, for documentation required for disenrollments.   Submit checklist with all disenrollments submitted to HQCC). | | | | | | | | | | | | X |
| | | | | | | | | | | | | | |
| **WAIVER OF RIGHTS** | (Refer to Chapter 6, Figure 6-6, Checklist, for documentation required for disenrollments.   Submit checklist with all disenrollments submitted to HQCC). | | | | | | | | | | | | X |
| | | | | | | | | | | | | | |
| **TERMINATION/RETENTION** (Electronic) | X | | | | F | F | | | | | F | | |

## Appendix B  TOC

**Support Documentation for Cadet Actions (December, 2006)(continued)**

**NOTES:**  Additional information required may be requested on a case-by-case basis.

1.  Use **CC FM 131-E** as the basic request/transmittal for submission of paperless (electronic) requests.  PMS verifies on this form that all supporting documentation in the Cadet's File at the Battalion (items indicated with the letter "F").

2.  Use **CC Fm 131-R** as the basic request/transmittal (vice memo or letter) for submission of paper requests.

3.  The PMS must obtain and review the **DD Form 785** before reenrolling any applicant who was previously under contract even if waiver/exception is not required.

4.  **DD Form 214** must contain portion with RE Code and narrative reason for separation; SMP Cadets: Include whether or not the Cadet is in good standing with unit and **DA 4824-R** or **NGB 594-1**, as applicable.

5.  **DA Form 5248-R** must accompany request for waiver for all infractions committed after submission of **SF 86**.

**\*  NOTE:**  PMS will verify on the form that he is in possession of the following documents for non-immigrant alien participation:   (1)  Dept of Justice Form I-151 or I-551; (2) I-94; (3) Letter from alien's country (Embassy) authorizing participation in ROTC; and (4) Documentation for medical qualification.
**\*\*NOTE:**  Dual Military/Dual ROTC Cadets must have an updated family care plan on file (**DA Form 5304** and **DA Form 5305**).

A204

## Appendix C TOC

**C-1.**   **The Enlistment/Reenlistment Document Armed Forces of the United States (DD Form 4 Series)**

**C-2.**  Preparation instructions for completion of the scholarship Cadet contract (**DA Form 597-3**, Jul, 2005) are as follows:

| ITEM | TITLE/DESCRIPTION | EXPLANATION AND/OR ENTRY |
|---|---|---|
| PART I | | |
| A. | STUDENT NAME | Enter applicant's complete last name (including compound full name, if applicable), full first name, middle initial, and any suffix including Jr., Sr., III, etc.  If applicant's given initial(s) rather than first and/or middle name, enter each initial(s). |
| B. | SOCIAL SECURITY NUMBER (SSN) | Enter applicant's SSN, separating division with a hyphen: **Example:  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** |
| C. | DATE OF BIRTH (YYYYMMDD) | Enter year, month and day sequence. **Example:  19800204** |
| D. | NAME OF EDUCATIONAL INSTITUTION | Enter the name of the degree-granting institution.  If partnership school, enter the name of both. **Example:  Learn University/Staly College** |
| E. | ADDRESS OF EDUCATIONAL INSITUTION | Enter complete address of the degree-granting institution. |
| F. | DATE EDUCATION COMMENCES (YYYYMMDD) | Enter the date education begins under this contract.  (DO NOT enter the date Cadet started college as a Freshman, unless 4-yr. scholarship recipient). |
| G. | COMPLETION DATE (YYYYMMDD) | Enter projected graduation date under this contract. |
| H. | ADDRESS OF RECORD (include ZIP code) | Enter full mailing address of permanent home of record to include ZIP code. |
| I. | ACADEMIC MAJOR IN WHICH DEGREE IS TO BE ATTAINED | Enter academic major in which awarded scholarship. |
| J. | EXTENDED BENEFITS RECEIVED | Enter the number of school terms for which HQ Cadet Command has approved scholarship benefits. **Example:  2 semesters** |

*Page 106 of 126*

A205

**Appendix C**  TOC

**C-2.**  Preparation instructions for completion of the scholarship Cadet contract (**DA Form 597-3**, Jul, 2005) (continued)

| ITEM | TITLE/DESCRIPTION | EXPLANATION AND/OR ENTRY |
|---|---|---|
| K. | PERIOD COVERED | Enter date covered by approval of extended benefits. **Example:  93.09/20 - 94.05/15** |
| L. | DATE APPROVED (YYYYMMDD) | Enter date of correspondence from HQ Cadet Command approving extension of scholarship benefits. |
| M. | AUTHORIZED | Enter HQ Cadet Command (HQ Cadet Command is the approving authority for extended scholarship benefits). |
| PARAGRAPH 1a. | PAY SCHOLARSHIP BENEFITS | Enter scholarship type. **Example:  Enter "4" (if student is being awarded a 4-Yr. scholarship, etc.)** |
| PARAGRAPH 1a(1) | TUITION AND FEES | Enter the maximum dollar amount of the scholarship award. Example:  $17,000 or $20,000 for full time school, enter corresponding rate. |
| PARAGRAPH 1a(2) | BOOKS AND LABORATORY FEES | Enter the full dollar amount currently authorized by Cadet Command. |
| PARAGRAPH 1b | PAY MONTHLY SUBSISTENCE | Enter the dollar amount of monthly subsistence for Cadet's class at the rate authorized by Cadet Command. |
| | PART II | |
| N. | HOME ADDRESS (including ZIP code) | Enter complete mailing address where student's parents are residing, including zip code. |
| O. | SIGNATURE | Student will sign full name in first, middle and last name sequence. **Example:  John D. Doe, Jr.** |
| P. | DATE (YYYYMMDD) | Enter date student signs the contract. |

**Appendix C** `TOC`

**C-2.**  Preparation instructions for completion of the scholarship Cadet contract (**DA Form 597-3**, Jul, 2005) (continued)

| PART III | | |
|---|---|---|
| **ITEM** | **TITLE/DESCRIPTION** | **EXPLANATION AND/OR ENTRY** |
| Q | SIGNATRE OF PARENT OR GUARDIAN | If scholarship is a minor, the parent or guardian, as appropriate, must sign this block. |
| R | SIGNATURE OF WITNESS | Witness, other than applicant's contracting official, must attest to the signature of parent or guardian. |
| S | DATE (YYYYMMDD) | Enter date of signature in Blocks Q and R. |
| PART IV | | |
| T | EFFECTIVE DATE OF ENROLLMENT (YYYYMMDD) | Enter the date student begins participating as a FULLY QUALIFIED Cadet (DO NOT back date the contract to the beginning of the school term if scholarship student's not fully qualified).  This date should be the SAME as the date in **Block 18b. of  the DD4** series (**see Appendix E**). |
| PART V | | |
| U | NAME OF CONTRACTING OFFICIAL | Enter complete name/rank of accepting contracting official. |
| V | SIGNATURE OF ROTC CONTRACTING OFFICIAL | Prior to signing, accepting contracting official will verify with student the correctness of entries and explain all applicable paragraphs of contract to the student.  Individual identified in ITEM U above will sign his/her name as typed/printed in that Block. |
| W | DATE (YYYYMMDD) | Date of signature of contracting official. **Example:  20020830** |

A207

**Appendix C** TOC

**C-3. Preparation instructions for completion of the Non-Scholarship Cadet contract (DA Form 597**, Jul, 2005) are as follows:

| ITEM | TITLE/DESCRIPTION | EXPLANATION AND/OR ENTRY |
|---|---|---|
| A. | STUDENT NAME | Enter applicant's complete last name (including compound full name, if applicable), full first name, middle initial, and any suffix including Jr., Sr., III, etc.  If applicant's given initial(s) rather than first and/or middle name, enter each initial(s). |
| B. | SOCIAL SECURITY NUMBER (SSN) | Enter applicant's SSN, separating division with a hyphen: **Example:  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** |
| C. | DATE OF BIRTH (YYYYMMDD) | Enter year, month and day sequence. **Example:  19800204** |
| D. | NAME OF EDUCATIONAL INSTITUTION | Enter the name of the degree-granting institution.  If partnership school, enter the name of both. **Example:  Learn University/Staly College** |
| E. | ADDRESS OF EDUCATIONAL INSITUTION | Enter complete address of the degree-granting institution. |
| F. | DATE EDUCATION COMMENCES (YYYYMMDD) | Enter the date education begins under this contract.  (DO NOT enter the date Cadet started college as a Freshman, unless 4-yr. scholarship recipient). |
| G. | COMPLETION DATE (YYYYMMDD) | Enter projected graduation date under this contract. |
| H. | ADDRESS OF RECORD (include ZIP code) | Enter full mailing address of permanent home of record to include ZIP code. |
| I. | ACADEMIC MAJOR IN WHICH DEGREE IS TO BE ATTAINED | Enter academic major pursuing as a non-scholarship Cadet.  If dual degree, enter both. **Example:  History/Religion** |
| PART I | | |
| PARAGRAPH 1a. | PAY MONTHLY SUBSISTENCE | Enter the dollar amount of monthly subsistence for Cadet's class at the rate authorized by Cadet Command. |

A208

**C-3.  Preparation instructions for completion of the Non-Scholarship Cadet contract (DA Form 597, Jul, 2005) are as follows: (continued)**

| PART II | | |
|---|---|---|
| J. | **HOME ADDRESS (including ZIP code)** | Enter complete mailing address where student is presently residing, including zip code. |
| K. | **SIGNATURE** | Student will sign full name in first, middle and last name sequence. **Example:  John D. Doe, Jr.** |
| L. | **DATE (YYYYMMDD)** | Enter date student signs the contract. |
| **PART III** | | |
| M | **SIGNATRE OF PARENT OR GUARDIAN** | If scholarship is a minor, the parent or guardian, as appropriate, must sign this block. |
| N | **SIGNATURE OF WITNESS** | Witness, other than applicant's contracting official, must attest to the signature of parent or guardian. |
| O | **DATE (YYYYMMDD)** | Enter date of signature in Blocks Q and R. |
| **PART IV** | | |
| P | **EFFECTIVE DATE OF ENROLLMENT (YYYYMMDD)** | Enter the date student begins participating in ROTC (to include conditional contract).  This date should be the SAME as the date in **Block 18b. of the DD4** series (**Exception**:  *Conditional students, see Para 2-61, and conditional SMP Cadets, see Para. 2-58*). |
| Q | **NAME OF CONTRACTING OFFICIAL** | Enter complete name/rank of accepting contracting official. |
| R | **SIGNATURE OF ROTC CONTRACTING OFFICIAL** | Prior to signing, accepting contracting official will verify with student the correctness of entries and explain all applicable paragraphs of contract to the student.  Individual identified in ITEM Q above will sign his/her name as typed/printed in that Block. |

A209

**Appendix C**  TOC

**C-3.  Preparation instructions for completion of the Non-Scholarship Cadet contract (DA Form 597, Jul, 2005) are as follows:  (continued)**

| PART V | | |
|---|---|---|
| S | **DATE (YYYYMMDD)** | Date of signature of contracting official; not the date the PMS actually signs the contract. **Example:  20020830 (Exception:** *Conditional students, see Para.* **2-61** *and Para* **2-58** *for conditional contracting of Cadets.***)** |

A210

**Appendix C**  TOC

**C-4**.  Preparation for the Planned Academic Program Worksheet (**CC FM 104-R** , Dec 04) are as follows:

a.  The **CC FM 104-R** will be completed for each applicant/Cadet who is contracting to ensure academic alignment.  The intent of this form is to input the data on the PC to prevent errors, especially in the formulas.

b.  Preparation of this form is self-explanatory.  When the various Blocks are chosen, a "What's This?" message block will appear which provides instructions for entering correct data in each block.  Once the information in Block 1 and Block 4a of Page 1, and Block 9 of page 2 is entered, the same information will automatically populate Page 3, Statement of Understanding.

c.  Block 5. Credit Hours.  Items in Block 5 will automatically calculate when data is entered.  Block 5 will calculate both semester and quarter hours.  From the drop down menu box, select S for semester and Q for quarter system.  A sample with instructions for completion of Block 5 is below:

| SAMPLE | |
| --- | --- |
| 5.  CREDIT HOURS | |
| a. Total hours required for degree (Does not include ROTC) | 120 |
| (1) ROTC Hours that do not count (Include any ROTC hours that do not count towards the degree to ensure academic and military alignment is maintained | 20 |
| (2) Total Hours Required (automatically calculated) | 140 |
| Normal Academic Progression Standard (NAPS) (automatically calculated) (The Total Hours Required divided by the total number of semesters/quarters established in the school catalog to complete the degree + ROTC hours).  In this sample, 120 hours (which is normally a 4-year academic program), and eight (8) semesters was used to calculate the academics + ROTC hours required (e.g., 140/8 = 17.50).  This is the normal academic progression required per semester in order to remain academically aligned. | 17.50 |
| b. Transfer credits accepted toward degree (Based on institutional certifying official) | 45 |
| c. Credits toward degree completed to date | 30 |
| d. Remaining for Degree, e.g., 140 - (45 + 30) = 65 (automatically calculated) | 65 |
| e. Number of authorized semesters (automatically calculated) (Remaining for Degree/Normal Academic Progression, e.g., 65/17.50 = 3.71 (rounds up to 4)).  (Any fraction equal to or less than .5 will be rounded down to the lower whole number and anything greater than .5 will be rounded up to the next higher whole number.) | 4 |

A211

**Appendix C**   `TOC`

**C-4.  (continued)**

d.  An outline of all courses (term, year, course number, course title, number of credit hours per course (Hrs.), number of credit hours per course that counts towards the degree (Cts.), and grade) will be annotated for each term.  This academic assessment should be designed to meet the Cadets academic ability while maintaining fulltime status.   Block 7 will calculate the total credit hours and credit points per school term when the data is entered.

e.  The registrar and examiner of credentials (or other institutional certifying official) and the Cadet must sign and date Blocks 10 thru 13.

f.  The PMS and the Cadet will sign Page 3, Statement of Understanding, the date the Cadet in contracted.

g.  The **CC FM 104-R** will be reviewed with the Cadet at the end of each school term (upon receipt of grades) in order to monitor proper academic alignment and proper Mission Set.

(1)  The Cadet initial and date Block 8 beside each term to indicate they have been counseled.

(2)  If the Cadets initial Planned Academic Program Worksheet changes, initiate a change within **30** days.  PMS will revalidate proper Mission Set alignment.

A212

**Appendix C**   TOC

**C-5**.  **Processing of Cadet Action Request, CC Form 131-R (Paper Cadet Actions)**

a.  The **CC Form 131-R** is used to initiate paper Cadet actions originating from the Battalion Commander/PMS (including certain waiver requests, exceptions to policy, and disenrollment actions) forwarded to HQCC.  Electronic (paperless) requests submitted in lieu of hard copy requests will not be processed by Cadet Command.

**NOTE**:  *Refer to* ***Appendix C-8*** *for instructions regarding submission of paperless (electronic) Cadet action requests, i.e., (1) Non-immigrant alien participation (2) Non-Scholarship age waivers (3) Dependency waivers (4) Self-admitted drug use (5) Certain misdemeanor civil convictions waivers and (6) Requests for termination of scholarship benefits with retention in a Non-Scholarship status.*

b.  Each request for Cadet action will be comprised of **CC Form 131-R**, and those documents required for the particular action (see matrix at **Appendix B**).  The Battalion Commander/PMS (or representative) will, as a part of the recommendation, annotate the appropriate table used and verify the correctness and accuracy of the matters presented. Blocks should be filled out by the battalion administrative personnel based on the routing of the particular action.

c.  Cadets requesting action will check the block and prepare the reason for the request in detail.  Use a plain sheet of paper for continuation of the action.

d.  The additional sheet may be used and attached if more space is required.  The Cadet will sign and date the request and submit the request to the Battalion Commander/PMS. When received from the Cadet, he/she will complete the certification portion of the reverse side of the form, and check the appropriate block, and prepare appropriate remarks in recommending approval or disapproval of the request.  Once signed and dated, the request, with all appropriate documentation, will be forwarded to the approval authority for final determination (see matrix at **Appendix B** for approval flow and authority).

e. Actions being requested by the Battalion Commander/PMS will have the action checked with a short explanation prepared by the Battalion Commander/PMS (or representative). It will not be signed by the Cadet.  With that exception, it will be prepared and processed in the same manner as those initiated by the Cadet.  In cases of medical determinations the Cadet is required to sign and date Blocks 18 and 19 of **CC FM131-R**.

f.  Refer questions to your point of contact at Cadet Command, ATTN: ATCC-PA-C.

A213

**Appendix C**   TOC

**C-6.  Preparation of Cadet Enrollment Record, CC Form 139-R**

a.  Use.  The purpose of this form is to obtain essential information from the student in order to establish his/her record on the Cadet Data Base, execute the Loyalty Oath, certify certain statements which impact on eligibility, acknowledge a Privacy Act statement, and verify enrollment eligibility.  It is to be used to determine student eligibility for participation in the ROTC Program for commissioning credit and contracting.  The student portion of the form will not be used by itself for the purpose of verifying enrollment eligibility and contracting.  All portions of the form must be completed prior to contracting any Cadet.  It will be completed by all students enrolling for commissioning credit or contracting on the first day of ROTC class.  Retain a copy in the Cadet's ROTC **Cadet 201 File**.

b.  Most blocks are self-explanatory; However, page 6 contains instructions and reference notes to regulations and Cadet Command Pamphlet to determine eligibility policies.

c.  Preparation of form.

(1)  If completed manually (handwritten), the Cadet will legibly print information in Part I, page 1.  (Recommend using a pencil in case of subsequent changes).

(2)  If completing the form electronically, click on the various blocks and a "What's This?" message block will appear to provide instructions for entering correct data in each block. Once the name and SSN have been entered on the first page, the last name and SSN will automatically populate on Pages 2 thru 5.

(3)  Allow the student to come back later if there are blanks or unanswered questions on specific information.

d.  Height/weight information should be approximate and in inches/pounds.

e.  The completion of the Cadet Statements portion, Part IV, Page 2, is essential for later determination of eligibility and compliance with statutory requirements.  Have the student fill his/her name and SSN at the top of this portion.  Explain the purpose of the Privacy Act statement is to allow exchange of information with USAREC in the event the student decides to leave school.  Have the student read the statement concerning verification.  In filling out this portion have the student check the appropriate block and initial by the check.  It is important to explain that the student's certification of the statements and execution of the Loyalty Oath are required in order for a student to be eligible for contracting in the ROTC Program.  The Cadets signature and date will be done in ink.

A214

**Appendix C**   TOC

**C-6.  (continued)**

f.  Subsequent to the completion of Pages 1 and 2 of the form by the student, the Enrollment Officer will complete the Enrollment Eligibility Checklist portion, as appropriate. This action must be undertaken immediately for all scholarship students and prior to contract consideration for Non-Scholarship Cadets.  Match the student's status against each criteria area and check the appropriate answer.  There is space on the Eligibility Checklist for appropriate notes (such as when a waiver has been approved, etc.).

g.  Refer to **Appendix B**, Approval Authority/Flow of Cadet Actions matrix, to determine where the waiver  approval authority rests in the case of a waivable ineligibility.

h.  Once each area is checked, the Enrollment Officer will check the appropriate box as to the students eligibility for full participation and contracting **http://www.army.mil/usapa/eforms/pdf/A597_3.PDF** as appropriate.  If the student is fully eligible or receives a waiver, the date of execution of the **DA Form 597** or **597-3** and **DD Form 4** will be annotated.  The Enrollment Officer will sign and date Page 5 when eligibility status is verified as indicated.

i.  Data on the forms will be re-verified by the cadre with the Cadet during required periodic counseling.  A statement to this effect will be made on the counseling record and signed by the Cadet.

A215

Appendix C **TOC**

## C-7. Affidavit Format/Sample

a.  Use.  The purpose of the affidavit is to obtain essential information from the student in order to establish the facts surrounding any incident, civil conviction, when requesting a waiver or exception to policy.  The affidavit should include any and all specific facts.

b.  General.  This form should be typewritten.  Care should be taken to ensure all facts are revealed.  Any corrections or typewritten strikeovers should be initialed by pen and ink by the person making the statement.

### AFFIDAVIT FORMAT/SAMPLE

I, John P. Penny, do solemnly swear this statement of my record of conviction(s) and of the circumstances surrounding said conviction(s) is true and accurate to the best of my knowledge and belief, and that I have not been convicted of any violation(s) other than a minor traffic violation(s) or those as reported below:

**DATE OF OFFENSE(S):**  31 Aug 1999

**OFFENSE(S):**  Minor in possession/driving under the influence

**SENTENCE(S):**  $475.00 fine; $72.50 Court Costs; and mandatory nine (9) weeks alcohol awareness class.

### STATEMENT OF FACTS:

On the evening of 31 Aug 1999, three teammates from our high school football team and I were invited to a graduation party at the house of a mutual friend.  We drove in my car to the party and arrived at about 10:00 PM.  When we got there we found that there must have been 70 to 80 students from our high school there.  Our friend's parents were out of town.  Everyone seemed to be having a good time and some of the graduating seniors who looked older used some fake ID to get a couple of kegs of beer.  Though my teammates and I knew better, we decided to go ahead and each had a couple of beers.  We thought wed just hang around for a little bit and then leave.

The party started to get really loud about 11:30 PM and my friends and I thought it might be a good idea to leave.  We each had a beer in our hand.  Just about then we saw police car lights flashing through the living room windows.  I said that wed better get out of the house through the back door.  If we were caught it meant that wed be kicked off the team and placed on suspension from school.  We ran out the back door and went around the corner to where my car was parked.  We didn't think to throw the beers away but threw the can down on the floor of the back seat and half covered them with a jacket.  In my hurry to leave, I squealed my tires.  That must have gotten the attention of one of the police officers as we were met two blocks away by another police car that stopped us.  I was told by the officer to get out of the car.  When I was standing behind the car, the officer shined his flashlight into the car and saw the beers.  He then told my friends to get out of the car.  We were taken in police cars to the police station.  I was given a breathalyzer test, which registered .10.  I was charged with driving under the influence

**Appendix C**   `TOC`

**C-7.  (continued)**

and with being a minor in possession of alcohol.  My teammates were also charged with minor in possession.  They charged approximately 75 students with various offenses at the party, which included most of the senior class, some juniors, and a few sophomores.

Due to the backlog created my case was not heard by a judge until June 2001.  I pled guilty and was given the find stated in above as well as having to pay court costs and attend a nine-week class.  The fine and court costs were paid on 18 June 2001 and I completed class on 9 October 2001.  Additionally, I was required to sit out the 1991 football season and was placed on probation by the school superintendent for one term. My past record of school activities was taken into account and I was allowed to come back to the football team.

I certify that the above statement was duly taken and subscribed in my presence at Pomfret, Oregon this (date) day of (MM/YY).

_____
**Typed name of person making affidavit**
_____
**Signature of person making affidavit**
_____
**Typed name of battalion Cdr/PMS or EEO**
_____
**Signature of battalion Cdr/PMS or EEO**
_____
**Grade and Organization**

A217

**Appendix C**  TOC

**C-8.  Preparation and Processing of CC Form 131-E (Electronic Cadet Actions)**

a.  The Cadet action requests listed below will be processed electronically.  Hard copy requests submitted in lieu of electronic form will not be processed by Cadet Command. (Cadet action requests not listed below must be submitted in hard copy on the **CC Form 131-R** (see **App C-5** above)):

(1)  Non-immigrant alien participation (Paragraph 2-6)
(2)  Age waivers (Paragraph 2-34c)
(3)  Dependency waivers (Paragraph 2-40)
(4)  Self-admitted drug use (Paragraph 2-37)
(5)  Misdemeanor civil conviction waivers, excluding those in Paragraph 2-4e(1) thru (3)
(6)  Termination of scholarship benefits (Paragraph 4-6)

b. Using email and the Cadet Action Request form (**CC Form 131-E**) makes the following assumptions:

(1)  The PMS is certifying that all supporting documentation is accurate and complete and is being retained in the Cadet's personnel file (documents will be subject to inspection during command inspections or assistance visits).

(2)  The PMS has presented all the facts to include any prior information that may have bearing on the decision. If pertinent information to support the request is not annotated on the Cadet Action Request form, it will be necessary to request the documentation, thereby, negating the paperless concept.

(3)  All blocks on the Cadet Action Request MUST be completed (except Section 1a) since supporting documents are not included.

c.  The approval path will go from Battalion through the Brigade to Headquarters, email address:  **CadetActionsCDTCM@usaac.army.mil**.  Each Brigade will determine the POC who will receive the email from the PMS; however, the e-mail address on **CC Form 131-E** (Blocks 2 and 3) should reflect the Brigade Commanders address.

d.  Refer questions to your point of contact at Cadet Command, ATTN: ATCC-PA-C.

e.  Instructions for Completing the Cadet Action Request Form (**CC Form 131-E**) - Electronic Form

(1)  This is a Microsoft Excel form. For completion, open the document and select Page 1 at the bottom of the screen. Select, double click, and complete each block (1-23) typing the information requested below.  (**NOTE:**  *If you click on an incorrect cell, you will receive an error message click OK and select the cell/block under the block heading.*) When the form is completed, Save As using the Cadet's name, e.g., Smith, John.

(2)  Blocks 1 thru 23 will be completed by the battalion as follows:

A218

**C-8.  (continued)**

1.  PMS/Battalion email address

2.  Brigade information, e.g., POC name/phone number and Brigade Commander e-mail address (there are 2 lines for information, put Bde Cdr e-mail address on second line).

3.  **CadetActionsCDTCM@usaac.army.mil**

4.  Battalion POC name, phone number & e-mail address (there are 2 lines for information, put e-mail address on second line).

5.  School name/FICE Code (there are 2 lines for information, put FICE Code on second line).

6.  Type of action requested (e.g., age waiver, dependency waiver, etc.).

**SECTION I**

7.  Self Explanatory

8.  Self Explanatory

9.  Cadets mailing address

10.  If applicable, if not type N/A

11.  Enter type of scholarship (2, 3, 4; 0=Non-Scholarship)

12.  Self Explanatory

13.  Enter the Academic Discipline M (ADM) of the Cadet (1 thru 5):

      1=Generalist
      2=Technical
      3=Physical Science/Analytical
      4=Engineering
      5=Nursing

14.  Enter the most current cumulative grade point average as of the date of request.

15.  Enter most current height in inches and weight in pounds and the date of information, e.g. 69/165-04/01/03, and in the block enter G=GO or N=NO GO.

16.  Enter most current APFT data/date, e.g., 275-03/28/03, and in the block enter G=GO or N=NO GO.

**C-8.  (continued)**

17.  S-A-L Assessment type an X inside the box for the category(s) as applicable, type extra curricular activities in the text box.

18.  List any other Cadet actions that have been submitted, either pending actions or already completed actions and date.

19.  Select the appropriate box and type an X, as applicable.

20.  Remarks section should document specific information to support the request, e.g., facts surrounding the request or incident, blood alcohol content (BAC) (if DWI/DUI), all previous convictions, frequency and timeframe of drug use, whether probation has been satisfied, etc.  If pertinent information to support the request is not annotated on the form, it will be necessary to request the documentation, negating the paperless concept.  f space runs out annotate that remainder will be completed on page 3, i.e., continued on Page 3.

21.  Type PMS name as follows //JOHN SMITH// indicating the original is signed and in the Cadets file.

22.  Type in the date, i.e., 02/01/04.

**SECTION Ia WILL NOT BE USED.**

Once the form is completed, save as using the Cadet's name, e.g., Smith, John. (Saving as a separate document will leave the form blank for future use). Attach the completed document to an e-mail message and forward to the Brigade Commander. The email subject line will include the following: Paperless/Type of Action/Cadet Name/SSN [last four]/School, e.g., Paperless Civil Conviction/John Smith/3333/Columbia University.

**SECTION II  (FOR BRIGADE COMMANDER USE)**

-- Brigade Commander clicks in either concur or non-concur text box and places his/her initials in the appropriate box.

- Comments can be made in text box- if more space is needed type see Page 3- then proceed to appropriate box on Page 3 to finish comments.

- Save the document and forward to this headquarters via e-mail address: **CadetActionsCDTCM@usaac.army.mil**.

A220

**Appendix C**  `TOC`

**C-8.  (continued)**

f.  Any questions should be directed to your Cadet Command POC, ATCC-PA-C for processing Cadet actions.

A221

Appendix D   TOC

## LIST OF TYPICAL MINOR TRAFFIC OFFENSES (Extract of Table 4-8, AR 601-210)

This list of typical traffic offenses below is a guide.  Treat the offenses listed as minor traffic offense despite the classification under State law and whether the determination is deemed a conviction or adjudication under State law.  If an applicant/Cadet has been found guilty of minor traffic offense and the fine (to exclude court costs) is less than $250, a waiver is not required except when the applicant has accumulated 6 or more such offenses during 1 year.  Also, see **AR 601-210**, Paragraph 4-8.  However, if the fine (to include court cost) is $250 or more or the individual received a jail sentence (even if suspended), a request for waiver is required and will be submitted in accordance with Chapter 3 of this pamphlet.

## MINOR TRAFFIC OFFENSES:

- Blocking or retarding traffic.
- Bicycle ordinance violation.
- Crossing yellow line, driving left of center.
- Contempt of court for minor traffic offenses.
- Disobeying traffic lights, signs, or signals.
- Driving on shoulder.
- Driving uninsured vehicle.
- Driving with blocked vision/tinted window.
- Driving with expired plates or without plates.
- Driving without license or with suspended or revoked license.
- Driving without registration or with improper registration.
- Driving wrong way on one-way street.
- Failure to appear for traffic violations.
- Failure to comply with officer's directive.
- Failure to have vehicle under control.
- Failure to signal.
- Failure to stop or yield to pedestrian.
- Failure to submit report after accident.
- Failure to yield right-of-way.
- Faulty equipment, such as defective exhaust, horn, lights, mirrors, muffler, signal device, steering device, tail pipe, or windshield wipes.
- Following too closely.
- Hitchhiking.
- Improper backing, such as backing into intersection or highway, backing on expressway, or backing over crosswalk.
- Improper blowing of horn.
- Improper passing, such as passing on right, passing in no passing zone, passing stopped school bus, or passing a pedestrian in crosswalk.
- Improper turn.
- Invalid or unofficial inspection sticker, failure to display inspection sticker.
- Jaywalking.
- Leaving key in ignition.
- License plates improperly displayed or not displayed.
- Operating overloaded vehicle.
- Racing, dragging, or contest for speed.

**Appendix D**  TOC

## MINOR TRAFFIC OFFENSES:  (continued)

- Reckless, careless or imprudent driving (considered a traffic offense when the fine is less than $300 and there is no confinement), court costs are not part of a fine.
- Seat belt/child restraint violation.
- Skateboard/roller skate violations.
- Speeding.
- Spilling load on highway.
- Spinning wheels, improper start, zigzagging, or weaving in traffic.
- Violation of noise control ordnance.

A223

**Figures** TOC

### Figure 2-3, Initial Entry Weight Table for Males

| Military Acceptable Weight (in pounds) as Related to Age and Height for Males - Initial Army[1,2] | | | | | |
|---|---|---|---|---|---|
| Height (Inches) | Maximum Weight (Any Age) | 17-20 | 21-27 | 28-39 | 40 and Over |
| 61 | 100 | 139 | 141 | 143 | 146 |
| 61 | 102 | 144 | 146 | 148 | 151 |
| 62 | 103 | 148 | 150 | 153 | 156 |
| 63 | 104 | 153 | 155 | 158 | 161 |
| | | | | | |
| 64 | 105 | 158 | 160 | 163 | 166 |
| 65 | 106 | 163 | 165 | 168 | 171 |
| 66 | 107 | 168 | 170 | 173 | 177 |
| 67 | 111 | 174 | 176 | 179 | 182 |
| | | | | | |
| 68 | 115 | 179 | 181 | 184 | 187 |
| 69 | 119 | 184 | 186 | 189 | 193 |
| 70 | 123 | 189 | 192 | 195 | 199 |
| 71 | 127 | 194 | 197 | 201 | 204 |
| | | | | | |
| 72 | 131 | 200 | 203 | 206 | 210 |
| 73 | 135 | 205 | 208 | 212 | 216 |
| 74 | 139 | 211 | 214 | 218 | 222 |
| 75 | 143 | 217 | 220 | 224 | 228 |
| | | | | | |
| 76 | 147 | 223 | 226 | 230 | 234 |
| 77 | 151 | 229 | 232 | 236 | 240 |
| 78 | 153 | 235 | 238 | 242 | 247 |
| 79 | 159 | 241 | 244 | 248 | 253 |
| 80 | 166 | 247 | 250 | 255 | 259 |

| Maximum Body Fat by Years of Age | | | |
|---|---|---|---|
| 17-20 | 21-27 | 28-39 | 40 and Over |
| 26% | 26% | 28% | 30% |

**NOTES**:

[1]If a male exceeds these weights, percent body fat will be measured by the method described in AR 600-9.
[2]If a male also exceeds this body fat, he will be rejected for service.

*Page 125 of 126*

A224

**Figures**  TOC

**Figure 2-4, Initial Entry Weight Table for Females**

| Height (Inches) | Maximum Weight (Any Age) | 17-20 | 21-27 | 28-39 | 40 and Over |
|---|---|---|---|---|---|
| | | | | | |
| 58 | 90 | 112 | 115 | 119 | 122 |
| 59 | 92 | 116 | 119 | 123 | 126 |
| 60 | 94 | 120 | 123 | 127 | 130 |
| 61 | 96 | 124 | 127 | 131 | 135 |
| | | | | | |
| 62 | 98 | 129 | 132 | 137 | 139 |
| 63 | 100 | 133 | 137 | 141 | 144 |
| 64 | 102 | 137 | 141 | 145 | 148 |
| 65 | 104 | 141 | 145 | 149 | 153 |
| | | | | | |
| 66 | 106 | 146 | 150 | 154 | 158 |
| 67 | 109 | 149 | 154 | 159 | 162 |
| 68 | 112 | 154 | 159 | 164 | 167 |
| 69 | 115 | 158 | 163 | 168 | 172 |
| | | | | | |
| 70 | 118 | 163 | 168 | 173 | 177 |
| 71 | 122 | 167 | 172 | 177 | 182 |
| 72 | 125 | 172 | 177 | 183 | 188 |
| 73 | 128 | 177 | 182 | 188 | 193 |
| | | | | | |
| 74 | 130 | 183 | 189 | 194 | 198 |
| 75 | 133 | 188 | 194 | 200 | 204 |
| 76 | 136 | 194 | 200 | 206 | 209 |
| 77 | 139 | 199 | 205 | 211 | 215 |
| | | | | | |
| 78 | 141 | 204 | 210 | 216 | 220 |
| 79 | 144 | 209 | 215 | 222 | 226 |
| 80 | 147 | 214 | 220 | 227 | 232 |

*Military Acceptable Weight (in pounds) as Related to Age and Height for Females - Initial Army[1,2]*

| Maximum Body Fat by Years of Age | | | |
|---|---|---|---|
| 17-20 | 21-27 | 28-39 | 40 and Over |
| 32% | 32% | 34% | 36% |

**NOTES:**

[1]If a female exceeds these weights, percent body fat will be measured by the method described in AR 600-9.

[2]If a female also exceeds this body fat, she will be rejected for service.

*Page 126 of 126*

A225

Singh v. McHugh et al.

(Department of the Army Form 597)

# ARMY SENIOR RESERVE OFFICERS' TRAINING CORPS *(ROTC)* NONSCHOLARSHIP CADET CONTRACT

For use of this form see AR 145-1; the proponent agency is DCS G-1

| DATA REQUIRED BY THE PRIVACY ACT OF 1974 | |
|---|---|
| **AUTHORITY:** | Title 10, USC, Sections 2101 through 2111, and 3013. Title 5, USC, Section 301. |
| **PRINCIPAL PURPOSE:** | To specify the contractual agreements and obligations and to document contracting in the Army Senior Reserve Officers' Training Corps Nonscholarship Program. |
| **ROUTINE USES:** | This form will be maintained in the cadet's Miliary Personnel Records Jacket and becomes a permanent part of the official personnel records as confirmation of enrollment, contracting, obligation and agreements. |
| **DISCLOSURE:** | Disclosure of the information requested in this contract is voluntary.  However, applicable portions must be completed if the applicant desires to be contracted in the Army ROTC Nonscholarship Program. |

## PREAMBLE

This contract represents an agreement entered into between the United States Army and the Reserve Officers' Training Corps *(ROTC)* nonscholarship cadet named herein, with the consent of the parent or guardian if the cadet is under the age of 18, to effect said cadet's participation in the Army Reserve Officers' Training Corps Program.  It is hereby agreed by both parties, the United States Army and the Cadet, that the sole purpose of the ROTC nonscholarship program is to produce officers for the United States Army.  Entry into this program is a serious commitment.  This commitment must be made with the resolve to attain a commission.  If there are any doubts about the prospective cadet's ability or determination to fulfill the terms of this contract, then this contract should not be executed.  In consideration of the mutual benefits, which will accrue to the parties hereto by reason of the cadet's participation in the Army ROTC and later service in the United States Army, the parties agree to the terms below.

## CONTRACT

| | |
|---|---|
| A. STUDENT'S NAME *(Last, First, MI)* | D. NAME OF EDUCATIONAL INSTITUTION |
| B. SSN | E. ADDRESS OF EDUCATIONAL INSTITUTION |
| C. DATE OF BIRTH *(YYYYMMDD)* | |
| F. DATE EDUCATION COMMENCES *(YYYYMMDD)*    G. COMPLETION DATE *(YYYYMMDD)* | H. ADDRESS OF RECORD *(Include ZIP Code)* |
| I. ACADEMIC MAJOR IN WHICH DEGREE IS TO BE ATTAINED | |

## PART I - AGREEMENT OF THE DEPARTMENT OF THE ARMY

1. **DEPARTMENT OF THE ARMY AGREEMENT** . In consideration of the agreement in Part II below, the Department of the Army agrees to--

    a. **PAY MONTHLY SUBSISTENCE** . Pay a subsistence allowance for participation in the nonscholarship program for 10 months of any academic year *(or the actual duration of the academic year, whichever is shorter)* at the rate of $ _____ for MS II cadets; $ _____ for MS III cadets; $ _____ for MS IV cadets; and $ _____ for MS V cadets, for no more than a total of 30 months.   These rates are generally prescribed by law and implemented by the Secretary of Defense and may change during the period of this contract.

    b. **PAY FOR ATTENDANCE AT LEADER DEVELOPMENT AND ASSESSMENT COURSE** *(LDAC)*.  Provide a daily rate of pay, which is prescribed by law for cadets of the United States Military Academy and implemented by the Department of Defense Military Pay and Allowance Entitlements Manual *(DODPM)* , for the period that the cadet attends LDAC.

    c. **PROVIDE TRAINING.** Provide the cadet with U.S. Army-sponsored and -funded Reserve Officer Training.

    d. **DELAY ACTIVE DUTY FOR GRADUATE/PROFESSIONAL STUDY.** The obligated period of active duty this contract requires may be delayed upon commissioning, if the cadet's application for resident graduate or professional study is approved, until the completion of the authorized delay.

    e. **COMMISSION AS AN OFFICER.** Upon satisfactory completion of the academic, military, and all other requirements of the Army ROTC Program, a cadet may be appointed as a reserve officer in the Army in the grade of second lieutenant.

---

**DA FORM 597, JUL 2005**     DA FORM 597, AUG 2004, IS OBSOLETE.
APD LC v1.01ES

A227

**PART II -  AGREEMENT OF NONSCHOLARSHIP CADET CONTRACTING IN THE SENIOR ROTC PROGRAM**

2.  **GENERAL CADET AGREEMENT**.  As the ROTC nonscholarship cadet named above, I agree to do the following:

    a.  **ENLISTMENT AGREEMENT**.  As a condition for membership in the Army ROTC Program, I agree to enlist in the Reserve Component of the United States Army *(with assignment to the USAR Control Group (ROTC))* for a period prescribed by the Secretary of the Army.

    b.  **ENROLLMENT AGREEMENT**.  I agree to enroll in the necessary courses and successfully complete, within the prescribed time, the requirements for the degree in the academic major stated above.  I agree to remain enrolled in and successfully complete the ROTC program, including LDAC and all training as prescribed by the Secretary of the Army or his/her designee, as a prerequisite for commissioning.

    c.  **FULL-TIME STUDENT AGREEMENT**.  I agree to remain a full-time student in good standing at the educational institution named above until I receive my degree.  A full-time student is defined as one enrolled in sufficient academic courses to obtain junior and senior academic status at the end of each appropriate one-academic-year increment for the duration of my college program.  This includes the required Army ROTC classes, which may be part of or in addition to those courses required for my degree. If I desire to transfer to another institution or take a leave of absence from the continuous performance of this contract, I agree to obtain prior written approval from the Professor of Military Science *(PMS)*

    d.  **ACADEMIC GRADE POINT AVERAGE AGREEMENT** I agree to maintain, at a minimum, a cumulative academic grade point average of 2.0 on a 4.0 or equivalent scale.  This grade point average must also be maintained for each semester or quarter. If I am required by my academic major or by the school I am attending to maintain a higher cumulative and semester or quarter grade point average, I agree to maintain that higher standard until the completion of the academic requirements for my degree.  I understand and agree that failure to maintain the minimum academic grade point average may subject me to disenrollment from the ROTC program.

    e.  **ROTC COURSES GRADE POINT AVERAGE AGREEMENT**.  I agree to maintain at least a 2.0 on a 4.0 or equivalent scale, cumulative and semester or quarter academic grade point average in all ROTC courses.  I understand and agree that failure to maintain the minimum ROTC courses grade point average may subject me to disenrollment from the ROTC program.

    f.  **MEDICAL AND PHYSICAL FITNESS STANDARDS**

        (1) I agree to maintain eligibility for enrollment and retention in ROTC and commissioning, as defined by statute, Army regulation, and this contract, throughout the period of this contract.  I agree to meet and maintain the Army Physical Fitness Test *(APFT)* standard and the screening weight or body fat percentage required by the Army Weight Control Program as required of active duty soldiers each year and prior to attendance at ROTC LDAC.  These will be continuous requirements that I must continue to meet until the date that I report to Officer Basic Course *(OBC)* or a Reserve Component unit and thereafter.  Commissioning eligibility standards, including the APFT and Army Weight Control Program standards, are subject to change, and I must keep myself informed of such changes through contact with the PMS.  I understand and agree that failure to maintain the weight and physical fitness requirements may subject me to disenrollment from the ROTC program.

        (2) I agree to undergo precommissioning drug and alcohol screening tests, normally administered during LDAC training, or as may otherwise be prescribed by U.S. Army Cadet Command.  If the result of any test is positive, I will be subject to disenrollment from the ROTC program.

        (3) I agree to undergo testing for HIV *(Human Immunodeficiency Virus)* antibody during my precommissioning physical examination, normally during LDAC training or as the U.S. Army Cadet Command may otherwise prescribe.  If the result of the testing is confirmed positive, I will be disenrolled from the ROTC program.

    g.  **NURSE CADET AND MEDICAL SPECIALIST CORPS CADET ADDITIONAL AGREEMENT** I agree, if I am a nurse candidate or a medical specialist corps cadet, to complete a baccalaureate program from an accredited and approved educational institution with an academic and clinical curriculum in English; I also agree to complete my ROTC training requirements by my projected commissioning date and accept, if offered, a commission in the USAR.  I further understand that if selected for active duty Army Nurse Corps or Army Medical and Specialist Corps, I must first pass the professional degree and licensing exam requirements set forth in relevant Army regulations prior to entry on active duty for my particular specialty.  If a nurse cadet, I will take the exam not later than 60 days after graduation.  If I fail the exam, I must retake it within 120 days after the first exam.  If I fail my nurse licensing examination for the second time, I will be branched based on the needs of the Army.

A228

| PART II - AGREEMENT OF NONSCHOLARSHIP CADET CONTRACTING IN THE SENIOR ROTC PROGRAM *(Continued)* |
|---|

3. **ADDITIONAL TERMS AND CONDITIONS**. I further understand that---

    a. **DISCLOSURE OF DISQUALIFYING CONDITIONS**. By executing this contract, I represent that I meet all eligibility criteria for contracting in the ROTC Program and commissioning, as defined by statute, Army regulation, and this contract. I represent that I have disclosed or will disclose any and all pre-existing medical conditions and non-medical conditions that would make me ineligible for enrollment in the ROTC program as specified in statute, Army regulations *(including but not limited to, AR 145-1)*, and this contract. If I am ineligible for contracting in ROTC based on a particular medical or non-medical condition, but such ineligibility may be waived, I must obtain an approved waiver before executing this contract. Failure to have disclosed or to disclose any disqualifying condition, including any conditions I should have known about, will subject me to disenrollment from the ROTC program. I certify that I have been notified of the Department of Defense Homosexual Conduct Policy, and I understand that my sexual orientation does not make me ineligible for contracting with the Army. Therefore, nothing in this paragraph requires a disclosure of my sexual orientation in violation of the Department of Defense Homosexual Conduct Policy as addressed in AR 600-20.

    b. **NATURE OF DUTIES AND CONSCIENTIOUS OBJECTOR STATUS**. My acceptance of the terms and conditions of this agreement signifies my readiness to bear arms, to engage in and support combat operations and to operate and support operations of approved weapons systems. If I at any time apply for and receive conscientious objector status, I will be disenrolled from the program. If conscientious objector status is approved, my failure to complete the service obligation within this contract will result in my disenrollment.

    c. **CADET OBLIGATION**

        (1) **CADETS**. I understand and agree that I will incur an active duty obligation after the first day of MS III year *(junior year)*.

        (2) **GREEN-TO-GOLD CADETS**. If I was conditionally discharged from the active Army to become a nonscholarship advanced course cadet, I am obligated and may not voluntarily withdraw from the ROTC program from the date of discharge without incurring an active duty obligation as stipulated in paragraph 5 of this contract. The only exception to this requirement is if I am disenrolled from ROTC because of personal hardship. In case of personal hardship, I may request to be returned to active duty in my enlisted status to serve out the time remaining on my original active duty enlistment contract instead of the active duty obligation stipulated in paragraph 5b of this contract if there is at least one year remaining on my original active duty enlistment and I am otherwise eligible for active duty.

4. **CADET AGREEMENTS UPON PROGRAM COMPLETION**. Upon completion of all requirements for appointment, to include medical qualification, all prescribed military science courses, LDAC, and any other training that may be prescribed by the Secretary of the Army or his or her designee, I agree to, as prescribed by the Secretary of the Army, complete the following requirements:

    a. **ACCEPTANCE OF APPOINTMENT**. I agree to accept an appointment, if offered, as a commissioned officer in the USAR or ARNG, in accordance with governing Army regulations. I understand that upon appointment, I will incur a military service obligation not to exceed *(8)* years and cannot resign such appointment before completion; however, this obligation may be eight met in a variety of methods as outlined below. I further understand that active duty service may include worldwide assignment or assignment to a branch that involves combat or exposure to nuclear, chemical, or biological weapons.

        (1) **ACTIVE DUTY ASSIGNMENT**. If selected for such duty, I agree to serve on active duty as a commissioned officer in the U.S. Army for the time prescribed by relevant Army regulations based on the needs of the Army, followed by service in the USAR Control Group *(Reinforcement)* or a Troop Program Unit *(TPU)* until the remainder of my eight-year contractual military service obligation has been served.

        (2) **RESERVE COMPONENT DUTY ASSIGNMENT**. If I am not selected for extended active duty, I will serve a short period of active duty or active duty for training if appointed in a Reserve Component. I will complete an officer's basic course for branch qualification. This will be followed by service in a Reserve Component Unit *(ARNGUS or USAR)* which has Monthly Unit Training Assemblies and an annual training period of approximately two weeks, until the remainder of my contractual military service obligation has been served.

**PART II - AGREEMENT OF NONSCHOLARSHIP CADET CONTRACTING IN THE SENIOR ROTC PROGRAM** *(Continued)*

(3) **UNAVAILABILITY OF TROOP PROGRAM UNIT ASSIGNMENT**. If I am fulfilling my obligation through Reserve Component duty and an appropriate troop program unit assignment is not available as defined by applicable Army regulations or becomes unavailable in either the U.S. Army Reserve or the Army National Guard of the United States, I agree to participate as a member of the Individual Mobilization Augmentee *(IMA)* program by serving at least twelve *(12)* days, excluding travel time, on annual training each fiscal year as directed by the Human Resources Command - St. Louis  (HRC-St Louis).  If neither an appropriate unit nor an IMA assignment is available, I agree to participate as a member of the Individual Ready Reserve *(IRR)* by serving up to twelve*(12)*days of training each fiscal year until such time as an appropriate unit or IMA assignment becomes available or until the expiration of my contractual military service obligation.  I may be required to travel the distance specified in Army regulations to fulfill my contractual military service obligation.

(4) **THE ARMY NATIONAL GUARD COMBAT REFORM INITIATIVE***(ANGCRI)*.  If I am offered the opportunity to participate in the Army National Guard Combat Reform Initiative *(ANGCRI)*, I understand and agree that in return for participation in the ANGCRI program, I will serve my remaining service obligation in an Army National Guard unit, in lieu of completing my active duty service obligation, including mandatory service requirements as prescribed by Federal statute, Army regulation, and my ROTC contract.  Furthermore, if I voluntarily, or because of misconduct, fail to complete my obligated Reserve service in an Army National Guard unit, the Army may require me to return to active duty to complete the remainder of my service obligation.

b. **APPLICATION FOR RESERVE COMPONENT DUTY ASSIGNMENT**.  I understand that I may apply for a Reserve Component appointment and request service on active duty or service with a Reserve Component Unit  *(ARNGUS or USAR)* at my discretion.  However, my selection for the appointment and service shall be determined according to the needs of the Army at the time that my requested appointment is considered.  Further, specific career field choices and branch assignments cannot be guaranteed but will be made according to the needs of the Army.

5. **TERMS OF DISENROLLMENT**.  I understand and agree that if I am disenrolled from the ROTC program for breach of contractual terms or any other disenrollment criteria established now or in the future by Army regulations  *(which include, but are not limited to, AR 145-1)* incorporated herein by reference, I am subject to the terms in paragraphs 5a, 5b and 5c below-

a. **I AGREE TO SERVE ON ENLISTED ACTIVE DUTY**.  Under the terms of this contract, the Secretary of the Army or his or her designee, may order me to active duty as an enlisted soldier, if I am qualified, for a period of not more than two *(2)* years if I fail to complete the ROTC program and am disenrolled after the point of obligation.  Any unexpired portion of my enlistment obligation remaining after such active duty must be served in the USAR Control Group *(Reinforcement)*

b. **I AGREE TO TRANSFER TO THE INDIVIDUAL READY RESERVE***(IRR), IF APPLICABLE*.  If I am disenrolled from ROTC and assigned to the ROTC Control Group, and I am not ordered to active duty and am not pending such an order under the terms of this contract, applicable Army regulations, or statute, then-

(1) If I have previously completed basic training *(BT)*  or eight weeks of one station unit training*(OSUT)*  and I do not join a troop program unit, then I will be transferred to the Individual Ready Reserve.

(2) If I have not completed BT or eight weeks of OSUT and I have no previous military service, I will be discharged from the USAR unless I find a Reserve unit vacancy and am accepted to fill that vacancy within 60 days of disenrollment.

c. **I AGREE THAT PENDING DISCHARGE, I MAY NOT ENLIST**.  I may not enlist in the active Army, another military service, or in a military service academy while I am a contracted ROTC cadet unless I am properly discharged from the ROTC program.

6. **LEAVE OF ABSENCE**.  If I am placed in a leave of absence due to my failure to meet academic or military retention standards as prescribed by statute, Army regulations, or this contract, I will not be relieved of my obligations to the U.S. Army and my obligations under this contract remain in effect.

7. **RELEASE FROM OBLIGATIONS**.  I understand that the Secretary of the Army or his/her designee may at any time release me without notice from the obligations under this contract and disenroll me from the ROTC Program without further benefits hereunder if, in the opinion of the Secretary of the Army or his or her designee, it is in the best interest of the Army.

**PART II - AGREEMENT OF NONSCHOLARSHIP CADET CONTRACTING IN THE SENIOR ROTC PROGRAM** *(Continued)*

8. **COMPLIANCE WITH AND CHANGES IN ELIGIBILITY REQUIREMENTS.** I acknowledge that I have discussed the eligibility requirements pertaining to enrollment in ROTC, enlistment in the USAR or ARNGUS, and accepting a commission as an officer, with the PMS or other designated and authorized ROTC cadre members, and that I understand these requirements. I realize that these requirements may change in the future. I agree to keep myself apprised of all changes in requirements and to maintain my eligibility to participate in ROTC at all times in the future. I also agree to inform the PMS of any change in my eligibility *(medical and non-medical)* based on current or revised requirements as soon as I know or should reasonably have known, recognizing my agreement to keep myself apprised of all applicable changes in requirements. Failure to so advise the PMS of such changes in eligibility that I was aware of or should have been aware of may result in disenrollment.

9. **ORDER TO ACTIVE DUTY IN THE EVENT OF WAR.** I understand that either as an enlisted member or as a commissioned officer in the Reserve Component of the Army of the United States or upon my transfer or assignment thereto, I may be ordered to active duty without my consent in the event of a war, a national emergency declared by Congress or the President, an order of the Selected Reserve to active duty authorized by the President, and as otherwise authorized by law, such call to active duty could be for the duration of a war or any period of time authorized by law.

10. **COMPLETE AGREEMENT AND SEVERABILITY.** I understand the provisions in the contract contain the only binding promises by and to both parties. This agreement controls over any conflicting advice or information that I may have received orally or in writing from Cadet Command, my PMS, other cadre, cadets or others regarding my obligations and agreements to the Army. If any provision within this agreement is determined to be invalid or unenforceable by a court of law, the remaining terms and agreements remain in full force and effect.

| J. HOME ADDRESS *(Include ZIP Code)* | K. SIGNATURE |
|---|---|
| | L. DATE *(YYYYMMDD)* |

**PART III - CONSENT OF PARENT OR GUARDIAN TO ENROLL IN ROTC & ENLIST IN THE U.S. ARMY RESERVE**
*(To be completed if applicant is under 18 years of age at time of enrollment in the ROTC program)*

11. I certify that I am the applicant's parent or legal guardian, and that the applicant's date of birth as shown above is correct.

12. I consent to applicant's enrollment in the ROTC and to enlistment in the USAR.

13. I have read and thoroughly understand the above statements of terms under which the applicant is being enrolled. I relinquish all claims to applicant's service and to any wages or compensation for such service. I understand that the applicant will be subject to all of the requirements and lawful commands of the officers who may from time to time be placed over the applicant, and I certify that no promise of any kind has been made to me concerning the applicant's assignment to duty or appointment as an officer as an inducement to me to sign this contract.

| M. SIGNATURE OF PARENT OR GUARDIAN | N. SIGNATURE OF WITNESS | O. DATE *(YYYYMMDD)* |
|---|---|---|

**PART IV - CONFIRMATION OF ENROLLMENT AS AN ROTC NONSCHOLARSHIP CADET**
*(And of Enrollment in the ROTC Program, if not previously enrolled)*

| 14. On the basis of the above executed contract *(Part II)*, and the executed consent of the parent or guardian *(Part III)*, if applicable, I have selected and enrolled this applicant as a cadet in the ROTC Program on the effective date of enrollment in item P. | P. EFFECTIVE DATE OF ENROLLMENT *(YYYYMMDD)* |
|---|---|

**PART V - FOR THE SECRETARY OF THE ARMY**

| Q. NAME OF ROTC CONTRACTING OFFICIAL *(Print or Type)* | S. DATE *(YYYYMMDD)* |
|---|---|
| R. SIGNATURE OF ROTC OFFICIAL | |

A231

Singh v. McHugh et al.

(Cadet Command Form 139-R)

# CADET APPLICATION AND ENROLLMENT RECORD

For use of this form, see CC Pam 145-4, the proponent agency is ATCC-PAC

## DATA REQUIRED BY THE PRIVACY ACT OF 1974

**Authority**        10 USC 2101, 2103, 2104, 2107, 2111, and 5 USC 301

**Principal Purpose(s)**   To obtain personnel data in order to determine eligibility for enrollment and serve as a source document for cadet's service record throughout participation in the ROTC Program. Provides data for the administration of the ROTC student commencing with application for enrollment into the ROTC Program.

**Routine Uses**   To verify eligibility to participate in the ROTC Program, the names, addresses and telephone numbers (as in the event of death, injury, illness or unauthorized absence while participating in ROTC activities, to facilitate contact with complete information with a cadet during other than normal training periods, to make a matter of record the information provided by the cadet.

**Disclosure**   Disclosure is voluntary, however, failure to provide complete information and provide responses will suspend the enrollment process into the ROTC Program.

## PART I - GENERAL INFORMATION

1. NAME (Last, First, MI)
2. SSN
3. COLLEGE ID #
4. E-MAIL

5. LOCAL ADDRESS
5a. CITY
5b. STATE
5c. ZIP CODE
6. PHONE

7. PERMANENT ADDRESS
7a. CITY
7b. STATE
7c. ZIP CODE
8. PHONE

9. DOB
10. POB
11. RELIGIOUS PREF
12. BLOOD TYPE
13. ACT
14. SAT

15. SEX
16. HEIGHT
17. WEIGHT
18. MARITAL STATUS
19. DEPENDENTS
19a. NUMBER OF DEPENDENTS

20. RACE/ETHNICITY (Check One)   ☐ African American   ☐ American Indian   ☐ Asian   ☐ Caucasian   ☐ Hispanic   ☐ Other   ☐ "other", Explain:

21. CITIZENSHIP (Check One)   ☐ U.S. Citizen   ☐ U.S. Born   ☐ Naturalized   ☐ Born Overseas With U.S. Parents   ☐ Dual Citizenship (See CC PAM 145-4, 2-39)
☐ Non U.S. Citizen   ☐ Immigrant Alien   ☐ Nonimmigrant Alien   ☐ Refugee

22. Do you have any condition that could interfere with you participating in a normal college physical education course?
22a. If "yes" explain

23. Have you ever received Medical Disability payments from any source?
23a. If "yes" explain

24. NEXT OF KIN
24a. ADDRESS
24b. PHONE

## PART II - ACADEMIC INFORMATION

25. ROTC HOST SCHOOL
25a. FICE CODE
26. SCHOOL OF ATTENDANCE
26a. FICE CODE

27. RESIDENCY STATUS
28. ACADEMIC CLASS
29. PROJECTED GRADUATION DATE
30. ACADEMIC MAJOR

31. ACADEMIC MINOR
32. CREDITS TOWARD DEGREE
33. CREDITS REQUIRED FOR DEGREE
34. CGPA (COLLEGE)

35. OTHER COLLEGES ATTENDED
35a. YEAR(S) ATTENDED
36. HIGH SCHOOL ATTENDED

36a. GRADUATION DATE
37. ROTC SCHOLARSHIP RECIPIENT
37a. If "yes" what type?

38. OTHER SCHOLARSHIPS
39. JROTC EXPERIENCE

## PART III - CURRENT OR PRIOR MILITARY SERVICE (TO INCLUDE OFFICER PRODUCING PROGRAMS)

☐ NOT APPLICABLE (Go to PART IV)

40. CURRENT SERVICE: Are you currently in the Armed Forces?
40a. If "yes" which Branch?
40c. Is your spouse currently a member of the Armed Forces?

40b. SMP UNIT
40d. If "yes" what type of discharge?
41b. Were you ever enrolled in a Service Academy?

41. PRIOR SERVICE: Have you ever been enrolled in an officer producing program?
41a. Were you ever disenrolled from the ROTC Program?
41e. If "yes" what was the RE Code?

41c. Were you ever discharged from the Armed Forces?
41d. If "yes" what type of discharge?
41e. If "yes" what type?

41f. Months of Active Service
41g. Have you ever been discharged for medical reasons?
41 h. If "yes", explain:

REPLACES ALL PREVIOUS EDITIONS, WHICH ARE OBSOLETE.

USACC Form 139-R, 29 JUL 14

Page 1 of 6

A233

| | Last Name | |
|---|---|---|
| | | SSN |

# CADET APPLICATION AND ENROLLMENT RECORD

## PART IV - STUDENT STATEMENTS

**42. RELEASE OF INFORMATION**

The Privacy Act requires that we notify you of other routine uses of the information we collect from you. You should know that if you leave school, we might provide your name, address, and phone number to the U.S. Army Recruiting Command. This is done because the Active Army, Army Reserve, and National Guard want and need intelligent young men and women. They also have programs which might help you return to college. The transfer of information to the Recruiting Command means that, if you drop from school, you may receive information in the mail or be called by an Army Recruiter. You are under no obligation to accept the mail or to talk to the recruiter.

☐ I have read and understand the above statement concerning data required by the Privacy Act of 1974.

Verification of the following statements is required in order to assist in establishing eligibility to participate in the ROTC program. Failure to provide a response will preclude further processing as an enrolled cadet. Failure to provide an accurate or truthful response is grounds for barring entry into the ROTC program or for the initiation of disenrollment action. Your signature at the bottom of this page will attest to the accuracy of your responses on this form.

**43. STATEMENT OF CRIMINAL PROCEEDINGS BY CIVIL OR MILITARY AUTHORITIES**

I have not been indicted or summoned into court under civilian or military law as a defendant in a criminal proceeding, to include any and all proceedings involving juvenile or adult criminal offenses,  but excluding minor traffic violations (Exception: alcohol-related driving offenses) which involved a fine or forfeiture, alone, of less than $250. I have not had 6 or more minor traffic violations (excluding parking violations) in a 12-month period where the fine is $100 or more per offense. I have not had 12 or more minor traffic violations (excluding parking violations) during the previous 3 years where the fine is $100 or more per offense. I have never been convicted, fined, imprisoned, placed on probation, paroled, or pardoned (to include alcohol violations and misdemeanors), except for minor traffic violations as defined above. I will advise the Professor of Military Science of any future information pertaining to any changes of criminal conduct against myself and I shall do so as soon as practical under the circumstances. Records that are expunged, sealed, set aside, dismissed, or original findings or pleas changed STILL require a waiver.

Check One:

☐ The above statement is true.   ☐ The above statement is not true - Explain:

**44. SUBSTANCE ABUSE**

Check One:

☐ I have never used an illegal substance or drug.

☐ I have used illegal substances or drugs only on an experimental or limited basis.   When: _____   How Often: _____

☐ I have been a recent or frequent user of illegal substances or drugs.   When: _____   How Often: _____

NOTE: Any future drug use will be grounds for disenrollment from the ROTC Program.

**45. RELIGIOUS ACCOMMODATION**

The U.S. Army cannot guarantee that my religious practices will be accommodated. I acknowledge and understand that it is the Department of the Army's policy to accommodate religious practices as long as the practice will not have an adverse impact on military readiness, unit cohesion, standards, health, safety or discipline. I further acknowledge and understand that the U.S. Army has the right to amend or eliminate any such accommodation based on the needs of the Army.

☐ I have read and understand the above statement concerning accommodation of my religious practices.

**46. CONSCIENTIOUS OBJECTION**

If you have moral convictions that preclude you from bearing firearms and/or participating in full military service with the U.S. Army, to include armed combat, then you are a conscientious objector. AR 600-43 defines conscientious objection as "A firm, fixed and sincere objection to participation in war in any form or the bearing of arms, because of religious training and belief."

Check One:   ☐ I am not a conscientious objector.   ☐ I am a conscientious objector.   Explain:

Intentionally Left Blank

_____
SIGNATURE OF CADET

**47. LOYALTY OATH (OPTIONAL FOR NONCONTRACTED CADETS)**

"All information given on this form is correct to the best of my knowledge."

"I do solemnly swear (or affirm) that I will support and defend the Constitution of the United States of America against all enemies, both foreign and domestic; that I will bear true faith and allegiance to the same, and that I take this obligation freely, without any mental reservation or purpose of evasion, so help me God."

_____        _____
SIGNATURE OF CADET                                      DATE

USACC Form 139-R, 29 JUL 14

A234

# CADET APPLICATION ENROLLMENT RECORD

Last Name: 
SSN: 

## PART V - BASIC COURSE ENROLLMENT ELIGIBILITY CHECKLIST*

**ALL NONCONTRACTED CADETS MUST MEET THE FOLLOWING CRITERIA TO ENROLL IN THE BASIC COURSE:**
Enrollment Eligibility Officer: Verify the criteria below and sign the certification on page 5.

**48. ACADEMIC STATUS**
☐ Eligible: Registered for and attending full time (in accordance with university policy - usually 12 or more credit hours) a regular course of instruction resulting in an accredited undergraduate or graduate degree at a host or partnership school.
☐ Ineligible (Waiver denied): Not registered for and attending full time a regular course of instruction at a host or partnership school.

**49. CONSCIENTIOUS OBJECTION**
☐ Eligible: (a) U.S. Citizen and is not a conscientious objector. (b) Enrolled alien student (exempt by statute). (c) Students required by their school to take military training.
☐ Ineligible: Student is a U.S. Citizen and a conscientious objector at a school, which does not require its students to take military training. (NOTE: Prior to enrollment students who have previously been conscientious objectors must furnish a letter stating they no longer have convictions that preclude bearing arms and participating in full military service with the U.S. Army).

**50. CHARACTER**
☐ Eligible: Good moral character. No domestic violence conviction.
☐ Ineligible: Nonwaiverable. Domestic violence misdemeanor or felony conviction.

**51. TATTOOS**
☐ Eligible: Student does not have any tattoos specifically prohibited by Army policy (see ineligible below).
☐ Ineligible: (a) Any tattoo/brand on the face, neck or head (permanent facial makeup that conforms to AR 670-1 makeup standards is permitted). (b) Other tattoos/brands that are visible and detract from a soldierly appearance while wearing the Class A uniform. (c) Other tattoos/brands that are prejudicial to good order and discipline.

**52. CITIZENSHIP**
☐ Eligible: U.S. Citizen (Must be verified per instructions). (Dual citizens must renounce foreign citizenship prior to receiving a clearance (see CC PAM 145-4, 2-39a)).
☐ Approval Required: (a) Immigrant Alien (b) Refugee (NOTE: Aliens are ineligible for scholarship and SMP, even if approved for enrollment).
☐ Approval Granted (Eligible):   Date
☐ Ineligible: Nonimmigrant Aliens.

**53. MEDICAL**
☐ Eligible: DA Form 3425-R has been completed and signed by a qualified medical physician (or equivalent statement from university health care provider) showing no medical condition/physical impairment that precludes enrollment in the basic course.
☐ Ineligible (Waiver denied or nonwaiverable): Qualified medical physician refuses to complete and sign DA Form 3425-R for the student.

***NOTE: ENROLLMENT ELIGIBILITY OFFICER WILL CHECK THE INFORMATION IN PARTS I - III AND THE STUDENT'S STATEMENTS IN PART IV AND ADVISE THE STUDENT IF A WAIVER IS REQUIRED PRIOR TO CONTRACTING I.E., AGE, RE-CODE, DEPENDENCY, CIVIL CONVICTION, SUBSTANCE ABUSE, ETC. (Waiver approval is not guaranteed).**

## PART VI - NONSCHOLARSHIP CONTRACTING ELIGIBILITY CHECKLIST

**ALL NONSCHOLARSHIP CADETS MUST MEET THE FOLLOWING CRITERIA TO CONTRACT:**
Enrollment Eligibility Officer: Verify the criteria below and sign the certification on page 5. (Scholarship students must also meet scholarship eligibility requirements in Part VII)

**54. PREVIOUS CRITERIA**
☐ Eligible: Student meets criteria 49-54 on the Basic Course Enrollment Eligibility Checklist (Part V).
☐ Waiver Required: Pending waiver for criteria in Part V above.          ☐ Waiver Granted (Eligible):   Date
☐ Ineligible (Waiver denied or nonwaiverable).

**55. CIVIL CONVICTION**
☐ Eligible: (a) No civil conviction, adverse adjudication, or court-martial conviction other than minor traffic violations (Exception: alcohol-related driving offenses) resulting in a fine of less than $250. (b) Not guilty verdict or successful appeal of a conviction.
☐ Waiver Required (Prior to Contracting): Any civil conviction, adverse adjudication, or court-martial conviction other than minor traffic violations (Exception: Alcohol-related driving offenses) resulting in a fine of less than $250. Any conviction resulting in other adverse dispositions (punishment other than a fine) requires a waiver. Convictions where the record is expunged, sealed, set aside, dismissed, or original finding or pleas changed still require a waiver.
   ☐ Waiver Granted (Eligible):   Date
☐ Ineligible (Waiver denied or nonwaiverable): (a) Pending charges for violating any civil law;  (b) On supervised and/or conditional probation.

**56. DEPENDENCY**
☐ Eligible: (a) Single student with no dependents.  (b) Married student with no more than three (3) dependents, to include spouse.  (c) Single student whose children have been placed by court order in the custody of an adult relative/legal guardian and the student is not required to pay child support.
☐ Waiver Required (Prior to Contracting): (a) More than three (3) dependents (spouse plus more than 2 children under 18 years old).  (b) Single parent whose children have been placed by court order in the custody of an adult relative/legal guardian when the student is required to pay child support.  (c) Spouse is also in Army ROTC and there are children under 18 years old.  (d) Spouse is in a military component of any Armed Service (other than Inactive Ready Reserve) when student has a child under 18 years old.
   ☐ Waiver Granted (Eligible):   Date
☐ Ineligible (Waiver denied or nonwaiverable): Single parents who have legal custody of their children who are under 18 years old.

USACC Form 139-R, 29 JUL 14

A235

A236

Last Name

SSN

# CADET APPLICATION ENROLLMENT RECORD

## PART VI - NONSCHOLARSIP CONTRACTING ELIGIBILITY CHECKLIST (CONTINUED)

**ALL NON-SCHOLARSHIP CADETS MUST MEET THE FOLLOWING CRITERIA TO CONTRACT:**
Enrollment Eligibility Officer: Verify the criteria below and sign the certification on page 5. (Scholarship students must also meet scholarship eligibility requirements in Part VII.)

**57. SUBSTANCE ABUSE**
☐ Eligible: (a) Never used chemical substances or drugs; (b) Self admitted limited, experimental use of chemical substances or drugs which occurred over 6 months prior to contracting, unless disqualified by DoDMERB.
☐ Waiver Required: (a) Self admitted use of chemical substances or drugs on an experimental or limited basis, which occurred within six (6) months prior to contracting. (b) Self admitted frequent and/or habitual use of chemical substances or drugs prior to contracting.
☐ Waiver Granted (Eligible): _____ Date _____
☐ Ineligible (Waiver denied or nonwaiverable) Chemical substance or drug abuse requiring professional care, which is medically disqualifying.

**58. LOYALTY OATH**
☐ Eligible: Cadet signed loyalty oath.
☐ Ineligible: Refuses to sign loyalty oath.

**59. PRIOR SERVICE**
☐ Eligible: (a) No prior service. (b) Honorably discharged from the Armed Services with a qualifying RE code of 1 on DD Form 214. (c) Currently in the Army Reserve or National Guard (see NOTE below).
☐ Waiver Required: (a) Honorably discharged with an RE code other than 1 on DD Form 214. ☐ Waiver Granted (Eligible): _____ Date _____
☐ Ineligible (Waiver denied or nonwaiverable): (a) Honorably discharged with a disqualifying RE code on the DD Form 214. (b) More than ten (10) years Active Duty, without an exception to policy from CC. (c) Any type of discharge other than "honorable". (d) Current or former commissioned officer, or has a certificate of eligibility for appointment as a commissioned officer. (e) On Active Duty at time of contracting. A soldier on terminal leave is ineligible until actual separation.
**NOTE:** Contracted cadets cannot be in the USAR or ARNG (to include IRR) outside of the SMP program. Upon contracting, current members of the USAR or ARNG must either sign an SMP contract (and remain a member of the USAR or ARNG) or sever ties with their USAR or ARNG unit (the ROTC contract overrides any reserve component contract).

**60. CITIZENSHIP**
☐ Eligible: U.S. citizen. (Dual citizens must renounce foreign citizenship prior to receiving a clearance, which is a prequisite for commissioning (see CC PAM 145-4, 2-39a)).
☐ Ineligible (Nonwaiverable): Non-U.S. citizen.

**61. PLACEMENT CREDIT**
☐ Eligible: Student is enrolling in the Alternate Entry Program, the Accelerated Cadet Commissioning Training Program/Or student has received credit for MS I & MS II by any combination of the following (as set forth in CC Reg 145-3, Table 6-1): (a) Completed Basic Course. (b) Successfully completed LTC. (c) Completed Basic Training in one of the Armed Services. (d) Credit for Senior ROTC training (Army, Navy, Air Force, Marine, or Coast Guard). The first year of any SROTC = credit for MS I. Any additional years of SROTC = credit for the Basic Course. (e) Participation in a service academy. One year = credit for MS I. Two years = credit for the Basic Course. (f) JROTC experience. One = no credit. Two years = PMS may award up to MS I credit. Three years = PMS may award up to full Basic Course credit.
☐ Ineligible (Waiver denied/Nonimmigrant Aliens)

**62. ACADEMIC STATUS**
☐ Eligible: (a) All students must be enrolled full time AND academically aligned AND have a cumulative college GPA (if any) of 2.0 on a 4.0 scale or equivalent. (b) MJC freshman also require at least a 2.0 cumulative high school GPA AND SAT score of 850 or ACT of 17.
☐ Waiver Required: Graduate student with less than full time enrollment (waiverable). ☐ Waiver Granted (Eligible): _____ Date _____
☐ Ineligible (Waiver denied): (a) Student is not academically aligned (Exceptions to policy may be considered); (b) Cumulative college GPA is less than 2.0 (nonwaiverable).

**63. PHYSICAL FITNESS**
☐ Eligible: Score 180, with a minimum of 60 points in each event, on a single APFT.
☐ Ineligible (Nonwaiverable): Failure to meet eligibility criteria.

**64. MEDICAL**
☐ Eligible: Student is fully medically qualified by a DoDMERB physical.
☐ Waiver Required: Student is medically disqualified by a DoDMERB or MEPS physical, if applicable. ☐ Waiver Granted (Eligible): _____ Date _____
☐ Ineligible (Waiver denied or nonwaiverable).

**65. AGE**
☐ Eligible: Student is at least 17 years of age at time of contracting and will be less than age 30 at time of commissioning.
☐ Waiver Required (Prior to Contracting): Age 35 or older at time of commissioning. Brigade Commander can waive thru age 39. CG is waiver approval authority for over 39 years of age.
**NOTE:** Retirement benefits are at risk for 33 and higher. ☐ Waiver Granted (Eligible): _____ Date _____
☐ Ineligible (Waiver denied or nonwaiverable): Student is younger than 17 at time of contracting.

Last Name _____
SSN _____

# CADET APPLICATION ENROLLMENT RECORD

## PART VII - SCHOLARSHIP ELIGIBILITY CHECKLIST

**ALL SCHOLARSHIP CADETS MUST MEET THE FOLLOWING CRITERIA TO CONTRACT:**
Enrollment Eligibility Officer: Verify the criteria below and sign the certification on page 5. Scholarship students must also meet scholarship eligibility requirements. **NOTE:** Green to Gold scholarship applicants must meet additional criteria in order to apply. Refer to the current Green to Gold application for details.

### 66. PREVIOUS CRITERIA
☐ Eligible: (a) Four-year and three-year scholarship winners must meet scholarship eligibility requirements. **NOTE:** Green to Gold scholarship applicants must meet additional criteria 55-61 on the Advanced Course Eligibility Checklist (Part VI). (b) Two-year scholarship winners must meet criteria 55-62 on the Advanced Course Eligibility Checklist (Part VI). (**NOTE:** Alternate Entry Option students are ineligible for scholarship).
☐ Ineligible: Ineligible for contracting unless student is fully qualified.

### 67. MEDICAL
☐ Eligible: Student is fully medically qualified by DoDMERB.
☐ Waiver Required: Student is medically disqualified by DoDMERB.   ☐ Waiver Granted (Eligible):   Date _____
☐ Ineligible (Waiver denied or nonwaiverable).

### 68. MAJOR
☐ Eligible: Student is majoring in one of the majors listed in CC Reg 145-1.
☐ Waiver Required: Student is not majoring in one of the majors listed in CC Reg 145-1.   ☐ Waiver Granted (Eligible):   Date _____
☐ Ineligible (Waiver denied).

### 69. AGE
☐ Eligible: Student must be 17 years of age within the first semester following award of the scholarship (cannot contract until reaches age 17) and be under 31 years of age on 31 December of the calendar year of commissioning.
☐ Ineligible (Statutory-Nonwaiverable): Student exceeds the statutory maximum age requirement IAW CC Reg 145-1.

### 70. ACADEMIC STATUS
☐ Eligible: Student must meet ALL THREE of the following criteria: (a) Academically aligned. (b) Cumulative college GPA of 2.5 on a 4.0 scale, OR student has no college GPA yet, but has a cumulative high school GPA of 2.5 on a 4.0 scale. (c) Full time student (in accordance with university policy - usually 12 or more credit hours).

|  HS GPA  |  OR  |  College GPA  |
|----------|------|---------------|

☐ Waiver Required: (a) Student has a cumulative college GPA of less than 2.5 on a 4.0 scale. Rounding is not permitted. (b) Student has no cumulative college GPA yet, but has a cumulative high school GPA of less than 2.5 on a 4.0 scale. (c) Graduate student who is enrolled less than full time.   ☐ Waiver Granted (Eligible):   Date _____
☐ Ineligible (Waiver denied or nonwaiverable).

### 71. ACT/SAT
☐ Eligible: (a) Two-year scholarship recipient: no requirement (except two-year MJC). (b) Two-year MJC, three-year or four-year scholarship recipient with composite ACT score of 19 or greater OR composite SAT score of 920 or greater.

|  SCORE: SAT Verbal ☐  |  SAT Math ☐  |  ACT Composite ☐  |
|-----------------------|--------------|-------------------|

☐ Waiver Required: Two-year MJC, three-year or four-year scholarship recipient with composite ACT score of less than 19 OR composite SAT score of less than 920.

|  SCORE: SAT Verbal ☐  |  SAT Math ☐  |  ACT Composite ☐  |
|-----------------------|--------------|-------------------|

☐ Waiver Granted (Eligible):   Date _____
☐ Ineligible (Waiver denied or nonwaiverable): Two-year MJC, three-year or four-year scholarship applicant who has not taken the ACT or SAT.

### 72. ACADEMIC CREDITS
☐ Eligible: At the time the scholarship begins, (a) Two-year scholarship recipients must have at least 4 semester/6 quarters remaining. (b) 2 1/2-year scholarship recipients must have at least 5 semester/7-8 quarters remaining. (c) Three-year scholarship recipients must have 6 semesters/9 quarters remaining, or (d) 3 1/2-year scholarship recipients must have 7 semesters/10-11 quarters remaining.
☐ Waiver Required: If the student does not meet the criteria above.   ☐ Waiver Granted (Eligible):   Date _____
☐ Ineligible (Waiver denied).

### 73. PHYSICAL FITNESS
☐ Eligible: Score of 180 with 60 points in each event on a single APFT. **NOTE:** All scholarship applicants must be given a physical assessment (APFT or PFT) during the face-to-face interview for assessment of physical ability. The APFT must be passed NLT 15 Dec (or NLT 1 May for mid-term entries) at the 60/60/60 - 180 standard prior to contracting.
☐ Ineligible (Nonwaiverable): Failure to meet eligibility criteria.

## PART VIII - ENROLLMENT OFFICER CERTIFICATION

Certify by signature as many as applicable:
☐ **BASIC COURSE:** Student is eligible (fully or by waiver) for entry into the Basic Course.
Name/Rank: _____   Signature: _____   Date: _____
☐ **NONSCHOLARSHIP:** Student is eligible (fully or by waiver) to contract as a nonscholarship.
Name/Rank: _____   Signature: _____   Date: _____
☐ **SCHOLARSHIP:** Student is eligible (fully or by waiver) to contract as a scholarship recipient.
Name/Rank: _____   Signature: _____   Date: _____

USACC Form 139-R, 29 JUL 14

Page 5 of 6

A237

# CADET APPLICATION AND ENROLLMENT RECORD
## Instructions and Notes (CC Pam 145-4)

The purpose of the Cadet Application and Enrollment Record (CC Form 139-R) is threefold:

1. To record necessary information for entering a Cadet into the CCIMS database.
2. To create a legal record of Cadet enrollment.
3. To guide the Enrollment Eligibility Officer through the process of determining eligibility for enrollment and contracting.

A student is not enrolled in Army ROTC until he/she has completed, signed, and initialed this form and the Enrollment Eligibility Officer certifies by signature that the student is eligible for entry into the Basic Course. A Cadet under the Basic Course has completed, signed, and initialed this form and the Enrollment Eligibility Officer certifies by signature that the Cadet is eligible for contracting.

Contracting any student is subject to the approval of the PMS, even when all other eligibility criteria are met.
Cadre will verify that the information on this form is current and accurate during each required periodic counseling with the Cadet.

Reproduction of this form on cardstock for durability is recommended. You may fill in permanent information in ink and changeable items in pencil.
If a waiver is required, refer to the current "Approval Authority/Flow of Cadet Actions" matrix and CC Pam 145-4, or other published guidance for current processing of waivers.
This form will be retained in the Cadet's MPRJ as a permanent document and retained with the Cadet Record Brief for five years following the Cadet's appointment or disenrollment.

Notes and references:

Part I-III   Height and weight is approximate. Fully discuss with the student any physical conditions they identify in Part I.

Part IV   Signing the Loyalty Oath is optional for noncontracted students enrolling in the Basic Course. Aliens do not sign the Loyalty Oath.

Part V   Basic Course Enrollment Eligibility (Noncontracted Cadets):  See notes/instructions for Part V.
(1) Academic Status:  AR 145-1, Ch 3; CC Pam 145-4.
(2) Conscientious Objection: AR 145-1, Ch 3; CC Reg 145-1.
(3) Character:  AR 145-1, Ch 3; CC Pam 145-4.
(4) Tattoos:  AR 670-1, dtd 1 Jul 02, para 1-8e. TRADOC MSG dtd 011525Z, Subj:  TRADOC/USAREC IET RECRUIT/CADET TATTOO/BRAND POLICY
(5) Citizenship:  Must be verified. The following documents may be used in verifying U.S. Citizenship:  (a) Birth Certificate, (b) Certificate of Naturalization, (c) Certificate of Citizenship of parents, (d) INS Form N-560
(Certificate of Citizenship, (e) Department of State Form 1350 (Certificate of Birth Abroad of a Citizen of the U.S.A.), (f) FS Form 240 (Report of Birth, Child Born Abroad of American Parent or Parents), (g) FS Form
545 (Certification of Birth Abroad of a Citizen of the U.S.A.), (h) Unexpired fully valid US Passport issued in the name of the applicant. AR 145-1, Ch 3; CC Reg 145-1 (for scholarship; CC Pam 145-4 (for processing aliens
for enrollment refer to AR 145-1, Ch3, and CC Pam 145-4).  Dual citizenship-foreign citizenship must be renounced prior to receipt of a clearance, which is a prerequisite for commissioning.
(6) Medical: AR 145-1, Ch 3; CC Pam 145-4; AR 40-29; AR 40-501, Ch 2. Height and weight standards for prior service Cadets are found in AR 600-9. Height and weight standards for non-prior service Cadets are found
in AR 40-501 and CC Pam 145-4.

Part VI   Nonscholarship Contracting Eligibility.  See notes/instructions for Part VI.
(1) Basic Course Eligibility Requirements:  Cadet must meet basic course eligibility requirements - (1) - (6).
(2) Civil Conviction: AR 145-1, Ch3; CC Reg 145-1; CC Pam 145-4; and AR 601-210, Ch 4.
(3) Dependency: AR 145-1, Ch 3; CC Pam 145-4. In questions of custody, only court orders are acceptable.  Powers of Attorney have no binding legal effect in such cases.  Cadre will not counsel or advise sole parent
applicants to turn over legal custody; they may only advise on eligibility standards IAW Army policy.
(4) Substance Abuse: AR 145-1, Ch 3; CC Pam 145-4. Aliens specifically exempted by law.
(5) Prior Service:  AR 145-1, Ch 3; CC Reg 145-1; CC Pam 145-4; AR 601-210, Table 3-6 contains RE codes and their eligibility status.
(6) Prior Service:  AR 145-1, Ch 3; CC Reg 145-1; CC Pam 145-4; AR 601-210, Table 3-6 contains RE codes and their eligibility status.
(7) Citizenship:  Must be verified. The following documents may be used in verifying U.S. Citizenship:  (a) Birth Certificate, (b) Certificate of Naturalization, (c) Certificate of Citizenship of parents, (d) INS Form N-560
(Certificate of Citizenship, (e) Department of State Form 1350 (Certificate of Birth Abroad of a Citizen of the U.S.A.), (f) FS Form 240 (Report of Birth, Child Born Abroad of American Parent or Parents), (g) FS Form
545 (Certification of Birth Abroad of a Citizen of the U.S.A.), (h) Unexpired fully valid US Passport issued in the name of the applicant. AR 145-1, Ch 3; CC Reg 145-1 (for scholarship; CC Pam 145-4 (for processing aliens
for enrollment refer to AR 145-1, Ch3, and CC Pam 145-4).
(8) Placement Credit:  AR 145-1, Ch 3; CC Reg 145-1.
(9) Academic Alignment:  CC Pam 145-4.
(10) Physical Fitness:  AR 145-1, Ch 3; CC Reg 145-1; CC Pam 145-4; Cadet scholarship and non-scholarship contracts.
(11) Medical: AR 145-1, Ch 3; CC Pam 145-4; AR 40-29; AR 40-501, Ch 2. Height and weight standards for prior service Cadets are found in AR 600-9. Height and weight standards for non-prior service Cadets are found in
AR 40-501 and CC Pam 145-4. Female students who are pregnant are ineligible to contract, but regain eligibility at the end of the pregnancy. Pregnancy after enrollment is not a disqualifier.
(12) Age:  Statutory:  AR 145-1, Ch 3; CC Reg 145-1; CC Pam 145-4.

Part VII   Scholarship Contracting Eligibility.  See notes/instructions for Parts VI and VII.
(1) Basic Contracting Eligibility Requirements:  Cadet must meet basic contracting eligibility requirements in Part VI.
(2) Medical: AR 145-1, Ch 3; Cc Pam 145-4; AR 40-29; AR 40-501, Ch 2. Height and weight standards for prior service Cadets are found in AR 600-9. Height and weight standards for non-prior service Cadets are found in
AR 40-501 and CC Pam 145-4. Female students who are pregnant are ineligible to contract, but regain eligibility at the end of the pregnancy. Pregnancy after enrollment is not a disqualifier.
(3) Major: CC Reg 145-1, Appendix F.
(4) Age:  Statutory:  AR 145-1, Ch 3; CC Reg 145-1.
(5) GPA:  CC Reg 145-1.
(6) SAT/ACT:  CC Reg 145-1.
(7) Academic Credits: CC Reg 145-1.
(8) Physical Fitness: AR 145-1, Ch 3; CC Reg 145-1; CC Pam 145-4; Cadet scholarship and non-scholarship contracts.

A238

Singh v. McHugh et al.
(Technical Bulletin 287)

**TB MED 287**

## TECHNICAL BULLETIN

# PSEUDOFOLLICULITIS OF THE BEARD AND ACNE KELOIDALIS NUCHAE

APPROVED FOR PUBLIC RELEASE; DISTRIBUTION IS UNLIMITED

# HEADQUARTERS, DEPARTMENT OF THE ARMY

# 1  SEPTEMBER 2000

A240

TECHNICAL BULLETIN }
No. MED 287 }

HEADQUARTERS
DEPARTMENT OF THE ARMY
Washington, DC, *1 September 2000*

# PSEUDOFOLLICULITIS OF THE BEARD AND ACNE KELOIDALIS NUCHAE

---

**REPORTING ERRORS AND RECOMMENDING IMPROVEMENTS**
You can help improve this publication. If you find any mistakes or if you know a way to improve procedures, please let us know. Mail your memorandum or DA Form 2028 (Recommended Changes to Publications and Blank Forms) to Commander, U.S. Army Medical Command, ATTN: MCHO-CL-C, 2050 Worth Road, Fort Sam Houston, TX 78234-6010.

---

**Approved for public release; distribution is unlimited.**

|  |  | Paragraph | Page |
|---|---|---|---|
| Section I. | GENERAL |  |  |
|  | Purpose | 1 | 1 |
|  | References | 2 | 1 |
|  | Explanation of abbreviations and terms | 3 | 1 |
| Section II | PSEUDOFOLLICULITIS BARBAE |  |  |
|  | Introduction | 4 | 1 |
|  | Pathogenesis | 5 | 1 |
|  | Clinical approach to the patient | 6 | 2 |
|  | Management techniques | 7 | 2 |
|  | Guidelines for treatment in relation to clinical severity | 8 | 4 |
|  | Profile considerations | 9 | 5 |
|  | Summary | 10 | 6 |
| Section III | ACNE KELOIDALIS NUCHAE |  |  |
|  | Introduction | 11 | 6 |
|  | Pathogenesis | 12 | 6 |
|  | Clinical approach to the patient | 13 | 6 |
|  | Management techniques | 14 | 6 |
|  | Summary | 15 | 7 |
| Appendix A. | REFERENCES |  | A-1 |
| Glossary |  |  | Glossary-1 |

## List of Figures

| Number | Title | Page |
|---|---|---|
| 1 | Pathogenesis of pseudofolliculitis barbae | 2 |
| 2 | Allowing the beard to grow may release ingrown hairs and, thus, may be part if the treatment of pseudofolliculitis barbae | 4 |

---

*This bulletin supersedes TB MED 287, 1 January 1983.

## Section I. General

### 1. Purpose

This technical bulletin provides information with respect to the diagnosis and medical management of pseudofolliculitis of the beard (PFB) and acne keloidalis nuchae. It is specifically intended to assist medical officers in the proper management of active duty and reserve component soldiers who are afflicted with these conditions.

### 2. References

Referenced publications and forms and a selected bibliography are listed in appendix A.

### 3. Explanation of abbreviations and terms

Abbreviations and special terms used in this bulletin are explained in the glossary.

## Section II. Pseudofolliculitis Barbae

### 4. Introduction

a. *Synonyms*. PFB is also known as pili incarnati, chronic scarring pseudofolliculitis of the beard, and ingrown hairs of the beard.

b. *Definition*. PFB is a chronic papulopustular dermatitis of the bearded area resulting from reentry penetration of the epidermis by the growing hair.

c. *Epidemiology*. Although it may occur in any male with curly hair, the black man's genetic predisposition to tight coiling makes him particularly susceptible to this condition. Severe forms are usually encountered only in this race; however, they may also be seen in individuals of Mediterranean descent. The association with shaving, particularly close shaving, is widely accepted. The exact incidence is unknown but the condition, particularly in its mild forms, appears quite common in black men. Clinical impressions are that many patients have fathers and or brothers with this problem. This observation suggests that PFB does not disappear at some specific age.

d. *Military considerations*.

(1) Standards of appearance, as specified in current Army regulations, do not permit the active duty member to exercise the option to wear a beard. Since PFB often becomes apparent only following a period of regular shaving, the majority of men with this condition have had insufficient cause to develop this problem before entering military service.

(2) The medical management of PFB (see para 7) often necessitates the wearing of a beard during some phase of treatment. The commander is acutely aware of the bearded military patient when he appears in sharp contrast to his clean-shaven counterpart. This encounter can create problems if all parties concerned fail to recognize the necessity for medical treatment. This is a particularly sensitive area in interpersonal relations because it commonly concerns a minority (the bearded soldier-patient) within a minority (the black man).

(3) Problems related to morale and discipline should not influence a medical decision for proper treatment of the military patient. The well-motivated soldier within an informed military community should not create problems relating to morale and discipline because he is receiving legitimate medical therapy.

(4) Army Medical Department (AMEDD) personnel must work with both the military community and the patient to ensure an environment within which proper treatment of PFB can exist in harmony with the traditions and discipline of the military community.

(5) Individual military patients who exceed the medical authorization required for treatment must expect the same discipline as their cohorts. This is a command responsibility.

### 5. Pathogenesis

a. *Anatomical factors*. The direction of hair growth in the curved pattern of hair growth is the principal characteristic which initiates the process. The hair emerges almost parallel to the skin and immediately turns in the direction of the epidermis. The arc continues with penetration into the skin as if to complete a full circle. The external portion of the hair from exit to reentry is usually short, averaging 2 millimeters (mm) in length. As the tip proceeds into the dermis, epithelial cells incompletely form about the shaft forming a pseudofollicle. The resistance increases and penetration gradually ceases, ending at about 2 or 3 mm into the skin. Further growth will result in a loop over the surface of the skin. The inflammatory reaction produces the papules, and in a continuing spectrum, the pustule (fig 1). Additionally, if untreated, large cysts may occur containing one or more curled hairs.

b. *Mechanical factors*. When the tip of the emerging hair is cut sharply, penetration is facilitated. Two situations exist in which the emerging hair penetrates the wall of the follicle rather than arcing across a portion of skin prior to reentry. The first situation occurs when the skin is stretched during shaving (that is, a "barber close shave"). When the skin is released, the tip of the growing hair lies beneath the surface and grows in an arc through the follicular wall. A second similar situation may follow the plucking of individual hairs.



*Figure 1. Pathogenesis of pseudofolliculitis barbae*

*c. Infectious factors.* Pathogenic bacteria do not appear to influence the uncomplicated course of PFB. Cultures from pustules reveal the normal flora of the skin rather than the pathogenic staphylococcal organism usually noted in true bacterial folliculitis.

## 6. Clinical approach to the patient

PFB is a common problem in black men, although it is seen in all races. The papules are subjected to denudation with shaving, increasing inflammation and patient discomfort. The process is particularly prone to occur in the submandibular area because of the density and direction of growth. Because of these factors, hair in this region is subjected to a closer cut. Once the condition has developed, it will persist indefinitely as long as the patient shaves daily in his usual manner. Treatment is, therefore, directed toward clearing the dermatitis and instituting measures to prevent recurrence. The management is clearly related to the severity of the condition and varies in relation to the extent of disease.

## 7. Management techniques

*a. Close shaving.* Close shaving and plucking the individual hairs are contraindicated for the reasons outlined in paragraph 5b. If such procedures are followed, a transient improvement may be noted, only to be followed by an intense exacerbation as the hairs penetrate the follicle wall during regrowth.

*b Adequate time for shaving.* One of the most important methods of management is to allow adequate time to shave carefully. Shaving in a hurry often leads to close shaving, nicking of papules, and inattention to post-shave therapy. It is recommended that the soldier shave the night before, thus allowing adequate time for the preshave, shave, and post-shave phases to be executed properly. The soldier will experience the beginnings of a "5 o'clock shadow" shortly after noon the following day.

*c. Dislodgement.* Dislodgement of the ingrown tip is desirable since it will hasten resolution of inflammation. Individual hairs, if seen, can be manually dislodged by inserting a toothpick or similar instrument under the loop (never into the skin). A measure for more general treatment utilizing this principle is the use of a rough washcloth (for example, terry cloth). Rubbing such a cloth across the beard area, in clockwise and counterclockwise circles, will facilitate the release of embedded hair tips.

*d. Preshave methods.* The preshave period is as important as the shave itself. It is here that the beard area is prepared. The face should be washed with warm water. This allows for hydration of the hair shafts and softens the skin overlying the ingrown hairs. It is during this phase that dislodgement with the washcloth can be performed. Once the face is adequately hydrated, one of several preshave medications may be applied. A preshave/after-shave lotion containing aloe vera,

propylene glycol, dimethicone, and vitamin E as its major components, or a hydroglide shaving solution and moisturizer which is predominantly propylene glycol may be used. These products are available in most post exchanges. The preshave is applied and allowed to remain on the face. This creates a glide surface for the razor and protects the skin if depilatories are being used. A medicated shaving gel is then applied directly over the preshave. A study showed that the two used together outperformed either alone when used with other techniques.

e.  *Razors.* Previously, razor shaving was discouraged due to the cutting of hairs too closely and the nicking of papules. There are appropriate razors available in most post exchanges for use with this condition. This single blade system has a foil guard to protect against shaving too closely and against nicking existing papules. The razor is used no more than five shaves before it becomes dull and must be discarded. Shaving is accomplished by using gentle even strokes in the direction of beard growth. The same areas should not be shaved over more than once. The skin of the face and neck should not be stretched beyond normal. The razor should be rinsed with cool water between strokes. This protects the blade from becoming prematurely dull.

f.  *Waterless shaving.* This method, also known as dry shaving, utilizes any one of several shaving lotions which contain alpha-hydroxy acids or waterless soaps. After the face is washed and dried, the lotion is applied, and a razor shave is performed. No preshave or shave gel is applied in this method. The remaining lotion is washed off after the shave is complete. This method is particularly useful in areas where supplies of water are limited (that is, deployment and field environments). During a "Usage Trial" conducted at Fort Sam Houston, several of the waterless shave products were tested. They were generally well accepted by participants; however, numerous soldiers complained of facial irritation and a stinging sensation after using lotions containing the alpha-hydroxy acids.

g.  *Depilatories.*

(1) *General.* Previously, a mainstay of therapy was the use of a chemical depilatory to produce a blunt hair end which is less capable of penetrating the skin. Usually 6 weeks of depilatory usage is necessary before its effectiveness can be ascertained. With few exceptions, any use of a razor during this period (blade, electric, or so-called black razor) completely obviates the benefits of a chemical depilatory. Proper use of the depilatory, as outlined below, must be emphasized and reemphasized to the patients since misusage results in burning, itching, and, occasionally, more severe reactions. Many patients have now been found to be sensitive to various components of the depilatories. Even in the absence of symptoms, the chemical depilatories have low patient acceptability because of a strong sulfide odor and or a messy application procedure.

(2) *Use of barium sulfide powder.* The barium sulfide is in approximately 2 percent strength adjusted to pH 11 with calcium hydroxide. Most post exchanges stock such a product. The patient must be instructed in directions for use as follows.

(a) The barium sulfide powder is mixed to a watery consistency and applied thinly to only one-half of the beard area.

(b) Three minutes after the start of the application, a spatula or tongue blade is used to remove the paste. The removal instrument should be kept moistened with water and continually wiped free of paste with disposable tissue paper. Strokes should be short, rapid, and in the direction of hair growth. If hair from heavier bearded areas remains following the first few strokes, repeat the process after waiting an additional 30 to 60 seconds.

(c) When the paste is removed, rinse that half of the face thoroughly and rapidly three times using soap between rinses. Barium sulfide is difficult to rinse from the face. The longer the paste remains in contact with the skin, the greater the irritation it will produce. The same procedure is performed on the other half of the beard area. If irritation still develops, the patient should limit barium sulfide to one third of the bearded area at a time until he becomes proficient in the removal technique.

(d) To alleviate the irritation sometimes caused by such agents, a wet dressing (for example, washcloth and cool water) may be held against the face for 3 to 5 minutes, followed immediately by the application of a corticosteroid cream over the involved area. Additionally, a cream depilatory is available which does not require mixing and is less irritating than the original formulation. It, too, is available in post exchanges.

(3) *Use of calcium thioglycollate preparations.* Many commercial depilatories contain calcium thioglycollate. Directions for use are as follows.

(a) A thick layer of cream is applied, covering all hair to be removed (in the same manner as that described for barium sulfide) and spread evenly against the direction of hair growth. Disposable gloves may be worn, if desired.

(b) After waiting 10 to 15 minutes for any one area, the cream is removed with a spatula or tongue blade. To ensure complete removal, that portion of the face should be rinsed thoroughly and rapidly three times, using soap between rinses.

h. *After-shave techniques.* The application of a good after-shave preparation is equally important in the treatment process. Several after-shave creams are available in the post exchanges. One product has resorcin, bromelain, and vitamin A (150,000 International Units) as its active ingredients. The vitamin A acts as a keratolytic agent, keeping skin from overgrowing the hairs which are attempting to grow back into the skin. The other two components act as anti-inflammatory agents.

**TB MED 287**

Another product, a cream, uses sulfur as its main ingredient. In these products, the sulfur imparts both anti-inflammatory and keratolytic properties. Some clinicians advocate the use of the alpha-hydroxy acid lotions; however, these may be irritating to freshly shaven skin.

*i. The next morning.* On the morning following the shave, the face should be washed with a good mild soap and patted dry. A liberal amount of an emollient moisturizing lotion should be applied to the beard area. It is here that the alpha-hydroxy acid preparations have the most benefit. The alpha-hydroxy acids act as a very mild chemical peel and remove built-up skin cells as they moisturize the skin. This moisturization keeps the hairs and skin soft, making repenetration difficult.

*j. The break period.* It is critical that the face be given a periodic break from the harsh effects of shaving. If duty allows, the soldier should refrain from shaving on the weekend or off-duty days. This will give the facial skin time to recover and allow any additional therapies to take effect.

## 8. Guidelines for treatment in relation to clinical severity

*a. Mild condition (few, scattered papules with scant hair growth of the beard area).* Initially, a trial of shaving every third to every other day with an appropriate PFB razor may be initiated. The medicated after-shave creams should still be used on a daily basis. Once the condition improves, resume shaving on the regular nightly schedule.

*b. Moderate condition (heavier beard growth, more scattered papules, no evidence of pustules or denudation).* For moderate PFB, tretinoin 0.025 percent cream or gel may be used as a substitute for an after-shave. The soldier should be advised to let the face dry for 10 to 15 minutes prior to application of tretinoin. Only a "pea" sized amount is needed to cover the beard area. Shaving should again be spaced out over a 2 to 3-day period and nightly intervals resumed when the condition improves. A chemical depilatory can be used as a substitute at this point. This, however, should be reserved for failure to improve on the medication regimen. Instruct the patient with directions as discussed in paragraph 7g.

*c. Severe condition (many papules with pustules and or denuded areas).* The patient should allow beard growth (for profile limitations, see para 9) and be observed for resolution of the PFB process. Clearing usually occurs within a month, although a few remaining papules may require that the ingrown tips be mechanically dislodged as described. An initial worsening may appear the week following the discontinuation of shaving since all hairs are now available for reentrance into the skin. Following this initial paradoxical response, the dermatitis will go into remission. The mechanical reasons for beard growth as a treatment are illustrated



*Figure 2. Allowing the beard to grow may release ingrown hairs and, thus, may be part of the treatment of pseudofolliculitis barbae*

in figure 2. At this point, a gel containing 5 percent benzoyl peroxide (BPO) should be applied to the just-washed face and allowed to dry for 5 to 10 minutes. One percent hydrocortisone cream, can then be applied to the affected areas. The BPO acts as a topical antibiotic and has anti-inflammatory effects. The weak steroid creams also impart anti-inflammatory effects and decrease skin cell growth over the papules/pustules. When the PFB is no longer evident, hair removal should be resumed according to instructions listed under moderate condition (para *b* above).

*d. Progressive disease.* Patients who demonstrate severe adverse reaction and progression of the disease following all methods of hair removal should be allowed to increase their hair length. The length of the hair required to prevent PFB is not great. Usually one-eighth to one-fourth inch is sufficient. The profile given to the patient should specify the maximum length of beard that is necessary. The length should not exceed one-fourth inch unless the physician giving the profile specifically states that a beard longer than one-fourth inch is necessary. In all cases, the maximum length should be stated. This one-fourth inch length refers to the total measurement of the curled hair. Hairs should be kept trimmed with electric clippers (not electric razors). Virtually all individuals with PFB will require profiling of the entire face and neck area at some point in therapy. The frequency of shaving should be specified by the appropriate physician, dermatologist, or physician assistant (for example, once weekly, etc.). The profile should clearly state, to the commander and the soldier, the method of treatment, frequency, method of shaving permitted, and maximum length of hair that is necessary for treatment. No styling is permitted.

## 9.  Profile considerations

*a. General.* According to AR 40-501, DA Form 3349 (Physical Profile) must be issued for active duty personnel when beard growth is required during treatment of PFB. This record functions as a means of communication between the medical facility and the patient's commander, informing the latter of the member's physical condition. For temporary profiles, three copies are necessary: original and one copy to the unit commander and one copy in the health record. For permanent profiles, four copies are necessary: original and one copy to the unit commander, one copy in the health record, and one copy in the clinic file. THE PATIENT WILL ALSO BE GIVEN A COPY. THE UNIT COMMANDERS' COPIES WILL BE DELIVERED BY MEANS OTHER THAN THE PATIENT. (See AR 40-501.)

*b. Designation.* A patient with PFB will not ordinarily require a restriction in duty or assignment. While under the treatment, his appearance may differ from that prescribed in current Army regulations. For this reason, the numerical designation "2" will be uti-

lized under the "P" factor of the "PULHES" profile system. The nature of the profile will be further identified as temporary or permanent.

(1) *Temporary profiles.* This form of profile is used during treatment of PFB, such as in clearing a severe condition prior to resumption of hair removal, when a short period of beard growth (generally less than 6 weeks) is required. Cases requiring longer periods to clear are usually management problems and a dermatologist should be consulted who will ordinarily initiate the appropriate profile.

(2) *Permanent profiles.* A permanent profile requires a physical profile board whose proceedings are recorded on DA Form 3349, to include a signature of three physicians knowledgeable of the patient's condition. A dermatologist will normally be a member of the board when considering a patient with PFB. This profile is utilized when the patient's condition is progressive and must be confirmed periodically, particularly in conjunction with inpatient or continuing outpatient care. In most cases, the conditions that require wearing of a beard do not improve. Therefore, once a permanent profile authorizing a beard is given, it normally will not require frequent reevaluation. However, such a reevaluation can be done when a commander requests it or when there are indications of a change in the clinical situation.

*c. Use of protective masks.* The beard growth which may be required as a treatment for PFB will not interfere with the safe utilization of the new M-40 protective mask. Long beards will reduce the protection provided by the mask. The exact amount of the loss in protection is not fully documented.

(1) The existence of a beard does not prevent performance of most military duties. Therefore, the fact that a profile is awarded authorizing the growth of a beard should not ordinarily require any change or limitation in the performance of military duties.

(2) A more common occurrence might be that a soldier with a beard may enter a tactical situation where use of the protective mask is required. This problem can be handled within existing rules because a unit commander has the authority to require that a soldier's beard be shaved if the unit is in, or about to enter, a situation where use of a protective mask is required, and where inability to safely use the mask could endanger the soldier and the unit. This authority should not be used to require that a soldier be clean-shaven for maneuvers and other tactical simulations. It should only be used when there is an actual need to wear the protective mask in a real tactical operation. A soldier with a profile authorizing a beard should continue to wear the beard while using a protective mask in all training and tactical simulations where a protective mask is required. This will ensure that he is fully familiar with its use. However, if there is an actual danger of exposure to a toxic environment, then the soldier can be required to shave the beard.

## 10. Summary

Currently, depilatories, topical creams, and so-called PFB razors do not offer a permanent definitive answer for PFB and, at best, only temporarily ameliorate the underlying problem. Any male patient determined to have PFB or ingrown hairs of the beard treated by an Army physician, dermatologist, or physician assistant may be given an appropriate beard profile. This beard must be uniform, neatly trimmed, and normally will not exceed one-fourth inch in length. Virtually all individuals with PFB profiles will require profiling of the entire face and neck area, and this determination should be made by an appropriate physician, dermatologist, or physician assistant at the nearest medical facility. Finally, and most importantly, it is implicitly understood that any individual possessing a beard will wear it at a length that makes him combat ready at all times.

## Section III. Acne Keloidalis Nuchae

## 11. Introduction

a. *Synonyms*. Acne keloidalis nuchae is also known as keloidal acne, dermatitis papillaris capilliti, and folliculitis keloidalis.

b. *Definition*. Acne keloidalis nuchae is a chronic disorder affecting the posterior scalp and upper neck and arises from a process similar to PFB. The major difference between the two is that in acne keloidalis, the longstanding process leads to scarring and keloid-like thickening of the affected scalp.

c. *Epidemiology*. This disorder, developing only in post-pubertal males, affects predominantly black males. Reports in the literature have also noted development in Orientals and in whites of Mediterranean descent. It is most frequent before the age of 25 and occurs from wearing the closely shaven "high and tight" hair style.

d. *Military considerations*.

(1) The standards of appearance specify a neatly trimmed hairstyle. Tapering of the hair of the posterior scalp and neck does not interfere with the wearing of military headgear or the protective mask. There is no requirement for the "high and tight" hairstyle.

(2) While the medical management of acne keloidalis nuchae often necessitates wearing a longer hairstyle, hair can still be maintained at an acceptable length and not detract from proper military appearance.

## 12. Pathogenesis

a. *Anatomical factors*. Acne keloidalis nuchae occurs in men with tightly curled hair similar to that of PFB. Studies have noted the presence of sharply pointed, short, curled hairs, with surrounding foreign body granulomatous reactions within the scars. The short hairs penetrate the skin and create a foreign body reaction. This leads to the development of papules/pustules, and, subsequently, keloid-like hypertrophic scarring occurs. There have been no specific bacterial organisms implicated in this process; however, secondary bacterial infection may occur, often complicating the management and contributing to the progression of the disorder.

b. *Mechanical factors*. The hairs, cut too short to create the "high and tight" look, reenter the skin, or may rupture the follicular wall before exiting the follicular orifice. A granulomatous infiltrate develops, and secondary cicatrization begins with the development of hypertrophic scarring. In those individuals genetically predisposed, this scarring may eventually become a true keloid formation.

c. *Infectious factors*. There is no specific bacterial agent currently implicated in the development of the disorder. Secondary infection may occur, and, occasionally, the disorder may develop after a superficial bacterial infection from poorly sterilized barber instruments.

## 13. Clinical approach to the patient

This condition, while uncommon, has seen an increase in recent years due to a return to the "high and tight" style of military haircut. The papules, once developed, are chronic and difficult to treat. They can also be irritated by the top of the shirt or jacket collar, which often adds to the progression of the disorder. Treatment is directed towards eliminating the contributing factors, halting the development of any further scarring, and decreasing the existing scar formation.

## 14. Management techniques

a. *Close shaving*. The soldier should be advised to cease wearing the closely trimmed "high and tight" hair style and allow his hair to grow to a longer, yet still militarily acceptable, length.

b. *Antibiotics*. The use of antibiotics should be reserved for the treatment of a known bacterial infection. One of the more skin specific classes of antibiotics is tetracycline. It imparts both antibiotic and anti-inflammatory properties. Before beginning any antibiotic regimen, culture and sensitivity testing should be performed on samples taken from the affected scalp.

c. *Steroids*. Topical steroids are of great value in the treatment of acne keloidalis nuchae. A good mid-potent topical steroid should be applied twice daily to the affected areas. Intralesional steroid injections, given monthly or every 6 weeks (depending on the severity of the scarring) are helpful in decreasing scar formation. Triamcinolone acetonide is given as the recommended course, beginning at concentrations of 20 milligrams/milliliter (mg/ml) in very severe cases, or 10 mg/ml in less severe cases, and decreasing gradually to 3 mg/ml

strength as the scars subside. On the average, intralesional injections of the 10 mg/ml strength are the most commonly used for maintenance therapy.

*d. Wide excision.* For cases that are either severe or unremitting, wide excision of the scars, with healing by secondary intention, is recommended. Recent studies have shown excellent results. While some scar formation is unavoidable, the resulting scar is much more cosmetically acceptable than those of the preoperative condition. This technique should be reserved for dermatologists and surgeons and should not be attempted at the general medical level. It should not be performed in individuals who are prone to the development of keloids. The soldier will be placed on convalescent leave during the post-operative phase of this treatment.

*e. Profiles.* If needed, profiles should be given to prevent irritation by the wear of protective headgear or other protective garments (for example, flak-jackets with high collars as worn by combat vehicle crewmen). These profiles are used for the duration of the treatment period. To date, no permanent profiling has been necessary for this condition. Commanders are reminded that the soldier may be instructed to wear protective headgear and other protective clothing, as the mission requires. This authority should not be used to require these items during maneuvers or tactical simulations.

## 15. Summary

Currently, the mainstay of treatment for acne keloidalis nuchae consists of changing the soldier's hairstyle from one that is too closely shaven to one that is longer but still militarily acceptable. Topical and intralesional steroids are the most commonly used techniques for treatment and currently have a good success rate. However, this disorder is chronic and may be recurrent. For those disorders that are severe or resistant to other forms of treatment, wide excision with healing by secondary intention is recommended. The patient should be initially evaluated by a dermatologist, and a strategy for therapy can be devised. After evaluation by a dermatologist, the treatment regimen can be administered by physicians and physician assistants who are familiar with the disorder. It should be understood that this condition does not remove the soldier from a combat-ready status.

# Appendix A
# References

The following listed publications can normally be obtained at, or through, AMEDD library facilities or through normal distribution channels.

## A-1. Publications.
AR 40-501
Standards of Medical Fitness.

## A-2. Forms.
DA Form 3349
Physical Profile

## A-3. Selected Bibliography

Arnold, H.L., Odom, R.B., and James, W.D. Andrew's Diseases of the Skin. Philadelphia, WB Saunders Co., 1990, pp 896, 261–262.

Brauner, G.H., and Flandemeyer, K.L. Pseudofolliculitis Barbae, 2: Treatment. Int Dermatol 16:520, 1977.

Coquilla, R.H., and Lewis, C.W. Management of Pseudofolliculitis Barbae. Military Medicine, 160, 5:263–269, 1995.

Craig, G.E. Shaving in Relationship to Disease of the Bearded Area of the Face. Arch Dermatol 71:11-13, 1955.

Fitzpatrick, T.B., et al. Dermatology in General Practice. New York, McGraw-Hill Book Co., 1993, pp 689, 2433.

Kelly, P. Surgical Therapy for Acne Keloidalis. At the 100th Annual Scientific Assembly of the National Medical Association, Atlanta, Georgia, 31 July 1995.

Kenney, J.A. Management of Dermatoses Peculiar to Negroes. Arch Dermatol 91:126–129, 1965.

Rook, A., Wilkinson, D.S., and Ebling, F.J.G. Textbook of Dermatology. Oxford, Blackwell Scientific Publications, 1992, pp 974, 977–978.

Strauss, J.S., and Kligman, A.M. Pseudofolliculitis of the Beard. Arch Dermatol 74:533–542, 1956.

# GLOSSARY

**AMEDD**
Army Medical Department

**BPO**
benzoyl peroxide 5 percent gel

**mg**
milligram(s)

**ml**
milliliter(s)

**mm**
millimeter(s)

**PFB**
pseudofolliculitis of the beard

**TB MED 287**

By Order of the Secretary of the Army:

ERIC K. SHINSEKI
*General, United States Army*
*Chief of Staff*

Official

*Joel B. Hudson* (signature)

JOEL B. HUDSON
*Administrative Assistant to the*
*Secretary of the Army*

DISTRIBUTION:
    To be distributed in accordance with Initial Distribution Number (IDN) 341759, requirements for TB MED 287.

A251

PIN: 009980-000

A252

Singh v. McHugh et al.
(Army Regulation 40-501)

**Army Regulation 40–501**

**Medical Services**

# Standards of Medical Fitness

Rapid Action Revision (RAR) Issue Date: 4 August 2011

**Headquarters**
**Department of the Army**
**Washington, DC**
**14 December 2007**

# UNCLASSIFIED

A254

Headquarters
Department of the Army
Washington, DC
14 December 2007

*Army Regulation 40–501

Effective 14 January 2008

Medical Services

# Standards of Medical Fitness

By Order of the Secretary of the Army:

RAYMOND T. ODIERNO
*General, United States Army*
*Chief of Staff*

Official:

*[signature]*
JOYCE E. MORROW
*Administrative Assistant to the*
*Secretary of the Army*

**History.** This publication is a rapid action revision (RAR). This RAR is effective 20 September 2011. The portions affected by this RAR are listed in the summary of change.

**Summary.** This publication implements DODD 6130.3 and DODI 6130.4. It provides information on medical fitness standards for induction, enlistment, appointment, retention, and related policies and procedures.

**Applicability.** This regulation applies to the active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve, unless otherwise stated. It also applies to candidates for military service. During mobilization, the proponent may modify chapters and policies contained in this regulation.

**Proponent and exception authority.** The proponent of this regulation is The Surgeon General. The proponent has the authority to approve exceptions or waivers to this regulation that are consistent with controlling law and regulations. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or its direct reporting unit or field operating agency, in the grade of colonel or the civilian equivalent. Activities may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include formal review by the activities senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25–30 for specific guidance.

**Army management control process.** This regulation contains internal control provisions and identifies key internal controls that must be evaluated (see appendix B).

**Supplementation.** Supplementation of this regulation and establishment of command and local forms are prohibited without prior approval from The Surgeon General (DASG–HS–AS), 5109 Leesburg Pike, Falls Church, VA 22041–3258.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to the Office of The Surgeon General (DASG–HS–AS), 5109 Leesburg Pike, Falls Church, VA 22041–3258.

**Distribution.** This publication is available in electronic media only and is intended for command levels A, B, C, D, and E for medical activities only of the active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve.

## Contents (Listed by paragraph and page number)

**Chapter 1**
**General Provisions,** *page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Responsibilities • 1–4, *page 1*
Medical classification • 1–5, *page 1*
Review authorities and waivers • 1–6, *page 1*

**Chapter 2**
**Physical Standards for Enlistment, Appointment, and Induction,** *page 2*
General • 2–1, *page 2*

*This regulation supersedes AR 40–501, dated 14 December 2007. This edition publishes a rapid action revision of AR 40–501.

AR 40–501 • 14 December 2007/RAR 4 August 2011                                    i

A255                          **UNCLASSIFIED**

**Table 2–2**
**Military acceptable weight (in pounds) as related to age and height for females—Initial Army procurement[1, 2]**

| Height (inches) | Minimum weight any age yielding a BMI of 19 | Maximum weight by years of age | | | |
|---|---|---|---|---|---|
| | | 17–20 | 21–27 | 28–39 | 40 and over |
| 58 | 91 | 122 | 124 | 126 | 127 |
| 59 | 94 | 127 | 128 | 130 | 131 |
| 60 | 97 | 132 | 134 | 135 | 136 |
| 61 | 100 | 136 | 137 | 139 | 141 |
| 62 | 104 | 140 | 141 | 144 | 145 |
| 63 | 107 | 145 | 147 | 148 | 149 |
| 64 | 110 | 149 | 151 | 153 | 154 |
| 65 | 114 | 154 | 156 | 158 | 160 |
| 66 | 117 | 160 | 160 | 162 | 165 |
| 67 | 121 | 163 | 166 | 168 | 169 |
| 68 | 125 | 168 | 171 | 173 | 174 |
| 69 | 128 | 173 | 176 | 178 | 180 |
| 70 | 132 | 178 | 181 | 183 | 185 |
| 71 | 136 | 183 | 186 | 188 | 191 |
| 72 | 140 | 189 | 191 | 194 | 196 |
| 73 | 144 | 194 | 196 | 200 | 202 |
| 74 | 148 | 199 | 203 | 204 | 206 |
| 75 | 152 | 205 | 208 | 210 | 212 |
| 76 | 156 | 210 | 213 | 215 | 216 |
| 77 | 160 | 216 | 219 | 221 | 223 |
| 78 | 164 | 222 | 224 | 227 | 229 |
| 79 | 168 | 227 | 230 | 234 | 236 |
| 80 | 173 | 233 | 236 | 240 | 241 |
| | | Maximum body fat by years of age | | | |
| | | 17–20 | 21–27 | 28–39 | 40 and over |
| | | 32% | 32% | 34% | 36% |

Notes:
[1] If a female exceeds these weights, percent body fat will be measured by the method described in AR 600–9.
[2] If a female also exceeds this body fat, she will be rejected for service.

# Chapter 3
# Medical Fitness Standards for Retention and Separation, Including Retirement

### 3–1. General

This chapter gives the various medical conditions and physical defects which may render a Soldier unfit for further military service and which fall below the standards required for the individuals in paragraph 3–2, below. These medical conditions and physical defects, individually or in combination, are those that—

    *a.* Significantly limit or interfere with the Soldier's performance of their duties.

*b.* May compromise or aggravate the Soldier's health or well-being if they were to remain in the military Service. This may involve dependence on certain medications, appliances, severe dietary restrictions, or frequent special treatments, or a requirement for frequent clinical monitoring.

*c.* May compromise the health or well-being of other Soldiers.

*d.* May prejudice the best interests of the Government if the individual were to remain in the military Service.

## 3–2. Application

These standards apply to the following individuals (see chaps 4 and 5 for other standards that apply to specific specialties):

*a.* All commissioned and warrant officers of the Active Army, ARNG/ARNGUS, and USAR.

*b.* All enlisted Soldiers of the Active Army, ARNG/ARNGUS, and USAR.

*c.* Students already enrolled in the HPSP and USUHS programs.

*d.* Enlisted Soldiers of the ARNG/ARNGUS or USAR who apply for enlistment in the Active Army.

*e.* Commissioned and warrant officers of the ARNG/ARNGUS or USAR who apply for appointment in the Active Army.

*f.* Soldiers of the ARNG/ARNGUS or USAR who re-enter active duty under the "split-training option." (However, the weight standards of tables 2–1 and 2–2 apply to split option trainees.)

*g.* Retired Soldiers recalled to active duty.

## 3–3. Disposition

Soldiers with conditions listed in this chapter who do not meet the required medical standards will be evaluated by an MEB as defined in AR 40–400 and will be referred to a PEB as defined in AR 635–40 with the following caveats:

*a.* USAR or ARNG/ARNGUS Soldiers not on active duty, whose medical condition was not incurred or aggravated during an active duty period, will be processed in accordance with chapter 9 and chapter 10 of this regulation.

*b.* Soldiers pending separation in accordance with provisions of AR 635–200 or AR 600–8–24 authorizing separation under other than honorable conditions who do not meet medical retention standards will be referred to an MEB. In the case of enlisted Soldiers, the physical disability processing and the administrative separation processing will be conducted in accordance with the provisions of AR 635–200 and AR 635–40. In the case of commissioned or warrant officers, the physical disability processing and the administrative separation processing will be conducted in accordance with the provisions of AR 600–8–24 and AR 635–40.

*c.* A Soldier will not be referred to an MEB or a PEB because of impairments that were known to exist at the time of acceptance in the Army and that have remained essentially the same in degree of severity and have not interfered with successful performance of duty.

*d.* Physicians who identify Soldiers with medical conditions listed in this chapter should initiate an MEB at the time of identification. Physicians should not defer initiating the MEB until the Soldier is being processed for nondisability retirement. Many of the conditions listed in this chapter (for example, arthritis in para 3–14*b*) fall below retention standards only if the condition has precluded or prevented successful performance of duty. In those cases when it is clear the condition is long standing and has not prevented the Soldier from reaching retirement, then the Soldier meets the standard and an MEB is not required.

*e.* Soldiers who have previously been found unfit for duty by a PEB, but were continued on active duty (COAD) under the provisions of AR 635–40, chapter 6, will be referred to a PEB prior to retirement or separation processing.

*f.* If the Secretary of Defense prescribes less stringent standards during partial or full mobilization, individuals who meet the less stringent standards but do not meet the standards of this chapter will not be referred for an MEB or a PEB, until the termination of the mobilization or as directed by the Secretary of the Army.

## 3–4. General policy

Possession of one or more of the conditions listed in this chapter does not mean automatic retirement or separation from the Service. Physicians are responsible for referring Soldiers with conditions listed below to an MEB. It is critical that MEBs are complete and reflect all of the Soldier's medical problems and physical limitations. The PEB will make the determination of fitness or unfitness. The PEB, under the authority of the U.S. Army Physical Disability Agency, will consider the results of the MEB, as well as the requirements of the Soldier's MOS, in determining fitness. (See chapter 9 and chapter 10 of this regulation for processing of RC Soldiers.)

## 3–5. Abdominal and gastrointestinal defects and diseases

The causes for referral to an MEB are as follows:

*a.* Achalasia (cardiospasm) with dysphagia not controlled by dilatation or surgery, continuous discomfort, or inability to maintain weight.

*b.* Amoebic abscess with persistent abnormal liver function tests and failure to maintain weight and vigor after appropriate treatment.

*c.* Biliary dyskinesia with frequent abdominal pain not relieved by simple medication, or with periodic jaundice.

### 3–33. Anxiety, somatoform, or dissociative disorders

The causes for referral to an MEB are as follows:

   *a.* Persistence or recurrence of symptoms sufficient to require extended or recurrent hospitalization; or

   *b.* Persistence or recurrence of symptoms necessitating limitations of duty or duty in protected environment; or

   *c.* Persistence or recurrence of symptoms resulting in interference with effective military performance.

### 3–34. Dementia and other cognitive disorders due to general medical condition

The causes for referral to an MEB include persistence of symptoms or associated personality change sufficient to interfere with the performance of duty or social adjustment.

### 3–35. Personality conditions, transsexual, gender identity, exhibitionism, transvestism, voyeurism, other paraphilias, or factitious disorders; disorders of impulse control not elsewhere classified

   *a.* A history of, or current manifestations of, personality disorders, disorders of impulse control not elsewhere classified, transvestism, voyeurism, other paraphilias, or factitious disorders, psychosexual conditions, transsexual, gender identity disorder to include major abnormalities or defects of the genitalia such as change of sex or a current attempt to change sex, hermaphroditism, pseudohermaphroditism, or pure gonadal dysgenesis or dysfunctional residuals from surgical correction of these conditions render an individual administratively unfit.

   *b.* These conditions render an individual administratively unfit rather than unfit because of physical illness or medical disability. These conditions will be dealt with through administrative channels, including AR 135–175, AR 135–178, AR 635–200, or AR 600–8–24.

### 3–36. Adjustment disorders

Situational maladjustments due to acute or chronic situational stress do not render an individual unfit because of physical disability, but may be the basis for administrative separation if recurrent and causing interference with military duty.

### 3–37. Eating disorders

The causes for referral to an MEB are eating disorders that are unresponsive to treatment or that interfere with the satisfactory performance of duty.

### 3–38. Skin and cellular tissues

The causes for referral to an MEB are as follows:

   *a. Acne.* Severe, unresponsive to treatment, and interfering with the satisfactory performance of duty or wearing of the uniform or other military equipment.

   *b. Atopic dermatitis.* More than moderate, unresponsive to treatment, and which interferes with the Soldier's performance of duty.

   *c. Amyloidosis.* Generalized.

   *d. Cysts and tumors.* (See paras 3–42 and 3–43.)

   *e. Dermatitis herpetiformis.* Not responsive to therapy.

   *f. Dermatomyositis.*

   *g. Dermographism.* Interfering with the performance of duty.

   *h. Eczema, chronic.* Regardless of type, when there is more than minimal involvement and the condition is unresponsive to treatment and interferes with the satisfactory performance of duty.

   *i. Elephantiasis or chronic lymphedema.* Not responsive to treatment.

   *j. Epidermolysis bullosa.*

   *k. Erythema multiforme.* More than moderate and recurrent or chronic.

   *l. Exfoliative dermatitis.* Chronic.

   *m. Fungal infections, superficial.* If not responsive to therapy and interfering with the satisfactory performance of duty.

   *n. Hidradenitis suppurativa and/or folliculitis decalvans (dissecting cellulitis of the scalp).* If unresponsive to treatment and interferes with the satisfactory performance of duty.

   *o. Hyperhidrosis.* On the hands or feet, when severe or complicated by a dermatitis or infection, either fungal or bacterial and not amenable to treatment.

   *p. Leukemia cutis or mycosis fungoides or cutaneous T–Cell lymphoma.* (See also para 3–42.)

   *q. Lichen planus.* Generalized and not responsive to treatment.

   *r. Lupus erythematosus.* Cutaneous or mucous membranes involvement that is unresponsive to therapy and interferes with the satisfactory performance of duty.

   *s. Neurofibromatosis.* When interfering with the satisfactory performance of duty.

A258

*t. Panniculitis.* Relapsing, febrile, nodular.

*u. Parapsoriasis.* Extensive and not controlled by treatment.

*v. Pemphigus.* Not responsive to treatment and with moderate constitutional or systemic symptoms, or interfering with the satisfactory performance of duty.

*w. Psoriasis.* Extensive and not controllable by treatment.

*x. Radiodermatitis.* If resulting in malignant degeneration at a site not amenable to treatment.

*y. Scars and keloids.* So extensive or adherent that they seriously interfere with the function of an extremity or interfere with the performance of duty.

*z. Scleroderma.* Generalized or of the linear type that seriously interferes with the function of an extremity.

*aa. Tuberculosis of the skin.* (See paragraph 3–40.)

*ab. Ulcers of the skin.* Not responsive to treatment after an appropriate period of time if interfering with the satisfactory performance of duty.

*ac. Urticaria/Angioedema.* Chronic, severe, and not responsive to treatment.

*ad. Xanthoma.* Regardless of type, but only when interfering with the satisfactory performance of duty.

*ae. Intractable plantar keratosis, chronic.* Requires frequent medical/surgical care or that interferes with the satisfactory performance of duty.

*af. Other skin disorders.* If chronic or of a nature that requires frequent medical care, or interferes with the satisfactory performance of military duty.

## 3–39. Spine, scapulae, ribs, and sacroiliac joints

The causes for referral to an MEB are as follows (see also para 3–14):

*a. Dislocation.* Congenital, of hip.

*b. Spina bifida.* Demonstrable signs and moderate symptoms of root or cord involvement.

*c. Spondylolysis or spondylolisthesis.* More than mild symptoms resulting in repeated outpatient visits, or repeated hospitalization or limitations effecting performance of duty.

*d. Coxa vara.* More than moderate with pain, deformity, and arthritic changes.

*e. Herniation of nucleus pulposus.* More than mild symptoms following appropriate treatment or remedial measures, with sufficient objective findings to demonstrate interference with the satisfactory performance of duty.

*f. Kyphosis.* More than moderate, interfering with military duties.

*g. Scoliosis.* Severe deformity with over 2 inches deviation of tips of spinous process from the midline, or of lesser degree if recurrently symptomatic and interfering with military duties.

*h. Nonradicular pain involving the cervical, thoracic, lumbosacral, or coccygeal spine, whether idiopathic or secondary to degenerative disc or joint disease, that fails to respond to adequate conservative treatment and necessitates significant limitation of physical activity.* Range of motion (ROM) measurements should be obtained using a goniometer (a bubble goniometer/inclometer is also acceptable). SF Form 527 should be used to document the ROM and the method of measurement. Use the VA's instructions for completion of spine and joint evaluations. This includes the six measurements shown on VASRD Plate V ROM of cervical and thoracolumbar spine.

## 3–40. Systemic diseases

The causes for referral to an MEB are as follows:

*a. Amyloidosis.*

*b. Brucellosis.* Chronic with substantiated, recurring febrile episodes, severe fatigue, lassitude, depression, or general malaise.

*c. Leprosy.* Any type that seriously interferes with performance of duty or is not completely responsive to appropriate treatment.

*d. Myasthenia gravis.*

*e. Mycosis, Blastomycosis, Coccidioidomycosis, and Histoplasmosis.* Active, not responsive to therapy or requiring prolonged treatment, or when complicated by residuals that themselves are unfitting.

*f. Porphyria, cutanea tarda.*

*g. Sarcoidosis.* Progressive with severe or multiple organ involvement and not responsive to therapy.

*h. Tuberculosis.*

(1) Meningitis, tuberculous.

(2) Pulmonary tuberculosis (see para 3–26), tuberculous empyema, and tuberculous pleurisy.

(3) Tuberculosis of the male genitalia. Involvement of the prostate or seminal vesicles and other instances not corrected by surgical excision, or when residuals are more than minimal, or are symptomatic.

(4) Tuberculosis of the female genitalia.

(5) Tuberculosis of the kidney.

(6) Tuberculosis of the larynx.

## Chapter 7
## Physical Profiling

### 7–1. General
This chapter prescribes a system for classifying individuals according to functional abilities. Also see paragraphs 3-12, 3-13, 3–25, 3–27, 3–30, 3–45, and 3–46 for additional guidance on amputations, coronary artery disease, asthma, seizure disorders, and heat and cold injuries.

### 7–2. Application
The physical profile system is applicable to the following categories of personnel:

*a.* Registrants who undergo an induction or pre-induction medical examination related to Selective Service processing.

*b.* All applicants examined for enlistment, appointment, or induction.

*c.* Members of any component of the U.S. Army throughout their military Service, whether or not on active duty.

### 7–3. Physical profile serial system
*a.* The physical profile serial system is based primarily upon the function of body systems and their relation to military duties. The functions of the various organs, systems, and integral parts of the body are considered. Since the analysis of the individual's medical, physical, and mental status plays an important role in assignment and welfare, not only must the functional grading be executed with great care, but clear and accurate descriptions of medical, physical, and mental deviations from normal are essential.

*b.* In developing the system, the functions have been considered under six factors designated "P–U–L–H–E–S." Four numerical designations are used to reflect different levels of functional capacity. The basic purpose of the physical profile serial is to provide an index to overall functional capacity. Therefore, the functional capacity of a particular organ or system of the body, RATHER THAN THE DEFECT PER SE, will be evaluated in determining the numerical designation 1, 2, 3, or 4.

*c.* The factors to be considered are as follows:

(1) *P—Physical capacity or stamina.* This factor, general physical capacity, normally includes conditions of the heart; respiratory system; gastrointestinal system; genitourinary system; nervous system; allergic, endocrine, metabolic and nutritional diseases; diseases of the blood and blood forming tissues; dental conditions; diseases of the breast, and other organic defects and diseases that do not fall under other specific factors of the system.

(2) *U—Upper extremities.* This factor concerns the hands, arms, shoulder girdle, and upper spine (cervical, thoracic, and upper lumbar) in regard to strength, range of motion, and general efficiency.

(3) *L—Lower extremities.* This factor concerns the feet, legs, pelvic girdle, lower back musculature and lower spine (lower lumbar and sacral) in regard to strength, range of motion, and general efficiency.

(4) *H—Hearing and ears.* This factor concerns auditory acuity and disease and defects of the ear.

(5) *E—Eyes.* This factor concerns visual acuity and diseases and defects of the eye.

(6) *S—Psychiatric.* This factor concerns personality, emotional stability, and psychiatric diseases.

*d.* Four numerical designations are assigned for evaluating the individual's functional capacity in each of the six factors. Guidance for assigning numerical designators is contained in table 7–1. The numerical designator is not an automatic indicator of "deployability" or assignment restrictions, or referral to an MEB. The conditions listed in chapter 3 and the Soldier's functional limitations, rather than the numerical designator of the profile, will be the determining factors for MEB processing.

(1) An individual having a numerical designation of "1" under all factors is considered to possess a high level of medical fitness.

(2) A physical profile designator of "2" under any or all factors indicates that an individual possesses some medical condition or physical defect that may require some activity limitations.

(3) A profile containing one or more numerical designators of "3" signifies that the individual has one or more medical conditions or physical defects that may require significant limitations. The individual should receive assignments commensurate with his or her physical capability for military duty.

(4) A profile serial containing one or more numerical designators of "4" indicates that the individual has one or more medical conditions or physical defects of such severity that performance of military duty must be drastically limited.

*e.* Anatomical defects or pathological conditions will not of themselves form the sole basis for recommending assignment or duty limitations. While these conditions must be given consideration when accomplishing the profile, the prognosis and the possibility of further aggravation must also be considered. In this respect, profiling officers must consider the effect of their recommendations upon the Soldier's ability to perform duty. Profiles must be realistic. All profiles and assignment limitations must be specific, and written in lay terms. If the commander has questions about a profile or is unable to use the Soldier within the profile limitations, the procedures in paragraph 7–12 will apply.

(1) Determination of individual assignment or duties to be performed is a commander's decision. Limitations such

as "no field duty," or "no overseas duty," are not proper medical recommendations. (However, they are included as administrative guidelines in pregnancy profiles.) Profiling officers will provide enough information regarding the Soldier's physical limitations to enable the nonmedical commander and AHRC to make a determination on individual assignments or duties. The profiling officer is responsible for entering the correct administrative code from table 7-2 into Item 2 of the DA Form 3349.

(2) It is the responsibility of the commander or personnel management officer to determine proper assignment and duty, based upon knowledge of the Soldier's profile, assignment limitations, and the duties of their grade and MOS.

(3) The commander has the final decision on the deployment of Soldiers in his/her unit. When medical providers and commanders disagree on the medical readiness status of a Soldier, the decision will be raised to the first general officer in the Soldier's chain of command, who will review both medical and commander recommendations and make the final decision whether to deploy the Soldier.

(4) Table 7–1 contains the physical profile functional capacity guide.

(5) See TB MED 287 for profiling Soldiers with pseudofolliculitis.

## 7–4. Temporary vs. permanent profiles

*a. Electronic requirements.* All temporary profiles greater than 30 days and all permanent profiles must be completed electronically. There are two ways to access the electronic profile; one through AHLTA (Version 3.3.2), and one through MODS.

(1) *AHLTA.* Providers first sign into AHLTA and then select the "Medical Readiness" link in AHLTA. From the Medical Readiness portal, the provider then selects the link for the e-Profile.

(2) *MODS.* Providers can also access the e-Profile application at: https://apps.mods.army.mil.

*Note.* If the electronic systems are unavailable, the provider will issue a temporary profile in paper form for 30 days duration until the profile can be entered into e-Profile.

*b. Permanent profiles.* A profile is considered permanent unless a modifier of "T" (temporary) is added. A permanent profile may only be awarded or changed by the authority designated in paragraph 7–6, below. All permanent "3" and "4" profiles, for Soldiers on active duty, will be reviewed by an MEB physician or physician approval authority. An MEB physician is an MTF dedicated subject matter expert trained to perform disability evaluations per guidelines established in DODI 1332.38 (see AR 40–400 for MEB process). The MEB physician will assist the MTF commander in educating profiling officers on current physical profiling regulation and policy guidance.

(1) If the profile is permanent, the profiling officer must assess if the Soldier meets the medical retention standards of chapter 3. Those Soldiers on active duty who do not meet the medical retention standards must be referred to an MEB as per chapter 3. (See paras 9–10 and 10–25, respectively, for disposition of USAR and ARNG Soldiers not on active duty who do not meet medical retention standards.)

(2) Soldiers who have one or more condition(s) that do not meet medical retention standards are referred to a MEB / PEB after attaining the Medical Retention Determination Point (MRDP). The MRDP is when the Soldier's progress appears to have medically stabilized; the course of further recovery is relatively predictable; and where it can be reasonably determined that the Soldier is most likely not capable of performing the duties required of his MOS, grade, or rank. This MRDP and referral to a MEB/PEB will be made within 1 year of being diagnosed with a medical condition(s) that does not appear to meet medical retention standards, but the referral may be earlier if the medical provider determines that the Soldier will not be capable of returning to duty within 1 year. The MEB physician or physician approval authority will review all MEB referrals to insure that MRDP has been achieved prior to initiating a medical evaluation board; coordinate inappropriate MEB referrals back through the profiling officer for appropriate disposition; and assist physician approving authorities in reconciling profiling officer's questions and concerns about MRDP timing and MMRB versus MEB referrals. The MEB physician or physician approval authority will review all profiles to confirm that the MRDP has been reached before obtaining the approving authority signature.

(3) Those Soldiers (active duty and USAR/ARNG) who meet retention standards but have at least a 3 or 4 PULHES serial will be referred to a Medical MOS Retention Board (MMRB) in accordance with AR 600–60, unless waived by the MMRB convening authority.

(4) Permanent profiles may be amended (following the correct procedure) at any time if clinically indicated and will automatically be reviewed and verified by the privileged provider at the time of a Soldier's periodic health assessment or other medical examination.

(5) The Soldier's commander may also request a review of a permanent profile, in accordance with paragraph 7–12*b*.

*c. Temporary profiles.* Soldiers receiving medical or surgical care or recovering from illness, injury, or surgery, will be managed with temporary physical profiles until they reach the point in their evaluation, recovery, or rehabilitation where the profiling officer determines that MRDP has been achieved but no longer than 12 months. A temporary profile is given if the condition is considered temporary, the correction or treatment of the condition is medically advisable, and correction usually will result in a higher physical capacity. Soldiers on active duty and RC Soldiers not on active duty with a temporary profile will be medically evaluated at least once every 3 months at which time the profile may be extended for a maximum of 6 months from the initial profile start date by the profiling officer.

(1) Temporary profiles exceeding 6 months duration, for the same medical condition, will be referred to a specialist (for that medical condition) for management and consideration for one of the following actions:

(a) Continuation of a temporary profile for a maximum of 12 months from the initial profile start date;

(b) Change the temporary profile to a permanent profile;

(c) Determination of whether the Soldier meets the medical retention standards of chapter 3 and, if not, referral to a MEB.

(2) The profiling officer must review previous profiles before making a decision to extend a temporary profile and refer the Soldier to a medical specialist for management if the temporary profile has been in effect for 6 months. Any extension of a temporary profile must be recorded on DA Form 3349, and if renewed, item 8 on the DA Form 3349 will contain the following statement: "This temporary profile is an extension of a temporary profile first issued on (date)."

(3) Temporary profiles will specify an expiration date. If no date is specified, the profile will automatically expire at the end of 30 days from issuance of the profile. In no case will Soldiers carry a temporary profile that has been extended for more than 12 months. If a profile is needed beyond the 12 months, the temporary profile will be changed to a permanent profile. Exceptions to the 12-month temporary physical profile restriction must be approved by the medical treatment facility (MTF) commander or their designated senior physician approval authority (often the deputy commander for clinical services).

## 7–5. Representative profile serial and codes

To facilitate the assignment of individuals after they have been given a physical profile serial and for statistical purposes, code designations have been adopted to represent certain combinations of physical limitations or assignment guidance (see table 7–2, below). The alphabetical coding system will be recorded on the DA Form 3349, item 2 and personnel qualifications records. Up to three different codes can be listed in item 2. This coding system will not be used on medical records to identify limitations. The numerical designations under each profile factor, PULHES, are given in table 7–1, below.

## 7–6. Profiling officer and approving authority

a. *Profiling officers.* Commanders of Army MTFs are authorized to designate one or more physicians, dentists, optometrists, podiatrists, audiologists, nurse practitioners, nurse midwives, licensed clinical psychologists, and physician assistants as profiling officers. The commander will assure that those designated are thoroughly familiar with the contents of this regulation. Profiling officer limitations are as follows:

(1) *Physicians.* No limitations except for temporary profiles that exceed 6 months that require referral to a specialist (see para 7-4c(1)).

(2) *Dentists, optometrists, physical therapists, chiropractors, and occupational therapists.* No limitation within their specialty for awarding temporary or permanent numerical designators "1" and "2." A temporary numerical designator "3" may be awarded for a period not to exceed 90 days. Any extension beyond 90 days must be signed by a physician. (See para 7–8.)

(3) *Audiologists.* No limitation within their specialty for awarding permanent numerical designators "1," "2," "3," or "4" in cases of sensorineural hearing loss, if retrocochlear lesion has been ruled out. Changing from or to a permanent numerical designator "3" or "4" requires the co-signature of a physician approving authority (see para 7–8).

(4) *Physician assistants, nurse midwives, nurse practitioners, and licensed clinical psychologists.* Limited to awarding temporary numerical designators "2," "3," and "4" for a period not to exceed 90 days. Any extension of a temporary profile beyond 90 days must be signed by a physician, except when the provisions of paragraph 7–9 apply. However, physician assistants with AOC 65DM1 certified in orthopedics have no limitations in awarding temporary orthopedic profiles or permanent profiles with a numerical designator of "1" or "2." Physician assistants, nurse midwives, nurse practitioners, and licensed clinical psychologists may award permanent profiles of "2," "3," or "4" provided the profile is signed by the physician approving authority.

(5) *Podiatrists.* No limitations within their specialty for awarding temporary or permanent profiles with a numerical designator of "1" or "2." Podiatrists may award permanent profiles of "3" or "4" providing the profile is signed by a physician approving authority.

(6) *MEPS physicians, physician assistants, and nurse practitioners.* They will also be designated as profiling officers. (See para 7–7b.)

(7) *Other DOD physicians.* In those instances where a Soldier does not have access to an Army MTF, but is assigned to a location with another Department of Defense medical facility (Navy, Air Force), a physician from another Service can be a profiling officer, if designated by the commander.

(8) *AD TRICARE Prime Remote Soldiers, Selected Reserve (TPU, AGR, IMA) and ARNG Soldiers.* These Soldiers may have profiles completed via the current agencies contracted to provide these medical services.

b. *Approving authority.* Commanders of Army MTFs are authorized to designate or delegate one or more physicians as approving authorities. The commander will assure that those designated are thoroughly familiar with the contents of

this regulation. The approving authority must be a physician. Permanent "3" or "4" physical profiles require an approving authority signature.

## 7–7. Recording and reporting of initial physical profile

*a.* Individuals accepted for initial appointment, enlistment, or induction in peacetime normally will be given a numerical designator "1" or "2" physical profile in accordance with the instructions contained in this regulation. Initial physical profiles will be recorded on DD Form 2808 by the medical profiling officer at the time of the initial appointment, enlistment, or induction medical examination.

*b.* The initial physical profile serial will be entered on DD Form 2808 and also recorded on DD Forms 1966 (Record of Military Processing—Armed Forces of the United States), in the appropriate spaces. When the modifier "T" is entered on the profile serial, or in those exceptional cases where the numerical designator "3" is used on initial entry, a brief, nontechnical description of the defect will be recorded in the "Summary of Defects" section on the DD Form 2808, in addition to the exact diagnosis. All physical, geographic, or climatic area limitations applicable to the defect will also be entered in that section. If sufficient room for a full explanation is not available in that section, proper reference will be made in that section number and an additional sheet of paper attached. It is not uncommon for the MEPS to assign a profile with the numerical designator of "3" or "0" pending a medical waiver review of a disqualifying condition. This is for their administrative purposes only. If the individual receives a medical waiver, the waiver documentation completed by the waiver authority should indicate the appropriate profile in accordance with table 7–1.

## 7–8. Profiling reviews and approvals

*a.* Permanent "3" or "4" profiles require the signatures of 2 profiling officers, one of which is a physician approving authority (unless the provisions of 7–8*f* apply). (Permanent profiles of "3" or "4" for the Individual Ready Reserve are valid with only one signature if signed by the AHRC Surgeon or his/her designee.) (ANG requires the signatures of 2 profiling officers for all permanent profiles to include permanent "1" or "2." See para 10-12). Temporary or permanent profiles of "1" or "2" require the signature of one profiling officer. See paragraph 7–6 to determine who is authorized to sign profiles.

*b.* Situations that require a mandatory review of an existing physical profile include—

(1) Return to duty of a Soldier hospitalized. The attending physician will ensure that the patient has the correct physical profile, assignment limitations(s), and medical followup instructions, as appropriate.

(2) When directed by the appointing authority in cases of a problematical or controversial nature requiring temporary revision of profile.

(3) At the time of the periodic health assessment or other medical examination.

(4) Upon request of the unit commander.

(5) On request of a PEB.

(6) When a permanent "3" or "4" profile is changed to a permanent "1" or "2" the change requires the signatures of 2 profiling officers, one of which is a physician approving authority (unless the provisions of 7–8*f* apply).

*c.* A temporary revision of profile will be completed when, in the opinion of the profiling officer, the functional capacity of the individual has changed to such an extent that it temporarily alters the individual's ability to perform duty. Temporary profiles written on DA Form 3349 will not exceed 3 months except as provided for in paragraphs 7–8*d* and 7–9. Temporary profiles written on DD Form 689 (Individual Sick Slip) will not exceed 30 days.

*d.* Tuberculous patients returned to a duty status who require anti-tuberculous chemotherapy following hospitalization will be given a temporary "2" profile under the P factor of the physical profile for a period of 1 year with recommendation that the Soldier be placed on duty at a fixed installation and will be provided the required medical supervision for a period of 1 year.

*e.* The physical profile in controversial or equivocal cases may be verified or revised by the hospital commander or command surgeon.

*f.* Physical profiles for Reserve Soldiers not on active duty and for those Soldiers activated on orders for greater than 30 days in the Ready Reserve (ARNG/AR), Standby Reserve (AR), and Retired Reserve (AR), may be accomplished by the U.S. Army Regional Support Command (RSC) surgeons, division staff surgeons, Active Army medical facility profiling officers (Reserve Soldiers on orders for 30 days or greater only), USAR/ARNG contracted agencies profiling officers, the U.S. Army Reserve (USARC) command surgeon and the AHRC command surgeon or their designees (Ready Reserve only). For ARNG/ARNGUS Soldiers not on active duty, profiles will be accomplished by State ARNG/ARNGUS providers. The respective State surgeons (if physician) or their designated physician alternate can be the approving authority for permanent "3" or "4" profiles. The NGB chief surgeon is also an ARNG approval authority for all ARNG Soldiers. The ARNG division surgeons may be designated as approval authority, but would require delegation by each concerned State or Territory State surgeon. Approval authorities for the Army Reserve are the USARC command surgeon and the Regional Support Command surgeons. The USAR operational and functional command surgeons and division surgeons that function as command surgeons may be delegated profile-approving authority by the USARC command surgeon.

*g.* Individuals who were found unfit by a PEB but COAD used to be assigned a code "V" on their physical profile code. The code "V" is no longer used for this purpose but rather to identify Soldiers with restrictions on deployment. An "X" is now used to identify individuals who were found unfit by a PEB but COAD or COAR.

*h.* MEB physicians must ensure that all physical profile and assignment limitations are fully recorded on one DA Form 3349. When the Soldier is referred to a PEB, a copy of the consolidated DA Form 3349 will be forwarded to the PEB with the MEB proceeding, with distribution of the form as indicated in paragraph 7-11*b*, below. On the consolidated DA Form 3349, the MEB physician may be the profiling officer (1st signature). Cooperation between the MEB physician, PEB liaison officers, and the PEB is essential when additional medical information or profile reconsideration is requested from the MTF by the PEB. The limitations described on the profile form may affect the decision of fitness by the PEB.

*i.* Table 7–1 will be used when determining the numerical designator of the PULHES factors. (For example, a Soldier will not be given a permanent "3" or "4" solely on the basis of a referral to a PEB.)

## 7–9. Profiling pregnant Soldiers

*a. Intent.* The intent of these provisions is to protect the fetus while ensuring productive use of the Soldier. Common sense, good judgement, and cooperation must prevail between policy, Soldier, and Soldier's commander to ensure a viable program. This profile has been revised from the previous profile published in the 1995 edition of this regulation. This profile guidance has been revised and includes mandating an occupational health interview to assess risks to the Soldier and fetus and adding additional restrictions to reduce exposure to solvents, lead, and fuels that may be associated with adverse pregnancy outcomes.

*b. Responsibilities.*

(1) *Soldier.* The Soldier will seek medical confirmation of pregnancy and will comply with the instructions of medical personnel and the individual's unit commander.

(2) *Medical personnel.* A privileged provider (physician, nurse midwife/practitioner or physician assistant) will confirm pregnancy and once confirmed will initiate prenatal care of the Soldier and issue a physical profile. Nurse midwives, nurse practitioners, and physician assistants are authorized to issue routine or standard pregnancy profiles for the duration of the pregnancy. An occupational history will be taken at the first visit to assess potential exposures related to the Soldier's specific MOS. This history is ideally taken by the occupational medicine physician or nurse. However, if this is not feasible, the profiling officer must complete the occupational history. After review of the occupational history, the profiling officer (physician, nurse midwife/practitioner, or physician assistant), in conjunction with the occupational health clinic as needed, will determine whether any additional occupational exposures, other than those indicated in the paragraphs below, should be avoided for the remainder of the pregnancy. Examples include but are not limited to hazardous chemicals, ionizing radiation, and excessive vibration. If the occupational history or industrial hygiene sampling data indicate significant exposure to physical, chemical, or biological hazards, then the profile will be revised to restrict exposure from these workplace hazards.

(3) *Unit commander.* The commander will counsel all female Soldiers as required by AR 600–8–24 or AR 635–200. The unit commander will consult with medical personnel as required. This includes establishing liaison with the occupational health clinic and requesting site visits by the occupational health personnel if necessary to assess any work place hazards.

*c. Physical profiles.*

(1) Profiles will be issued for the duration of the pregnancy. The MTF will ensure that the unit commander is provided a copy of the profile, and advise the unit commander as required. Upon termination of pregnancy, a new profile will be issued reflecting revised profile information. Physical profiles will be issued as follows:

(2) Under factor "P" of the physical profile, indicate "T–3."

(3) List diagnosis as "pregnancy, estimated delivery date."

*d. Limitations.* Unless superceded by an occupational health assessment, the standard pregnancy profile, DA Form 3349, will indicate the following limitations:

(1) Except under unusual circumstances, the Soldier should not be reassigned to overseas commands until pregnancy is terminated. (See AR 614–30 for waiver provisions and for criteria curtailing OCONUS tours.) She may be assigned within CONUS. Medical clearance must be obtained prior to any reassignment.

(2) The Soldier will not receive an assignment to duties where nausea, easy fatigue, or sudden lightheadedness would be hazardous to the Soldier, or others, to include all aviation duty, Classes 1/2/3. (However, there are specific provisions in para 4–13*c* that allow the aircrew member to request and be granted permission to remain on flight status. ATC personnel may continue ATC duties with approval of the flight surgeon, obstetrician, and ATC supervisor.)

(3) Restrict exposures to military fuels. Pregnant Soldiers must be restricted from assignments involving frequent or routine exposures to fuel vapors or skin exposure to spilled fuel such as fuel handling or otherwise filling military vehicles with fuels such as mogas, JP8, and JP4.

(4) No weapons training in indoor firing ranges due to airborne lead concentrations and bore gas emissions. Firing of weapons is permitted at outdoor sites. (See (11) below, for other weapons training restrictions.) No exposure to

organic solvent vapors above permissible levels. (For example, work in ARMS room is permitted if solvents are restricted to 1999 MIL–PRF–680, degreasing solvent.)

(5) No work in the motor pool involving painting, welding, soldering, grinding, and sanding on metal, parts washing, or other duties where the Soldier is routinely exposed to carbon monoxide, diesel exhaust, hazardous chemicals, paints, organic solvent vapors, or metal dusts and fumes (for example, motor vehicle mechanics). It does not apply to pregnant Soldiers who perform preventive maintenance checks and services (PMCS) on military vehicles using impermeable gloves and coveralls, nor does it apply to Soldiers who do work in areas adjacent to the motor pool bay (for example, administrative offices) if the work site is adequately ventilated and industrial hygiene sampling shows carbon monoxide, benzene, organic solvent vapors, metal dusts and fumes do not pose a hazard to pregnant Soldiers. (See (11), below, for PMCS restrictions at 20 weeks of pregnancy.)

(6) The Soldier must avoid excessive vibrations. Excessive vibrations occur in larger ground vehicles (greater than 1 1/4 ton) when the vehicle is driven on unpaved surfaces.

(7) Upon the diagnosis of pregnancy, the Soldier is exempt from regular unit physical fitness training and APFT testing/weight standards for the duration of the pregnancy and 180 days past pregnancy termination. After receiving medical clearance from their health care provider to participate in physical training, commanders will enroll Soldiers who are pregnant or postpartum to take part in the Army Pregnancy/Postpartum Physical Training (PPPT) program, an element of the Army Physical Fitness Training Program, in accordance with AR 350–1, Army Training and Education. The PPPT Program is designed to maintain health and fitness levels of pregnant Soldiers, and successfully integrate postpartum Soldiers back into unit physical fitness training programs with emphasis on achieving the APFT standards in accordance with guidance provided in the Army Physical Fitness Training Program, and meeting height/weight standards in accordance with guidance provided in the Army Weight Control Program. Pregnant and postpartum Soldiers must be cleared by their health care provider prior to participating in physical fitness training. Once pregnancy has been confirmed, the Soldier is exempt from wearing load bearing equipment (LBE) to include the web belt, individual body armor (IBA) and/or any other additional equipment. Wearing of individual body armor and/or any other additional equipment is not recommended and must be avoided after 14 weeks gestation.

(8) The Soldier is exempt from all immunizations except influenza and tetanus-diphtheria and from exposure to all fetotoxic chemicals noted on the occupational history form. The Soldier is exempt from exposure to chemical warfare and riot control agents (for example, nuclear, biological, and chemical training) and wearing MOPP gear at any time.

(9) The Soldier may work shifts.

(10) The Soldier must not climb or work on ladders or scaffolding.

(11) At 20 weeks of pregnancy, the Soldier is exempt from standing at parade rest or attention for longer than 15 minutes. The Soldier is exempt from participating in swimming qualifications, drown proofing, field duty, and weapons training. The Soldier must not ride in, perform PMCS on, or drive in vehicles larger than light medium tactical vehicles due to concerns regarding balance and possible hazards from falls.

(12) At 28 weeks of pregnancy, the Soldier must be provided a 15-minute rest period every 2 hours. Her workweek should not exceed 40 hours and the Soldier must not work more than 8 hours in any 1 day. The 8-hour work day does include one hour for physical training (PT) and the hours worked after reporting to work or work call formation, but does not include the PT hygiene time and travel time to and from PT.

*e. Performance of duty.* A woman who is experiencing a normal pregnancy may continue to perform military duty until delivery. Only those women experiencing unusual and complicated problems (for example, pregnancy-induced hypertension) will be excused from all duty, in which case they may be hospitalized or placed sick in quarters. Medical personnel will assist unit commanders in determining duties.

*f. Sick in quarters.* A pregnant Soldier will not be placed sick in quarters solely on the basis of her pregnancy unless there are complications present that would preclude any type of duty performance.

## 7–10. Postpartum profiles

*a.* Convalescent leave (as prescribed by AR 600–8–10) after delivery will be for a period determined by the attending physician. This will normally be for 42 days following normal pregnancy and delivery.

*b.* Convalescent leave after a termination of pregnancy (for example, miscarriage) will be determined on an individual basis by the attending physician.

*c.* Prior to commencing convalescent leave, postpartum Soldiers will be issued a postpartum profile. The temporary profile will be for 45 days. It begins on the day of child birth or termination of pregnancy and will allow PT at the Soldier's own pace. Soldiers are encouraged to use the AT-Home component of the ARMY PPPT Program while on convalescent leave. If a Soldier decides to return early from convalescent leave, the temporary profile remains in effect for the entire 45 days.

*d.* Soldiers will receive clearance from the profiling officer to return to full duty.

*e.* Postpartum (any pregnancy that lasts 20 weeks and beyond) Soldiers, in accordance with DODD 1308.1, are exempt from the APFT and from record weigh-in for 180 days following termination of pregnancy. After receiving clearance from their health care provider to resume physical fitness training, postpartum Soldiers will take part in the postpartum physical fitness training element of the Army. Postpartum Soldiers must receive clearance from their health

care provider prior to returning to regular unit physical fitness training if it is before 180 days following pregnancy termination. After receiving clearance from their physician to resume physical training, they are expected to use the time in preparation for the APFT.

*f.* The above guidance will only be modified if, upon evaluation of a physician, it has been determined the postpartum Soldier requires a more restrictive or longer profile because of complicated or unusual medical problems.

## 7–11. Preparation, approval, and disposition of DA Form 3349

*a. Preparation of DA Form 3349.*

(1) The DA Form 3349 will be used to record both permanent profiles and temporary profiles. The DA Form 689 (Individual Sick Slip) may be used in lieu of DA Form 3349 for temporary profiles not to exceed 30 days and will include information on activities the Soldier can perform, as well as the physical limitations. An SF 600 will be used to attach additional information to the DA Form 3349 on the physical activities a Soldier can or cannot perform if there is inadequate space on the DA Form 3349. This additional SF 600 will be clearly labeled as a continuation of the DA Form 3349.

(2) If electronic profiling is available, an electronic DA Form 3349 will be used for all profiles over 30 days duration.

(3) The DA Form 3349 will be prepared as follows:

*(a) Item 1.* Record medical conditions and/or physical defects in common usage, nontechnical language that a layman can understand. For example, "compound comminuted fracture, left tibia" might simply be described as "broken leg." The checkboxes labeled Injury and Illness/Disease are used for tracking purposes. Check the injury box if the Soldier's medical condition is the result of an injury; otherwise, check the box labeled Illness/Disease.

*(b) Item 2.* Code designations (defined in table 7-2) are limited to permanent profiles for administrative use only and are to be completed by the profiling officer. Up to three different codes can be listed. All functional and assignment limitations are recorded in item 8.

*(c) Item 3.* Enter under each permanent and temporary PULHES factors the appropriate profile serial code (1, 2, 3, and 4) as prescribed) for the specific PULHES factor. A Soldier may have a permanent profile for one condition and a temporary profile for another. All permanent profile blocks must be filled in. Only the applicable block under the temporary profile needs to be completed. For example, a Soldier with a sprained ankle who has permanent H3 hearing loss would be coded 111311 in the permanent PULHES space but _ _ 3 _ _ under the temporary PULHES space.

*(d) Item 4.* Profile type. Check the appropriate block "a" or "b" for the type of profile. If the profile is temporary, enter the expiration date. If the profile is permanent, the profiling officer must assess if the Soldier meets retention standards of chapter 3 (Item 7).

*(e) Item 5.* Answer "Yes" or "No" to items 5a through 5j. These functional activities are the minimum requirements to be considered medically qualified for military duties worldwide and under field conditions. If any answer is "No" then the appropriate profile serial will in most cases be at least a 3 and the Soldier will be referred to a MEB. If the Soldier is able to do all the functional activities listed in 5 and meets the retention standards of chapter 3, the Soldier will be referred to a MMRB in accordance with AR 600–60, unless waived by the MMRB convening authority.

*(f) Item 6.* Physical Fitness Test. Check either "Yes" or "No" to indicate whether the Soldier can perform the activities for the APFT. The "Yes" or "No" blocks on the alternate APFT need only be completed if the Soldier has restrictions for the regular APFT. If the Soldier cannot perform at least an alternate APFT the profile serial will be at least a 3 and referred to an MEB.

*(g) Item 7.* Those Soldiers (active duty and USAR/ARNG) who meet retention standards but have at least a permanent 3 or 4 PULHES (yes for item 7) serial will be referred to a MMRB in accordance with AR 600–60, unless waived by the MMRB convening authority. Those Soldiers on active duty who do not meet retention standards ("No" for item 7), must be referred to an MEB as per chapter 3. (See paras 9–10 and 10–26 for disposition of USAR and ARNG Soldiers not on active duty who do not meet medical retention standards.)

*(h) Item 8.* This space will be used to list any other physical activity restrictions or limitations not listed elsewhere on the form. In accordance with paragraph 7–4*b*, the profiling officer must review previous profiles before making a decision to extend a temporary profile. If this is an extension of a previous temporary profile, fill in the date of the original temporary profile in Item 8.

*(i) Items 9, 10, and 11.* Name and signature of profiling officer and date profile completed. Print name, grade and title of profiling officer, signature, and date. Permanent "1" or "2" profiles require the signature of one profiling officer. The signature of the profiling officer for "1" or "2" profiles is written in the section: "Typed name, grade, and title of profiling officer." Permanent "3" or "4" profiles require the signatures of two profiling officers, one of whom is the physician approving authority (unless the provisions of 7–8*f* apply). (See para 7–8 to determine who is qualified to be a profiling officer.) Temporary profiles require only the signature of one profiling officer except for extensions of profiles noted in paragraph 7–6*a*(2).

*(j) Items 12, 13, and 14.* Name and signature of approving authority and date reviewed. The approving authority will be designated by the MTF commander. (In the case of RC Soldiers not on active duty, see para 7–8*f*.) The approving

authority for permanent "3" or "4" profiles must be a physician. If the approving authority does not concur with the profiling officer recommendation, the MTF commander will make the final decision.

*(k) Item 15.* How to access electronic profiles on Soldiers. Commanders can access the electronic profiles of Soldiers in their unit by going to http://www.mods.army.mil/ and clicking on "e-Profile" in MODS in the list of applications. Commanders are required to register and be approved to access the e-Profile module in MODS before they can gain access to the electronic profiles

*(l) Item 16.* Include patient identification: Name (Last, First); Grade/Rank; SSN (last 4 numbers or SSN); and the Soldier's unit.

*(m) Item 17.* Hospital or Medical facility.

*(n) Item 18.* Profiling Officer E-mail.

*b. Disposition of DA Form 3349 (temporary or permanent) by the MTF.* The electronic profile will be routed to the military personnel office (MILPO) and the Soldier's medical record. A paper copy of DA Form 3349 will be given to the Soldier. If the e-Profile is not available, a paper copy will be delivered by means other than the individual on whom the report is made to the following:

(1) Original to the Soldier's health record.

(2) One copy to the Soldier's commander.

(3) One copy to the MILPO.

*c. Medical Protection System.* The profiling officer (or approving authority if applicable) is responsible for ensuring the PULHES and Date of Profile is entered into the Medical Protection System (MEDPROS).

## 7–12. Responsibility for personnel actions

*a.* Commanders and personnel officers are responsible for necessary personnel actions, including appropriate entries on personnel management records and the assignment of the individual to military duties commensurate with the individual's physical profile and recorded assignment limitations.

*b.* If the Soldier's commander believes the Soldier cannot perform within the limits of the permanent profile, the commander will request reconsideration of the profile by the profiling physician. Reconsideration must be accomplished by the profiling officer, who will either amend the profile or revalidate the profile as appropriate. Commanders may also request a review of temporary profiles.

## 7–13. Physical profile and the Army Weight Control Program

The DA Form 3349 will not be used to excuse Soldiers from the provisions of AR 600–9. The AR 600–9 contains a standard memorandum for completion by a physician if there is an underlying or associated disease process that is the cause of the overweight condition. The inability to perform all APFT events or the use of certain medications is not generally considered sufficient medical rationale to exempt a Soldier from AR 600–9.

**Table 7–1**
**Physical profile functional capacity guide**

| Profile | P | U | L | H | E | S |
|---|---|---|---|---|---|---|
| Serial | Physical capacity | Upper extremities | Lower extremities | Hearing–ears | Vision–eyes | Psychiatric |
| Factors to be considered. | Organic defects, strength, stamina, agility, energy, muscular coordination, function, and similar factors. | Strength, range of motion, and general efficiency of upper arm, shoulder girdle, and upper back, including cervical and thoracic vertebrae. | Strength, range of movement, and efficiency of feet, legs, lower back and pelvic girdle. | Auditory sensitivity and organic disease of the ears | Visual acuity, and organic disease of the eyes and lids. | Type severity, and duration of the psychiatric symptoms or disorder existing at the time the profile is determined. Amount of external precipitating stress. Predisposition as determined by the basic personality makeup, intelligence, performance, and history of past psychiatric disorder impairment of functional capacity |
| 1 | Good muscular development with ability to perform maximum effort for indefinite periods. | No loss of digits or limitation of motion; no demonstrable abnormality; able to do hand to hand fighting. | No loss of digits or limitation of motion; no demonstrable abnormality; able to perform long marches, stand over long periods, run. | Audiometer average level for each ear not more than 25 dB at 500, 1000, 2000 Hz with no individual level greater then 30 dB. Not over 45 dB at 4000 Hz. | Uncorrected visual acuity 20/200 correctable to 20/ 20, in each eye. | No psychiatric pathology. May have history of a transient personality disorder. |
| 2 | Able to perform maximum effort over long periods. | Slightly limited mobility of joints, muscular weakness, or other musculo-skeletal defects that do not prevent hand–to–hand fighting and do not disqualify for prolonged effort. | Slightly limited mobility of joints, muscular weakness, or other musculo-skeletal defects that do not prevent moderate marching, climbing, timed walking, or prolonged effort. | Audiometer average level for each ear at 500, 1000, 2000 Hz, *or* not more than 30 dB, with no individual level greater than 35 dB at these frequencies, and level not more than 55 dB at 4000 Hz; *or* audiometer level 30 dB at 500 Hz, 25 dB at 1000 and 2000 Hz, and 35 dB at 4000 Hz in better ear. (Poorer ear may be deaf.) | Distant visual acuity correctable to not worse than 20/40 and 20/70, or 20/30 and 20/100, or 20/20 and 20/ 400. | May have history of recovery from an acute psychotic reaction due to external or toxic causes unrelated to alcohol or drug addiction. |
| 3 | Unable to perform full effort except for brief or moderate periods. | Defects or impairments that require *significant* restriction of use. | Defects or impairments that require *significant* restriction of use. | Speech reception threshold in best ear not greater than 30 dB HL, measured with or without hearing aid; or acute or chronic ear disease. | Uncorrected distant visual acuity of any degree that is correctable not less than 20/40 in the better eye. | Satisfactory remission from an acute psychotic or neurotic episode that permits utilization under specific conditions (assignment when outpatient psychiatric treatment is available or certain duties can be avoided). |
| 4 | *Functional level below P3.* | *Functional level below U3.* | *Functional level below L3.* | *Functional level below H3.* | *Visual acuity below E3.* | Does not meet S3 above. |

**Table 7–2**
**Profile codes***

| Code | Description/assignment limitation | Medical criteria (examples) |
|---|---|---|
| CODE A | No assignment limitation. | No demonstrable anatomical or physiological impairment within standards established in table 7–1. |
| CODE B | Soldier has minor impairments that may disqualify for certain MOS training or assignment. | Minimal loss of joint motion, visual and hearing loss |
| CODES D through N | Possesses impairments that limit functions or assignments. *The codes listed below are for military personnel administrative purposes. Corresponding limitations are general guidelines and are not to be taken as verbatim limitations. (For example, a Soldier with a code D may not be able to run but may have no restrictions on marching or standing.) Item 8 of DA Form 3349 will contain the specific limitations.* | |
| CODE D | No strenuous physical activity. | Organic cardiac disease, pulmonary insufficiency. |
| CODE E | No continuous consumption of combat rations. | Endocrine disorders—recent or repeated peptic ulcer activity—chronic gastrointestinal disease requiring dietary management. |
| CODE F | No assignment or deployment to OCONUS areas where definitive medical care for the Soldier's medical condition is not available. | Individuals who require continued medical supervision with hospitalization or frequent outpatient visits for serious illness or injury. |
| CODE H | No duty where sudden loss of consciousness would be dangerous to self or to others such as work on scaffolding, vehicle driving, or near moving machinery. | Seizure disorders; other disorders producing syncopal attacks of severe vertigo, such as Ménierè's syndrome. |
| CODE J | Given known handicaps associated with high frequency hearing loss similar to this, commanders are highly recommended to make an individual risk assessment of any Soldier with hearing loss that might be tasked to perform duties that require good hearing. For example, localization and detection of friend or foe sounds, scout, point, sentry, forward listening, post/observer, radio/telephone operator (RTO), and so forth. (See DA Pam 40–501, para 2–4, Combat readiness effects.) Hearing protection measures are required to prevent further hearing loss.<br><br>• 1–No exposure to noise in excess of 85 dBA (decibels measured on the A scale) or weapon firing without use of properly fitted hearing protection. Annual hearing test required.<br><br>• 2– Further exposure to noise is hazardous to health. No duty or assignment to noise levels in excess of 85 dBA or weapon firing (not to include firing for preparation of replacements for overseas movement (POR) qualification or annual weapons qualification with proper ear protection). Annual hearing test required.<br><br>• 3– No exposure to noise in excess of 85 dBA or weapon firing without use of properly fitted hearing protection. This individual is "deaf" in one ear. Any permanent hearing loss in the good ear will cause a serious handicap. Annual hearing test required.<br><br>• 4–Further duty requiring exposure to high intensity noise is hazardous to health. No duty or assignment to noise levels in excess of 85 dBA or weapon firing (not to include firing for overseas movement (POR) or weapon firing without use of properly fitted ear protection). No duty requiring acute hearing. A hearing aid must be worn to meet medical fitness standards. | Susceptibility to acoustic trauma. |

**Table 7–2**
**Profile codes*—Continued**

| Code | Description/assignment limitation | Medical criteria (examples) |
|---|---|---|
| CODE N | Limitations restricting wearing of combat boots. | Any vascular or skin condition of the feet or legs that, when aggravated by continuous wear of combat boots, tends to develop unfitting ulcers. |
| CODE S | MEB. Soldier has been determined to meet medical retention standards of Chapter 3 by a Medical Evaluation Board (MEB). | |
| CODE T | Waiver granted for a disqualifying medical condition/standard for initial enlistment or appointment. The disqualifying medical condition/standard for which a waiver was granted will be documented in the Soldier's accession medical examination. | |
| CODE U | Soldier has a limitation that needs to be considered Individually as follows: (Briefly define limitation in item 8, comment section.) | Any significant functional assignment limitation not specifically identified elsewhere. |
| CODE V | Deployment. This code identifies a Soldier with restrictions on deployment to certain areas. | Explanations of condition(s) and specific restrictions are noted in the medical record. |
| CODE W | MMRB. This Soldier has a permanent 3 or 4 profile who has been evaluated by a MMRB (MOS Medical Review Board) with a recommendation to retain or reclassify and returned to duty. | |
| CODE X | COAD/COAR. This Soldier is allowed to continue in the military service with a disease, injury, or medical defect that is below medical retention standards, pursuant to a waiver of retention standards under chapter 9 or 10 of this publication, or waiver of unfit finding and continued on active duty or in active Reserve status under AR 635–40. | |
| CODE Y | Fit for duty. This Soldier has been determined to be fit for duty (not entitled to separation or retirement because of physical disability) after complete processing under AR 635–40. | |

Notes:
* Codes do not automatically correspond to a specific numerical designator of the profile but are based on the general physical/assignment limitations.

# Chapter 8
# Medical Examinations—Administrative Procedures

## 8–1. General
(See chap 6 for aviation administration procedures.) This chapter provides—

*a.* General administrative policies relative to military medical examinations.

*b.* Requirements for periodic medical examinations and periodic health assessments (PHA), separation, mobilization, and other medical examinations.

*c.* Policies relative to hospitalization of examinees for diagnostic purposes and use of documentary medical evidence, consultations, and the individual health record.

*d.* Policies relative to the scope and recording of medical examinations accomplished for stated purposes.

## 8–2. Applications
The provisions contained in this chapter apply to all medical examinations and PHAs accomplished at U.S. Army medical facilities or accomplished for the U.S. Army.

## 8–3. Physical fitness
*a.* Maintenance of physical and medical fitness is an individual military responsibility, particularly with reference to preventable conditions and remediable defects. Soldiers have an obligation to maintain themselves in a state of good physical condition so that they may perform their duties efficiently. Soldiers must seek timely medical advice whenever they have reason to believe that a medical condition or physical defect affects, or is likely to affect, their physical or mental wellbeing, or readiness status. They should not wait until the time of their annual periodic health assessment to make such a condition or defect known. Soldiers are responsible to seek medical care and report such medical care to

A270                            AR 40–501 • 14 December 2007                            85

Singh v. McHugh et al.
(DA Form 3349)

# PHYSICAL PROFILE

For use of this form, see AR 40-501; the proponent agency is the Office of the Surgeon General.

| 1. MEDICAL CONDITION: *(Description in lay terminology)*  □ INJURY? Or  □ ILLNESS/DISEASE? | 2. CODES *(Table 7-2 AR 40-501)* | 3. Temporary / Permanent | P | U | L | H | E | S |
|---|---|---|---|---|---|---|---|---|

| 4. PROFILE TYPE | YES | NO |
|---|---|---|
| a. TEMPORARY PROFILE *(Expiration date YYYYMMDD)*  *(Limited to 3 months duration)* | □ | □ |
| b. PERMANENT PROFILE *(Reviewed and validated as a minimum with every periodic physical exam or after 5 years from the date of issue)* | □ | □ |
| c. IF A PERMANENT PROFILE WITH A 3 OR 4 PULHES, DOES THE SOLDIER MEET RETENTION STANDARDS IAW CHAPTER 3 AR 40-501? *(IF USAR/ARNG/ARNGUS SOLDIER NOT ON ACTIVE DUTY SEE PARA. 9-10 & 10-26, AR 40-501 IF SOLDIER DOES NOT MEET RETENTION STANDARDS.)* | Needs MMRB | Needs MEB/PEB |

| 5. FUNCTIONAL ACTIVITIES FOR PERMANENT AND TEMPORARY PROFILES *(If any answer (a-f) is NO then the profile should be at least a 3)* | | |
|---|---|---|
| a. ABLE TO CARRY AND FIRE INDIVIDUAL ASSIGNED WEAPON | □ | □ |
| b. ABLE TO MOVE WITH A FIGHTING LOAD AT LEAST 2 MILES *(48 LBS. Includes helmet, boots, uniform, LBE, weapon, protective mask, pack, etc.)* | □ | □ |
| c. ABLE TO WEAR PROTECTIVE MASK AND ALL CHEMICAL DEFENSE EQUIPMENT | □ | □ |
| d. ABLE TO CONSTRUCT AN INDIVIDUAL FIGHTING POSITION *(Dig, fill, & lift sand bags, etc.)* | □ | □ |
| e. ABLE TO DO 3-5 SECOND RUSHES UNDER DIRECT AND INDIRECT FIRE | □ | □ |
| f. IS SOLDIER HEALTHY WITHOUT ANY MEDICAL CONDITION THAT PREVENTS DEPLOYMENT? | □ | □ |

| 6. APFT | YES | NO | ALTERNATE APFT *(Fill out if unable to do APFT run otherwise N/A)* | | YES | NO |
|---|---|---|---|---|---|---|
| 2 MILE RUN | □ | □ | APFT WALK | N/A | □ | □ |
| APFT SIT-UPS | □ | □ | APFT SWIM | N/A | □ | □ |
| APFT PUSH UPS | □ | □ | APFT BIKE | N/A | □ | □ |

| 7. STANDARD *OR* MODIFIED AEROBIC CONDITIONING ACTIVITIES *(Check all applicable boxes)* | | | | |
|---|---|---|---|---|
| UNLIMITED RUNNING | □ | □ | OR RUN AT OWN PACE & DISTANCE | □ |
| UNLIMITED WALKING | □ | □ | OR WALK AT OWN PACE & DISTANCE | □ |
| UNLIMITED BIKING | □ | □ | OR BIKE AT OWN PACE & DISTANCE | □ |
| UNLIMITED SWIMMING | □ | □ | OR SWIM AT OWN PACE & DISTANCE | □ |

| 8. UPPER BODY WEIGHT TRAINING *(See FM 21-20)* | 9. LOWER BODY WEIGHT TRAINING *(See FM 21-20)* |
|---|---|

| 10. OTHER: e.g. Functional limitations and capabilities and other comments: *(May continue on page 2)* | 11. THESE PARAMETERS ARE OPTIONAL, USE AS NEEDED |
|---|---|
| | Lifting or carrying max weight _____ or _____ distance |
| | Running maximum distance _____ |
| | Prolonged standing - maximum time per episode _____ |
| | Marching with standard field gear except rucksack max distance _____ |
| □ This temporary profile is an extension of a temporary profile first issued on _____ | Impact activities such as jumping max # reps in one day _____ |

| 12. TYPE NAME & GRADE OF PROFILING OFFICER | 13. SIGNATURE | 14. DATE *(YYYYMMDD)* |
|---|---|---|

| 15. ACTION BY APPROVING AUTHORITY | □ APPROVED   □ NOT APPROVED |
|---|---|

| 16. TYPE NAME & GRADE OF SENIOR PROFILING OFFICER OR APPROVING AUTHORITY | 17. SIGNATURE | 18. DATE *(YYYYMMDD)* |
|---|---|---|

| 19. ACTION BY UNIT COMMANDER *(See para 7-12, AR 40-501)* | YES | NO |
|---|---|---|
| THIS PROFILE REQUIRES A CHANGE IN THIS SOLDIER'S MOS or DUTY ASSIGNMENT | □ | □ |

| 20. COMMENT |
|---|
| If this is a **permanent** profile with a PULHES serial of **3** or **4** refer to block 4c |

| 21. TYPE NAME & GRADE OF UNIT COMMANDER | 22. SIGNATURE | 23. DATE *(YYYYMMDD)* |
|---|---|---|

| 24. PATIENT'S IDENTIFICATION *(For typed or written entries give: Name (Last, first); grade; SSN; hospital or medical facility)* | 25. UNIT |
|---|---|
| | 26. ISSUING CLINIC, PROVIDER E-MAIL & PHONE NUMBER |
| | PROFILING OFFICER (Or Approving Authority if applicable) IS RESPONSIBLE FOR ENSURING THE PULHES & DATE OF PROFILE IS ENTERED INTO MEDPROS. ORIGINAL COPY POSTED IN MEDICAL RECORDS, 1 COPY TO UNIT COMMANDER, 1 COPY GIVEN TO SOLDIER, 1 COPY TO MILPO. |

A272

## PHYSICAL PROFILE - PAGE 2 *(OPTIONAL)*

| PATIENT'S NAME | DATE *(YYYYMMDD)* |
|---|---|
| | |

CONTINUATION *(From page 1, Item 10)*

A273

Singh v. McHugh et al.
(DA Pam 600-3)

**Department of the Army
Pamphlet 600–3**

**Personnel-General**

# Commissioned Officer Professional Development and Career Management

**Headquarters
Department of the Army
Washington, DC
3 December 2014**

## UNCLASSIFIED

A275

**Headquarters
Department of the Army
Washington, DC
3 December 2014**

**\*Department of the Army
Pamphlet 600–3**

Personnel-General

# Commissioned Officer Professional Development and Career Management

By Order of the Secretary of the Army:

RAYMOND T. ODIERNO
*General, United States Army
Chief of Staff*

Official:

GERALD B. O'KEEFE
*Administrative Assistant to the
Secretary of the Army*

**History.** This publication is a major revision.

**Summary.** This pamphlet outlines officer development and career management programs for each of the Army's career branches and functional areas. It does not prescribe the path of assignment or educational assignments that will guarantee success but rather describes the full spectrum of developmental opportunities an officer can expect throughout a career. It emphasizes the need of the future force leader to broaden and acquire a greater depth vice

breadth of experience in challenging leadership positions. In addition, this pamphlet provides a summary of the special branches (The Judge Advocate General's Corps, Chaplain Corps, and U.S. Army Medical Department).

**Applicability.** This pamphlet applies to the Active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve, unless otherwise stated. During mobilization, procedures in this publication can be modified to support policy changes as necessary.

**Proponent and exception authority.** The proponent of this pamphlet is the Deputy Chief of Staff, G–1. The proponent has the authority to approve exceptions or waivers to this pamphlet that are consistent with controlling law and regulations. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or its direct reporting unit or field operating agency, in the grade of colonel or the civilian equivalent. Activities may request a waiver to this pamphlet by providing justification that includes a full analysis of the expected benefits and must include formal review by the activity's senior

legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25–30 for specific guidance.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to Deputy Chief of Staff, G–1 (DAPE–MPO), 300 Army Pentagon, Washington DC 20310–0300.

**Distribution.** This publication is available in electronic media only and is intended for command levels A, B, C, D, and E for the Active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve.

---

**Contents** (Listed by paragraph and page number)

**Part One
Philosophy and Management,** *page 1*

**Chapter 1
Introduction,** *page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Current perspective • 1–4, *page 1*
Warrior Ethos and Army Values • 1–5, *page 1*
The Army Profession • 1–6, *page 2*
Mentoring, counseling, and coaching • 1–7, *page 2*
Officer Personnel Management System overview • 1–8, *page 2*

---

*This pamphlet supersedes DA Pam 600–3, dated 10 February 2010.

A276

DA PAM 600–3 • 3 December 2014

**UNCLASSIFIED**

i

*c. Public Affairs Reserve Component assignments.* RC FA 46 officer assignments parallel those of their AC colleagues with some inherent component unique differences. These component unique positions include State Area Command Public Affairs officer, Broadcast Operations Detachment commander/operations officer and Unified Command staff IMA. Many positions parallel the AC, to include Public Affairs Operations Center commander, Mobile Public Affairs Detachment commander, Broadcast Operations Detachment commander, Public Affairs detachment commander, BCT Public Affairs officer, division Public Affairs officer, TSC Public Affairs officer.

# Chapter 25
# Military Intelligence Branch

## 25–1. Introduction

*a. Purpose.* The purpose of intelligence is to support commanders and staffs in gaining situational understanding of threats, terrain and weather, and civil considerations. Intelligence is the product resulting from the collection, processing, integration, evaluation, analysis, and interpretation of available information concerning foreign nations, hostile or potentially hostile forces or elements, or areas of actual or potential operations. Intelligence is both a process and a function that enables the Army to conduct unified land operations. Intelligence is inherently JIIM and leverages the intelligence enterprise. The Army focuses its intelligence effort through the intelligence warfighting function. The intelligence warfighting function systematically answers requirements to support unified land operations. This effort provides information and intelligence to all of the warfighting functions and directly supports the exercise of mission command throughout the conduct of operations.

*b. Proponent information.* The CG, U.S. Army Intelligence Center of Excellence (Chief of the Military Intelligence Corps) is the proponent for Branch 35. The Office of the Chief, Military Intelligence is the personnel proponent office for Branch 35.

*c. Functions.* Military Intelligence officers must ensure that the intelligence warfighting function operates effectively and efficiently. They must understand how the operational variables of politics, military, economic, social, information, infrastructure, physical environment and time (PMESII–PT), impact the commander's operational environment.

(1) Military Intelligence officers must know, understand, and be able to operate within the Intelligence Enterprise and complementary intelligence capabilities.

*(a)* Intelligence disciplines.

*1.* Counterintelligence.

*2.* Geospatial Intelligence.

*3.* Human Intelligence.

*4.* Measurement and Signature Intelligence.

*5.* Open-source Intelligence.

*6.* SIGINT.

*7.* Technical Intelligence (TECHINT).

*(b)* Complementary intelligence capabilities are specific to the unit and circumstances at each echelon and can vary across the Intelligence Enterprise. These capabilities include but are not limited to:

*1.* Biometrics-enabled intelligence (BEI).

*2.* Cyber-enabled intelligence.

*3.* Document and media exploitation (DOMEX).

*4.* Forensic-enabled intelligence (FEI).

(2) Military Intelligence officers integrate intelligence and information from all relevant sources (all-source intelligence) in order to analyze situations or conditions that impact operations. Intelligence work requires the ability to interpret patterns associated with complex situations, as well as the ability to synthesize and interpret such activities. Analytical proficiency requires an understanding of the tactical concepts of both friendly and threat operations. These officers must be able to clearly articulate findings in both written and oral assessments.

## 25–2. Unique knowledge and skills of a Military Intelligence officer

The intelligence core competencies are the most basic activities and tasks the Army uses to describe and drive the Intelligence warfighting function and leverage the Intelligence Enterprise. The core competencies are intelligence synchronization, intelligence operations, and intelligence analysis. These competencies are taught at varying levels throughout the Military Intelligence educational system and are applicable to all Military Intelligence officers, regardless of AOC

*a.* Intelligence synchronization is the "art" of integrating information collection and intelligence analysis with operations to effectively and efficiently support decision-making ADRP 2–0. This core competency ensures the Intelligence warfighting function supports mission command. Intelligence synchronization balances time with collection, production, required accuracy, and specificity to meet the commander's and other requirements.

*b.* Intelligence operations are the tasks undertaken by Military Intelligence units and Soldiers to obtain information to satisfy validated requirements (ADRP 2–0). Intelligence operations are one of the four primary means for information collection. The other three are reconnaissance, surveillance, and security operations.

*c.* Intelligence analysis is the process by which collected information is evaluated and integrated with existing information to facilitate intelligence production (ADRP 2–0). The purpose of intelligence analysis is to describe the current-and attempt to proactively assess-threats, terrain, weather, and civil considerations. Intelligence analysis is continuous, complements intelligence synchronization, and enables operations. Military Intelligence officers use critical and creative thinking to conduct intelligence analysis and produce timely, predictive intelligence. Examples of Military Intelligence officer characteristics needed to conduct successful analysis include:

(1) Critical thinking: Critical thinking is essential to analysis. Using critical thinking, which is disciplined and self-reflective, provides more holistic, logical, and unbiased analysis and conclusions. Applying critical thinking ensures analysts fully account for the elements of thought, the standards of thought, and the traits of a critical thinker.

(2) Embracing ambiguity: Well trained analysts are critical due to the nature of changing threats and operational environments. They must embrace ambiguity and recognize and mitigate their own or others' biases, challenge their assumptions, and continually learn during analysis.

(3) Collaboration: Commanders, intelligence and other staffs, and intelligence analysts collaborate. They actively share and question information, perceptions, and ideas to better understand situations and produce intelligence. Collaboration is essential to analysis; it ensures analysts work together to effectively and efficiently achieve a common goal. Often, analytical collaboration is enabled by the Intelligence Enterprise.

## 25–3. Military Intelligence officer development

*a. Military Intelligence officer development—areas of concentration.* All Military Intelligence officers begin their career as 35D (All-Source Intelligence Officer) and may acquire AOC additional training as needed. Military Intelligence officers that acquire an additional AOC may have the opportunity to leverage these skills in future assignments. However, Military Intelligence officers must continue to successfully serve in the KD assignments for each grade.

(1) All-Source intelligence officer (35D). All Military Intelligence officers receive initial and advanced training as a 35D. Duties include directing, supervising, and coordinating the planning, collection, processing, production, and dissemination of all-source intelligence at all echelons, to include JIIM. They are well-versed in the Army intelligence process that consists of four steps (plan, direct, collect, produce and disseminate) and two continuing activities (analyze and assess). 35D officers use the intelligence process to provide intelligence support to mission command and to enhance the commander's situational understanding.

(2) Counterintelligence officer (35E). Duties include planning, directing, managing, coordinating, and participating in the collection, production, and dissemination of counterintelligence information and conducting counterintelligence investigations and operations at all echelons. Provide counterintelligence input and assistance to force protection planning and execution by limiting the effectiveness of foreign multidiscipline collection directed against Army operations, activities, technology, and personnel at all echelons, to include JIIM.

(3) Human Intelligence officer (35F). Duties include planning, directing, managing, coordinating, and participating in the collection, production, and dissemination of human intelligence derived from interrogation and military source operations (MSO). Duties include source deconfliction and operational management team (OMT) interoperability.

(4) SIGINT officer (35G). Duties include planning, directing, executing, supervising and coordinating the collection, analysis, production and dissemination of SIGINT; providing SIGINT support to EW and Cyber operations in support of commanders at all echelons.

(5) All-Source Intelligence Aviator (15C35). These officers are branched as Aviation officers but carry 35 as a FA. As aviators, they command platoons, companies, and battalions employing special electronic mission aircraft in support of tactical, operational, and strategic intelligence missions. They may perform duties as the Aviation battalion and brigade S2. They may also perform in Military Intelligence coded positions. As staff officers in Military Intelligence Aviation units, they plan for, direct, and control special electronic mission aircraft units to accomplish assigned intelligence missions. These officers also direct and control the training, safety, administration, communication, supply, maintenance, transportation, and force protection activities of special electronic mission aircraft units.

*b. Lieutenant development.*

(1) *Education.* Successful completion of the Military Intelligence BOLC at the U.S. Army Intelligence Center of Excellence at Fort Huachuca, AZ.

(2) *Assignment.* After completing the Military Intelligence BOLC, Military Intelligence lieutenants will likely be assigned to serve with Soldiers in leadership developmental positions such as platoon leader, XO, or in other assignments such as assistant S2, combat support battalion S2, assistant brigade S2 or staff officer in a Military Intelligence battalion. Military Intelligence lieutenants most commonly serve as intelligence officers at echelons corps and below.

(3) *Self-development.* Lieutenants should take every opportunity to broaden their knowledge of all aspects of military intelligence through courses, professional readings, and personal research into intelligence related topics.

(4) *Desired experience.* Lieutenants should strive to acquire, reinforce, and hone troop-leading, technical, tactical,

logistics, and administrative skills. Inculcation of the Warrior Ethos and Army Values is essential in the development of young Military Intelligence lieutenants. Prior to promotion for captain, the officer must possess an in-depth knowledge of combined arms and intelligence operations gained through on-the-job-training experience.

(5) The Military Intelligence Branch Detail Program is an important part of the Military Intelligence officer accession process. This critical program assigns newly commissioned officers to branches with large lieutenant requirements. It exposes a large number of operations support officers to operations branches. Upon selection to promotion to captain, these officers become Military Intelligence officers and are scheduled for the Military Intelligence Officer Transition Course prior to attending the Military Intelligence CCC. After completing both courses, detailed officers are developed in the same manner as their non-detailed Military Intelligence counterparts.

*c. Captain development.*

(1) Education. Successful completion of the Military Intelligence CCC.

(2) KD assignments. The following are considered KD assignments for Military Intelligence captains:

*(a)* Battalion S2.

*(b)* Company or detachment commander.

*(c)* Division G2 targeting officer.

*(d)* BCT A/S2, S2X.

*(e)* National support team lead.

*(f)* Combat support team lead.

(3) Self-development. Military Intelligence captains should take every opportunity to broaden their knowledge of all aspects of military intelligence and the Army through courses, professional readings and personal research into intelligence related topics.

(4) Desired experience. Branch-specific assignments will provide captains with exposure to the Army and in some cases, to JIIM organizations. Following company command and battalion S2 assignments, Military Intelligence officers should attempt to gain maximum experience by serving in multiple Military Intelligence duty positions. Branch immaterial and/or nominative assignments, particularly at echelons above corps or in the generating force, will also assist senior Military Intelligence captains by exposing them to new echelons, responsibilities and missions.

(5) Broadening opportunities. Broadening opportunities for Branch 35 captains are quite diverse, ranging from positions such as U.S. Army Intelligence Center of Excellence instructor to nominative positions in the joint arena. Fellowships in non-DOD agencies as well as scholarships to institutions of higher learning are also available. Officers are encouraged to seek out broadening experience after having served in their KD positions.

*d. Major development.*

(1) Education. Successful completion of ILE/JPME I level producing course.

(2) Key developmental assignments. The following are considered KD assignments for Military Intelligence majors:

*(a)* S2 of brigade/BCT/regiment/SF group.

*(b)* Analysis and control element (ACE) chief.

*(c)* Division collection manager.

*(d)* XO or S3 of any battalion/brigade/group.

*(e)* Division G2 planner, G2X.

*(f)* National mission team lead.

*(g)* Combat mission team lead.

*(h)* SMU troop command.

(3) Developmental assignments. Military Intelligence majors should strive to have a broad base of intelligence experience at various echelons. Following their successful KD assignment, Military Intelligence majors should serve in a balance of division, echelon at or above corps and joint assignments. Experience at multiple echelons will assist Military Intelligence majors at the next rank, as most Military Intelligence lieutenant colonel positions are within echelons above corps units. Military Intelligence majors should consider publication in academic and professional journals, as it will encourage Military Intelligence majors to critically develop their thoughts for a wide and discriminating audience.

(4) Self-development. Majors should actively pursue self-development opportunities to fully master all aspects of operations including JIIM operations. Self-development includes correspondence courses, civilian education, and institutional training.

(5) Broadening opportunities. Branch 35 majors are encouraged to seek post-KD broadening experiences both internal and external to the Army. Internal opportunities are ample and include U.S. Army Intelligence Center of Excellence course manager or doctrine writer, external may include any JIIM experience or fellowships in non-DOD agencies. All of these experiences enhance the adaptability and intellectual scope of the officers.

*e. Lieutenant colonel development.*

(1) *Education.* Military Intelligence lieutenant colonels are encouraged to complete JPME II.

(2) *Key developmental assignments.* The following are considered KD assignments for Military Intelligence lieutenant colonels:

*(a)* CSL key billet G–2, Corps G2X.

*(b)* CSL battalion-level commander (Military Intelligence battalion, brigade troop battalions /HHBN, USAREC battalion, installation/garrison commands).

*(c)* Corps ACE chief.

*(d)* CTC senior intel officer.

*(e)* Army staff/JIIM/Joint staff Military Intelligence coded billets.

(3) *Developmental assignments.* Officers selected for lieutenant colonel and CSL positions must seek assignments within the branch and with JIIM positions that directly contribute to, and develop, the Army intelligence profession.

(4) *Self-development.* Military Intelligence lieutenant colonels must continue to actively pursue self-development opportunities to fully master all aspects of operations including continued performance at multiple echelons and JIIM operations.

(5) *Desired experience.* Military Intelligence lieutenant colonels will serve at multiple echelons and types of positions throughout their tenure. Military Intelligence lieutenant colonels should seek the opportunity for joint qualification, intelligence broadening assignments and intelligence focused civilian and institutional training, as well as professional development through progressive assignments.

(6) *Broadening opportunities.* Some Military Intelligence lieutenant colonels may serve outside their branch in generalist positions at all levels from installation to Department of Army. They should also seek JIIM experience if they have not had it in prior years.

*f. Colonel development.*

(1) *Education.* Successful completion of a JPME II certificate through the SSC, or the successful completion of a JPME II level producing course.

(2) *Key developmental assignments.* Colonels contribute to the branch by serving in critical assignments to include the following:

*(a)* Corps G2.

*(b)* CSL brigade-level command.

*(c)* ASCC or ACOM G2.

*(d)* J2 (JSOC, Joint Task Force, and so forth), Combatant Command J2X.

*(e)* TRADOC capabilities manager.

*(f)* Army or joint staff Military Intelligence coded billets.

*g. Great skill key development.* Completion of training as listed in DA Pam 614–115 (S) and successful completion of/or assignment in a great skill tour for at least 12 months, is required for qualification at each grade.

## 25–4. Military intelligence officer special skill producing programs

Military Intelligence officers may apply for a number of skill producing programs that award a SI. Military Intelligence officers who participate in one of these programs are not eligible for FA designation. As a rule, selected Military Intelligence officers may participate in only one of the following programs:

*a. National Systems Development Program (NSDP) (SI 3F).* The NSDP is a 1-year intensive academic program comprised of various courses offered throughout the intelligence community. This program is designed to develop a cadre of space smart collection managers who understand and have the ability to harness national intelligence systems and capabilities and incorporate national-level support into tactical intelligence collection plans. Graduates serve an initial 12–24 month utilization tour applying their newly acquired skills as a division or corps intelligence collection manager in an Army priority unit upon completion. Selectees PCS to Fort Meade, MD. Once they complete the program, they are positioned to serve as future ACE chiefs, battalion S3/XOs, brigade S2, and division collection managers.

*b. Junior Officer Cryptologic Career Program (SI 3W).* This is a 3-year program conducted at the National Security Agency (NSA) at Fort Meade, MD. Participants serve 6-month operational tours in variety of NSA work centers and receive over 1,000 hours of formal instruction at the National Cryptologic School. The 3-year program develops each officer's cryptologic and management skills to prepare them for future leadership roles in essential cryptologic assignments. Selectees PCS to Fort Meade, Maryland, and follow-on assignments are to operational priority units throughout the Army.

*c. Master of Science of Strategic Intelligenc.* The Master of Science in Strategic Intelligence is a 12-month graduate degree producing program earning officers and warrant officers a Master of Science in Strategic Intelligence. The Master of Science in Strategic Intelligence curriculum emphasizes developing the student's understanding of intelligence at the national level, as well as understanding military strategy, national security policy, and the planning and execution of joint and combined operations. Officers selected under this program will PCS to Fort Belvoir, VA and will attend the National Intelligence University located at Bolling, Air Force Base. Officers will have follow-on assignments to serve as brigade S2s, ACE chiefs, battalion S3/XOs.

## Military Intelligence Officer Professional Development Model

| YRS SVC | | | 0 | 4 | 10 | 13 | 17 19 | 22 | 25 | 30 |
|---|---|---|---|---|---|---|---|---|---|---|
| **RANK** | | | LT | | CPT | MAJ | | LTC | COL | |
| | | | Company Grade Officer | | | Field Grade Officer | | | | |

| TRAINING | B O L C | CCC | ILE | | Senior Service College |
|---|---|---|---|---|---|
| | | Additional MI AOC Training | | Pre-Command Course | |
| | | ACS, JOCCP, AIDP, MSSI | | | |

| | | KEY DEVELOPMENTAL ASSIGNMENTS | | | |
|---|---|---|---|---|---|
| A S S I G N M E N T S | • Platoon Leader<br>• CO XO<br>• Assistant S2<br>• Combat Support BN S2<br>• Asst Bde S2<br>• MI BN Staff | • BN S2<br>• Company/Det Cdr<br>• Div G2 Targeting Officer<br>• BCT A/S2<br>• National Support Team Lead<br>• Combat Support Team Lead | • S2 BDE/BCT/Rgt/SF Grp<br>• ACE Chief<br>• Division Collection Mgr<br>• XO/S3 Bn/Bde/SF Grp<br>• Division G2 Planner<br>• National Mission Team Lead<br>• Combat Mission Team Lead<br>• SMU Troop Command | • CSL Division G2<br>• CSL Battalion level Cmd<br>• Corps ACE Chief<br>• CTC Senior Intelligence Officer<br>• Army Staff/JIIM/Joint Staff (35 coded) | • CSL Corps G2<br>• CSL Bde level Cmd<br>• ASCC or ACOM G2<br>• J2 (JSOC, JTF, etc)<br>• TRADOC Capabilities Manager<br>• Army and/or Joint Staff (35 coded) |
| | | BROADENING/NOMINATIVE CATEGORY ASSIGNMENTS | | | |
| | | • USAICoE Instructor/Doctrine Writer<br>• Fellowship in non-DoD agency | • USAICoE Course Mgr/Doctrine Writer<br>• JIIM<br>• Fellowship in non-DoD agency | • Army Generalist or JIIM (non 35 coded) | • Army Generalist or JIIM (non 35 coded) |

| CIVILIAN EDUCATION | BACCALAUREATE DEGREE | | GRADUATE EDUCATION | POST-GRADUATE DEGREE | |
|---|---|---|---|---|---|

**Figure 25–1. AC Military Intelligence officer development**

## 25–5. Warrant officer development

*a. Unique knowledge and skills of an Military Intelligence warrant officer.* Army warrant officers must maintain the level of officer characteristics as identified in paragraph 25–2.

(1) Military Intelligence warrant officers are leaders and skilled technicians. They have branch-unique skills, knowledge, and attributes that require professional development.

(2) Military Intelligence warrant officers must possess expert knowledge and skill in the intelligence warfighting functions' support of mission command. This knowledge includes practical experience in tactics, combined arms operations and the employment of intelligence systems and processes.

(3) Military Intelligence warrant officers sustain knowledge through institutional training and education, duty in operational assignments and continuous self-development. Warrant officers may deploy with their units or as individuals to support joint, multinational, humanitarian and peace keeping missions.

*b. Military Intelligence warrant officer military occupational specialties.* Military Intelligence warrant officers are experts who provide technical and tactical expertise and experience as well as invaluable leadership throughout the Military Intelligence community at all levels of command. The following are MOSs for Military Intelligence warrant officers.

(1) *All Source Intelligence technicians (350F).* Duties include planning, supervising, and conducting the analysis, fusion, production, dissemination and evaluation of all-source intelligence. All-source intelligence technicians leverage information from all intelligence disciplines and leverage automation to conduct trend, pattern and comparative analysis at all echelons. Duties also include synchronizing ISR in order to answer the commander's priority intelligence requirements in a timely manner. Their key function is to provide commanders with predictive analysis regarding an enemy's most probable course of action or reaction.

(2) *Geospatial Intelligence imagery technicians (350G).* Duties include planning, supervising, and conducting the collection and exploitation of IMINT and Measurement and Signature Intelligence from various sources. Geospatial Intelligence technicians participate in planning and coordinating collection, analysis, and exploitation of various

collections ranging from tactical-level imagery collected by unmanned aerial systems to national-level imagery intelligence products that support intelligence, reconnaissance, and surveillance operations at all echelons. Their key function is to provide imagery-related evidence in graphic or report format to support the intelligence process.

(3) *Attaché technicians (351Z).* Duties include coordinating operations and providing operational support in a Defense Attaché Office. Their key function is to ensure the effective management of Defense Attaché operations worldwide.

(4) *Counterintelligence technicians (351L).* Duties include planning, supervising, and conducting security-sensitive and counterintelligenc investigations operations and analysis in support of both the force protection missions and the predictive intelligence process. Their key function is to protect the force.

(5) *Human Intelligence collection technicians (351M).* Duties include planning, supervising and conducting human intelligence collection through interrogations, debriefings, liaison, sensitive operations, and document exploitation (DOCEX). Their key function is to collect human intelligence information in support of the predictive intelligence process.

(6) *Area Intelligence technicians (351Y).* See AR 614–115 (S) for duty description.

(7) *Signals Intelligence analysis technicians (352N).* Duties include planning and supervising the collection and analysis of SIGINT data in support of the predictive intelligence process. SIGINT analysis technicians actively participate in planning the placement and determining the effectiveness of tactical SIGINT collection assets in support of the combat commanders. Their key function is to provide the SIGINT portion of the all-source intelligence product.

(8) *Signals Collector technicians (352S).* Duties include the planning and coordinating the procurement, deployment, maintenance, and testing of signals collection, analysis, reporting, and processing equipment/software used by signals acquisition/exploitation analysis personnel. Their key function is to provide identification and analysis of unknown signals in support of the SIGINT mission.

(9) *Intelligence Systems maintenance technicians (353T).* Duties include supervising and performing intelligence systems maintenance operations at all echelons. Their key function is to ensure that intelligence equipment and systems are operational.

*c. Military Intelligence warrant officer development.*

(1) Warrant officer one development.

*(a) Education.* Upon graduation from WOCS and appointment to grade WO1, each officer will attend the WOBC. The Military Intelligence WOBC is an 11 week course that provides Military Intelligence warrant officers with the technical training of specialized skills, doctrine, tactics, and techniques associated with their specific MOS. Throughout the course, Military Intellegence WOBC seeks to instill the core competencies that every Military Intelligence warrant officer requires for success regardless of the operating environment.

*(b) Developmental assignments.* Developmental assignments are designed to enhance some aspect of warfighting skills, increase a level of responsibility, develop a greater understanding of interoperability among Army branches, or expose officers to branch-related generating force/JIIM opportunities that directly contribute to success as an innovative and adaptive leader. Military Intelligence warrant officers at WO1 can serve in a number of assignments such as intelligence production section chiefs, intelligence synchronization managers, platoon leaders, or team leaders at the BCT or division level or within a theater intelligence brigade in CONUS or OCONUS. Some SIGINT technicians will be assigned at regional SIGINT operations centers. There are occasional opportunities for assignment at the national and joint levels in the DOD. These are nominative assignments and are for the demonstrated exceptional performer in specialties required.

*(c) Self-development.* The WO1 should actively pursue self-development opportunities to fully master all aspects of operations. Self-development includes distributive learning courses, civilian education, and institutional training.

*(d) Desired experience.* The WO1 should continue to reinforce and hone technical, tactical, and officer skills. Inculcation of the Warrior Ethos and Army core values is essential in the development of young Military Intelligence warrant officers. Prior to promotion to CW2, warrant officers must possess an in-depth knowledge of combined arms and intelligence operations gained through on-the-job-training.

(2) Chief warrant officer two development.

*(a) Education.* Officers with at least 1 year time in grade as a CW2 are eligible to attend the Military Intelligence WOAC at Fort Huachuca, AZ. Officers should complete WOAC prior to consideration for promotion to CW3.

*(b) Developmental assignments.* CW2 Military Intelligence warrant officers can serve in a number of assignments such as intelligence production section chiefs, intelligence synchronization managers, G2X, OMT chiefs, and platoon leaders at the regimental, BCT or division level or within a theater intelligence brigade in CONUS or OCONUS. Some SIGINT technicians will be assigned at Regional SIGINT Operations Centers. Some warrant officers will receive opportunities to serve in multinational force assignments. There are occasional opportunities for assignment at the national and joint levels in the DOD. These are nominative assignments and are for the demonstrated exceptional performer in the specialties required.

*(c) Broadening opportunities.* Select CW2s may serve in the following broadening assignments consistent with the needs of the Army:

*1.* Combat trainer center observer controller/trainer.

*2.* Instructors or TAC officers at U.S. Army training centers.

*3.* Instructors or TAC officers at the Warrant Officer Cryptologic Career Program (WOCCP).

*(d) Self-development.* Completion of an associate's degree is a recommended goal prior to becoming eligible for promotion to CW3.

*(e) Desired experience.* Warrant officers should seek maximum exposure by serving in multiple Military Intelligence assignments and deployments.

(3) Chief warrant officer three development.

*(a) Education.* Officers should complete WOAC prior to 1-year time in grade as a CW3. Officers are eligible to attend WOSC after 1 year at CW3 grade, and should complete that course prior to consideration for promotion to CW4.

*(b) Developmental assignments.* CW3s serve at all levels from tactical to strategic. There are occasional opportunities for assignment at the national and joint levels in DOD. These are nominative assignments and are for the demonstrated exceptional performer in the specialties required.

*(c) Broadening opportunities.* Select CW3s may serve in the following broadening assignments consistent with the needs of the Army:

*1.* CTC observer controller/trainer.

*2.* Warrant Officer Basic and Advanced Course-instructors and course managers.

*3.* Proponent combat developers.

*4.* Doctrine writers.

*5.* Training developers.

*6.* Instructors or TAC officers at U.S. Army training centers or the WOCCP.

*(d) Self-development.* Completion of a baccalaureate degree is a recommended goal prior to becoming eligible for promotion to CW4. Warrant officers that have already obtained a baccalaureate degree should strongly consider pursuing a graduate degree at either a civilian educational institution or through enrolling in the Masters of Science Strategic Studies Program at the National Intelligence University.

*(e) Desired experience.* Warrant officers should seek maximum experience by serving in multiple Military Intelligence assignments and in Branch or warrant officer MOS-immaterial assignments, such as instructor, writer, or TAC officer.

(4) Chief warrant officer four development.

*(a) Education.* Officers should complete WOSC prior to one-year time in grade as a CW4. Officers become eligible for WOSSC after 1 year at CW4 grade, and should attend prior to consideration for promotion to CW5. Completion of a baccalaureate degree and working on a graduate degree is a recommended goal prior to becoming eligible for promotion to CW5. Officers who have already obtained a baccalaureate degree should strongly consider pursuing a graduate degree at either a civilian educational institution or through in the Master of Science Strategic Intelligence Program at the National Intelligence University. In addition, select warrant officers with exceptional records can apply to attend ILE; nominations will be addressed on case-by-case bases. warrant officers selected to attend National Intelligence University, ILE and possibly similar sister Service courses will receive a master's degree and incur a 3-year ADSO.

*(b) Developmental assignments.* CW4 Military Intelligence warrant officers can serve as: joint or national-level senior desk or regional analyst, corps intelligence production section chief, ACE deputy chief, corps intelligence synchronization manager, G2X, senior advisor to brigade commander, collection managers at joint or multinational force levels. Senior SIGINT technicians will be assigned at division, Corpl, theater intelligence brigades, regional cryptologic centers, and national-level agencies.

*(c) Broadening opportunities.* Select CW4s may serve in the following broadening assignments consistent with the level of requisite PME and the needs of the Army:

*1.* Military Intelligence warrant officer career manager.

*2.* Senior instructor/faculty at Military Intelligence branch schools or warrant officer career college.

*3.* Assignment to national-level agencies or National Command Authority.

*(d) Self-development.* Military Intelligence CW4s must continue to actively pursue self-development opportunities to fully master all aspects of operations including continued performance at multiple echelons and in joint operations.

*(e) Desired experience.* Military Intelligence CW4s will serve at multiple echelons and positions throughout their tenure as a CW4. They should seek to serve in joint assignments, as well as intelligence broadening assignments. Military Intelligence CW4s should seek intelligence focused civilian and institutional training, as well as professional development through progressive assignments.

(5) Chief warrant officer five development.

*(a)* Education. Completion of a graduate degree is a recommended goal. The WOSSC should be completed no later than 1 year time in grade as a CW5.

*(b)* Nominative, branch immaterial broadening assignments. Selected CW5s with appropriate skills, operational experience and requisite PME will serve the needs of the Army in nominative positions to include the following:

*1.* Chief warrant officer of the Military Intelligence Corps.

*2.* Warrant officer training branch chief.

*3.* Military Intelligence warrant officer proponent manager.

*4.* Branch immaterial leadership positions (011A) such as the deputy commandant at the Warrant Officer Career College, other senior-level TRADOC positions, and HQDA-level positions up to the Army staff senior warrant officer.

*(c)* Developmental assignments. Military Intelligence CW5s will serve the remainder of their career in key staff, national or joint positions designated for the grade of CW5.

---

### *Military Intelligence Warrant Officer Reserve Component Career Development Matrix*



Figure 25–2. AC Military Intelligence warrant officer career development

---

## 25–6. Military Intelligence Reserve Component officers

*a. General career development.* The ARNG and the USAR military intelligence officers serve in the same roles and missions as their AA counterparts. The unique nature of the RC Soldier's roles as a "citizen soldier" poses a significant challenge for professional development. To fulfill its wartime intelligence mission the Military Intelligence Corps is dependent upon extensive interaction between the AC and the RC. Geographic dispersion of units may constrain RC career progression within the Military Intelligence Corps. To meet professional development objectives, RC military intelligence officers must possess a willingness to rotate between assignments with TPUs, ARNG organizations, the IRR and IMA positions.

*b. Reserve Component military intelligence officer career development.* Required training and recommended branch developmental assignments by grade are as follows:

(1) *Lieutenant.*

*(a) Education.* Successful completion of the Military Intelligence BOLC (proponent institutional training conducted at the U.S. Army Intelligence Center of Excellence at Fort Huachuca, AZ).

*(b) Assignment.* After completing the Military Intelligence BOLC, Military Intelligence lieutenants will most likely be assigned to serve with troops in leadership development positions such as platoon leader, executive officer (XO), or

A284

### Reserve Component FM Officer Lifecycle Development and Utilization Model

Years  0 - - - - - - | - - - - - - - 5 - - - - - - | - - - - - 10 - - - - - - | - - - - - - 15 - - - - | - - - - - - - 20 - - - - - | - - - - 25

| Rank | Lieutenant | Captain | Major | Lieutenant Colonel | Colonel |
|---|---|---|---|---|---|
| **Professional Military Education** | BOLC | CCC FMTC | Intermediate Level Education | Advanced Operations and Warfighting Course | Senior Service College |
| **Additional Training** | • CDFM<br>• Certified Government Financial Manager<br>• Certified Government Auditing Professional<br>• Certified Public Finance Officer<br>• Fiscal Law<br>• Accounts Payable Admin Course dL<br>• CERP dL<br>• PCAM<br>• Disbursing Operations Course dL<br>• PPBES (dL or Res)<br>• Resource Management Budget Course dL | • Resource Management Tactical Course dL<br>• Deployed Operations Resource Management Course<br>• Army Comptroller Course<br>• ICAM<br>• Defense Comptrollership Program<br>• Training With Industry<br>• Financial Management 101<br>• GFEBS Cost Management | • Army Comptroller Course<br>• Defense Comptrollership Program<br>• Training With Industry<br>• Executive Comptroller Course<br>• GFEBS Financials<br>• Army Congressional Fellowship<br>• Defense Financial Management Course<br>• Reserve Component National Security Course<br>• Defense Decision Support Course | • Executive Comptroller Course<br>• Cost Management Certificate Course<br>• Senior Resource Managers Course<br>• Chief Financial Officer Academy<br>• Defense Strategy Course<br>• Defense Decision Support Course<br>• Defense Financial Management Course | • Senior Managers Course in National Security<br>• Senior Resource Managers Course<br>• Chief Financial Officer Academy<br>• Cost Management Certificate Course<br>• Defense Decision Support Course<br>• Defense Strategy Course |
| **Developmental and Utilization Assignments** | *Key Developmental Assignments* | | | | |
| | • Disbursing Officer | • FMS Detachment Commander<br>• Company CDR (90A/O1A)<br>• FMS Unit XO<br>• Disbursing Officer | • FMS Unit Commander<br>• Battalion XO (90A/O1A)<br>• 2-Star Cmd G8<br>• Deputy Division G8<br>• Separate BDE FM SPO<br>• Separate BDE/ESC G8<br>• Budget Officer<br>• Plans & Ops Officer | • 2-Star Cmd G8 / Comptroller<br>• ASCC G8 XO/Deputy & Budget CONOPS<br>• ABO XO, PPBC XO, Deputy Chief Current Ops<br>• Deputy ACOFS G8<br>• Battalion Commander (90A/O1A)<br>• Deputy Director, FMSC<br>• Disbursing Officer, FMSC | • Corps G8<br>• 3-Star Command G8 / Comptroller<br>• Director, FMS Center<br>• ASCC/ACOM G8<br>• ACOFS G8<br>• Senior Budget Analyst<br>• Brigade Commander (90A/O1A) |
| | *Broadening Experience* | | | | |
| | • Financial Management Officer<br>• STB Plans/Operations Officer<br>• Budget Officer<br>• Chief, RPA<br>• Chief, Commercial Vendor Services<br>• Accounting Officer<br>• Auditor<br>• Service School Instructor | • Banking Officer<br>• Program Manager<br>• Chief, RPA or O&M<br>• Inspector General<br>• ROTC-APMS<br>• Service School Instructor/Director<br>• SGS<br>• HRC Manager | | • Brigade XO (O1A)<br>• Budget/Manpower/Program Analyst<br>• FMS Liaison Officer / TFI<br>• Legislative Liaison<br>• Inspector General<br>• ROTC PMS<br>• SGS | • SSI Senior Liaison Officer<br>• CASCOM/TRADOC Liaison Officer / Total Force Integration<br>• Inspector General |
| **Self Development** | Certified Defense Financial Manager, FM Certification, Graduate Degree, Post Graduate Degree | | | | |

**Figure 37–2. Financial Management officer development model (Reserve)**

# Chapter 38
# Judge Advocate General's Corps

## 38–1. Unique features of The Judge Advocate General's Corps

*a. Purpose.* The mission of JAGC is to provide proactive legal support on all issues affecting the Army and the Joint Force, and deliver quality legal services to Soldiers, retirees, and their Families. This legal support encompasses the six core legal disciplines: administrative and civil law, military justice, international and operational law, contract and fiscal law, legal assistance and claims.

*b. Proponent information.* TJAG is the branch proponent of JAGC as administered through the Office of Personnel, Plans, and Training at Office of The Judge Advocate General, 2200 Army Pentagon, Washington, DC 20310–2200.

*c. Functions.* The JAGC is a special branch of the Army (10 USC 3064) whose duties and functions are discussed in AR 27–1 and FM 1–04.

(1) The JAGC consists of the following:

*(a)* General officers serving as TJAG; the Deputy Judge Advocate General; Assistant Judge Advocate General for Military Law and Operations (AJAG/MLO); the Commander, U.S. Army Legal Services Agency (USALSA); the Commander, The Judge Advocate General's Legal Center and School (TJAGLCS), Joint Chiefs of Staff Legal Counsel when assigned from the U.S. Army JAGC, Chief Judge, U.S. Army Court of Criminal Appeals (RC), Assistant Judge Advocate General for Military Law and Operations (RC), and Special Assistant to TJAG ARNG.

*(b)* Commissioned officers with a PMOS 27A or 27B who are:

*1.* In the AA and appointed in the JAGC; or

*2.* Members of the USAR and assigned to the JAGC; or

*3.* Members of the Army National Guard of the United States (ARNGUS) and assigned to the JAGC.

*(c)* Warrant officers with PMOS 270A who are certified as legal administrators and are:

*1.* In the AA and appointed in the JAGC; or

*2.* Members of the USAR and assigned to the JAGC; or

*3.* Members of the ARNGUS and assigned to the JAGC.

*(d)* Enlisted Soldiers with the MOS 27D who are:

*1.* In the RA and are assigned to the JAGC; or

*2.* Members of the USAR and assigned to the JAGC; or

*3.* Members of the ARNGUS and assigned to the JAGC.

*(e)* Other members of the Army assigned to the JAGC.

(2) TJAG is the military legal advisor to the Secretary of the Army and all officers and agencies of the Department of the Army. Under TJAG's authority to direct members of the JAGC in the performance of their duties (10 USC 3037 and AR 27–1) and to assign judge advocates UCMJ, Article 6, codified at 10 USC 806; AR 614–100), TJAG recruits, selects, determines qualifications, assigns and provides legal education for members of the JAGC. TJAG assigns all staff judge advocates (SJAs) and has final authority over all JAGC assignments. TJAG's frequent inspection of military legal offices in accordance with UCMJ, Article 6 (10 USC 806), offers a unique opportunity to mentor JAGC leaders directly and to monitor how junior officers are developed. In the Office of The Judge Advocate General (OTJAG), the Personnel, Plans, and Training Office (DAJA–PT) manages the JAGC under the supervision of TJAG, and represents TJAG in all Judge Advocate personnel proponent matters in coordination with TJAGLCS. Personnel policies are published annually by TJAG in publication JAG Pub 1–1.

(3) Judge advocates are attorneys who perform their duties under commanders of their assigned or attached commands or under other supervisory judge advocates, such as the SJA; Chief, Trial Judiciary; or the Chief, Trial Defense Service (TDS).

*(a)* The JAGC officers include judge advocates and warrant officer legal administrators in the AA, the USAR, and the ARNGUS. All JAGC officers receive technical legal supervision from TJAG and from the SJAs of their higher headquarters.

*(b)* Only judge advocates assigned to the U.S. Army TDS, or made available as an individual defense counsel, may provide advice and assistance to Soldiers suspected, accused or convicted of violations of the UCMJ on matters relating to those violations or suspected violations.

(4) Although judge advocates are U.S. Army officers and Soldiers first, they should primarily perform professional legal duties for which they are extensively trained. They normally should not be assigned nonlegal duties, such as officer of the day, inventory officer, range officer, FLIPL investigating officer, casualty notification officer, casualty assistance officer, or other duties that would interfere with or pose a conflict of interest with their primary assigned legal duties.

(5) To ensure a diverse assignment pattern for judge advocates, TJAG is delegated waiver authority to the force stabilization requirements.

(6) TJAG ensures that the numbers of authorized JAGC billets, by grade, will be sufficient to meet TJAG's statutory responsibility to provide quality legal services to the Army. Officers desiring more information on the JAGC authorizations or inventory should contact PP&TO, Office of The Judge Advocate General, 2200 Army Pentagon, Washington, DC 20310–2200.

(7) The JAGC branch consists of two AOCs with eight JAGC specific SIs and one warrant officer MOS. Judge advocates are classified as either 27A (Judge Advocate) or 27B (Military Judge). The eight JAGC specific SIs are: 3D (Government Contract Law Specialist), 3F (Patent Law Specialist), 3G (Claims/Litigation Specialist), 3N (International Law Specialist), and 3I1, 3I2, 3I3, and 3I4 (Specialist in Military Justice). Warrant officers in the JAGC are officers classified as 270A (Legal Administrators). These officers may also hold other ASIs.

(8) In support of 3I1, 3I2, 3I3, and 3I4 (Specialist in Military Justice), the JAGC developed four separate graduated SIs that allows the JAGC to better train and challenge judge advocates throughout their careers to improve their military justice proficiency. In addition to establishing basic (and in some cases continuing) training requirements, these SIs require progressive experience in military justice and litigation.

*(a)* 3I1/Code 3I—Basic Military Justice Practitioner.

*(b)* 3I2/Code 3M—Senior Military Justice Practitioner.

*(c)* 3I3/Code 3P—Expert Military Justice Practitioner.

*(d)* 3I4/Code 3T—Master Military Justice Practitioner.

## 38–2. Officer characteristics required (Active Army, U.S. Army Reserve, Army National Guard of the United States)

*a.* Characteristics required of all officers. All judge advocates are expected to possess the base characteristics that will enable them to develop into agile and adaptive leaders. They must be grounded in Army Values and the Warrior Ethos, competent in their core proficiencies, and broadly experienced to operate across the range of military operations. They must be able to operate in JIIM environments and leverage capabilities beyond the Army in achieving their

objectives. Judge advocates must be culturally astute and able to use their awareness and understanding to conduct operations innovatively and courageously to exploit opportunities in the challenges and complexities of the operational environment. Further explanation of these characteristics may be referenced in FM 3–0 and in chapter 3 of this publication. Judge advocates should leverage their training and educational background to help the command in operational environments. The JAGC officers must be focused on leadership, not only within the legal offices, but also the impact of legal operations on the command. Leadership training is required to be integrated into courses of instruction at TJAGLCS. The JAGC officers must remain personally and professionally prepared to deploy worldwide at all times. Regardless of assignment, all JAGC officers must be deployable, with their units or as individuals, to accomplish missions across the full range of military operations, from kinetic to counterinsurgency, to stability and reconstruction. Judge advocates must prepare themselves and their Families for this challenging lifecycle function.

*b.* Unique knowledge and skills of a judge advocate. Judge advocates must have the education, training, and experience equal or similar to that required of other members of the legal profession (10 USC 3065(e)) to include receiving a juris doctorate from an American Bar Association accredited school law school. TJAG certifies that judge advocates may practice law in the JAGC and this certification is required to maintain the appointment as a judge advocate. Per AR 27–1, judge advocates must be admitted to practice and have membership in good standing (as defined by the pertinent licensing authority) of the licensing authority of at least one jurisdiction. Attorney conduct is bound by the state rules of conduct in the state in which the attorney is licensed to practice law and AR 27–26.

(1) Judge advocates are required to maintain their good standing with their licensing authority and provide proof of good standing when considered for primary zone of a promotion board or first time consideration for school selection board.

(2) Judge advocates must self-certify to TJAG their good standing status in odd numbered years.

*c.* Unique requirements for judge advocates.

(1) Judge advocates develop themselves through progressively challenging assignments and by continuing their military and professional education.

(2) Continuing professional education for judge advocates. All judge advocates participate in continuing legal education throughout their careers. This training is required by many licensing states; it also keeps officers abreast of current legal developments. Continuing legal education consists of training conducted by SJAs, military judges, and regional and senior defense counsel; civilian training; and training provided at TJAGLCS. As judge advocates develop professionally and become eligible for more senior assignments as military judges, SJAs, and deputy SJAs, they attend specialized training, which is part of their overall professional development. Senior judge advocates may also be offered the opportunity for specialized management training.

## 38–3. Active Army judge advocate development

*a. Officer development model.* The judge advocate development model is focused more on the quality and range of experience, rather than the specific gates or assignments required to progress. See figure 38–1, below, for Judge Advocate AA developmental model. All assignments are made in the best interests of the Army. The objective of the JAGC career developmental model is to develop, employ, and retain broadly skilled judge advocates capable of performing successfully in any core legal discipline, at any location, in roles appropriate for their grade. Broadly skilled judge advocates provide the JAGC with officers capable of accomplishing today's mission and succeeding in an uncertain future. No single path to success exists in the JAGC. Sustained superior performance in a variety of assignments that develop and display each officer's broadly developed skills as an attorney, manager, and leader are the guarantors of success. The JAGC also recognizes its obligation to distribute talented officers fairly throughout the Corps: between TDA and TOE units, between CONUS and OCONUS commands, between the National Capital Region and the field, and between instructors who educate the Army and the legal advisors supporting commanders in day-to-day operations. The JAGC's career development, assignment, schooling, and promotion practices reflect these concerns.

(1) Initial entry judge advocates gain branch technical and tactical skills to develop a Warrior Ethos and gain important leadership experience in company grade assignments.

(2) Throughout an judge advocate's career, the model highlights the need to gain JIIM experience and exposure.

(3) Lifelong learning, supported by civilian and military education, provides critical opportunities to develop joint and expeditionary competencies. Expeditionary competencies are those needed by officers in an expeditionary force - regional knowledge, cultural awareness, foreign language, diplomacy, and statesmanship.

(4) Flexible time lines enable judge advocates to serve longer in developmental assignments ensuring they have adequate time to gain skills and experience and also support unit readiness and cohesion.

(5) The goal is to maintain a healthy, upwardly mobile career path as broadly skilled judge advocates. Fair, candid, and open personnel management is critical to meeting the JAGC's mission. Personnel management will be effective only when interest in professional development is shared among the JAGC leadership, supervisors, and individual members of the corps.

(6) Judge advocates will compete within their career field for promotion to all ranks.

*b. Judge advocate career.*

A287     DA PAM 600–3 • 3 December 2014

(1) *Becoming a judge advocate.*

(a) Applicants will continue to be accessed into the branch primarily by direct commissioning.

(b) Applications for appointment as a judge advocate come primarily from law school students, Reserve Officer Training Command (ROTC) officers attending law school on an educational delay, active members of the civilian bar, and active duty commissioned officers seeking participation in the Funded Legal Education Program. On occasion, officers transfer to the JAGC from other branches in the Army. To be appointed, a person must have earned a law degree from a law school accredited by the American Bar Association and must be admitted to practice and have membership in good standing (as defined by the pertinent bar) of at least one licensing authority.

(c) Judge advocates commissioned directly from civilian life enter active duty as AA officers. They are awarded 18 months constructive credit for promotion for the time spent in law school. Officers who do not qualify for appointment as captains are appointed as first lieutenants and are usually eligible for promotion to the rank of captain upon completion of initial entry training.

(d) The Funded Legal Education Program, authorized by 10 USC 2004 and AR 27–1, allows a small number of active duty officers to attend law school at U.S. Government expense. The program is available to officers with not less than 2 years or more than 6 years of total active Federal service at the time law school begins. Officers are detailed to the JAGC but remain in their basic branch until later appointed in or assigned to the JAGC in the rank in which they are serving.

(2) *Company grade development.*

(a) *Education.* The 12.5 week-long Judge Advocate Officer Basic Course (JAOBC/BOLC B) provides AC and RC judge advocates receiving their original appointment into the JAGC with the basic orientation and training necessary to perform their duties. The Fort Lee Phase of JAOBC/BOLC B serves to in-process judge advocates and augments training in Soldier skills that judge advocates will receive at the Direct Commissioned Officer Course (DCC). The Fort Lee Phase of JAOBC/BOLC B is approximately 2 weeks in length and is conducted at Fort Lee, Virginia. The Legal Center and School (LCS) Phase of JAOBC/BOLC B stresses military law. It is 10 1/2 weeks in length and is conducted at the LCS in Charlottesville, Virginia, immediately after completion of the Fort Lee Phase. All newly assessed judge advocates and Funded Legal Education Program officers will complete JAOBC/BOLC B. Failure to complete the course satisfactorily will result in return to basic branch, discharge, or other appropriate action. After completing JAOBC/BOLC B, all officers will attend the six-week DCC course. DCC is designed to provide judge advocates with Soldier and leadership training to instill the Warrior Ethos and build esprit de corps. DCC also provides an environment where judge advocates will work and train alongside each other in a tactical field setting.

(b) *Assignment.* Pre-graduate course assignments are KD milestones for new judge advocates. This initial assignment is normally the time when judge advocates develop basic technical skills and learn about the Army. New judge advocates are rotated through a variety of duties in many of the legal specialties in which judge advocates are expected to practice. The first JAGC assignment is not normally in a state in which a judge advocate is licensed, attended law school or performed on-the-job training (if a Funded Legal Education Program officer). These initial assignments may include, but are not limited to, legal assistance officer, claims judge advocate, administrative law attorney, labor counselor, contract/fiscal law attorney, operational law attorney, environmental law attorney, appellate attorney, Joint Task Force judge advocate, Special Forces battalion judge advocate, trial counsel, and defense counsel. In these early assignments, some judge advocates will have the opportunity to supervise other attorneys, Soldiers, and civilians. Most judge advocates serve as defense counsel before the graduate course, although first assignment judge advocates are not normally assigned to the U.S. Army TDS directly from initial entry training

(c) *Self-development.*

*1.* Judge advocate captains must continue to professionally grow as attorneys and as officers. This professional growth includes attending continuing legal education within their licensing jurisdiction or at TJAGLCS to ensure judge advocates grow academically. Judge advocates should attend applicable short courses at TJAGLCS to include the Criminal Law Advocacy Course (CLAC), legal assistance courses, contract and fiscal law courses, and any other course designed to assist the judge advocate's current mission.

*2.* Upon graduation from BOLC III, judge advocates are enrolled in the Judge Advocate Tactical Staff Officer Course and complete the course within 24 months of enrollment. The Judge Advocate Tactical Staff Officer Course is designed to familiarize judge advocates with the tactical staff officers' skills necessary to function effectively as part of a tactical-level staff. It consists of approximately 20 hours of online, self-paced instruction and includes eight lessons: Army Doctrine, the Military Decision-Making Process, Symbology, Army Organizations, Intelligence Preparation of the Battlefield, Joint Operations, Military Briefings, and BCT staff.

*3.* Judge advocates should also dedicate time to professional reading to gain a historical perspective on tactical, legal and leadership challenges.

(d) *Desired experience.* Varied experience across all the core legal disciplines at diverse locations produces broadly skilled judge advocates who can deploy in support of combat operations and provides judge advocates with a foundation for the Judge Advocate Graduate Course.

(3) *Major development.*

(a) *Education.* The centerpiece of junior officer professional development is attendance at the 10-month Judge

Advocate Graduate Course. Judge advocates are selected to attend the Judge Advocate Graduate Course upon selection for promotion to major or earlier if officers' career time lines allow earlier attendance (senior captains). The Judge Advocate Graduate Course educates career judge advocates in all areas of military law, legal communications, and management. The course prepares officers for middle and senior grade positions and also provides an opportunity to develop specialized knowledge and skills. The Judge Advocate Graduate Course is accredited by the American Bar Association as a graduate legal education program and is statutorily empowered to award the only graduate law degree (LL.M.) in military law in the United States. Officers incur a 2-year ADSO upon completion of the Graduate Course and normally serve a 2-year utilization tour. The Judge Advocate Graduate Course fulfills the role of the CCC and the Branch-Specific Intermediate Level Education (ILE) Qualification Course required of basic branch officers. The course serves as the Advanced Operations and Warfighting Course portion of the MEL ILE requirement. Upon graduation from the Graduate Course, judge advocates must complete ILE either in residence at Fort Leavenworth or at a satellite location. After completion of the Graduate Course and ILE, judge advocates will be JPME I qualified. All judge advocates must go before the ILE Advanced Operations Course selection board that convenes approximately 15 months after the Judge Advocate Graduate Course and may compete in the ILE Advanced Operations Course selection board the second and third year after the Judge Advocate Graduate Course. The board results from the Command and General Staff College board determines which judge advocates will attend Command and General Staff College (in residence at Fort Leavenworth). These board results also determine which judge advocates will have the opportunity to attend advanced civil schooling to obtain a LL.M., based on the needs of the Army, in areas like constitutional, criminal, tax or international law, health sciences or cyber-related issues. Selectees for Command and General Staff College and civil schooling to obtain an LL.M. will then serve a two-year utilization tour. Major judge advocates not attending Command and General Staff College and those selected for the LL.M program will attend ILE–Advanced Operations Course short course at a satellite location.

*(b) Key, developmental, and broadening assignments.* Following the graduate course, officers are assigned to field grade positions. Some judge advocates partially specialize but continue to be generalists. Some focus on specific legal disciplines such as military justice, or contract and fiscal law. Judge advocates also receive significant opportunities for leadership and management. Judge advocate majors can expect to serve as brigade judge advocates at a brigade, senior defense counsel, branch and division chiefs in large legal offices, deputy staff judge advocates, OICs of branch offices, command judge advocates of non-GCMCA commands, instructors at TJAGLCS, Command and General Staff College or at West Point, or as staff and trial attorneys in the litigating divisions in Washington, DC, other defense and U.S. Government agencies, or in the OTJAG.

*(c) Self-development.* Judge advocate majors must continue to professionally grow as attorneys and as officers. This professional growth includes attending continuing legal education within their licensing jurisdiction or at TJAGLCS to ensure the judge advocate grows academically. Majors should also dedicate time to professional reading to gain a historical perspective on tactical, legal, and leadership challenges.

*(d) Desired experience.* As a major in the JAGC, TJAG expects these officers to be the trusted command counsel at a brigade, to be mid-level leaders, to attain higher levels of Army and JIIM legal expertise, to be practitioners in specialized areas, and to be instructors at various DOD institutions.

(4) Lieutenant colonel development.

*(a)* Education. Senior lieutenant colonel judge advocates become eligible for selection to attend resident SSC or the Army War College Distance Education Program. The JAGC has numerous officers attend the U.S. Army War College, Industrial College of the Armed Forces, National War College, Naval War College and the Department of Justice Fellowship each year.

*(b)* Assignment. Lieutenant colonels have the opportunity to serve in more specialized assignments and in senior leadership positions. Judge advocate lieutenant colonels have their first opportunity to serve as military judges, regional defense counsel, or SJAs. They also serve as branch and division chiefs in the largest offices; the Office of the Judge Advocate, U.S. Army Europe; or the National Capital Region.

*(c) Self-development.* Judge advocate lieutenant colonels must continue to professionally grow as attorneys and as officers. This professional growth includes attending continuing legal education within their licensing jurisdiction or at TJAGLCS to ensure judge advocates grow academically. Lieutenant colonels should also dedicate time to professional reading to gain a historical perspective on tactical, legal, operational and leadership challenges.

*(d) Desired experience.* JAGC lieutenant colonels are assigned in highly complex practice areas and lead junior judge advocates officers, enlisted paralegals and civilian paraprofessionals. Lieutenant colonels serve as advisors to senior leaders and are exposed to the highest levels of DA, DOD, and the legislative processes.

(5) *Colonel development.*

*(a)* Education. Most colonels remain eligible for selection to attend resident SSC or the Army War College Distance Education Program. The JAGC has numerous officers attend the U.S. Army War College, Industrial College of the Armed Forces, National War College, Naval War College and the Department of Justice Fellowship each year.

*(b)* Assignment. Judge advocate colonels are senior trial and appellate military judges; SJAs at major installations, divisions, corps, ASCCs, ACOMs, DRUs, or combatant commands; division chiefs in the OTJAG and the USALSA, and dean and center director at TJAGLCS.

*(c) Self-development.* Judge advocate colonels must continue to professionally grow as attorneys and as officers. This professional growth includes attending continuing legal education within their licensing jurisdiction or at TJAGLCS to ensure judge advocates grow academically. Colonels should also dedicate time to professional reading to gain a historical perspective on tactical, legal, operational and leadership challenges. Staff judge advocate positions require MEL ILE and attendance at the Staff Judge Advocate Course at TJAGLCS. The MEL ILE is obtained by completing an Army ILE course or equivalent. Lieutenant colonel SJAs and colonels serving as division and corps SJAs will normally be assigned for a two-year tour. Colonels otherwise serving as SJAs will normally be assigned for a two or three-year tour.

*(d) Desired experience.* Colonels comprise the senior leadership of the JAGC and are the senior counsel to the leaders of the Army and DOD. These senior judge advocates occupy leadership positions on division and higher echelon staffs that require a thorough knowledge of strategy and the art and science of developing and using instruments of national power. Current operations mandate our senior judge advocates who advise the Army's senior flag officers be thoroughly versed and familiar with strategic thinking. Judge advocates at all levels, from the Joint Chiefs of Staff down through the brigade, assist in, advise on, and review the preparation and execution of plans crucial to success in all operations. Legal expertise is listed as a necessary capability for military forces for the successful execution of counterinsurgency operations (FM 3.24 Counterinsurgency).

(6) *Judge advocate positions.* Assignments in CONUS are normally a maximum of 3 years; however, the need to staff all legal offices properly and to develop the careers of all judge advocates effectively may require shorter or longer tours. Tour lengths for OCONUS assignments are outlined in AR 614–30.

(7) *Joint assignments.* After selection for promotion to major, judge advocates may be considered for joint duty assignments in joint organizations worldwide, including the Office of the Chairman of the Joint Chiefs, the Joint Staff, and the combatant commands. Joint experience is important to the Army. Due to the limited number of joint assignments available, judge advocates are not precluded from advancing into senior leadership positions because they are not titled "Joint Qualified" (see 10 USC 619a(b)(3)(C)). Based on the breadth of JAGC assignments, from lieutenant to colonel, judge advocates become masters of handling joint operations. Judge advocates serving in nominative positions as either legal advisors or SJAs will normally be assigned for three-year tours.

(8) *TDS assignments.* TDS assignments are considered a part of a normal career development in the JAGC. Judge advocates will normally be assigned to TDS for 18 months. Regional defense counsel and senior defense counsel will normally be assigned for a two-year tour.

(9) *Brigade judge advocates (BJA), Special Forces group judge advocates, and the Ranger Regiment judge advocate.* Majors assigned to a brigade operate under the command of a brigade commander and as part of a BCT staff with whom they have a habitual relationship. The BCT includes a BJA, a trial counsel, and a senior paralegal NCO. The BJA serves a critical role to providing expert and timely legal advice to brigade commanders and staff. Similarly, group judge advocates and the Ranger Regiment judge advocate operate under the command of an O6 commander while operating with a staff. The groups and the Ranger Regiment legal teams typically include a unit judge advocate and a senior paralegal NCO. TCs are typically assigned to each battalion echelon in these 2 formations.

(10) *Military judges.* Military judge positions require completion of the Military Judge Course at TJAGLCS and the Judge Advocate Officer Graduate Course. Officers selected for military judge positions will be scheduled to attend the next scheduled Military Judge Course, unless already certified as a military judge.

(11) *TJAGLCS.* TJAGLCS is the home of the Regiment and is the cornerstone of the JAGC's training, education, and operational force management. Because the health of the JAGC is contingent on an intellectually vibrant institution that is in touch with the field's needs, the assignment of quality, experienced officers and NCO to the TJAGLCS faculty and staff is a high priority.

(12) *Other assignments.* Judge advocates may be assigned to organizations and duties beyond those indicated above. These assignments may include duty with the Department of Justice, the Department of State, and the White House. The range of possible assignments is large. Many of these assignments are characterized as highly responsible and important, requiring mature, skilled and well-grounded officers. Assignments contained in subparagraphs 38–3a(5), above, and this paragraph are collectively known as JIIM assignments. Judge advocates do not serve in branch/FA (FA) generalist assignments.

(13) *Other Army training for judge advocates.* Judge advocates are Soldiers, officers, and lawyers. They participate in broad officer training programs including the BOLC, ILE, the Advanced Operations and Warfighting Course, and SSC. JAGC officers are encouraged, and may volunteer to participate, as their primary legal mission schedule permits, in their unit's military training operations and in specialized training such as combat lifesaver, combatives, airborne and air assault training. The purpose of participating in additional unit training or Soldier skills development, however, is to provide judge advocates exposure to the Army's missions and to enhance their primary role of advising commanders on legal issues.

(14) *Advanced civilian schooling.* TJAG selects a limited number of judge advocates annually to attend civilian institutions for 1 year at Government expense to obtain advanced legal education in specialized areas. This schooling supplements TJAGLCS graduate course training.

(15) *Career developmental models.* The career developmental models for AC and RC Judge Advocate officers are found in JAG 1–1.

## 38–4. Warrant officer characteristics required (Active Army, U.S. Army Reserve, Army National Guard of the United States)

*a. Unique knowledge and skills of legal administrators.* As strategic and tactical planners, legal administrators anticipate changes in the military climate, instituting changes to ensure the JAGC can support the Army's continually evolving missions.

(1) *Leadership role.* Legal administrators must be highly motivated, possessing tact, initiative, integrity, and mature judgment. Legal administrators are leaders, mentors, trainers, and technical and warfighting experts within their organizations. Legal Administrators serve as the Chief of the Administrative or Operations Division. Legal administrators are principal members of the legal leadership team who take an active role in preparing, planning, and managing military legal operations in garrison and operational environments.

(2) *Expertise.* Legal administrators must have education, training, and experience in legal operations, HR budget, security, project management, information and knowledge management, and the core legal disciplines (administrative and civil law, international and operational law, claims, military justice, legal assistance, contract and fiscal law, and legal assistance) and apply their knowledge and expertise in any environment. Legal administrators are the system administrators and technical experts for all JAGC specific applications, hardware, and facilities. (See DA Pam 611–21 for additional information duties and responsibilities.)

*(a) Military justice.* Legal administrators play a key role in assisting the SJA and the Chief of Military Justice with managing and executing pre-trial processing, case management, production of expert witnesses, post-trial processing, and budgets of courts martial.

*(b) Operational law.* Legal administrators assist the SJA and chief of operational law with planning, organizing, and executing office participation in contingency operations, including manning personnel documents, training all attorneys, paralegal specialists and NCOs in the execution of operational law missions

*(c) Administration.* In Staff Judge Advocate Offices, legal administrators serve as the Chief of the Administrative Division. In this capacity, they supervise office personnel, manage HR, office budgets, facilities, and equipment required to support legal services in garrison and deployed environments.

*(d) Information technology.* Within information management systems, legal administrators are responsible for the protection of attorney-client information. Legal administrators are also responsible for the upkeep and maintenance of the electronic Judge Advocate Warfighter System and provide the primary training for judge advocates and paralegals in hardware and software applications necessary for remote operations or deployment. Legal administrators are the SJA's operational law technologist.

*b. Certification.* TJAG certifies that legal administrators may perform legal administrator duties in the JAGC and this certification is required to maintain the appointment with a PMOS 270A. See DA Pam 611–21.

## 38–5. Active Army legal administrator, warrant officer development

*a. Warrant officer development model.* The legal administrator warrant officer development model is focused more on the quality and range of experience, rather than the specific gates or assignments required to progress. See figure 38–2 for JAGC AA warrant officer development model. All assignments are made in the best interests of the Army. The objective of the JAGC career developmental model is to build an expert, flexible force by balancing the needs of the Army, professional development, personal and Family needs, and personal preferences in every assignment. TJAG's goals are to develop every warrant officer professionally, ensure diversity of assignments, and provide opportunities for management, leadership and education. No single path to success exists in the JAGC. Sustained superior performance in a variety of assignments that develop and display officers' skills as Soldiers, managers, and leaders are the guarantors of success. The JAGC relies on legal administrators as experts and systems managers for the duration of their careers. Designed to provide career-long continuity to legal office operations, they may also serve in key positions within the JAGC such as OTJAG, TJAGLCS, and USALSA. These additional assignments provide opportunities for acquiring and developing additional skills in project and knowledge management, JAGC specific software application development, force management, and training development.

(1) Legal administrators are accessed from the JAGC enlisted corps (27D) through a board process. Soldiers serving in MOS 27D with between 5 and 12 years of service who have excelled in a variety of JAGC positions are candidates for accession. The Army's goal is to access these Soldiers between 4 and 8 years of service to maximize the amount of time they may serve prior to retirement. A waiver from the DCS, G–1 is required for Soldiers with a date of rank over 12 years.

(2) After successful completion of the WOCS and before attendance at the Legal Administrator WOBC, WO1s are assigned to staff judge advocate offices at their duty stations or first legal administrator assignments, where they are paired with experienced legal administrators to help mentor individuals for WOBC and future duties as legal administrators (currently only available to AA warrant officers).

*b. Utilization.*

(1) *Warrant officer one/chief warrant officer two.* Should be utilized in operational assignments to develop and gain valuable experience in operational management of legal offices. The first assignment should allow legal administrators an opportunity to develop their technical skills and officer proficiencies. Legal administrators should continue their self-development, professional reading and pursuit of educational goals.

(2) *Warrant officer three/chief warrant officer four.* At this point in warrant officers' careers, the model highlights their need to gain a broader understanding of their MOS. Nominative assignments are sought at this development stage. Warrant officers should continue their self-development, professional reading and pursuit of civilian educational goals. Senior legal administrators should continue to be utilized in operational assignments and positions of greater responsibility to continue to expand their knowledge and skills. Warrant officers at this development stage should seek assignments that will increase their value to the JAGC and the Army. Legal administrators should continue their self-development, professional reading, and pursuit of the next civilian educational goals. Senior legal administrators should serve as role models and mentors for junior warrant officers by assisting them in developing their skills. Senior legal administrators also develop more specific skills and experiences to qualify for senior positions.

(3) *Chief warrant officer five.* Capstone achievement for all legal administrators. Once legal administrators attain this rank they should be assigned to nominative or joint, interagency, intergovernmental, or special assignments. Lifelong learning, supported by civilian and military education, provides critical opportunities to develop joint and expeditionary competencies. Master legal administrators should serve as role models and mentors for junior and senior warrant officers, by assisting them in developing their skills. CW5s utilize all of their skills, abilities and talents at the most challenging assignments. Flexible timelines enable master warrant officers to serve longer in developmental assignments ensuring warrant officers have adequate time to gain skills and experience and also support unit readiness and cohesion.

*c. Length of tour.* Warrant officers will ordinarily complete the minimum months assigned on station as prescribed in AR 614–30 before being reassigned; however mission requirements may require earlier departure from an assignment. Reassignments are based on the need to maintain an OCONUS rotational base, satisfy requirements for special qualifications, and provide for career progression.

*d. Promotion time line.* RA WO1 is promoted to CW2 after 2 years in grade on the recommendation of the first lieutenant colonel in the chain of command. All other warrant officers, CW2 through CW5, are normally considered for promotion to the next higher rank by a DA promotion board, first below the zone after 3 years in grade and then in the zone after 4 years in grade. DA publishes zones of consideration prior to each promotion board. Warrant officers, upon promotion to CW2, are commissioned and appointed into the RA.

*e. Assignments.* The Chief Warrant Officer of the Corps (CWOC) manages the assignments of AA legal administrators in coordination with the JAGC's PP&TO.

*f. Legal Administrators Course.* All legal administrators (AA, USAR, and ARNG), should attend the annual Legal Administrators Course which focuses on new developments in technical management and mid-level management of Staff Judge Advocate office administration, operations, and support services.

*g. WO1 development.*

(1) *Education.*

(a) Complete all prerequisite MOS related distance learning courses prior to attendance at the WOBC. For specific course information, newly appointed WO1s should visit TJAGLCS's Web page.

(b) Must successfully complete the judge advocate WOBC. The WOBC is a 6-week resident course conducted at TJAGLCS for all newly appointed WO1s (AA, USAR, and ARNG). All newly appointed WO1s must attend and complete this six-week course and prerequisite studies that prepare the JAGC's warrant officers for assignment as a legal administrator. Upon completion, warrant officers are certified, per DA Pam 611–21, and awarded the MOS 270A, Legal Administrator.

(2) *Assignment.* See paragraph 38–5a(2).

(3) *Self-development.* Continue attending resident and nonresident short courses that are offered at TJAGLCS. Seek educational opportunities in the civilian sector at law office administration, and emerging business practices conferences. Pursue courses toward associate's and bachelor's degrees.

(4) *Desired experience.* Critical skills and knowledge to be an effective leader, mentor, and manager of an Army legal office.

*h. CW2 development.*

(1) *Education.*

(a) Must meet the qualifications in paragraph 38–5g(1).

(b) All legal administrators must complete the prerequisite studies (Action Officer Development Course (131–P00) and the Judge Advocate Tactical Staff Officer Course) and prerequisite MOS related DL courses prior to attendance at the WOAC.

(c) Attend the Warrant Officer Advanced Course. The WOAC is a 4-week resident course conducted at TJAGLCS. It provides officers continued leadership, tactical, and technical training needed to serve in Corps, Army, and Department of the Army level positions. CW2s are authorized to attend WOAC and attendance will be managed through the CWOC or designated representatives. Graduates of the WOAC receive the designation of MEL WOAC.

(2) *Developmental and broadening assignments.* See figure 38–2, below, for legal administrator development and utilization.

(3) *Self-development.* Continue to take resident and nonresident short courses offered at TJAGLCS. Seek educational opportunities in the civilian sector at law office administration, and emerging business practices conferences. Pursue courses toward associate's and bachelor's degrees.

(4) *Desired experience.* Possess the critical skills and knowledge to be an effective leader, mentor, and manager of an Army legal office.

*i. CW3 development.*

(1) *Education.*

(a) Must meet the qualifications in paragraph 38–5h.

(b) Attend the WOSC. The WOSC is a 4-week resident course conducted at the Warrant Officer Career College. It focuses on the staff officer and leadership skills needed to serve in the rank of CW4 at battalion and higher levels. CW3s are authorized to attend WOSC, and legal administrators are encouraged to attend prior to promotion to CW4. Graduates of the WOSC receive the designation of MEL WOSC.

(2) *Developmental and broadening assignments.* See figure 38–2, below, for legal administrator development and utilization.

(3) *Self-development.* Continue attending resident and nonresident short courses offered at TJAGLCS. Seek educational opportunities in the civilian sector at law office administration, and emerging business practices conferences. Pursue courses toward associate's and bachelor's degrees.

(4) *Desired experience.* Possess the critical skills and knowledge to be an effective leader, mentor, and manager of an Army legal office. Be ready to serve in positions of greater responsibility.

*j. CW4 development.*

(1) *Education.*

(a) Must meet the qualifications above in paragraph 38–5i.

(b) Attend WOSSC. The WOSSC is a four-week resident course conducted at the Warrant Officer Career College which focuses on a broader Army level perspective required for assignment to CW5 level positions. CW4s are authorized to attend and are encouraged to attend prior to promotion to CW5. Graduates of the WOSSC receive the designation of MEL WOSSC.

(2) *Developmental and broadening assignments.* See figure 38–2, below, for legal administrator development and utilization.

(3) *Self-development.* Continue attending resident and nonresident short courses offered at TJAGLCS. Seek educational opportunities in the civilian sector at law office administration, and emerging business practices conferences. Pursue courses towards associate's, bachelor's, and master's degrees.

(4) *Desired experience.* Senior-level technician and tactical expert on legal operations and has the skills and knowledge to serve at all levels within the JAGC.

*k. CW5 development.*

(1) *Education.* Must meet the qualifications above in paragraph 38–5j.

(2) *Developmental and broadening assignments.* CW5 legal administrators should be assigned to the most senior supervisory, advisory, and staff positions in OTJAG, the USALSA, TJAGLCS, or other special assignments when a specific need exists within the JAGC mission.

(3) *Self-development.* Seek educational opportunities in the civilian sector at law office administration, and emerging business practices conferences. Pursue courses towards bachelor's and master's degrees.

(4) *Desired experience.* Master-level technician and tactical expert within the JAGC for legal operations. Technical, functional, and branch systems integrator, trainer and leader.

*l. Other assignments.* Legal administrators may be assigned to organizations and duties beyond those indicated above. These assignments include duties in Joint organizations, Army Staff or Secretariat positions, the Warrant Officer Career College, and recruiting positions. The assignments can be characterized as highly responsible and important, requiring mature, well-rounded, and multi-skilled officers. RA (CW3 and above) legal administrators may be selected by TJAG for degree completion programs.

*m. Career developmental model.* The career developmental models for AC and RC Legal Administration warrant officers are found in JAG 1–1.

## 38–6. Reserve Component judge advocate development

*a. General.* Judge advocates serve in both the USAR and the ARNG. TJAG exercises technical supervision of USAR JAGC officers not on the active duty list. PPTO assists TJAG by developing policy and providing technical assistance in the career management of USAR judge advocate officers. TJAG, with the assistance of the National Guard Special Advisor to TJAG, through the Chief, NGB, also provides technical assistance to the respective State AG for the career management of ARNG judge advocates. In general, qualifications and professional development are

similar to AA judge advocates. All judge advocate assignments are made upon the recommendation of TJAG (Article 6, UCMJ, and 10 USC 806).

*b. RC judge advocate career development.*

(1) Professional development objectives are:

*(a)* Develop officers with the professional attributes and capabilities to meet the mobilization and warfighting needs of the Army, and in the case of ARNG judge advocates, to meet the additional civil and defense needs of the states and territories.

*(b)* Develop officers in the quantity and skill sets to meet the functional requirements of the Army in mobilization, and in the case of ARNG judge advocates, to meet the additional requirements of the states and territories.

*(c)* Develop officers with technical, managerial and administrative skills to serve in positions of increasing responsibility in the JAGC.

(2) *Company grade development.*

*(a) Assignments.* Company grade judge advocate assignments allow officers an opportunity to learn to be military lawyers, Soldiers, and officers. Company grade officers are exposed to a wide variety of experiences. The Army understands that at the same time judge advocates are learning their military craft, they are engaged in a full-time civilian career; however, high standards of Army participation and performance are still required.

*1.* Company grade judge advocates are assigned to junior positions, including Operational Law (OPLAW) judge advocate or trial counsel for a brigade, legal operations detachment team member or assistant team chief, defense counsel, and various junior positions (legal assistance, administrative and civil law, trial counsel) within staff and command judge advocate offices and sections. Judge advocates with less than 4 years experience will normally not be assigned to positions where they are the sole or senior judge advocate.

*2.* On rare occasions, company grade judge advocates are assigned to DIMA positions. Supervisors of DIMA judge advocates should provide training in military legal requirements and exposure to Soldier experiences. When possible, supervisory judge advocates should coordinate pairing up of new judge advocates with a platoon leader of a local line unit for a 1 or 2-day orientation on life as a Soldier. Supervisors should counsel junior officers on their legal abilities, Soldiering skills, and leadership. Junior DIMA judge advocates should occasionally drill, at least part of the year, with a TPU in their home area.

*3.* Non-JAGC assignments are generally discouraged for judge advocates; however, exceptions may be approved in rare circumstances where the non-JAGC assignments may be beneficial to the JAGC and the individual judge advocate. Such rare assignments must broaden the individual's perspective concerning the mission of the Army and enhance a judge advocate's ability to perform at a higher-level position later in his or her career. TJAG approves all requests for non-JAGC assignments, for a period not exceed 3 years.

*4.* Company grade judge advocates should not be assigned to the IRR except in unusual circumstances. Appointment of new judge advocates should be fixed to an authorization in a unit or a DIMA position. Company grade judge advocates should avoid spending greater than 24 months in the IRR.

*(b) Education.* The 12.5 week-long JAOBC/BOLC B provides AC and RC judge advocates receiving their original appointment into the JAGC with the basic orientation and training necessary to perform their duties. The Fort Lee Phase of JAOBC/BOLC B serves to in-process judge advocates and augments training in Soldier skills that judge advocates will receive at the DCC. The Fort Lee Phase of JAOBC/BOLC B is approximately 2 weeks in length and is conducted at Fort Lee, Virginia. The LCS Phase of JAOBC/BOLC B stresses military law. It is ten and one half weeks in length and is conducted at the LCS in Charlottesville, Virginia, immediately after completion of the Fort Lee Phase. All newly assessed judge advocates and Funded Legal Education Program officers will complete JAOBC/BOLC B. Failure to complete the course satisfactorily will result in return to basic branch, discharge, or other appropriate action. After completing JAOBC/BOLC B, all officers will attend the six-week DCC course. DCC is designed to provide judge advocates with Soldier and leadership training designed to instill the Warrior Ethos and build esprit de corps. DCC also provides an environment where judge advocates will work and train alongside each other in a tactical field setting.

(3) *Major development.*

*(a) Assignments.* Judge advocates usually have at least 7 years commissioned service when promoted to major. This rank is a mid-level grade with opportunities to supervise other judge advocates. Judge advocate majors should serve as role models and mentors for junior judge advocates, assisting them in developing their skills. This career phase is also a time to develop more specific skills and experiences to qualify for senior JAGC positions. RC JAGC majors should seek assignments as division-level deputy SJAs, legal operations detachment team chiefs, brigade-level command judge advocates, senior defense counsel, and GOCOM staff or command judge advocates or section chiefs. These assignments should follow developmental unit or DIMA experiences relating to the type of law practiced by the unit.

*(b) Education.*

*1.* The JAGC Officer Advanced Course (JAOAC) is designed to provide a working knowledge of the duties and responsibilities of field grade judge advocates. This course is the nonresident version of the Judge Advocate Graduate Course. This course serves as branch qualification for officers to serve in field grade judge advocate positions. Completion of the course is a prerequisite for promotion to Major. The JAOAC consists of 2 legal subject phases.

Phase I is a correspondence phase. Phase II is a 2-week resident phase taught at TJAGLCS. This course should be taken between the second and fifth years of commissioned Service as a judge advocate.

*2.* ILE is the means by which the Army ensures universal MEL ILE/JPME 1 qualification among Majors in the AA and RCs to develop familiarity with employment of multiservice and multinational forces used in Joint and combined arms operations; to develop basic knowledge of the joint operations planning process; and to create awareness of DOD requirements as well as individual Service capabilities, problems and needs. While some RC judge advocates may be selected to attend ILE in residence at Fort Leavenworth, KS, most will complete the requirement through a combination of distance education and two-week tours of active duty for training through TASS.

(4) *Lieutenant colonel development.* Judge advocates usually have at least 14 years of commissioned service when promoted to lieutenant colonel. This career phase is the beginning of senior-level assignments and performance expectations. Lieutenant colonels possess the legal expertise, Soldier skills, and confidence to communicate effectively with senior Army commanders. Lieutenant colonels serve as role models and mentors for junior judge advocates, counseling and assisting them in developing their skills and careers. Lieutenant colonels compete for principal tenured judge advocate positions, such as division SJA, GOCOM SJA (lieutenant colonel), regional defense counsel, or military judge (lieutenant colonel). The degree to which a judge advocate is competitive for these assignments is a function of prior developmental assignments and consistent performance as reflected on their evaluations. Developmental assignments for division SJA and GOCOM SJA (lieutenant colonel) may include the following:

(a) *Unit officers.* Deputy or section chief within an SJA office, legal operations detachment team chief, brigade-level command judge advocate, regional defense counsel, and military judge (lieutenant colonel).

(b) DIMA. SJA or deputy SJA and TJAGLCS professor or staff.

(5) *Colonel development.*

(a) *Assignments.* Judge advocates usually have at least 14 years of commissioned Service when promoted to colonel. For the majority of judge advocates, this career phase is their most senior level of service to the Army. This career phase is a period of full utilization of the officer's talents, experience, and training. Colonels interact effectively with senior Army commanders. Colonels lead, discipline, teach, and develop the field grade judge advocates under their technical and command supervision. Colonels, through training and experience, have prepared themselves for maximum use of their skills, abilities and talents as GOCOM staff judge advocates, legal operations detachment commanders, state judge advocates, and senior military judges. TJAG approves all colonel assignments. Prior assignments that offer the experience necessary to succeed at some of these assignments are listed below.

*1.* To succeed as a GOCOM SJA or state judge advocate, officers should serve in the following:

*a.* Unit officers. Division SJA, GOCOM SJA, legal operations detachment commander, or military judge.

*b.* DIMA. GOCOM SJA (lieutenant colonel or colonel) or deputy SJA (lieutenant colonel), or TJAGLCS professor or staff (lieutenant colonel).

*2.* To succeed as an legal operations detachment commander, officers should serve in the following:

*a.* Unit officers. Division SJA, GOCOM SJA, legal operations detachment section chief, or military judge.

*b.* DIMA. GOCOM SJA or deputy SJA of a major command.

*3.* To succeed as a senior military judge, officers should serve in the following:

*a.* Unit officers. Military judge (lieutenant colonel), legal operations detachment commander, regional defense counsel.

*b.* DIMA. USACCA (lieutenant colonel or colonel), TDS (lieutenant colonel or colonel), or TJAGLCS instructor in criminal law (lieutenant colonel or colonel).

(b) *Education.*

*1.* SSC. The Army War College is a SSC designed to prepare officers for duty as commanders and staff officers at the highest echelons. The course is not a prerequisite for promotion, but enhances any officer's ability to perform at the highest level. The Army War College Distance Education Course is a two-year distance education program consisting of home study and 2-week resident phases at Carlisle Barracks, Pennsylvania. Selection for this course is by a centralized board convened by HRC. This course is the only distance education course that the Army recognizes as MEL SSC producing. Completion of the course should occur between the 21st and 26th year of service.

*2. Continuing legal education.* Each year TJAGLCS offers specialized continuing legal education courses at Charlottesville, VA and at over 35 locations around the world. Taught by TJAGLCS faculty, these courses provide an essential update in a particular field of law. RC judge advocates are required to attend this training to maintain their basic professional competence as military lawyers. Individuals may apply for TJAGLCS resident continuing legal education training that varies in length from 3 days to 3 weeks. These courses provide practice oriented continuing legal education for military attorneys. TJAGLCS also provides weekend, on-site continuing legal education training at 20 CONUS Army locations and at selected OCONUS Army sites. Judge advocates should attend at least one continuing legal education course each year.

(c) *The Military Judge Course.* The purpose of the Military Judge Course is to provide military attorneys with advanced schooling to qualify them to perform duties as military judges at courts martial. This course is a 3-week course taught at TJAGLCS. The Chief Trial Judge, U.S. Army Trial Judiciary, selects Army officers for attendance.

**38–7. Reserve Component legal administrator (warrant officers) development**

*a. General.* Legal administrators serve in the USAR and the ARNG. TJAG exercises technical supervision of USAR JAGC warrant officers not on the active duty list. CWOC in coordination with PP&TO assists TJAG by developing policy and providing technical assistance in the career management of USAR warrant officers. TJAG, with the assistance of the National Guard Special Advisor to TJAG, through the Chief, NGB, also provides technical assistance to the respective State AG for the career management of ARNG legal administrators. In general, qualifications and professional development are similar to AA legal administrators (see para 38–5).

*b. RC legal administrator career development.*

(1) Professional development objectives are as follows:

*(a)* Development of warrant officer legal administrators with the professional attributes and capabilities to meet the mobilization and warfighting needs of the Army, and in the case of ARNG warrant officer legal administrators, to meet the additional civil and defense needs of the states and territories.

*(b)* Development of warrant officer legal administrators in the numbers and skills to meet the functional requirements of the Army in partial or total mobilization, and in the case of ARNG warrant officer legal administrators, to meet the additional requirements of the states and territories.

*(c)* Development of warrant officer legal administrators with technical, managerial and administrative skills to serve in positions of increasing responsibility in the JAGC.

(2) Utilization (see JAGC Warrant Officer (RC - AGR/TPU) life-cycle development and utilization model).

*(a) Warrant officer one/chief warrant officer two.* Legal administrators are utilized in operational assignments to develop and gain valuable experience in operational management of legal offices. Legal administrators should continue their self-development, professional reading, and pursuit of educational goals. The first assignment provides legal administrators an opportunity to develop their technical skills and officership development. The Army understands that RC warrant officers are learning their military craft, while they are engaged in a full-time civilian career; however, high standards of participation and performance are still required.

*(b) Chief warrant officer three/chief warrant officer four.* Senior legal administrators continue to be utilized in operational assignments and positions of greater responsibility to continue to expand their knowledge and skills. Senior legal administrators seek assignments that will increase their value to the JAGC and the Army. Legal administrators should continue their self-development, professional reading, and pursuit of the next civilian educational goals. Senior legal administrators should serve as role models and mentors for junior warrant officers, by assisting them in developing their skills. This career phase is also a time to develop more specific skills and experiences to qualify for senior positions.

*(c) Chief warrant officer five.* Capstone achievement for all legal administrators. Once legal administrators attain this rank they should be assigned to nominative, joint, interagency, intergovernmental, or special assignments. Lifelong learning, supported by civilian and military education, provides critical opportunities to develop joint and expeditionary competencies. Senior legal administrators should serve as role models and mentors for junior warrant officers, by assisting them in developing their skills. At this career phase, CW5s are fully utilized through their highly developed skills, abilities and talents at the most challenging assignments.

*c. Promotion time line.* The USAR and ARNG legal administrators must complete all prerequisite levels of military education applicable to legal administrators prior to selection to the next higher rank. For USAR warrant officer promotions, see AR 135–55. Also, for USAR warrant officers (CW2–CW4) with a date of rank earlier than 1 January 2005, see Reference Memorandums, DAAR–HR, dated, 8 October 03, Subject: Army Reserve Warrant Officer Professional Development Education (PDE) Management Improvements for ARNG warrant officer promotions, and AHRC–OPW–S, dated, 9 April 2004, Subject: Implementation of the Chief, Army Reserve (OCAR) New Warrant Officer Professional Development Plan. For ARNG promotions see NGR 600–101.

*d. Assignments.* CWOC manages the assignments of DIMAs and USAR AGRs in coordination with HRC and PP&TO–RC. An appointed USAR warrant officer manages the assignments of USAR legal administrators in coordination with the CWOC and the JAGC's PP&TO–RC. Pursuant to NGR 600–101, ARNG legal administrator assignments are managed by the respective state commands subject to prior certification by the CWOC that the applicant is eligible for entry into MOS 270A. Any assignment, utilization or actions against CW5 billets, must be coordinated with the CWOC for TJAG consideration.

*e. Warrant officer one development.*

(1) *Education.*

*(a)* Complete all prerequisite MOS related DL courses prior to attendance at the WOBC. For specific course information, newly appointed WO1s visit TJAGLCS Web page.

*(b)* Must successfully complete the Legal Administrator WOBC within 2 years of appointment. The WOBC is a 6-week resident course conducted at TJAGLCS for all newly appointed WO1s (AA, USAR, and ARNG). All newly appointed WO1s must attend and complete this 6-week course and prerequisite studies that prepare the JAGC's warrant officers for assignments as legal administrators. Upon completion, warrant officers are certified as per DA Pam 611–21 and awarded the MOS 270A, Legal Administrator.

*(c)* All legal administrators should attend the annual Legal Administrators Course which focuses on new developments in technical management and mid-level management of Army Staff Judge Advocate Office administration, operations, and support services.

(2) *Assignment.* See figure 38–7, below, for legal administrator development and utilization.

(3) *Self-development.* Attend resident and nonresident short courses that are offered at TJAGLCS. Seek educational opportunities in the civilian sector at legal technology conferences. Pursue courses towards associate's and bachelor's degrees.

(4) Desired experience. Critical skills and knowledge to be an effective leader, mentor, and manager of an Army legal office.

*f. Chief warrant officer two development.*

(1) *Education.*

*(a)* Must meet the qualifications above in paragraph 38–7e(1).

*(b)* All legal administrators must complete the prerequisite studies (Action Officer Development Course (131–P00)), the Judge Advocate Tactical Staff Officer Course, and prerequisite MOS related DL courses prior to attendance at the WOAC.

*(c)* Attend the Warrant Officer Advanced Course. The WOAC is a four-week resident course conducted at TJAGLCS. It provides officers continued leadership, tactical, and technical training needed to serve in Corps, Army, and Department of the Army level positions. CW2s are authorized to attend WOAC and attendance will be managed through the CWOC or designated representatives. Graduates of the WOAC receive the designation of MEL WOAC.

(2) *Developmental and broadening assignments.* See figures 38–5, below, for legal administrator development and utilization.

(3) *Self-development.* Continue to attend resident and nonresident short courses that are offered at TJAGLCS. Seek educational opportunities in the civilian sector at legal technology conferences. Pursue courses towards associate's and bachelor's degrees.

(4) *Desired experience.* Have the critical skills and knowledge to be an effective leader, mentor, and manager of an Army legal office.

*g. Chief warrant officer three development.*

(1) *Education.*

*(a)* Must meet the qualifications above in paragraph 38–7f.

*(b)* Attend the Warrant Officer Staff Course. The WOSC is a four-week resident course conducted at the Warrant Officer Career College which focuses on the staff officer and leadership skills needed to serve in the rank of CW4 at battalion and higher levels. CW3s are authorized to attend WOSC and legal administrators are encouraged to attend prior to promotion to CW4. Successful completion of WOSC is an ARNG requirement for promotion to CW4. For USAR warrant officers, successful completion will be a requirement for promotion to CW4 and CW5. Graduates of the WOSC receive the designation of MEL WOSC.

(2) *Developmental and broadening assignments.* See figure 38–4, below, for legal administrator development and utilization.

(3) *Self-development.* Continue to attend resident and nonresident short courses that are offered at TJAGLCS. Seek educational opportunities in the civilian sector at legal technology conferences. Pursue courses towards associate's and bachelor's degrees.

(4) *Desired experience.* Have the critical skills and knowledge to be an effective leader, mentor, and manager of an Army legal office. Be ready to serve in positions of greater responsibility.

*h. Chief warrant officer four development.*

(1) *Education.*

*(a)* Must meet the qualifications above in paragraph 38–7g.

*(b)* Attend WOSSC. The WOSSC is a 2-week resident course (in FY 11 will expand to 4-week resident course with prerequisite DL courses) conducted at the Warrant Officer Career College which focuses on a broader Army level perspective required for assignment to CW5 level positions. CW4s are authorized to attend and are encouraged to attend prior to promotion to CW5. The ARNGUS CW4 legal administrators being assigned to a W5 duty position must comply with the promotion and military education requirements of National Guard Regulation (NGR) 600–101, prior to promotion. Graduates of the WOSSC receive the designation of MEL WOSSC.

(2) *Developmental and broadening assignments.* See figure 38–4, below, for legal administrator development and utilization.

(3) *Self-development.* Continue to attend resident and nonresident short courses that are offered at TJAGLCS. Seek educational opportunities in the civilian sector at legal technology conferences. Pursue courses towards associate's, bachelor's and master's degrees.

(4) *Desired experience.* Senior-level technician and tactical expert on legal operations and has the skills and knowledge to serve at all levels within the JAGC.

*i. Chief warrant officer five development.*

(1) *Education.* Must meet the qualifications above in paragraph 38–7h.

(2) *Developmental and broadening assignments.* The CW5 legal administrators should be assigned to the most senior supervisory, advisory, and staff positions in USAR and ARNG senior warrant officer positions or other special assignments when there is a specific need within the JAGC.

(3) *Self-development.* Seek educational opportunities in the civilian sector at legal technology conferences. Pursue courses towards bachelor's and master's degrees.

(4) *Desired experience.* Master-level technician and tactical expert within the JAGC for legal operations. Technical, functional, and branch systems integrator, trainer and leader.

(5) *Other assignments.* In addition to the normal assignments that USAR and ARNG legal administrator may be assigned to (see fig 38–4), USAR and ARNG legal administrators can be assigned to organizations and duties beyond those indicated. These assignments include duties in Joint organizations, Army Staff or Secretariat positions, the Warrant Officer Career College, and recruiting positions. The assignments can be characterized as highly responsible and important, requiring mature, well-rounded, and multi-skilled officers.


## Chapter 39
## Chaplain Corps

### 39–1. Unique features of Chaplain Corps

*a. Unique purpose of Chaplain Corps.* The Chaplain Corps is a special branch of the Army whose mission is to provide for the comprehensive religious support to the Army across the spectrum of operations.

*b. Unique functions performed by Chaplain Corps.* Chaplains provide the religious, spiritual, moral and ethical support to the Army in any contingency. As religious leaders, they provide the Army community the opportunity to participate in worship and religious educational opportunities and to receive the pastoral care and spiritual enrichment it seeks. Chaplains preserve and perpetuate the faith-based values that often serve as the bedrock of our units and communities. As special staff officers, they coordinate religious support activities to support the commander's operational plans and objectives in war and peace. Similarly, they provide commanders with professional advice on the impact of religion on military operations.

*c. Unique features of work in Chaplain Corps.* Chaplains serve on the personal and special staff of the commander and assist in ensuring that the policies and leadership practices of the command are in keeping with strict moral, ethical and humanitarian standards. The Chaplain advises the commander and staff on matters pertaining to religion, morals and morale. The senior Chaplain assigned to a unit or headquarters is normally designated the Staff Chaplain or Command Chaplain. The Chaplain is responsible to the commander for all chaplain related activities within the command. The Staff Chaplain or Command Chaplain exercises staff and technical supervision of the activities of the other Chaplains assigned to the headquarters or organization. He or she provides staff supervision for the activities of Chaplains in subordinate commands and provides commanders and staff with advice, information, recommendations, programming, funding data and plans concerning religious activities, morale, chaplain and chaplain assistant personnel matters.

(1) The Chaplain branch encompasses two AOCs: Command and Unit Chaplain (56A); and Clinical Ministries Supervisor (56D).

*(a)* The Command and Unit Chaplain (56A) serves as a religious leader with staff functions for unit of assignment and to units requiring area religious coverage. The duties of Chaplains are those, which normally pertain to the clergy profession and those, which are prescribed by law, regulations and distinctive conditions and circumstances of the Department of the Army.

*(b)* The Clinical Ministries Supervisor (56D) applies to two types of supervisors who offer specialized supervision in the areas of Clinical Pastoral Education and Approved Supervisors for Family Life Chaplaincy.

(2) The Chaplain branch incorporates six SIs:

*(a)* Chaplain Educator/Trainer in Ethics or World Religions (7E).

*(b)* Chaplaincy Resources Manager (corps and installation) (7F).

*(c)* Marriage and Family Specialist (7K).

*(d)* Chaplaincy Resource Manager (HQDA, headquarters IMA, Region, ACOM, DRU, ASCC, USACHCS) (7M).

*(e)* Hospital Ministries Chaplain (7R).

*(f)* Combat Medical Ministry (7S).


### 39–2. Officer characteristics required

Chaplain officers are fully qualified members of the clergy of a religious faith group. Entry-level requirements are established by public law, DODIs, and ARs. Chaplains are required to possess a baccalaureate degree of no less than 120 semester hours; have completed a master's degree consisting of 72 semester hours (minimum) of graduate professional study from an accredited institution in theology or approved subjects and be certified by a qualified

religious organization which has met all the administrative requirements established by the Armed Forces Chaplains Board.

*a. Competencies and actions common to all.* The Army must have officers who can understand what leadership is and does. (For additional discussion of the definition of leadership, see ADP 6–22.) The enduring expression of Army leadership has been BE–KNOW–DO. Army leadership begins with what the leader must "BE"-the values and attributes that shape character. The knowledge that leaders should use in leadership is what Soldiers and Army Civilians "KNOW". Leaders cannot be effective until they apply what they know. What leaders "DO", or leader actions, is directly related to the influence they have on others and what is done.

(1) *Values.* Values are at the core of everything the Army is and does. The Army is an institution of people with unique and enduring values. These values must be a part of the men and women—officers, enlisted personnel and civilians—who are the Army. These values provide the sense of purpose necessary to sustain our soldiers in combat and help resolve ambiguities in operations other than war. Officers must establish and maintain an environment in the Army where soldiers and civilians do what is right; where individuals treat each other as they should be treated; and, where everyone can be all they can be. There are seven Army Values (leadership).

(a) *Loyalty.* Bear true faith and allegiance to the U.S. Constitution, the Army, your unit and other Soldiers.

(b) *Duty.* Fulfill your obligations.

(c) *Respect.* Treat people as they should be treated.

(d) *Selfless-service.* Put the welfare of the nation, the Army and your subordinates before your own.

(e) *Honor.* Live up to all the Army Values.

(f) *Integrity.* Do what is right, legally and morally.

(g) *Personal courage.* Face fear, danger or adversity (physical or moral).

(2) *There are six Chaplain Corps attributes (SACRED).*

(a) *Spirituality.* Engage others to seek and explore their faith.

(b) *Accountability.* Encourage individuals to make sound moral and ethical decisions.

(c) *Compassion.* Love in word and deed.

(d) *Religious leadership.* Influence others to live their faith.

(e) *Excellence.* Motivate individuals to do their best in all aspects of life.

(f) *Diversity.* Believe that our differences make us stronger.

(3) *Leader attributes.* Attributes are fundamental qualities and characteristics. Attributes define what an officer should be and guide leader actions. Army leader attributes are described in three categories—mental, physical, and emotional.

(a) Mental attributes describe aptitudes and capacities for learning that leaders should possess and develop. Included in this category are will, self-discipline, initiative, judgment, confidence, intelligence and cultural awareness.

(b) Physical attributes specify physical dispositions or aptitudes that can be nurtured and developed. Included in this category are health fitness, physical fitness, stamina, military bearing and professional bearing.

(c) Emotional attributes are those affective aptitudes or capacities that contribute to how one feels and substantially contribute to leadership. Included in this category are self-control, balance, and stability.

(4) *Leader skills.* Skills are synonymous with competencies. They are abilities or competencies that one develops and uses with people, with ideas and with things. Competence is of primary importance for all Army officers. The Army recognizes that officers must develop four types of skills.

(a) Interpersonal skills reflect competence in communicating with people.

(b) Conceptual skills refer to competence in handling ideas.

(c) Technical skills reflect competence with things.

(d) Tactical skills refer to the ability to put together technical, interpersonal, and conceptual skills and apply them to warfighting tasks.

(5) *Leader actions.* Officers provide purpose, direction and motivation as they influence their subordinates, operate to accomplish their mission and strive to improve their unit or organization. Leader actions are how Army officers act to achieve excellence and get the job done. These actions are applicable across all levels of leadership.

(a) Influencing refers to the use of appropriate people skills to guide subordinates or teams toward mission accomplishment. Influencing subdivides into communicating, decision-making and motivating.

(b) Operating or accomplishing the mission refers to the relative short-term actions of getting the job done. Operating divides into planning, executing and assessing.

(c) Improving refers to the long-term investment-type actions essential to improving everything the leader influences. Improving subdivides into developing (people), building (teams) and learning.

*b. Unique skills.* Chaplains must fully comprehend the organization, structure and doctrine of the warfighting Army as it evolves in the 21st Century. In addition, they:

(1) Plan and execute the Command Master Religious Plan in support of the unit's mission.

(2) Assess the impact of indigenous religious beliefs and practices on the unit's mission.

(3) Provide religious services of worship, including funerals and memorial services that occur in field and garrison.

(4) Provide specific Essential Elements of Religious Services that normally take place apart from formal religious services.

(5) Provide ministry to marriages and families.

(6) Offer pastoral care through counseling and advising.

(7) Teach classes on moral leadership, suicide awareness and religious education.

(8) Render pastoral care in a hospital setting.

(9) Render pastoral care in a confinement facility.

(10) Design and implement Unit Ministry Team training.

(11) Provide religious education for doctrinal understanding and spiritual development.

*c. Unique knowledge.* Chaplains must remain up-to-date on Army organization, structure and doctrine. They also:

(1) Possess expert knowledge of distinctive faith groups in order to perform and provide for the religious needs of the Army's Soldiers and Families.

(2) Remain current on developments in the civilian religious community for possible application to their area of expertise.

(3) Understand the elements of suicide awareness and prevention.

(4) Know the characteristics of healthy marriage and family relationships.

(5) Possess the knowledge of the dynamics of ethical decision-making.

(6) Assess the religious needs, prepare the command master religious plan, implement and evaluate the commander's religious program.

(7) Understand cultural issues and advise leaders on religious implications.

*d. Unique attributes.* Chaplains must possess the highest standards of discretion, integrity and professional ethics. In addition, they will:

(1) Provide religious support in a religiously pluralistic and diverse setting.

(2) Ensure the free exercise of religion.

## 39–3. Critical officer developmental assignments

Chaplain professional development provides skills, knowledge and experience enabling them to provide religious, spiritual and moral leadership and to perform staff officer functions in the Army. This is a comprehensive system that assigns chaplains according to the needs of the Army, and identifies and provides the training required to prepare and sustain chaplains for serving in these assignments.

*a. Branch qualification.* Upon completion of Chaplain BOLC, chaplain officers are eligible for worldwide deployment in their specialty. There are no by grade standards for AC chaplains.

*b. Chaplain Officer Education System and branch development.*

(1) *Newly commissioned chaplain.* The Chaplain BOLC provides initial entry military training for newly commissioned chaplains. Chaplain BOLC consists of 12 weeks of military training divided into four modules: Chaplain's Initial Military Training, Phase I (Staff Officer Introduction), Phase II (Pastoral Care Training), and Phase III (Ministry in a Combat Environment). Chaplain BOLC builds on the professional ministerial knowledge and skills acquired in civilian institutions prior to commissioning as a chaplain. Chaplain BOLC equips chaplains with knowledge and skills necessary to perform their duties as staff officers and to provide religious support at the battalion level. A noncombatant course, Chaplain BOLC trains chaplains how to conduct or provide religious support in today's multi-ethnic, multi-cultural, religiously diverse and pluralistic Army, across the full spectrum of military operations.

(2) *Captain.* Chaplain captains are normally assigned to battalions. They may also serve as hospital chaplains, and confinement facility Chaplains. Chaplains attend their branch CCC to acquire professional development in the Officer Education System. Captains selected for promotion are eligible to enroll in the ILE course, which further prepares them to serve as staff officers at the Brigade and Division level of competency. A select number of chaplain captains will be selected annually to attend Clinical Pastoral Education in order to prepare for ministry in the hospital setting.

(3) *Major.*

*(a)* Chaplain majors generally serve as brigade or group chaplains, assistant division chaplains, depot chaplains, service school instructors (or staff), family life chaplains, hospital chaplains, installation chaplain resource managers, installation chaplain training managers, and corps staff action officers.

*(b)* All chaplain majors attend ILE in conjunction with the Chaplain Brigade Course and complete the program within their first 2 years in grade.

*(c)* Some chaplain majors will attend fully funded civilian schooling and Clinical Pastoral Education to prepare them for chaplain assignments requiring additional skills. Such assignments include instructor in ethics, homiletics or world religion; resource management; family life chaplain; or hospital chaplain ministry.

(4) *Lieutenant colonel.*

*(a)* Chaplain lieutenant colonels serve as division staff chaplains, HQDA, ACOM, DRU, ASCC, and region staff

action officers, installation staff chaplains, Clinical Pastoral Education and Family life supervisors, and hospital chaplains.

*(b)* A select number of chaplain lieutenant colonels and colonels will either attend SSC in residence, or complete it through the U.S. Army War College Distance Education Program.

(5) *Colonel.* Chaplain colonels serve primarily as corps, ACOM, DRU, and ASCC staff chaplains, CONUS Army staff Chaplains, joint or unified command staff chaplains, installation staff chaplains, HQDA directors, Region, and medical center staff chaplains. Army Reserve chaplain colonels serve at the USARC, operational, functional, training and RSCs. ARNG chaplain colonels serve as Joint Force headquarters (formerly known as STARC) chaplains.

*c. Branch/functional area generalist assignments.* Chaplain officers do not normally serve in branch or FA generalist (formerly branch immaterial) assignments. These assignments will be made only as an exception to policy.

*d. Joint assignments.* Joint experience is important to the Army and valuable to the officers who serve in those billets. Joint assignments for chaplains are limited and not required for advancement to senior leadership.

## 39–4. Assignment preferences and precedence

*a. Preferences.* The chaplain branch has diverse assignment opportunities, which allow for varied career development paths. The goal of the professional development of chaplain branch officers is to produce and sustain highly-qualified clergy and staff officers. Assignments in the chaplain branch, which meet the needs of the Army, will be made to develop the chaplain's ability to achieve that goal. Requests from officers for assignments that do not contribute to achieving that goal will likely be rejected.

*b. Precedence.* Assignment to developmental positions will have precedence, although there is flexibility on the sequence of assignments. Some chaplain officer billets will be designated as requiring advanced education, either military or civilian. Officers assigned to those jobs must complete the required courses prior to reporting to their duty assignments.

*c. Reserve Component.* RC assignments are managed on a volunteer and position vacancy basis under the guidance of senior supervisory chaplains at all echelons. USAR AGR assignments are managed at HQDA, similar to the AC.

## 39–5. Duration of critical officer life-cycle assignments

*Assignment duration.* Most assignments for chaplain officers will be 24 to 36 months in length. OCONUS locations will continue to require specific tour lengths.

## 39–6. Requirements, authorizations and inventory

*a. Goal.* The goal is to maintain a healthy, viable career path for chaplain officers.

*b. Officer Personnel Management System III implementation.* The number of authorized chaplain billets, by grade, will vary as force structure decisions are made and actions to implement them are taken. Officers desiring more information on chaplain branch authorizations or inventory are encouraged to contact the branch office.

## 39–7. Key officer life-cycle initiatives for the Chaplain Corps

*a. Acquire.* Direct commissioning is the primary means of accessioning chaplain officers.

*b. Develop.* The chaplain branch provides a diversity of assignments and PME designed to equip chaplains to perform and provide religious support in pluralistic and diverse contexts. The chaplain branch affords equitable opportunities for chaplains to excel at their current level and to prepare for higher level of increased responsibility. As chaplain officers progress through their careers, in addition to PME, they become eligible for advance civilian training, which prepares them for specialized ministry positions (see fig 39–1).

*c. Utilize.* The Chief of Chaplains (CCH), as proponent of the branch, manages all chaplain officer personnel assignments. Chaplain officers serve at all echelons worldwide, from battalion to echelons above Corps. The goal of the chaplain assignment process is to place the right chaplain with the right experience and skills in the right position at the right time in order to provide the unit with the most effective and comprehensive religious support for the operational context. Key principles of chaplain officer utilization are:

(1) Pastoral—provide personal attention and pastoral consideration.

(2) Equitable—provide transparency and equity for all chaplains in balancing professional development, personal needs, and mission requirements.

(3) Responsive—implement a flexible and agile system in anticipation of transforming Army personnel requirements.

*d. Sustain.* The chaplain branch provides the career opportunities in which chaplain officers fulfill their calling and meaningful utilization of their abilities and competencies for ministry. The chaplain branch stresses the necessity of continuing education and a strong relationship between the chaplain and his/her endorsing agent in order to maintain professional qualifications for ministry. Chaplain branch officers must remain personally and professionally prepared to serve in a variety of contexts in garrison or worldwide deployment. Whether assigned to mobile TOE units with high levels of readiness or fixed-site TDA organizations, all Chaplain Corps officers must be prepared to deploy with their units or as IMAs to accomplish missions across the full spectrum of operations. to deter potential adversaries, to protect

national interests, or to support joint and multinational operations other than war such as humanitarian and peace keeping missions. The chaplain branch expects chaplain officers must prepare themselves and their families for this most challenging life-cycle function. The chaplain branch also expects supervisory chaplains to mentor subordinate chaplains to maximize their strengths and competencies and to develop them for service at the next level.

*e. Promote.* Chaplain officers compete at all grades for promotion within the chaplain branch, not against officers of other branches. The chaplain branch follows DA policies and procedures to ensure fairness and equitability for promotion, selection, and CCH Advisory Boards when selecting chaplain officers for promotion, key positions, and specialized advanced civilian training, in order to identify those chaplains who demonstrate the potential to serve at a higher level of responsibility and/or specialized area of ministry.

*f. Transition.* The CCH is the approving authority for chaplain officer separations due to retirement or unqualified resignation. Chaplain officers will separate from the Army in the same manner as all other officers. Chaplains can retire with less than 20 years of active Federal service at age 62. The chaplain branch recognizes and appreciates the honorable service of all chaplains, regardless of their length of service, and will provide responsive and respectful transition to retirees and those who resign their commissions.

## 39–8. Chaplain Corps Reserve Component officers

The chaplain RC officer is an integral part of the Army chaplaincy. The RC, ARNG and USAR, provide one half of the uniformed force structure in the Total Army Chaplaincy.

*a. General career development.* Developmental patterns and objectives are the same for the RCs with the following exceptions:

(1) Chaplain candidates are RC officers of the chaplain branch with the 56X AOC designation. Chaplain candidates are seminary students who are working to establish their academic and ecclesiastical credentials, in order to seek an appointment as an Army chaplain. Their training includes the Chaplain BOLC, while providing ministry practicum experiences and unit training. These ministry practicum include ministry at various installations, in Army medical centers, and in the disciplinary barracks. Candidates can enter RC or AC chaplain assignments upon completing their academic and ecclesiastical credentials and receiving an endorsement from their church bodies.

(2) The Chaplain Officer Basic Course for Reserve chaplains is the same as the course provided to AC Army chaplains. RC promotion to captain requires completion of all phases of Chaplain BOLC.

*b. Branch qualification and development opportunities.* Even though RC officers are limited by geographical considerations, they should strive for chaplain assignments that yield the same developmental opportunities as their AC counterparts. RC chaplains of all ranks (lieutenant through colonel) may serve in positions similar to AC (see fig 39–2).



Figure 39–1. AC Chaplain officer career development

A303                    DA PAM 600–3 • 3 December 2014



**Figure 39–2. RC Chaplain officer career development**

# Chapter 40
# Army Medical Department

## 40–1. The Army Medical Department description

The AMEDD is a special branch of the Army whose mission is to provide health services for the Army and, as directed, for other agencies, organizations and military Services. Six separate officer Corps or branches provide the leadership and professional expertise necessary to accomplish the broad Soldier support functions implicit to the mission. Specific information on AMEDD officer professional and career development may be found in detail in DA Pam 600–4.

## 40–2. Personnel management

The key to the distinctive personnel management system of the AMEDD is the six individual Corps, each with a defined mission; some with missions provided for by statute. The separate nature of the many disciplines that combine to make the total health care delivery system dictates some diversity in approach to the management of the personnel within that system. The AMEDD capitalizes upon the diversity of its Corps and is committed to developing and selecting the very best-qualified officers from its entire Corps for key leadership positions. The Surgeon General is responsible for AMEDD officer career management within the general policies established by the DCS, G–1. The Director of Personnel, Office of The Surgeon General, and the Commander, HRC manage AMEDD officers with the advice and assistance of the six AMEDD Corps chiefs and professional consultants.

**XO**
executive officer

**YG**
Year Group (figure)

**YOS**
year of service

## Section II
## Terms

**Area of concentration**
Identifies a requirement and an officer possessing a requisite area of expertise (subdivision) within a branch or FA. An officer may possess and serve in more than one AOC.

**Branch**
A branch is a grouping of officers that comprises an arm or Service of the Army in which, as a minimum, officers are commissioned, assigned, developed and promoted through their company grade years. Officers are accessed into a single basic branch and will hold that branch designation, which is later augmented between the 5th and 6th YOS with a FA. An accession branch admits officers upon commissioning; a non-accession branch admits experienced officers from the accession branches. With the exception of SF, all other branches are accession branches. SF recruits officers with a minimum of 3 years experience. (See chap 15 for further discussion.) Officers will serve their first 8 to 12 years developing the leadership and tactical skills associated with their branch. They will continue to wear their branch insignia throughout their military Service. All career branches are in the operations career field.

**Branch/functional area generalist position**
An 01A or 02A-coded position that may be filled by any officer, regardless of branch or FA designation. This is an umbrella term used to collectively describe two subset categories defined as officer generalist and combat arms generalist positions. (Note: Previously termed immaterial positions.)

**Captain Career Course**
This course is the second major branch school officers attend before company-level command. It combines the instruction formerly taught in the branch Officer Advanced Course and the Combined Arms and Services Staff School. The branch phase consists of 18-weeks of branch-specific technical and tactical training with integrated common core instruction. The 6-week TDY staff process phase at Fort Leavenworth prepares officers to function as staff officers at battalion, brigade and division level.

**Career field**
A specific grouping of functionally related officer, warrant officer, enlisted and civilian positions into management categories having a common mission area. Career fields consist of officer branches and FAs, warrant officer and enlisted military occupational specialties and civilian occupational series. There are four career fields: operations, information operations, institutional support, and operational support. (The term career field in lower case is also a generic term commonly used by military and civilian personnel when referring to their branch, FA, MOS, or civilian occupational series.)

**Combat arms generalist position**
A duty position requiring a broad understanding of combined arms doctrine, training and force structure. A combat arms generalist position is not identified with one specific branch or FA, but is limited to officers whose branches are Infantry, Armor, Field Artillery, Air Defense Artillery, Aviation, Special Forces, and USACE; and who are currently managed in the operations career field. These positions are documented in The Army Authorization Documents System with code 02A. (Note: Previously termed combat arms immaterial positions.)

**Functional area**
A FA is a grouping of officers by technical specialty or skill, which usually requires significant education, training and experience. An officer receives his or her FA between the 5th and 6th YOS. Individual preference, academic background, manner of performance, training and experience, and needs of the Army are all considered during the designation process.

**Functional designation**
The process whereby officers are reassigned from an accession branch to a FA or other branch. This designation is

made by a formal panel within HRC that weighs factors including needs of the Army, officer preference, rater and senior rater recommendations, education, training, and unique skills or attributes.

**Officer generalist position**

A duty position requiring a broad understanding of Army leadership, doctrine, policy, force structure and management. An officer generalist position is not identified with or limited to one specific branch or FA, but indicates that any officer may be assigned to the position. For example, both Armor Branch officers in the operations career field and FA 45 Comptrollers in the institutional support career field are eligible to serve in officer generalist positions. These positions are documented in The Army Authorization Document System with code 01A. (Note: Previously termed branch immaterial positions.)

**Skill**

Identifies a requirement and an officer possessing specialized skills to perform duties of a specific position that may require significant education, training, and experience. A skill can be related to more than one branch or FA. An officer may have more than one skill.

**Special branches**

A grouping of branches and officers primarily concerned with providing combat Service support and/or administration to the Army as a whole but managed separately from combat Service support branches. Special branches include AMEDD, Chaplain Corps, and JAGC.

**Strategic human resource management**

A broader, more holistic perspective on personnel management that extends beyond the fundamental life-cycle functions. Strategic human resource management focuses on the long-term vision of OPMS and links fundamental personnel management decisions to the desired end state. Strategic human resource management links character and leader development, the new OERs (DA Form 67–10 Series) and the personnel life-cycle management functions addressed in OPMS XXI. While the initial focus of SHRM is on officer personnel, Strategic human resource management will encompass the total force of officers, warrant officers, enlisted and civilian personnel.

**Section III**
**Special Abbreviations and Terms**
This section contains no entries.

Singh v. McHugh et al.
(Army Regulation 600-100)

**Army Regulation 600–100**

**Personnel—General**

# Army Leadership

**Headquarters**
**Department of the Army**
**Washington, DC**
**8 March 2007**

**UNCLASSIFIED**

A308

# *SUMMARY of CHANGE*

AR 600–100
Army Leadership

This major revision, dated 8 March 2007--

o Updates the definition of leadership and introduces the concept of the
  Pentathlete (para 1-4).

o Adds the Army Values, Warrior Ethos, Soldiers Creed, and the Civilian Creed
  (para 1-5).

o Adds Core Leader Competencies (para 1-6).

o Updates the levels of leadership (para 1-7).

o Adds the Leader Development Model; updates the three leader development
  domains; and adds counseling, coaching, and mentorship as tools for
  development, assessment, and feedback (para 1-8).

o Designates additional Army Leadership responsibilities (paras 2-2, 2-10, 2-
  12, 2-18, 2-20).

o Updates appendix A and glossary.

**Headquarters**
**Department of the Army**
Washington, DC
8 March 2007

***Army Regulation 600–100**

Effective 22 March 2007

Personnel—General

# Army Leadership

By Order of the Secretary of the Army:

PETER J. SCHOOMAKER
*General, United States Army*
*Chief of Staff*

Official:

*JOYCE E. MORROW*
JOYCE E. MORROW
*Administrative Assistant to the*
*Secretary of the Army*

**History.** This publication is a major revision.

**Summary.** This regulation establishes Army leadership policy and sets forth responsibilities for all aspects of leadership and leader development policy, doctrine, training, and research.

**Applicability.** This regulation applies to the Active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve, unless otherwise stated. This regulation also applies to the Department of the Army civilians. During mobilization, the proponent

may modify chapters and policies contained in this regulation.

**Proponent and exception authority.** The proponent of this regulation is the Deputy Chief of Staff, G–1. The proponent has the authority to approve exceptions or waivers to this regulation that are consistent with controlling law and regulations. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or its direct reporting unit or field operating agency, in the grade of colonel or the civilian equivalent. Activities may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include formal review by the activity's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25–30 for specific guidance.

**Army management control process.** This regulation contains management control provisions, but does not identify key management controls that must be evaluated.

**Supplementation.** Supplementation of

this regulation and establishment of command and local forms are prohibited without prior approval from Headquarters, Department of the Army, ATTN: DAPE–HRI, 300 Army Pentagon, Washington, DC 20310–0300.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to the Deputy Chief of Staff, G–1, ATTN: Human Resources Policy Directorate (DAPE–HRI), 300 Army Pentagon, Washington, DC 20310–0300.

**Distribution.** This publication is available in electronic media only and is intended for command levels A, B, C, D, and E for the Active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve.

# Contents (Listed by paragraph and page number)

**Chapter 1**
**General,** *page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Leadership overview • 1–4, *page 1*
Army Culture and leadership • 1–5, *page 1*
Core leader competencies • 1–6, *page 3*
Leadership levels • 1–7, *page 3*
Leader development • 1–8, *page 4*

*This publication supersedes AR 600–100, 17 September 1993.

A310

**UNCLASSIFIED**

**Contents—Continued**

**Chapter 2**
**Responsibilities,** *page 6*

General • 2–1, *page 6*
Secretary of the Army • 2–2, *page 6*
Chief of Staff, Army • 2–3, *page 6*
Deputy Chief of Staff, G–1 • 2–4, *page 6*
Commanding General, Human Resources Command • 2–5, *page 7*
Director, U.S. Army Research Institute for the Behavioral and Social Sciences • 2–6, *page 7*
Deputy Chief of Staff, G–3/5/7 • 2–7, *page 7*
Commanding General, U.S. Army Training and Doctrine Command • 2–8, *page 7*
Commanding General, U.S. Army Accessions Command/Deputy Commanding General, Initial Military Training • 2–9, *page 8*
Commanding General, Combined Arms Support Command • 2–10, *page 8*
Commanding General, Combined Arms Center/Commandant, U.S. Army Command and General Staff College • 2–11, *page 8*
Director, Center for Army Leadership • 2–12, *page 9*
Commandant, U.S. Army War College • 2–13, *page 9*
Superintendent, United States Military Academy • 2–14, *page 10*
Chief of Military History • 2–15, *page 10*
The Inspector General • 2–16, *page 10*
The Judge Advocate General • 2–17, *page 10*
Chief of Chaplains • 2–18, *page 10*
The Surgeon General/Commanding General, U.S. Army Medical Command • 2–19, *page 10*
Chief, National Guard Bureau • 2–20, *page 11*
State Adjutants General • 2–21, *page 11*
Chief, Army Reserve • 2–22, *page 11*
Commanders • 2–23, *page 11*

**Appendix A.**   References, *page 12*

**Figure List**

Figure 1–1: Army Values, *page 2*
Figure 1–2: Warrior Ethos, *page 2*
Figure 1–3: Soldier's Creed, *page 2*
Figure 1–4: Civilian Creed, *page 3*
Figure 1–5: Army training and leader development process, *page 5*

**Glossary**

## Chapter 1
## General

### 1–1. Purpose
This regulation—

  *a.* Establishes Army policy for leadership, by defining key terms associated with leadership, assigning responsibilities for management of leadership policy, and clarifying responsibilities and definitions among the Army leadership policy proponent, Deputy Chief of Staff (DCS), G–1, the Army leader development policy proponent (DCS, G–3/5/7), and the Center for Army Leadership proponent, the United States (US) Army Training and Doctrine Command/ Combined Arms Center (TRADOC/CAC) with the goal of successfully synchronizing all leadership and leader development policy.

  *b.* Provides direction and guidance to the Center for Army Leadership (CAL) (through TRADOC/CAC) for research, doctrine development, leadership assessment, training, and evaluation in all areas pertaining to Army leadership.

### 1–2. References
Required and related publications and prescribed and referenced forms are listed in appendix A.

### 1–3. Explanation of abbreviations and terms
Abbreviations and terms used in this regulation are explained in the glossary.

### 1–4. Leadership overview
  *a.* The Army defines leadership as influencing people by providing purpose, direction, and motivation, while operating to accomplish the mission and improve the organization.

  *b.* The Department of the Army (DA) mission is to provide necessary forces and capabilities to combatant commanders to support national security and defense strategies. The Army's strategic objectives clearly state the Army's purpose: provide relevant and ready land power for the 21st century security environment; train and equip Soldiers to serve as warriors and grow as adaptive leaders; sustain an all-volunteer force composed of highly competent Soldiers that are provided an equally high quality of life; and provide infrastructure and support to enable the force to fulfill its strategic roles and missions. The means of this strategy are people more specifically, leaders. This regulation focuses on leaders at all levels and in all cohorts: officers, warrant officers, noncommissioned officers, Soldiers, and DA civilians. These leaders represent the means for the Army to achieve its desired end.

  *c.* The DA develops competent and multifaceted military and civilian leaders who personify the Army values and the warrior ethos in all aspects from warfighting, to statesmanship, to enterprise management. The Army develops qualities in its leaders to enable them to respond effectively to what they will face. The DA describes the leaders it is creating as "Pentathletes," whose versatility and athleticism - qualities that reflect the essence of our Army - will enable them to learn and adapt in ambiguous situations in a constantly evolving environment. Pentathlete leaders are innovative, adaptive, and situationally aware professionals who demonstrate character in everything that they do, are experts in the profession of arms, boldly confront uncertainty, and solve complex problems. They are decisive and prudent risk takers who effectively manage, lead, and change organizations. Pentathletes are professionally educated, and dedicated to lifelong learning; resilient, mentally and physically agile, empathetic, and self-aware; and confidently lead Soldiers and civilians, build teams, and achieve the Army's over-arching strategic goals, while engendering loyalty and trust.

  *d.* Leaders must be able to operate independently in an ambiguous, dynamic, and politically sensitive environment. Leaders at all levels must be able to communicate, coordinate, and negotiate with a variety of personnel, including joint and coalition forces, interagency partners, nongovernmental organizations, local leaders, U.S. and foreign media, civilians, contractors, and people of different cultures and languages.

  *e.* Leaders must maintain tactical and technical competence, as applicable in their designated fields; keep abreast of, and remain adept in advances in information technology; and maintain their knowledge of the standards of conduct, policy, law, rules of engagement, and the Geneva Conventions.

  *f.* Leaders must be competent, full spectrum warfighters, and professionals who understand the strategic implications of their actions, behaviors, and decisions on Army, Department of Defense (DOD), and national objectives. They must understand that failure to act can impede operational progress by delaying development and delivery of required resources, through increased anti-American sentiment and enemy resistance, and by strengthening the appeal of ideas propagated by U.S. adversaries. Leaders must reinforce the view that actions which are counter to Army values and the standards of conduct can compromise the nation's strategic objectives. Requirements of today's leaders are extensive but necessary, given the contemporary operating environment (COE) in which they will lead.

### 1–5. Army Culture and leadership
  *a.* Army culture is a consequence of customs, traditions, ideals, ethos, values, and norms of conduct that have existed for more than 230 years. DA culture promotes certain norms of conduct, and leaders who manage operations

affected by the law of land warfare, require the highest level of individual and organizational discipline and moral values. The law of land warfare, the Uniform Code of Military Justice, and the standards of conduct structure the discipline imperative to which leaders must adhere. The moral and ethical tenets of the U.S. Constitution, the Declaration of Independence, and the Army Values (figure 1–1) characterize the Army's professionalism and culture, and describe the ethical standards expected of all Army leaders.

---

**Army Values**

<u>Loyalty</u>.  Bear true faith and allegiance to the US Constitution, the Army, your unit,
and other soldiers.  This means supporting the military and civilian chain of command, as well as devoting oneself to the welfare of others.
<u>Duty</u>.  Fulfill your obligations.  Duty is the legal and moral obligation to do what should be done without being told.
<u>Respect</u>.  Treat people as they should be treated.  This is the same as do unto others as you would have done to you.
<u>Selfless service</u>.  Put the welfare of the Nation, the Army, and subordinates before your own. This means putting the welfare of the Nation and accomplishment of the mission ahead of personal desires.
<u>Honor</u>.  Live up to all the Army values.  This implies always following your moral compass in any circumstance.
<u>Integrity</u>.  Do what's right—legally and morally.  This is the thread woven through the fabric of the professional Army ethic.  It means honesty, uprightness, the avoidance of deception, and steadfast adherence to standards of behavior.
<u>Personal courage</u>.  Face fear, danger, or adversity (physical or moral).  This means being brave under all circumstances (physical or moral).

**Figure 1–1. Army Values**

---

*b.* Army culture includes a unique service ethic expected of every Soldier to make personal sacrifices in selfless service to the nation. Commitment to this ideal is embodied in the Warrior Ethos (figure 1–2). Army leaders develop and sustain the Warrior Ethos through discipline, realistic training, commitment to the Army Values, and pride in the Army's heritage. Soldiers show their commitment to these guiding values and standards by willingly performing their duty and subordinating their personal welfare without expecting reward or recognition. Everything Soldiers do for the nation is supported by Army civilians and family members; consequently, Army leaders are committed to developing values-based leadership and seeing to the well-being of Soldiers and their families. Combined with the Warrior Ethos, the Soldiers Creed (figure 1–3) and the Civilian Creed (figure 1–4) embody the Army service ethic.

---

**Warrior Ethos**
　　　　I will always place the mission first
　　　　I will never accept defeat
　　　　I will never quit
　　　　I will never leave a fallen comrade

**Figure 1–2. Warrior Ethos**

---

**Soldier's Creed**
　　　　I am an American Soldier
　　　　I am a warrior and a member of a team
　　　　I serve the people of the United States and live the Army Values
　　　　I will always place the mission first
　　　　I will never accept defeat
　　　　I will never quit
　　　　I will never leave behind a fellow comrade
　　　　I am disciplined, physically and mentally tough, trained, and proficient
　　　　In my warrior tasks and drills
　　　　I always maintain my arms, my equipment, and myself
　　　　I am an expert and I am a professional
　　　　I stand ready to deploy, engage, and destroy the enemies of the
　　　　United States of America in close combat
　　　　I am a guardian of freedom and the American way of life
　　　　I am an American Soldier

**Figure 1–3. Soldier's Creed**

---

A313

**Civilian Creed**

I am an Army Civilian – a member of the Army Team
I am dedicated to our Army, our Soldiers, and Civilians
I will always support the mission
I provide stability and continuity during war and peace
I support and defend the Constitution of the United States
and consider it an honor to serve our Nation and our Army
I live the Army values of Loyalty, Duty, Respect, Selfless
Service, Honor, Integrity, and Personal Courage
I am an Army Civilian

**Figure 1–4. Civilian Creed**

## 1–6. Core leader competencies

*a.* To support the Army's strategic objective - "Trained and Equipped Soldiers and Developed Leaders" - the Army has identified core leader competencies that pertain to all levels of leadership - military and civilian. Core leader competencies are related leader behaviors that lead to successful performance, are common throughout the organization, and are consistent with the organizational mission and values. Core leader competencies support the Executive core competencies (ECQs) that civilian leaders are expected to master as they advance in their careers.

*b.* The following core leader competencies are described in more detail in Field Manual (FM) 6–22.

(1) *Leads others:* Leaders motivate, inspire, and influence others to take the initiative, work toward a common purpose, accomplish tasks, and achieve organizational objectives.

(2) *Extends influence beyond the chain of command:* Leaders must extend their influence beyond direct lines of authority and chains of command. This influence may extend to joint, interagency, intergovernmental, multinational, and other groups, and helps shape perceptions about the organization.

(3) *Leads by example:* Leaders are role models for others. They are viewed as the example and must maintain standards and provide examples of effective behaviors. When Army leaders model the Army Values, they provide tangible evidence of desired behaviors and reinforce verbal guidance by demonstrating commitment and action.

(4) *Communicate:* Leaders communicate by expressing ideas and actively listening to others. Effective leaders understand the nature and power of communication and practice effective communication techniques so they can better relate to others and translate goals into actions. Communication is essential to all other leadership competencies.

(5) *Creates a positive organizational climate:* Leaders are responsible for establishing and maintaining positive expectations and attitudes, which produce the setting for positive attitudes and effective work behaviors.

(6) *Prepares self:* Leaders are prepared to execute their leadership responsibilities fully. They are aware of their limitations and strengths and seek to develop and improve their knowledge. Only through preparation for missions and other challenges, awareness of self and situations, and the practice of lifelong learning and development can individuals fulfill the responsibilities of leadership.

(7) *Develops others:* Leaders encourage and support the growth of individuals and teams to facilitate the achievement of organizational goals. Leaders prepare others to assume positions within the organization, ensuring a more versatile and productive organization.

(8) *Gets results:* Leaders provide guidance and manage resources and the work environment, thereby ensuring consistent and ethical task accomplishment.

## 1–7. Leadership levels

The three levels of leadership are direct, organizational, and strategic; leader competencies apply to all levels. Each leadership level has requirements that differ in the mix, scope, depth, and breadth related to the core leader competencies. As leaders progress through the levels, their assignments become more complex and interdependent, and require more responsibility, accountability, and authority. Leaders at each level must be able to address unanticipated situations, as many may have to make decisions in stressful situations that can easily have strategic or political implications. Each leadership level is discussed in greater detail in FM 6–22.

*a.* Direct level leadership is frontline leadership that includes leaders from squad through battalion levels of tactical units, and from branch through division levels in Table of Distribution and Allowances (TDA) organizations. Direct leaders build cohesive teams, empower subordinates, and develop and execute plans which implement policies and accomplish missions. The face-to-face interpersonal leadership at this level influences human behavior, values, and ethics. Direct-level leaders must develop and refine their analytical and intuitive decision-making techniques; communication and interpersonal skills; and be able to operate independently - within the limits of the commander's

intent, assigned missions, task organization, and available resources. Direct leaders focus on short-range planning and mission accomplishment, from 3 months to 1 year or more.

*b.* Organizational level leadership exists in more complex organizations and includes leaders at brigade through corps levels, directorate through installation levels (TDA organizations), and assistant through undersecretary of the Army level. In addition to direct level leader requirements, organizational leaders tailor resources to organizations and programs, manage multiple priorities, establish long-term vision, and empower others to perform the mission. They deal with more complexity, more people, greater uncertainty, and a greater number of unintended consequences. Their influence is exhibited more through policy-making and systems integration than face-to-face contact. Organizational leaders must be competent in synchronizing systems and organizations and in planning, programming, budgeting, and execution (PPBE). Their policies influence the command climate, and they must be adept in communication, negotiation, critical reasoning, and interpersonal skills. They must be skilled at complex decision-making and problem solving and have a good understanding of the entire range of full-spectrum operations. These leaders focus on midrange planning and mission accomplishment ranging from 1 to 5 years or more.

*c.* Strategic level leadership exists at the highest levels of the Army and includes military and civilian leaders at division and corps level through the national level. Strategic leaders set the organizational structure, allocate resources, and articulate the strategic vision. Strategic leadership involves running the Army; developing strategic plans, policies, guidance, and laws; determining force structure designs based on future mission requirements and capabilities; prioritizing over-arching Army programs against competing interests; and articulating Army programs and policies to the highest levels of DOD and the government. Strategic leaders scan the external environment to maintain focus and understand the context of future organizational roles. They must be adept in corporate level business management and prudent managers of taxpayer dollars. They work closely with higher-level leadership and dignitaries, and their decisions impact the political arena, personnel and resources, and have wide-ranging consequences. In addition to direct and organizational level responsibilities, strategic leaders must possess knowledge of the force structure change process and DOD, governmental, and legislative processes. Interpersonal skills must facilitate consensus building, negotiation, and influence peers and policy makers. Strategic leaders must be adept at complex decision-making, problem solving, and critical reasoning, and set the example by their words, decisions, and actions. They must convey messages indicating their professional integrity, priorities, and direction, and that support Army traditions, values, and ethics. Strategic leaders focus on the long-range vision for their organization ranging from 5 to 20 years or more.

## 1–8. Leader development

*a.* Leader development is the deliberate, continuous, sequential, and progressive process, grounded in Army values, that grows Soldiers and civilians into competent and confident leaders capable of decisive action. Leader development is achieved through lifelong synthesis of the knowledge, skills, and experiences gained through institutional training and education, organizational training, operational experience, and self-development. Commanders and other organizational leaders play the key role in leader development that ideally produces competent, confident, and agile leaders who act with boldness and initiative in dynamic and complex situations.

*b.* The Army training and leader development model (figure 1–5) identifies important interactions for training Soldiers and developing leaders. It requires lifelong learning and identifies three developmental domains that shape critical learning experiences: operational, institutional, and self-development. The model portrays the development of trained and ready units led by competent and confident leaders, and depicts a continuous cycle of education, assessment, and feedback. For each domain, specific measurable actions are required and each domain uses assessment and feedback from various sources to maximize mission readiness and to develop leaders. (See DA Pamphlet (Pam) 350–58 for a detailed discussion of the model.)



**Figure 1–5. Army training and leader development process**

(1) *Training and leader development domains.* The three domains of leader development (institutional training and education, operational assignments, and self-development) are dynamic and interconnected. The individual gains knowledge and skills and enhances abilities at the institution and practices them during operational assignments. Self-development enhances, sustains, and expands the knowledge, skills, and abilities gained from assignments and institutional learning.

*(a) Institutional training and education.* The Army's school system provides leaders with the education (how to think) and training (how to do) needed to perform duty position requirements. The Army's progressive, sequential, and parallel education systems that support Army Force Generation (ARFORGEN) will help ensure future leaders are armed with the knowledge base they will need to succeed in modular formations. Leaders attend institutional training courses following appropriate career development models.

*(b) Operational assignments.* Operational assignments translate theory into practice by placing leaders in positions to apply the knowledge and skills they acquired during institutional training and education. Repetitive performance of duty position requirements - coupled with self-awareness, assessment, and feedback - refines leader skills, broadens knowledge, and shapes attitudes and subsequent behavior.

*(c) Self-development.* Self-development initiatives focus on maximizing leader strengths, reducing weaknesses, and achieving individual leader development goals. Self-development is a continuous process that takes place during institutional training and education, and during operational assignments; it should stretch and broaden the individual beyond the job or training. Another aspect of self-development that helps Army leaders prepare for future responsibilities and grow professional expertise is civilian education or training at universities or colleges.

(2) The Army training and leader development management process was developed and implemented as a means to recommend improvements to training and leader development policy, strategy, and capabilities needed to provide trained and ready Soldiers, leaders, and units to combatant commanders. The management process starts with Councils of Colonels (COC) and culminates with providing recommendations to the Army leadership through the Training and Leader Development General Officer Steering Committee (for more information, see DA Pam 350–58).

*c.* All leaders have a responsibility to develop those junior to them to the fullest extent possible. In addition to institutional training and education, leaders can facilitate development through the knowledge and feedback they provide through counseling, coaching, and mentoring.

(1) *Counseling.* Counseling is a standardized tool used to provide feedback to a subordinate. Counseling focuses on the subordinate by producing a plan outlining actions the subordinate can take to achieve individual and organizational goals. It is central to leader development and should be part of a comprehensive program for developing subordinates. A consistent counseling program includes all subordinates, regardless of the level of each ones potential.

(2) *Coaching.* The original meaning of coaching refers to the function of helping someone through a set of tasks. In the military, coaching occurs when a leader guides another persons development in new or existing skills during the practice of those skills. Unlike mentoring or counseling where the mentor/counselor generally has more experience than the supported person, coaching relies primarily on teaching and guiding to help bring out and enhance current

capabilities. A coach helps those being coached to understand and appreciate their current level of performance and their potential, and instructs them on how to reach the next level of knowledge and skill.

(3) *Mentorship.* Mentorship is the voluntary developmental relationship that exists between a person of greater experience and a person of lesser experience that is characterized by mutual trust and respect. The focus of mentorship is voluntary mentoring that extends beyond the scope of chain of command relationships and occurs when a mentor provides the mentee advice and counsel over a period of time. Effective mentorship will positively impact personal and professional development. Assessment, feedback, and guidance are critical within the mentoring relationship and should be valued by the mentee in order for growth and development to occur.

*d.* As future battlefields evolve into increasingly dynamic and fluid environments, systems that facilitate the acceleration of leader development are needed. The Army training and leader development model and tools, such as counseling, coaching, and mentorship, are development multipliers that can enhance and influence maturity, self-awareness, adaptability, and conceptual and team-building skills in all leaders.


# Chapter 2
# Responsibilities

## 2–1. General
Every leader will—
  *a.* Set and exemplify the highest ethical and professional standards as embodied in the Army Values.
  *b.* Accomplish the unit mission.
  *c.* Ensure the physical, moral, personal, and professional wellbeing of subordinates.
  *d.* Effectively communicate vision, purpose, and direction.
  *e.* Build cohesive teams and empower subordinates.
  *f.* Teach, coach, and counsel subordinates.
  *g.* Build discipline while inspiring motivation, confidence, enthusiasm, and trust in subordinates.
  *h.* Develop their own and their subordinates' skills, knowledge, and attitudes.
  *i.* Anticipate and manage change and be able to act quickly and decisively under pressure.
  *j.* Use initiative to assess risk and exploit opportunities.
  *k.* Treat subordinates with dignity, respect, fairness, and consistency.
  *l.* Foster a healthy command climate.

## 2–2. Secretary of the Army
The Secretary of the Army is the proponent for civilian Executive and Senior Professional (ESP) management, and will provide policy, program oversight, guidance, and direction for ESPs Army-wide. The Secretary, or his designated representative, will objectively manage all ESPs to ensure their professional and leadership development needs are met, and their assignments fully utilize their skills and capabilities.

## 2–3. Chief of Staff, Army
The Chief of Staff, Army, will provide for general officer leadership, leader development policy, and training.

## 2–4. Deputy Chief of Staff, G–1
The leadership mission of the DCS, G–1 is to enhance the readiness of the Army by embedding the human dimension into all leadership and leader development policies (in coordination with the DCS, G–3/5/7), programs, and initiatives to better enable the Army to meet its objectives in the joint COE. In order to accomplish this mission, the DCS, G–1 will—
  *a.* Exercise general staff supervision and responsibility for developing and promoting Army leadership policies.
  *b.* Serve as the Army Staff (ARSTAF) policy proponent for both military and civilian leadership, to include oversight of AR 600–100 and AR 600–89.
  *c.* Serve as ARSTAF proponent for the Civilian Creed.
  *d.* Select points of contact to coordinate with and advise the DCS, G–3/5/7 and the Commandant, Command and General Staff College, regarding leadership and leader development issues.
  *e.* Participate in or support appropriate leadership and leader development conferences.
  *f.* Coordinate and prioritize leadership research with special emphasis on the activities of the U.S. Army Research Institute for the Behavioral and Social Sciences (ARI). Approves leadership research conferences that ARI organizes and conducts with the goal of coordinating research of participating agencies and organizations, and to review findings.
  *g.* Evaluate leadership policies and programs as they affect units and organizations in the field. Approves, schedules,

and conducts leadership conferences, when appropriate, to integrate and synchronize leadership and leader development policies, issues, and programs (working with the G–3/5/7).

*h.* Coordinate with the DCS, G–3/5/7 to ensure leadership and personnel management policies are synchronized with leader development policies.

*i.* Serve as point of contact for issues relating to civilian leadership and leader development.

*j.* Serve as a permanent member of the Leader Development COC and the Training and Leader Development General Officer Steering Committee.

*k.* Serve as Headquarters, Department of the Army (HQDA) proponent for Active, Reserve, and civilian mentorship policies, programs, and initiatives.

*l.* Serve as HQDA proponent for Army Values.

*m.* Synchronize programmatic requirements through the PPBES process (G–8, Program Analysis and Evaluation Directorate; Army Budget Office; G–3/5/7).

## 2–5. Commanding General, Human Resources Command

The Commanding General, Human Resources Command (HRC) (a field operating agency of the DCS, G–1) will—

*a.* Ensure professional development programs for Army personnel, including schooling and assignment procedures, are consistent with Army leadership, leader development, and management policies.

*b.* Advise and assist the Leader Development Management Process on leader development issues and policies as required. Specifically, advises the G–1 on issues and policies that pertain to Army manning priorities and assignments in order to provide the best opportunities for leader development.

*c.* Advise the DCS, G–1 of the impact of implementation of personnel management policies on leadership policy, and the DCS, G–3/5/7 on leader development policies.

*d.* Provide resource support as required to ensure continued core civilian leadership training and leader development through institutional training.

*e.* Participate in Army leadership, leadership research, and leader development conferences, as appropriate.

*f.* Provide results or an executive summary of all leader, leadership, and leader development studies to the CAL.

## 2–6. Director, U.S. Army Research Institute for the Behavioral and Social Sciences

The Director, U.S. Army Research Institute for the Behavioral and Social Sciences (Under the DCS, G–1) will—

*a.* Respond to leadership research priorities established by DCS, G–1.

*b.* Provide general research support to those agencies charged with responsibilities for developing theory, concepts, doctrine, and policy in the fields of leadership and leader development.

*c.* Coordinate with other DOD research agencies to review and evaluate research that relates to leadership and management, as appropriate.

*d.* Stay abreast of developments in leadership and management theory and practice in other services and civilian organizations.

*e.* Organize and participates in Army leadership, leadership research, and leader development conferences.

*f.* Provide results or an executive summary of all leader, leadership, and leader development studies to the CAL.

## 2–7. Deputy Chief of Staff, G–3/5/7

The DCS, G–3/5/7 is the ARSTAF proponent for training and leader development. The G–3/5/7 leader development mission is to develop, coordinate, and program combined arms training and leader development strategies-based policy, programs, and initiatives that will achieve Chief of Staff, Army-directed levels of individual, leader, and unit training readiness required for the Army to meet national military strategy needs. The DCS, G–3/5/7 will—

*a.* Exercise general staff responsibility for all policies and matters relating to individual and unit training.

*b.* Exercise direct responsibility for leader development policy for the Army, to include DA Pam 350–58.

*c.* Coordinate leader development actions with appropriate ARSTAF agencies and major Army commanders.

*d.* Work closely with the DCS, G–1, and the Center for Army Leadership to ensure G–1 leadership policy, doctrine, and programs and G–3/5/7 leader development policy, doctrine, and programs are consistent and complementary.

*e.* Conduct and participate in Army leader development, leadership, and leadership research conferences, to include hosting semi-annual Training and Leader Development Councils of Colonels and General Officer Steering Committee meetings, as well as annual Chief of Staff, Army, Training and Leader Development Council meetings.

*f.* Manage and provide oversight on all current and future Army Training and Leader Development recommended actions.

## 2–8. Commanding General, U.S. Army Training and Doctrine Command

The Commanding General, U.S. Army Training and Doctrine Command (CG, TRADOC) will—

*a.* Develop Army leadership and leader development operational concepts, doctrine, and programs in coordination with HQDA and based upon Army leadership theory and policies.

*b.* Integrate Army leadership and leader development doctrine in all training programs in service schools and training centers for commissioned and warrant officers, NCOs, and Army civilians at progressive and sequential phases of career development.

*c.* Serve as proponent for FM 6–22.

*d.* Manage all leadership and leader development education and training programs of instruction, to include development and implementation of leadership assessment policy, in TRADOC service schools and training centers.

*e.* Monitor the development and implementation of Developmental Leadership Assessment training products, materials, and tools for officer, warrant officer, NCO, and Army civilian leadership training programs.

*f.* Conduct and participates in leadership, leadership research, and leader development conferences.

*g.* Monitor the integration of leader development requirements into the Cadre Training Course (CTC), Home Station, and Institutional Training Master Plans.

*h.* Monitor the integration of lessons learned into all leader development courses.

*i.* Monitor the development and maintenance of specific proponent career maps under the TRADOC area of responsibility.

## 2–9. Commanding General, U.S. Army Accessions Command/Deputy Commanding General, Initial Military Training

The Commanding General, U.S. Army Accessions Command (USAAC)/Deputy Commanding General, Initial Military Training (DCG–IMT) (under TRADOC) will—

*a.* Provide integrated command and control of the recruiting and initial military training for the Army's officer, warrant officer, and enlisted forces to meet the Army's manpower and readiness requirements and standards.

*b.* Conduct Basic Officer Leader Course pre-commissioning leadership instruction for the U.S. Military Academy (USMA), Reserve Officer Training Corps (ROTC), Officer Candidate School (OCS), and Warrant Officer Candidate School (WOCS).

*c.* Conduct leadership instruction for Junior ROTC and the National Defense Cadet Corps.

*d.* Establish and provide IMT policy and execution guidance to TRADOC commanders and staff outside the IMT chain of command. Embeds the Army culture and leadership in all facets of IMT.

*e.* Establish, and is the approving authority for, the Basic Officer Leader Courses (BOLC) I, II, and III common core task lists, in coordination with the USMA.

*f.* Establish accreditation policy and provide guidance and quality assurance for the execution of all officer and enlisted IMT programs in TRADOC schools (BOLC I, II, and III; and IET); and IMT assessment/assistance visits policy and guidance for all officer and enlisted IMT installations.

*g.* Conduct and participate in leadership, leadership research, and leader development conferences.

*h.* Provide results or an executive summary of all leader, leadership, and leader development studies to the CAL.

## 2–10. Commanding General, Combined Arms Support Command

The Commanding General, Combined Arms Support Command, (CG CASCOM) (under TRADOC) will—

*a.* Conduct leadership training.

*b.* Conduct and participate in leadership, leadership research, and leader development conferences.

*c.* Provide results or an executive summary of all leader, leadership, and leader development studies to the CAL.

## 2–11. Commanding General, Combined Arms Center/Commandant, U.S. Army Command and General Staff College

The Commanding General, Combined Arms Center (CG, CAC)/Commandant, U.S. Army Command and General Staff College (ACGSC) (under TRADOC) will—

*a.* Serve as the TRADOC proponent for Leader Development and Education, Professional Military Education (officer, warrant officer, NCO, and civilian) and Army doctrine.

*b.* Provide guidance and support for leadership, leader development, and leadership research conferences.

*c.* Conduct instruction in leadership and ethics for the Intermediate Level Education (ILE), Pre-Command Course, Division Commander/Assistant Division Commander Course, and other courses as directed.

*d.* Coordinate closely with service schools, training centers, the U.S. Army War College (USAWC), Army Management Staff College, U.S. Army Reserve schools, Army National Guard state military academies, and pre-commissioning schools (USMA, ROTC, OCS, and WOCS) to achieve an integrated, progressive, and sequential leadership and ethics instruction program.

*e.* Assist in the integration of approved leadership and leader development doctrine into Army-wide programs of instruction.

*f.* Establish and maintain close coordination with service schools, the research community, the civilian academic community, other services, and services of other countries to monitor and evaluate research and studies in ethics and cohesion.

*g.* Develop and provide training support materials on leadership, leader development, leadership assessment, and ethics to all Army service schools, TRADOC training centers, and other Army organizations.

*h.* Develop and conduct leadership training for Army civilians at the foundation, basic, intermediate, and advanced levels, as directed by TRADOC.

*i.* Monitor the civilian sector for appropriate leadership training services, in coordination with the DCS, G–1, and DCS, G–3/5/7. Evaluates potential training packages and incorporates them into leadership curricula, as appropriate.

*j.* Develop programs in accordance with established Army standards that will enhance the communication skills (reading, writing, and listening) of leaders Army-wide. This is done in coordination with the Office of the Chief of Public Affairs, TRADOC Commander, and HRC Commander.

*k.* Participate in leadership, leader development, and leadership research conferences.

*l.* Serve as proponent for the Battle Command Knowledge System (BCKS).

*m.* Manage the BCKS Leader Network Integration Cell. This is a series of connected online professional forums that create a network/platform for professional interactions across the Army. These forums consist of communities of peers who are linked through online collaboration systems and are dedicated to advancing their profession through knowledge sharing and shared learning. The BCKS Leader Network facilitates peer discussions and professional dialogue by commanders, leaders, staffs, and NCOs to enable leader development and knowledge generation based on the experiences of other professionals.

*n.* Provide results or an executive summary of all leader, leadership, and leader development studies to the CAL.

## 2–12. Director, Center for Army Leadership

The Center for Army Leadership (under CAC/TRADOC) is the CAC lead for leadership and leader development research, analysis, assessment and evaluation; leadership doctrine; coordination, development and management of initiatives within the Army Training and Leader Development Management Process; and the integration and synchronization of Professional Military Education (PME) and Civilian Education System (CES) to sustain excellence in growing Army leaders. The Director, CAL will—

*a.* Directly support the Commanding General, Combined Arms Center (CG, CAC) in accomplishing all tasks required in paragraph 2–11 above.

*b.* Work closely with DCS, G–3/5/7 (DAMO–TRL) and DCS, G–1 (DAPE–HRI) to ensure leadership and leader development policies, programs, and initiatives are synchronized with current doctrine, concepts, and theories.

*c.* Facilitate the coordination and integration of research, concepts and doctrine development, training, and evaluation in all areas of leadership, in coordination with DCS, G–1 and DCS, G–3/5/7.

*d.* Serve as the Army lead for FM 6–22.

*e.* Establish and maintain close coordination with service schools, the research community, the civilian academic community, other services, and services of other countries to monitor and evaluate research and studies in leadership, leader development, and leadership assessment.

*f.* Review and evaluate leadership education and training curricula in TRADOC service schools and training centers. Provide assistance to service schools not under TRADOC in the review and evaluation of leadership curricula. Provide recommendations on requirements for Army leadership instructor education.

*g.* Evaluate, design, and develop leader development programs and concepts. Conduct research and analysis to identify and assess leadership and leader development trends, requirements, strategies, technologies, and techniques. Develops, maintains, and promulgates leadership doctrine.

*h.* Design, field, and monitor leadership assessment programs and/or tools that contribute to Army leader development in institutional training, operational assignments, and self-development. Maintain liaison and coordinate with Army agencies that use assessment techniques, to include Cadet Command, USMA, and USAWC.

## 2–13. Commandant, U.S. Army War College

The Commandant, U.S. Army War College (USAWC) (under TRADOC) will—

*a.* Conduct instruction in command, leadership, and management for all USAWC resident and nonresident students. Coordinate with the CAC/ACGSC to ensure this instruction is integrated with, and linked progressively and sequentially to leadership instruction in TRADOC schools.

*b.* Be responsible for strategic leader development of the Army's senior leaders.

*c.* Establish and maintain liaison with DCS, G–1, DCS, G–3/5/7, CAL, ARI, and other agencies as needed to ensure coordination of leadership research and instructional activities at USAWC with TRADOC leader development programs, leadership instruction in TRADOC schools, development of Army leadership doctrine, and the overall leadership research program.

*d.* Provide research consultation and other assistance on request.

*e.* Participate actively in Army leadership, leadership research, and leader development conferences.

*f.* Provide results or an executive summary of all leader, leadership, and leader development studies to the CAL.

## 2–14. Superintendent, United States Military Academy

The Superintendent, United States Military Academy (USMA) will—

   *a.* Conduct Basic Officer Leadership Course pre-commissioning leader development and leadership instruction for the U.S. Corps of Cadets.

   *b.* Establish and maintain liaison with DCS, G–1, DCS, G–3/5/7, TRADOC, CAL, ARI, and other agencies as needed to ensure coordination of leadership instructional activities at USMA with other pre-commissioning programs, and with TRADOC leadership instruction.

   *c.* Provide consultation, research, and other assistance in support of other Army leadership agencies, consistent with available resources and the Academy mission.

   *d.* Participate actively in Army leadership, leader development, and leadership research conferences, and assist CAL in the development of Army leadership doctrine and training support materials, consistent with available resources and the Academy mission.

   *e.* Advise CG, TRADOC, on leader development theory, concept, and changing perceptions of the leader development field.

   *f.* Provide results or an executive summary of all leader, leadership, and leader development studies to the CAL.

## 2–15. Chief of Military History

The Chief of Military History will—

   *a.* Produce historical publications on topics relating to leadership.

   *b.* Conduct historical research, prepare bibliographies, and develop and present narratives and other accounts of leadership and leader development topics.

   *c.* Develop and assist Army museums in developing historical exhibits on leadership topics.

## 2–16. The Inspector General

The Inspector General (TIG) will—

   *a.* Extend the eyes, ears, voice, and conscience of the Commander.

   *b.* Assess or investigate alleged violations of the Army's professional ethic.

   *c.* Assist the commander in teaching and training leaders on the fundamental tenets of the Army ethic.

   *d.* Provide a continuing assessment of the command, operational, managerial, logistical, and administrative effectiveness of the Army.

## 2–17. The Judge Advocate General

The Judge Advocate General (TJAG) will—

   *a.* As the primary staff assistant to the Army Chief of Staff, perform assigned responsibilities for the Department of Defense Ethics Program.

   *b.* Maintain the Standards of Conduct Office to manage two critical elements of the ethics program: compliance with requirements, and support to field commands and ethics counselors.

   *c.* Integrate leadership training in courses of instruction at TJAG Legal Center and School.

## 2–18. Chief of Chaplains

The Chief of Chaplains will—

   *a.* Provide advice and assistance to Army leaders so they are equipped to fulfill their moral leadership responsibilities for the Army.

   *b.* Address the religious, moral, social, and ethical dimensions of Soldier and civilian actions in war and during peace through the Commander's Moral Leadership Training Program.

## 2–19. The Surgeon General/Commanding General, U.S. Army Medical Command

The Surgeon General/Commanding General, U.S. Army Medical Command (USAMEDCOM) will—

   *a.* Serve as the proponent for Army Medical Department officer professional development and career management.

   *b.* Integrate Army leadership doctrine in all education and training programs of instruction at the U.S. Army Medical Department Center and School.

   *c.* Develop and manage a developmental leadership assessment program at the U.S. Army Medical Department Center and School.

   *d.* Participate in Army leadership, leader development, and leadership research conferences, as appropriate.

   *e.* Coordinate with ARI on the leadership and cohesion aspects of medical research, particularly the prevention and treatment of combat stress and psychiatric casualties. Provide results or an executive summary of all leader, leadership, and leader development studies to the CAL.

   *f.* Provide research support to the DCS, G–1, upon request.

## 2–20. Chief, National Guard Bureau

The Chief, National Guard Bureau (CNGB) will—

*a.* In conjunction with DCS, G–1, DCS, G–3/5/7, TRADOC, FORSCOM, and Office of the Chief, Army Reserve, recommend, establish, and promulgate Army policies for leadership training and education, and leader development for the Army National Guard, Active Guard, and military technician Soldiers.

*b.* Conduct Soldier training and education and leader development in the Officer Education System (OES), Warrant Officer Education System (WOES), Noncommissioned Officer Education System (NCOES), and other training programs in TRADOC-accredited The Army School System (TASS) schoolhouses.

## 2–21. State Adjutants General

State Adjutants General (Commanders, State Area Commands, Army National Guard (ARNG)) will—

*a.* Conduct leadership training and education in OCS, NCOES and other training programs in state military academies for military personnel.

*b.* Conduct leader development in OCS, NCOES and other training programs in state military academies for military personnel.

## 2–22. Chief, Army Reserve

The Chief, Army Reserve (CAR) will—

*a.* In conjunction with DCS, G–1, DCS, G–3/5/7, TRADOC, FORSCOM, and NGB, recommend, establish, and promulgate Army policies for leadership training, education, and leader development for Individual Mobilization Augmentees, Active Reserve, and Individual Ready Reserve Soldiers.

*b.* Conduct leadership training and education, and leader development in OES, NCOES, and other training programs in TASS.

## 2–23. Commanders

Commanders will—

*a.* Ensure unit level leadership training is conducted for assigned Active and Reserve Component forces and Army civilians, in accordance with AR 350–1.

*b.* Supervise in-unit leadership training of Individual Ready Reserve and Individual Mobilization Augmentee personnel assigned or attached to Active or Reserve Component units.

*c.* Participate in leadership, leadership research, and leader development conferences, as appropriate.

*d.* Provide recommendations and feedback concerning leadership and leader development issues and programs to DCS, G–1, DCS, G–3/5/7, or U.S. Army Command and General Staff College, as appropriate.

*e.* Ensure compliance at all levels of leadership in accordance with paragraph 2–1 above.

## Appendix A
## References

**Section I**
**Required Publications**

**AR 350–1**
Army Training and Leader Development. (Cited in para 2–23*a*.)

**DA Pam 350–58**
Leader Development for Americas Army. (Cited in paras 1–8*a*, 2–7*b*.)

**FM 6–22**
Army Leadership - Competent, Confident, and Agile. (Cited in paras 1–7, 2–8*c*, 2–12*d*.)

**Section II**
**Related Publications**
A related publication is a source of additional information. The user does not have to read it to understand this publication.

**AR 10–7**
Organization and Functions: United States Army Research Institute for the Behavioral and Social Sciences

**AR 10–87**
Army Commands, Army Service Component Commands, and Direct Reporting Units (in final staffing)

**AR 600–20**
Army Command Policy

**AR 600–83**
The New Manning System - COHORT Unit Replacement System

**AR 600–89**
General Douglas MacArthur Leadership Award Program

**AR 690–400**
Total Army Performance Evaluation System

**AR 690–950**
Career Management

**DA Pam 600–3**
Commissioned Officer Professional Development and Career Management

**DA Pam 600–4**
AMEDD Officer Development and Career Management

**DA Pam 600–25**
US Army Noncommissioned Officer Professional Development Guide

**FM 1**
The Army

**FM 3**
Operations

**FM 7–0**
Training the Force

**FM 7–1**
Battle Focused Training

**NGR 10–2**
Organizations and Functions: State Area Command, Army National Guard. (Available at http://www.ngbpdc.ngb.army.mil.)

### Section III
### Prescribed Forms
No entries in this section.

### Section IV
### Referenced Forms
No entries in this section.

## Glossary

**Section I**
**Abbreviations**

**ACGSC**
Army Command and General Staff College

**AR**
Army Regulation

**ARFORGEN**
Army Force Generation

**ARI**
Army Research Institute for the Behavioral and Social Sciences

**ARNG**
Army National Guard

**ARSTAF**
Army Staff

**BCKS**
Battle Command Knowledge System (BCKS)

**BOLC**
Basic Officer Leadership Course

**CAC**
Combined Arms Command

**CAL**
Center for Army Leadership

**CAR**
Chief, Army Reserve

**CASCOM**
Combined Arms Support Command

**CES**
Civilian Education System

**CG**
Commanding General

**CNGB**
Chief, National Guard Bureau

**COC**
Council of Colonels

**COE**
Contemporary Operating Environment

**CTC**
Cadre Training Course

**DCG**
Deputy Commanding General

**DCS, G–1**
Deputy Chief of Staff, G–1

**DCS, G–3/5/7**
Deputy Chief of Staff, G–3/5/7

**DOD**
Department of Defense

**ECQ**
Executive Core Qualifications

**ESP**
Executive and Senior Professional

**FM**
Field Manual

**HQDA**
Headquarters Department of the Army

**HRC**
Human Resources Command

**IET**
Initial Entry Training

**ILE**
Intermediate Level Education

**IMT**
Initial Military Training

**MSAF**
Multi-Source Assessment and Feedback

**NCOES**
Noncommissioned Officer Education System

**NGB**
National Guard Bureau

**OAA**
Office of the Administrative Assistant

**OCS**
Officer Candidate School

**OES**
Officer Education System

**PAM**
Pamphlet

**PME**
Professional Military Education

**PPBE/S**
Planning, Programming, Budgeting, and Execution/System

A326                                 AR 600–100 • 8 March 2007                                 15

**ROTC**
Reserve Officer Training Corps

**TASS**
The Army School System

**TDA**
Table of Distribution Allowances

**TIG**
The Inspector General

**TJAG**
The Judge Advocate General

**TRADOC**
Training and Doctrine Command

**U.S.**
United States

**USAAC**
U.S. Army Accessions Command

**USAMEDCOM**
U.S. Army Medical Command

**USAWC**
United States Army War College

**USMA**
United States Military Academy

**WOCS**
Warrant Officer Candidate School

**WOES**
Warrant Officer Education System

**Section II**
**Terms**

**Army Values**
Army Values are the baseline, core, and foundation of every Soldier. They define all Soldiers: who they are, what they do, and what they stand for. They drive Soldiers internally (their beliefs) and externally (their actions), at home and work, in peace and war.

*a. Loyalty.* Bear true faith and allegiance to the U.S. Constitution, the Army, your unit, and other Soldiers. This means supporting the military and civilian chain of command, as well as devoting oneself to the welfare of others.

*b. Duty* . Fulfill your obligations. Duty is the legal and moral obligation to do what should be done without being told.

*c. Respect.* Treat people as they should be treated. This is the same as do unto others as you would have done unto you.

*d. Selfless service.* Put the welfare of the Nation, the Army, and subordinates before your own. This means putting the welfare of the Nation and accomplishment of the mission ahead of personal desires.

*e. Honor.* Live up to all the Army Values. This implies always following your moral compass in any circumstance.

*f. Integrity.* Do what's right legally and morally. This is the thread woven through the fabric of the professional Army ethic. It means honesty, uprightness, the avoidance of deception, and steadfast adherence to standards of behavior.

*g. Personal Courage.* Face fear, danger, or adversity (physical or moral). This means being brave under all circumstances (physical or moral).

**Battle Command Knowledge System**

A virtual collaborative network that hosts structured forums for officers and NCOs. The BCKS is a fully integrated, interoperable network-centric capability that supports training, leader development, battle command and doctrine. BCKS is broken into five sub-portals that serve as key self-development sources where leaders can connect with peers to discuss relevant issues, develop solutions, and provide useful tools to others.

**Civilian Creed**

The Civilian Creed refers to the professional attitudes and beliefs that characterize the Department of Army Civilian (DAC). At its core, the Civilian Creed requires unrelenting and consistent determination to do what is right and to do it with pride, both in war and peace. No matter the conditions, it is the DA civilians selfless commitment to the Nation, the Army, and fellow civilians and Soldiers that keeps them going. It is the professional attitude that inspires every Department of Army Civilian. (See figure 1–4.)

**Climate**

The state of morale and level of satisfaction of members of an organization.

**Command**

Command is the authority that a commander in the military service lawfully exercises over subordinates by virtue of rank or assignment. Command includes the leadership, authority, responsibility, and accountability for effectively using available resources and planning the employment of, organizing, directing, coordinating, and controlling military forces to accomplish assigned missions. It includes responsibility for unit readiness, health, welfare, morale, and discipline of assigned personnel. Title 10, Section 3583, requires exemplary conduct by all commanding officers and others in authority in the Army. All commanders are required to—

  *a.* Present themselves as examples of virtue, honor, patriotism, and subordination;

  *b.* Be vigilant in inspecting the conduct of all persons who are placed under their command;

  *c.* Guard against and suppress all dissolute and immoral practices and to correct, according to the laws and regulations of the Army, all persons who are guilty of them; and

  *d.* Take all necessary and proper measures under the laws, regulations, and customs of the Army to promote and safeguard the morale, physical wellbeing, and the general welfare of officers and enlisted personnel under their command or charge.

**Culture**

The set of long-held values, beliefs, expectations, and practices shared by a group that signifies what is important and influences how an organization operates.

**Developmental Leadership Assessment Training**

Training Support Packages that teach leaders to identify and analyze subordinate leader behaviors and how to provide feedback and developmental counseling.

**Doctrine**

Fundamental principles by which military forces or elements thereof guide their actions. Doctrine evolves from theory and concepts based on values, beliefs, historical perspective, experience, and research.

**Leader Development**

Leader development is the deliberate, continuous, sequential, and progressive process, grounded in Army values, that grows Soldiers and civilians into competent and confident leaders capable of decisive action. Leader development is achieved through lifelong synthesis of the knowledge, skills, and experiences gained through institutional training and education, organizational training, operational experience, and self-development.

**Leadership Assessment**

A structured process that focuses on developing leaders by using multiple observations and frequent feedback sessions. Assessment provides information about a leader's readiness or potential to lead effectively in a particular position or level within the Army.

**Leadership**

The process of influencing people by providing purpose, direction, and motivation, while operating to accomplish the mission and improve the organization.

**Mentorship**
A voluntary and developmental relationship that exists between a person with greater experience and a person with less experience, and which is characterized by mutual trust and respect.

**Pentathlete**
Pentathletes are multi-skilled, innovative, adaptive, and situationally aware professionals who demonstrate character in everything that they do, are experts in the profession of arms, personify the warrior ethos in all aspects from war fighting to statesmanship to enterprise management, and boldly confront uncertainty and solve complex problems.
  *a.* A Pentathlete—
  (1) Is a strategic and creative thinker.
  (2) Builds leaders and teams.
  (3) Is a competent full-spectrum warfighter or accomplished professional who supports the Soldier.
  (4) Is effective in managing, leading changing large organizations.
  (5) Is skilled in governance, statesmanship, and diplomacy.
  (6) Understands cultural context and works effectively across it.
  *b.* Pentathlete attributes are—
  (1) To set the standard for integrity character.
  (2) To be a confident and competent decision-maker in uncertain situations:
  *(a)* Prudent risk taker.
  *(b)* Innovative.
  *(c)* Adaptive.
  (3) Empathetic and always positive.
  (4) Professionally educated and dedicated to lifelong learning.
  (5) Effective communicator.

**Policy**
A written communication that initiates or governs action, conduct, or procedures, giving a definite course or method of action, or that determines present and future decisions. Policy implements, interprets, or prescribes public law and executive orders and explains the execution of actions, or directives from a higher level; it delegates authority and assigns responsibility; and it dictates an action to be carried out, a procedure to be followed, a form to be used, or a report to be submitted.

**Self-development**
A planned, continuous, lifelong process individual leaders use to enhance their competencies and potential for progressively more complex and higher-level assignments (see DA PAM 350–58).

**Soldiers Creed**
The Soldier's Creed captures the spirit of being a Soldier and the dedication Soldiers feel to something greater than themselves. It outlines the fundamental obligations of Soldiers to their fellow Soldiers, their unit, and the Army and extends beyond service as a Soldier to include commitment to family and society (see figure 1–3).

**Warrior Ethos**
The Warrior Ethos is embedded in the Soldier's Creed and is the very essence of what it means to be a Soldier. The Warrior Ethos describes the frame of mind of the professional Soldier and proclaims a Soldiers selfless commitment to the Nation, mission, unit, and fellow Soldiers. When internalized, it produces the will to win. (See figure 1–2.)

**Section III**
**Special Abbreviations and Terms**
There are no entries in this section.

**UNCLASSIFIED**

PIN 059983–000