IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **IKNOOR SINGH**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **No. 1:14-cv-01906-ABJ** |
| | ) | |
| **JOHN MCHUGH**, in his official capacity as | ) | |
| Secretary of the United States Army, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |

## PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Plaintiff hereby moves for summary judgment on the ground that the undisputed material facts entitle him to judgment as a matter of law, as further explained in the accompanying memorandum of law, statement of undisputed material facts, declarations, depositions, and other evidence submitted herewith.

Respectfully submitted,

/s/ Heather L. Weaver
Heather L. Weaver (D.C. Bar No. 495582)
Daniel Mach (D.C. Bar No. 461652)
American Civil Liberties Union Foundation
915 15th Street, NW, Suite 600
Washington, DC 20005
Tel. (202) 675-2330
Fax. (202) 546-0738
*hweaver@aclu.org*
*dmach@aclu.org*

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union of the Nation's Capital
4301 Connecticut Avenue, NW, Suite 434
Washington, DC 20008
Tel. (202) 457-0800
Fax. (202) 457-0805
*artspitzer@aclu-nca.org*

March 21, 2015

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **IKNOOR SINGH**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **No.  1:14-cv-01906-ABJ** |
| | ) | |
| **JOHN MCHUGH**, in his official capacity as | ) | |
| Secretary of the United States Army, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## PLAINTIFF'S MEMORANDUM OPPOSING DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT AND SUPPORTING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

The U.S. Army grants exceptions to its grooming and uniform regulations on a widespread basis; since 2007, officials have granted more than 300,000 grooming and uniform waivers to soldiers across the Army. For example, the Army authorizes "shaving profiles" permitting soldiers with certain skin conditions or other medical needs to deviate from facial hair regulations by growing beards. Plaintiff's Statement of Undisputed Facts ("SOUF") ¶¶ 39-54. Since 2007, a *minimum* of 46,690 *permanent* shaving profiles and 57,616 temporary shaving profiles have been authorized by the Army; the actual numbers are likely much higher because the Army does not track shaving profiles in any systematic way. *Id.* ¶¶ 48-49.

Medical needs are not the only reasons the Army has permitted soldiers to grow beards: Special Forces and other special operations teams are not always held to the Army's clean-shaven rule, *id.* ¶¶ 55-56; and the Army has authorized grooming accommodations over the years for adherents of the Sikh, Jewish, and Muslim faiths whose religious tenets prohibit them from shaving, *id.* ¶¶ 79-159.

The Army likewise grants numerous exemptions from its grooming standards regarding tattoos. Since the Army published new tattoo standards in March 2014, nearly 200,000 soldiers with non-conforming tattoos, including "full sleeve" tattoos, hand tattoos, and neck tattoos, have been grandfathered. *Id*. ¶¶ 59-61.   And the Army has approved numerous tattoo waivers under the revised regulations:  In the last year alone, the Army granted grooming exceptions to new soldiers for non-conforming tattoos that express, among other individual beliefs and characteristics, their faith, cultural heritage, and even their love of movies (e.g., The Nightmare Before Christmas, Star Wars, and American Psycho), cartoon characters (e.g., Mickey Mouse), bands (e.g, the Misfits, Five Finger Death Punch, and Type O-Negative), motor vehicles, and

holidays like Christmas and Halloween (represented by a candy corn chasing a Christmas tree monster).  *Id.* ¶¶ 63-68.

Soldiers are also granted waivers from uniform rules for medical reasons, and local commanders may permit soldiers to deviate from uniform standards for a variety of purposes. *Id.* ¶¶ 70-71. The Army, furthermore, allows Jewish soldiers to wear yarmulkes and has granted exceptions to several Sikh soldiers to wear turbans and unshorn hair.  *Id.* ¶¶ 77-79.

These Sikhs, who were granted the very same religious accommodation that Plaintiff requests in this case, have included both enlisted soldiers and commissioned officers; and the evidence overwhelmingly shows that their religious accommodations did not compromise military readiness, unit cohesion, morale, good order, discipline, health, or safety. *See id*. ¶¶ 80-149.  Quite the opposite:  These Sikh soldiers have been celebrated and recognized by their superiors and commanding officers, and the Army at large, for their stellar performance, including their strong leadership skills, professionalism, and dedication to the Army's mission. *See id.* ¶¶ 106, 113, 116, 127, 132, 142, 148. In light of this multiplicity of grooming and uniform waivers and exceptions, and various other Army exemptions, *see id.* ¶¶ 39-163, Defendants cannot meet their burden under RFRA of demonstrating that denial of Plaintiff's religious accommodation is necessary to further compelling governmental interests in "individual and unit readiness, unit cohesion and morale, good order, discipline, health and safety."  *See* ECF Doc. 21-3, BS 000001-000007.  The Army cannot, for example, credibly claim, on one hand, that permitting Mr. Singh to "express [his] identity" by wearing his turban, unshorn hair, and beard, *id.* at 000002, would undermine unit cohesion, discipline, and readiness while, on the other hand, allowing exceptions for yarmulkes, SOUF ¶ 77, and tattoos that are

visible on the neck and hands, exceed size limits, and express individual preferences and beliefs in almost every way imaginable, *see id.* ¶¶ 57-68.

Nor can the Army reasonably argue that Plaintiff's beard would undermine cohesion, discipline, and readiness and be unsafe while, at the same time, permanently exempting since 2007 more than forty-six thousand soldiers from the clean-shaven rule for medical or mission-related reasons and allowing them to deploy abroad with their authorized facial hair. The Sikhs who have served with religious accommodations have demonstrated that the Sikh articles of faith pose no threat to unit cohesion, morale, discipline, good order, and readiness.  And, notwithstanding the Army's contrary claims, these Sikh soldiers and officers have been able to obtain the necessary seals on their protective facemasks and complete all training exercises and tests with their beards and specially adapted turbans, *id.* ¶ 80-149*, and have even served in deployed environments with their fellow soldiers. See, e.g.*, *id.* ¶¶ 109, 129.

Defendants also cannot plausibly maintain that granting Mr. Singh an exception from applicable grooming and uniform rules would render him unable to lead and motivate soldiers as an officer while continuing to make tattoo waivers, shaving profiles, and yarmulke exceptions available to officers and ROTC cadets.  Indeed, Defendants have admitted that "soldiers or cadets who have obtained a waiver or exemption from Army regulations have become officers and have successfully led other soldiers." *Id.* ¶ 66. The experiences of the previously accommodated Sikhs – who, as commissioned and non-commissioned officers in both the Basic and Special Branches, have commanded and otherwise led numerous soldiers – bears out the Army's admission.

In their letter denying Mr. Singh's accommodation, and in their Motion to Dismiss or for Summary Judgment, Defendants make all of these claims, but they offer virtually no evidence to

support their conclusions other than their own say-so. The Supreme Court has made clear that RFRA does not permit "unquestioning deference" to such unsupported and conclusory determinations, especially when the government permits non-religious conduct or practices that have similar effects on the very same interests the government cites in denying an accommodation. *See Holt v. Hobbs*, 135 S. Ct. 853 (2014) (holding that prison rule prohibiting religious beards on ground that weapons could be hidden therein failed scrutiny under RFRA when prison allowed inmates to grow long hair in which contraband could just as easily be hidden); *Church of the Lukumi Babalu Aye, Inc. v. City Of Hialeah*, 508 U.S. 520, (1993) (striking down ordinances that prohibited religious animal sacrifice but permitted the killing of animals for various secular purposes); *cf. Fraternal Order of Police v. City of Newark,* 170 F.3d 359 (1999) (striking down police rule that prohibited religious beards but allowed beards for medical reasons) (Alito, J.).

Even if Defendants could show that denying Mr. Singh's religious accommodation furthers a compelling governmental interest, they have not shown that their denial meets their burden under RFRA's "'exceptionally demanding'" requirement that their actions use the least restrictive means. *Holt*, 135 S. Ct. at 864 (quoting *Burwell v. Hobby Lobby*, 134 S. Ct. 2751, 2780 (2014)).  Less restrictive means abound: Most obviously, Defendants can grant Mr. Singh the same religious accommodations that have been afforded other Sikhs. And, in the very unlikely event that Mr. Singh's articles of faith do somehow interfere with his performance or cause the potential harms that Defendants prognosticate – contrary to the experience of other Sikhs who have served – Defendants can simply deny him a commission and disenroll him from ROTC.

This case is appropriate for adjudication on the merits; and the undisputed facts weigh overwhelmingly in favor of Plaintiff.  Accordingly, Plaintiff respectfully requests that this Court deny Defendants' Motion to Dismiss or for Summary Judgment and grant Plaintiff's Cross-Motion for Summary Judgment.

**FACTS**

Plaintiff respectfully refers the Court to his Statement of Undisputed Facts and accompanying exhibits, filed herewith.

**ARGUMENT**

## I.   DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED.

Defendants' Motion to Dismiss under Fed. R. Civ. P. 12(b)(1) should be denied.  "Taking the [Plaintiff's] allegations as true and drawing all reasonable inferences in [his] favor, as [courts] must at this stage," *Council for Urological Interests v. Sebelius*, 668 F.3d 704, 713 (D.C. Cir. 2011), Plaintiff has adequately established that this case is justiciable and that the Court may properly assert subject-matter jurisdiction over his RFRA claim.

Defendants' Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) should also be denied. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court assumes the truth of all well-pleaded factual allegations in the complaint and construes reasonable inferences from those allegations in the plaintiff's favor.  *See, e.g., Sissel v. HHS*, 760 F.3d 1, 5 (D.C. Cir. 2014); *Doe v. Rumsfeld,* 683 F.3d 390, 391 (D.C. Cir. 2012).

As set forth below, Plaintiff has properly alleged facts that plausibly show that his religious beliefs are sincere and that Defendants' refusal to accommodate them substantially

burdens his religious exercise in a manner that is not necessary to serve a compelling government interest.

### A.    <u>This Case Is Justiciable.</u>

Despite arguing that this case is non-justiciable, Defendants recognize that "'courts have evinced increased willingness to review military actions alleged to contravene express constitutional, statutory, or regulatory requirements.'"  Defs. Mot. at 22 (quoting *Blevins v. Orr*, 721 F.2d 1419, 1421-22 (D.C. Cir. 1983)).  Indeed, this Court has repeatedly ruled on service members' claims alleging wrongful discharge or other violations on various grounds.

The D.C. Circuit has rejected Defendants' argument that claims related to military enrollment and personnel decisions are non-justiciable.  In *Dilley v. Alexander*, 603 F.2d 914, 920 (D.C. Cir. 1979), for example, the Court of Appeals reinstated two Army Reserve officers who were involuntary released from active duty after being passed over for promotions. Ordering the Army to reconsider the promotions, the Court held that the decisions violated both federal law and the Army's own regulations, which required promotion boards to include an "appropriate number" of Reserve officers.  *Id.* at 916, 920.  Although the Court remained "fully mindful of the restricted role of the judiciary with respect to the internal affairs of the military departments," *id.* at 919, it rejected the Army's argument that the matter was not justiciable, explaining:

> Courts have shown no hesitation to review cases in which a violation of the Constitution, statutes, or regulations is alleged. It is a basic tenet of our legal system that a government agency is not at liberty to ignore its own laws and that agency action in contravention of applicable statutes and regulations is unlawful. The military departments enjoy no immunity from this proscription. It is the duty of the federal courts to inquire whether an action of a military agency conforms to the law, or is instead arbitrary, capricious, or contrary to the statutes and regulations governing that agency.

*Id.* at 920 (internal citations omitted); *see also Emory v. Secretary of Navy*, 819 F.2d 291, 294, 260 (D.C. Cir. 1987) ("[C]onstitutional questions that arise out of military decisions regarding the composition of the armed forces are not committed to the other coordinate branches of government. Where it is alleged, as it is here, that the armed forces have trenched upon constitutionally guaranteed rights through the promotion and selection process, the courts are not powerless to act. The military has not been exempted from constitutional provisions that protect the rights of individuals. It is precisely the role of the courts to determine whether those rights have been violated."); *Matlovich v. Secretary of the Air Force*, 591 F.2d 852, 859, 192 (D.C. Cir. 1978) ("It is established, of course, that the federal courts have the power and the duty to inquire whether a military discharge was properly issued under the Constitution, statutes, and regulations.").

This Court has applied these principles many times. In *Larsen v. U.S. Navy*, 486 F. Supp. 2d 11, 18-19 (D.D.C. 2007), three ministers alleged that the Navy's quotas on liturgical and non-liturgical chaplains were unconstitutional and caused them to be denied commissions in the Navy Chaplain Corps.  The Court "reject[ed] the Navy's contention that its personnel decisions are immune from judicial scrutiny where constitutional wrongs are alleged." *Id; see also Lilly v. Schwartz*, 713 F. Supp. 2d 15, 17-18 (D.D.C. 2010) (holding that "judicial review of [military] personnel decisions is appropriate when a plaintiff alleges a constitutional violation or a violation of applicable statutes or regulations"); *McVeigh v. Cohen*, 996 F. Supp. 59, 60-61 (D.D.C. 1998) ("Where the military has violated a constitutional right, or as in this case, a federal statute, or its own regulations, the military is clearly subject to judicial review."); *cf. Chappell v. Wallace*, 462 U.S. 296, 304 (1983) (stating that "this Court has never held, nor do we now hold, that personnel

are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service").

Here, Mr. Singh alleges that the Army's policy requiring him to shave off his beard, cut his hair, and abandon his turban in order to enroll and participate in ROTC violates RFRA – a federal statute enacted to protect core religious exercise rights from infringement by "*all* Federal law, and *the implementation of that law, whether statutory or otherwise*."  42 U.S.C. § 2000bb–3(a) (emphasis added).  He also alleges that this policy violates the DoD's and the Army's own religious accommodation regulations, which expressly incorporate RFRA's legal standard.  The Army cannot simply evade judicial scrutiny of acts alleged to contravene these protections.  *See, e.g.*, *Larsen v. U.S. Navy*, 346 F. Supp. 2d 122, 128 (D.D.C. 2004) ("[T]he court reads the plaintiffs' complaint to request an opportunity to be considered for commission in the Corps without an intentionally illegal set of hiring criteria. The court has authority to adjudicate this claim and therefore denies the defendants' motion to dismiss for lack of subject-matter jurisdiction on this point.").

The cases cited by Defendants do not alter this conclusion.  *See* Defs. Mot. at 20.  The opinions in *Khalsa v. Weingberger*, 787 F.2d 1288 (9th Cir. 1986) and *West v. Brown*, 558 F.2d 757 (5th Cir. 1977), are not binding on this Court.  Nor should they be regarded as persuasive authority:  Both courts assessed the justiciability of the claims before them using the *Mindes* test, *see Mindes v. Seaman*, 453 F.2d 197 (5th Cir.1971), which the D.C. Circuit has refused to adopt because it "erroneously 'intertwines the concept of justiciability with the standards to be applied

to the merits of [the] case.'" *Kreis v. Secretary of Air Force*, 866 F.2d 1508, 1512 (D.C. Cir. 1989) (quoting *Dillard v. Brown*, 652 F.2d 316, 323 (3rd Cir. 1981)).[1]

### B.   Plaintiff Has Adequately Alleged a Substantial Burden on His Religious Exercise.

Despite arguing that Plaintiff's religious exercise has not been substantially burdened because ROTC enrollment is voluntary and there is no right to military service, Defendants concede that, "generally, 'the loss of a [government] job opportunity for failure to compromise one's convictions states a constitutional claim.'" Defs. Mot. at 16 (quoting *Rutan v. Republican Party*, 497 U.S. 62, 76-77 (1990)).   Consistent with *Rutan*, the D.C. Circuit has held that government service is a valuable benefit that may not be conditioned on unconstitutional demands.   *See, e.g.*, *Autor v. Pritzker*, 740 F.3d 176, 182, (D.C. Cir. 2014).   Plaintiff has more-than-plausibly alleged that Defendants' grooming and uniform policies force him to choose between his religious practices and a valuable government benefit. Those allegations clearly state a claim under RFRA's substantial-burden requirement.

Defendants' proposed interpretation of RFRA's substantial-burden requirement would have troubling implications for religious liberty.   Under Defendants' reasoning, for instance, the federal government could ban all religious garb, including turbans, yarmulkes, kufis, headscarves, and even rosary beads and religious T-shirts, from certain federal buildings; people

---

[1] *Kreis* likewise offers no support for Defendants' argument. *See* Defs. Mot. at 20-21.  There, the appellant did not claim he was wrongly denied a promotion "based upon illegitimate consideration[s]" that violated a statute or the Constitution. *See Kreis,* 866 F.2d at 1511 (contrasting facts with those in *VanderMolen v. Stetson*, 571 F.2d 617 (D.C. Cir. 1977), where the court held that "promotion granted by Air Force may not be rescinded by Air Force based upon illegitimate consideration").  Rather, *Kriess* alleged that he was "entitled to retroactive promotion '[u]nder principles established by prior Correction Board cases.'"  *Id.* at 1511. Though it dismissed that claim, the court *did* hold that Kreis could proceed with his claim alleging that the Air Force's failure to correct his records violated the Administrative Procedure Act. *Id.* at 1514-15.

of faith would have no recourse under RFRA because there is no independent right to enter or visit federal facilities like the Smithsonian Institution or the Statue of Liberty and entry into those facilities is voluntary.

Moreover, if, as Defendants suggest, the voluntary nature of military service and the absence of a right to serve were sufficient grounds to defeat any asserted substantial burden, the military could simply ban outright all new enlistees who are Sikhs or members of any other particular faith.[2]   Were that to occur, under Defendant's argument, no one could clear the substantial-burden hurdle imposed by RFRA, or the Free Exercise Clause,[3] to challenge such a policy.  Defendants' own regulations, which incorporate RFRA's "substantial burden" language, recognize that substantial burdens on religious exercise can exist even in an all-volunteer army.

In fact, there is no requirement that an individual have an independent constitutional or statutory right to serve in a government position or to receive any other government benefit in order to challenge denial of that position or benefit on unlawful grounds.  *See, e.g.*, *Rutan*, 497 U.S. at 72 ("[T]his Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely.  It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests.") (internal quotation marks omitted).  Most recently, the D.C Circuit rebuffed Defendants' argument in *Autor v. Pritzker*, 740 F.3d 176, 183 (D.C. Cir. 2014), holding that the appellants – lobbyists

---

[2] At least one Army official seemed to suggest that was the case with respect to Mr. Singh, declaring, "It is not legally permissible . . . to grant religious exceptions to allow a Sikh Cadet to enroll in the ROTC program while maintaining his religious articles."  Verif. Compl. ¶ 27.

[3] *See, e.g.*, *Church of the Lukumi*, 508 U.S. at 546 ("A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny."); *see also, e.g.*, *Hernandez v. C.I.R.*, 490 U.S. 680, 698-99 (1989) ("The free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden.").

barred from serving on certain government Industry Trade Advisory Committees (ITACs) – had pled a viable claim where they alleged that the ban forced them to choose between a valuable government benefit and the exercise of their First Amendment right to petition the government.

The *Autor* Court acknowledged that there was no right to serve on ITACs and that service on the committees was voluntary in the most fundamental sense, as committee members received no government pay and even covered their own expenses.  *Id.* at 182-83.  Nevertheless, the Court determined that ITAC service "qualifies as a governmental benefit." *Id.* at 180, 183. Noting that other courts have extended the unconstitutional conditions doctrine "to a broad range of non-monetary benefits and none, to our knowledge, has found a benefit too insignificant," the Court ultimately concluded that ITAC service is a government benefit because it "has value to those who seek it" and "the government can use its power to withhold the benefit to pressure Appellants to forgo constitutionally protected activity."  *Id.* at 182 (citing *Cuffley v. Mickes*, 208 F.3d 702, 707 (8th Cir. 2000) (participation in adopt-a-highway program) and *Hyland v. Wonder*, 972 F.2d 1129, 1135–36 (9th Cir. 1992) (volunteer position)).

Defendants do not dispute that "'generally the loss of a government job opportunity for failure to compromise…. [s]tates a constitutional claim.'"  Defs. Mot. at 16 (quoting *Rutan*, 497 U.S. at 76-77).  Instead, they argue that that enrollment in ROTC is different than receipt of government employment, welfare, and other benefits.  But as discussed above, this Court and others have treated participation and employment in military programs as deserving of the same protections, regularly adjudicating claims brought by service members that involve alleged violations of regulations, federal law, or the Constitution.

Mr. Singh sincerely believes that he must maintain a beard and unshorn hair and wear his

turban.   Verif. Compl. ¶¶ 15-16; SOUF ¶8.   ROTC is an important and unique government program: It serves as the largest commissioning source in the U.S. military, and it provides members with a variety of valuable benefits, financial and otherwise. *See* Verif. Compl. ¶ 18-19. By conditioning receipt of this benefit upon conduct proscribed by Mr. Singh's faith, or alternatively, denying the benefit because of practices dictated by his sincere religious beliefs, Defendants are "putting substantial pressure on an adherent to modify his behavior and to violate his beliefs" and therefore "a burden upon religion exists."   *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981); *see also Sherbert v. Verner*, 374 U.S. 398, 403-04 (1963); *cf. Koontz v. St. Johns River Water Management Dist.*, 133 S. Ct. 2586, 2595 (2013) ("We have recognized that regardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them."); *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007) ("By denying benefits to [those] who follow their beliefs, the state puts undue pressure on the adherents to alter their behavior and to violate their beliefs in order to obtain government benefits, thereby imposing a substantial burden on religious exercise.").

Accordingly, in *Thomas*, the Court held that the religious exercise of a Jehovah's Witness was substantially burdened by the State's denial of unemployment benefits after he voluntarily quit his job at a manufacturing plant after the factory began producing weapons in violation of his religious beliefs. *Id.* at 717-18.   Similarly, in *Sherbert*, 374 U.S. at 403-04, the Supreme Court found that the state had substantially burdened the plaintiff's religious exercise by denying her unemployment benefits after she refused to work on Saturdays, in accordance with the tenets of her faith.  The Court reasoned that "the pressure upon [the plaintiff] to forego that practice is

13

unmistakable" because the government's action "forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." *Id*. at 404.

The burden on Mr. Singh's religious exercise is likewise plainly "substantial" and sufficient to invoke the protections accorded Mr. Singh under the Army's own regulations and RFRA. *See, e.g.*, *Thomas*, 450 U.S. at 718 ("While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial."); *see also, e.g.*, *Rutan*, 497 U.S. at 77 (rejecting government's argument "that the burden imposed [by patronage rules was] not of constitutional magnitude," and citing "[d]ecades of decisions by this Court [that] belie such a claim"); *cf. Hobby Lobby*, 134 S. Ct. at 2776 (finding substantial burden even though "[i]t is true that the plaintiffs could avoid these assessments by dropping insurance coverage altogether and thus forcing their employees to obtain health insurance on one of the exchanges established under ACA"); *Tagore v. United States*, 735 F.3d 324, 330-32 (5th Cir. 2013) (holding that RFRA's substantial-burden requirement was "not a serious hurdle" where Sikh federal employee "gave up her job rather than wear a shorter-bladed kirpan" and "risked violating federal law when she entered the Leland building while wearing" her article of faith).

Defendants try to circumvent this outcome by pointing to the D.C. Circuit's recent decision in *Priests for Life*, Defs. Mot. at 17, but the comparison is inapt.  In *Priests for Life*, the government authorized a religious exemption to a law requiring employers to provide contraceptive insurance coverage to their employees.  *Priests for Life v. HHS*,  772 F.3d 229, 237 (D.C. Cir. 2014).   Appellants argued, however, that the "exemption process itself," which required them to fill out a form to claim the exemption, "impose[d] a substantial burden on their religious faiths" because it would purportedly trigger insurance companies to provide the

14

coverage on an independent basis.  *Id.* at 246 (internal quotation marks omitted).  Explaining that the appellants had misunderstood how the regulations operate, the Court correctly concluded: "Religious objectors do not suffer substantial burdens under RFRA where the only harm to them is that they sincerely feel aggrieved by their inability to prevent what *other* people would do to fulfill regulatory objectives after they opt out.  They have no RFRA right to be free from the unease, or even anguish, of knowing that third parties are legally privileged or obligated to act in ways their religion abhors." *Id.* (emphasis added).  *Accord Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008) (finding no substantial burden where appellant "allege[d] that the DNA Act's requirement that the federal government collect and store his DNA information requires the government to act in ways that violate his religious beliefs, but [had] suggest[ed] no way in which these governmental acts pressure him to modify his own behavior in any way that would violate his beliefs").

Unlike in *Priests for Life* and *Kaemmerling*, Plaintiff does not complain that Defendants' regulations will cause third parties to act in a way that offends his religious beliefs.[4]  His burden is much more direct and substantial.  *He* will have to shave *his* beard, cut *his* hair, and abandon *his* turban or else *he* will have to forfeit a valuable government benefit for which *he* would otherwise be eligible.  Plaintiff's personal, religiously mandated grooming and dress practices are the very type of core religious exercise that RFRA was intended to protect; and many courts have recognized that governmental impositions on similar practices impose a substantial burden.

---

[4] Defendants' reliance on *Navajo Nation v. U.S. Forest Serv.*, 535 F.2d 1058 (9th Cir. 2008) (en banc), Defs. Mot. at 15, is also misplaced.  The appellant Indian tribes were not pressured to change their religious exercise in order to obtain a government benefit.  In contrast to Mr. Singh, they were able to access the alleged benefit (use of the federal land at issue) and "continue[d] to pray, conduct their religious ceremonies, and collect plants for religious use."  *Id.* at 1063.  *United States v. Lee*, 455 U.S. 252 (1982) is also inapposite.  There, the Supreme Court assumed an adequate burden in the case; the decision instead rested on the government's compelling interest. *See Lee*, 455 U.S. at 257-58.

*See, e.g., Holt*, 135 S. Ct. at 866 (upholding Muslim prisoner's religious-exercise right to grow a beard); *Potter v. District of Columbia*, 558 F.3d 542, 546, 551 (D.C. Cir. 2009) (upholding grant of summary judgment resting on finding that Fire Department ban on beards imposed a substantial burden on Muslim, Nazarine Christian, and Jewish firefighters' religious beliefs); *Couch v. Jabe*, 679 F.3d 197, 200 (4th Cir. 2012) (finding that prison's no-beard policy substantially burdened Muslim prisoner's religious exercise); *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 265-66 (5th Cir. 2010) (holding that public school's rule requiring Native American student to wear his long hair in a bun or braided and tucked inside his shirt imposed a substantial burden on his religious exercise); *Smith v. Ozmint*, 578 F.3d 246, 250-51 (4th Cir. 2009) (ruling that prison policy mandating close-cropped haircuts substantially burdened Rastafarian prisoner's religious practice); *Warsoldier v. Woodford*, 418 F.3d 989, 996 (9th Cir. 2005) (finding that Native American's religious exercise was substantially burdened by prison's hair-length restriction); *Ali v. Stephens*, No. 9:09–CV–52, 2014 WL 5355529, at *7 (E.D. Tex.) (Sept. 26, 2014) (recognizing substantial burden where prison rules prevented Muslim plaintiff from "wearing a fist-length beard and wearing his Kufi at all times"); *Morgan v. City of New York*, No. 12-cv-704, 2014 WL 3407714, at *8 (E.D.N.Y. July 10, 2014) (holding that Rastafarian plaintiff's religious exercise was substantially burdened by removal of his turban for 20 to 30 minutes when he was transferred to police station after his arrest); *Benning v. Georgia*, 864 F. Supp. 2d 1358, 1365 (M.D. Ga. 2012) (determining that prisoner's religious exercise was substantially burdened when policies restricting facial hair conflicted with his sincere belief that Jewish law forbade him from shaving his earlocks); *Hundal v. Lackner*, No. EDCV 08-00543-CAS, 2011 WL 1935734, at *5-6 (C.D. Cal. Apr. 12, 2011) (noting that prisoner had alleged facts sufficient to show a substantial burden where prison rules

barred beards longer than one-half inch, and plaintiff had stated "that cutting his beard is against the tenets of his Sikh religion"); *Singh v. Goord*, 520 F. Supp. 2d 487, 503 (S.D.N.Y. 2007) (holding that removal of Sikh prisoner's turban during outside transport substantially burdened his religious exercise "[b]ecause plaintiff sincerely believes he is required to wear his turban at all times"); *Gartrell v. Ashcroft*, 191 F. Supp. 2d 23, 25-26 (D.D.C. 2002) (ruling, under RFRA, that federal Bureau of Prisons policy of placing prisoners in Virginia facilities that mandated "hair short, in military-style fashion, and prohibit[ed] all inmates from wearing beards" imposed substantial burden on Muslim and Rastafarian litigants whose religious beliefs forbade shaving off beards or cutting hair).

## II.   PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT.

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *McCauley v. Salazar*, 38 F. Supp. 3d 35, 38 (D.D.C. 2014) (quoting Fed. R. Civ. P. 56(a)).  As this Court has explained:

> The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam). But if the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

*Id.* Under these standards, Plaintiff is entitled to summary judgment on his cross-motion.

### A.    RFRA Does Not Permit Unquestioning Deference to the Government, Even in Specialized Contexts Like the Military.

In 1993, Congress enacted the Religious Freedom Restoration Act, which prohibits the federal government from imposing a substantial burden on a person's religious exercise unless the "application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C § 2000bb-1. The statute applies to "all Federal law, and the implementation of that law, whether statutory or otherwise," *id.*, and to every "branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States," 42 U.S.C. § 2000bb–3(a), including the DoD and all branches of the military. *See, e.g.,* H.R. Rep. No. 103–88 (1993), U.S. Code Cong. & Admin. News 1993, p. 1892 ("Pursuant to the Religious Freedom Restoration Act, the courts must review claims of prisoners and military personnel under the compelling governmental interest test."); S. Rep. No. 103–111 (1993), U.S. Code Cong. & Admin. News 1993, pp. 1892, 1899 ("Under the unitary standard set forth in the act, courts will review the free exercise claims of military personnel under the compelling governmental interest test.").

Thus, in *Rigdon v. Perry*, 962 F. Supp. 150, 162 (D.D.C. 1997), this Court held that the Army had violated RFRA by barring military chaplains from encouraging congregants to contact Congress regarding certain legislation. *Cf. Veitch v. Danzig*, 135 F. Supp. 2d 32, 35 (D.D.C. 2001) (stating that "[i]f, as plaintiff contends, this controversy is centered upon a religious orthodoxy mandated by the Navy – even one officially sanctioned as appropriate for a military population of diverse religious beliefs – plaintiff's First Amendment claims are by no means insubstantial," and pointing to RFRA as a potential source of relief). And, recognizing its

obligation to comply with RFRA, the DoD incorporated RFRA's strict-scrutiny standard earlier this year into its own religious-accommodation instructions. *See* Instruction No. 1300.17 § 4e(1) (eff. Jan. 22, 2014) (affirming that "[t]he DoD places a high value on the rights of members of the Military Services to observe the tenets of their respective religions . . . [and] protects the civil liberties of its personnel and the public to the greatest extent possible, consistent with military requirements").

Suggesting that this Court apply *Goldman v. Weinberger*, 475 U.S. 503 (1986), to Plaintiff's RFRA claim, Defs. Mot. at 24-25, Defendants contend that the RFRA intended only to restore the legal standards that existed before the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), and that the statute does not displace deference to military judgments. The Supreme Court has rejected these arguments.

In *Hobby Lobby*, 134 S. Ct. at 2761 n.3, the Court held that "RFRA did more than merely restore" the pre-*Smith* case law; "it provided even broader protection for religious liberty than was available under those decisions." *See also id.* at 2767 n.18 ("RFRA, by imposing a least-restrictive-means test, went beyond what was required by our pre-*Smith* decisions."). And in *Holt*, 135 S. Ct. at 859, which involved another specialized context (prisons) where the government is ordinarily accorded significant deference, the Supreme Court made clear that government officials are not entitled to "unquestioning acceptance" under either RFRA or its "sister statute," the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq. See also id.* at 864 ("RLUIPA . . . does not permit such unquestioning deference.").

In *Holt*, the Supreme Court held that the Arkansas Department of Corrections had failed to demonstrate that denial of a Muslim prisoner's request to grow a half-inch beard comported with RLUIPA's strict-scrutiny test, a test that is identical to the analysis imposed by RFRA. *Id.*

at 867.   Although the magistrate judge, the district court, and the court of appeals "all thought that they were bound to defer to the Department's assertion that allowing petitioner to grow such a beard would undermine its interest in suppressing contraband," *id*. at *8, the Court firmly rejected this view:

> RLUIPA, like RFRA, makes clear that it is the obligation of the courts to consider whether exceptions are required under the test set forth by Congress. That test requires the Department not merely to explain why it denied the exemption but to prove that denying the exemption is the least restrictive means of furthering a compelling governmental interest. Prison officials are experts in running prisons and evaluating the likely effects of altering prison rules, and courts should respect that expertise. But that respect does not justify the abdication of the responsibility, conferred by Congress, to apply RLUIPA's rigorous standard.

*Id*. (internal quotation marks and citation omitted).

In light of the Supreme Court's rulings in *Hobby Lobby* and *Holt*, it is clear that *Goldman* does not dictate the outcome of Plaintiff's RFRA claim.   As discussed further below, Defendants have failed to meet their difficult burden under RFRA of demonstrating that their denial of a religious accommodation for Mr. Singh is the least restrict means of furthering a compelling governmental interest. On the contrary, the undisputed evidence shows that granting Mr. Singh a religious accommodation would not harm the government's asserted interests and that there are far less restrictive means of protecting those interests.

**B.** **Defendants Have Not Demonstrated That Their Denial of Mr. Singh's Religious Accommodation Is the Least Restrictive Means of Furthering a Compelling Interest.**

Because Mr. Singh has "effectively demonstrated that [his] sincere exercise of religion was substantially burdened," it falls to Defendants to "demonstrate that the application of the burden to [Mr. Singh] would, more likely than not, be justified by the asserted compelling interests." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006).   Under RFRA, the term "demonstrate" means "meets the burdens of going forward with

the evidence and of persuasion."  42 U.S. Code § 2000bb–2.  Defendants have not satisfied this burden.

The Supreme Court has instructed that, under RFRA, a "categorical approach" offering generalized assertions of compelling interests "cannot carry the day."  *O Centro*, 546 U.S. at 430-32.  Rather, "[u]nder the more focused inquiry required by RFRA . . . the Government [has] to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened."  *Id.* at 430-431; *see also Holt*, 135 S. Ct. at 853 (stating that RLUIPA and RFRA "require[] us to scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants" and "to look to the marginal interest in enforcing" the challenged government action in that particular context") (internal quotation marks omitted); *Hobby Lobby*, 134 S. Ct. at 2779 (noting that the governmental interest cannot be "couched in very broad terms" but must be "focused" on the particular claimant whose interest is substantially burdened); *Kaemmerling*, 553 F.3d 669, 682 (D.C. Cir. 2008) ("We must look beyond the 'broadly formulated interests justifying the general applicability' of the statute to examine the interests the government seeks to promote as applied to [the plaintiff] 'and the impediment to those objectives' that would flow from granting him a specific exemption.") (quoting *O Centro*, 546 U.S. at 431); *Westchester Day Sch.*, 504 F.3d at 353 (explaining that, under strict scrutiny, the government "must show a compelling interest in imposing the burden on religious exercise in the particular case at hand, not a compelling interest in general").

But speculation and generalizations are nearly all that have been offered by Defendants in support of their denial.  In his letter denying Mr. Singh's religious accommodation request, Lt. Gen. McConville made a number of claims regarding the possible impact of Mr. Singh's

requested accommodation; however, his assertions appear to be based on very little personal experience and almost no empirical evidence.

1.   *There is little credible evidence to support the reasoning set forth in Defendants' letter denying Mr. Singh's religious accommodation.*

At his deposition, Lt. Gen. McConville testified that he has had virtually no opportunity in the course of his military career to observe or evaluate the effect of religious or other waivers from Army uniform and grooming regulations on Army units and soldiers.  SOUF ¶ 184.  During his entire Army career, he has supervised or commanded only *one* or *two* soldiers with shaving profiles. *Id.* ¶ 185.  This was during his tenure as Commanding General of the 101st Airborne Division in Afghanistan.  *Id.*  According to his testimony, there were "one or two soldiers I might have seen that had temporary [shaving] profiles."  *Id.*  Other than that, he stated that, "to the best of [his] recollection [he had] never commanded a unit where soldiers had beards."  *Id.* ¶ 188.  Nor could McConville recall any specific soldiers under his command who had worn yarmulkes. *Id.* ¶ 189. And it appears that none of the soldiers who have received grooming and uniform religious accommodations have fallen under his professional purview.

Nevertheless, citing his Army experience, McConville stated in his denial letter that granting a religious accommodation would cause Mr. Singh to "lack credibility" among the soldiers he will eventually command and would render Mr. Singh "unable to understand how to motivate [his] soldiers.  ECF Doc.  21-3, BS 000002.  McConville claimed, among other conclusions, that the requested religious accommodation would "adversely impact efforts to develop cohesive teams" and would "cause [Mr. Singh] to be viewed as an outsider by [his] peers."  *Id.* at BS 000003, 000005.

In light of Lt. Gen. McConville's admission that he has had virtually no experience commanding soldiers with beards or religious head-coverings, these conclusions about the

possible impact of granting Mr. Singh's requested accommodation appear to be based on little more than speculation and fear.  Indeed, when questioned at length about the myriad claims made in his letter, Lt. Gen. McConville stated again and again that he not received reports of any specific evidence suggesting that grooming and uniform exceptions, such as medically authorized beards and yarmulkes, had caused the type of harm he predicted would befall the Army if Mr. Singh's religious accommodation were granted.  SOUF ¶¶ 187, 189.  He also testified that he was not aware of any studies or other empirical evidence showing that medically authorized beards, yarmulkes, other grooming and uniform exemptions, or religious accommodations had caused the problems he identified in his denial letter. *Id.* ¶ 190. Meanwhile, several Sikhs who have been granted accommodations identical to the one sought by Plaintiff, have made clear that their grooming and uniform exceptions have not brought about the parade of horribles feared by Lt. Gen. McConville, *id.* ¶¶ 147, 192; far from it, the evidence points to the exact opposite conclusion.  Not only have these Sikhs' years of service *not* harmed unit cohesion, discipline, health, etc., but they have resulted in a much stronger military apparatus altogether.

In concluding that the proposed religious accommodation would pose a health risk to Mr. Singh, Lt. Gen. McConville does mention a gas mask study conducted by the Army in 2009. That lone study, however, is inadequate to meet the Army's evidentiary burden here.  First, it involved only 32 test subjects.  *Id.* ¶ 205. Second, of the bearded subjects who did not achieve the deployability Protection Factor ("PF") of 1667, many were never tested clean-shaven, and thus there was no comparison baseline to ensure that those same bearded would have obtained a 1667 PF without their beards.  *Id.* ¶¶ 207-09. Third, although "multiple factors affect a mask's ability to achieve a passing PF score when worn on bearded subjects such as facial features,

beard length, and beard density," the study did not control for these factors in assessing the impact of beards on the facemasks' operation. *Id.* ¶¶ 213-14.

Even putting aside these flaws in the study, the results showed that the majority – 59.38% (or 19) – of bearded subjects wearing full protective clothing and a M40 mask were able to obtain a PF of 1667; the majority – 71.88% (or 23) – of bearded subjects wearing full protective clothing and a M45 mask were able to obtain a PF of 1667; and the majority – 53.13% (or 17) of – bearded subjects wearing full protective clothing and a M50 mask were able to obtain a PF of 1667. *Id.* ¶¶ 207-09. Moreover, 100% of bearded subjects wearing full protective clothing and a M53 mask with a Powered Air Purifying Respirator ("PAPR") – a configuration that the Army has permitted its special operations soldiers to use – were able to obtain a PF of 1667. *Id.* ¶¶ 210-11. Furthermore, Major Kalsi, Captain Rattan, Corporal Lamba, and Colonel Khalsa have all attested to the fact that they have been able to obtain a seal on gas masks and pass gas chamber tests while wearing their beards and helmets. *Id.* ¶¶ 87, 103, 123, 128, 147.

2. *Defendants' widespread grooming and uniform waivers further undermine their asserted reasons for denying the religious accommodation.*

Under RFRA, where other exemptions, policies, and practices exist that would undermine the very same interests asserted by the government as compelling, it will be difficult for the government to prove that denial of the accommodation or exemption at issue furthers a compelling interest. *See, e.g., O Centro*, 546 U.S. at 433 ("'It is established in our strict scrutiny jurisprudence that 'a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.'") (quoting *Church of Lukumi*, 508 U.S. at 547); *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 475 (5th Cir. 2014) ("The very existence of a government-sanctioned exception to a regulatory scheme that is purported to be the least restrictive means can, in fact, demonstrate that other,

less-restrictive alternatives could exist."); *cf. Holt*, 135 S. Ct. at 863 ("Since the Department does not demand that inmates have shaved heads or short crew cuts, it is hard to see why an inmate would seek to hide contraband in a 1/2–inch beard rather than in the longer hair on his head."); *Hobby Lobby*, 134 S. Ct. at 2782 ("HHS itself has demonstrated that it has at its disposal an approach that is less restrictive . . . HHS has already established an accommodation for nonprofit organizations with religious objections.").

Since 2007, Defendants have granted more than 300,000 exceptions (via either waivers, accommodations, or grandfathering) of grooming and uniform rules.  For example, since 2007, at least 49,690 *permanent* shaving profiles and 57,616 temporary shaving profiles have been authorized for soldiers.[5]  SOUF ¶ 48.  These temporary and permanent shaving profiles have been authorized for officers and non-officers alike, as well as for ROTC cadets.  The Army has also deployed soldiers with shaving profiles for operations in foreign countries.  *Id.* ¶ 54.

Defendants try to downplay the significance of these shaving profiles, which authorize beards up to one-quarter of an inch, or more if medically necessary), *id.* ¶ 44, by stating that they are subject to command review and that soldiers may be dismissed from the Army if "a condition is permanent in nature and interferes with military duties." Defs. Mot. at 36.  But the Army has not produced any evidence showing that any commander has actually prohibited any soldier from complying with a temporary or permanent shaving profile.  *Id.*  Nor has the Army produced evidence that even one of the nearly 50,000 permanent shaving profile recipients since 2007 has been referred to a Medical Evaluation Board or dismissed because of his shaving profile.  *Id.*

---

[5] The overall total and annual numbers of temporary and permanent shaving profiles authorized since 2007 is likely higher because "widespread use of e-Profile by the [Army's] Active Component did not begin until 2011," and some temporary shaving profiles may not be reflected in the system even after 2011. SOUF ¶ 48.

The Army's broad exceptions for thousands of permanent medical beards as well as its exceptions for operation-related beards, in addition to the religious exceptions already granted by Defendants, strongly suggest that Plaintiff's accommodation under RFRA will not adversely affect the Army's cited interests in unit cohesion, discipline, readiness, and health and safety.  As permanent shaving profiles have also been authorized for officers, these exceptions also belie Defendants' claims that granting a Plaintiff a waiver would undermine his ability to lead.[6]

The Army's widespread tattoo exceptions also undermine the reasons provided for denying Plaintiff's religious accommodation.   The Army claims that Mr. Singh's accommodation would disrupt unit cohesion and morale by emphasizing his individual identity. Yet, tattoos are, by their nature, some of the most expressive forms of an individual's identity, and the Army permits a wide range of eccentric expression in this regard.  Although it recently tightened tattoo rules, nearly 200,000 soldiers with non-conforming tattoos were grandfathered under the new policy; and the Army continues to grant waivers for tattoos that violate the revised policy, including tattoos that are visible when in uniform and tattoos for prospective officers and ROTC cadets.  SOUF ¶¶ 60-69.  These tattoo exceptions further underscore the fact that the Army does not now demand, and has never demanded, exact uniformity.[7]  And they make clear that denial of one additional accommodation for Mr. Singh could not possibly constitute the least restrictive means of furthering Defendants' asserted interests.

Like the prison officials in *Holt*, who were "experts in running prisons and evaluating the likely effects of altering prison rules," Defendants have expertise in running the Army and

---

[6] Similarly, the approval of thousands of medical, criminal conviction, and other waivers for incoming and existing ROTC cadets weakens Defendants' claims that officers who do not comply with the same rules as their future subordinate soldiers will be ill-equipped to lead. SOUF ¶¶ 72-74.

[7] Army grooming and uniform regulations authorize variation in grooming, appearance, and dress in a number of different ways.  *See* SOUF ¶¶ 27-28.

evaluating the impact of changes to Army rules.  *Holt*, 135 S. Ct. at 864.  According that expertise respect, however, does not mean that Defendants' claims should be free from judicial evaluation and oversight.  Defendants simply have not met their burden of demonstrating that their denial of Mr. Singh's religious accommodation actually furthers their compelling interests or is the least restrictive means.  Rather, as discussed further below, the undisputed facts overwhelmingly show that it is extremely unlikely that granting Mr. Singh a religious accommodation would adversely impact the Army's asserted interests and that the Army is well-equipped to deal with its articulated concerns in a manner that is much less restrictive than a blanket denial of the requested accommodation.

**C.**     **The Undisputed Facts Show That Granting Mr. Singh the Same Religious Accommodation Provided to Other Sikhs Would Not Harm the Army's Interests and Is A Viable Less Restrictive Alternative Than a Blanket Denial.**

Not only have Defendants failed to produce adequate evidence to meet their burden under RFRA's strict-scrutiny test, but the undisputed facts in this case affirmatively contradict Defendants' conclusory and speculative reasons for denying Plaintiff's religious accommodation. The evidence shows that the accommodations previously granted to Sikhs have had no adverse effect on unit cohesion, morale, good order, discipline, individual and unit readiness, health or safety.

Corp. Lamba, Maj. Kalsi, Cpt. Rattan, and Col. Khalsa – all practicing Sikhs – have received *stellar* evaluations and recommendations throughout their Army service.  *See* SOUF ¶¶ 106, 113, 116, 127, 132, 142, 148. They have all received awards for their performance, with Maj. Kalsi receiving the Bronze Star and Col. Khalsa receiving, among other honors, the Legion of Merit Award.  *Id.* ¶¶ 92-93, 112, 130-31, 135, 146.  This evidence flatly refutes Defendants' claims about Sikhs in the Army.

For example, Corp. Lamba's superiors have stated that he "exemplifies all Army values, instinctively, leads from the front and strives for higher standard"; "is an exceptional Solider and posses[es] all the attributes and qualities I look for and are required to be an outstanding Army Officer"; "has been a tremendous Soldier, an invaluable member of my team, and has had an amazing impact on his peers and supervisors"; and "is not only a great role model for today's Soldiers, [but] his outstanding performance within our ranks can strengthen the bonds not only within the Army, but also between other countries who view this Warrior and see that the Army, and America, accepts all who can and are willing to perform for our Great Nation." *Id.* ¶ 91.

Maj. Kalsi's superiors have stated that he "consistently displays the character, morals, and ethics and poise expected of a military officer" and "possesses absolutely unlimited potential as a leader, military officer and physician." *Id.* ¶¶ 113, 116.

Cpt. Rattan's superiors have stated that he "possesses in full measure all of the Army values and conducts himself with integrity both on and off duty"; "live[s] the warrior ethos"; "serves as an example for others"; is "a seasoned and disciplined professional"; "wears the uniform with pride"; has "[m]ilitary bearing" that is "beyond reproach"; is a "charismatic officer who leads from the front" and "serves as a great mentor for less experiences officers"; and "[i]nspires, motivates, and encourages subordinates." *Id.* ¶ 113.

And Col. Khalsa, who has held a variety of assignments, including Battalion Commander, was lauded repeatedly by his superiors, who deemed him "our best battalion commander, bar none." *Id.* ¶ 141. They have noted, in addition, that "he is held in the highest esteem by his superiors and subordinates alike" and that he "understands troops and understands leadership." *Id.* ¶ 142. *See also id.* ¶ 148 (listing additional praise for Col. Khalsa).

In sum, the previously accommodated Sikhs have had enormous success, including leadership and command positions, in the Army. They have achieved this success while completing all required education, training, and testing, including training and testing relating to protective facemasks,[8] with their articles of faith intact. Their reviews make clear that their service benefitted and advanced the Army's mission. Granting Plaintiff an accommodation would do the same, and it would aid the Army in its efforts to increase the number of soldiers who speak critical languages such as Hindi, Urdu, and Punjabi, and to grow diversity among its leadership ranks. *See id.* ¶¶ 9, 215-18.

Defendants' own research provides further support for granting Plaintiff an accommodation: In a case study of Corp. Lamba's accommodation, the Army found that it "did not have a significant impact on mission accomplishment, military readiness, unit cohesion, morale, discipline safety, and health." *Id.* ¶ 168. And this result is consistent with the reliable research evidence relating to small-group and unit military cohesion. *See id.* ¶¶ 181; MacCoun Dec. ¶ 23 ("There is no credible evidence that allowing reasonable religious accommodations in dress and appearance poses any significant threat to unit cohesion or unit effectiveness.").

The facts and evidence overwhelmingly suggest that granting Mr. Singh the same religious accommodation afforded to other Sikhs is an eminently viable option that is less restrictive than outright denial of his request. Defendants dismiss this option out of hand, Defs. Mot. ar 39-50, citing Plaintiff's desire to go into the Military Intelligence Branch, and noting that Maj. Kalsi and Cpt. Rattan, as well as some other accommodated individuals are part of the Special Branches. But Defendants have not shown that the Special Branches and Basic Branches are remarkably different in terms of the various reasons for denial set forth in Lt. Gen.

---

[8] *See, e.g.*, SOUF ¶¶ 86, 103-05, 108, 121, 123, 128, 137.

McConville's denial letter.  The grooming and uniform exceptions discussed above, including the medical beard exceptions, tattoo exceptions, uniform exceptions, and other religious and non-religious accommodations granted by the Army have not been restricted to soldiers in the Special Branches. Nor have these exceptions been limited only to enlisted soldiers in the Basic Branches. These exceptions, waivers, and accommodations have been available to all soldiers and officers in both the Special Branches and the Basic Branches.  And, in any event, both Corp. Lamba and Col. Khalsa have served in the Basic Branches with outstanding results.  Col. Khalsa served in military intelligence for years and was well respected in that field.  SOUF ¶¶ 134-42

Moreover, research evidence and the Army's experience with previous similar accommodations demonstrate that the "military is very capable of managing religious accommodations in dress and appearance through appropriate leadership, training, and consistently enforced standards of professionalism and personal conduct."  MacCoun Decl. ¶ 23.

For example, Army officials helped "creat[e] the conditions for success" with Corp. Lamba's accommodation by engaging in advance and open communication with his commanders and others and ensuring that these leaders acted appropriately in response to the accommodations.  SOUF ¶¶ 169, 172.  And the Army's experiences with integrating women, African Americans, and gays and lesbians all make clear that the Army has the tools to ensure that its expressed concerns about granting an accommodation here do not come to fruition.  *See, e.g.*, MacCoun Decl. ¶¶20-22.  The Army can quite manageably employ the same tools and strategies here.[9]  At the very least, Defendants' refusal to even *try* to do so evinces their failure under RFRA's least-restrictive-means requirement.

---

[9] Further, although the experiences of previously accommodated Sikhs indicate that is unlikely Plaintiff's beard would cause problems with his use of a protective facemask, were an issue to arise, the Army is well equipped to deal with it too.  The Army's gas mask study shows that

## **CONCLUSION**

For all the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' Motion to Dismiss or for Summary Judgment and grant Plaintiff's Cross-Motion for Summary Judgment.

Respectfully submitted,

/s/ Heather L. Weaver
Heather L. Weaver (D.C. Bar No. 495582)
Daniel Mach (D.C. Bar No. 461652)
American Civil Liberties Union Foundation
915 15th Street, NW, Suite 600
Washington, D.C. 20005
Tel. (202) 675-2330
Fax. (202) 546-0738
*hweaver@aclu.org*
*dmach@aclu.org*

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union of the Nation's Capital
4301 Connecticut Avenue, NW, Suite 434
Washington, D.C. 20008
Tel. (202) 457-0800
Fax. (202) 457-0805
*artspitzer@aclu-nca.org*

*Attorneys for Plaintiff*

March 21, 2015

---

there are equipment options that work for all individuals with beards, SOUF ¶¶ 196-203, and the Army has an entire program dedicated to Hard to Fit soldiers and has gone out of its way to find appropriate facemasks for those soldiers, even ordering non-standard, non-Army approved British facemasks for several individuals. *Id.* ¶ 201.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I filed the foregoing document, as well as all supporting documents,

via the Court's electronic filing system, which served the documents on Defendants' counsel:

WAYNE H. WILLIAMS
Special Assistant U.S. Attorney
555 Fourth Street, N.W.
Washington, D.C.  20530
*wayne.williams@usdoj.gov*


<u>/s/ Heather L. Weaver</u>
Heather L. Weaver


Dated: March 21, 2015