## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————
                                    )
IKNOOR SINGH,                       )
                                    )
            Plaintiff,              )
                                    )
      v.                            )      Civil Action No. 1:14-cv-01906 (ABJ)
                                    )
JOHN MCHUGH, et al.,                )
                                    )
                                    )
            Defendants.             )
———————————————————)

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

The Defendants, John McHugh, Lieutenant General ("LTG") James McConville, Brigadier General ("BG") Peggy Coombs, and Lieutenant Colonel ("LTC") Daniel Cederman, in their official capacities and through undersigned counsel, respectfully submit this reply in support of their motion to dismiss the complaint in this case and for summary judgment.[1]  ECF No. 21.  This brief is also submitted in opposition to Plaintiff's cross-motion for summary judgment and Plaintiff's opposition to Defendants' motions.  ECF No. 32.

## INTRODUCTION

Plaintiff insists that the law compels the granting his requested accommodations in full in an Armed Forces officer development program.  However, the context of a military program that trains and grows future commanders, the Army has determined not to accommodate Plaintiff's request.  The Army implemented RFRA and has legally granted appropriate religious

---

[1]     Defendants incorporate and rely upon its previously filed Exhibits A-P [ECF No. 21-2], the Administrative Record [ECF No. 21-3], Regulatory Appendix [ECF No. 21-4], and newly filed Exhibits Q-JJ in this Opposition and reply.

accommodation requests.  But in this case the Army has decided its compelling interests necessitate denial.

As a threshold matter, this Court should not provide the relief Plaintiff seeks by ordering his enlistment into the Army.  Courts have long recognized the Army's role in determining force composition and have eschewed judicially ordered commissions.  Plaintiff's baseline qualifications, such as his ability to pass a standard Army Physical Fitness Test and a Department of Defense physical, have not been assessed.  Even if fully qualified to contract, Plaintiff would only be contracted after he competes against other cadets for a limited number of contracts.  The Court should not circumvent the processes the Army uses to build a highly qualified and professional officer corps by ordering a directed enlistment.

Next, Plaintiff's RFRA claim should be dismissed because his religious exercise is not substantially burdened.  Participation and employment in military programs are not analogous to civilian governmental employment, welfare, and other benefits programs.  Service in the military has long been recognized as appreciably different from civilian employment because of its unique nature, which underpins the diminished statutory and constitutional rights that are a feature of military service.

Alternatively, the Army's decision withstands strict scrutiny as applied to the military, and Defendants should be granted summary judgment.  Neither the Supreme Court nor Congress intended to displace a long and independent line of cases that articulate that deference to reasonable military judgments concerning force management and force composition is demanded. The compelling nature of the Army's interest in developing a cohesive and credible officer corps has not been undermined by the granting of reasonable exceptions in different contexts from the accommodations Plaintiff seeks.  The Army's decision, to deny Plaintiff's request that it

accommodate his religious practices, is grounded in professional judgments predicated on military necessity. Experience has validated that the Army takes seriously its obligation to consider religious accommodation requests on a case by case basis without judicial intervention. Consequently, the Army's decision deserves deference and should be upheld.

## ARGUMENT

### A. Plaintiff's Request for Enlistment in the Army is Non-Justiciable and Should be Dismissed

Plaintiff's request for a directed enlistment should be deemed non-justiciable[2] because it would circumvent the ordinary processes by which the Army assesses qualifications to serve an officer. These processes allow the Army to make professional judgments and assessments about applicants. Circumvention of this process will cause this Court to tread into areas that exceed judicial competence.

Plaintiff seeks a court-ordered enlistment that would make him a member of the Army Reserve and would place him directly on the path to an officer commission. *See* Compl. (ECF No. 1) at ¶¶ 20-21; *Request for Relief*; DA Form 597, *see also, Army Senior Reserve Officers' Training Corps (ROTC) Nonscholarship Cadet Contract*, ¶ 4(a) (A229, ECF No. 21-4). Courts have long recognized and continue to adhere to the principle that they cannot order the Army to commission a military officer. *See Koroluk v. Fanning*, No. 3:13-cv-758-H, 2014 U.S. Dist. WL 6387514, *2 (W.D. Ky., Nov. 14, 2014) (observing "[o]f course, this Court has no authority to commission an officer in the military, and military appointments are not subject to judicial review" but denying

---

[2] In light of the District Court's opinion in *Saint-Fleur v. McHugh*, No. 1:13-cv-01019, 2015 WL 1209908, at *3 (D.D.C., Mar. 17, 2015), Defendants note that their motion to dismiss for non-justiciability should be considered under Rule 12(b)(6) and not Rule 12(b)(1). *See id.* ("The court has subject-matter jurisdiction over Plaintiff's APA claim under the federal question" statute, 28 U.S.C. § 1331. . . Whether or not his claim is a non-justiciable military personnel decision is an argument under Rule 12(b)(6) for failure to state a claim.") (internal citations and quotations omitted).

motion to dismiss based on non-justiciability of plaintiff's APA challenge to an ROTC

disenrollment) (citing *Orloff v. Willoughby*, 345 U.S. 83, 94 (1953)).  As the Supreme Court has

recognized: "[J]udges are not given the task of running the Army. . . .  Orderly government

requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the

Army must be scrupulous not to intervene in judicial matters."  *Orloff*, 345 U.S. at 94.

  In order to enlist (contract) into Army ROTC and proceed on the path to a commission,

Plaintiff must meet a number of baseline qualifications that uniformly apply to all individuals who

seek to contract.  *See* Army Regulation 145-1, *Senior Reserve Officers' Training Corps Program:*

*Organization, Administration and Training*, ¶¶ 3-3 to 3-25 (hereinafter "Army Reg. 145-1)

(A047-054, ECF No. 21-4); Cadet Command Pamphlet 145-4, *Enrollment and Disenrollment*

*Criteria, Policy and Procedures*, ¶¶ 2-29 – 2-56 (hereinafter "CC Pam. 145-4") (A122-140, ECF

No. 24-1).  Plaintiff must pass a medical examination, the Army Physical Fitness Test, meet

weight and body fat standards, and comply with criterion pertaining to citizenship, substance

abuse, civil convictions, moral character, age, dependency, and academic status.  *See generally*,

Army Reg. 145-1 (A27-98, ECF No. 24-1); CC Pam. 145-1 (A99-225, ECF No. 24-1) (regulation

and ROTC guidance documents that generally describe the requirements to enter Army service).

Even if fully qualified, the Army only contracts those cadets who are the most qualified to serve as

officers as determined through a competitive process that considers scholastic, athletic, and

leadership abilities.  Def. Exh. DD, Webber Depo. at 13-16; Def. Exh. CC, Cederman Depo. at

24-26, 38.

  The Army has presently made no determinations regarding Plaintiff's qualifications to

contract.  Def. Exh. CC, Cederman Depo. at 23-25; *see also* Army Reg. 145-1, ¶¶ 3-3 to 3-25

(A047-054, ECF No. 24-1); CC Pam. 145-4, ¶¶ 2-29 – 2-56 (A122-140, ECF No. 24-1).  Plaintiff

may never reach contracting consideration if, for example, a medical examination reveals that he

has an disqualifying medical condition or if he fails to pass the Army Physical Fitness Test.  Even

if fully qualified, Plaintiff may simply not be among the most qualified and offered a contract.  The

Court should not circumvent these competitive and uniformly applicable processes by ordering

Plaintiff's enlistment here.

Orloff's recognition that deference is warranted for "legitimate Army matters" has not

been displaced by any of the cases Plaintiff cites.  Pl. Mem. Opp'n to Def's Mot. to Dismiss at 10,

ECF No. 32 (citing Larsen v. U.S. Navy, 346 F. Supp. 2d 122, 128 (D.D.C. 2004)).  For example,

his reliance on Larsen is misguided in the face of his clear request for a provisional enlistment

because the plaintiffs in Larsen did not seek judicially ordered commissions.  Instead the Larsen

plaintiffs sought only an opportunity to compete irrespective of the criteria they challenged.

Larsen v. U.S. Navy, 1:02-cv-02005-RC, Pl. Mem. in Opp'n., ECF No. 9, at 3, 6 ("Plaintiffs

request that the Court issue an order requiring the Navy to: . . . [a]llow Plaintiffs, if otherwise

qualified, the opportunity to be commissioned as Navy chaplains") (emphasis added) (Def. Exh.

BB).

Plaintiff's other cited cases do not stand for the proposition that courts can circumvent the

Army's lawful processes for assessing and evaluating who to commission.  Instead they more

modestly affirm the notion that current and former members of the military may challenge their

discharges and promotions through various judicial mechanisms.  See, e.g.,  Emory v. Sec'y of

Navy, 819 F.2d 291, 291 (D.C. Cir. 1987) (career Navy officer challenging his non-selection for

promotion); Blevins v. Orr, 721 F.2d 1419, 1419 (D.C. Cir. 1983) (career Air Force officer

challenging his non-selection for promotion); Dilley v. Alexander, 603 F.2d 914, 916 (D.C. Cir.

1979) (reserve officer seeking reinstatement and back promotion); Matlovich v. Sec'y of Air Force,

591 F.2d 852, 855 (D.C. Cir. 1978) (challenging plaintiff's discharge from the military); *Lilly v. Schwartz*, 713 F. Supp. 2d 15, 16 (D.D.C. 2010) (challenging plaintiff's separation from the Army and seeking reinstatement). Plaintiff's circumstance is markedly different because he is not yet in the Army, unlike those plaintiffs described in the cases he cites. Accordingly, Plaintiff's request for a judicially directed enlistment should be dismissed.

**B.      Plaintiff's Religious Exercise is not Substantially Burdened by the Army's Decision**

Plaintiff does not suggest that the Army has precluded him from practicing his religion currently as a civilian. Thus, Plaintiff cannot demonstrate that the Army's grooming regulation "substantially burdens" his religious expression, and his claim should be also dismissed. *See Priests for Life v. U.S. Dep't of Health and Human Serv.*, 772 F.3d 229, 244 (D.C. Cir. 2014); *Kaemmerling v. Lappin*, 553 F.3d 669, 677-78 (D.C. Cir. 2008) (stating that the government substantially burdens religion if a person must choose between a government benefit and practicing her religion). Inability to join the military is not the loss of a government benefit for purposes of RFRA because military service has long been recognized as unique. This is so for several reasons.

First, courts have consistently recognized that there is no right to serve in the Army. *See Knehans v. Alexander*, 566 F.2d 312, 314 (D.C. Cir. 1977) (holding plaintiff "had no constitutionally protected entitlement to continued active duty as a commissioned officer in the Army"); *Smith v. Harvey*, 541 F. Supp. 2d 8, 15 (D.D.C. 2008) (stating that there is "no constitutionally-protected property interest in continued military service"); *Spelman v. McHugh*, No. Cv-13-01134, 2014 WL 4178211, *7 (D.D.C. Aug. 21, 2014) ("Courts in this Circuit have repeatedly found that '[t]here is no protected property interest in continued military service.'") (alteration in original) (quoting *Spadone v. McHugh*, 864 F. Supp. 2d 181, 189 (D.D.C. 2012)).

Second, the notion that military service should not be characterized as a government benefit is buttressed by the fact that constitutional rights, such as First Amendment rights, are applied differently in the military context. *See Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) ("The military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps."); *Parker v. Levy*, 417 U.S. 733, 759 (1974) ("'Speech that is protected in the civil population may . . . undermine the effectiveness of response to command.'")  (quoting *United States v. Priest*, 45 C.M.R. 338, 344 (1972)); *Carlson v. Schlesinger*, 511 F.2d 1327, 1332 (D.C. Cir. 1975) ("A commanding officer must be afforded substantial latitude in balancing competing military needs and first amendment rights.").  Thus, while members of the military services are entitled to the protections of the First Amendment, "the different character of the military community and the military mission requires a different application of those protections." *Parker*, 417 U.S. at 758.  The rights of military men must yield somewhat "'to meet certain overriding demands of discipline and duty . . . .'" *Id*. at 744 (quoting *Burns v. Wilson*, 346 U.S. 137, 140 (1953)).

Third, major statutory features applicable to civilian society are not imputed, absent clear intent, to service members because of the special status of the military and the near-plenary control that Congress has over it.  *See, e.g., Chappell v. Wallace*, 462 U.S. 296 (1983) (holding that soldiers who claimed they had been the victims of racial discrimination in violation of their constitutional rights could not bring a suit for damages in civilian court under *Bivens*); *Feres v. United States*, 340 U.S. 135, 146 (1950) (finding that tort claims by military members against the U.S. government for injuries suffered incident to service are barred); *Cummings v. Dep't of the Navy*, 279 F.3d 1051, 1059 (D.C. Cir. 2002) (noting that the ADA and Rehabilitation Act do not

7

apply to the military absent a clear direction from Congress); *Collins v. Sec'y of Navy*, 814 F. Supp. 130, 131 (D.D.C. 1993) ("Title VII does not apply to uniformed members of the military.").

These critical differences between civilian employment and military service have been clearly recognized by the D.C. Circuit Court of Appeals.  In *Milbert v. Koop*, the D.C. Circuit stated "[w]hile military service possesses some of the characteristics of ordinary civilian employment, it differs materially from such employment in a number of respects that immediately spring to mind, and the peculiar status of uniformed personnel of our armed forces has frequently been recognized by the courts."  830 F.2d 354, 358 (D.C. Cir. 1987), *superseded by* 42 U.S.C. § 213(f) (2000).  None of this is to argue that service members lack rights or are without legal redress.  However, fundamental features of military service render such service as being materially different than the benefits at issue in *Sherbert v. Verner*, 374 U.S. 398, 412 (1963).

Without citing to a single case that treats military service as a government benefit, Plaintiff instead relies on a civilian "unconstitutional conditions doctrine" case,  *Autor v. Pritzker*, 740 F.3d 176, 182 (D.C. Cir. 2014), to make his benefits arguments.  Pl. Mem. Opp'n to Def's Mot. to Dismiss ECF No. 32, at 10-16.  Plaintiff's reliance on *Autor* highlights the error in applying civilian context cases to the military.  A similar restriction on voluntary service in advisory groups as that seen in *Autor* could plainly pass muster in a military context where the First Amendment rights of service members often must yield to the unique nature and needs of the service.  *See Parker*, 417 U.S. at 759 ("Speech that is protected in the civil population may . . . undermine the effectiveness of response to command." ) (quoting *United States v. Gray*, 42 C.M.R. 255 (1970)).

Contrary to Plaintiff's assertions, a narrow ruling on Plaintiff's individual request for accommodation that recognizes the unique nature of military service would not have "troubling implications for religious liberty" nor would it allow the Army to categorically "ban all new

enlistees who are Sikhs or members of any other particular faith[.]"  While RFRA may not afford a remedy, such a policy would be subject to strict scrutiny for targeting a particular religious group. *See Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 533 (1993) ("Although a law targeting religious beliefs as such is never permissible . . . if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest.") (internal citations omitted); *Hartmann v. Stone*, 68 F.3d 973, 978 (6th Cir. 1995) ("[B]ecause if the regulations are not neutral and generally applicable, we need not address the Religious Freedom Restoration Act").  Here the Army's grooming regulations are not aimed to exclude particular religious groups, but instead are directed at establishing uniform standards applicable to all who wear the uniform.  Moreover, the Army's regulations are not applicable to Plaintiff as a civilian. Thus, because Plaintiff has failed to establish that military service is a government benefit, he cannot establish that his religious practice has been substantially burdened, and his claim should be dismissed.

**C.    The Army's Decision on Plaintiff's Request for Accommodation Meets Strict Scrutiny as Applied to the Military**

The Army's judgments regarding how to develop its officer corps and build an effective fighting force deserve deference.  This case directly implicates military judgments regarding the composition and training of military officers.  In the Army's professional judgment, as stated in LTG McConville's decision, the Army's grooming policy is an *essential component* of officer development in the Reserve Officer Training Corps.  Agency Decision, AR at 3-4, ECF No. 21-3. The development of credible and capable officers requires that cadets are "inculcated into the Army and its values, training methods, and traditions in a way that is reflective of what their future

Soldiers will expect of them[.]"  *Id*. at 1-2.  The policy also "allows a strong team identity to be

forged, distinguishes service members from the civilian population, reinforces notions of selfless

service, and provides a routine that instills discipline[.]"  *Id*. at 1.  The Army views the

development of its officer corps as paramount to maintaining a force that is capable of providing

for this Nation's defense.  *Id*. at 2-4.  The composition of the Army and training of the force is an

area where substantial deference is owed to the knowledge and expertise of military professionals.

### 1.      Deference to Professional Military Judgments Endures

The Supreme Court and Congress have not displaced the lengthy line of cases that counsel

that military determinations are owed deference.  This lineage of cases addresses legitimate

judicial concerns about separation of powers and about the unique nature of America's armed

forces.  The Supreme Court highlighted these concerns in its opinion in *Goldman* when it wrote:

> But "within the military community there is simply not the same [individual]
> autonomy as there is in the larger civilian community." *Parker*, [417 U.S. at 751].
> In the context of the present case, when evaluating whether military needs justify a
> particular restriction on religiously motivated conduct, courts must give great
> deference to the professional judgment of military authorities concerning the
> relative importance of a particular military interest.  *See Chappell*, [462 U.S.  at
> 305]; *Orloff*,[345 U.S. at 93-94].  Not only are courts "'ill-equipped to determine
> the impact upon discipline that any particular intrusion upon military authority
> might have,'" *Chappell v. Wallace*, [462 U.S. at 305] (*quoting* Warren, *The Bill of
> Rights and the Military*, 37 N. Y. U. L. REV. 181, 187 (1962), but the military
> authorities have been charged by the Executive and Legislative Branches with
> carrying out our Nation's military policy.  "[Judicial] deference . . . is at its apogee
> when legislative action under the congressional authority to raise and support
> armies and make rules and regulations for their governance is challenged." *Rostker
> v. Goldberg*, 453 U.S. 57, 70 (1981).

*Goldman v. Weinberger*, 475 U.S. 503, 507-08 (1986); s*ee also Brown v. Glines*, 444 U.S. 348,

360 (1980) ("[T]he special character of the military requires civilian authorities to accord military

commanders some flexibility in dealing with matters that affect internal discipline and morale").

Deference to the military here is premised on an independent and unchanged pre-*Smith* line

of cases as seen in this Court's opinion in *Bitterman v. Sec'y of Def.*, 553 F. Supp. 719, 724 (D.D.C. 1982).  In *Bitterman* the Court applied a compelling interest and least restrictive means analysis similar to *Yoder* and upheld an Air Force regulation that prohibited the wear of yarmulkes. *Id*. at 726.  The Court relied on the very same cases that underpin *Goldman*:  namely *Parker v. Levy*, *Orloff v. Willoughby*, and *Brown v. Glines*, and recognized that its "strict standard of review is to be tempered by the *substantial deference* to be accorded military judgments as to the appropriate ways in which to further a compelling interest[.]"  *Bitterman*, 553 F. Supp. at 734-24 (emphasis added).  The Court here should apply no less deference than that which the Court applied in *Bitterman* when it described the Air Force policy as based on "considered judgment[s] of professional military officials, prompted by generations of experience in war and peace."  *Id*. at 724.

Goldman's continuing vitality is clear in that the Supreme Court has continued to cite it and its predecessor cases even in the wake of RFRA.  *See e.g.*, *Winter v. Natural Resources Def. Counsel, Inc.*, 555 U.S. 7, 9 (2008) (citing *Goldman* while stating that "[m]ilitary interests do not always trump other considerations, and the Court has not held that they do, but courts must give deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.").  Courts within this circuit and elsewhere have favorably spoken of and applied *Goldman* to Free Exercise claims.  *See e.g.,  Larsen v. U.S. Navy*, 486 F. Supp. 2d 11, 27 (D.D.C. 2007), *reversed on other grounds*, 525 F.3d 1 (D.C. Cir. 2008) (discussing when applying *Goldman* that "the Supreme Court rejected the traditional 'strict scrutiny' analysis in favor of a more deferential analysis"); *Adair v. England*, 183 F. Supp. 2d 31, 50 (D.D.C. 2002), *reversed in part on other grounds*, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) (discussing but rejecting application of *Goldman* because the challenged policy

11

did not deal with a "regulation that involved inherently operational, strategic, or tactical matters.").

Congress did not displace *Goldman* deference with RFRA.  While the D.C. Circuit has not squarely addressed this issue, in *Lebron v. Rumsfeld et al.*, 670 F.3d 540, 558-60 (4th Cir. 2012), the Fourth Circuit considered the impact of RFRA on *Goldman* and its predecessor cases and implicitly rejected the view that RFRA displaced them.  The Fourth Circuit observed that "[Congress is aware of the reluctance by courts to intrude into matters of military governance, and when it wishes to legislate with respect to the military, it does so with precision." *Id.* at 559.  From this principle, the Fourth Circuit took notice that Congress was precise in overturning, by a statute located in Title 10, the prohibition on wearing a yarmulke, and that it expressly delegated broad authority to the Secretary of Defense to define what is "neat and conservative[.]" *Id.* (quoting 10 U.S.C. § 774).  The lack of similar precision in RFRA and its location in Title 42 led the court to conclude in dicta that "Congress passed RFRA to overturn the decision [*Smith*] in the *civilian context*[.]" *Id* (emphasis added).  Very simply, had Congress intended to displace deference as exemplified in *Goldman* via RFRA, it would have expressly done so.

The Supreme Court in *Burwell v. Hobby Lobby Stores Inc.*, 134 S. Ct. 2751 (2014), and *Holt v. Hobbs*, 135 S. Ct. 853 (2015), non-military cases, did not intend to eliminate the deference to the military as exemplified in *Goldman*.  To support his assertion that deference to the Army is muted, Plaintiff highlights two footnotes in *Hobby Lobby* where the Court states that "RFRA did more than merely restore the balancing test used in the *Sherbert* line of cases" and that it "provided even broader protection for religious liberty than was available under those decisions."  Pl. Mem. Opp'n to Def's Mot. to Dismiss, ECF No. 32 at 19, (citing *Hobby Lobby Stores, Inc.*,134 S. Ct. at 2761 n.3, 2767 n.18 (2014)).  Plaintiff's reliance on this language is misplaced.  The Court was careful to note that its view of broader protection was based on its perception that "RFRA's least

12

restrictive means requirement was not used in the pre-*Smith* jurisprudence RFRA purported to codify." *Hobby Lobby Stores, Inc.*, 134 S. Ct. at 2761 at n.3. But the Court was fractured on what the pre-*Smith* cases purported to apply, and left the larger issue of whether RFRA provided broader protection than the pre-*Smith* cases unresolved. *Id*. at 2767 n.18 ("For present purposes, *it is unnecessary to adjudicate this dispute.* Even if RFRA simply restored the status quo ante, there is no reason to believe . . . that the law was meant to be limited to situations that fall squarely within the holdings of pre-*Smith* cases") (emphasis added)).

    *Holt v. Hobbs* did not change military deference law either. First, *Holt's* applicability to the unique military context cannot simply be assumed from the case law.[3] Second, *Holt* did not appreciably change this Circuit's law on deference to military judgments. In *Holt* the Supreme Court was clear that the lower court had engaged in impermissible "unquestioning deference" after the lower court found "preposterous" the assertion that plaintiff's beard could hide contraband, yet nonetheless afforded prison officials deference on this point. *Holt*, 135 S.Ct. at 861. Justice Sotomayor emphasized that deference still persists in her concurrence by stating that she did "not understand the Court's opinion to preclude deferring to prison officials' reasoning when that deference is due — that is, when prison officials offer a *plausible explanation for their chosen policy* that is supported by whatever evidence is *reasonably available* to them." *Id*. at 867 (Sotomayor, J., concurring) (emphasis added).

    *Holt's* limitation on unquestioning deference is not novel, and is akin to this Circuit's opinion in *Haselwander v. McHugh*, 774 F.3d 990, 993 (D.C. Cir. 2014). In *Haselwander* the D.C.

---

[3]    While legislators have at times spoken conjunctively of the unique concerns necessitating deference that are raised in both military and prison environments, it would be a mistake to assume prisons and the military are to be treated the same. *See* H.R. Rep. 103-88 (May 11, 1993) (the House Committee "recognize[d] that religious liberty claims in the context of prisons and the military present far different problems for the operation of those institutions than they do in civilian settings.").

Circuit found an "illogical" and "patently unfair" military correction board's decision "unworthy

of deference" even though such decisions are generally reviewed under an unusually deferential

application of the arbitrary or capricious standard.  *Id.  Holt* did not rewrite military deference law,

any more than *Haselwander* did, but instead applied a logical idea that has been embraced by this

circuit.  *See Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1515 (D.C. Cir. 1989) (stating that an

agency decision is owed no deference if it fails to "give a reason that a court can measure . . .

against the 'arbitrary or capricious' standard of the APA."); *see also Coburn v. McHugh*, 679 F.3d

924 (D.C. Cir. 2012).

Each of the classic areas involving professional military judgments deserving of deference

are implicated by Lieutenant General McConville's decision.  *See Gilligan v. Morgan*, 413 U.S. 1,

10 (1973) ("The complex, subtle, and professional decisions as to the composition, training,

equipping, and control of a military force are essentially professional military judgments, subject

always to civilian control of the legislative and executive branches.").  Composition and training

are implicated because the Army's decision is based in "generations of experience in war and

peace" and explicitly sets out how it believes it can best develop a credible and cohesive officer

corps.  *See Bitterman v. Sec'y of Def.*, 553 F. Supp. 719, 725 (D.D.C. 1982); s*ee also* Agency

Decision (AR1-7).  Equipping of the force also implicated as evidenced by Plaintiff's clearly

degraded ability to safeguard himself with a protective mask.  *Id.*

The Army's decision here is inherently more complex than the prison official's decision in

*Holt*.  The prison official's assertion regarding the ability to hide contraband in beards was viewed

as being facially absurd and the trial court recognized it as such.  In contrast, the Army's decision

weighs several variables concerning Plaintiff's accommodation request.  This decision assessed

and ultimately decided a distinctly military matter, for which the Army's leadership is undeniably

14

in best position, by virtue of its experience and expertise, to decide.  Agency Decision AR 1-7,

ECF No. 21-3; s*ee Thomasson v. Perry*, 80 F.3d 915, 926 (4th Cir. 1996) ("[T]he need for

deference also derives from the military's experience with the particular exigencies of military

life.  Among these is the attainment of unit cohesion. . . . should the judiciary interfere with the

intricate mix of morale and discipline that fosters unit cohesion, it is simply impossible to estimate

the damage that a particular change could inflict upon national security[.]").

    When Congress intends to make important policy changes that potentially impact the force,

military commanders remain central to that process because they know America's armed forces

the best.  *See Lebron*, 670 F.3d at 558 ("[W]hen Congress wishes to legislate with respect to the

military . . . it does so with precision.").  For example, the repeal of the ban on openly gay service

members was executed deliberately, without judicial intervention, and gave military leaders wide

latitude to shape success by assessing and managing relative impacts on the force.  *See* 10 U.S.C. §

654 (2010) *repealed by* Don't Ask don't Tell Repeal Act of 2010, P.L. 111-321 § 2(f)(1)(A), 124

Stat. 3516 (setting forth a number of certifications regarding force impacts that were required to be

made prior to repeal).  Prior to repeal of the ban, courts consistently avoided hasty judicial

intervention and gave deference to the Army's judgments regarding the impacts of the policy on

the overall force structure.  *See Cook v. Gates*, 528 F.3d 42, 65 (1st Cir. 2008) (rejecting challenge

to 10 U.S.C. § 654); *Thomasson,* 80 F.3d at 927(rejecting challenge to 10 U.S.C. § 654 under a

rational basis standard and observing that the court "owe[s] respect to the military's estimation of

the effect of homosexual conduct on military discipline.  This estimation will be made through

innumerable personnel decisions informed by the military's assessment of the unique demands of

military life"); *accord Richenberg v. Perry*, 97 F.3d 256, 262 (8th Cir. 1996).  Similarly, changes

to the military's policy regarding direct ground combat assignments for women were also

voluntarily undertaken with a phased approach.  Secretary of Defense Memorandum, *Elimination of the 1994 Direct Ground Combat Definition and Assignment Rule* (Jan. 24. 2013) (Def. Exh. Z).  These examples counsel against bold judicial intervention, and most importantly demonstrate that successful change requires military commanders to be central to the decision-making process and articulates the need to value command judgments regarding impacts to the military.

No one understands the unique cultural patina of the entire Army more than its senior leaders.  One such leader is Lieutenant General James McConville, the chief personnel officer for the United States Army, who earned a broad perspective from commanding at all levels within the combat ranks.  Def. Exh. FF, LTG McConville Depo. at 9-12.  His thirty-four years of experience, including his combat tour of duty as commander of the prestigious 101st Airborne Division, offers a unique and discerning perspective that this Court should not hastily displace with the limited vantage points of individuals who have not served in similar positions.  *Id*; s*ee Owens v. Brown*, 455 F. Supp. 291, 300 (D.D.C. 1978) ("the peculiar demands of military discipline and duty, adds impetus to the idea that military judgments deserve an especially high degree of respect.").  Lieutenant General McConville leveraged and drew upon his years of experience when he made an individual determination on the particular request made by Plaintiff.  Agency Decision AR at 1-7, ECF No. 21-3.  Consequently, the Court should provide substantial deference to the Army's decision here.

        **2.**      **The Government's Compelling Interest in Developing a Cohesive and Credible Officer Corps is Undeniable**

The Army's decision to deny Plaintiff's request for a grooming accommodation while in an officer training program furthers compelling interests in maintaining a credible officer corps and an effective fighting force that is capable of meeting the Nation's defensive needs.  The interest in

cultivating and maintaining an effective Army by developing a disciplined, well trained, credible, cohesively bonded, and reliable corps of officers in ROTC is undeniably compelling, and furthered by the Army's decision for the following reasons.

First, uniforms are a principal means by which the Army takes individuals and forges them into soldiers who will put mission accomplishment before personal wants.  Agency Decision, AR at 2, ECF No. 21-3.  Wear of the uniform serves as a reminder that the essence of military service "is subordination of the desires and interest of the individual to the needs of the service."  *See Goldman*, 475 U.S. at 507 (quoting *Orloff v. Willoughby*, 345 U.S. 83, 92 (1953)) (internal marks omitted).  Second, an emphasis in ROTC on Army uniform standards cultivates discipline that will be sustained in combat.  Agency Decision, AR at 4, ECF No. 21-3.  The Army uses uniformity, ritual, and drill as a means of infusing cadets with a disciplined character that as officers will not wither in combat, and will allow them to lead and sustain their soldiers.  Agency Decision, AR at 3-5, ECF No. 21-3.  By maintaining "smartness of appearance and action; cleanliness and maintenance of dress, maintenance of equipment, cleanliness of quarters; deference to senior Soldiers and officers; and mutual respect between senior and subordinate personnel" discipline is cultivated.  Agency Decision *Id*. at 4.  Third, an emphasis on grooming standards in ROTC contributes to a credible officer corps that is principally connected to the soldiers it will lead by ensuring that they are "inculcated into the Army and its values, training methods, and traditions in a way that is reflective of what their future Soldiers will expect of them[.]"  *Id*. at 1-2.  Fourth, the wearing of a common uniform also assists in building strong teams in ROTC units and prepares a nationwide pool of cadets to easily converge as officers in the larger Army by "provid[ing] visual evidence of mutual experience[.]"  *Id*. at 3.  This in turn "facilitates more focused training, and ultimately a stronger officer corps."  *Id*.  Fifth, Plaintiff's health and safety would be negatively

17

impacted by allowing him to wear a beard and unshorn hair.  *Id*. at 6.  Facial hair very simply

degrades the ability to obtain a proper seal on the masks used to protect soldiers in chemical and

biological environments.  *Id*.

> ### a.    The Army's Compelling Interests are Not Undermined

The Army has not undermined its compelling interests in this case by permitting some

deviations from uniform rules.  These limited deviations reflect a careful balancing of equally

compelling interests by military commanders who must keep a broad perspective on the force's

overall readiness.

The Secretary of the Army could, hypothetically, promulgate policies to immediately

separate current soldiers with medical profiles[4] for shaving, but America's Army would not be as

diverse and thereby would be weaker.  *Compare* 10 U.S.C. § 1218 (giving the secretary wide

authority to dictate standards for fitness to serve) *with* Technical Bulletin 287, ¶ 2-1c,

*Pseudofolliculitis of the Beard and Acne Keloidalis Nuchae* (Dec. 10, 2014) ("TB MED 287")

("Although PFB [pseudofolliculitis barbae] can occur in other races, it occurs mainly in

African-American/black males.  Black individuals have a higher tendency for developing PFB due

to their genetic predisposition for curly hair.") (Def. Exh. AA); *see also Grutter v. Bollinger*, 539

U.S. 306, 331 (2003) (approvingly recognizing that the Armed Forces officer corps must be highly

qualified and diverse)(quoting amicus brief); *cf. Bradley v. Pizzaco of Neb., Inc.*, 939 F.2d 610,

613 (8th Cir. 1991) ("The EEOC's evidence makes clear that Domino's strictly-enforced no-beard

policy has a discriminatory impact on black males.  PFB prevents a sizable segment of the black

---

[4]        Shaving profiles are limited to the minimum length necessary to treat the underlying medical condition.  TB
287, ¶ 2-5d (Def. Exh. AA).  Ordinarily this will be 1/8 to 1/4 inch, but it can exceed 1/4 inch growth if medically
necessary.  *Id*.  A key feature of a shaving profile is that the profiled soldier will be required to shave in a chemical or
biological environment.  TB 287, ¶ 2-1c (if there is an actual danger of exposure to a toxic environment, then the
Soldier must be required to shave the beard.)"  Citations are to a recent version of the TB 287 that was implemented
during the course of this litigation.

male population from appearing clean-shaven, but does not similarly affect white males.").

      The Army could discharge individuals with nonconforming tattoos, but Army leadership determined that other compelling interests required an exception to policy because the ranks would otherwise be damagingly thinned. *See* Stipulation of Lieu of Rule 30(b)(6) testimony (noting of approximately 1,000,000 soldiers in the Army, that 197,102 soldiers had to be grandfathered into the policy change) (Def. Exh. W at 2). The Army recently announced its intent to rescind limits "on a particular size or number of tattoos permitted on the arms or legs" but it will continue to "prohibit tattoos above the T-shirt neckline, on the head, face, wrists and hands." C. Todd Lopez, *Army to Revise Tattoo Policy*, www.army.mil/article/145780/Army_to_revise_tattoo_policy/ (Apr. 2, 2015) (Def. Exh V) (last accessed April 9, 2015). In reaching his recommendation on this most recent policy change, the Sergeant Major of the Army, Daniel Dailey, noted the careful balancing of important interests that the tattoo policy must take in account:

> Dailey said he has asked Soldiers about how the current tattoo policy might affect their decision to separate from military service. He said "overwhelmingly," Soldiers have said the policy would play a role in their deciding to stay in or to leave.

> Dailey said he did not want the tattoo policy to be the deciding factor for why a good Soldier might decide to leave the Army. He said he felt that the policy might in some way be at odds with the requirement to maintain an all-volunteer force.

> "So then we struggle with - do the standards of discipline we've established override the needs of what we need to maintain the all-volunteer force, and the quality all-volunteer force, even more so as we draw down," he asked. "When we move this standard too far to the right, can we actually maintain the all-volunteer force in the future?"

> Dailey's discussions with Soldiers and his concerns regarding the effects of the existing tattoo policy *on the Army's ability to maintain the all-volunteer force*, were included in his own recommendations regarding the tattoo policy that he made to the Army chief of staff and the Army secretary.

*Id* (emphasis added). Surely the effective function of the Army can be irreversibly damaged if the

ranks cannot be filled.  Similarly, the Army could also prohibit the growth of beards for all

operational reasons, but mission accomplishment would be nonsensically and perversely

subverted to grooming concerns, when the Army promotes grooming as a means of furthering

mission accomplishment.  Agency Decision, AR at 2-3, ECF No. 21-3.

The professional judgment required to carefully balance these compelling interests, as

reflected in these decisions, should not be undermined by a ruling that would force the Army to

discharge soldiers with tattoos and treatable medical conditions simply to preserve another

compelling interest.  *See Bitterman v. Sec'y of Def.*, 553 F. Supp. at 724 ("There is no doubt that

the effective functioning and maintenance of the Air Force is a substantial compelling

governmental interest").  The Army's compelling interests have been well maintained.

### b.      Plaintiff's Case was Based on an Individual Assessment

Plaintiff's request for accommodation in order to train in ROTC and his stated desire to

serve as an officer in the Military Intelligence Branch is also materially different from the facts and

circumstances of the approved religious accommodations he relies upon.  Compl., ECF No. 1, ¶

14.  Since 2000 the Army has only granted the accommodations Plaintiff has requested to

individuals who possessed specialized professional skills that were needed by the Army in a time

of war.

Unlike Plaintiff, Major Kalsi, Captain Rattan, and Corporal Lamba joined the military in

response to specialized programs that actively sought the unique skills these individuals possessed

during a time of growing conflict.  Pl. Exh. 7, Kalsi Depo., ECF No 32-3 at 15-18; Pl. Exh. 34,

Rattan Depo., ECF No. 32-7 at 9-10.  Their respective service in Special Branches[5] underscores

---

[5]        The Special Branches are different from Basic Branches because they focus on professional technical skills
and less on the leadership of large teams of soldiers.  Def. Exh. EE, 30(b)(6) Eggerton Depo. at 13-14; *see* 10 U.S.C. §

that they have unique professional skills that the Army needed.  Major Kalsi (physician) and

Captain Rattan (dentist) are both medical professionals with extensive specialized training and

entered their branches via direct commissioning programs that specifically identified[6] the branch

of the Army each would serve.  Pl. Exh. 7, Kalsi Depo., ECF No 32-3 at 13-15; Pl. Exh. 34, Rattan

Depo., ECF No. 32-7 at 8-10.  Corporal Lamba[7] is a highly educated individual who was recruited

to the Army under the Military Accessions Vital to the National Interest (MAVNI) program.[8]  Pl.'s

Stmt. Of Undis. Mat. Facts, ¶ 80, ECF. No 32-2; Pl. Exh 57, ¶ 4, ECF. No. 32-11   In contrast,

Plaintiff is an undergraduate student and the Army is not actively using ROTC as a means of

aggressively filling the needs Plaintiff perceives it has for the languages he can speak.[9]  Def. Exh.

DD, Webber Depo. at 16; *see also* Def. Exh. Y, Webber Memo.  Lieutenant General McConville

plainly considered Plaintiff's unique language skills in his decision and simply found them not

---

3065(e). (officers performing duty in "engineering, law, medicine, or theology. . . must have the qualifications, by education, training, or experience, equal to or similar to those usually required of members of that profession[.]").  As aptly stated by Mr. Eggerton, the difference between the branches is akin to the difference "between [a] football team and tennis[.]"  Def. Exh. EE, 30(b)(6) Eggerton Depo. at 13-14.  Basic branches are like "a football team you have 12 or 11, a number of folks that have to work together to achieve a mission.  And the special branch is a tennis player.  I am going against my opponent, which might be a disease, if you are a medical officer.  It might be a specifically difficult case, if you are an attorney."  *Id.*  The Court should therefore refrain from drawing overbroad conclusions from the service of Major Kalsi, Captain Rattan, and Corporal Lamba.

[6]     In contrast, ROTC assigns cadets to branches based on a competitive system that balances the needs of the Army near the point of commissioning.  *See* Army Reg. 145-1, ¶ 6-19 (A075).

[7]     Corporal Lamba also was an enlisted soldier and not an officer.  Amongst other major differences between officer and enlisted service, Corporal Lamba did not have a commission.  See 10 U.S.C. § 531 (the President appoints commissioned military officers);  Furthermore, Corporal Lamba was assigned to Military Occupational Specialty ("MOS") 68W – Health Care Specialist, meaning he was regimentally affiliated with the Army's Medical Department, a Special Branch.  Def. Exh S, section X.

[8]     The MAVNI program "is a recruiting program that allows legal non-citizens with in-demand skills to join the Army in exchange for expedited U.S. Citizenship."  *See generally* MAVNI Information Sheet for Language Recruits, available at http://www.goarmy.com/.../mavni/mavni-language.pdf (last visited Apr. 6, 2014).

[9]     Though ROTC has immersion programs for those with language skill, the current emphasis in ROTC remains on the recruitment of science, technology, engineering, and mathematics ("STEM") students.  Def. Exh. DD, COL Webber Depo. at 16; *see also* Def. Exh. Y, Webber Memo

necessary in this context.  Agency Decision, AR at 7, ECF No. 21-3.

The needs of the Army now are also far different than when other exceptions were granted. LTG McConville highlighted that the Army is different now because it is downsizing after years of protracted conflict with large scale deployments.  Emphasizing this point, he writes that "at a time when the Army is now culling the force and returning many good Soldiers back to civilian life after nearly thirteen years at war, emphasis on the consistent and even handed application of standards[10] is now even more important."  Agency Decision, AR at 5, ECF No. 21-3.

By granting accommodations to Corporal Lamba, Captain Rattan, Major Kalsi and others[11] the Army has demonstrated that it takes seriously its obligation to consider religious accommodation requests on case by case basis.  These accommodations were granted by the Army and were managed internally by the Army.  Def. Exh. R, S, T, U.  The relative professional success of these individuals validates the Army's decision-making process and its decision to grant accommodations in appropriate circumstances.

### 3.     The Army's Decision is the Least Restrictive Means of Furthering the Government's Compelling Interest

The government need not "refute every conceivable option" to prove that a law is narrowly tailored.  *Hamilton v. Schriro*, 74 F.3d 1545, 1556 (8th Cir. 1996); *see also Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 188-89 (1979) (Blackmun, J., concurring). Plaintiff's absolute position offers no viable alternative least restrictive means.

---

[10]     Though Colonel (Ret.) Khalsa served in Military Intelligence, he was commissioned and grandfathered under the prior regulatory system.  COL Khalsa Declaration, ¶¶ 2-7, ECF No. 32-10.  There is little question Colonel Khalsa (Ret.) served well and honorably, and retired in 2009; however, the Army's consideration of how to implement its compelling interests have changed since his enlistment in 1976.

[11]  The Army has also approved religious grooming exceptions to wear beards for three other individuals with unique professional expertise:  an orthopedic surgeon, an anesthesiologist, and a chaplain.  Def. Exh. Q.

The Army cannot decide now that it will simply find Plaintiff an assignment within the organization, and then at the point of commissioning assign him to a position where his accommodation may have some conceivably lesser impact on the military necessity factors.  The Army's professional judgment is that granting Plaintiff's accommodation in the context of Plaintiff's ROTC officer training would profoundly change his training to a degree that he would be unqualified to lead.  Furthermore, because ROTC branch assignments "must be made according to the needs of the Army" based on the "branch/specialty strength requirements" of the Army, (Army Reg. 145-1, ¶ 6-19 (A075, ECF No. 21-4)), the Army cannot project precisely today what operational considerations it will need to address with the pool of available ROTC officers in 2017.  Nor could the Army retain needed flexibility in the force if it must pledge Plaintiff's assignment in a particular occupational specialty, unit, or duty location.  *See Lindenau v. Alexander*, 663 F.2d 68, 71 (10th Cir. 1981) ("Military regulations must be considered in the light of military exigencies, must be geared to meet the imperative needs of mobilization and national vigilance -- when there is no time for 'litigious interruption'") (internal citation and quotation omitted).

The fact also remains that Plaintiff's requested accommodation would put him at greater risk as shown by a peer reviewed protective mask study that was conducted with a statistically large sample size by an accredited laboratory.[12]  Def. Exh. JJ  at 59; Def. Exh. HH, Pappas Depo. at 26-30, 62-63; *see also* Def. Exh. P, ECF. No. 21-2, ¶ 10, Alex G. Pappas Decl.  The study reaches the unremarkable conclusion other studies reached before it, that every approved Army

---

[12]        As the test has 32 participants it is considered to have a highly reliable sample size.  Def. Exh. HH, Pappas Depo. at 26 ("Again, if you do statistics above 30 is a large sample.  So any time you want to do a valid test, or a highly reliable test, you want to do above that.").

protective mask configuration is degraded by facial hair.[13]  Def. Exh. JJ; *see also* Def. Exh. P, ECF. No. 21-2, ¶¶ 9, 10, Alex G. Pappas Decl.  In tests of the M40[14], M45, M50, and M53 masks (without a Powered Air Purifying Respirator ("PAPR")) clean shaven subjects exceeded the Army safety standards, bearded subjects consistently failed.[15]  Def. Exh. II.

Plaintiff seeks to usurp the Army's role in determining how it will equip its forces by highlighting two features of the study.  First, Plaintiff points to the passage rate for bearded subjects using the various masks, apparently as a means to arguing that such rates are good enough for chemical protection purposes.  But the Army has determined that such rates are not good enough and requires a passage rate of no less than 88%.  Pl. Mem. Opp'n to Def's Mot. to Dismiss, ECF No. 32, at 24.  Plaintiff's position clearly disregards the Army's rightful obligation to set acceptable safety standards for its soldiers in combat.  *See North Dakota v. United States*, 495 U.S. 423, 443, (1990) ("When the Court is confronted with questions relating to military discipline and military operations, we properly defer to the judgment of those who must lead our Armed Forces in battle.").  Plaintiff further ignores that the various masks are designed for certain specific

---

[13]    Army protective masks seal against the skin of the face, facial hair prevents a smooth sealing against the face, therefore the mask is degraded.  Def. Exh. HH, Pappas Depo. at 29-30, 62-63 78 ("because you have hair sticking out of your peripheral seal which will cause leaks.  And then it is not just the leaks.  It is if a person has facial hair out, he is going to have to get decon'd because you are not going to get the agent out of his facial hair.").

[14]    The M40 is the most issued mask for most Army forces but it is being replaced by the M50.  Def. Exh. GG, Loudy Depo. at 38, 54.

[15]    Plaintiff attacks the study's reliability because the test did not always verify the ability of a bearded subject to seal a mask while clean shaven.  Plaintiff appears to suggest that bearded persons may have been consistently failing their fit tests due to other features like face or head size.  Mem. Opp'n to Def's Mot. to Dismiss, ECF No. 32 at 23-24.  However the report summary makes clear that the "test took facial anthropometrics into account as many individuals were used with beards and as clean shaven."  (Def. Exh. II, 008729).  The consistent degraded performance of bearded subjects and the consistent passage of shaved subjects contradict Plaintiff's point.  Furthermore, a mask like the M40 is designed to protect a wide range of the population thereby inherently significant deviations would not be expected. Def. Exh. GG, Loudy Depo. at 38 ("Currently the issued mask for most forces is the M40/42, and that was designed to fit from the 5th percentile female to the 95th percentile male); at 49-50 (observing one time as the manager of the Hard to Fit program Mr. Loudy saw a soldier that did not fit in the M40 and M45 mask).

military specialties and are not simply used interchangeably.  Def. Exh. GG, Loudy Depo. at 54-55, 59.

Second, Plaintiff appears to suggest that the Army could simply issue him an M53 mask with a PAPR.  Pl. Mem. Opp'n to Def's Mot. to Dismiss, ECF No. 32. at 24.  This argument fails. The M53 with a PAPR is not used by conventional military forces because it offers a degraded level of battlefield flexibility and protection.  Specifically, the PAPR adds extra weight, has a hose that is subject to snagging, is not part of ordinary supply channels, and requires batteries that if depleted would leave the soldier defenseless against chemical attack.  Def. Exh. HH, Pappas Depo. at 80-81; Def. Exh. GG, Loudy Depo. at 60.  Though some forces may use the M53 with PAPR, Plaintiff's argument refuses to acknowledge that there is a major difference in outfitting those whose very mission is to confront certain threats -- using the best protection that can be provided -- versus accepting a degraded level of protection as a baseline for the Army.

The Army has scrupulously considered Plaintiff's request for religious accommodation. Assessing the unique facts of his case, the Army employed the professional judgments of military leaders regarding the effects of his accommodation as balanced against military necessity factors such as the composition, training and equipping of the Army.  The Army reasonably determined that his request cannot be granted.  That decision is grounded in inimitable judgments regarding impacts on the Army's interests that have long been heeded by the Courts and Congress, and should not be usurped here.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss and alternatively its motion for summary judgment.

Respectfully Submitted,

VINCENT H. COHEN, JR,
D.C. Bar #471489
Acting United States Attorney
for the District of Columbia

DANIEL F. VAN HORN
D.C. Bar #924092
Chief, Civil Division


BY: _____/s/_____
WAYNE H. WILLIAMS
Special Assistant U.S.  Attorney
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 252-2574
wayne.williams@usdoj.gov


OF COUNSEL
Major David M. O'Dea
Military Personnel Branch
U.S. Army Litigation Division
9275 Gunston Road
Fort Belvoir, VA 22060

26