Singh v McHugh  - Exhibit Q

(As of 3 October 2014)

**Requests for waivers of uniform and/or grooming policy based on religious faith (formerly exceptions to policy) from Soldiers**

| DATE OF DECISION | FAITH GROUP | MOS | REQUESTED | APPROVE/DISAPPROVE |
|---|---|---|---|---|
| 29 July 2014 | Islamic | 27D, Paralegal Specialist | Full mustache and beard | Disapproved |
| 3 July 2014 | Rastafarian | 42A, Human Resources Specialist (NCO) | Dreadlocks | Disapproved |
| 24 April 2014 | Islamic | 92G, Food Service Specialist (Cook) | Wear headscarf with uniform | Disapproved |
| 2 April 2014 | Rastafarian | 92Y, Unit Supply Specialist | Dreadlocks | Disapproved |
| 23 October 2013 | Sikh | 36B, Financial Management Technician | Beard, unshorn hair and a turban | Disapproved |
| 27 September 2013 | Islamic | Inmate | Beard | Disapproved |
| 6 August 2013 | Sikh | Orthopedic Surgeon | Beard, unshorn hair and a turban | Approved (Grandfathered) |
| 6 August 2013 | Sikh | 68W, Health Care Specialist (Medic) | Beard, unshorn hair and a turban | Approved (Grandfathered) |
| 6 August 2013 | Sikh | Dentist | Beard, unshorn hair and a turban | Approved (Grandfathered) |
| 6 August 2013 | Islamic | Orthopedic Surgeon | Beard | Approved (Grandfathered) |
| 6 August 2013 | Islamic | Anesthesiologist | Beard | Approved (Grandfathered) |
| 6 August 2013 | Jewish | Chaplain | Beard | Approved (Grandfathered) |
| 6 August 2013 | Islamic | Pediatrician | Wear hijab with uniform | Disapproved |
| 6 August 2013 | Sikh | 15T, UH-60 Helicopter Repairer | Beard, unshorn hair and a turban | Disapproved |
| 26 June 2012 | Islamic | Psychiatrist | Beard | Disapproved |

Religious Accommodation requests will be approved unless they "will have an adverse impact on unit readiness, individual readiness, unit cohesion, morale, discipline, safety, and/or health" (AR 600-20, Army Command Policy, Rapid Action Revision, 20 September 2012). These factors are known individually and collectively as 'military necessity.'

The Deputy Chief of Staff, G-1 is the approval or disapproval authority for all requests for a waiver of uniform and/or grooming policy based on religious faith (religious accommodation). Local commanders can approve requests for religious accommodation of worship practices and dietary requirements. Religious accommodations for worship and dietary practices are not tracked at HQDA level.

Hajibs and headscarves may be worn with the uniform in a chapel setting.

Singh v McHugh  - Exhibit R



**DEPARTMENT OF THE ARMY**
OFFICE OF THE DEPUTY CHIEF OF STAFF G-1
300 ARMY PENTAGON
WASHINGTON DC 20310-0300

DAPE-ZA



MEMORANDUM THRU

Commander, United States Forces Command (FORSCOM), Fort Bragg, NC 28310
Commander, I Corps, Joint Base Lewis-McCord, WA 98433
Commander, 210th BfSB, Joint Base Lewis-McCord, WA 98433
Commander, 3-38 Cavalry, 210th BfSB, Joint Base Lewis-McCord, WA 98433
Commander, HHT, 3-38 Cavalry, 210th BfSB, Joint Base Lewis-McCord, WA 98433

FOR SPC Simran Lamba

SUBJECT: Exception to Army Regulation 670-1 Appearance and Grooming Policy Based on Religious Belief – SPC Simran Lamba

1. We recently conducted a review of the limited exception to Army personal appearance and grooming policies granted to you based on your request to practice the tenets of your religious faith. Currently, you are authorized to wear a beard, unshorn hair and a turban for the duration of your present assignment. This letter amends the terms of your exception to policy (ETP); it supersedes the ETP granted to you via a letter dated August 30, 2010. The terms of your ETP are amended as described below.

2. Policy for the accommodation of religious practices is provided in Department of Defense Instruction 1300.17, *Accommodation of Religious Practices Within the Military Services*, February 10, 2009; Army Regulation (AR) 670-1, *Wear and Appearance of Army Uniforms and Insignia*, February 3, 2005 (Rapid Action Revision, May 11, 2012); and AR 600-20, *Army Command Policy*, March 18, 2008 (Rapid Action Revision, September 20, 2012). Generally, Soldiers are able to observe their religious practices if doing so does not adversely impact military necessity. "Military necessity" is the collective effect of the following factors: unit readiness, individual readiness, unit cohesion, morale, discipline, safety, and/or health (AR 600-20, paragraph 5-6).

3. You were granted an ETP during a period in which the Army insufficiently scrutinized such requests and, due to your reliance on the ETP, we conclude it unfair and unwise to enforce generally-applicable grooming regulations for you in the future. Your current, limited ETP is hereby amended to an indefinite ETP. This indefinite ETP may be revoked by the Deputy Chief of Staff (DCS), G-1, if required by military necessity, and you should be prepared to comply with AR 670-1 if directed to do so. This indefinite ETP will allow you to make Permanent Change of Station (PCS) moves and to travel on Temporary Duty (TDY) or movement orders. However, any deployment OCONUS will be scrutinized by your commander, as the wearing of a beard renders gas masks unsafe. Should your commander determine that military necessity requires suspension

Singh v. McHugh 015927

DAPE-ZA

SUBJECT: Exception to Army Regulation 670-1 Personal Appearance and Grooming Policies Based on Religious Belief – SPC Simran Lamba

d. It is SPC Lamba's responsibility to ensure his beard is well maintained and presents a neat and orderly appearance.

3. This granting of an indefinite ETP is based solely on the unique facts and circumstances related to SPC Lamba; it does not constitute or establish precedent regarding an exception to policy for any other individual.

4. The current unit commander and all subsequent unit commanders of SPC Lamba will counsel SPC Lamba in writing to ensure he understands expectations. At a minimum the commander will address the following:

a. Grooming exceptions to policy will be neat and well maintained at all times, to present a disciplined Soldierly appearance.

b. Military necessity – accommodations of a Soldier's religious practices must be examined against military necessity and cannot be guaranteed at all times.

c. Performance, perceptions, problems, adjustments to training, etc.

d. Please furnish SPC Lamba with a copy of this memorandum.

5. SPC Lamba's assignments manager is authorized to order, via the Army assignments system, Permanent Changes of Station for SPC Lamba. Care should be taken when sending SPC Lamba outside CONUS, that his beard, unshorn hair, and turban not pose a danger to himself, his family, his command, or the mission.

6. The unit commander is responsible for ensuring the counseling is completed.

7. Point of contact is CH (LTC) Terrence Walsh at the Command Policy and Programs Division, DCS, G-1 at commercial (703) 571-7229.

HOWARD B. BROMBERG
Lieutenant General, USA
Deputy Chief of Staff, G-1

CF:

Commander, HRC, US Army Human Resources Command, 1600 Spearhead Division Avenue, Fort Knox, Kentucky 40122-5105
Official Military Personnel File, SPC Simran Preet Lamba

2

Singh v. McHugh015928



**DEPARTMENT OF THE ARMY**
OFFICE OF THE DEPUTY CHIEF OF STAFF G-1
300 ARMY PENTAGON
WASHINGTON, DC 20310-0300

DAPE-ZA

2 F AUG 2013

MEMORANDUM THRU

Commander, United States Forces Command (FORSCOM), Fort Bragg, NC 28310
Commander, I Corps, Joint Base Lewis-McCord, WA 98433
Commander, 210th BfSB, Joint Base Lewis-McCord, WA 98433
Commander, 3-38 Cavalry, 210th BfSB, Joint Base Lewis-McCord, WA 98433

FOR Commander, HHT, 3-38 Cavalry, 210th BfSB, Joint Base Lewis-McCord, WA 98433

SUBJECT: Exception to Army Regulation 670-1 Personal Appearance and Grooming Policies Based on Religious Belief - SPC Simran Lamba

1. This memorandum provides guidance relating to an indefinite exception to the Army personal appearance and grooming policies, as provided in Army Regulation (AR) 670-1, for SPC Simram Lamba, based on his religious belief.

2. On 20 August 2010, SPC Lamba was granted a limited exception to policy (ETP) to wear a beard, unshorn hair, and a turban in observance of the tenets of his religion for so long as he is assigned to his present duty assignment. Effective immediately, SPC Lamba's ETP is indefinite; until notified otherwise, and except as indicated below, this indefinite ETP is valid for the length of SPC Lamba's service in the Army.

   a. This indefinite ETP may be revoked by the Deputy Chief of Staff (DCS), G-1, if required by military necessity, and SPC Lamba should be prepared to comply with AR 670-1 if directed to do so.

   b. This indefinite ETP will allow SPC Lamba to make Permanent Change of Station (PCS) moves and to travel on Temporary Duty (TDY) or movement orders.

   c. However, any deployment OCONUS will be scrutinized by SPC Lamba's commander, as the wearing of a beard renders gas masks unsafe. Should the commander determine that military necessity requires suspension of this ETP for the duration of the deployment, he/she will forward a recommendation through command channels to the DCS, G-1 for decision.

DAPE-ZA

SUBJECT:  Exception to Army Regulation 670-1 Appearance and Grooming Policy Based on Religious Belief – SPC Simran Lamba

of this ETP for the duration of the deployment, he/she will forward a recommendation through command channels to the DCS, G-1 for decision.  You are also authorized to attend Department of the Army schools and field exercises under this ETP.

4.  It is your responsibility to ensure your beard, unshorn hair and turban is well maintained and presents a neat and orderly appearance.  Your command will provide written guidance to ensure your understanding of expectations.

5.  This indefinite ETP does not constitute or establish precedent regarding an exception to policy for any other individual.  Each request for an ETP must be evaluated on its own unique facts and individual circumstances, and balanced against the potential impact of granting the requested ETP on "military necessity."

6.  Should you require assistance, my point of contact for this memorandum is CH (LTC) Terrence Walsh at the Command Policy and Programs Division, Office of the Deputy Chief of Staff, G-1 at commercial telephone (703) 571-7229.

HOWARD B. BROMBERG
Lieutenant General, USA
Deputy Chief of Staff, G-1

CF:

Commander, HRC, US Army Human Resources Command, 1600 Spearhead Division Avenue, Fort Knox, Kentucky 40122-5105
Official Military Personnel File, SPC Simran Preet Lamba

2

Singh v McHugh  - Exhibit S

# ENLISTED RECORD BRIEF

| BRIEF DATE 20140901 | NAME LAMBA, SIMRAN PREET | | RANK - DOR CPL | | 20100901 | PMOS 68W | | | COMPONENT | REGULAR |

## SECTION I – Assignment Information

| OS/Deployment Combat Duty | #S - 0 |
| Start-End Date | #I - 0 |

CT | MOT | ST | # | M

| | C | 0 | 0 |
| | Q | 0 | 0 |
| | R | 0 | 0 |
| | TOT - 0 | | |

**Dwell Time**

| Start | 20100901 |
| Month - Days | 48 Mo 22 Days |
| Date Dependents Arrived OS | |
| PMOS | 68W |
| SMOS | |
| Bonus MOS | |
| Bonus Enlist Elig Dt | |
| Promotion Points/YRMO | |
| Prev Promotion Points/YRMO | |
| Prom Seq# | Prom Select Dt |

**Promotion MOS**

| ASVAB | Test # / Dt | ASVAB 07 | 20091201 |
| GT | 108 | ELEC | 102 | FOOD | 99 | TECH | 104 |
| ADMIN | 111 | FA | 102 | COMMO | 106 |
| CMBT | 191 | MECH | 94 | MAINT | 98 |
| AEA / Dt | | |
| Flag Code | Flag Start Dt | Flag Expira ion Dt |

| Date of Loss 20110401 | Date of Last PCS | | |
| ASGT | FROM | MO | UNIT NO | ORGANIZATION |

## SECTION II – Assignment Information

| | DEROS | |
| | DROS | |

| SQI | | 0 |
| POSI/YRMO | | / |
| ASI | | 00 |

## SECTION II – Security Data

| PSI Status | SECRET | Fld Def PS Stat | NONE |
| PSI Invest INIT | | 20091214 |
| PSI Invest Compl | | 20100415 |

## SECTION V – Foreign Language

| Language | Read | Listen | Speak |
| HINDI | 30 | 30 | 30 |
| HINDUSTANI | | 30 | 30 |
| PUNJABI | 80 | 80 | 80 |
| URDU | 80 | 26 | 26 |

| DLAB | |

## SECTION VI – Military Education

| MEL/MES | SSD LVL 1GRADUATED | ACH | Year |
| Course | | | 2012 |
| BDE CBT TEAM TRAUMA | | | |

BMO 20122060DA FORM 3595-R(M16)/99
Correspondence CRS Total # Hrs 207

## SECTION IX – Assignment Information

| STATION | LOC | COMD |
| JBLM LEWI | US | SS |
| JBLM LEWI | US | SS |
| JBLM LEWI | US | SS |
| FT LEWIS | US | SS |
| FT LEWIS | US | SS |
| FT SAM HO | US | MC |
| FT SAM HO | US | MC |
| FT JACKSO | US | SS |
| | | |
| LOS ANGEL | AP | |

## SECTION III – Service Data

| BASD 20100901 | PEBD 20100901 | BESD 20100823 |
| ETS 20140831 | DIEMS 20100823 | Reenl Elig/Prohib so |
| # Days Lost | AGCM Dt 20130831 | AGCM Elg Dt 20160831 |

| | PVT | PV2 | PFC | SPC - CPL |
| DOR | 20100330 | | | 20100901 |
| | SGT | SSG | SFC | MSG - 1SG |
| DOR | | | | |
| DOR | SGM - CSM | | | |

## SECTION VII – CIVILIAN Education

| Level Completed 6 YR COLL | Yr | 2009 |
| DEGREE MASTERS DEGREE | | |
| Institution POLYTECHNIC INS-BRKLYN,NY | Yr | 2009 |
| Discipline MS/INDUSTRIAL ENGINEERING | | |
| Ins Tutor | Yr | |
| Discipline | | |
| Number Of Semester Hours Completed | 32 | |

### Technical Certification

| Course Name | |
| | Dt Certified | Dt Expires |

## SECTION VIII – Awards and Decorations

| ARCOM | 1 |
| AGCM | 1 |
| NDSM | 1 |
| GWT SM | 1 |
| ASR | 1 |
| DMB-DWV | 1 |
| MOBSS-P | 1 |

| Date of Last NCOER | | |
| DUTY TITLE | DMOS | ASI | LANG |
| KNOWN LOSSES | 68W10 | 00 | YY |
| EMERGENCY CARE SGT | 68W20 | 00 | |
| AMBULANCE AIDE/DRIVER | 68W10 | 00 | YY |
| HEALTH CARE SP | 68W10 | 00 | YY |
| HEALTH CARE SP | 68W10 | 00 | YY |
| AIT STUDENT | 68W10 | 00 | YY |
| AIT STUDENT | 68W10 | 00 | YY |
| RA TRAINEE | 1 | | YY |
| RA TRAINEE | 1 | | |

## SECTION IV – Personal/Family Data

| Date of Birth | |
| Country of Citz | MALE/ASIAN |

| Mil Spouse SSN/MPC | |
| Svc Comp / DoD | |
| Emergency Data Verified Date 20140307 |

### SECTION X - Remarks

| HIV YRMO 201309 | |
| RGMT AFL CORPAM | |
| Date Last Photo | |

| TRCMS | CPOSCD | TRCHMO | FYCAL |

Singh v. McHugh015938

Singh v McHugh  - Exhibit T



**DEPARTMENT OF THE ARMY**
OFFICE OF THE DEPUTY CHIEF OF STAFF G-1
300 ARMY PENTAGON
WASHINGTON DC 20310-0300

Reply to
Attention of

DAPE-ZA ▮▮▮▮▮▮▮▮▮▮ AUG 0 6 2013

MEMORANDUM THRU

Commander, US Army Medical Command, ATTN: DASG-ZA, Suite 4SW112, 7700
Arlington Blvd, Falls Church, VA 22042

Commander, Northern Regional Medical Command, 9275 Doerr Road, Building 1221,
Fort Belvoir, VA 22060

Commander, Womack Army Medical Center, Fort Bragg, NC 28307

Commander, MEDDAC Student Company, Womack Army Medical Center, Fort Bragg,
NC 28307

FOR CPT Tejdeep Rattan

SUBJECT: Exception to Uniform and Grooming Policy Based on Religious Belief –
CPT Tejdeep Rattan

1. We recently conducted a review of the limited exception to Army personal
appearance and grooming policies granted to you based on your request to practice the
tenets of your religious faith. Currently, you are authorized to wear a beard, unshorn
hair, and a turban for the duration of your present assignment. This letter amends the
terms of your exception to policy (ETP); it supersedes the ETP granted to you via
memorandum dated 19 October 2011. The terms of your ETP are amended as
described below.

2. Policy for the accommodation of religious practices is provided in Department of
Defense Instruction 1300.17, *Accommodation of Religious Practices Within the Military
Services*, February 10, 2009; Army Regulation (AR) 670-1, *Wear and Appearance of
Army Uniforms and Insignia*, February 3, 2005 (Rapid Action Revision, May 11, 2012);
and AR 600-20, *Army Command Policy*, March 18, 2008 (Rapid Action Revision,
September 20, 2012). Generally, Soldiers are able to observe their religious practices if
doing so does not adversely impact military necessity. "Military necessity" is the
collective effect of the following factors: unit readiness, individual readiness, unit
cohesion, morale, discipline, safety, and/or health (AR 600-20, paragraph 5-6).

3. You were granted an ETP during a period in which the Army insufficiently scrutinized
such requests and, due to your reliance on the ETP, we conclude it unfair and unwise to
enforce generally-applicable grooming regulations for you in the future. Your current,
limited ETP is hereby amended to an indefinite ETP. This indefinite ETP may be
revoked by the Deputy Chief of Staff (DCS), G-1, if required by military necessity, and
you should be prepared to comply with AR 670-1 if directed to do so. This indefinite

Singh v. McHugh015802

DAPE-ZA
SUBJECT:  Exception to Uniform and Grooming Policy Based on Religious Belief –
CPT Tejdeep Rattan

ETP will allow you to make Permanent Change of Station (PCS) moves and to travel on
Temporary Duty (TDY) or movement orders.  However, any deployment OCONUS will
be scrutinized by your commander, as the wearing of a beard renders gas masks
unsafe.  Should your commander determine that military necessity requires suspension
of this ETP for the duration of the deployment, he/she will forward a recommendation
through command channels to the DCS, G-1 for decision.  You are also authorized to
attend Department of the Army schools and field exercises under this ETP.

4.  It is your responsibility to ensure your beard, unshorn hair and turban are well
maintained and present a neat and orderly appearance.  Your command will provide
written guidance to ensure your understanding of expectations.

5.  This indefinite ETP does not constitute or establish precedent regarding an
exception to policy for any other individual.  Each request for an ETP must be evaluated
on its own unique facts and individual circumstances, and balanced against the
potential impact of granting the requested ETP on "military necessity."

6.  Should you require assistance, my point of contact for this memorandum is CH
(LTC) Terrence Walsh at the Command Policy and Programs Division, Office of the
Deputy Chief of Staff, G-1 at commercial telephone (703) 571-7229.


HOWARD B. BROMBERG
Lieutenant General, USA
Deputy Chief of Staff, G-1

CF:
Commander, HRC, US Army Human Resources Command, 1600 Spearhead Division
   Avenue, Fort Knox, Kentucky 40122-5105
Official Military Personnel File, CPT Tejdeep Singh Rattan

Singh v. McHugh015803



**DEPARTMENT OF THE ARMY**
OFFICE OF THE DEPUTY CHIEF OF STAFF G-1
300 ARMY PENTAGON
WASHINGTON DC 20310-0300

Reply to
Attention of

DAPE-ZA

AUG 0 6 2013

MEMORANDUM THRU



Commander, US Army Medical Command, ATTN: DASG-ZA, Suite 4SW112, 7700 Arlington Blvd, Falls Church, VA 22042

Commander, Northern Regional Medical Command, 9275 Doerr Road, Building 1221, Fort Belvoir, VA 22060

Commander, Womack Army Medical Center, Fort Bragg, NC 28307

FOR Commander, MEDDAC Student Company, Womack Army Medical Center, Fort Bragg, NC 28307

SUBJECT: Exception to Army Regulation 670-1 Appearance and Grooming Policy Based on Religious Belief – CPT Tejdeep Rattan

1. This memorandum provides guidance relating to an indefinite exception to the Army personal appearance and grooming policies, as provided in Army Regulation (AR) 670-1, for CPT Tejdeep Rattan, based on his religious belief.

2. On 19 October 2011, CPT Rattan was granted a limited exception to policy (ETP) to wear a beard, unshorn hair, and a turban in observance of the tenets of his religion for so long as he is assigned to his present duty assignment. Effective immediately, CPT Rattan's ETP is indefinite; until notified otherwise, and except as indicated below, this indefinite ETP is valid for the length of CPT Rattan's service in the Army.

   a. This indefinite ETP may be revoked by the Deputy Chief of Staff (DCS), G-1, if required by military necessity, and CPT Rattan should be prepared to comply with AR 670-1 if directed to do so.

   b. This indefinite ETP will allow CPT Rattan to make Permanent Change of Station (PCS) moves and to travel on Temporary Duty (TDY) or movement orders.

   c. However, any deployment OCONUS will be scrutinized by CPT Rattan's commander, as the wearing of a beard renders gas masks unsafe. Should the commander determine that military necessity requires suspension of this ETP for the duration of the deployment, he/she will forward a recommendation through command channels to the DCS, G-1 for decision.

   d. CPT Rattan is also authorized to attend Department of the Army schools and field exercises under this ETP.

Singh v. McHugh 015804

DAPE-ZA

SUBJECT: Exception to Army Regulation 670-1 appearance and grooming policy based on religious belief – CPT Tejdeep Rattan

e. It is CPT Rattan's responsibility ████████ to ensure his beard, unshorn hair and turban are well maintained and present a neat and orderly appearance.

3. This granting of an indefinite ETP is based solely on the unique facts and circumstances related to CPT Rattan; it does not constitute or establish precedent regarding an exception to policy for any other individual.

4. The current unit commander and all subsequent unit commanders of CPT Rattan will counsel CPT Rattan in writing to ensure he understands expectations. At a minimum the commander will address the following:

a. Grooming exceptions to policy will be neat and well maintained at all times, to present a disciplined Soldierly appearance.

b. Military necessity – accommodations of a Soldier's religious practices must be examined against military necessity and cannot be guaranteed at all times.

c. Performance, perceptions, problems, adjustments to training, etc.

d. Please furnish CPT Rattan with a copy of this memorandum.

5. The Office of the Surgeon General is authorized to order, via the Army assignments system, Permanent Changes of Station for CPT Rattan. Care should be taken when sending CPT Rattan outside CONUS, that his beard, unshorn hair, and turban do not pose a danger to himself, his family, his command, or the mission.

6. The unit commander is responsible for ensuring the counseling is completed.

7. Point of contact is CH (LTC) Terrence Walsh at the Command Policy and Programs Division, DCS, G-1 at commercial (703) 571-7229.

HOWARD B. BROMBERG
Lieutenant General, USA
Deputy Chief of Staff, G-1

CF:

Commander, HRC, US Army Human Resources Command, 1600 Spearhead Division Avenue, Fort Knox, Kentucky 40122-5105
Official Military Personnel File, CPT Tejdeep Singh Rattan

2

Singh v. McHugh015805

Singh v McHugh  - Exhibit U



**DEPARTMENT OF THE ARMY**
OFFICE OF THE DEPUTY CHIEF OF STAFF G-1
300 ARMY PENTAGON
WASHINGTON, DC  20310-0300

OCT 2 7 2011

DAPE-ZA

OCT 19 2011

MEMORANDUM FOR Commander, Human Resources Command, 1600 Spearhead Division Avenue, Fort Knox, KY 40122-5405

SUBJECT:  Special Management of Limited Exception to Appearance and Grooming Policy based on Religious Belief - Major Kamaljeet S. Kalsi

1.  This memorandum provides guidance for the assignment management of MAJ Kalsi. On 22 October 2009, the Deputy Chief of Staff (DCS), G-1 granted MAJ Kalsi a limited exception to the Army's appearance and grooming policy.  MAJ Kalsi is permitted to wear a beard, uncut hair, and turban, in observance of the tenets of his religion, for the duration of his assignment at Womack Army Medical Center (WAMC), Fort Bragg.

2.  I hereby direct that the attached approval letter be placed in MAJ Kalsi's Official Military Personnel File.  The appropriate Movement Non-Availability Reason (MVNAR) and Assignment Consideration Code will be updated in the appropriate personnel systems (TAPDB, eMilpo) to alert the branch manager to coordinate with DCS, G-1, the Soldier's current command, prospective gaining command, and the Soldier prior to military movement.  The MVNAR code will prevent major military movement (e.g. PCS, TCS, deployment, etc. [PROFIS included]) without prior coordination with the DCS, G-1.

3.  MAJ Kalsi must resubmit a new exception to policy request, IAW AR 600-20, to DCS, G-1 before any military movement.  Failure to do so will result in MAJ Kalsi being required to adhere to the Army appearance and grooming policy.

4.  Point of contact is Chaplain (LTC) Samuel Godfrey, Command Policy and Programs Division, DCS, G-1 at commercial 703-604-0670/0668/0669.

Encl
Approval Letter

THOMAS P. BOSTICK
Lieutenant General, GS
Deputy Chief of Staff, G-1

CF:
Cdr, HQ, WAMC, Ft Bragg, NC
MAJ Kalsi

Singh v. McHugh015620



**DEPARTMENT OF THE ARMY**
OFFICE OF THE DEPUTY CHIEF OF STAFF G-1
300 ARMY PENTAGON
WASHINGTON, DC  20310-0300

OCT 2 2 2009

Captain Kamaljeet S. Kalsi
17 Skyview Terrace
Riverdale, New Jersey 07457

Dear Captain Kalsi:

On May 29, 2009, the then-Deputy Chief of Staff, G-1, received your religious accommodation appeal to wear a beard, uncut hair, and turban in keeping with the tenets of your Sikh faith.  Based on the facts of your individual case and subject to the conditions specified in the third paragraph, I am granting your appeal.

Department of Defense Instruction 1300.17, *Accommodation of Religious Practices Within the Military Services*, Army Regulation 670-1, *Wear and Appearance of Army Uniforms and Insignia*, and Army Regulation 600-20, *Army Command Policy*, establish Department of Defense and Army policy regarding Soldier hair and grooming practices and the wear of religious apparel, articles, or jewelry.  These references also establish standards for processing requests for religious accommodation.

Based on a review of these standards and the specific facts of your case, I am granting your appeal to wear a beard, uncut hair, and turban in keeping with the tenets of your faith.  Your beard, uncut hair, and turban will be neat and well maintained at all times.  Your command will provide specific guidance on the proper standards applicable to your wear of a turban, beard and uncut hair.  This accommodation is based solely on the facts and circumstances of your case, as balanced against the potential impact of accommodation on "military necessity," defined in Army Regulation 600-20, paragraph 5-6 as including the factors of unit readiness, individual readiness, unit cohesion, morale, discipline, safety and/or health.  This accommodation is granted for your attendance at military school and your follow-on assignment.  This accommodation cannot be guaranteed at all times and may be revoked due to changed conditions.  This accommodation does not constitute a blanket accommodation for any other individual; as each request must be evaluated based on its own unique facts and individual circumstances.

I wish you every success as you move forward in service with our Army.

Sincerely,

GINA S. FARRISEE
Major General, GS
Acting Deputy Chief of Staff, G-1



**DEPARTMENT OF THE ARMY**
OFFICE OF THE DEPUTY CHIEF OF STAFF G-1
300 ARMY PENTAGON
WASHINGTON, DC  20310-0300

DAPE- ZA

OCT 19 2011

MEMORANDUM FOR Major Kamaljeet S. Kalsi, Womack Army Medical Center (WAMC), 2817 Reilly Rd, Fort Bragg, NC  28310

SUBJECT:  Limited Exception to Appearance and Grooming Policy Based on Religious Belief - MAJ Kalsi

1.  This memorandum provides guidance concerning the limited exception to the Army appearance and grooming policy, as provided in Army Regulation (AR) 670-1, approved for you by the Deputy Chief of Staff (DCS), G-1 on 22 October 2009.

2.  You are temporarily permitted to wear a beard, uncut hair, and turban in observance of your religious beliefs.  This exception to policy was granted only for your attendance at military school and follow on assignment at WAMC.  This exception to policy is not permanent and cannot be guaranteed at all times or for all future duty assignments.  Additionally, this exception to policy may be revoked by the DCS, G-1 due to changed conditions.  You should be prepared to comply with AR 670-1, as directed by DCS, G-1 if military necessity dictates.

3.  It is your responsibility to ensure your beard, uncut hair, and turban are well maintained and present a neat and orderly appearance.

4.  Your command will counsel you in writing to ensure understanding of expectations.  Your command will also verify the completeness of any new requests for exception to policy.

5.  The written counseling will be used by DCS, G-1 to determine the impact (on you, your fellow Soldiers, your unit, and the Army as a whole) of extending the exception to policy and assess that impact in relation to military necessity, as defined in AR 600-20, paragraph 5-6.

6.  Before any major military movement (PCS, TCS, overseas movement, deployment [PROFIS included], DA Selected School, etc.), you must initiate a new request for exception to policy for approval by the DCS, G-1.  Coordination must be made with DCS G-1, your Human Resources Command (HRC) assignment manager, and your command in advance of any major military movement.

7.  Future requests for exception to policy must be submitted according to instructions in AR 600-20, paragraph 5-6 through command channels to DCS G-1, ATTN: DAPE–HR–L, Washington, DC 20310–0300.

DAPE-ZA
SUBJECT:  Limited Exception to Appearance and Grooming Policy Based on Religious
Belief - MAJ Kalsi

8.  Should you require assistance, my point of contact is Chaplain (LTC) Samuel
Godfrey, Command Policy and Programs Division, DCS, G-1 at commercial 703-604-
0670/0668/0669.

THOMAS P. BOSTICK
Lieutenant General, GS
Deputy Chief of Staff, G-1

CF:
Cdr, HQ, WAMC, Ft Bragg, NC
Cdr, HRC, 1600 Spearhead Ave, Ft Knox, KY

Singh v. McHugh015623



**DEPARTMENT OF THE ARMY**
OFFICE OF THE DEPUTY CHIEF OF STAFF G-1
300 ARMY PENTAGON
WASHINGTON, DC 20310-0300

DAPE-ZA                                                             OCT 19 2011

MEMORANDUM FOR Commander, Womack Army Medical Center (WAMC), 2817 Reilly Rd, Fort Bragg, NC 28310

SUBJECT: Exception to Army Regulation 670-1 Appearance and Grooming Policy based on Religious Belief - Major Kamaljeet S. Kalsi

1. This memorandum provides guidance relating to a limited exception to the Army appearance and grooming policy, as provided in Army Regulation (AR) 670-1, for MAJ Kalsi, based on his religious belief.

2. On 22 October 2009, the Deputy Chief of Staff (DCS), G-1, granted CPT Kalsi (promoted to MAJ, 1 October 2011) a limited exception to policy, for the wear of his beard, uncut hair, and turban in observance of the tenets of his religion. This exception to policy is limited both in terms of time and circumstances. It is temporary in nature; only granted for his current duty assignment at WAMC. It is also condition specific; if the conditions of service at WAMC change, the exception to policy is subject to revocation.

3. The granting of future exceptions to the Army appearance and grooming policy is not guaranteed. The current exception could be revoked if required by military necessity, as defined in AR 600-20, paragraph 5-6. The granting and/or revocation of exceptions to policy are the exclusive prerogative of the DCS, G-1. Only the DCS G-1 may grant exceptions to AR 670-1; granted exceptions may only be revoked by the DCS G-1.

4. This limited exception to policy is based solely on the unique facts and circumstances related to MAJ Kalsi and his current duty assignment. Before any future military movement (PCS, TCS, overseas movement, deployment [PROFIS included], DA Selected School, etc.), MAJ Kalsi will be required to initiate a new request for exception to policy. MAJ Kalsi must be prepared to comply with AR 670-1 if his request for exception to policy is not granted.

5. The unit commander will counsel MAJ Kalsi in writing to ensure he understands expectations. At a minimum the commander must address the following:

   a. Grooming and uniform exceptions to policy will be neat and well maintained at all times to present a disciplined Soldierly appearance.
   b. Military necessity - accommodations of Soldier's religious practices must be examined against military necessity (unit readiness, individual readiness, unit cohesion, morale, discipline, safety, and/or health) and cannot be guaranteed at all times.
   c. Address performance, perceptions, problems, adjustments to training, etc.

Singh v. McHugh015624

DAPE-ZA
SUBJECT:  Exception to Army Regulation 670-1 Appearance and Grooming Policy
based on Religious Belief - Major Kamaljeet S. Kalsi

   d.  Ensure that MAJ Kalsi understands his exception does not apply in a deployed
environment.  In case of deployment, he will need to comply with AR 670-1 unless he
obtains an additional exception from DCS, G-1 specifically for the deployed area of
operation.

6.  For resubmission for change of circumstance MAJ Kalsi will need:

   a.  Written request explaining in detail the nature of the request (mandatory).
   b.  Chain of Command Recommendation (to include ACOM/ASCC/DRU)
(mandatory).
   c.  Chaplain's Memorandum.  The chaplain will interview the Soldier.  The interview
is not privileged information.  The memorandum must state that the interview occurred
and address the religious basis and sincerity of the Soldier's request.  The chaplain is
not required to make a recommendation (mandatory).
   d.  Legal Review (mandatory).
   e.  Statements from peers (optional).
   f.  Copies of religious writings (optional).
   g.  Statements or doctrinal declarations concerning tenets of the Soldier's faith.
(optional).
   h.  Documents pertaining to the Soldier's character of service (optional).

7.  The unit commander is responsible for ensuring the counseling is completed and
forwarded, along with any future requests for exception to policy to the DCS, G-1,
ATTN: DAPE–HR–L, Washington, DC 20310–0300.  In advance of any major military
movement by MAJ Kalsi, the unit will coordinate with DCS, G-1, the HRC assignment
manager, and the Soldier concerning a new request for exception to policy according to
instructions in AR 600-20, paragraph 5-6.

8.  Point of contact is Chaplain (LTC) Samuel Godfrey, Command Policy and Programs
Division, DCS, Army G-1 at commercial 703-604-0670/0668/0669.

THOMAS P. BOSTICK
Lieutenant General, GS
Deputy Chief of Staff, G-1

2

Singh v. McHugh015625

Singh v McHugh  - Exhibit V

Homepage > News Archives > Article

## Army to revise tattoo policy

April 2, 2015

By **C. Todd Lopez**

g+1  5    Like  3,581 people like this.



*A Soldier displays his tattoos grandfathered in under the current Army Regulation 670-1. The number and size of tattoos on the arms and legs will be less restrictive under an updated policy, Army Chief of Staff Gen. Ray Odierno says will soon take effect.*

HUNTSVILLE, Ala. (April 2, 2015) -- The Army will update its policy on tattoos during the coming weeks, making it more accommodating to current social norms, the Army's chief of staff said.

During a press conference during the Association of the United States Army Global Force Symposium and Exposition here, Army Chief of Staff Gen. Ray Odierno said the service regularly reviews and makes updates to Army Regulation 670-1.

"As part of the regular process that we go through in reviewing regulations, covering the wear and appearance of the Army uniform, and the appearance of our Soldiers, we will be releasing in the coming weeks, an update to that policy, and the most notable change is going to be the change in the tattoo policy in the Army," Odierno said.

Soldiers will no longer be limited to a particular size or number of tattoos permitted on the arms or legs, Odierno said, provided those tattoos are not extremist, indecent, sexist or racist.

The policy will, however, continue to prohibit tattoos above the T-shirt neckline, on the head, face, wrists and hands. There will be an exception allowing one ring tattoo on each hand.

Odierno said that changes to the policy came after listening to feedback from Soldiers, and after discussion with senior enlisted leaders.

"We have listened to the Soldiers," Odierno said. "I've talked to our sergeants major and our non-commissioned officers and some of our officers and frankly, society is changing its view of tattoos, and I think we need to change along with it."

During an interview last week, Sgt. Maj. of the Army Daniel A. Dailey discussed the upcoming change to the Army tattoo policy. He said that the message from the Soldiers he talks to is clear: Soldiers have tattoos, tattoos are acceptable now, and the tattoo policy might affect a decision to re-enlist.

"You can't go anywhere without hearing about the Army's tattoo policy," Dailey said. "It came up when I was at the U.S. Army Sergeants Major Academy too. So it's not just Soldiers, but leaders as well."

The sergeant major said American culture has changed, and that tattoos are more accepted now than they have ever been before. The Army is a reflection of American society, and American society, he said, accepts tattoos.

"I think this is a realization that we are in a different generation," he said. "Tattoos are more prevalent in young Americans than I think they have ever been throughout American history."

When it was implemented, the current Army tattoo policy did not force out Soldiers who had tattoos below the elbow or knee or above the neck line. However, the policy did require Soldiers to have those tattoos documented. It also limited additional tattoos in those places.

"These Soldiers understand that, they know they are grandfathered in," Dailey said. "But they have fears. We have documented every one of those tattoos, and they expect that could one day be used against them with regards to promotions or things like that."

Dailey said he has asked Soldiers about how the current tattoo policy might affect their decision to separate from military service. He said "overwhelmingly," Soldiers have said the policy would play a role in their deciding to stay in or to leave.

Dailey said he did not want the tattoo policy to be the deciding factor for why a good Soldier might decide to leave the Army. He said he felt that the policy might in some way be at odds with the requirement to maintain an all-volunteer force.

"So then we struggle with - do the standards of discipline we've established override the needs of what we need to maintain the all-volunteer force, and the quality all-volunteer force, even more so as we draw down," he asked. "When we move this standard too far to the right, can we actually maintain the all-volunteer force in the future?"

Dailey's discussions with Soldiers and his concerns regarding the effects of the existing tattoo policy on the Army's ability to maintain the all-volunteer force, were included in his own recommendations regarding the tattoo policy that he made to the Army chief of staff and the Army secretary.

**Related Links**

Army News Service

Army.mil: Inside the Army

Chief of Staff Gen. Raymond T. Odierno

Sergeant Major of the Army Sgt. Maj. of the Army Daniel A. Dailey

Dailey discusses revised tattoo policy on Fort Bragg

Singh v McHugh  - Exhibit W

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IKNOOR SINGH,             )
                                )
           Plaintiff,       )
                                )
       v.                  )     Civil Action No. 14-cv-1906 (ABJ)
                                )
JOHN MCCHUGH, et al.      )
                                )
          Defendants.    )
                                )

## I.  STIPULATION IN LIEU OF RULE 30(b)(6) TESTIMONY

COME NOW the United States Army, and stipulate as follows in lieu of providing Federal Rule of Civil procedure 30(b)(6) testimony in response to Plaintiff's Matter for Examination 3 as identified via letter date February 10, 2015:

The Office of the Deputy Chief of Staff, G-1 (Personnel), maintains records of approved religiously based uniform, personal appearance, and personal grooming practice exceptions. By policy, the Deputy Chief of Staff, G-1, is an approval authority for religious accommodations to the Army's wear and appearance of the uniform, personal appearance, and personal grooming standards. Based on a review of its records, the Army has approved six religiously based uniform, personal appearance, and personal grooming practice exceptions since 2000. Three of the exceptions were granted to Sikhs allowing them to wear unshorn beards, unshorn hair, and turbans while in uniform.

Soldiers may also be granted uniform and grooming exceptions for medical reasons if a soldier is issued a profile by a health care provider, and the profile is approved by the soldier's commander. A validly approved health care profile could permit a soldier to temporarily or permanently wear ¼ inch facial hair in order to treat an ongoing medical condition, or for example, a soldier could be permitted to wear tennis shoes rather than boots due to a foot condition. The Army cannot readily determine how many uniform and grooming exceptions have been granted for medical reasons over the past five years because records of profiles are issued to Soldiers by their individual health care providers and are subject to local command review. The Army is comprised of over one million Soldiers, who move between thousands of commands at locations around the world.

Soldiers may also request exceptions for non-conforming tattoos, branding, and body mutilation as approved by the Deputy Chief of Staff, G-1. Between April 1, 2014 and January 29, 2015 the Directorate of Military Personnel Management, Office of the Deputy Chief of Staff,

G-1 approved 147 exceptions for non-conforming tattoos and 0 exceptions for branding and body mutilations for the Active, National Guard, and Reserve components. On March 31, 2014, the Army changed its tattoo, branding, and body mutilation policy. Under the change 197,102 Soldiers in the Active, National Guard, and Reserve components were grandfathered into the policy.

Local commanders may permit individuals to make minor deviations from baseline uniform standards to meet operational, safety, and mission requirements. For example a commander may permit Soldiers to wear tennis shoes with the Army Combat Uniform while doing physical training or to wear unit t-shirts during physical training to enhance unit esprit de corps. As the Army is comprised of over one million Soldiers, who move between thousands of commands at locations around the world, the Army cannot readily determine how many grooming and uniform exceptions commanders have granted for operational, safety, and mission requirements over the past five years because the exceptions are not centrally managed.

The Army does not know the total number of general uniform, personal appearance, and personal grooming exceptions granted over the past 5 years because such data is not centrally managed. No assessments to determine the cumulative impact of all exceptions on the Army's overall readiness, unit cohesion, morale, good order, discipline, safety, and/or health have been performed.

THOMAS C. SEAMANDS
Major General, GS
Director of Military
    Personnel Management

2

Singh v McHugh  - Exhibit X

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **IKNOOR SINGH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 14-cv-1906 (ABJ)** |
| | ) | |
| **JOHN MCCHUGH, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

### I.   STIPULATION IN LIEU OF RULE 30(b)(6) TESTIMONY

COME NOW the United States Army, and stipulate as follows in lieu of providing Federal Rule of Civil procedure 30(b)(6) testimony in response to Plaintiff's Matter for Examination 4 as identified via letter date February 10, 2015:

The Army cannot determine the number of times officers have been granted accommodations, waivers, and exemptions in the past 5 years that have resulted in officers being subjected to different practices and rules than those imposed on their subordinates. The Army has hundreds of regulations and policies that are continually updated and frequently implemented at the lowest levels of command. Regulatory exceptions can be granted by various levels of command, dependent upon the specific policy to which the exception is sought. Approved exceptions are not centrally maintained by one office in the Army. In some cases, if a lower level commander can approve the exception, documents may be maintained at that level. Furthermore, the inability to compile this data is compounded by the fact that the Army is comprised of over one million Soldiers, who move between thousands of commands at locations around the world.

The Army does not know the total number times officers have been granted accommodations, waivers, and exemptions in the past 5 years that have resulted in officers being subjected to different practices and rules than those imposed on their subordinates because such data is not centrally managed. No assessments to determine the cumulative impact of such accommodations, waivers, and exemptions on the Army's overall readiness, unit cohesion, morale, good order, discipline, safety, and/or health have been performed.

THOMAS C. SEAMANDS
Major General, GS
Director of Military
   Personnel Management

Singh v McHugh  - Exhibit Y



**DEPARTMENT OF THE ARMY**
HEADQUARTERS, UNITED STATES ARMY CADET COMMAND
**FORT KNOX, KENTUCKY, 40121**

REPLY TO
ATTENTION OF

ATCC-OD                                                          19 March 2015

Memorandum for record.

Subject:  Col Webbers deposition in the case of Mr. Singh vs US Army.
1. Background.  During the deposition by the ACLU, the lawyers asked me about the PROJECTGO and language scholarships.
2. USACC does not have any scholarships that recognizes and rewards native speakers of foreign languages.  We have a very small program that awards scholarships to cadets that are studying languages identified on the Army's Focused Language List.  This program is intended for Cadets majoring in one of these languages, usually non native Foreign language speakers, to increase the Army's capabilities in this area.  This program is designed specifically to fill the gap created by the difficulty finding native Non English speakers that qualify for ROTC.
3. DLENSEO is a DOD program that tries to coordinate military policy to encourage cultural awareness and language skills.  I was not aware DLENSEO call their program PROJECT GO, until after the Deposition.  The program is not designed for Native Non English speakers, but for traditional American college students to become more culturally astute.
4. I believe the questions from the ACLU were about incentivizing individuals who already spoke strategic languages.  As such, we do not have any program for that type of cadet.
5. POC is the undersigned at Paul.l.webber.mil@mail.mil

Paul L. Webber
Col, MI
Chief,  RMID

Singh v McHugh  - Exhibit Z





JAN 2 4 2013

MEMORANDUM FOR SECRETARIES OF THE MILITARY DEPARTMENTS
                    ACTING UNDER SECRETARY OF DEFENSE FOR PERSONNEL
                    AND READINESS
                    CHIEFS OF THE MILITARY SERVICES

SUBJECT: Elimination of the 1994 Direct Ground Combat Definition and Assignment Rule

      We are fully committed to removing as many barriers as possible to joining, advancing, and succeeding in the U.S. Armed Forces. Success in our military based solely on ability, qualifications, and performance is consistent with our values and enhances military readiness. Today, women make up 15% of the U.S. military and are indispensable to the national security mission. In fact, thousands of women have served alongside men in Iraq and Afghanistan, and like men, have been exposed to hostile enemy action in those countries. However, many positions in our military remain closed to women because of the 1994 Direct Ground Combat Definition and Assignment Rule.

      In February 2012, in collaboration with the Joint Chiefs of Staff, we modified the 1994 Rule, thereby opening up over 14,000 positions previously closed to women. Subsequently, the Joint Chiefs of Staff reviewed the 1994 Direct Ground Combat Definition and Assignment Rule and they now propose a way forward that will fully integrate women without compromising our readiness, morale, or war-fighting capacity. We agree with their approach and guiding principles, and the milestones they propose. A copy of the memorandum explaining the advice of the Joint Chiefs of Staff is attached.

      Therefore, the 1994 Direct Ground Combat Definition and Assignment Rule excluding women from assignment to units and positions whose primary mission is to engage in direct combat on the ground is rescinded effective immediately. Currently closed units and positions will be opened by each relevant Service, consistent with the guiding principles set forth in the attached memorandum and after the development and implementation of validated, gender-neutral occupational standards and the required notifications to Congress. The Military Departments shall submit by May 15, 2013, to the Secretary of Defense through the Chairman of the Joint Chiefs of Staff and the Under Secretary of Defense for Personnel and Readiness, their detailed plans for the implementation of this directive. Their plans shall be consistent with the guiding principles, and goals and milestones contained in the attached memorandum.

      Integration of women into newly opened positions and units will occur as expeditiously as possible, considering good order and judicious use of fiscal resources, but must be completed no later than January 1, 2016. Any recommendation to keep an occupational specialty or unit closed to women must be personally approved first by the Chairman of the Joint Chiefs of Staff, and then

by the Secretary of Defense; this approval authority may not be delegated. Exceptions must be narrowly tailored, and based on a rigorous analysis of factual data regarding the knowledge, skills and abilities needed for the position. The Military Departments shall submit quarterly progress reports on their implementation of this memo to the Secretary of Defense through the Chairman of the Joint Chiefs of Staff and the Under Secretary of Defense for Personnel and Readiness.

Martin E. Dempsey
General, USA
Chairman of the Joint Chiefs of Staff

Leon E. Panetta
Secretary of Defense

Attachment:
As stated

cc:
Under Secretary of Defense for Acquisition, Technology, and Logistics
Under Secretary of Defense for Policy
Under Secretary of Defense for Intelligence
General Counsel of the Department of Defense
Assistant Secretary of Defense for Legislative Affairs
Assistant Secretary of Defense for Public Affairs

Singh v McHugh  - Exhibit AA

**TB MED 287**

_____

**TECHNICAL BULLETIN**

Medical Services

# PSEUDOFOLLICULITIS OF THE BEARD AND ACNE KELOIDALIS NUCHAE

APPROVED FOR PUBLIC RELEASE, DISTRIBUTION IS UNLIMITED
HEADQUARTERS, DEPARTMENT OF THE ARMY

_____

10 December 2014

HEADQUARTERS                                               *TB Med 287
DEPARTMENT OF THE ARMY
Washington, DC
10 December 2014

## PSEUDOFOLLICULITIS OF THE BEARD AND
## ACNE KELOIDALIS NUCHAE

> You can help to improve this bulletin.  If you find any mistakes or have a recommendation to improve procedures, please let us know.  Mail a memorandum or DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to Commander, U.S. Army Medical Command, ATTN: MCHO-CL-C, 2847 Worth Road, JBSA Fort Sam Houston, TX 78234.

|  | Paragraph | Page |
|---|---|---|
| CHAPTER 1 GENERAL | | |
| History | 1-1 | 4 |
| Purpose | 1-2 | 4 |
| References | 1-3 | 4 |
| Explanation of abbreviations and terms | 1-4 | 4 |
| | | |
| CHAPTER 2 PSEUDOFOLLICULITIS BARBAE | | |
| Introduction | 2-1 | 5 |
| Pathogenesis | 2-2 | 5 |
| Clinical approach to the patient | 2-3 | 7 |
| Management techniques | 2-4 | 7 |
| Guidelines for treatment in relation to clinical severity | 2-5 | 10 |
| e-Profile considerations | 2-6 | 11 |
| Medical evaluation board/physical evaluation board | 2-7 | 13 |
| Summary | 2-8 | 13 |
| | | |
| CHAPTER 3 ACNE KELOIDALIS NUCHAE | | |
| Introduction | 3-1 | 14 |
| Pathogenesis | 3-2 | 14 |
| Clinical approach to patient | 3-3 | 15 |
| Management techniques | 3-4 | 15 |
| Medical evaluation board/physical evaluation board | 3-5 | 15 |
| Summary | 3-6 | 16 |
| | | |
| APPENDIX A REFERENCES | | 17 |
| | | |
| GLOSSARY | | 19 |

_____

*This bulletin supersedes TB MED 287 dated 1 September 2000.

TB MED 287

List of Figures

| Number | Title | Page |
|--------|-------|------|
| 2-1 | Pathogenesis of pseudofolliculitis barbae | 6 |
| 2-2 | Mechanical reasons for beard growth as a treatment | 11 |

# CHAPTER 1

# GENERAL

**1-1.  History**
This issue publishes a revision.

**1-2.  Purpose**
This technical bulletin provides information with respect to the diagnosis and medical management of pseudofolliculitis of the beard (PFB) and acne keloidalis nuchae (AKN). It is specifically intended to assist medical officers and other healthcare providers in the proper management of active duty and Reserve Component Soldiers who are afflicted with these conditions.

**1-3.  References**
Referenced publications, forms, and a selected bibliography are listed in appendix A.

**1-4.  Explanation of abbreviations and terms**
Abbreviations and special terms used in this publication are explained in the glossary.

## CHAPTER 2

## PSEUDOFOLLICULITIS BARBAE
_____

**2-1. Introduction**
   *a. Synonyms.* PFB is also known as pseudofolliculitis barbae, pili incarnati, chronic scarring pseudofolliculitis of the beard, and ingrown hairs of the beard.
   *b. Definition.* PFB is a common hair disorder characterized by a foreign body inflammatory reaction that is caused by ingrown hairs of the face and beard areas after removal of the hair.  It is a chronic papulopustular dermatitis of the bearded area resulting from entry and penetration of the epidermis by the tip of the growing curved hair.  Pathogenesis involves anatomic, mechanical, and genetic factors described below.
   *c. Epidemiology.* Curly hair has a much higher tendency of growing back into the skin than straight or wavy hair.  Although PFB can occur in other races, it occurs mainly in African-American/black males.  Black individuals have a higher tendency for developing PFB due to their genetic predisposition for curly hair.  The PFB process is not gender dependent and can occur in any skin area subjected to regular shaving, plucking, waxing or other traumatic means of hair removal.  PFB can occur in women including those with endocrine disorders in which beard hair growth may occur.
   *d. Military considerations.*
   (1)  Standards of appearance, as specified in current Army regulations, do not permit the active duty member to exercise the option to wear a beard.  Since PFB only becomes apparent following a period of regular traumatic removal of the hair–shaving, pulling, and plucking–the majority of men with this condition have had insufficient cause to develop this problem before entering military service.
   (2)  The medical management of PFB (see para 2-4) often necessitates the wearing of a beard during some phase of treatment.  The commander is acutely aware of the bearded Soldier when he appears in sharp contrast to his clean-shaven counterpart.  This encounter can create problems if all parties concerned fail to recognize the necessity for medical treatment.  Problems related to morale and discipline should not influence a medical decision for proper treatment of the military patient.  The well-motivated Soldier within an informed military community should not create problems relating to morale and discipline because he is receiving legitimate medical therapy.
   (3)  Army Medical Department (AMEDD) personnel must work with both the patient's supervisor and the patient to ensure an environment within which proper treatment of PFB can exist in harmony with the traditions and discipline of the military.
   (4)  Individual military patients who exceed the medical authorization required for treatment may be subject to disciplinary action.  This is a command responsibility.

**2-2. Pathogenesis**
   *a. Anatomical factors.* A deoxyribonucleic acid (DNA) sequence variation, which gives rise to a disruptive amino acid substitution in the companion layer-specific keratin gene of the hair follicle, is partially responsible for the characteristic expression and

represents an additional genetic risk factor for PFB.  With traumatic removal of the hair, the companion layer is disrupted allowing re-growing intrafollicular hairs to more easily penetrate through the follicle and into the skin.  The direction of hair growth is also problematic, especially in the whorled beard pattern or on curved areas along the jaw line.  The hair emerges almost parallel to the skin and immediately turns in the direction of the epidermis.  The arc continues with penetration into the skin as if to complete a full circle.  The external portion of the hair from exit to reentry is usually short, averaging 2 millimeters (mm) in length.  As the tip proceeds through the epidermis and into the dermis, epithelial cells incompletely form about the shaft forming a pseudofollicle.  The resistance increases and penetration gradually ceases, ending at about 2 or 3 mm into the skin.  Further growth will result in a loop over the surface of the skin.  The resulting inflammatory reaction produces the papules, and in a continuing spectrum, the pustules (fig 2-1).  Additionally, if untreated, large cysts may occur containing one or more curled hairs.  The resulting inflammatory response can also lead to the common post-inflammatory hyperpigmentation and to keloid formation and/or hypertrophic scarring.



Figure 2-1.  Pathogenesis of pseudofolliculitis barbae

*b. Mechanical factors.*  When the tip of the emerging hair is traumatically cut at an angle, the resulting sharpened point of the hair facilitates penetration of the skin.  Two situations exist in which the emerging hair penetrates the wall of the follicle rather than arcing across a portion of skin prior to entry.  The first situation occurs when the skin is stretched during shaving (that is, a "barber close shave").  When the skin is released, the tip of the growing hair lies beneath the skin surface and grows in an arc through the disrupted companion layer and follicular wall.  A second similar situation may follow the plucking of individual hairs.

*c. Infectious factors.*  Pathogenic bacteria do not typically complicate PFB.  Cultures from pustules reveal the normal flora of the skin rather than the pathogenic staphylococcal organisms usually noted in true bacterial folliculitis.

*d. Genetic factors.*  A single nucleotide polymorphism (DNA sequence variation) resulting in a disruptive Ala12Thr amino acid substitution in the 1A a-helical segment of the companion layer-specific keratin K6hf gene of the hair follicle is partially responsible for the phenotypic (characteristic) expression.

## 2-3.  Clinical approach to the patient

The PFB papules are subjected to irritation and denudation with shaving, increasing inflammation and patient discomfort.  The submandibular area is particularly prone to PFB because of the density and often sharply angled direction of hair growth.  Because of these factors, hair in this region is subjected to a more traumatic cut.  Once the condition has developed, it will persist indefinitely.  Treatment is, therefore, directed toward clearing the dermatitis and instituting measures to prevent recurrence.  The management is clearly related to the severity of the condition and varies in relation to the extent of disease.  Rarely, if left untreated, large, disfiguring scars or keloids may develop in the affected areas.

## 2-4.  Management techniques

*a. Traumatic hair removal.*  Pulling and plucking the individual hairs are contraindicated for the reasons outlined in paragraph 2-2*b.*

*b. Adequate time for shaving.*  One of the most important methods of management is to allow adequate time to prepare the hair and the skin for shaving (15 minutes).  Shaving without adequate preparation will result in more trauma to the hair follicle and the skin.  It is recommended that the Soldier shave the night before, thus allowing adequate time for the pre-shave, shave, and post-shave phases to be executed properly.  The Soldier may experience the beginnings of a "5 o'clock shadow" shortly after noon the following day.

*c. Dislodgement.*  Dislodgement of the ingrown hair tip is desirable since it will hasten resolution of inflammation.  Individual hairs, if seen, can be manually dislodged by inserting a toothpick or similar item under the loop (never into the skin).  A measure for more general treatment utilizing this principle is the use of a rough washcloth (for example, terry cloth).  Rubbing such a cloth across the beard area, in clockwise and counterclockwise circles, will facilitate the release of embedded hair tips.

*d. Pre-shave methods.*  The pre-shave period is as important as the shave itself.  It is here that the beard area is prepared.  The face should be washed with warm water.  This allows for hydration of the hair shafts and softens the skin overlying the ingrown hairs.  It is during this phase that dislodgement with the washcloth can be performed.  Once the face is adequately hydrated, one of several pre-shave medications may be applied.  A pre-shave lotion containing aloe vera, propylene glycol, dimethicone, and vitamin E as its major components, or a hydroglide shaving solution and moisturizer which is predominantly propylene glycol may be used.  These products are available in most post exchanges.  The pre-shave is applied and allowed to remain on the face for 2 minutes.  This creates a glide surface for the razor and protects the skin if depilatories are being used.  A medicated shaving gel is then applied directly over the pre-shave to

the wet face and allowed to soften the hair and hydrate the skin for 4 minutes.  A study showed that the two used together outperformed either alone when used with other techniques.  This drops the tensile strength of the hair by 40 percent allowing for less trauma to the hair follicle and less of an angled cut to the hair tip.

*e. Razors.*  Previously, razor shaving was discouraged due to the cutting of hairs too closely and the nicking of papules.  Appropriate razors are now available in most post exchanges for use with the PFB condition.  The single blade system has a foil guard to protect against shaving too closely and against nicking existing papules.  The razor is used no more than five shaves before it becomes dull and must be discarded.  Shaving is accomplished by using gentle even strokes in the direction of beard growth.  The same area should not be shaved over more than once.  The skin of the face and neck should not be stretched beyond normal.  The razor should be rinsed with cool water between strokes.  This protects the blade from becoming prematurely dull.  Use of razors with multiple blades, which now are commonly available, is also acceptable as the blades are closer together making it more difficult for a papule to enter between the blades.  There has also been some evidence to suggest that power or vibrating blades may actually stimulate the pili arrector muscle to stand the hair up at a better angle.

*f. Post-razor hydration.*  It is extremely important to hydrate the irritated surface after shaving.  It is recommended to wash off the remaining shaving gel with warm water, apply a post-shave hydrating lotion to the wet face, allow it to remain on the face for 1-2 minutes, and then to pat dry.  Many of the post-shave lotions contain aloe vera which acts as a topical anti-inflammatory and which can help with the post inflammatory hyperpigmentation.

*g. Waterless shaving.*  This method, also known as dry shaving, utilizes any one of several shaving lotions which contain alpha-hydroxy acids or waterless soaps.  After the face is washed and dried, the lotion is applied, and a razor shave is performed.  No pre-shave or shave gel is applied in this method.  The remaining lotion is washed off after the shave is complete.  This method is particularly useful in areas where supplies of water are limited (that is, deployment and field environments).  During a "Usage Trial" conducted at Fort Sam Houston, several of the waterless shave products were tested.  They were generally well accepted by participants; however, numerous Soldiers complained of facial irritation and a stinging sensation after using lotions containing the alpha-hydroxy acids.

*h. Depilatories.*

(1)  General.  Previously, a mainstay of therapy was the use of a chemical depilatory to produce a blunt hair end which is less capable of penetrating the skin.  Usually 6 weeks of depilatory usage is necessary before its effectiveness can be ascertained.  With few exceptions, any use of a razor (blade, electric, or so-called black razor) during this period completely obviates the benefits of a chemical depilatory.  Proper use of the depilatory, as outlined below, must be emphasized and reemphasized to the patients since misusage results in burning, itching, and, occasionally, more severe reactions.  Many patients have now been found to be sensitive to various components of the depilatories.  Even in the absence of symptoms, the chemical depilatories have low patient acceptability because of a strong sulfide odor and/or a messy application procedure.

(2)  Use of barium sulfide powder.  The barium sulfide is in approximately 2 percent strength adjusted to lower acidity (pH 11) with calcium hydroxide.  Most post exchanges stock such a product.  The patient must be instructed in directions for use as follows:

*(a)*  The barium sulfide powder is mixed to a watery consistency and applied thinly to only one-half of the beard area.

*(b)*  Three minutes after the start of the application, a spatula or tongue blade is used to remove the paste.  The removal instrument should be kept moistened with water and continually wiped free of paste with disposable tissue paper.  Strokes should be short, rapid, and in the direction of hair growth.  If hair from heavier bearded areas remains following the first few strokes, repeat the process after waiting an additional 30 to 60 seconds.

*(c)*  When the paste is removed, rinse that half of the face thoroughly and rapidly three times using soap between rinses.  Barium sulfide is difficult to rinse from the face.  The longer the paste remains in contact with the skin, the greater the irritation it will produce.  The same procedure is performed on the other half of the beard area.  If irritation still develops, the patient should limit barium sulfide to one-third of the bearded area at a time until he becomes proficient in the removal technique.

*(d)*  To alleviate the irritation sometimes caused by such agents, a wet dressing (for example, washcloth and cool water) may be held against the face for 3 to 5 minutes, followed immediately by the application of a mild corticosteroid cream over the involved area.  Additionally, a cream depilatory is available which does not require mixing and is less irritating than the original formulation.  It, too, is available in post exchanges.

(3)  Use of calcium thioglycollate preparations.  Many commercial depilatories contain calcium thioglycollate.  Directions for use are as follows:

*(a)*  A thick layer of cream is applied, covering all hair to be removed (in the same manner as that described for barium sulfide) and spread evenly against the direction of hair growth.  Disposable gloves may be worn, if desired.

*(b)*  After waiting 10 to 15 minutes for any one area, the cream is removed with a spatula or tongue blade.  To ensure complete removal, that portion of the face should be rinsed thoroughly and rapidly three times, using soap between rinses.

*i.  After-shave techniques.*  The application of a good after-shave preparation is equally important in the treatment process.  Several after-shave creams are available in the post exchanges.  One product has resorcin, bromelain, and vitamin A (150,000 International Units) as its active ingredients.  The vitamin A acts as a keratolytic agent keeping the skin from overgrowing the hairs which are attempting to grow back into the skin.  The other two components act as anti-inflammatory agents.  Another product, a cream, uses sulfur as its main ingredient.  The sulfur imparts both anti-inflammatory and keratolytic properties.  Some clinicians advocate the use of the alpha-hydroxy acid lotions; however, these may be irritating to freshly shaven skin.

*j.  The next morning.*  On the morning following the shave, the face should be washed with a mild soap and patted dry.  A liberal amount of an emollient moisturizing lotion should be applied to the beard area.  It is here that the alpha-hydroxy acid preparations have the most benefit.  The alpha-hydroxy acids act as a very mild chemical peel and remove built-up skin cells as they moisturize the skin.  This moisturization keeps the hairs and skin soft, making penetration of the skin by the hair tip more difficult.

*k. The break period.*  It is critical that the face be given a periodic break from the harsh effects of shaving.  If duty allows, the Soldier should refrain from shaving on the weekend or off-duty days.  This will give the facial skin time to recover and allow any additional therapies to take effect.

*l. Lasers.*  Laser beard hair reduction with the long-pulse 1,064 nm neodymium-doped yttrium aluminum garnet (also known as Nd:YAG) laser has been shown to improve PFB.  These lasers are usually available in military treatment facilities where dermatology services are provided.

## 2-5.  Guidelines for treatment in relation to clinical severity

*a. Mild condition (few, scattered papules with scant hair growth of the beard area).*  Initially, a trial of shaving with the recommended preparation times outlined in paragraph 8, above, is recommended.  Shaving every third to every other day with an appropriate preparation time may be initiated.  The medicated after-shave creams should still be used on a daily basis.  Once the condition improves, resume shaving on the regular nightly schedule.

*b. Moderate condition (heavier beard growth, more scattered papules, no evidence of pustules or denudation).*  For moderate PFB, tretinoin 0.025 percent cream or gel may be used.  The Soldier should be advised to let the face dry for 10 to 15 minutes prior to application of tretinoin.  Only a "pea" sized amount is needed to cover the beard area.  Shaving should again be spaced out over a 2 to 3-day period and nightly intervals resumed when the condition improves.  A chemical depilatory can be used as a substitute at this point.  This, however, should be reserved for failure to improve on the medication regimen.  Instruct the patient with directions as discussed in paragraph 2-4*h.*  Azelaic acid may be a helpful topical treatment in those individuals with prominent post-inflammatory hyperpigmentation.

*c. Severe condition (many papules with pustules and/or denuded areas).*  The patient should allow beard growth (for e-Profile limitations, see para 2-6) and be observed for resolution of the PFB process.  Clearing usually occurs within a month, although a few remaining papules may require that the ingrown tips be mechanically dislodged as described.  An initial worsening may appear the week following the discontinuation of shaving since all hair tips are now available for entry into the skin.  Following this initial paradoxical response, the dermatitis will go into remission.  The mechanical reasons for beard growth as a treatment are illustrated in figure 2-2.  That is, allowing the beard to grow may release ingrown hairs and, thus, may be part of the treatment of pseudofolliculitis barbae.  At this point, a gel containing 5 percent benzoyl peroxide (BPO) should be applied to the just-washed face and allowed to dry for 5 to 10 minutes.  One percent hydrocortisone cream can then be applied to the affected areas.  The BPO acts as a topical antibiotic and has anti-inflammatory effects.  The weak steroid creams also impart anti-inflammatory effects and decrease skin cell growth over the papules/pustules.  When the PFB is no longer evident, hair removal should be resumed according to instructions listed under moderate condition (para *b*, above).



Figure 2-2.  Mechanical reasons for beard growth as a treatment

   *d.  Progressive disease.*  Soldiers who demonstrate severe adverse reaction and progression of the disease following all methods of hair removal should be allowed to increase their hair length.  The length of the hair required to prevent PFB is not great.  Usually one-eighth to one-fourth inch is sufficient.  DA Form 3349 (Physical Profile) entered into e-Profile for the Soldier should specify the maximum length of beard that is necessary.  The length should not exceed one-fourth inch unless the physician giving the profile specifically states that a beard longer than one-fourth inch is necessary.  In all cases, the maximum length should be stated.  This one-fourth inch length refers to the total measurement of the curled hair.  Hairs should be kept trimmed with electric clippers (not electric razors).  Virtually all individuals with PFB will require a profile for the entire face and neck area at some point in therapy.  The frequency of shaving should be specified by the appropriate profiling officer (physician, dermatologist, nurse practitioner, or physician assistant) (for example, once weekly, and so forth).  DA Form 3349 in e-Profile should clearly state, to the commander and the Soldier, the method of treatment, frequency, method of shaving permitted, and maximum length of hair that is necessary for treatment.  No styling is permitted.

## 2-6.  e-Profile considerations
   *a.  General.*  According to Army Regulation (AR) 40-501, DA Form 3349 must be issued and entered into e-Profile for active duty personnel when beard growth is required during treatment of PFB.  This electronic profile record functions as a means of communication between the medical provider and the Soldier's commander, informing the latter of the member's physical condition.  The e-Profile is the only acceptable and valid profile method as paper profiles or profiles generated from other than the e-Profile are not authorized or valid.  The available system-level templates in e-Profile, shaving-

temporary and shaving-permanent, will be utilized for all profiling.  Providers may individualize instructions in block 8 if clinically indicated.

 *b. Designation.*  A Soldier with PFB will not ordinarily require a restriction in duty or assignment.  While under the treatment, the Soldier's appearance may differ from that prescribed in current Army regulations.  For this reason, the numerical designation "2" will be utilized under the "P" factor of the "PULHES" e-Profile system with a profile A code as follows: 211111/A.  A PULHES 111111/A is not authorized in e-Profiles for PFB.  The shaving profile is currently the only policy exception to the use of a numerical designation "2" in PULHES associated with an A profile code.  The nature of the profile will be further identified as temporary or permanent.

 (1)  Temporary profiles.  This form of e-Profile is used during treatment of PFB, such as in clearing a severe condition prior to resumption of hair removal, when a short period of beard growth (generally less than 6 weeks) is required.  Cases requiring longer periods to clear are usually management problems and a dermatologist should be consulted who will ordinarily initiate the appropriate profile.

 (2)  Permanent profiles.  A permanent profile in e-Profile is utilized when the Soldier's condition is progressive and must be confirmed periodically, particularly in conjunction with inpatient or continuing outpatient care.  In most cases, the conditions that require wearing of a beard do not improve.  Therefore, once a permanent profile authorizing a beard is given, it will be reassessed annually in conjunction with the periodic health assessment (See AR 40-501).  However, such a reevaluation can be done when a commander requests it or when there are indications of a change in the clinical situation.

 *c. Use of protective masks.*  The beard growth which may be required as a treatment for PFB may interfere with the safe utilization of any chemical-biological protective mask.  Any wearing of protective masks in an individual with PFB must be validated with a fit test.

 (1)  The existence of a beard does not prevent performance of most military duties.  Therefore, the fact that a profile is awarded authorizing the growth of a beard should not ordinarily require any functional limitations requiring a change or limitation in the performance of military duties.

 (2)  A more common occurrence might be that a Soldier with a beard may enter a tactical situation where use of the protective mask is required.  This problem can be handled within existing rules because a unit commander has the authority to require that a Soldier's beard be shaved if the unit is in, or about to enter, a situation where use of a protective mask is required and where inability to safely use the mask could endanger the Soldier and the unit.  This authority should not he used to require that a Soldier be clean shaven for maneuvers and other tactical simulations.  It should only be used when there is an actual need to wear the protective mask in a real tactical operation.  A Soldier with a profile authorizing a beard should continue to wear the beard while using a protective mask in all training and tactical simulations where a protective mask is required.  This will ensure that the Soldier is fully familiar with its use.  However, if there is an actual danger of exposure to a toxic environment, then the Soldier must be required to shave the beard.

## 2-7.  Medical evaluation board/physical evaluation board

Rarely, PFB may be associated with the formation of chronic large, disfiguring keloids in the beard area that are recalcitrant to treatment or that may render a Soldier unfit for further military service.  Soldiers with conditions listed in chapter 3 of AR 40-501 who do not meet the required medical retention standards will be referred to the Disability Evaluation System (DES) as defined in AR 635-40.  Examples of conditions that would require a referral to the DES include but are not limited to: inability to wear protective headgear; keloids that are so extensive and adherent that they interfere with the performance of duty; or if chronic or of a nature that requires frequent medical care or interferes with the satisfactory performance of military duty (see AR 40-501).

## 2-8.  Summary

Currently, depilatories, topical creams, and so-called PFB razors do not offer a permanent definitive answer for PFB and, at best, only temporarily ameliorate the underlying problem.  One of the most important methods of management is to allow adequate time to prepare the hair and the skin for shaving.  With the recent advent of laser hair reduction, a new therapeutic modality exists that can benefit patients.  Any male Soldier determined to have PFB or ingrown hairs of the beard treated by an Army physician, dermatologist, nurse practitioner, or physician assistant may be given an appropriate shaving profile.  This beard must be uniform, neatly trimmed, and normally will not exceed one-fourth inch in length.  Virtually all individuals with PFB profiles will require profiling of the entire face and neck area, and this determination should be made by an appropriate physician, dermatologist, nurse practitioner, or physician assistant at the nearest medical facility.  Finally, and most importantly, it is implicitly understood that any individual possessing a beard will wear it at a length that makes the Soldier combat ready at all times.

# CHAPTER 3

# ACNE KELOIDALIS NUCHAE

---

**3-1. Introduction**

*a. Synonyms.* AKN is also known as keloidal acne, dermatitis papillaris capilliti, and folliculitis keloidalis.

*b. Definition.* AKN is a chronic disorder affecting the posterior scalp and upper neck and arises from a process similar to PFB. The major difference between the two is that in AKN, the longstanding process leads to a chronic folliculitis, an inflammatory, scarring alopecia, and keloid-like thickening of the affected scalp.

*c. Epidemiology.* This disorder, developing only in post-pubertal males, affects predominantly African-American/black males. Reports in the literature have also noted development in Orientals and in whites of Mediterranean descent. It is most frequent before the age of 25 and occurs from wearing the closely shaven "high and tight" hair style. It is believed that the pathogenesis of AKN is due to the same keratin defect as has been described in PFB.

*d. Military considerations*

(1) The standards of appearance specify a neatly trimmed hairstyle. Tapering of the hair of the posterior scalp and neck does not interfere with the wearing of military headgear or the protective mask. There is no requirement for the "high and tight" hairstyle.

(2) While the medical management of AKN often necessitates wearing a longer hairstyle, hair can still be maintained at an acceptable length and not detract from proper military appearance.

**3-2. Pathogenesis**

*a. Anatomical factors.* AKN occurs in men with tightly curled hair similar to that of PFB. Studies have noted the presence of sharply pointed, short, curled hairs, with surrounding foreign body granulomatous reactions within the scars. The short hairs penetrate the skin and create a foreign body reaction. This leads to the development of papules, pustules, and, subsequently, keloid-like hypertrophic scarring occurs. There have been no specific bacterial organisms implicated in this process; however, secondary bacterial infection may occur, often complicating the management and contributing to the progression of the disorder.

*b. Mechanical factors.* The hairs, cut too short to create the "high and tight" look, enter the skin, or may rupture the follicular wall before exiting the follicular orifice. A granulomatous infiltrate develops, and secondary cicatrization begins with the development of hypertrophic scarring. In those individuals genetically predisposed, this scarring may eventually develop into a true keloid formation.

*c. Infectious factors.* There is no specific bacterial agent currently implicated in the development of the disorder. Secondary infection may occur, and, occasionally, the disorder may develop after a superficial bacterial infection from poorly sterilized barber instruments.

**3-3.  Clinical approach to the patient.**  This condition, while uncommon, has seen an increase in recent years due to a return to the "high and tight" style of military haircut. The papules, once developed, are chronic and difficult to treat.  They can also be irritated by the top of the shirt or jacket collar, which often adds to the progression of the disorder.  Treatment is directed towards eliminating the contributing factors, halting the development of any further scarring, and decreasing the existing scar formation.

**3-4.  Management techniques**
  *a.  Close shaving.*  The Soldier should be advised to allow his hair to grow to a longer, yet militarily acceptable, length and not choose a closely trimmed "high and tight" hair style.
  *b.  Antibiotics.*  The use of antibiotics should be reserved for the treatment of a known bacterial infection.  Tetracyclines are one of the more skin-specific classes of antibiotics which impart both antibiotic and anti-inflammatory properties.  Before beginning any antibiotic regimen, culture and sensitivity testing should be performed on samples taken from the affected scalp.
  *c.  Steroids.*  Topical steroids are of great value in the treatment of AKN.  A mild to mid-potent topical steroid should be applied twice daily to the affected areas. Intralesional steroid injections, given monthly or every 6 weeks (depending on the severity of the scarring) are helpful in decreasing scar formation.  Triamcinolone acetonide is given as the recommended course, beginning at concentrations of 20 milligrams/milliliter (mg/ml) in very severe cases, or 10 mg/ml in less severe cases, and decreasing gradually to 3 mg/ml strength as the scars subside.  On the average, intralesional injections of the 10 mg/ml strength are most commonly used for maintenance therapy.
  *d.  Wide excision.*  For cases that are either severe or unremitting, wide excision of the scars, with healing by secondary intention, is recommended.  Recent studies have shown excellent results.  While some scar formation is unavoidable, the resulting scar is much more cosmetically acceptable than the scarring of the preoperative condition. This technique should be reserved for dermatologists and surgeons and should not be attempted at the general medical level.  It should not be performed in individuals who are prone to the development of keloids.  The Soldier will be placed on convalescent leave during the post-operative phase of this treatment with a corresponding e-Profile.
  *e.  Profiles.*  If needed, DA Form 3349 entered into e-Profile should be given to prevent irritation by the wear of protective headgear or other protective garments (for example, flak-jackets with high collars as worn by combat vehicle crewmen).  These profiles are used for the duration of the treatment period.  To date, no permanent profiling has been necessary for this condition.  Commanders are reminded that the Soldier may be instructed to wear protective headgear and other protective clothing, as the mission requires.  This authority should not be used to require these items during maneuvers or tactical simulations.

**3-5.  Medical evaluation board/physical evaluation board**
Rarely, AKN may be associated with the formation of chronic large, disfiguring keloids in the posterior scalp and nape of neck area that are recalcitrant to treatment or that may

render a Soldier unfit for further military service.  Soldiers with conditions listed in chapter 3 of AR 40-501 who do not meet the required medical retention standards will be referred to the DES as defined in AR 635-40.  Examples of conditions that would require a referral to the DES include but are not limited to: inability to wear protective headgear; keloids that are so extensive and adherent that they interfere with the performance of duty; or if chronic or of a nature that requires frequent medical care or interferes with the satisfactory performance of military duty (see AR 40-501).

**3-6.  Summary**
Currently, the mainstay of treatment for AKN consists of changing the Soldier's hairstyle from one that is too closely shaven to one that is longer but still militarily acceptable.  Topical and intralesional steroids are the most commonly used techniques for treatment and currently have a good success rate.  However, this disorder is chronic and may be recurrent.  For those disorders that are severe or resistant to other forms of treatment, wide excision with healing by secondary intention is recommended.  The Soldier should be initially evaluated by a dermatologist, and a strategy for therapy can be devised.  After evaluation by a dermatologist, the treatment regimen can be administered by healthcare providers who are familiar with the disorder.  It should be understood that this condition does not remove the Soldier from a combat-ready status.

# APPENDIX A

## REFERENCES

The following listed publications can normally be obtained at, or through, AMEDD library facilities or through normal distribution channels.

**Section I**
**Required Publications**

**AR 40-501**
Standards of Medical Fitness.  (Cited in paras 2-6*a* and *b(2)*, 2-7, and 3-5.)

**Section II**
**Related Publications**

**AR 11-34**
The Army Respiratory Protection Program (paragraph 3-5, Respirator Use)

**AR 670-1**
Guide to the Wear and Appearance of Army Uniforms and Insignia

Bolognia JL, Jorizzo JL, Schaffer JV.  *Dermatology*. 3 e. Philadelphia: Elsevier Saunders 2012, pp. 579-583, 1580.

Brauner GH, Flandemeyer KL.  Pseudofolliculitis barbae, 2: Treatment. *Int Dermatol* 1977;16:520.

Burns T, Breathnach S, Cox N, Griffiths C.  *Rook's Textbook of Dermatology*. 8e. Chichester, West Sussex, UK: Wiley-Blackwell 2010, pp. 9.9, 28.50, 30.26, 78.12.

Coquilla RH, Lewis CW.  Management of pseudofolliculitis barbae. *Mil Med* 1995; 160(5): 263-269.

Craig GE.  Shaving in relationship to disease of the bearded area of the face. *Arch Dermatol* 1955;71:11-13.

Goldsmith LA, Katz SI, Gilchrest BA, Paller AS, Leffell DJ, Wolff K.  *Fitzpatrick's Dermatology in General Medicine*. 8e New York: McGraw-Hill Medical, 2012, pp. 1000, 2134.

Greidanus TG.  Pseudofolliculitis of the beard.
http://emedicine.medscape.com/article/1071251, retrieved 13 March 2014.

James, WD, Berger TG, Elston DM.  Andrew's Diseases of the Skin. 11 e. London: Elsevier Saunders 2011, pp. 238-239, 758-759.

Kelly P.  Surgical Therapy for Acne Keloidalis.  At the 100th Annual Scientific Assembly of the National Medical Association, Atlanta, Georgia, 31 July, 1995.

Kelly AP.  Pseudofolliculitis barbae and acne keloidalis nuchae.  *Dermatol Clin* 2003; 21: 645-653.

Kenney JA.  Management of dermatoses peculiar to Negroes. *Arch Dermatol* 1965; 91:126-129.

Letada P.   Acne keloidalis nuchae, http://emedicine.medscape.com/article/1072149, retrieved 13 March 2014.

Perry PK, Cook-Bolden FE, Rahman Z, Jones E, et. al.  Defining pseudofolliculitis barbae in 2001: A review of the literature and current trends. *J Am Acad Dermatol* 2002;46:S113-119.

Schulze R, Meehan KJ, Lopez A, Sweeney K, et al.  Low-fluence 1,064-nm laser hair reduction for pseudofolliculitis barbae in skin types IV, V, and VI.  *Dermatol Surg* 2009;35:98-107.

Sperling LC, Homoky C, Pratt L, Sau P.  Acne keloidalis is a form of primary scarring alopecia. *Arch Dermatol* Apr 2000;136(4):479-84.

Strauss JS, Kligman AM.  Pseudofolliculitis of the beard. *Arch Dermatol* 1956;74:533-542.

Winter H, Schissel D, Parry DAD., Smith TA, et al.  An unusual Ala12Thr polymorphism in the 1A α-helical segment of the companion layer-specific keratin K6hf:  Evidence for a risk factor in the etiology of the common hair disorder pseudofolliculitis barbae.  *J Invest Dermatol* 2004;122:652-657.

Yurechko S, Carter K, ETG, PF/Toxic Chambers Group. Quantitative fit factor test on the effects of beard growth on military respirator performance.  RDCB-DET-C, U.S. Army Edgewood Chemical Biological Center, September 2009.

**Section III**
**Prescribed Forms**

This section contains no entries.

**Section IV**
**Referenced Forms**

**DA Form 3349**
Physical Profile

# GLOSSARY

## ABBREVIATIONS

**AKN**
acne keloidalis nuchae

**AMEDD**
Army Medical Department

**AR**
Army regulation

**BPO**
benzoyl peroxide

**DES**
Disability Evaluation System

**mg**
milligram(s)

**ml**
milliliter(s)

**PFB**
pseudofolliculitis of the beard

**PFB**
pseudofolliculitis barbae

TB MED 287

By Order of the Secretary of the Army:

RAYMOND T. ODIERNO
*General, United States Army*
*Chief of Staff*

Official:

GERALD B. O'KEEFE
*Administrative Assistant to the*
*Secretary of the Army*

Distribution:

This publication is available in electronic media only and is intended for command levels C, D, and E for the Active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve.

**PIN:  009980-000**

Singh v McHugh  - Exhibit BB

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REV. CHARLES E. LARSEN, et al.,    )
           )
        v.           )     Case No. 02CV02005
           )
THE UNITED STATES NAVY, et al.    )
           )

## PLAINTIFFS MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO THE DEFENDANTS MOTION TO DISMISS

Respectfully submitted,

DATED: March 3, 2003          _____/S/_____

Arthur A. Schulcz, Sr.
D.C. Bar No. 453402
Counsel for the Plaintiffs
2521 Drexel Street
Vienna, VA 22180
703-645-4010

# **INDEX**

INDEX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.     COURTS DO NOT FAVOR MOTIONS TO DISMISS . . . . . . . . . . . . . . . . . . . . . 4

II.    NOTHING IN THE PLAINTIFFS' COMPLAINT DEPRIVES THE COURT OF
       JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       A.     The Complaint Asks for Relief Within the Court's Jurisdiction . . . . . . . . . . . . . . 6

              1.     Plaintiffs' complaint asks for the "opportunity to compete" for a
                     commission, rather than a court ordered commission . . . . . . . . . . . . . . . 6

              2.     Plaintiffs are entitled to commissions if the Navy cannot show that they
                     would have been denied a commission absent the unlawful prejudice . . . 7

              3.     *Orloff v. Willoughby* has no bearing on this case . . . . . . . . . . . . . . . . . . . 9

       B.     The Claims for Equitable Relief by Larsen, McNear and Myers Are Not Claims
              for Money Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

              1.     The Complaint does not ask for monetary relief for Larsen, McNear and
                     Myers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

              2.     Constructive credit is an equitable remedy for the loss of opportunity
                     which cannot be compensated by other means . . . . . . . . . . . . . . . . . . . . 16

              3.     Reverend Larsen's request for retirement as at least a Lieutenant
                     Commander is not a claim for back pay or money damages . . . . . . . . . . 17

              4.     The Navy has no basis to request dismissal of the entire Complaint . . . . 18

       C.     Plaintiffs' Constitutional Injuries Provide Standing and Entitle Them to
              Injunctive and Declaratory Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

              1.     The Navy's lack of standing argument finds no support in the

i

complaint and the relevant case law . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        2.    Courts in this Circuit have found the denial of equal opportunity
           guaranteed by the Fifth Amendment provides the injury in fact
           necessary to confer standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        3.    The Navy's prejudice and its injuries to Plaintiffs will continue. . . . . . . 24

    D.    The Navy's Statute of Limitations Argument Ignores the Law in this Circuit and
       this Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        1.    10 U.S.C. § 2401(a) is subject to equitable tolling . . . . . . . . . . . . . . . . 26

        2.    The Navy's alleged announcement of the Thirds Policy did not start the
           Statute of Limitations running . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        3.    The Navy's use of the word "quota" did not put Larsen on Notice . . . . . 30

    E.    Rev. Linzey Is Entitled to Bring Monetary Claims Against the Navy . . . . . . . . 31

III.    PLAINTIFFS HAVE STATED A VALID RELIGIOUS FREEDOM RESTORATION
     ACT CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

IV.    AMENDMENT TO THE COMPLAINT IS APPROPRIATE . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Adair v. England*, 185 F.Supp 31 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Memphis Community School Dist. v. Stachura*, 477 U.S. 299 (1986) . . . . . . . . . . . . . . . . . . . . 31

*Altman v. Minnesota Dept. of Corrections*, 251 F.3d 1199 (8th Cir. 2001) . . . . . . . . . . . . 33, 34

*Atchinson v. District of Columbia*, 73 F.3d 418 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 5

*Brown v. Polk County*, 61 F.3d 650 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Carey v. Piphus*, 435 U.S. 247 (1978 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Clark v. Library of Congress*, 750 F.2d 89 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . 8, 18, 19, 21

*Harris v. Secretary , U.S. Dept. of Veterans Affairs*, 126 F.3d 339 (D.C. Cir. 1997) . . . . . . . . . 5

*Dilley v. Alexander*, 603 F.2d 914 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*Dilley v. Alexander*, 627 F.2d 407 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Emory v. Secretary of the Navy*, 819 F.2d 291 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . 11, 13, 14

*Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corporation*,
    28 F.3d 1268 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Firestone v. Firestone*, 76 F.3d 1205 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Guam v Guerrero*, 290 F.3d 1210 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Hobson v. Wilson*, 737 F.2d 1 (D.C. Cir. 1884), *cert denied*,
    470 U.S. 1084 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28,29, 36

*Hohri v. United States,* 782 F.2d 227 D.C. Cir. 1987), *reversed on other grounds*
    482 U.S. 64 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27,28

*Hubbard v. EPA*, 982 F.2d 531 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 17, 18

*Hubbard v. EPA*, 949 F.2d 453 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*In re Young (Christians v. Crystal Evangelical Free Church)*, 141 F.3d 854

iii

(8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32,33

*Jackson v. Culinary School of Washington*, 788 F. Supp. 1233 (D.D.C. 1992), *remanded on other grounds*, 27 F.3d 573 (D.C. Cir. 1994), *vacated*, 515 U.S. 1139 (1995) . . . . . . . . . 5

*Katcoff v. Marsh*, 755 F.2d 223 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 30

*Kreis v. Secretary of the Air Force*, 866 F.2d 1508 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . 12, 13

*MacFarlane v. Grasso*, 696 F.2d 217 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Meyer v. Federal Bureau of Prisons*, 929 F. Supp. 10 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . 32

*Orloff v. Willoughby,* 345 U.S. 83 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Perry v. Sinderman*, 408 U.S. 593 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Pilchman v. Department of Defense*, 154 F.Supp.2d 415 (E.D.N.Y. 2001) . . . . . . . . . . . . . . . . 11

*Rigdon v. Perry*, 962 F.Supp. 150 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Roe v. Wade*, 410 U.S. 113 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Saunders v. White*, 191 F.Supp.2d 95 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 8, 20, 22-24

*Shahar v. Bowers*, 114 F.3d 1097 (11th Cir. 1997) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Show v. Petterson*, 955 F.Supp. 182 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Steffan v. Aspin*, 8 F.3d 57 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Steffan v. Perry*, 41 F.3d 677 (D.C. Cir. 1994) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Tucker v. California Dept. of Educ.*, 97 F.3d 1204 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Bauer*, 84 F.3d 1549 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*United States v. Brockamp* 519 U.S. 347 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Hardman*, 297 F.3d 1116 (10th Cir. 2002) (en banc) . . . . . . . . . . . . . . . . . . . 33

*United States v. Nat'l Treas. Employees' Union*, 513 U.S. 454, 466, 473 (1995) . . . . . . . . . . . 33

iv

*United States v. Odessa Union Warehouse Co-Op*, 833 F.2d 172 (9th Cir. 1987) . . . . . . . . . . . 15

*United States v. Stanley*, 483 U.S. 669 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Venters v. City of Delphi*, 123 F.3d 956 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Wallace v. Chappell*, 462 U.S. 296 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ward v. Connor*, 657 F.2d 45 (4th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943) . . . . . . . . . . . . . . . . 25

## FEDERAL STATUTES

10 U.S.C. § 1251 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

10 U.S.C. § 2401(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

28 U.S.C. § 1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15, 26, 31, 35

28 U.S.C. § 2401(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

42 U.S.C. § 1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

42 U.S.C. § 1985 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Religious Freedom Restoration Act, codified at 42 U.S.C. § 2000bb . . . . . . . . . . . . 2, 21, 31, 32

## OTHER AUTHORITIES

*Wright & Miller*, Federal Practice & Procedure: Civil 2d, § 1349 . . . . . . . . . . . . . . . . . 4

# INTRODUCTION

These Non-liturgical clergy Plaintiffs, who were otherwise qualified to become Navy chaplains, claim that the Navy has violated the Constitution's mandate of government neutrality in matters of religion by rejecting their chaplain applications on the basis of illegal religious quotas. They claim those quotas were not based on meeting the Navy's Free Exercise needs, but designed to favor clergy from liturgical Christian denominations and faith groups, *i.e.*, Roman Catholic and liturgical Protestant, and prejudice non-liturgical Christian faith group clergy.

These claims are similar to those made in the two current challenges to the policies governing the Navy Chaplain Corps now pending in this Court, the *Chaplaincy of Full Gospel Churches v. England*, No. 99cv002945, and *Adair v. England*, 00cv00566, (collectively the "Chaplain Cases"). *See Adair*, 183 F.Supp.2d 31, 36-45 (D.D.C. 2002) (explaining the parties, cases, claims and causes of action). Like this case, the Chaplain Cases allege that the defendants (hereafter "the Navy") have established illegal quotas and goals for chaplain accessions favoring liturgical Protestants although Non-liturgical Christians constitute the majority of the Navy's population that has identified a religious preference. *Compare* Larsen Complaint Exhibit 1 (Non-liturgical faith groups constitute approximately 49% of the Navy personnel who identify a faith preference while liturgical Protestants constitute only about 11%) with Exhibit 4 (Navy chaplain accession for liturgical Protestants consistently greater than Non-liturgical clergy.). This favoritism violates the Constitution's mandate of government religious "benevolent neutrality." This Court has found the Chaplain Cases' claims were valid. *Adair,* 183 F.Supp.2d at 57 (hiring policies violate Establishment Clause), 59 (hiring policies and practices violate strict scrutiny), 60 and 63 (identification of chaplain's faith group to the board), 64 (liturgical General Protestant service violates the Establishment Clause), 65-67 (Free exercise and religious speech).

Plaintiffs here allege that the driving force behind their rejections as chaplains was the Navy's unconstitutional prejudice manifested by favoring liturgical Protestants over non-liturgical Protestants without a compelling government reason. This mirrors the Chaplains Cases claims. If the allegations in this Complaint are taken to be true, the Navy used forbidden prejudice to illegally deny Plaintiffs the opportunity to compete for a limited number of chaplain openings on the same basis as Protestant liturgical clergy. Ignoring the Complaint's exhibits, alleged facts and claims, the Navy argues that the Court does not have jurisdiction to address these claims based on a relief the Plaintiffs did *not* ask for. Comparing the allegations in the Plaintiffs' complaint to the arguments in the Navy's Motion to Dismiss ("MTD"), it would appear that the Navy has either mistaken the *Larsen* Complaint for some other complaint, or grossly misconstrued the Complaint and fabricated relief which these Plaintiffs have not asked for. This epitomizes this Court's observation in *Adair*, 183 F.Supp.2d at 57, that "reading the attorneys' briefs in this case is like attending a debate in which the participants have shown up in two different rooms." The very cases the Navy cites in support of its positions show that its arguments are not valid. Ignoring the validity of Plaintiffs' claims, the Navy asks for dismissal of the same claims the Court has already validated in the Chaplains Cases rather than asking for a dismissal only of the Navy's own imagined relief. Continuing to mismatch the applicable law and the Plaintiffs' Complaint, the Navy also argues that the Plaintiffs have not stated a claim for relief under the Religious Freedom Restoration Act, codified at 42 U.S.C. § 2000-bb.

As shown below, the Navy's arguments are invalid, have no basis in fact or law, and are spurious. The Court should deny the Navy's Motion to Dismiss.

# SUMMARY OF ARGUMENT

The Navy's four arguments for lack of subject matter jurisdiction rely on two factors: misstatements of Plaintiffs' requested relief and willful blindness to the relevant law. Rather than address the specific relief that Plaintiffs' actually requested, "if otherwise qualified, the opportunity to be commissioned as Navy chaplains", the Navy twists this request into a "demand that this Court order the commission of Plaintiffs as officers in the Chaplain Corps." Plaintiffs have made no such demand. Instead, they ask for the opportunity to compete for commissions in the Chaplain Corps on an equal basis with and under the same criteria as Roman Catholic and Protestant liturgical clergy did at the time Plaintiffs applied for Chaplain Corps commission.

The Navy's second mischaracterization occurs when the Navy morphs Plaintiffs claims for equitable relief into a demand for money damages. The only Plaintiff who asks for money damages is Chaplain Linzey, and then only as authorized under 28 U.S.C. § 1346 (a)(2) which is not a substantive relief statute but one that grants jurisdiction to the district court. The equitable relief that all Plaintiffs seek is consistent with historic responses to institutional discrimination.

The Navy's third argument, lack of standing, is completely devoid of any First Amendment analysis and ignores well established law that constitutional violations create an "injury in fact" sufficient to confer standing, especially where the violation is capable of repetition but evading review. The Navy also ignores the fact that a government's preference for or hostility against any religion or religious tradition is a continuing violation of the First Amendment's Establishment and Free Exercise Clauses and results in a denial of the equal treatment mandated under the Fifth Amendment's Due Process Clause.

The Navy's fourth argument, that the statute of limitations bars the claims of Larsen and

3

McNear, ignores the relevant precedent in this Circuit that fraudulent concealment of a cause of action by the government tolls the statute until the plaintiff is made aware of the basis for a cause of action. The Complaint specifically makes that claim (Count 5) which must be assumed as true. The Navy has also closed its eyes to the well established rule that government officials are presumed to follow the law. In this case, that presumption establishes that the Plaintiffs could not have been on notice of the Navy's alleged unconstitutional prejudice. Absent some obvious manifestation of systematic religious prejudice, Plaintiffs could presume the reasons that the Navy provided them for rejecting their chaplain applications were made in good faith and in accordance with the law. Only the publicity generated by the other chaplain cases now pending in this Court, *see Adair,* 183 F.Supp. 2d at 35-40, alerted the Plaintiffs to the overriding prejudice which evidence will show has shaped the Chaplain Corps' accessions policies and decisions and led to the plaintiffs' rejection as chaplains.

The Navy's "no RFRA claim" argument is totally devoid of any analysis of "burden" and relevant case law. Discrimination in employment based on religious prejudice is a burden sufficient to trigger RFRA.

## ARGUMENT

## I.     COURTS DO NOT FAVOR MOTIONS TO DISMISS.

Federal courts view motions to dismiss with disfavor. Such motions are "granted sparingly and with caution in order to make certain that a plaintiff is not improperly denied a right to have his claim adjudicated on the merits." *Wright & Miller*, Federal Practice & Procedure: Civil 2d, § 1349, p. 192-93. A court must not dismiss a complaint "unless it appears

beyond a reasonable doubt that a plaintiff can provide no set of facts in support of his claim that would entitle him to relief." *Atchinson v. District of Columbia*, 73 F.3d 418, 422 (D.C. Cir. 1996) (quoting *Conley v. Gibson*, 355 U.S. 41, 45 (1957)). The court must "accept as true all the complaint's factual allegations, giving [plaintiffs] the benefit of all inferences that can be derived from the facts alleged." *Id.* This reflects the well established public policy that wrongs should be brought to light, addressed and remedied.

Furthermore, the Federal Rules establish a liberal amendment policy to cure technical defects in pleadings. *See* Fed. R. Civ. P. 15. The Federal Rules reject a gamesmanship approach to pleading "and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Harris v. Secretary , U.S. Dept. of Veterans Affairs*, 126 F.3d 339, 343 (D.C. Cir. 1997). "The federal rule policy of deciding cases on the basis of the substantive rights involved rather than technicalities requires that plaintiff be given *every opportunity to cure* a formal defect in the pleading." *Jackson v. Culinary School of Washington*, 788 F. Supp. 1233, 1265 n.36 (D.D.C. 1992) (quoting 5A, C. Wright & Miller, *Federal Practice and Procedure*, § 1357, at 360-67)(emphasis added), *remanded on other grounds*, 27 F.3d 573 (D.C.Cir. 1994), *vacated*, 515 U.S. 1139 (1995).

## II.   NOTHING IN THE PLAINTIFFS' COMPLAINT DEPRIVES THE COURT OF JURISDICTION.

The Navy's tendency to misconstrue the allegations of a complaint that the Court noted in *Adair*, 183 F. Supp.2d at 57, is evident here. Even a cursory comparison of the Complaint with the Navy's allegations shows that the Navy's arguments depend on misconstruing the Plaintiffs' allegations and requested relief. The Navy's fabricated argument that Plaintiffs ask the Court to

order that they be commissioned, MTD at 7-9, and that they seek monetary relief, *id.* at 1-14, is a fabrication not supported by the actual words of the Complaint.

**A.    The Complaint Asks for Relief Within the Court's Jurisdiction.**

The Complaint's plain words do not ask the Court to order the Navy to commission any plaintiff. Rather, it asks the Court to declare that the Navy's accession policy that denied them chaplain commissions is unconstitutional and then provide the opportunity to compete for a commission under the conditions that governed their applications when Plaintiffs applied.

**1.    Plaintiffs' complaint asks for the "opportunity to compete" for a commission, rather than a court ordered commission.**

The Navy's first fictional argument why the Court lacks jurisdiction is that "Plaintiffs Demand that this Court Order the Commissioning of Plaintiffs as Officers in the Chaplain Corps." MTD at 7. The Navy then spends three pages explaining why the Court has no power to order a person be commissioned. *Id.* at 7-9. Absent from this abstract argument is any specific reference[1] or quote as to what exactly Plaintiffs asked for in their Complaint. The reason for this absence is obvious once the Complaint is read, since Plaintiffs made no such request. If the Navy's chaplain accession policies are declared unconstitutional, the specific relief Plaintiffs' Complaint requests, in the form of an Order that relates to commissioning, is:

> Plaintiffs request that the Court issue an order requiring the Navy to:
>
> \*\*\*
>
> 3.    Allow Plaintiffs, if otherwise qualified, the *opportunity* to be commissioned as Navy chaplains;

---

[1] The Navy MTD's only reference to the Complaint on this issue is a "*See Compl.* at 26", MTD at 7, without any specific reference to any plaintiff's "demand" that he be commissioned.

    4.     Provide to the Court and Plaintiffs a plan to remedy Plaintiffs' lost *opportunity* for career and promotion opportunities, including:

        a     For Rev. Larsen

            i)     the *opportunity* to serve as a Navy chaplain on active duty;

            ii)    constructive credit for active duty for the years between when the Navy denied his application and his commissioning;

            iii)   upon his subsequent retirement, award of retirement pay as at least a Lieutenant Commander;

        b.    For Rev. McNear, constructive credit for three years active duty service and the *opportunity* to serve in the Naval Reserve as a chaplain.

        c.    For Rev. Myers, the *opportunity* to serve as a Navy chaplain.

Complaint at 26, ¶¶ 3 and 4 of section C ("An Order") (emphasis added).

Nothing in the Complaint *demands* that Plaintiffs be commissioned. The relief they seek is related to the injury produced by the policy they challenge, the denial of an equal opportunity to compete for a government benefit unhindered by illegal criteria or restrictions in violation of the Constitution.

**2.    Plaintiffs are entitled to commissions if the Navy cannot show that they would have been denied a commission absent the unlawful prejudice.**

The Navy ignores the well established law, illustrated by the very cases that it cites, that appointment to a position which was illegally denied is both a valid claim and a valid remedy. *Hubbard v. EPA*, 982 F.2d 531 (D.C. Cir. 1992), a case cited by the Navy (MTD at 10 and 12), illustrates this rule. Plaintiff Hubbard sued the EPA for failure to select him for an opening as an investigator in violation of his First Amendment right of free speech. After finding that he had stated a claim and that the EPA had, in fact, violated his First Amendment rights, the court then held that "Hubbard was entitled to be instated as an EPA investigator." *Id.* at 532 (citing *Hubbard*, 949 F.2d 453, 461 (D.C. Cir. 1991)). Consequently, EPA was ordered to

appoint him to the position that he had initially sought but EPA had illegally denied. *Id.*

*Clark v. Library of Congress*, 750 F.2d 89 (D.C. Cir. 1984)[2], produced the same result. There the D.C. Circuit reversed the district court's dismissal of the plaintiff's complaint which alleged the Library of Congress had violated his First Amendment rights in denying him a position in the Library of Congress. *Id.* at 99 and 102. While holding that sovereign immunity precluded money damages for back pay, the court also held that the plaintiff could pursue his "non-monetary relief in the form of reinstatement to the position he should have been promoted to ... and an injunction" against similar First Amendment violations. *Id.* at 102.

The situation facing Plaintiffs in this case is similar to the issues in *Saunders v. White,* 191 F.Supp.2d 95 (D.D.C. 2002). The plaintiff, Army Lt. Col. Saunders, challenged his failure to be selected for promotion based on improper racial and gender criteria in the Army's promotion process. The Army alleged that he had no standing, an argument the court rejected. *Id.* at 100-115. The court then addressed plaintiff's facial challenge to the Army's affirmative action guidance used by the promotion boards, *id.* at 123-126, and found it unconstitutional because it established illegal racial and gender preferences. *Id.* at 126 and 134, respectively. However, the court allowed the Army the opportunity to escape "liability" if it could show that the plaintiff would not have been selected for promotion under race and gender neutral criteria in the years it considered Saunders for promotion. *Id.* at 114 and 119.

Here, Plaintiffs met all the criteria for commissioning, including successfully passing the Navy's initial screening and evaluations. Yet, the Navy rejected their applications. For Larsen, McNear and Myers, this occurred in the Chaplain Accession and Recall Evaluation ("CARE")

---

[2] Also cited by the Navy, MTD at 11 and 13.

Board process. According to the Complaint, the Plaintiffs' rejections were driven by religious bias that preferred liturgical clergy. *E.g.,* Complaint ¶ 26. Consequently, under the *Saunders* analysis, if the accession process is declared unconstitutional, the Navy may show the Plaintiffs would have been rejected using constitutional criteria. Plaintiffs believe that the Navy would be unable to meet that burden given the need to fill legal chaplain accessions based on Constitutional criteria, *i.e.* quotas related to Navy faith group demographics. *See, e.g., Katcoff v. Marsh,* 755 F.2d 223, 225-26 (2d Cir. 1985)(Army based its chaplain accession goals "on the denominational distribution of the population of the United States"). Thus, Plaintiffs must initially "compete" for the positions they were denied. However, absent the Navy's showing they would have been rejected on neutral criteria, Plaintiffs are entitled to be commissioned.

### 3. *Orloff v. Willoughby* has no bearing on this case.

The Navy's discussion of *Orloff v. Willoughby*, 345 U.S. 83 (1953), MTD at 7-8, is not applicable to the facts of this case. In *Orloff*, the Army inducted a doctor who was beyond the normal draft age because the federal law which helped fund his medical education allowed for such an induction. *Id.* at 84. Although most doctors inducted under the same law were offered commissions, Dr. Orloff was denied a commission because he refused to fill out the necessary forms or provide information related to a loyalty certificate, a requirement for all seeking a commission, *i.e.*, no satisfactory loyalty certificate means no commission. *Id.* at 89. The Supreme Court made it clear that it could not issue an order directing his commissioning because Dr. Orloff's refusal to provide a satisfactory loyalty certificate meant he had not met the basic requirements for a commission, a determination made by the Executive branch. *Id.* at 90-91 ("if he is the first [doctor] to be denied a commission, it may be because he is the first doctor

to haggle about questions concerning loyalty. *** We are not easily convinced that the whole military establishment is out of step except Orloff."). The Court noted that Orloff's refusal to provide the necessary loyalty information precluded the President from "reposing special trust and confidence in the patriotism, valor, fidelity and abilities" of Orloff that would accompany a commission and form the basis of deciding whether to grant a commission. *Id* at 91. The Court recognized that the "President of the United States, before certifying his confidence in an officer and appointing him to a commissioned rank, has the right to learn whatever facts the President thinks may affect his fitness." *Id.* Because Orloff had not provided that information, a requirement for all commissioning candidates, a court could not assume the duty given to the President or substitute its judgement for his. That consideration is not present here.

Here, all Plaintiffs met the requirements for commissioning. If the allegations in the Complaint are assumed to be true, the Navy did not deny these Plaintiffs commissions because they were not qualified for a commission, but because they were not a favored faith group, an unconstitutional criteria in violation of the Constitution. This gives rise to a cause of action. *Adair*, 183 F.Supp.2d at 57 ("the court holds that the plaintiffs have stated a claim that the defendants' policies and practices relating to the hiring and retention of Chaplains violate the Establishment Clause of the First Amendment."). The Supreme Court has consistently affirmed the jurisdiction of the courts to address constitutional violations by the military. *See*, *e.g., United States v. Stanley*, 483 U.S. 669, 683 (1987) (drawing a distinction between the availability of judicial "redress designed to halt or prevent the constitutional violations" and the lack of jurisdiction to hear claims for money damages incident to military service); *Wallace v. Chappell*, 462 U.S. 296, 304 (1983) ("this Court has never held, nor do we now hold, that military

10

personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service."). The precedents in this Circuit are clear that the military must follow the Constitution and courts have a duty to address constitutional violations. *Emory v. Secretary of the Navy,* 819 F.2d 291, 294 (D.C. Cir. 1987); *Dilley v. Alexander,* 603 F.2d 914, 920 (D.C. Cir. 1979); *Adair,* 183 F.Supp.2d at 52, 66-68.

Courts have consistently affirmed the principle that they have jurisdiction to determine if a military service has denied appointments for commissions. For example, in *Pilchman v. Department of Defense,* 154 F.Supp.2d 415 (E.D.N.Y. 2001), the district court reviewed a *pro se* "[p]laintiff's claim that the rejection of his application for the Navy's nuclear propulsion officer candidate program was based on religious bias." *Id.* at 417, 421. The court held that "insofar as the complaint seeks injunctive relief for alleged violations of plaintiff's constitutional rights, the Court may entertain those claims and award appropriate relief if they are found meritorious." *Id.* at 421 (citing various cases). After reviewing the claims and evidence, the court dismissed the complaint because the Navy showed that the plaintiff failed both Navy medical and program educational requirements, *id.* at 422, and the plaintiff failed to properly allege sufficient facts to support a discrimination claim. *Id.* at 422-23. In this case, these Plaintiffs met all the requirements to be Navy chaplains[3], and they have alleged the reason for their rejection was an unconstitutional quota system[4], the existence of which is shown by the Navy's chaplain accession

---

[3]  *See, e.g.,* Complaint at 7 (Myers told by recruiter "that he had one of the strongest records before the board")

[4]  *E.g.,* ¶ 26.    The Navy's applied accession policy and its goals:
        A.      Were designed to, and did in fact, limit the opportunities of Plaintiffs and other non-liturgical clergy to become Navy chaplains.
        B.      Were based on the Navy's prejudice and bias toward non-liturgical faith

goals and its religious demographics.  *E.g.,* Complaint Exhibits 1-4.

To support its invalid argument that it has an absolute and arbitrary right to determine who may be commissioned, the Navy has misstated the issue before the court in *Kreis v. Secretary of the Air Force*, 866 F.2d 1508 (D.C. Cir. 1989).  There, the issue was *not* "a plaintiff's demand that he be appointed to an officer position" as claimed by the Navy, MTD at 8.  Rather, Kreis claimed that the Air Force Board of Corrections failed to provide appropriate relief concerning his officer efficiency reports and consequently he was entitled to retroactive promotion.  *Id.* at 1510.  The court noted that because of the nature of the issue, *i.e.,* the correction of fitness reports and subsequent evaluation of the impact of any change in the officer's promotion potential, "Congress has vested in the Secretary alone the authority to determine whether the original selection boards erred in comparing appellant to the other candidates for promotion."  *Id.* at 1511.  Comparing candidates for promotion is a far different issue than deciding whether a plaintiff has been denied a commission or government position because of unconstitutional criteria.

The Navy's argument is also undermined by the fact that although the *Kreis* Court ruled that Kreis' claim for retroactive promotion was non-justiciable, that court did remand the case to the district court "to evaluate, in light of administrative law, the reasonableness of the Secretary's decision not to take certain corrective action with respect to appellant's record."  *Id.*  This demonstrates that even highly subjective decisions such as promotions are subject to judicial review.  The *Kreis* court required that the Secretary "give a reason [explaining his exercise of

---

groups  and their chaplains.
Complaint at 18-19.  *See also* ¶¶ 28-45.

12

discretion] that a court can measure" against the Administrative Procedure Act's normal standards. *Id.* at 1514-15. The *Kreis* court reviewed administrative challenges to Air Force promotion and correction board decisions; it neither examined nor addressed claims of constitutional or statutory violations. The issue determines the type of review. *Compare Kreis*, 866 F.2d at 1511 (retroactive promotion issue non-justiciable) with *Dilley*, 603 F.2d at 920 ("This logic [that 'it is not the business of the courts to run the military'] is wholly inappropriate, when a case presents an issue that is amenable to judicial resolution. Specifically, courts have shown no hesitation to review cases in which a violation of the Constitution, statutes, or regulations is alleged."). These Plaintiffs raise constitutional issues and this Circuit's precedents make it clear that it is the court's duty to measure such challenged actions or policies against the Constitution and provide appropriate relief.

The D.C. Circuit rejected a similar Navy non-justiciable argument in *Emory v. Secretary of the Navy*, 819 F.2d 291 (D.C. Cir. 1987), where a Naval officer alleged unconstitutional racial prejudice in Navy promotions. The District Court initially "granted [the Navy's] motion to dismiss, finding that the case was non-justiciable because it is not capable of resolution through the judicial process without interference into areas reserved to other branches of government." *Id.* at 292 (quoting the District Court). The D.C. Circuit rejected that conclusion:

> We have no quarrel with the district court's conclusion that the operation of the military is vested in Congress and the executive and it is not for the courts to establish the composition of the armed forces. But the constitutional questions that arise from military decisions regarding the composition of the armed forces are not committed to other coordinate branches of government. When it is alleged, as it is here, that the armed forces have trenched upon constitutionally guaranteed rights through the promotion and selection process, the courts are not powerless to act. The military has not been exempted from constitutional provisions that protect the rights of individuals. *Parker v. Levy*, 417 U.S. 733 (1974). It is precisely the role of the court to determine whether those rights have

13

been violated.  *Dillard v. Brown*, 652 F.2d 316, 320 (3d Cir. 1981).

*Id.* at 294.

In *Steffan v. Aspin*, 8 F.3d 57 (D.C. Cir. 1993), a panel of the D.C. Circuit found that a

Naval Academy senior had been improperly separated based on his admission of homosexuality.

The panel ordered the Navy to "grant Mr. Steffan his diploma from the United States Naval

Academy, reinstate him to military service and commission him as an officer." *Id.* at 70.

Although the D.C. Circuit, *en banc*, reversed the panel's finding that his discharge was

unconstitutional, *Steffan v. Perry,* 41 F.3d 677 (D.C. Cir. 1994) (*en banc*), the original panel's

decision illustrates a basic law: the government cannot deny employment or a commission to a

person otherwise qualified on the basis of illegal criteria.  *See MacFarlane v. Grasso,* 696 F.2d

217, 223 (2d Cir. 1982) (government can't deny military employment on unconstitutional

criteria); *Perry v. Sinderman*, 408 U.S. 593, 597 (1972) (government may not deny benefit,

including public employment, "on a basis that infringes his constitutionally protected interests").


**B.     The Claims for Equitable Relief by Larsen, McNear and Myers Are Not
         Claims for Money Damages**

The Navy's second excursion into fantasy land is its claim that "Plaintiffs' Claims for

Money Damages are Barred by Sovereign Immunity."  MTD at 10 -14.  Since these Plaintiffs

have not asked for money damages or back pay, the Navy has morphed Plaintiffs' equitable

claims into claims for money damages.  This argument is another example of the Navy's

misrepresentation and misinterpretation of the Complaint.  Specifically, the Navy argues that

Plaintiffs seek "monetary damages for their failure to have been appointed as officers in the Navy

Chaplain Corps."  *Id.* at 10.

14

> Here, three of the plaintiffs seek monetary relief from the United States
> government based on the Navy's failure to commission them as officers in the
> Navy Chaplain Corps. Plaintiff Larsen seeks an award of retirement pay based on
> the rank he believes defendants would have awarded him had he been accepted as
> a Naval chaplain. He also seeks constructive credit for active duty service ...
> which implies a demand that he receive pay commensurate with active duty
> service for that period.

*Id.* The Navy then argues " the Plaintiffs fail to suggest any waiver of sovereign immunity that

would entitle them to monetary damages of any sort from the United States." *Id.*

The Navy's argument is fallacious in two aspects. First, Plaintiffs do not request money

damages. As shown in II.A.1 above and the Complaint's Prayer for Relief paragraphs A, B and

D, the Plaintiffs ask for equitable relief rather than money damages. Chaplain James Linzey

joins in the equitable relief and asks for damages authorized by 28 U.S.C. § 1346(a), which

grants the Court jurisdiction to hear his claim.

The second reason the Navy's argument is flawed is that the relief Plaintiffs seek is what

they were entitled to; it is necessary to make them whole, the purpose of equitable relief. "The

essence of equity jurisdiction is the power of the court to fashion a remedy depending upon the

necessities of the particular case." *United States v. Odessa Union Warehouse Co-Op*, 833 F.2d

172, 175 (9th Cir. 1987)(citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)).

**1.    The Complaint does not ask for monetary relief for Larsen, McNear
          and Myers.**

The relief that Plaintiffs seek is shown in II.A.1 above. Nowhere do Larsen,

McNear or Myers ask for money damages. The Navy argues without reference or explanation

that their claim for constructive credit "implies a demand that [plaintiffs] receive pay

commensurate with active duty service for that period." MTD at 10. As shown below,

constructive credit does not mean back pay, otherwise the Complaint would have said so. This is

15

not a case where a military person has been illegally separated from active duty and then restored

after the illegality has been judicially determined and relief provided. In such a case the

separation is void, and since the service person was never legally off active duty, he is therefore

entitled to his active duty pay. *Dilley v. Alexander*, 627 F.2d 407, 411 (D.C. Cir. 1980)

("Appellants have never been lawfully discharged, so in the eyes of the law, they remain in

service."). Here, these Plaintiffs were never hired. While back pay can be awarded in Title VII

cases, Title VII does not apply to the military.

 The Complaint clearly asks for equitable, non-monetary relief as explained below. The

Navy has no authority to change the relief Plaintiffs have asked for.

 **2. Constructive credit is an equitable remedy for the loss of opportunity which cannot be compensated by other means.**

 If the Navy's accession policies violate the Constitution, the constructive credit

that Larsen, McNear and Myers seek is an equitable remedy. It provides credit for their lost

opportunities the Navy denied them which becomes important in computing their years of service

for retirement or other considerations, i.e., restitution. If these Plaintiffs had been commissioned

and then illegally separated, they would be entitled to constructive credit once the illegality of

their separation was adjudicated. *Dilley*, 627 F.2d at 411 (addressing constructive service). A

similar rationale and equitable principles follow here. Under existing law, there may be no way

to compensate Plaintiffs financially for the Navy's illegal denial of a commission and the

opportunity for these Plaintiffs to accrue time which would count for retirement or other

purposes. 10 U.S.C. § 1251 establishes 62 as the normal age limit for Navy service.[5] Thus, the

---

 [5] 10 U.S.C. § 1251 allows a limited number of exceptions with the Secretary's approval.

16

Navy 's illegal prejudice  limits the amount of time Plaintiffs can serve, which in turn affects

their retirement options and pay.  However, there is nothing to preclude their being awarded

constructive credit.  The law does not permit a defendant, even the United States, to profit by his

own misconduct.  As noted above, the constructive credit follows only after their entitlement to

be commissioned is established and is necessary to make the Plaintiffs whole.

### 3.  Reverend Larsen's request for retirement as at least a Lieutenant Commander is not a claim for back pay or money damages.

The Rev. Larsen served as a Navy enlisted person on active duty for more than 16

years.  Complaint ¶ 4.A.  The Navy's unlawful denial of his application to become a chaplain

also deprived him of the opportunity to fully compete for promotion and serve the time necessary

to qualify for a pension as an officer.  Rev. Larsen's objective is not money damages but to use

the skills, abilities and talents he has developed as a pastor (in addition to his prior service

experiences) as a Navy chaplain.  Consequently, he is asking for the opportunity to become a

Chaplain, to do what the Navy illegally denied him when it refused his application to become a

chaplain because he was a Non-liturgical clergyman.  This is one of the "specific remedies" in

the Complaint  that "attempt to give the plaintiff the very thing to which he is entitled", as

contrasted with "'damages' which are sums of money used as compensatory relief," *Hubbard,*

982 F.2d at 536 (quoting *Bowen v. Massachusetts*, 487 U.S. 879,  895 (1988)), which Plaintiffs

have not requested.  Currently, Rev. Larsen is entitled to a reserve retirement at the appropriate

time based on his 16 years enlisted active duty plus his reserve time.  Rev. Larsen's request here

reflects the fact that he was illegally denied the opportunity to a) complete a Navy career as a

chaplain and an officer, and b) to compete for promotion as a chaplain.  However, his requested

relief is premised on the fact that he has and will earn what he is entitled to.

His request is not much different from the relief sought by Massachusetts in *Bowen*. There the Supreme Court addressed the issues of "an adjustment ... in the size of the federal grant that is payable in huge quarterly installments." 487 U.S. at 893. The Court held that Massachusetts' attempt to enforce a statutory entitlement was a claim for specific relief. *Id.* at 900-01. Here, as in that case, any small change in the amount of a pension that Rev. Larsen might be entitled to later is nothing less than "restitution," an equitable concept and specific relief rather than money damages. *Id.* at 893. Back pay typically seeks reimbursement for work not done because of an illegal employment practice. These Plaintiffs seek compensation only for the work that they will provide, recognition of the results of the Navy's prejudice in terms of their lost opportunity and restitution therefrom. For example, McNear seeks a commission in the Naval Reserve. This will enable him to serve as a chaplain in the Naval reserve. Any payment for this service would be what he is entitled to for his time just as any other reserve chaplain. Constructive credit for the time he (and the other Plaintiffs) lost is restitution, necessary to make the Plaintiff whole.

### 4.     The Navy has no basis to request dismissal of the entire Complaint.

Although the Complaint clearly asks for equitable, non-monetary relief as explained below, the Navy improperly asks that the entire Complaint be dismissed. MTD at 1 and 26 ("plaintiffs' complaint should be dismissed in its entirety"). Even if Plaintiffs had asked for monetary relief, that would not have resulted in dismissal of the entire Complaint since their request for declaratory and injunctive relief and the opportunity to compete for commissions would still remain. *See Hubbard*, 982 F.2d at 532; *Clark,* 750 F.2d at 102.

18

**C.    Plaintiffs' Constitutional Injuries Provide Standing and Entitle Them to Injunctive and Declaratory Relief.**

The Navy incorrectly claims that "Plaintiffs fail to meet Article III's standing requirements for prospective relief" because "they fail to allege that they face immediate or imminent injury." MTD at 15. This argument completely fails to consider their First Amendment claims which form the nucleus of this case. Plaintiffs allege that the Navy has violated the Establishment Clause by preferring one religious tradition, *i.e.* liturgical, over their religious tradition and denied them an employment opportunity based on that preference. The preference and prejudice that prevented Plaintiffs fair consideration for commissions in the past still exist today. *See Adair*, 183 F.Supp.2d at 36-45 (explaining the parties, cases, claims and causes of action). Unless enjoined, it will continue, even if Plaintiffs are commissioned. Without an injunction, the Navy will be able to continue and repeat its unconstitutional conduct while evading review.

"It is well established that sovereign immunity does not bar suits for specific relief against government officials where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority." *Clark*, 750 F.2d at 102. The non-monetary relief that Clark requested was in the "form of reinstatement to the position he would have been promoted to, correction of his personnel records and an injunction against the defendants prohibiting any future infringement of his first amendment rights." *Id.* Plaintiffs in this case request similar relief. Complaint at 24-27.

**1.    The Navy's lack of standing argument finds no support in the complaint and the relevant case law.**

The Navy's reliance on *Fair Employment Council of Greater Washington, Inc. v.*

*BMC Marketing Corporation*, 28 F.3d 1268 (D.C. Cir. 1994), MTD at 16-17, is misapplied.

That case involved two Afro-American testers for a fair employment organization who brought a

claim for damages under Title VII and 42 U.S.C. § 1981, and also sought an injunction as

prospective relief.  The Court found that: a) they had no standing because they had signed an

agreement with the Fair Employment Council not to accept any offers of employment from the

defendant and thus "had no interest in securing a job through BMC", *id.* at 1271; and b) they had

misrepresented their credentials and qualifications, *id*. at 1273.  The court then found that  the

testers could not show "that future violation of their rights is even remotely possible" since these

arrangements precluded any injury as a result of the defendant's conduct.  *Id.* at 1275.

Here, the Plaintiffs have suffered a direct injury because of their identification as non-

liturgical clergy as the result of the Navy's alleged prejudice.  Whereas the testers in *BMC* had no

interest in employment, these Plaintiffs are interested in becoming chaplains.  As shown by the

relief sought in the Complaint, Plaintiffs Larsen, McNear and Myers want the commissions that

the Navy illegally denied them, assuming that they were, in fact, qualified.  A declaration that the

Navy's policies do, in fact, violate the Establishment Clause and have burdened Plaintiffs' Free

Exercise Rights is a necessary step to obtain the relief that they seek, the opportunity to compete

fairly for commissions in the Chaplain Corps.  Thus, their "injury will be redressed by a

favorable decision." *Saunders,* 191 F.Supp.2d at 111 (quoting *Lujan v. Defenders of Wildlife,*

504 U.S. 555, 560 (1992)).

The Complaint is clear that the discriminatory policy which favors liturgical over non-

liturgical clergy springs from an overarching, systematic prejudice against non-liturgical faith

groups which permeates the culture of the Chaplain Corps and is evidenced in its policies and

management decisions.

> This federal action challenges the systematic and pervasive religious
> prejudice in the accession decisions of the Corps that led to its denial of the
> requests by Revs. Larsen, McNear, Myers and Linzey to become Navy chaplains.
> This systematic prejudice includes the Navy's establishment of illegal religious
> quotas for Navy chaplain accessions that are not related to the religious
> demographics of DON.  Rather, the Navy's chaplain accessions policies and goals
> favoring liturgical clergy have established a preferred religious tradition and a
> religious patronage system in the Corps while  minimizing the career
> opportunities for non-liturgical chaplains in the Corps. The Navy's illegal
> prejudice and policies violates the First and Fifth Amendments and the Religious
> Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000-bb as amended.

Complaint, ¶ 2.

An injunction prohibiting the Navy from continuing its unconstitutional policies of

preference and favoritism directly benefits the Plaintiffs by addressing one aspect of this manifest

violation of the Establishment Clause.  An injunction is a recognized remedy in addressing

constitutional violations and discriminatory policies.  *E.g.*, *Clark*, 750 F.2d at 102.  An injunction

is necessary to force the Navy to return to the religious neutrality mandated by the First

Amendment.  The probability of continuing injury due to the Navy's prejudice without

declaratory and  injunctive relief is not remote, but certain and foreseeable based on the Navy's

past and present practices.  The continuing nature of this preference and prejudice is

demonstrated by the Chaplain Cases plaintiffs' recent petition for a writ of mandamus.  The

*CFGC* and *Adair* 12/27/02 Reply to the Navy's Opposition to Plaintiffs' Petition (incorporated

by reference) at 23-25 ("Lyle's Recall Represents Only the 'Tip of the Iceberg' of the Navy's

Illicit and Discriminatory Behavior") describes a recent continuing pattern in accessions of

preference for Liturgical denominations and prejudice toward Non-liturgical chaplains that

mirrors the claims here.

The Navy points out that Larsen, McNear and Myers "would not be eligible for an active duty commission without obtaining an age waiver", MTD at 17. The issue is not whether they would be granted waivers currently. Rather, the questions are: a) whether at the time they applied for Chaplain Corps commissions, their denial of fair consideration was based on illegal criteria; and b) whether the Navy would have denied their commissioning applications originally if it had used constitutional criteria. *See, e.g.*, *Saunders,* 191 F.Supp. 2d at 116 ("the defendant has not presented any evidence that the original boards would have reached the same conclusion using a race and gender neutral standard."); 118-19 (to escape liability Army must prove "that the 1996 and 1997 boards would not have selected Saunders for promotion using valid criteria").

All of these Plaintiffs would have been eligible for age waivers when they applied initially, if such waivers were necessary. All of them had prior service, which entitled them to additional consideration because of the Navy's policy of counting and crediting prior service in computing the necessary age limits.[6] The very year the Navy denied McNear's application, the Navy approved 7 age waivers for liturgical clergy, whereas no waivers were granted non-liturgicals clergy such as McNear.[7]

---

[6] Age limits are necessary to allow a service person to complete the 20 years of service necessary to qualify for a military retirement by the time the person reaches 10 U.S.C.§ 1251's age limit of 62. Because prior military service may count in this computation, Navy recruiting documents in Plaintiffs' possession will show that the Navy has given some applicants a year for year credit for their prior military service when determining whether an age waiver is necessary. The fact that these Plaintiffs were not offered this benefit in their consideration for commissioning is part of their claim of prejudice and justification for the application of strict scrutiny.

[7] Any Navy argument that Plaintiffs would not be granted or eligible for age waivers would fail based on the application of strict scrutiny. The Navy's own records, produced in the Chaplains Cases litigation, shows that the Navy routinely granted liturgical clergy age waivers

### 2.    Courts in this Circuit have found the denial of equal opportunity guaranteed by the Fifth Amendment provides the injury in fact necessary to confer standing.

In *Saunders v. White*, 191 F. Supp. 2d 95 (D.D.C. 2002), the court addressed the standing issue of an Army officer who challenged his failure to be selected for promotion based on the Army's use of improper racial and gender criteria in the promotion process. Although the Army alleged that Saunders had no standing, the court rejected that argument. The court found two types of "injury in fact" that conferred standing on the plaintiff. The first type was the injury resulting from his "inability to compete on an equal footing." *Id.* at 102. The court explained that the "injury in fact" was "the denial of equal treatment resulting from the imposition of the discriminatory policy, not the ultimate inability to obtain the benefit." *Id.* (quoting *Northeastern Fla. Chapter of the Associated Gen. Contractors of America v. City of Jacksonville,* 508 U.S. 656, 666 (1993)). This enabled the plaintiff to seek prospective relief as well as retrospective relief. *Id.* at 102-104.

The second type of "'injury in fact' is the actual denial of the benefit rather than the inability to have competed for the benefit on an equal footing." *Id.* at 104. In employment discrimination cases such as the present case, the Navy has forgotten that it has the burden to show that its actions have not produced an injury. "Even if the injury in fact is the actual denial of the benefit rather than the inability to have competed for it on an equal footing, however,

---

while infrequently, if ever, granting them to Non-liturgical clergy such as Plaintiffs. Chaplains Cases (*Adair* 5/13/02) Plaintiffs' Reply Memorandum in Support of Plaintiffs Motion for Partial Summary Judgment at 35 and Exhibits P and S thereto. This practice establishes a preference for one religious tradition over another in violation of the Establishment Clause and triggers strict scrutiny. *Adair*, 183 F.Supp.2d at 50 (*Larson v. Valenti*'s "strict scrutiny standard applies to this case").

plaintiffs do not have to show - at least in employment discrimination cases - that they would have received the benefit absent the discriminatory policy." *Id.* at 105. This is because "in the case of the ... constitutional torts of employment discrimination, the Supreme Court has held that the burden of proof on the issue of injury rests on the employer, the defendant, rather than the employee, the plaintiff." *Id.* (quoting *Doll v. Brown,* 75 F. 3d 1200, 1202 (7th Cir. 1996)).

Thus, for the above reasons, Plaintiffs have standing.

### 3.    The Navy's prejudice and its injuries to Plaintiffs will continue.

In some ways, the injuries these Plaintiffs have suffered are similar to the circumstances in which plaintiffs are allowed standing to litigate injuries and issues that are capable of repetition but evading review because of the time limits involved. *E.g., Roe v. Wade*, 410 U.S. 113, 124-25 (1973). While plaintiffs if successful on their constitutional and RFRA claims will not suffer the exact injury of which they complin here, *i.e.*, denial of a commission, the underlying injury that comes from an unconstitutional prejudice will continue without an injunction.

Here, Plaintiffs have alleged the Navy used unconstitutional criteria and bias to deny them fair and equal consideration in evaluating their applications to become Navy chaplains. In doing so, the Navy denied these Non-liturgical clergy Plaintiffs who had prior military service age waivers while granting such waivers to Liturgical clergy and claiming that Plaintiffs' rejections had a lawful basis. Now that the Navy's misconduct has come to light, it says to these Plaintiffs and the Court, "Even if we denied your application on unconstitutional grounds and did not credit your prior service, too bad, you're too old to become a chaplain and therefore you can't have standing because our fraudulent concealment of our misconduct has kept you from having

the opportunity to be injured again by our prejudice." Unchecked by a judicial decision, the

Navy can continue this game of favoritism for some preferred faith groups while prejudicing

others. The question is not whether Plaintiffs will apply for commissions again. The question is

whether the same prejudice will meet them if their claims are found valid by the Court. That

answer is "Yes" and is addressed in the Complaint's paragraph 2, describing the Navy's culture

of religious prejudice, the prime mover of the Plaintiffs' injuries.

> The very purpose of the Bill of Rights was to withdraw certain subjects from the
> vicissitudes of political controversy, to place them beyond the reach of majorities
> and officials and to establish them as legal principles to be applied by the courts.
> One's right to life, liberty, and property, to free speech, a free press, freedom of
> worship and assembly, and other fundamental rights may not be submitted to a
> vote; they depend on the outcome of no elections.

*West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 638 (1943). Thus, Plaintiffs

have standing because, absent an injunction, the Navy will continue to operate in an area that the

Constitution has forbidden the government from entering and those operations are directed

against Plaintiffs.

### D. The Navy's Statute of Limitations Argument Ignores the Law in this Circuit and this Court.

The Navy's claim that the Court "lacks subject matter jurisdiction over the claims

asserted by Plaintiffs Larsen and McNear because their claims are barred by the Statute of

Limitations", MTD at 18, ignores both the Complaint and the law in this Circuit. In *Adair*, the

Navy raised the identical argument that it raises here, that the statute of limitations precluded

some plaintiffs from bringing claims. 183 F. Supp.2d at 53-54. The *Adair* plaintiffs raised

issues of fraudulent concealment. *Id* at 54 (plaintiffs allege "continuous violation and self

concealing fraud" and "fraudulent concealment"). The *Adair* Court denied the Navy's motion to

dismiss, applying "the D.C. Circuit's well settled precedent and conclud[ing] that a ruling on the statute of limitations argument would be premature." *Id.* at 54-55. The same rationale applies here.

Ironically, at the end of the Navy's six-page discussion of why the Statute of Limitations bars these claims, the Navy cites the *Adair* Court's reference at 183 F.Supp. 2d at 54 to *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996). The Navy cites both *Adair* and *Firestone* as supporting its allegations that the Plaintiffs' claims "are barred by the limitations period ... and should be dismissed under Fed. R. Civ. P. 12." MTD at 23. To the contrary, both of those cases contradict the Navy's position and support Plaintiffs'. Both cases state the law in this Circuit that "when a defendant fraudulently conceals the basis of a plaintiff's cause of action, the Statute of Limitations is tolled until the time that a reasonably diligent plaintiff could have discovered the elements of his claim." *Adair* 183 F.Supp. 2d at 54 (citing *Hohri v. United States*, 782 F.2d 227, 246, (D.C. Cit. 1986), *overruled on other grounds*, 482 U.S. 64 (1987)). The *Adair* reference to *Firestone* quotes the law in this Circuit that "Court's should hesitate to dismiss a complaint on Statute of Limitations grounds based solely on the face of the complaint." *Id.* (quoting *Firestone*, 76 F. 3d at 1209). This is because SOL issues involving fraudulent concealment are intensely factual and can involve burden shifting. *Hobson v. Wilson*, 737 F.2d 1, 35 (D.C. Cir. 1884), *cert denied*, 470 U.S. 1084 (1985) (once plaintiff shows fraudulent concealment, burden is on defendant to show plaintiff had notice of his cause of action.).

**1.      10 U.S.C. § 2401(a) is subject to equitable tolling.**

The Navy has once again demonstrated willful blindness by ignoring the clear words of Plaintiffs' Count 5 in the Complaint, "Fraudulent Concealment of the Evidence of

Plaintiffs' Cause of Action." Complaint at 23, ¶¶ 46 - 50.  Although the Navy acknowledged

"that limitations period of § 2410(a) [is] subject to tolling for fraudulent concealment," MTD at

21 and cited *Hohri v. United States,* 782 F.2d 227, 247-48 D.C. Cir. 1987), *reversed on other*

*grounds* 482 U.S. 64 (1987), the Navy attempts to side step that rule by claiming that "Congress

did not intend the equitable tolling doctrine to apply" to 28 U.S.C. § 2401(a).  MTD at 20-21.

This is a remarkable conclusion given that *Hohri* specifically addressed tolling under 28 U.S.C. §

2401(a).  In *Hohri,*  the D.C. Circuit acknowledged the government's argument "that statutes of

limitations governing claims against the United States ... should be strictly construed", but (the

D.C. Circuit) replied, "we nonetheless believe that fraudulent concealment tolls 28 U.S.C. §

2401(a), the statue of limitations at issue in this case."  782 F.2d at 247.  *Id.* at 248.  *Hori* relied

on other D.C. Circuits precedents, *id*. at 246-48, and remains the law of the Circuit today.  *See ,*

*e.g., Adair*, 183 F. Supp.2d at 54.  The Navy has provided no authority to show why the Court

should ignore this circuit's precedent.

### 2. The Navy's alleged announcement of the Thirds Policy did not start the Statute of Limitations running.

The Navy points to the Plaintiffs' allegation that the "Thirds Policy" was formally

announced in early fiscal year 1988 to establish that Plaintiffs were on notice of the Navy's

unconstitutional accession policies.  MTD at 22 (citing Complaint ¶ 18.B).  It is indeed ironic

that the Navy, having denied the existence of the "Thirds Policy" in *Adair,* now points to the very

policy it denies to show that Plaintiffs as civilian clergy should be on notice of a policy

announced to the Chaplain Corps.  This despite the fact that the formal announcement of a policy

comes with the presumption of legality.  *See Adair*, 185 F.Supp at 60 (explaining the

presumption that officers follow the law).

The Navy's argument fails for at lest two reasons.  First, the Navy's argument fails to meet the D.C. Circuit's well defined law on the notice required to start the SOL running:

> By "notice" we refer to an awareness of sufficient facts to identify a particular cause of action, be it a tort, constitutional violation or a claim of fraud.  We do not mean the kind of notice – based on hints, suspicion, hunches or rumors – that require a plaintiff to make inquiries in the exercise of due diligence but not to file suit.

*Hobson,* 737 F.2d at 35.  Thus, the requirement is to know facts sufficient to establish a specific cause of action and file suit.  *Id.* The Navy has not identified what those facts were and how they were revealed to Plaintiffs.  The Navy has not shown how civilian clergy would be aware of a Navy policy that was announced only to active duty chaplains, whose intent and ramifications were deliberately obscured, and which was not publicized in civilian media or recruiting literature. The Navy has provided no proof that it published its Third Policy in recruiting literature, that its recruiters made it known to applicants such as Plaintiffs, or even if the recruiters understood or knew of the policy.   The Navy's arguments fall far short of this Circuit's standard for notice of a specific cause of action.  *See Hobson,* 737 F.2d at 38-39 (rejecting FBI claims that newspaper articles and other indications failed to put the plaintiffs on notice that they had a cause of action against the government).

*Hohr*i provides a good  illustration of the type of facts necessary to start the tolling of the statute of limitations (SOL), which are absent here.[8]  *Hohri* addressed Japanese-American

---

[8]  The Navy's MTD at 21 implies that *Hohri* has somehow been overruled, calling it a "pre-*Brockamp* case" referring to *United States v. Brockamp* 519 U.S. 347 (1997) which found tolling not applicable to § 6511 of the Internal revenue Code of 1986, *id.* at 348, a very specific, technical and detailed provision relating to recovery of overpayments. *Brockamp* did not address a general tolling statue like 28 U.S.C. § 2401(a).  The Ninth Circuit's application of equitable tolling § 6511 was contrary to all other Circuits that had considered the same question.  *Id.* at 349.   Agreeing with the other Circuits, the Supreme Court found that Congress had constructed

plaintiffs' claims against the United States for their forced evacuation and internment in World

War II after Pearl Harbor. They claimed that the United States had fraudulently concealed the

fact that there was no military necessity for the evacuation and internment. *Id.* at 243 ("the

gravamen of appellants' claim is that there was no such military emergency"). Although

documents showing that the government's justifications were questionable "were in the public

domain as early as 1949", *id.* at 250, the court held that this was not sufficient to start the SOL

running because the plaintiffs had no cause of action until Congress set up a special Commission

in 1980 to review the legality of the internment. "In so doing Congress removed the presumption

of deference to the judgment of the political branches. With this step the statute of limitations

began to run on appellants' Taking Clause claims." *Id.* at 253. Applying *Hohri*'s logic here, it is

obvious that the Navy has not shown that it revealed to Plaintiffs the basis for their constitutional

and RFRA claims. The Navy has presented no evidence that it advertised or publicized the

Thirds Policy to Chaplain applicants or that it revealed the prejudicial basis of its derivation and

application. In other words, the Navy has not met its burden to show these Plaintiffs were on

notice of the Navy's unconstitutional prejudice against them as reflected in the Navy's accession

policies.

  The second reason that the Navy's argument fails is that it ignores the presumption of

regularity in government operations and statements. Like the presumption of deference to

military judgement in wartime that the D.C. Circuit found dispositive in *Hohri*, 783 F.2d at 252-

---

the statute so that it was clear that courts were not to imply equitable tolling. illustrated many of
these specific provisions, *id*. at 351, and pointed out that "§ 6511 sets forth explicit exceptions to
its basic time limits, and those very specific exceptions do not include 'equitable tolling.'" *Id*.
These factors led the Court to conclude "that Congress did not intend courts to read other
unmentioned, open ended, 'equitable' exceptions into the statute that it wrote." *Id*. at 352.

53, the Navy's explanations of why these Plaintiffs were rejected for commissioning came with a presumption that is normally almost irrefutable. *Adair*, 183 F.Supp.2d at 60 ("government officials are presumed to act in good faith"). The presumption that Navy officers will follow the law applies to Navy recruiting officers. *Id*. The Plaintiffs were entitled to rely on the Navy's assertions that its rejection of these Plaintiffs' applications for commissioning were for allegedly valid reasons. Plaintiff McNear initially challenged the Navy's denial by seeking Congressional intervention. The Navy responded to his Congressman's inquiry by stating that "he was over age." McNear could presume that the Navy had given a lawful response. Only in the recent Chaplain Cases litigation has it become known that in the same year it denied McNear's application because of his age, the Navy approved age waivers for 3 Protestant liturgical and 4 Roman Catholic applicants who were older than Rev. McNear. *Adair* 5/13/02 Plaintiffs' Reply Memorandum in Support of Plaintiffs Motion for Partial Summary Judgment at 35 and Exhibit S thereto (incorporated by reference). This implies he was rejected because he was non-liturgical, not because of his age. Also like the *Hohri* plaintiffs, these Plaintiffs obtained knowledge of their cause of action years after the injury, only when the Chaplain Cases' litigation showed that the presumption of regularity did not apply to the Chaplain Corps's accession policies. Thus, these Plaintiffs did not have notice of their specific cause of action.

### 3. The Navy's use of the word "quota" did not put Larsen on Notice.

Likewise, the Navy's allegation that Larsen was on notice of a constitutional violation because he was told "that his faith group had 'no quota'", MTD at 23, is equally fallacious. The use of the word "quota" did not put Larsen on notice that the Navy's quota system was based on unconstitutional prejudice. The acceptance of the term "quota" is understandable

in light of the Second Circuit's decision in *Katcoff* where it noted the Army's procedure for allocating its chaplain quotas among faith groups was based "on the denominational distribution of the population of the United States" and was therefore neutral. 755 F.2d at 225-26. The Navy has not provided even a whisper of evidence that would show that Larsen should have known that its quotas were arbitrary and prejudicial. The presumption of regularity again defeats the Navy's irrational argument. The Navy has not shown why Larsen should presume its policies and justification provided in an official Navy letter are unconstitutional. Only with the Chaplain Cases litigation has the arbitrary and prejudicial nature of the Navy's accession quotas become known.

### E. Rev. Linzey Is Entitled to Bring Monetary Claims Against the Navy

Rev. Linzey, now an active Army Chaplain, in addition to equitable relief, seeks "such commendation as in appropriate under 28 U.S.C. § 1346(a)(2)." This does not include back pay but would include other expenses associated with his seeking a commission and any other expenses properly treated as restitution or damages directly flowing from his denial of a fair consideration for a commission. The law is clear that some damages flowing proximately from deprivations of constitutional rights are compensable. *Carey v. Piphus*, 435 U.S. 247 (1978); *Memphis Community School Dist. v. Stachura*, 477 U.S. 299 (1986). *See also Saunders*, 191 F.Supp.2d at 105 (citing "constitutional torts of employment discrimination")

### III. PLAINTIFFS HAVE STATED A VALID RELIGIOUS FREEDOM RESTORATION ACT CLAIM

The Navy's final argument, that Plaintiffs' have failed to state a claim under 42 U.S.C. § 2000-bb, the Religious Freedom Restoration Act ("RFRA"), upon which relief can be granted,

31

MTD at 23-25, also ignores the Complaint and misstates the applicable RFRA law.

The Religious Freedom Restoration Act provides in pertinent part:

> a) **In general**.  Government shall not substantially burden a
> person's exercise of religion even if the burden results from a rule
> of general applicability, except as provided in subsection (b).
>
> b) **Exception**.  Government may substantially burden a person's
> exercise of religion only if it demonstrates that application of the
> burden to the person -
>
>> 1) is in furtherance of a compelling governmental interest; and
>> 2) is the least restrictive means of furthering that compelling
>> governmental interest.
>
> c) **Judicial relief.**  A person whose religious exercise has been burdened
> in violation of this section may assert that violation as a claim or defense
> in a judicial proceeding and obtain appropriate relief against a
> government....

42 U.S.C. §2000bb-1.

The general rule under the Religious Freedom Restoration Act ("RFRA") is a total

prohibition on governmental action which "burdens" an individual's "exercise of religion." 42

U.S.C. §2000bb-1(a).  The Act then provides an "exception" to that rule where the government

can "demonstrate" that the objectionable requirement is nevertheless the "least restrictive means"

of accomplishing a "compelling governmental interest." *Id*. §2000bb-1(b).  The term

"demonstrates" is defined to mean "meets the burden of going forward with the *evidence* and of

persuasion."  42 U.S.C. §2000bb-2(3) (emphasis added).  As Judge Noonan stated writing for the

Ninth Circuit:

> The statute goes beyond the constitutional language that forbids the
> 'prohibiting of the free exercise of religion and uses the broader
> verb 'burden': a government may burden religion only on the terms
> set out ... If there is a substantial burdening of a person's exercise
> of religion, the government must meet two tests. [1st] The

> government must 'demonstrate' that the application of the burden
> to this particular person furthers 'a compelling governmental
> interest.' [2d] The government must 'demonstrate' that this
> application 'is the least restrictive means of furthering that
> compelling governmental interest.' [Finally, *w]hat is meant by
> 'demonstrate' is explicitly defined in terms of the government's
> burdens 'of going forward with the evidence and of persuasion.'*

*United States v. Bauer,* 84 F.3d 1549, 1558 (9th Cir. 1996) (emphasis added). *See also In re*

*Young (Christians v. Crystal Evangelical Free Church)*, 141 F.3d 854 (8th Cir. 1998).

The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq., has been held

constitutional as applied to federal agencies and federal governmental activities that substantially

burden the free exercise of religion. *See, e.g., Meyer v. Federal Bureau of Prisons*, 929 F. Supp.

10 (D.D.C. 1996) (applying RFRA to federal prisoner case); *Guam v Guerrero*, 290 F.3d 1210

(9th Cir. 2002); *United States v. Bauer*, 84 F.3d 1549 (9th Cir. 1996) (RFRA applied to marijuana

possession charge); *United States v. Hardman*, 297 F.3d 1116 (10th Cir. 2002) (*en banc*)

(applying the Religious Freedom Restoration Act to claims against a federal agency); *In re*

*Young*, 141 F.3d 854 (8th Cir. 1998) (RFRA applied to claims against Internal Revenue Service).

There is no question that the First Amendment, which animates the principles advanced

by RFRA, protects religious persons from discrimination in public employment, and that denial

of public employment or negative actions taken against a religious employee on the basis of his

or her relief "substantially burden" that exercise of their belief. Tucker v. California Dept. of

Educ., 97 F.3d 1204 (9th Cir. 1996); *Brown v. Polk County*, 61 F.3d 650 (8th Cir. 1995); *Venters*

*v. City of Delphi*, 123 F.3d 956 (7th Cir. 1997); *Altman v. Minn. Dept. of Corr.*, 251 F.3d 1199

(8th Cir. 2001); *United States v. Nat'l Treas. Employees' Union,* 513 U.S. 454, 466, 473 (1995)

(federal employees' speech, including one employee's public lectures on the Quaker religion,

held protected as "matter of public concern"); *Shahar v. Bowers*, 114 F.3d 1097 (11th Cir. 1997) (*en banc*) (assuming state employee's decision to hold herself out as "married" to fellow lesbian and engage in religious marriage ceremony was protected speech).

"Under RFRA, the threshold question is whether plaintiffs' exercise of religion has been substantially burdened." *Show v. Petterson*, 955F.Supp. 182 1898 (S.D.N.Y. 1997). If the allegations in the complaint are assumed to be true, as they must in evaluating a motion to dismiss, *Adair*, 183 F.Supp.2d at 46, the Navy denied Plaintiffs' commissions in the Navy Chaplain Corps because of their Non-liturgical faith. This squarely fits the type of burden that "occurs when government 'conditions receipt of an important benefit such as employment upon conduct proscribed by a religious faith, or ... denies such a benefit because of conduct mandated by religious belief.'" *Altman v. Minnesota Dept. of Corrections*, 251 F.3d 1199, 1204 (8th Cir. 2001) (quoting *Thomas v. Review Board.*, 450 U.S. 707, 717-18 (1981)).

One of the characteristics that distinguishes Non-liturgical clergy form liturgical clergy is that preaching is a critical and essential part of Non-liturgical worship services. Based n the alleged acts of prejudice, it can be assumed that the Navy does not like this characteristic common to most Non-liturgical faith groups, especially those represented by Plaintiffs. In *Rigdon v. Perry*, 962 F.Supp. 150 (D.D.C. 1997), plaintiffs challenged a Department of Defense attempt to prohibit military chaplains from communicating to their congregations about or preaching on abortion during Congress' attempt to pass a partial birth abortion ban. DOD argued that an anti-lobbying directive applied to what the chaplains said from their pulpit. *Id*. at 156-58. The court found that, among other things, the DOD's attempts to restrict chaplains peaching violated RFRA. *Id*. at 160-162. The Navy appears to have decided that the best way to restrict

34

Non-liturgical clergy from preaching is not to commission them as chaplains. The effect of the

Navy's denial of Plaintiffs' applications for commissions is more effective than the DOD's

approach in Rigdon. Here, the Navy used a quota system not related to the Navy's free exercise

needs to burden Plaintiffs' faith and restrict their speech by denying them commissions to which

they were entitled.


## IV.    AMENDMENT TO THE COMPLAINT IS APPROPRIATE

Plaintiffs have not asked for monetary damages *per se* except for Rev. Linzey who asked

for damages as allowed under 28 U.S. C. § 1346(a). This would have covered any direct

financial loss as a result of the Navy's prejudice, *e.g.*, travel expenses, or as the Court may find

appropriate. However, a review of the Navy's far reaching prejudice and its impact on Plaintiffs

indicates that they also have a cause of action under 42 U.S.C. § 1985. The prejudicial actions

taken against them by the Navy were part of a illegal scheme, or conspiracy, to deny them and

other Non-liturgical clergy, on the basis of their religious faith, the equal opportunity to compete

for chaplain commissions. This would meet the definition of an illegal conspiracy. *Hobson*, 757

F.2d at 51 ("A civil conspiracy is defined as an agreement between two or more people to

participate in an unlawful act or a lawful act in an unlawful manner."). This prejudice towards a

religious grouping, *i.e.*, Non-liturgical clergy and faith groups, falls with in the scope of § 1985

which allows for the award of damages as the Court and the evidence may find appropriate. *See*

*Ward v. Connor*, 657 F.2d 45, 47-48 (4th Cir. 1981); *Hobson*, 757 F.2d at 21 (discussing cases in

which "several circuits have ruled that politics and religion define such a class" that meets the

"class based discriminatory animus that section 1985 requires."). Government officers and

officials are liable under § 1985.  *Hobson*, 757 F.2d at 18-20, 55 (FBI engaged in illegal activities

in violation of plaintiffs constitutional rights).  Consequently, once the Court has dismissed the

Navy's MTD, Plaintiffs will amend the Complaint under Rule 15 to include a violation of 42

U.S.C. § 1985.


## CONCLUSION

The Navy's Motion to Dismiss has no basis in fact of law.  It presumes and argues that

Plaintiffs are asking for relief that they have nor asked for.  It inappropriately construes Plaintiffs'

requests for specific relief into request for money damages and ignores Plaintiffs' injuries in fact

resulting from the Navy's establishment of a preferred religious tradition .  Finally, the Navy

ignores the Complaint's allegations of fraudulent concealment and the law in this Circuit to argue

that the statue of limitations has run.  The Court should dismiss the Navy's frivolous MTD and

consider sanctions for its willful blindness to the Complaint and the applicable law.

Respectfully submitted,


DATED: March 3, 2003                     _____/S/_____
                                         Arthur A. Schulcz, Sr.
                                         D.C. Bar No. 453402
                                         Counsel for the Plaintiffs
                                         2521 Drexel Street
                                         Vienna, VA 22180
                                         703-645-4010

36

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REV. CHARLES E. LARSEN, et al.,   )
                      )
         v.           )     Case No. 02CV02005
                      )
THE UNITED STATES NAVY, et al.   )
                      )

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2003, a true and correct copy of **Plaintiffs' Opposition and Memorandum of Points and /authorities in Support of Plaintiffs' Opposition to Defendants Motion to Dismiss** and proposed Order was served on the following by fax and overnight mail:

      Michael Q. Hyde
      Attorney, Civil Division
      U.S. Department of Justice
      20 Massachusetts Ave., NW
       Room 6138
      Washington, D.C. 20001

                               _____/S/_____
                               Arthur A. Schulcz, Sr.,
                               D.C. Bar No. 453402
                               Counsel for Plaintiffs
                               2521 Drexel Street
                               Vienna, VA 22180
                               703-645-4010

Singh v McHugh  - Exhibit CC

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IKNOOR SINGH,

          Plaintiff,

     vs.                     No.1:14-cv-01906-ABJ

JOHN MCHUGH, in his official
capacity as Secretary of the
United States Army, et al.,

          Defendants.

-----------------------------

30(b)(6) DEPOSITION OF

LIEUTENANT COLONEL DANIEL CEDERMAN

BY AND FOR UNITED STATES ARMY


Washington, D.C.

Thursday, February 26, 2015


Reported by:  Lori J. Goodin, RPR, CLR, CRR

          Realtime Systems Administrator

JOB NO. 13606F

Page 2

1

2

3

4                    February 26, 2015

5                        4:58 p.m.

6

7    30(b)(6) Deposition of

8

9         LIEUTENANT COLONEL DANIEL CEDERMAN,

10

11   Held at American Civil Liberties Union

12   Foundation, 915 15th Street, Northwest,

13   Suite 600, Washington, D.C. before Lori J.

14   Goodin, RPR, CLR, CRR, Realtime Systems

15   Administrator, and a Notary Public in and for

16   the District of Columbia.

17

18

19

20

21

22

23

24

25

Page 3

1   A P P E A R A N C E S:

2

3   Attorneys for Plaintiff:

4         AMERICAN CIVIL LIBERTIES UNION FOUNDATION

5         915 15th Street, Northwest, Suite 600

6         Washington, D.C.  20005

7         202-675-2330

8      BY:  HEATHER L. WEAVER, ESQUIRE

9         hweaver@aclu.org
   AND
10        AMERICAN CIVIL LIBERTIES UNION OF

11        THE NATION'S CAPITAL

12        4301 Connecticut Avenue, Northwest

13        Washington, D.C.  20008

14        202-457-0800

15     BY:  ARTHUR B. SPITZER, ESQUIRE

16        artspitzer@aclu-nca.org

17

18  Attorneys for Defendants:

19        UNITED STATES DEPARTMENT OF JUSTICE

20        555 Fourth Street, Northwest

21        Washington D.C.  20530

22        BY:  WAYNE H. WILLIAMS, ESQUIRE

23           wayne.williams@usdoj.gov

24           JANE M. LYONS, ESQUIRE

25           jane.lyons@usdoj.gov

```
 1          A P P E A R A N C E S  (CONTINUED):

 2

 3    Also Present:

 4          LTC Joseph M. Masterson, U.S. Army

 5          David O'Dea, U.S. Army

 6          Daniel Hill, U.S. Army

 7          Nicole Fish, U.S. Army

 8          Chris Koschnitzky, U.S. Army

 9

10          Alex Sverdlik, ACLU

11          Anisha Singh

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    EXAMINATION INDEX

2                                            PAGE

3    BY MS. WEAVER                            6

4

5

6

7                        EXHIBITS

8    30(b)(6)

9    EXHIBIT      DESCRIPTION                PAGE

10   Exhibit 14  Cederman's declaration      22

11

12        (Original Exhibit included with the

13   original transcript.)

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    PROCEEDINGS

2

3        LIEUTENANT COLONEL DANIEL CEDERMAN,

4    having been first duly sworn, testified as

5    follows:

6                    EXAMINATION

7    BY MS. WEAVER:

8        Q.    Hi, good afternoon.

9        A.    Good afternoon.

10       Q.    I am Heather Weaver.  I am one of

11   the attorneys for the plaintiff in this case.

12            Have you ever been deposed before?

13       A.    No.

14       Q.    Okay.  And, could you state your

15   name for the record.

16       A.    Yes, Daniel Cederman.

17       Q.    Have you ever given testimony in a

18   court case, either via affidavit or in court?

19       A.    No.

20       Q.    Okay.  So, now I'm just going to

21   give you some instructions which everybody here

22   has heard multiple times.

23            Because the court reporter is

24   reporting what we say, it is important that we

25   don't talk over one another.  So, let me finish

1    my questions and then you can answer.

2          A.    Okay.

3          Q.    Also try to give a verbal response

4    just so that there is something for the court

5    reporter to record.

6                And, if I ask a question and it is

7    unclear, please let me know and I will try to

8    rephrase it.

9          A.    Okay.

10         Q.    Your attorneys may object to certain

11   questions for the record.  And you can go ahead

12   and answer my question after they have objected

13   unless they instruct you not to.

14         A.    Okay.

15         Q.    Are you on any medications that

16   would affect your testimony today?

17         A.    No.

18         Q.    Is there any other reason that you

19   can't testify under oath today?

20         A.    No.

21         Q.    Okay.  Other than your attorneys,

22   did you speak with anyone to prepare for today's

23   deposition?

24         A.    The subject matter experts at Cadet

25   Command for policy and procedure.

1        Q.    Okay.  What do you mean by subject

2    matter experts?

3        A.    To ensure that my recruiting and

4    retention policies are in alignment with Cadet

5    Command.  Just wanted to double-check.

6        Q.    Okay.  Anybody else?

7        A.    No.

8        Q.    Did you talk to Colonel Webber or

9    Mr. Burns?

10       A.    The individuals who were in the

11   other room, yes.

12       Q.    Okay.

13       A.    But they are from Cadet Command,

14   so --

15       Q.    Oh, I see.  Okay.  Did you review

16   any documents in the preparation for today?

17       A.    Yes.

18       Q.    What documents did you review?

19       A.    I looked over several regulations,

20   so AR 670-1 and AR 670-20.  And the memorandum

21   from DHE-1 that was put out.  And I also reviewed

22   my own statement.

23       Q.    And by memorandums, you mean the

24   letter that denies his religious accommodation?

25       A.    Yes.

Page 9

```
 1          Q.    Okay.  I'm just going to get a

 2    little bit of your educational and work history

 3    background.  Can you provide your educational

 4    background?

 5          A.    I have a Bachelor's in computer

 6    science, or correction, computer engineering from

 7    the Rochester Institute of Technology.  And I

 8    have a Master's degree in organizational

 9    leadership and design from Chapman University.

10          Q.    Okay.  And what is your current

11    position?

12          A.    I am the Professor of Military

13    Science at Hofstra University.

14          Q.    And I went over this with another

15    deponent, but I just want to make sure I

16    understand.

17                The Hofstra ROTC program is part of

18    a larger battalion that includes other ROTC

19    programs; is that correct?

20          A.    Yes.

21          Q.    Okay.  And who is the Commanding

22    Officer of that battalion?

23          A.    My, the Brigade Commander of Second

24    Brigade who controls these schools in our region

25    is Colonel Heintzelman.
```

Page 10

1          Q.     Okay.  What are your current job

2   duties?

3          A.     I am responsible for the leadership

4   training and commissioning of the ROTC cadets in

5   my school and also my partnership schools.  So

6   overall, I am responsible for the budget, the

7   training cycles, the cadre themselves, and the

8   well-being of my cadets.

9          Q.     And what about, what are the other

10  schools that are part of your cadre?

11         A.     My host university is Hofstra so

12  that is where my headquarters is.

13                And then my partnership school is

14  Stony Brook, which is located on Long Island.

15  And I have an additional roughly ten schools that

16  cadets come from to one of those two.

17                So, as an example, Farmingdale,

18  Adelphi, Molloy, NY IT, and Nassau Community

19  College will come to Hofstra.

20                And then Suffolk Community College

21  will go to Stony Brook for ROTC.

22         Q.     So they are two separate programs?

23  Do they do --

24         A.     It is the same cadre.  So we will

25  teach Tuesday and Thursdays at Hofstra, and then

Page 11

1    we will teach on Fridays at Stony Brook.

2         Q.    And do all of the students in the

3    cadre attend all of those classes regardless of

4    location?

5         A.    No.  We have two locations that the

6    cadets can attend depending on their location.

7         Q.    I see.

8         A.    Because I am responsible for ROTC on

9    all of Long Island.  So, due to the distance

10   between Hofstra and Stony Brook and how big the

11   island is, I give them two opportunities, either

12   at the Stony Brook location or at the Hofstra

13   location.

14        Q.    How many cadets are in the cadre?

15        A.    Right now I have 87 cadets.  That

16   number does fluctuate rather regularly due to new

17   enrollments or individuals who no longer want to

18   be in the program.

19        Q.    Okay.  Before you were in this

20   position, what were you doing?

21        A.    I was with the 416 Theater Engineer

22   Command as the Emergency Operations Center OIC.

23              And that was in Darien, Illinois.

24        Q.    What were your duties there?

25        A.    I was responsible for the

Page 12

1    mobilization and readiness of the 416 Theater

2    Engineer Command who has worldwide deployment

3    responsibilities.

4            As well as being the Emergency

5    Operation Center Chief, which is responsible for

6    all classified and unclassified message traffic

7    in and out of that unit.

8        Q.    Were there any duties as part of

9    that job that related to ROTC?

10       A.    Not in that position, no.

11       Q.    Okay.  How long were you at that

12   position for?

13       A.    One year.

14       Q.    And prior to that, where were you?

15       A.    I was at joint base Lewis-McChord as

16   one of the 104th Training Division underneath the

17   108 Training Command.

18       Q.    And what were your responsibilities

19   there?

20       A.    I was the G3 Plans Officer for the

21   104 Division, so I was responsible for developing

22   the training and summer training plans for all of

23   our soldiers.

24       Q.    Did that job involve any interaction

25   or any responsibilities relating to ROTC?

Page 13

1        A.    Yes.   The 104th Training Division

2    provides the reserve component support to Cadet

3    Command.

4              So, during the summer training cycle

5    when Cadet Command would run LDAC and LTC, the

6    two summer training events.  A reserve component

7    would be attached to that.  And they are soldiers

8    doing 29 days annual training or 14 days annual

9    training, because they are the citizen soldiers.

10   So, they only do one weekend a month.

11             So, we were responsible for

12   providing that support to Cadet Command in the

13   summer.

14        Q.    Okay.  And how long were you there?

15        A.    In that capacity five years.

16        Q.    And before that what were you doing?

17        A.    Before that I was with the 402nd

18   Civil Affairs Battalion, and I was attached to

19   the 82nd Airborne Division in Iraq, for

20   approximately 14 months.

21        Q.    Okay.  And so, you were deployed to

22   Iraq?

23        A.    Yes.

24        Q.    And I assume the answer is no, but

25   did your duties have anything to do with ROTC

Page 14

1    while you were in Iraq?

2         A.    No.

3         Q.    Okay.  And before you were deployed

4    to Iraq, what were you doing?

5         A.    I was Alpha Company, 3rd of the

6    414th Company Commander in the 104th Training

7    Division.

8         Q.    Were there any job duties as part of

9    that division that involved ROTC?

10        A.    Yes.

11        Q.    Okay.

12        A.    I was the Committee Chief for the

13   Hand Grenade Committee and the U.S. Weapons

14   Committee for a period of 18 months.

15        Q.    And how did that involve ROTC?

16        A.    Those committees provided training

17   to cadets in the summer.  And as I spoke about

18   the 104th doing all of the support.  That company

19   did one portion of that support.

20        Q.    Okay.

21        A.    So we provided one particular

22   committee because of my rank at the time.

23        Q.    And when did you first enlist in the

24   Army?

25              MR. WILLIAMS:  Objection.

Page 15

```
 1              MS. LYONS:  Wrong word.  He didn't
 2     enlist.
 3  BY MS. WEAVER:
 4        Q.    What would be the proper, I'm not
 5  sure what the proper word would be.
 6        A.    I did enlist.  So, I enlisted in
 7  1992.
 8        Q.    Okay.
 9        A.    And I joined the reserves as a
10  Private.  But immediately following basic
11  training, I went to and signed up for ROTC.
12              So, I did go through regular basic
13  training.
14        Q.    Okay.  And so you went, you enlisted
15  and then you went through ROTC as well?
16        A.    Then I went through ROTC, yes.
17        Q.    And from the time that you graduated
18  from ROTC, up until the most recent position we
19  just talked about, the Hand Grenade Committee,
20  were there any other positions that you held that
21  involved working with ROTC?
22        A.    No, no.  All of the positions prior
23  to that were active component engineer positions.
24        Q.    Okay.  And I would like to get a
25  little bit -- we have already gotten some of the
```

Page 16

1    background about the Hofstra battalion, or what

2    would you call it?

3           A.    Battalion.

4           Q.    Battalion.  What are the typical

5    ROTC related activities each day for students?

6           A.    Do you mean every day of the week or

7    just on particular days?

8           Q.    Well, let's start with, are there

9    ROTC related activities that take place every

10   day?

11          A.    From a training perspective on

12   Mondays, Wednesday -- correction.

13               Mondays, Wednesday, and Thursdays at

14   Hofstra, we will do physical training in the

15   morning from 6:30 until 7:30.

16               And then on Tuesdays and Thursdays,

17   we will do classroom instruction, followed by

18   lab.

19               So, Tuesday will be an hour and a

20   half of classroom instruction, only for the

21   juniors and seniors.  And then on Thursday we

22   would do an hour and a half of classroom

23   instruction for all MS1s through 4s followed by

24   three hours of lab.

25               For the Stony Brook cadets, it is a

Page 17

1    slightly different schedule, but similar in the

2    amount of time allocated.

3              So, they will do physical training

4    Monday, Wednesday, and Friday, from 6:30 until

5    7:30.  And then all day Friday from, I think 9

6    until probably about 1600, they will do classroom

7    and lab.

8         Q.    And, what happens in the labs?

9         A.    The lab portion is the practical --

10   normally it is the practical application of the

11   classroom portion.

12        Q.    Can you give me an example?

13        A.    An easy example would be for land

14   navigation and terrain association.  So in the

15   classroom portion, they would learn how to read a

16   map, how do use a compass, how to do

17   intersection, resection on the map.

18             And then for the lab portion we

19   would go out to either Belmont for, which is a

20   park, for the Hofstra cadets, or go in the

21   Back 40, effectively, for the Stony Brook cadets,

22   because they have a lot of woods.

23             And we will do practical

24   applications.  So, we will set points out in the

25   woods and give them a starting location, and see

Page 18

1    if they can find it.

2         Q.    Okay.  So, in addition to the

3    physical training three times a week, the classes

4    two times a week, and the three-hour lab once a

5    week, are there any other organized activities

6    that happen each week in ROTC?

7         A.    Once a semester we will have a

8    training exercise which will be a three-day

9    exercise normally.  And it is an extension of the

10   labs is probably the best way to put it.

11              So, more practical application.  No

12   classroom portion.  It is just practical

13   application of patrolling, doing tactical or land

14   navigation or things of that nature.  So that is

15   once a semester.

16              And then during the week there are

17   additional volunteer opportunities for cadets if

18   they want to do a color guard for a baseball

19   game.

20              Or if they -- well, this is more of

21   what I'm told, but they would go to part of our

22   cadet recruiting teams to go to high schools or

23   college recruiting events to participate in those

24   activities, to, you know, help increase brand

25   awareness, and see if we can find anyone who

Page 19

1    would be interested in the program on Long

2    Island.

3        Q.    Are there any other activities or

4    events that cadets engage in, as part of the ROTC

5    program?

6        A.    There are numerous individual

7    events.  I mean I can describe some of the other

8    ones.  Like we had a dining-in where it is

9    actually a dinner, which has a very formal way

10   that it is presented.  And it is used to build

11   camaraderie amongst the cadet corps.

12              We also have a staff ride for the

13   seniors that they will go to, which is -- they go

14   to a Civil War battlefield and kind of see what

15   those generals saw, and kind of make their

16   tactical assessments.

17              And then we have a military ball at

18   the end of the year, where there is another

19   formal military function, out of tradition.  And

20   it has a very set format at well.  And we also

21   provide some awards during that.

22              I think that is the main ones that I

23   can think of.

24       Q.    And then outside of all of those

25   activities, are the cadets required to report to

Page 20

1    you on a daily basis or for, you know, inspection

2    of their uniforms each day or anything like that?

3          A.    The mandatory formations for --

4          Q.    That is what I was looking for?

5          A.    The mandatory formations are the PT

6    and the classes and the field training exercises.

7                Those are really when we get

8    accountability of all cadets within the program.

9                The other individual events -- it

10   depends because the cadets run a lot of those

11   events themselves.  We will have a cadre that are

12   present, but it is not something where we get

13   100 percent accountability.

14         Q.    Okay.  Which of these events ---so

15   you are familiar with the plaintiff in this case

16   Iknoor Singh?

17         A.    Yes.

18         Q.    And which of these events is he

19   permitted to participate in?

20         A.    As an auditing student he is

21   participating in the classroom portion.  So, for

22   him, the Tuesdays and Thursdays for an hour and a

23   half.  He, or -- correction, the Thursdays for an

24   hour and a half, not the Tuesdays, he

25   participates in classroom instruction.

Page 21

1                    Additionally, starting in January, I

2     had him voluntarily, if he wants to, come to

3     physical training in the morning from 6:30 to

4     7:30.  And he has attended a few of those

5     sessions but not all of them.

6          Q.    Is that because he is recovering

7     from minor surgery?

8          A.    Yes.

9          Q.    What happens at the physical

10    trainings?

11         A.    The physical training sessions are

12    conducted to kind of get a baseline level of

13    physical fitness for all of our cadets.

14                So, we will do upper body,

15    abdominal, some cardiovascular.  And it is a

16    critical measurement for me to see how my cadets

17    are doing physically, because that is one of the

18    criteria for seeing how well they will do as a

19    leader.

20         Q.    Aside from the classroom portion and

21    the physical trainings, are there any other

22    aspects of, any other events that we discussed

23    earlier that he participates in?

24         A.    No, not on a regular basis.

25         Q.    And do you have any other

Page 22

```
 1    interaction with him outside of those, any
 2    other -- let me clarify.
 3                  Any other regular interaction with
 4    him outside of those events?
 5                  MR. WILLIAMS:  Objection.
 6                  THE WITNESS:  No regular
 7       interaction.  I have seen him from time to
 8       time, as he is a Hofstra student.
 9                  But, nothing associated with ROTC,
10       specifically.
11    BY MS. WEAVER:
12       Q.    Okay.  This is just your declaration
13    that you submitted in this case.  And it is
14    Exhibit 14.
15                  (30(b)(6) Exhibit Number 14
16                  marked for identification.)
17    BY MS. WEAVER:
18       Q.    Do you recognize this declaration?
19       A.    Yes.
20       Q.    Okay.  Did you prepare this
21    declaration?
22       A.    Yes.
23       Q.    Let's go to Paragraph 2?
24       A.    Two.
25       Q.    In the last sentence you say, "He is
```

1   currently holding a grade of A in the MS 201

2   course in which he is enrolled, and I anticipate

3   that he will continue to perform well."

4             Does that remain true?

5        A.    Academically, yes.  He has already

6   completed the MS 201 course, as it was a one

7   semester, and he is currently enrolled in the

8   MS 202 course.

9        Q.    Okay.  That is the course that meets

10   on Thursdays?

11        A.    Correct.

12        Q.    By the way, if he ultimately does

13   not obtain a religious accommodation, will he be

14   able to attend the Thursday classes next year?

15        A.    No.  And the reason for that is by

16   Cadet Command regulation you have to be

17   contracted to attend advanced course classes,

18   which are our junior and senior classes.

19        Q.    So, this semester will be the last

20   course that he could attend in your department?

21        A.    Yes.

22        Q.    Okay.  And currently he is enrolled

23   in MS 202?

24        A.    Yes.

25        Q.    Okay.  Has Mr. Singh's beard or

1   turban or hair affected his performance in that

2   class?

3          A.    No.   Not for, during his classroom

4   portion.

5          Q.    Has it affected his performance in

6   physical training?

7          A.    His personal performance, no.   My

8   assessment of his physical fitness at this time

9   due to the limited interaction, because he has

10  only been to a few events, is he has a ways to go

11  to be able to pass the Army Physical Fitness Test

12  which is one of the reasons why I invited him, to

13  come help see if he can get better at that.

14         Q.    At what point do you have to take

15  the Army Physical Fitness Test?

16         A.    He needs to be able to pass that in

17  order to contract.

18         Q.    Okay.   What does that entail?

19         A.    It is a two-mile run, two minutes of

20  push-ups, and two minutes of sit-ups.

21         Q.    Two-mile run and what was the other?

22         A.    Two minutes of push-ups, and two

23  minutes of sit-ups.

24         Q.    And if he were granted a religious

25  accommodation in this case, what is the latest

1    that he would be able to take that physical

2    fitness test?

3         A.    It depends on if contracts are

4    available at that time.

5              From a historical perspective, it

6    would be prior to finals during the semester.  So

7    that would be sometime in early May, either late

8    April or early May, when we have a for-record PT

9    test scheduled for that time right now.

10        Q.    Sorry?

11        A.    We have a for-record test as a

12   battalion already scheduled, not specifically for

13   him, but he would be able to participate in that.

14        Q.    If there are contracts available at

15   that time?

16        A.    Yes.

17        Q.    Okay.  And can you explain to me how

18   that works?  Are there a certain number of

19   contracts available each May?

20        A.    So, prior to December, there was

21   effectively an open contract cap.

22              So, what I mean by this is, I was

23   missioned to commission 12 individuals, 12

24   Lieutenants into the Army.  But I really didn't

25   have a contract sealing, so I could contract 20,

Page 26

1    25, in anticipation of attrition.

2              Now, I have been given, just

3    recently, a hard contract cap of 15.  As of right

4    now I have 14 of those 15 contracts already

5    assigned for his year group, and one more

6    pending, if the individual passes height/weight.

7         Q.    And, for what time period is that

8    contract cap run?

9         A.    It is by year group.

10             So, at the school level, at my

11   level, I am only allowed by my brigade to have 15

12   contracts.

13             Cadet Command, as a whole, and I

14   don't want to speak for Cadet Command but there

15   is a large number of contracts that they hold?

16   So, could I get another contract from Cadet

17   Command, if I hit my cap?  Possibly, but it is

18   not guaranteed.  I'm only given 15.  And this is

19   new.

20        Q.    Is this the first -- well, this, you

21   have sort of just answered this.  But is this the

22   first time that you had a contract cap placed on

23   you, either in your experience at Hofstra or --

24   actually you didn't run a prior -- okay.  Never

25   mind.

1              Is this to your knowledge the first

2     time a contract cap has been placed on the

3     Hofstra battalion?

4          A.    Yes.  And it was not just placed on

5     me, but that was placed on Cadet Command wide, in

6     an effort to reduce overage, so not commissioning

7     too many.

8          Q.    Is the contract cap the same for

9     each battalion?

10              MR. WILLIAMS:  Objection.

11    BY MS. WEAVER:

12          Q.    If you know, please answer.

13          A.    For those who are commissioning

14    12 -- and I don't know of the specific math

15    behind it.

16              But, we assume a particular

17    attrition rate so, therefore, if I commissioned

18    12, I can assume three would attrit.

19              So, therefore they are giving me 15

20    contracts.  I mean I think there is some math

21    behind that, but I don't know specifically what

22    it is.

23          Q.    We should have asked our last

24    witness about that.

25              Well, so, is what you are saying --

Page 28

1    okay.  So is the contract cap tied to the number

2    of cadets you ultimately are directed to

3    commission?

4              MR. WILLIAMS:  Objection.  This is

5         starting to get well outside of the topic

6         that Colonel Cederman was identified to

7         testify to.  If it comes to dealing with

8         Mr. Singh's participation and ultimate

9         process through Hofstra ROTC, I understand.

10             But if you are asking about Army, as

11        a whole, that is not what this witness was

12        identified.

13   BY MS. WEAVER:

14        Q.    Is it your understanding that your

15   contract cap right now where you have one spot

16   left is tied to the number of people that you are

17   supposed to commission?

18        A.    Yes.

19        Q.    Do you know if that is the case for

20   the contract caps that have been issued to other

21   battalions?

22             MR. WILLIAMS:  Objection.

23             THE WITNESS:  Yes.  It is based on

24        the commission mission.

25   BY MS. WEAVER:

1          Q.     How is this contract cap

2    communicated?

3                  MR. WILLIAMS:  Objection.

4                  THE WITNESS:  To --

5    BY MS. WEAVER:

6          Q.     I will rephrase it.  Is this a new

7    policy or a new regulation or was it -- is this a

8    new policy or a new regulation?

9                  MR. WILLIAMS:  Objection.  The

10             witness has already testified that this came

11             from higher and that it was passed down to

12             him.

13    BY MS. WEAVER:

14          Q.     From whom did this come from?

15          A.     I received this direction from my

16    brigade.

17          Q.     Okay.  From the Brigade Commander.

18          A.     Yes.

19          Q.     So, Scott Heintzelman.  I'm not sure

20    if I'm saying his name correctly.

21          A.     Yes.

22          Q.     Okay.  So, when did you receive

23    that?

24          A.     It was probably around December time

25    frame.  It was after this was submitted.

Page 30

1          Q.     Are there any documents evidencing

2     this contract cap?

3                 MR. WILLIAMS:  Objection.

4     BY MS. WEAVER:

5          Q.     As it pertains to Hofstra

6     University.

7          A.     I'm sure there is -- let me

8     rephrase.

9                 There was a directive sent down, but

10    I cannot recall if it was in an order or a

11    tasking or an e-mail.

12         Q.     What would a tasking be?

13         A.     Similar to an order.  It is just a

14    different format.

15         Q.     Would it be a written memo of sorts?

16         A.     Yes.

17         Q.     Okay.  Let's go to the declaration

18    again.  Paragraph 6.

19                You state in here that, "The

20    uniformity standards provide a means by which I

21    can assess how well cadets and enrollees are able

22    to follow directions on a consistent basis, how

23    well they are able to react to constructive

24    criticism, and how well they carry out standing

25    directives without being reminded repeatedly

Page 31

1    about those directives."

2              Are there ways that you are able to

3    assess those factors?  Let's start with how well

4    candidates and enrollees are able to follow

5    directions on a consistent basis.

6              Are there ways for you to assess how

7    well candidates and enrollees are able to follow

8    directions on a consistent basis?

9         A.    Yes.

10        Q.    And what are those ways?

11        A.    In addition to adherence to

12   standards and policies, having been given orders,

13   to see if they carry them out, providing them

14   opportunities to demonstrate initiative through

15   planning, training, or leading small unit

16   operations, or even providing presentations on

17   current events and military history.

18              So, these are many tools that I will

19   use.

20              But, the grooming standards and

21   uniformity, especially with equipment and

22   appearance and their, both their dress and ACU

23   uniforms, their combat uniforms are critical to

24   those assessments as well.

25        Q.    If a cadet has received a grooming

Page 32

```
 1   and uniform accomodation, when you inspect that
 2   cadets's appearance, if he is complying with that
 3   accommodation, is he considered in compliance
 4   with the rules?
 5        A.    Are you asking do I have anyone, or
 6   are you asking hypothetically?
 7        Q.    No, I'm just asking -- let's start
 8   there.
 9              Do you have any cadets that have had
10   a grooming or uniform exception?
11        A.    No.
12        Q.    Are you aware of any cadets a
13   grooming or uniform exception in the last five
14   years?
15              MR. WILLIAMS:  Objection.
16              THE WITNESS:  Not a grooming
17        exception.  The one instance that I do not
18        know specifically of was an individual who
19        was Muslim and only wanted to wear the PT
20        shorts -- or, correction, did not want to
21        only wear the PT shorts, wanted to wear the
22        Army physical fitness pants as well so she
23        was granted that accommodation at the
24        battalion level, because it didn't require a
25        religious exception.
```

1                    It was just an adjustment to the

2       existing uniform.

3    BY MS. WEAVER:

4         Q.    Do the rest of the cadre wear shorts

5    as part of that uniform?

6                    MR. WILLIAMS:  Objection.

7                    THE WITNESS:  Yes.

8    BY MS. WEAVER:

9         Q.    Okay.

10        A.    Dependent on summer, winter.  I

11   mean, the uniform changes depending on the

12   weather.

13        Q.    But if this woman was granted a

14   right to wear pants, even when the rest of the

15   cadre was wearing shorts?

16                    MR. WILLIAMS:  Objection.  Misstates

17       the witness's testimony.

18                    THE WITNESS:  From what I was told,

19       yes.  I was not at Hofstra when this

20       occurred, because it occurred several years

21       ago.

22                    But that was the only instance that

23       I have heard of.  So, I do not have any

24       direct knowledge of it.

25   BY MS. WEAVER:

Page 34

1      Q.    Okay.  Are there other ways in which

2  you can tell whether -- other than by resort to

3  the uniform and grooming standards, are there

4  other ways in which you can tell how well a cadet

5  reacts to constructive criticism?

6      A.    Yes.

7      Q.    Can you provide some examples of

8  those?

9      A.    An example would be a decision

10  brief, for an example.

11          So, deciding what course of action

12  to take.  They would present the brief, and then

13  I would provide them feedback in the AAR process.

14          And then give them the opportunity

15  to make adjustments.

16          Or to see if future decision briefs,

17  they made those calculated adjustments as well.

18          And another example may be in the

19  field when they are leading a patrol, if the way

20  they are controlling their unit isn't working or

21  isn't tactically sound, we would give them

22  suggestions, and see if they make the adjustment.

23          And then they would be assessed on

24  that.

25      Q.    Are there any other ways that you

Page 35

1    can determine how well a cadet reacts to

2    constructive criticism?

3         A.    Aside from those two?

4         Q.    Uh-huh.

5         A.    I mean, it is really a case-by-case

6    basis, depending on the task or order or briefing

7    assigned.

8              Or, from the aspect of physical

9    training, if they are performing the exercises

10   correctly or putting forth the effort and

11   actually getting something out of it.

12             So, it really depends on the

13   situation.  And there is a multitude of ways to

14   assess it.

15             But it is all stemming from what the

16   standard is, either from a briefing standard,

17   physical fitness standard, or an appearance

18   standard, and how they fall in regards to those

19   standards.

20        Q.    And is there another way to tell how

21   well cadets carry out standing directives without

22   being reminded repeatedly about those directives?

23        A.    Well, if they carry out the

24   directives, they don't have to be reminded

25   repeatedly.

1          Q.     Well, let me ask this, what are some

2    other standing directives that cadets have to

3    follow?

4          A.     The most obvious ones, and the ones

5    that we present initially to our Freshmen are

6    show up ten minutes before formation time.

7                 Be in the proper uniform, and have

8    the proper equipment ready to train.

9                 Always have a pen and paper on you,

10   as an example.  Always have your safety card in

11   your upper pocket.

12                So, these are things that we can

13   spot check to make sure they are following those

14   rules and procedures that we are trying to

15   engrain in them, like having an ethics and values

16   card with them, so they can kind of look back at

17   that.

18                But this repetition will then

19   instill that uniformity.  So, I don't have to

20   worry about an individual not coming with a pen

21   and paper, because since their freshman year,

22   they have been instilled to carry it in their

23   cargo pocket and have their pen in the handy pen

24   holders in the ACUs.

25                And I can be relatively assured that

Page 37

1    they would have that at that point in time.  So,

2    those are some of the things that we would do.

3        Q.    If Mr. Singh were granted an

4    accommodation here, and he proceeded with

5    enrolling in ROTC for his junior and senior

6    years, at the end of the ROTC program in

7    determining whether or not to grant him a

8    commission, what are the factors that you would

9    consider?

10       A.    So --

11             MR. WILLIAMS:  Objection.  Lack of

12       foundation.

13   BY MS. WEAVER:

14       Q.    Go ahead.

15       A.    So, you said enrolled.  So, and

16   there is a specific difference between enrolled

17   and contracted.  So --

18       Q.    Okay.  Is it true that if he is

19   granted an accommodation for ROTC, if he joins

20   his junior year, he will have to become a

21   contracted cadet?

22       A.    For him to proceed into his junior

23   year, he will need to be contracted, yes.

24       Q.    Right.  So, just as background, we

25   are aiming to have a decision in this case with

1   the court by May, so this semester would be over.

2   It would be for the junior year.

3            And so, at that point, if he were to

4   contract as a cadet, let's just say that, and he

5   completed the program, and you were, it was time

6   to determine whether or not to grant him

7   accommodation, what are the factors that you

8   would consider?

9            MR. WILLIAMS:  Objection.  I don't

10      even understand the question.

11  BY MS. WEAVER:

12      Q.    What factors do you consider in

13  deciding whether or not to grant a cadet a

14  commission?

15      A.    So, the, once they contract -- or,

16  correction.  Once a cadet has been contracted,

17  meaning he has competed against his enrolled

18  peers and has made it into the contracted status,

19  provided they maintain what the minimum

20  requirements by Cadet Command are, they will be

21  commissioned.

22            So, the attrition that we receive

23  over the next two years is usually due to the

24  fact this they drop below a 2.0 GPA for a non

25  scholarship student.

Page 39

1            Or, I believe it is a 2.5 but I am

2      not 100 percent sure for a scholarship student,

3      and as long as they can pass the PT test.

4      Normally we will still commission.

5            Unless there is some glaring

6      systemic issue that the cadet has, as long as he

7      meets the minimum standards after he contracts,

8      he will be commissioned.

9            MR. WILLIAMS:  I want to lodge an

10          objection that this is outside of Colonel

11          Cederman's expertise, what he was identified

12          for.

13          Commissioning is a complicated

14          process.  And there are some additional other

15          legal steps that are involved beyond

16          contracting command, beyond the Army as a

17          whole, that involves the President, that we

18          are kind of skipping over.

19          So, I just don't want this to be the

20          Army's official position that the Army gives

21          out commissions.  I just want to clarify the

22          record on that.

23          MS. WEAVER:  Okay.

24      BY MS. WEAVER:

25          Q.    Do you make a determination or a

1    recommendation regarding whether each cadet

2    should be commissioned?

3         A.    Yes.  If, now, commissioned -- see,

4    I don't know how to properly phrase it, but there

5    are things like scrolling and stuff like that

6    that I am not familiar with at all.

7              But, from my perspective, it is up

8    to me to determine if a cadet should be

9    commissioned.

10             But, as long as he is meeting the

11   standards, I have to have cause to not commission

12   him.  Meaning an integrity violation, or a

13   failure to adapt, or failing the height/weight or

14   something of that nature.

15             But, if there is cause, I will not

16   commission that cadet.

17        Q.    Okay.  So, if Mr. Singh were granted

18   an accommodation and any of his articles of

19   faith, meaning his beard or his turban or his

20   hair interfered with meeting those minimum

21   standards, would you be able to deny him a

22   commission?

23        A.    Meeting the minimum standards for --

24        Q.    That you consider when you consider

25   whether or not to grant someone a commission?

 1               MR. WILLIAMS:  Objection.  Colonel

 2      Cederman cannot grant a commission.

 3   BY MS. WEAVER:

 4        Q.    Okay.  I apologize for using the

 5   language, grant a commission.

 6               But, in determining whether or not a

 7   cadet should be commissioned.  You just stated

 8   that you could deny a cadet, you could conclude

 9   that a cadet should not be commissioned for

10   various reasons, correct?

11        A.    Yes.

12        Q.    If Mr. Singh were granted an

13   accommodation, religious accommodation, and it

14   turned out that his accommodation, his religious

15   articles were interfering with his ability to

16   meet the requirements that you consider in

17   determining whether a cadet should be granted a

18   commission, could you deny him that commission?

19               MR. WILLIAMS:  I'm going to lodge

20         another objection.  This is well outside the

21         scope of the 30(b)(6) deposition and for what

22         the witness was identified to depose.

23               And it is asking a hypothetical that

24         is beyond what the Army can actually present

25         an official answer at this time.

1              THE WITNESS:   Should I answer?

2    BY MS. WEAVER:

3         Q.    Yes, go ahead.

4         A.    Any decisions as a Professor of

5    Military Science that I make will be in

6    accordance with existing Army regulations and

7    standards, as far as I am aware of them at my

8    level.

9              I cannot picture something that his

10   religious accommodation would cause him to get a

11   lower GPA or fail a PT test.  But, it is

12   hypothetical.

13             The main things that we look at for

14   commissioning are GPA, physical fitness,

15   leadership capabilities, failure to adapt, and

16   then also integrity violations, such as, you know,

17   a DUI or forgery or something of that nature.  Or

18   some kind of theft or something like that.

19             Hypothetically if he violated one of

20   those, he, he would be denied a commission just

21   like any other cadet would be.

22             MS. WEAVER:   Okay.  We are done,

23      thanks.

24         (Whereupon, signature not having been

25   waived, the deposition concluded at 5:44 p.m.)

1                    CERTIFICATE OF COURT REPORTER

2     UNITED STATES OF AMERICA  )

3     DISTRICT OF COLUMBIA        )

4            I, LORI J. GOODIN, the reporter before

5     whom the foregoing deposition was taken, do

6     hereby certify that the witness whose testimony

7     appears in the foregoing deposition was sworn by

8     me; that the testimony of said witness was taken

9     by me in machine shorthand and thereafter

10    transcribed by computer-aided transcription; that

11    said deposition is a true record of the testimony

12    given by said witness; that I am neither counsel

13    for, related to, nor employed by any of the

14    parties to the action in which this deposition

15    was taken; and, further, that I am not a relative

16    or employee of any attorney or counsel employed

17    by the parties hereto, or financially or

18    otherwise interested in the outcome of this

19    action.

20                      _____

21                      LORI J. GOODIN

22                      Notary Public in and for the

23                      District of Columbia

24

25    My Commission expires May 14, 2016

Page 44

1              DEPOSITION ERRATA SHEET

2

3    Our Assignment No. 113606

4    Case Caption:  Singh v. McHugh

5

6         DECLARATION UNDER PENALTY OF PERJURY

7              I declare under penalty of perjury

8    that I have read the entire transcript of

9    my Deposition taken in the captioned matter

10   or the same has been read to me, and

11   the same is true and accurate, save and

12   except for changes and/or corrections, if

13   any, as indicated by me on the DEPOSITION

14   ERRATA SHEET hereof, with the understanding

15   that I offer these changes as if still under

16   oath.

17         Signed on the _17_ day of

18   __March_____, 20_15_.

19

20   _____

21   Lieutenant Colonel Daniel Cederman

22

23

24

25

Page 45

```
 1              DEPOSITION ERRATA SHEET
 2    Page No. 11 Line No. 22 Change to: OIC = officer
 3    in Change
 4    Reason for Change:_____
 5    Page No. 13 Line No. 5 Change to: LDAC= Leadership
 6    Development & Assesment Course
 7    Reason for Change:_____
 8    Page No. 13 Line No. 5 Change to: LTC= Leader
 9    Training Course
10    Reason for Change:_____
11    Page No. 20 Line No. 5 Change to: PT= Physical
12    Training
13    Reason for Change:_____
14    Page No. 23 Line No. 1 Change to: MS= Military
15    Science
16    Reason for Change:_____
17    Page No. 36 Line No. 24 Change to: ACU = Army
18    Combat Uniform
19    Reason for Change:_____
20    Page No.____Line No.____Change to:_____
21    _____
22    Reason for Change:_____
23
24    SIGNATURE:_____ DATE: 17 March 2015
25            Lieutenant Colonel Daniel Cederman
```

1                    DEPOSITION ERRATA SHEET

2       Page No.____Line No._____Change to:_____

3       *No change*_____

4       Reason for Change:_____

5       Page No.____Line No._____Change to:_____

6       _____

7       Reason for Change:_____

8       Page No.____Line No._____Change to:_____

9       _____

10      Reason for Change:_____

11      Page No.____Line No._____Change to:_____

12      _____

13      Reason for Change:_____

14      Page No.____Line No._____Change to:_____

15      _____

16      Reason for Change:_____

17      Page No.____Line No._____Change to:_____

18      _____

19      Reason for Change:_____

20      Page No.____Line No._____Change to:_____

21      _____

22      Reason for Change:_____

23

24      SIGNATURE:_____DATE: *17 Mar 2015*

25           Lieutenant Colonel Daniel Cederman

**A**
AAR 34:13
abdominal 21:15
ability 41:15
able 23:14 24:11,16
  25:1,13 30:21,23
  31:2,4,7 40:21
Academically 23:5
accommodation
  8:24 23:13 24:25
  32:3,23 37:4,19
  38:7 40:18 41:13
  41:13,14 42:10
accomodation 32:1
accountability 20:8
  20:13
accurate 44:11
ACLU 4:10
action 34:11 43:14
  43:19
active 15:23
activities 16:5,9
  18:5,24 19:3,25
ACU 31:22
ACUs 36:24
adapt 40:13 42:15
addition 18:2 31:11
additional 10:15
  18:17 39:14
Additionally 21:1
Adelphi 10:18
adherence 31:11
adjustment 33:1
  34:22
adjustments 34:15
  34:17
Administrator
  1:24 2:15
advanced 23:17
Affairs 13:18
affect 7:16
affidavit 6:18
afternoon 6:8,9
ago 33:21
ahead 7:11 37:14
  42:3
aiming 37:25

Airborne 13:19
al 1:7
Alex 4:10
alignment 8:4
allocated 17:2
allowed 26:11
Alpha 14:5
AMERICA 43:2
American 2:11 3:4
  3:10
amount 17:2
and/or 44:12
Anisha 4:11
annual 13:8,8
answer 7:1,12
  13:24 27:12 41:25
  42:1
answered 26:21
anticipate 23:2
anticipation 26:1
Anybody 8:6
apologize 41:4
appearance 31:22
  32:2 35:17
appears 43:7
application 17:10
  18:11,13
applications 17:24
approximately
  13:20
April 25:8
AR 8:20,20
Army 1:7,13 4:4,5
  4:6,7,8 14:24
  24:11,15 25:24
  28:10 32:22 39:16
  39:20 41:24 42:6
Army's 39:20
ARTHUR 3:15
articles 40:18
  41:15
artspitzer@aclu-...
  3:16
Aside 21:20 35:3
asked 27:23
asking 28:10 32:5,6
  32:7 41:23

aspect 35:8
aspects 21:22
assess 30:21 31:3,6
  35:14
assessed 34:23
assessment 24:8
assessments 19:16
  31:24
assigned 26:5 35:7
Assignment 44:3
associated 22:9
association 17:14
assume 13:24
  27:16,18
assured 36:25
attached 13:7,18
attend 11:3,6 23:14
  23:17,20
attended 21:4
attorney 43:16
attorneys 3:3,18
  6:11 7:10,21
attrit 27:18
attrition 26:1 27:17
  38:22
auditing 20:20
available 25:4,14
  25:19
Avenue 3:12
awards 19:21
aware 32:12 42:7
awareness 18:25

**B**
B 3:15
Bachelor's 9:5
back 17:21 36:16
background 9:3,4
  16:1 37:24
ball 19:17
base 12:15
baseball 18:18
based 28:23
baseline 21:12
basic 15:10,12
basis 20:1 21:24
  30:22 31:5,8 35:6

battalion 9:18,22
  13:18 16:1,3,4
  25:12 27:3,9
  32:24
battalions 28:21
battlefield 19:14
beard 23:25 40:19
believe 39:1
Belmont 17:19
best 18:10
better 24:13
beyond 39:15,16
  41:24
big 11:10
bit 9:2 15:25
body 21:14
brand 18:24
brief 34:10,12
briefing 35:6,16
briefs 34:16
brigade 9:23,24
  26:11 29:16,17
Brook 10:14,21
  11:1,10,12 16:25
  17:21
budget 10:6
build 19:10
Burns 8:9

**C**
C 3:1 4:1
cadet 7:24 8:4,13
  13:2,5,12 18:22
  19:11 23:16 26:13
  26:14,16 27:5
  31:25 34:4 35:1
  37:21 38:4,13,16
  38:20 39:6 40:1,8
  40:16 41:7,8,9,17
  42:21
cadets 10:4,8,16
  11:6,14,15 14:17
  16:25 17:20,21
  18:17 19:4,25
  20:8,10 21:13,16
  28:2 30:21 32:9
  32:12 35:21 36:2

cadets's 32:2
cadre 10:7,10,24
  11:3,14 20:11
  33:4,15
calculated 34:17
call 16:2
camaraderie 19:11
candidates 31:4,7
cap 25:21 26:3,8,17
  26:22 27:2,8 28:1
  28:15 29:1 30:2
capabilities 42:15
capacity 1:6 13:15
CAPITAL 3:11
caps 28:20
Caption 44:4
captioned 44:9
card 36:10,16
cardiovascular
  21:15
cargo 36:23
carry 30:24 31:13
  35:21,23 36:22
case 6:11,18 20:15
  22:13 24:25 28:19
  37:25 44:4
case-by-case 35:5
cause 40:11,15
  42:10
Cederman 1:12 2:9
  6:3,16 28:6 41:2
  44:21 45:25 46:25
Cederman's 5:10
  39:11
Center 11:22 12:5
certain 7:10 25:18
CERTIFICATE
  43:1
certify 43:6
Change 45:2,4,5,7
  45:8,10,11,13,14
  45:16,17,19,20,22
  46:2,4,5,7,8,10,11
  46:13,14,16,17,19
  46:20,22
changes 33:11
  44:12,15

Chapman 9:9
check 36:13
Chief 12:5 14:12
Chris 4:8
citizen 13:9
Civil 2:11 3:4,10
  13:18 19:14
clarify 22:2 39:21
class 24:2
classes 11:3 18:3
  20:6 23:14,17,18
classified 12:6
classroom 16:17,20
  16:22 17:6,11,15
  18:12 20:21,25
  21:20 24:3
CLR 1:23 2:14
college 10:19,20
  18:23
Colonel 1:12 2:9
  6:3 8:8 9:25 28:6
  39:10 41:1 44:21
  45:25 46:25
color 18:18
Columbia 1:1 2:16
  43:3,23
combat 31:23
come 10:16,19 21:2
  24:13 29:14
comes 28:7
coming 36:20
command 7:25 8:5
  8:13 11:22 12:2
  12:17 13:3,5,12
  23:16 26:13,14,17
  27:5 38:20 39:16
Commander 9:23
  14:6 29:17
Commanding 9:21
commission 25:23
  28:3,17,24 37:8
  38:14 39:4 40:11
  40:16,22,25 41:2
  41:5,18,18 42:20
  43:25
commissioned
  27:17 38:21 39:8

40:2,3,9 41:7,9
commissioning
  10:4 27:6,13
  39:13 42:14
commissions 39:21
committee 14:12
  14:13,14,22 15:19
committees 14:16
communicated
  29:2
Community 10:18
  10:20
company 14:5,6,18
compass 17:16
competed 38:17
completed 23:6
  38:5
compliance 32:3
complicated 39:13
complying 32:2
component 13:2,6
  15:23
computer 9:5,6
computer-aided
  43:10
conclude 41:8
concluded 42:25
conducted 21:12
Connecticut 3:12
consider 37:9 38:8
  38:12 40:24,24
  41:16
considered 32:3
consistent 30:22
  31:5,8
constructive 30:23
  34:5 35:2
continue 23:3
CONTINUED 4:1
contract 24:17
  25:21,25,25 26:3
  26:8,16,22 27:2,8
  28:1,15,20 29:1
  30:2 38:4,15
contracted 23:17
  37:17,21,23 38:16
  38:18

contracting 39:16
contracts 25:3,14
  25:19 26:4,12,15
  27:20 39:7
controlling 34:20
controls 9:24
corps 19:11
correct 9:19 23:11
  41:10
correction 9:6
  16:12 20:23 32:20
  38:16
corrections 44:12
correctly 29:20
  35:10
counsel 43:12,16
course 23:2,6,8,9
  23:17,20 34:11
court 1:1 6:18,18
  6:23 7:4 38:1
  43:1
criteria 21:18
critical 21:16 31:23
criticism 30:24
  34:5 35:2
CRR 1:23 2:14
current 9:10 10:1
  31:17
currently 23:1,7,22
cycle 13:4
cycles 10:7

**D**

D.C 1:15 2:13 3:6
  3:13,21
daily 20:1
Daniel 1:12 2:9 4:6
  6:3,16 44:21
  45:25 46:25
Darien 11:23
DATE 45:24 46:24
David 4:5
day 16:5,6,10 17:5
  20:2 44:17
days 13:8,8 16:7
dealing 28:7
December 25:20

29:24
deciding 34:11
  38:13
decision 34:9,16
  37:25
decisions 42:4
declaration 5:10
  22:12,18,21 30:17
  44:6
declare 44:7
**Defendants** 1:8
  3:18
degree 9:8
demonstrate 31:14
denied 42:20
denies 8:24
deny 40:21 41:8,18
department 3:19
  23:20
Dependent 33:10
depending 11:6
  33:11 35:6
depends 20:10 25:3
  35:12
deployed 13:21
  14:3
deployment 12:2
deponent 9:15
depose 41:22
deposed 6:12
deposition 1:11 2:7
  7:23 41:21 42:25
  43:5,7,11,14 44:1
  44:9,13 45:1 46:1
describe 19:7
**DESCRIPTION**
  5:9
design 9:9
determination
  39:25
determine 35:1
  38:6 40:8
determining 37:7
  41:6,17
developing 12:21
**DHE-1** 8:21
difference 37:16

different 17:1
  30:14
dining-in 19:8
dinner 19:9
direct 33:24
directed 28:2
direction 29:15
directions 30:22
  31:5,8
directive 30:9
directives 30:25
  31:1 35:21,22,24
  36:2
discussed 21:22
distance 11:9
**District** 1:1,1 2:16
  43:3,23
division 12:16,21
  13:1,19 14:7,9
documents 8:16,18
  30:1
doing 11:20 13:8
  13:16 14:4,18
  18:13 21:17
double-check 8:5
dress 31:22
drop 38:24
due 11:9,16 24:9
  38:23
**DUI** 42:17
duly 6:4
duties 10:2 11:24
  12:8 13:25 14:8

**E**

E 3:1,1 4:1,1
e-mail 30:11
earlier 21:23
early 25:7,8
easy 17:13
educational 9:2,3
effectively 17:21
  25:21
effort 27:6 35:10
either 6:18 11:11
  17:19 25:7 26:23
  35:16

**Emergency** 11:22
   12:4
**employed** 43:13,16
**employee** 43:16
**engage** 19:4
**engineer** 11:21
   12:2 15:23
**engineering** 9:6
**engrain** 36:15
**enlist** 14:23 15:2,6
**enlisted** 15:6,14
**enrolled** 23:2,7,22
   37:15,16 38:17
**enrollees** 30:21
   31:4,7
**enrolling** 37:5
**enrollments** 11:17
**ensure** 8:3
**entail** 24:18
**entire** 44:8
**equipment** 31:21
   36:8
**ERRATA** 44:1,14
   45:1 46:1
**especially** 31:21
**ESQUIRE** 3:8,15
   3:22,24
**et** 1:7
**ethics** 36:15
**events** 13:6 18:23
   19:4,7 20:9,11,14
   20:18 21:22 22:4
   24:10 31:17
**everybody** 6:21
**evidencing** 30:1
**EXAMINATION**
   5:1 6:6
**example** 10:17
   17:12,13 34:9,10
   34:18 36:10
**examples** 34:7
**exception** 32:10,13
   32:17,25
**exercise** 18:8,9
**exercises** 20:6 35:9
**Exhibit** 5:9,10,12
   22:14,15

**EXHIBITS** 5:7
**existing** 33:2 42:6
**experience** 26:23
**expertise** 39:11
**experts** 7:24 8:2
**expires** 43:25
**explain** 25:17
**extension** 18:9

**F**
**fact** 38:24
**factors** 31:3 37:8
   38:7,12
**fail** 42:11
**failing** 40:13
**failure** 40:13 42:15
**faith** 40:19
**fall** 35:18
**familiar** 20:15 40:6
**far** 42:7
**Farmingdale** 10:17
**February** 1:16 2:4
**feedback** 34:13
**field** 20:6 34:19
**finals** 25:6
**financially** 43:17
**find** 18:1,25
**finish** 6:25
**first** 6:4 14:23
   26:20,22 27:1
**Fish** 4:7
**fitness** 21:13 24:8
   24:11,15 25:2
   32:22 35:17 42:14
**five** 13:15 32:13
**fluctuate** 11:16
**follow** 30:22 31:4,7
   36:3
**followed** 16:17,23
**following** 15:10
   36:13
**follows** 6:5
**for-record** 25:8,11
**foregoing** 43:5,7
**forgery** 42:17
**formal** 19:9,19
**format** 19:20 30:14

**formation** 36:6
**formations** 20:3,5
**forth** 35:10
**foundation** 2:12
   3:4 37:12
**Fourth** 3:20
**frame** 29:25
**freshman** 36:21
**Freshmen** 36:5
**Friday** 17:4,5
**Fridays** 11:1
**function** 19:19
**further** 43:15
**future** 34:16

**G**
**G3** 12:20
**game** 18:19
**generals** 19:15
**getting** 35:11
**give** 6:21 7:3 11:11
   17:12,25 34:14,21
**given** 6:17 26:2,18
   31:12 43:12
**gives** 39:20
**giving** 27:19
**glaring** 39:5
**go** 7:11 10:21 15:12
   17:19,20 18:21,22
   19:13,13 22:23
   24:10 30:17 37:14
   42:3
**going** 6:20 9:1
   41:19
**good** 6:8,9
**Goodin** 1:23 2:14
   43:4,21
**gotten** 15:25
**GPA** 38:24 42:11
   42:14
**grade** 23:1
**graduated** 15:17
**grant** 37:7 38:6,13
   40:25 41:2,5
**granted** 24:24
   32:23 33:13 37:3
   37:19 40:17 41:12

   41:17
**Grenade** 14:13
   15:19
**grooming** 31:20,25
   32:10,13,16 34:3
**group** 26:5,9
**guaranteed** 26:18
**guard** 18:18

**H**
**H** 3:22
**hair** 24:1 40:20
**half** 16:20,22 20:23
   20:24
**Hand** 14:13 15:19
**handy** 36:23
**happen** 18:6
**happens** 17:8 21:9
**hard** 26:3
**headquarters**
   10:12
**heard** 6:22 33:23
**Heather** 3:8 6:10
**height/weight** 26:6
   40:13
**Heintzelman** 9:25
   29:19
**held** 2:11 15:20
**help** 18:24 24:13
**hereof** 44:14
**hereto** 43:17
**Hi** 6:8
**high** 18:22
**higher** 29:11
**Hill** 4:6
**historical** 25:5
**history** 9:2 31:17
**hit** 26:17
**Hofstra** 9:13,17
   10:11,19,25 11:10
   11:12 16:1,14
   17:20 22:8 26:23
   27:3 28:9 30:5
   33:19
**hold** 26:15
**holders** 36:24
**holding** 23:1

**host** 10:11
**hour** 16:19,22
   20:22,24
**hours** 16:24
**hweaver@aclu.org**
   3:9
**hypothetical** 41:23
   42:12
**hypothetically** 32:6
   42:19

**I**
**identification**
   22:16
**identified** 28:6,12
   39:11 41:22
**Iknoor** 1:3 20:16
**Illinois** 11:23
**immediately** 15:10
**important** 6:24
**included** 5:12
**includes** 9:18
**increase** 18:24
**INDEX** 5:1
**indicated** 44:13
**individual** 19:6
   20:9 26:6 32:18
   36:20
**individuals** 8:10
   11:17 25:23
**initially** 36:5
**initiative** 31:14
**inspect** 32:1
**inspection** 20:1
**instance** 32:17
   33:22
**instill** 36:19
**instilled** 36:22
**Institute** 9:7
**instruct** 7:13
**instruction** 16:17
   16:20,23 20:25
**instructions** 6:21
**integrity** 40:12
   42:16
**interaction** 12:24
   22:1,3,7 24:9

interested 19:1 43:18
interfered 40:20
interfering 41:15
intersection 17:17
invited 24:12
involve 12:24 14:15
involved 14:9 15:21 39:15
involves 39:17
Iraq 13:19,22 14:1 14:4
island 10:14 11:9 11:11 19:2
issue 39:6
issued 28:20

**J**

J 1:23 2:13 43:4,21
**JANE** 3:24
jane.lyons@usdo... 3:25
January 21:1
job 1:25 10:1 12:9 12:24 14:8
**JOHN** 1:6
joined 15:9
joins 37:19
joint 12:15
Joseph 4:4
junior 23:18 37:5 37:20,22 38:2
juniors 16:21
**JUSTICE** 3:19

**K**

kind 19:14,15 21:12 36:16 39:18 42:18
know 7:7 18:24 20:1 27:12,14,21 28:19 32:18 40:4 42:16
knowledge 27:1 33:24
Koschnitzky 4:8

**L**

L 3:8
lab 16:18,24 17:7,9 17:18 18:4
labs 17:8 18:10
**Lack** 37:11
land 17:13 18:13
language 41:5
large 26:15
larger 9:18
late 25:7
latest 24:25
**LDAC** 13:5
leader 21:19
leadership 9:9 10:3 42:15
leading 31:15 34:19
learn 17:15
left 28:16
legal 39:15
let's 16:8 22:23 30:17 31:3 32:7 38:4
letter 8:24
level 21:12 26:10 26:11 32:24 42:8
**Lewis-McChord** 12:15
**Liberties** 2:11 3:4 3:10
**Lieutenant** 1:12 2:9 6:3 44:21 45:25 46:25
**Lieutenants** 25:24
limited 24:9
**Line** 45:2,5,8,11,14 45:17,20 46:2,5,8 46:11,14,17,20
little 9:2 15:25
located 10:14
location 11:4,6,12 11:13 17:25
locations 11:5
lodge 39:9 41:19
long 10:14 11:9 12:11 13:14 19:1 39:3,6 40:10

longer 11:17
look 36:16 42:13
looked 8:19
looking 20:4
Lori 1:23 2:13 43:4 43:21
lot 17:22 20:10
lower 42:11
**LTC** 4:4 13:5
**LYONS** 3:24 15:1

**M**

M 3:24 4:4
machine 43:9
main 19:22 42:13
maintain 38:19
mandatory 20:3,5
map 17:16,17
marked 22:16
Master's 9:8
**Masterson** 4:4
math 27:14,20
matter 7:24 8:2 44:9
**McHugh** 1:6 44:4
mean 8:1,23 16:6 19:7 25:22 27:20 33:11 35:5
meaning 38:17 40:12,19
means 30:20
measurement 21:16
medications 7:15
meet 41:16
meeting 40:10,20 40:23
meets 23:9 39:7
memo 30:15
memorandum 8:20
memorandums 8:23
message 12:6
military 9:12 19:17 19:19 31:17 42:5
mind 26:25
minimum 38:19

39:7 40:20,23
minor 21:7
minutes 24:19,20 24:22,23 36:6
mission 28:24
missioned 25:23
**Misstates** 33:16
mobilization 12:1
**Molloy** 10:18
**Monday** 17:4
**Mondays** 16:12,13
month 13:10
months 13:20 14:14
morning 16:15 21:3
**MSIs** 16:23
multiple 6:22
multitude 35:13
**Muslim** 32:19

**N**

N 3:1 4:1
name 6:15 29:20
**Nassau** 10:18
**NATION'S** 3:11
nature 18:14 40:14 42:17
navigation 17:14 18:14
need 37:23
needs 24:16
neither 43:12
**Never** 26:24
new 11:16 26:19 29:6,7,8,8
Nicole 4:7
No.1:14-cv-0190... 1:5
non 38:24
normally 17:10 18:9 39:4
**Northwest** 2:12 3:5 3:12,20
**Notary** 2:15 43:22
number 11:16 22:15 25:18 26:15

28:1,16
numerous 19:6
**NY** 10:18

**O**

**O'Dea** 4:5
oath 7:19 44:16
object 7:10
objected 7:12
objection 14:25 22:5 27:10 28:4 28:22 29:3,9 30:3 32:15 33:6,16 37:11 38:9 39:10 41:1,20
obtain 23:13
obvious 36:4
occurred 33:20,20
offer 44:15
**Officer** 9:22 12:20
official 1:6 39:20 41:25
Oh 8:15
**OIC** 11:22
okay 6:14,20 7:2,9 7:14,21 8:1,6,12 8:15 9:1,10,21 10:1 11:19 12:11 13:14,21 14:3,11 14:20 15:8,14,24 18:2 20:14 22:12 22:20 23:9,22,25 24:18 25:17 26:24 28:1 29:17,22 30:17 33:9 34:1 37:18 39:23 40:17 41:4 42:22
once 18:4,7,15 38:15,16
ones 19:8,22 36:4,4
open 25:21
**Operation** 12:5
operations 11:22 31:16
opportunities 11:11 18:17 31:14
opportunity 34:14

order 24:17 30:10
    30:13 35:6
orders 31:12
organizational 9:8
organized 18:5
original 5:12,13
outcome 43:18
outside 19:24 22:1
    22:4 28:5 39:10
    41:20
overage 27:6
overall 10:6

**P**

P 3:1,1 4:1,1
p.m 2:5 42:25
Page 5:2,9 45:2,5,8
    45:11,14,17,20
    46:2,5,8,11,14,17
    46:20
pants 32:22 33:14
paper 36:9,21
Paragraph 22:23
    30:18
park 17:20
part 9:17 10:10
    12:8 14:8 18:21
    19:4 33:5
participate 18:23
    20:19 25:13
participates 20:25
    21:23
participating 20:21
participation 28:8
particular 14:21
    16:7 27:16
parties 43:14,17
partnership 10:5
    10:13
pass 24:11,16 39:3
passed 29:11
passes 26:6
patrol 34:19
patrolling 18:13
peers 38:18
pen 36:9,20,23,23
penalty 44:6,7

pending 26:6
people 28:16
percent 20:13 39:2
perform 23:3
performance 24:1
    24:5,7
performing 35:9
period 14:14 26:7
perjury 44:6,7
permitted 20:19
personal 24:7
perspective 16:11
    25:5 40:7
pertains 30:5
phrase 40:4
physical 16:14 17:3
    18:3 21:3,9,11,13
    21:21 24:6,8,11
    24:15 25:1 32:22
    35:8,17 42:14
physically 21:17
picture 42:9
place 16:9
placed 26:22 27:2,4
    27:5
plaintiff 1:4 3:3
    6:11 20:15
planning 31:15
plans 12:20,22
please 7:7 27:12
pocket 36:11,23
point 24:14 37:1
    38:3
points 17:24
policies 8:4 31:12
policy 7:25 29:7,8
portion 14:19 17:9
    17:11,15,18 18:12
    20:21 21:20 24:4
position 9:11 11:20
    12:10,12 15:18
    39:20
positions 15:20,22
    15:23
Possibly 26:17
practical 17:9,10
    17:23 18:11,12

preparation 8:16
prepare 7:22 22:20
present 4:3 20:12
    34:12 36:5 41:24
presentations
    31:16
presented 19:10
President 39:17
prior 12:14 15:22
    25:6,20 26:24
Private 15:10
probably 17:6
    18:10 29:24
procedure 7:25
procedures 36:14
proceed 37:22
proceeded 37:4
PROCEEDINGS
    6:1
process 28:9 34:13
    39:14
Professor 9:12 42:4
program 9:17
    11:18 19:1,5 20:8
    37:6 38:5
programs 9:19
    10:22
proper 15:4,5 36:7
    36:8
properly 40:4
provide 9:3 19:21
    30:20 34:7,13
provided 14:16,21
    38:19
provides 13:2
providing 13:12
    31:13,16
PT 20:5 25:8 32:19
    32:21 39:3 42:11
Public 2:15 43:22
push-ups 24:20,22
put 8:21 18:10
putting 35:10

**Q**

question 7:6,12
    38:10

questions 7:1,11

**R**

R 3:1 4:1
rank 14:22
rate 27:17
react 30:23
reacts 34:5 35:1
read 17:15 44:8,10
readiness 12:1
ready 36:8
really 20:7 25:24
    35:5,12
Realtime 1:24 2:14
reason 7:18 23:15
    45:4,7,10,13,16
    45:19,22 46:4,7
    46:10,13,16,19,22
reasons 24:12
    41:10
recall 30:10
receive 29:22 38:22
received 29:15
    31:25
recognize 22:18
recommendation
    40:1
record 6:15 7:5,11
    39:22 43:11
recovering 21:6
recruiting 8:3
    18:22,23
reduce 27:6
regarding 40:1
regardless 11:3
regards 35:18
region 9:24
regular 15:12
    21:24 22:3,6
regularly 11:16
regulation 23:16
    29:7,8
regulations 8:19
    42:6
related 12:9 16:5,9
    43:13
relating 12:25

relative 43:15
relatively 36:25
religious 8:24
    23:13 24:24 32:25
    41:13,14 42:10
remain 23:4
reminded 30:25
    35:22,24
repeatedly 30:25
    35:22,25
repetition 36:18
rephrase 7:8 29:6
    30:8
report 19:25
Reported 1:23
reporter 6:23 7:5
    43:1,4
reporting 6:24
require 32:24
required 19:25
requirements
    38:20 41:16
resection 17:17
reserve 13:2,6
reserves 15:9
resort 34:2
response 7:3
responsibilities
    12:3,18,25
responsible 10:3,6
    11:8,25 12:5,21
    13:11
rest 33:4,14
retention 8:4
review 8:15,18
reviewed 8:21
ride 19:12
right 11:15 25:9
    26:3 28:15 33:14
    37:24
Rochester 9:7
room 8:11
ROTC 9:17,18
    10:4,21 11:8 12:9
    12:25 13:25 14:9
    14:15 15:11,15,16
    15:18,21 16:5,9

18:6 19:4 22:9
28:9 37:5,6,19
**roughly** 10:15
**RPR** 1:23 2:14
**rules** 32:4 36:14
**run** 13:5 20:10
24:19,21 26:8,24

**S**

**S** 3:1 4:1
**safety** 36:10
**save** 44:11
**saw** 19:15
**saying** 27:25 29:20
**schedule** 17:1
**scheduled** 25:9,12
**scholarship** 38:25
39:2
**school** 10:5,13
26:10
**schools** 9:24 10:5
10:10,15 18:22
**science** 9:6,13 42:5
**scope** 41:21
**Scott** 29:19
**scrolling** 40:5
**sealing** 25:25
**Second** 9:23
**Secretary** 1:6
**see** 8:15 11:7 17:25
18:25 19:14 21:16
24:13 31:13 34:16
34:22 40:3
**seeing** 21:18
**seen** 22:7
**semester** 18:7,15
23:7,19 25:6 38:1
**senior** 23:18 37:5
**seniors** 16:21 19:13
**sent** 30:9
**sentence** 22:25
**separate** 10:22
**sessions** 21:5,11
**set** 17:24 19:20
**SHEET** 44:1,14
45:1 46:1
**shorthand** 43:9

**shorts** 32:20,21
33:4,15
**show** 36:6
**signature** 42:24
45:24 46:24
**signed** 15:11 44:17
**similar** 17:1 30:13
**Singh** 1:3 4:11
20:16 37:3 40:17
41:12 44:4
**Singh's** 23:25 28:8
**sit-ups** 24:20,23
**situation** 35:13
**skipping** 39:18
**slightly** 17:1
**small** 31:15
**soldiers** 12:23 13:7
13:9
**Sorry** 25:10
**sort** 26:21
**sorts** 30:15
**sound** 34:21
**speak** 7:22 26:14
**specific** 27:14
37:16
**specifically** 22:10
25:12 27:21 32:18
**SPITZER** 3:15
**spoke** 14:17
**spot** 28:15 36:13
**staff** 19:12
**standard** 35:16,16
35:17,18
**standards** 30:20
31:12,20 34:3
35:19 39:7 40:11
40:21,23 42:7
**standing** 30:24
35:21 36:2
**start** 16:8 31:3 32:7
**starting** 17:25 21:1
28:5
**state** 6:14 30:19
**stated** 41:7
**statement** 8:22
**States** 1:1,7,13 3:19
43:2

**status** 38:18
**stemming** 35:15
**steps** 39:15
**Stony** 10:14,21
11:1,10,12 16:25
17:21
**Street** 2:12 3:5,20
**student** 20:20 22:8
38:25 39:2
**students** 11:2 16:5
**stuff** 40:5
**subject** 7:24 8:1
**submitted** 22:13
29:25
**Suffolk** 10:20
**suggestions** 34:22
**Suite** 2:13 3:5
**summer** 12:22 13:4
13:6,13 14:17
33:10
**support** 13:2,12
14:18,19
**supposed** 28:17
**sure** 9:15 15:5
29:19 30:7 36:13
39:2
**surgery** 21:7
**Sverdlik** 4:10
**sworn** 6:4 43:7
**systemic** 39:6
**Systems** 1:24 2:14

**T**

**tactical** 18:13
19:16
**tactically** 34:21
**take** 16:9 24:14
25:1 34:12
**taken** 43:5,8,15
44:9
**talk** 6:25 8:8
**talked** 15:19
**task** 35:6
**tasking** 30:11,12
**teach** 10:25 11:1
**teams** 18:22
**Technology** 9:7

**tell** 34:2,4 35:20
**ten** 10:15 36:6
**terrain** 17:14
**test** 24:11,15 25:2,9
25:11 39:3 42:11
**testified** 6:4 29:10
**testify** 7:19 28:7
**testimony** 6:17
7:16 33:17 43:6,8
43:11
**thanks** 42:23
**Theater** 11:21 12:1
**theft** 42:18
**things** 18:14 36:12
37:2 40:5 42:13
**think** 17:5 19:22,23
27:20
**three** 16:24 18:3
27:18
**three-day** 18:8
**three-hour** 18:4
**Thursday** 1:16
16:21 23:14
**Thursdays** 10:25
16:13,16 20:22,23
23:10
**tied** 28:1,16
**time** 14:22 15:17
17:2 22:7,8 24:8
25:4,9,15 26:7,22
27:2 29:24 36:6
37:1 38:5 41:25
**times** 6:22 18:3,4
**today** 7:16,19 8:16
**today's** 7:22
**told** 18:21 33:18
**tools** 31:18
**topic** 28:5
**tradition** 19:19
**traffic** 12:6
**train** 36:8
**training** 10:4,7
12:16,17,22,22
13:1,4,6,8,9 14:6
14:16 15:11,13
16:11,14 17:3
18:3,8 20:6 21:3

21:11 24:6 31:15
35:9
**trainings** 21:10,21
**transcribed** 43:10
**transcript** 5:13
44:8
**transcription** 43:10
**true** 23:4 37:18
43:11 44:11
**try** 7:3,7
**trying** 36:14
**Tuesday** 10:25
16:19
**Tuesdays** 16:16
20:22,24
**turban** 24:1 40:19
**turned** 41:14
**two** 10:16,22 11:5
11:11 13:6 18:4
22:24 24:19,20,22
24:22 35:3 38:23
**two-mile** 24:19,21
**typical** 16:4

**U**

**U.S** 4:4,5,6,7,8
14:13
**Uh-huh** 35:4
**ultimate** 28:8
**ultimately** 23:12
28:2
**unclassified** 12:6
**unclear** 7:7
**underneath** 12:16
**understand** 9:16
28:9 38:10
**understanding**
28:14 44:14
**uniform** 32:1,10,13
33:2,5,11 34:3
36:7
**uniformity** 30:20
31:21 36:19
**uniforms** 20:2
31:23,23
**Union** 2:11 3:4,10
**unit** 12:7 31:15

34:20
**United** 1:1,7,13
  3:19 43:2
**university** 9:9,13
  10:11 30:6
**upper** 21:14 36:11
**use** 17:16 31:19
**usually** 38:23

### V

**v** 44:4
**values** 36:15
**various** 41:10
**verbal** 7:3
**violated** 42:19
**violation** 40:12
**violations** 42:16
**voluntarily** 21:2
**volunteer** 18:17
**vs** 1:5

### W

**waived** 42:25
**want** 9:15 11:17
  18:18 26:14 32:20
  39:9,19,21
**wanted** 8:5 32:19
  32:21
**wants** 21:2
**War** 19:14
**Washington** 1:15
  2:13 3:6,13,21
**way** 18:10 19:9
  23:12 34:19 35:20
**WAYNE** 3:22
**wayne.williams...**
  3:23
**ways** 24:10 31:2,6
  31:10 34:1,4,25
  35:13
**Weapons** 14:13
**wear** 32:19,21,21
  33:4,14
**wearing** 33:15
**weather** 33:12
**Weaver** 3:8 5:3 6:7
  6:10 15:3 22:11
  22:17 27:11 28:13

28:25 29:5,13
30:4 33:3,8,25
37:13 38:11 39:23
39:24 41:3 42:2
42:22
**Webber** 8:8
**Wednesday** 16:12
  16:13 17:4
**week** 16:6 18:3,4,5
  18:6,16
**weekend** 13:10
**well-being** 10:8
**went** 9:14 15:11,14
  15:15,16
**wide** 27:5
**WILLIAMS** 3:22
  14:25 22:5 27:10
  28:4,22 29:3,9
  30:3 32:15 33:6
  33:16 37:11 38:9
  39:9 41:1,19
**winter** 33:10
**witness** 22:6 27:24
  28:11,23 29:4,10
  32:16 33:7,18
  41:22 42:1 43:6,8
  43:12
**witness's** 33:17
**woman** 33:13
**woods** 17:22,25
**word** 15:1,5
**work** 9:2
**working** 15:21
  34:20
**works** 25:18
**worldwide** 12:2
**worry** 36:20
**written** 30:15
**Wrong** 15:1

### X

### Y

**year** 12:13 19:18
  23:14 26:5,9
  36:21 37:20,23
  38:2
**years** 13:15 32:14

33:20 37:6 38:23

### Z

### 0

### 1

**100** 20:13 39:2
**104** 12:21
**104th** 12:16 13:1
  14:6,18
**108** 12:17
**113606** 44:3
**12** 25:23,23 27:14
  27:18
**13606F** 1:25
**14** 5:10 13:8,20
  22:14,15 26:4
  43:25
**15** 26:3,4,11,18
  27:19
**15th** 2:12 3:5
**1600** 17:6
**18** 14:14
**1992** 15:7

### 2

**2** 22:23
**2.0** 38:24
**2.5** 39:1
**20** 25:25 44:18
**20005** 3:6
**20008** 3:13
**201** 23:1,6
**2015** 1:16 2:4
**2016** 43:25
**202** 23:8,23
**202-457-0800** 3:14
**202-675-2330** 3:7
**20530** 3:21
**22** 5:10
**25** 26:1
**26** 1:16 2:4
**29** 13:8

### 3

**30(b)(6)** 1:11 2:7
  5:8 22:15 41:21

**3rd** 14:5

### 4

**4:58** 2:5
**40** 17:21
**402nd** 13:17
**414th** 14:6
**416** 11:21 12:1
**4301** 3:12
**4s** 16:23

### 5

**5:44** 42:25
**555** 3:20

### 6

**6** 5:3 30:18
**6:30** 16:15 17:4
  21:3
**600** 2:13 3:5
**670-1** 8:20
**670-20** 8:20

### 7

**7:30** 16:15 17:5
  21:4

### 8

**82nd** 13:19
**87** 11:15

### 9

Singh v McHugh  - Exhibit DD

Page 1

                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA


        IKNOOR SINGH,

                    Plaintiff,

                    vs.                    No.1:14-cv-01906-ABJ

        JOHN MCHUGH, in his official
        capacity as Secretary of the
        United States Army, et al.,

                    Defendants.

        ------------------------------




            30(b)(6) DEPOSITION OF COLONEL PAUL WEBBER

              BY AND FOR UNITED STATES ARMY




                    Washington, D.C.

                Thursday, February 26, 2015




        Reported by:  Lori J. Goodin, RPR, CLR, CRR

                    Realtime Systems Administrator

        JOB NO. 13606E

Page 2

1

2

3

4                    February 26, 2015

5                       4:24 p.m.

6

7

8              30(b)(6) Deposition of COLONEL PAUL

9    WEBBER, held at American Civil Liberties

10   Union Foundation, 915 15th Street, Northwest,

11   Suite 600, Washington, D.C. before Lori J.

12   Goodin, RPR, CLR, CRR, Realtime Systems

13   Administrator and a Notary Public in and for

14   the District of Columbia.

15

16

17

18

19

20

21

22

23

24

25

```
1              A P P E A R A N C E S:

2

3    Attorneys for Plaintiff:

4              AMERICAN CIVIL LIBERTIES UNION FOUNDATION

5              915 15th Street, Northwest, Suite 600

6              Washington, D.C.   20005

7              202-675-2330

8        BY:  HEATHER L. WEAVER, ESQUIRE

9              hweaver@aclu.org
     AND
10             AMERICAN CIVIL LIBERTIES UNION OF

11             THE NATION'S CAPITAL

12             4301 Connecticut Avenue, Northwest

13             Washington, D.C.   20008

14             202-457-0800

15       BY:  ARTHUR B. SPITZER, ESQUIRE

16             artspitzer@aclu-nca.org

17

18   Attorneys for Defendants:

19             UNITED STATES DEPARTMENT OF JUSTICE

20             555 Fourth Street, Northwest

21             Washington D.C.   20530

22             BY:  WAYNE H. WILLIAMS, ESQUIRE

23                  wayne.williams@usdoj.gov

24                  JANE M. LYONS, ESQUIRE

25                  jane.lyons@usdoj.gov
```

1          A P P E A R A N C E S (CONTINUED):

2

3     Also Present:

4          LTC Joseph M. Masterson, U.S. Army

5          David O'Dea, U.S. Army

6          Daniel Hill, U.S. Army

7          Nicole Fish, U.S. Army

8          Chris Koschnitzky, U.S. Army

9

10         Alex Sverdlik, ACLU

11         Anisha Singh

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    EXAMINATION INDEX

 2                                              PAGE

 3   BY MS. WEAVER                                6

 4

 5

 6

 7                       EXHIBITS

 8

 9            (No exhibits were marked.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 6

```
 1                      PROCEEDINGS

 2

 3                  COLONEL PAUL WEBBER,

 4    having been first duly sworn, testified as

 5    follows:

 6                      EXAMINATION

 7    BY MS. WEAVER:

 8         Q.    Thank you for coming this afternoon.

 9    Have you ever been deposed before?

10         A.    Yes.

11         Q.    And for what case was that?

12         A.    One was the U.S. Army against

13    Captain Wartez.  And the other was a civilian

14    matter in the state of New Hampshire.

15         Q.    When you say U.S. Army versus

16    Captain Wartez, was that an internal military

17    court?

18         A.    Yes.

19         Q.    And have you ever given testimony in

20    court or via affidavit?

21         A.    Those two occasions.

22         Q.    Okay.  Well, since you have already

23    been deposed you probably know all of this, but I

24    will just go through it anyway.

25         A.    Please.
```

1          Q.    The court reporter is recording

2     everything we say, and so we have to make sure

3     that, one, we don't talk over each other.  And,

4     two, that all of your responses are verbal so

5     that she can record when you have said yes or no.

6               If a question is unclear, please let

7     me know.  I will try to rephrase it.

8               Your attorneys may make objections

9     to preserve them for the record.  But, you can go

10    ahead and answer after they are done making these

11    objections, unless they instruct you not to.

12              Are you on any medications that

13    would affect your testimony today?

14         A.    No.

15         Q.    Any other reason you can't testify

16    under oath today?

17         A.    No.

18         Q.    Other than your attorneys, did you

19    speak with anyone to prepare for today's

20    deposition?

21         A.    Yes.

22         Q.    Who did you speak with?

23         A.    I spoke with Lieutenant Colonel

24    Cederman, the Professor of Military Science, the

25    Brigade Commander.  I talked to the lawyers at

```
 1   Staff Judge Advocate.
 2              Basically reviewed the original
 3   request for waivers on the documentation that
 4   came through here.  I was talking to people.  I
 5   talked to my subordinates and asked them to pull
 6   some data for me, some information, so I could
 7   prepare for this case, or this testimony.
 8              That is about it.
 9        Q.   Okay.
10        A.   I talked to my wife, so she knows
11   where I am and she knows what I am doing.
12        Q.   And when you say you reviewed the
13   request documents, you mean in relation to
14   Mr. Singh's request?
15        A.   Yes.
16        Q.   Okay.  I would like to just get some
17   of your professional and educational background.
18              What degrees do you hold?
19        A.   I hold a Bachelor's of science in
20   mathematics with a minor in physics and
21   psychology from Norwich University.
22              And then I have a Master's of
23   operational analysis systems and engineering from
24   George Mason.
25        Q.   Okay.  And your current position is
```

1    that you are at a G2 for the United States Army

2    Cadet Command; is that correct?

3          A.    Right.  But, the name has been

4    changed.  I am in charge of recruiting,

5    marketing, incentives, missioning, and other

6    things.  But RMID is my directorate.

7          Q.    Okay.  RMAD?

8          A.    I, for incentives.  Essentially I am

9    responsible for bringing 10,000 cadets to ROTC

10   across the nation.

11         Q.    10,000 cadets each year?

12         A.    Yes.

13         Q.    Is that the goal that has been set

14   by the Army?

15         A.    No.

16         Q.    Where does that number come from?

17         A.    That number comes from me.

18         Q.    Okay.  Is that your personal goal?

19         A.    No.

20         Q.    Where does it derive from?

21         A.    It derives from calculating

22   essentially the attrition rates of the cadet load

23   of what is required by each military science

24   level.

25               What is required at each stage of

```
 1   the cohort through four years of school.  So it
 2   is essentially a mathematical formula.
 3              We look at how many cadets come in,
 4   traditionally, at a four-year point.  And we have
 5   other methods to come in at a two-year point,
 6   one year in, two years in.
 7              So, when I look at the whole of it,
 8   it is about 10,000 people I have to bring in
 9   every year.
10         Q.   And is that what the goal of
11   obtaining about 5,350 commissions per year?
12         A.   Yes.  I mean, I believe that is --
13   yes, I have a mission of commissioning 5,000.  In
14   the past it has been 5,350.  It is currently
15   5,165.  And in the next few years it will be
16   5,265.
17         Q.   And was that goal met last year?
18         A.   Yes.
19         Q.   Is there any year in the past five
20   years that it hasn't been met?
21         A.   No.
22         Q.   How long have you been in this
23   current position?
24         A.   Three years.  Three and a half
25   years.
```

1           Q.    And before that, where were you?

2           A.    I was the Professor of Military

3    Science at the University of New Hampshire.

4           Q.    So, you were in charge of the ROTC

5    unit at the University of New Hampshire?

6           A.    Yes.

7           Q.    And how many cadets were in that

8    unit?

9           A.    I would have between 110 and 145

10   cadets per year.

11          Q.    How long were you a Professor of

12   Military Science there?

13          A.    Three years.

14          Q.    And before that?

15          A.    I was the Director of the

16   Operational Analysis Directorate at U.S. Army

17   Cadet Command at Fort Monroe, Virginia.

18          Q.    And what were your responsibilities

19   there?

20          A.    As you can tell, I have degrees in

21   mathematics.  So that was essentially a

22   quantitative analysis directorate that was

23   designed to do data analysis, set the individual

24   commission missions for ROTC programs throughout

25   the nation.

```
 1                Set the incentive levels based on
 2    the math behind it.
 3                So, I was in charge of that.
 4         Q.    And by incentive levels, do you mean
 5    like scholarships or --
 6         A.    Yes, ma'am.
 7         Q.    Does it include anything else?
 8         A.    We use -- yes.  We look at
 9    marketing, marketing materials, marketing money,
10    we -- things like that.
11         Q.    Okay.  And I'm sorry if you said
12    this already, but how long were you the Director
13    of Operational --
14         A.    Operational Analysis --
15         Q.    Analysis?
16         A.    -- division.  I was there
17    approximately three years.
18         Q.    Okay.  And before that?
19         A.    I was a two years in the same
20    headquarters managing the scholarship program.
21         Q.    For ROTC?
22         A.    Uh-huh.
23         Q.    And before that?
24         A.    Before that I was in school at Fort
25    Leavenworth, Kansas, Command General Staff
```

```
 1    College.
 2              Q.    And you were a student there?
 3              A.    Yes.  For one year.
 4              Q.    Have you held any other positions in
 5    the Army that involved responsibilities relating
 6    to ROTC?
 7              A.    No.  Other than I was a cadet --
 8              Q.    Okay.
 9              A.    -- when I started.
10              Q.    Where were you a cadet?
11              A.    Norwich.
12              Q.    Okay.  So, I wanted to, I got a
13    lot -- we already spoke previously with, maybe it
14    was Mr. Burns.
15              So, I got a lot of information.  I
16    won't ask you the same questions.  So, this is
17    going to be somewhat short I hope.  I wanted to
18    discuss ROTC recruitment with you.
19              What factors or qualities does the
20    Army look for in prospective ROTC cadets?
21              A.    We have a three part system called
22    SAL.  It is an acronym.  Scholar, athlete,
23    leader.
24              Essentially we look, under the
25    scholarship, scholar, we are looking for young
```

1    men and women who have the ability to get through

2    and excel in college.  College environment is a

3    requirement for most officers to have a

4    Bachelor's of some type.

5             And the smarter a person is or the

6    better they are in an academic setting, they will

7    be better off getting advanced degrees.  Most

8    field grade officers have an advanced degree of

9    some type.

10            So, scholar, we use kind of

11   traditional measurements of that, college GPA,

12   standardized testing, SAT, ACT.  Some of the

13   testing inside colleges.

14            Athletic, we are looking for

15   physically fit men and women who exhibit a, not

16   just the ability to be fit, but who have accepted

17   and live a fit lifestyle.

18            So, it is not enough for them to go

19   run and pass a PT test.  But they have got, they

20   will be rewarded if they have a fit lifestyle on

21   their own.

22            We measure that.  The Army has a

23   physical fitness test, which can be provided to

24   you, I'm sure, by these folks here.  It is a

25   public, it is in the public domain.  It

1    constitutes push-ups, sit-ups and run, two-mile
2    run.
3               However, more importantly, it is
4    really the ability, you know, it is a fit
5    lifestyle, eating right.  Not doing things that
6    are going to damage your fitness.
7               We measure some of this athletic by
8    how many team sports you have been in in high
9    school.  Whether you participate in college
10   athletics, college club sports, things like that.
11              And then leadership.  Clearly we are
12   not looking for advanced leaders, leaders who
13   have already led battalions or already led
14   military formations.  But we are looking for
15   people who have tried to take part in group
16   activities and shown some sort of leadership
17   potential in high school and in college.
18              So, those are the three main areas
19   where we have tried to evaluate cadets.
20        Q.   Okay.  Thank you.  And, are there
21   any other factors that fall outside of SAL that
22   you look at?
23        A.   Sure.
24        Q.   What are those?
25        A.   Sure.  So these, the SAL criteria is

Page 16

1    kind of the global yardstick that we apply to

2    every cadet.  There are academic backgrounds,

3    academic majors that we are interested in.

4              I have a specific numeric goal to

5    produce and commission anywhere between 145 and

6    1 -- and 225 nurses for the active duty.

7              25 percent of my commissions have to

8    be in the STEM field, science, technology,

9    engineering, math.

10             We do, when it is available,

11   appreciate former soldiers, who have been

12   enlisted who come in.  And we appreciate academic

13   quality diversity.  Different types of schools,

14   Stanford, you know, ivy league schools versus

15   state and local schools.

16        Q.    What about language skills, foreign

17   language skills?

18        A.    Right.  We don't have, I'm not

19   missioned to produce and commission officers with

20   language specific, strategic language skills.

21             That is more USAREC -- I'm sorry,

22   the enlisted, the U.S. Army Recruiting Command.

23             Individuals with direct language

24   skills tend to be enlisted soldiers in the United

25   States Army.  And so our counterparts in the U.S.

1    Army Recruiting Command focus on that.

2              We do value in ROTC a cultural

3    awareness.  We like, you know, we acknowledge

4    that language proficiency is helpful, but it is

5    not a prerequisite, and I'm not missioned or set

6    any goals to produce any.

7         Q.    Are you familiar with Project Go?

8         A.    No.

9         Q.    Okay.

10        A.    Unless, if you could give me some

11   more details about that.

12        Q.    My understanding is that, I don't

13   have a lot of details, but my understanding is

14   that Project Go was at one point in recent years

15   a program that was intended to recruit ROTC

16   cadets who spoke certain critical languages.

17        A.    I'm not familiar with Project Go.

18        Q.    Would a program of that nature be

19   headquartered in your office?

20        A.    Yes.

21        Q.    Okay.  Have there been in the past

22   ten years specific, programs that were

23   specifically geared towards recruiting cadets

24   with foreign language skills for specific

25   languages?

1          A.     Could you restate the question?

2          Q.     In the past ten years have there

3     been any ROTC programs that were specifically

4     geared towards recruiting cadets with foreign

5     language proficiency in certain languages?

6          A.     No, not for specific languages.

7     There has been recruit for, STEM is recent, the

8     push for STEM is recent.  There been times where

9     they said, where is, we need to produce officers

10    with some cultural understanding, but it has been

11    focused on not the romance languages.  We are not

12    looking for people who speak French or Spanish.

13         Q.     Maybe I'm being too coy.  I'm

14    talking about languages like Punjabi, Hindi,

15    Urdu, those types of languages.

16         A.     That has been the focus of USAREC.

17         Q.     And that is U-S-A-R-E-C?

18         A.     U-S-A-R-E-C.

19         Q.     Okay.  What about -- you got into

20    this a little bit, but what about ethnic or

21    racial diversity, is that a factor in recruiting

22    cadets?

23         A.     I'm not given specific goals on

24    religious or racial quotas.

25         Q.     Though there aren't specific goals,

1    does diversity, the need to, does the desire to

2    increase diversity in the Army play a role in

3    recruiting?

4           A.    The Army recognizes the value of

5    diversity and has encouraged us to represent

6    America in the broadest terms.

7                 So in doing that we make sure that

8    we don't have all of our production from one

9    state, for example.  In some extreme, some

10   extreme examples.  I make sure that we have

11   people from California, people from Texas, people

12   from military colleges.

13                We make sure that we have access for

14   all ethnic groups, for all people who are in

15   college, regardless of their economic background.

16          Q.    Are there any ROTC, any -- are there

17   any policies or programs in place to enhance

18   diversity within the ROTC or -- let me rephrase

19   that.

20                Are there any policies or programs

21   in place relating to racial, ethnic, or religious

22   diversity in ROTC?

23          A.    In marketing we use a significant

24   amount of our marketing resources for diversity.

25   Primarily, excuse me, racial diversity looking at

```
 1    increasing African American and Hispanic
 2    participation in ROTC.
 3         Q.    What are the, if you know, let's
 4    just take, I guess, the most recent recruitment
 5    here, I guess would that be the fall of 2014?
 6         A.    Sure.  I mean, we continually
 7    recruit.  So --
 8         Q.    Okay.  Well, let's just take the
 9    2014/2015 academic year.
10              Would, what is the, of the 10,000
11    cadets -- or, let me stop.
12              Let's take the 2014.  Of the 10,000
13    cadets that you recruited in 2014, what was the
14    racial and ethnic background of those cadets?
15              MR. WILLIAMS:  Objection.
16    BY MS. WEAVER:
17         Q.    You can answer.
18         A.    I have no idea.
19         Q.    Okay.
20         A.    I could know it if I went back in my
21    office and had access to my, the database that I
22    believe Mr. Burn was talking about.  My people
23    could calculate who came in and calculate that.
24    I don't know.
25              I could, yeah.
```

1          Q.     Do you, other than, like, going back

2     to calculate it, do you -- do you generally make

3     that calculation each year?

4          A.     Of who comes in?

5          Q.     Yes.

6          A.     No.

7          Q.     Okay.

8          A.     I'm sorry, of some parts of it.  So,

9     I calculate who comes in from the four-year

10    scholarship.  And I'm sorry, I wasn't trying to

11    be coy.  But of the general population, I don't

12    calculate it.

13         Q.     Okay.  And is the information

14    relating to the racial and ethnic background of

15    those scholarship applicants publicly available?

16    Is that published anywhere?

17         A.     I don't know.  So, let me clarify.

18    We report our, those, that information up the

19    chain of command inside Army forums, if you will.

20              We do provide -- well, we report

21    that up to the Army forums.

22         Q.     You report the numbers relating to

23    scholarship cadets up to Army forums or --

24         A.     Right.  Yes.  We do.  We do do that.

25         Q.     You said that you use a large part

```
 1    of your marketing resources to help increase

 2    racial diversity.

 3              What type of actions have you taken,

 4    and what examples of marketing resources can you

 5    give?

 6         A.    Posters.  We have made sure that

 7    there are African American cadets prominently

 8    displayed on posters.  There is Hispanic cadets

 9    prominently displayed on banners, on web banners.

10    Things like that.

11              We publish electronic advertisements

12    on websites that would market towards African

13    American or Hispanic populations.  Same things

14    with magazines.  Things like that.

15         Q.    Are there any other policies or

16    programs in place that relate to racial, ethnic,

17    or religious diversity in ROTC?

18         A.    We report our production by how many

19    we commission every year.  I'm not sure if that,

20    that is different in that we measure what we

21    actually produce.

22         Q.    So you measure the diversity at the

23    time of commissioning?

24         A.    Uh-huh.  As a whole.  As the group

25    as a whole.
```

Page 23

```
 1            Q.    Are there absolute bars to

 2    recruitment?  Meaning, are there nonwaiverable

 3    factors that certain potential cadets might have?

 4            A.    Yes.

 5            Q.    What are those?

 6            A.    Well, Mr. Burns is the expert on

 7    that.  But, for some extreme examples, if you are

 8    missing two legs, we would not recruit you.

 9                  If you were, you know, some extreme

10    obviously physical issues, mental issues, I'm not

11    trying to be funny, but, obviously if you are on

12    death row, if you've got multiple felonies, and

13    you are in prison, we don't recruit you.

14                  So, there are certainly some

15    nonwaiverable things.  U.S. -- you have to be a

16    U.S. citizen to be an Army officer.  So, if you

17    are unwilling to become a U.S. citizen, or if you

18    are not close to being a U.S. citizen, then we

19    would not recruit you.

20            Q.    The average yield of the commissions

21    from the recruiting members each year you said

22    was about 5,300?

23            A.    I'm sorry?

24            Q.    The average yield of the commissions

25    from recruited members each year is about 5,300,
```

Page 24

```
 1    is that correct?

 2                MR. WILLIAMS:  Objection.

 3                THE WITNESS:  So, it is a little bit

 4       higher than that in the last five years,

 5       but --

 6    BY MS. WEAVER:

 7         Q.    Okay.  What reason might, what are

 8    the reasons that a recruit who has gone through

 9    the whole ROTC process, would be denied a

10    commission?

11         A.    I don't understand the question.

12         Q.    So, if somebody is recruited into

13    ROTC and they go through all of the training and

14    they get to their senior year, what are the

15    reasons that they might be denied a commission,

16    at that point?

17         A.    So we have a multitude of --

18                MR. WILLIAMS:  Objection.  Are you

19       asking at the end of the process beyond

20       recruitment and for ROTC, but actually to

21       commissions?  Is that the balance of your

22       question?

23    BY MS. WEAVER:

24         Q.    I'm asking at the point of

25    commissioning what would be reasons that a
```

1   commission is denied.

2           MR. WILLIAMS: And I would object

3     because that would be outside the scope of

4     the 30(b)(6) and the information this witness

5     was identified for.

6   BY MS. WEAVER:

7       Q.   Okay. You can answer.

8       A.   So, some extreme examples -- again

9   this is under Mr. Burns's purview. He is in

10  charge of waivers and disenrollments.

11       But if a cadet is killed in a

12  traffic accident, or any kind of -- it happens.

13  With that kind of volume. Then we would not

14  commission them.

15       Somebody fails college their senior

16  year, we would not commission them. They would

17  be, they would fail to complete their training.

18  A cadet commits a dishonorable act. Forges

19  signatures. We would disenroll him, regardless

20  of the completion of the training.

21       So, there are multiple ways we would

22  do that. Multiple scenarios where we would not

23  hesitate to disenroll a cadet.

24       Q.   When you use the term, disenroll, is

25  that a, does that, is that mean that the Army has

```
 1    initiated the process as opposed to the cadet?
 2              MR. WILLIAMS:  Objection.
 3              THE WITNESS:  A disenrollment can be
 4         initiated both ways.
 5              MS. WEAVER:  Okay.  We are done.
 6            (Whereupon, signature not having been
 7    waived, the deposition concluded at 4:54 p.m.)
 8                     *   *   *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    CERTIFICATE OF COURT REPORTER

2    UNITED STATES OF AMERICA    )

3    DISTRICT OF COLUMBIA         )

4         I, LORI J. GOODIN, the reporter before

5    whom the foregoing deposition was taken, do

6    hereby certify that the witness whose testimony

7    appears in the foregoing deposition was sworn by

8    me; that the testimony of said witness was taken

9    by me in machine shorthand and thereafter

10   transcribed by computer-aided transcription; that

11   said deposition is a true record of the testimony

12   given by said witness; that I am neither counsel

13   for, related to, nor employed by any of the

14   parties to the action in which this deposition

15   was taken; and, further, that I am not a relative

16   or employee of any attorney or counsel employed

17   by the parties hereto, or financially or

18   otherwise interested in the outcome of this

19   action.

20                    _____

21                    LORI J. GOODIN

22                    Notary Public in and for the

23                    District of Columbia

24

25   My Commission expires May 14, 2016

1                     DEPOSITION ERRATA SHEET

2

3    Our Assignment No. 113606

4    Case Caption:  Singh v. McHugh

5

6            DECLARATION UNDER PENALTY OF PERJURY

7            I declare under penalty of perjury

8    that I have read the entire transcript of

9    my Deposition taken in the captioned matter

10   or the same has been read to me, and

11   the same is true and accurate, save and

12   except for changes and/or corrections, if

13   any, as indicated by me on the DEPOSITION

14   ERRATA SHEET hereof, with the understanding

15   that I offer these changes as if still under

16   oath.

17           Signed on the _19_ day of

18   March                  , 2015.

19

20   _____

21           Colonel Paul Webber

22

23

24

25

Page 29

1                    DEPOSITION ERRATA SHEET

2    Page No. 6 Line No. 13 Change to: Captian

3    Heurtez.    And the other was a

4    Reason for Change: Wrong Name

5    Page No. ___ Line No. ___ Change to: ___

6    ___

7    Reason for Change: ___

8    Page No. ___ Line No. ___ Change to: ___

9    ___

10   Reason for Change: ___

11   Page No. ___ Line No. ___ Change to: ___

12   ___

13   Reason for Change: ___

14   Page No. ___ Line No. ___ Change to: ___

15   ___

16   Reason for Change: ___

17   Page No. ___ Line No. ___ Change to: ___

18   ___

19   Reason for Change: ___

20   Page No. ___ Line No. ___ Change to: ___

21   ___

22   Reason for Change: ___

23

24   SIGNATURE: ___                    DATE: 19 mar 15

25            Colonel Paul Webber