## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
IKNOOR SINGH,                                     )
)
          Plaintiff,                          )
)
     v.                                          )     Civil Action No. 14-1906 (ABJ)
)
JOHN MCHUGH, *et al.*,                            )
)
          Defendants.                         )
_____)

## MEMORANDUM OPINION

Plaintiff Iknoor Singh is a rising junior at Hofstra University and an observant Sikh. In accordance with his religion, plaintiff does not cut his hair or beard, and he wears a turban. He has endeavored to enroll in the Reserve Officers' Training Corps ("ROTC") program run by the United States Army at his university, but his religious practices do not conform to Army uniform and grooming standards. Plaintiff sought a religious accommodation that would enable him to enroll in ROTC with his articles of faith intact, but the Army denied the request. Plaintiff contends that the Army's refusal to accommodate his religious exercise violates the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, and he brought this lawsuit against John McHugh, in his official capacity as Secretary of the United States Army; Lieutenant General James C. McConville, in his official capacity as Deputy Chief of Staff, G-1, United States Army; Brigadier General Peggy C. Combs, in her official capacity as Commanding General, United States Army Cadet Command; and Lieutenant Colonel Daniel L. Cederman, in his official capacity as Commander of the ROTC program at Hofstra University.

In their motion for summary judgment, defendants remind the Court of the doctrine that cautions judges to afford substantial deference to the judgment of military commanders and to decline to interpose their own views in matters involving the composition and training of military officers.  In opposing defendants' motion and advancing his own, plaintiff points out that like all government agencies, the Armed Services are governed by the congressional determination – enshrined in RFRA – to tip the scale in favor of individual religious rights.  He notes that even the military must be able to demonstrate that a policy that imposes a substantial burden upon an individual's ability to practice his religion furthers a compelling government interest, and is the least restrictive alternative available for furthering that interest.  In other words, while the Court must accord the military a great deal of respect, particularly in its identification of the compelling interests involved, the defendants still bear the burden to come forward with sufficient evidence to satisfy the strict scrutiny inquiry:  does the specific application of Army policy to this plaintiff further the asserted compelling interest and do so in the least restrictive manner?

The Court finds that defendants have failed to show that the application of the Army's regulations to this plaintiff and the denial of the particular religious accommodation he seeks further a compelling government interest by the least restrictive means.  Therefore, and for the additional reasons set forth below, defendants' dispositive motions will be denied and judgment will be entered in favor of the plaintiff.  The Court accords substantial deference to the Army's judgments concerning the essential role that uniformity plays in military training and effectiveness. But given the tens of thousands of exceptions the Army has already made to its grooming and uniform policies, its successful accommodation of observant Sikhs in the past, and the fact that, at this time, plaintiff is seeking only to enroll in the ROTC program, the Army's refusal to permit him to do so while adhering to his faith cannot survive the strict scrutiny that RFRA demands.

This decision is limited to the narrow issue presently before the Court – plaintiff's ability to enroll in ROTC with his turban, unshorn hair, and beard – and it does not address plaintiff's eventual receipt of a contract or an Army commission.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Iknoor Singh is a rising junior at Hofstra University and an adherent of the Sikh faith.  Pl.'s Statement of Undisputed Material Facts in Supp. of Cross-Mot. for Summ. J. [Dkt. # 32-2] ("Pl.'s SOF") ¶ 8; Defs.' Resp. to Pl.'s SOF [Dkt. # 37-1] ("Defs.' SOF Resp.") ¶ 8.  In accordance with his religion, plaintiff does not cut his beard or hair, and he tucks his unshorn hair under a turban.  Pl.'s SOF ¶ 8; Defs.' SOF Resp. ¶ 8.  Plaintiff maintains the sincere belief that if he cut his hair, shaved his beard, or abandoned his turban, he would be "dishonoring and offending God."  Pl.'s SOF ¶ 8; Defs.' SOF Resp. ¶ 8.

The Army operates an ROTC program at Hofstra University that plaintiff has sought to join.  Pl.'s SOF ¶¶ 9, 13; Defs.' SOF Resp. ¶¶ 9, 13.  Plaintiff hopes to serve in Military Intelligence, and he speaks Urdu, Hindi, and Punjabi, as well as English.  Ex. 7 to Decl. of Pl. in Supp. of Pl.'s Mot. for Prelim. Inj. [Dkt. # 3-2, 27–28].  Plaintiff has participated in ROTC as an auditing student but he has not yet enrolled in the program because the Army demands that he first agree to abide by its grooming and uniform regulations by removing his turban, cutting his hair, and shaving his beard.  Pl.'s SOF ¶¶ 9, 13; Defs.' SOF Resp. ¶¶ 9, 13.  Plaintiff requested a religious accommodation that would permit him to enroll with his articles of faith intact, and that request has now been formally denied.  Letter from Lieutenant General James C. McConville to Pl. (Dec. 19, 2014) [Dkt. # 18-1] ("McConville Letter") at 1.

The Army initially took the position that the would-be soldier was bound to comply with the grooming and uniform policies before he could enroll in ROTC and that it could not even

consider a request for an accommodation until he did so.  *See* Ex. C to Defs.' Mot. to Dismiss and

for Summ. J. [Dkt. # 21-2, 13–14].   On November 12, 2014, before the Army had agreed to

consider plaintiff's accommodation request, plaintiff filed this action and sought:  (1) a preliminary

injunction requiring the Army to process the accommodation request and ordering a temporary

accommodation and "provisional enlistment" if the request was denied; (2) a declaratory judgment

that defendants' refusal to grant plaintiff a religious exemption to the Army's grooming and

uniform standards would violate RFRA; (3) a permanent injunction enjoining defendants from

enforcing the Army's standards insofar as they would require plaintiff to cut his hair, shave his

beard, and remove his turban, and ordering defendants to allow plaintiff "to join" the Hofstra

ROTC unit; and (4) attorney's fees and costs.  Compl., Request for Relief ¶¶ a–d.  The next day,

plaintiff filed a motion for a preliminary injunction seeking the preliminary relief identified in the

complaint.  Pl.'s Mot. for Prelim. Inj. [Dkt. # 3].

While the motion for a preliminary injunction was pending, defendants notified the Court

that the Army had changed its position, and that it would process plaintiff's accommodation

request.  Defs.' Opp. to Pl.'s Mot. for Prelim. Inj. [Dkt. # 16] at 1.  On December 19, 2014, the

request was denied.  Notice of Filing of Agency's Decision on Pl.'s Accommodation Request [Dkt.

# 18] ("Decision Notice"); McConville Letter.  In light of defendants' consideration and denial of

plaintiff's request, the Court consolidated the motion for a preliminary injunction with the merits

pursuant to Federal Rule of Civil Procedure 65.  Minute Order (Dec. 22, 2014).

Defendants filed a motion to dismiss or, in the alternative, for summary judgment on

January 20, 2015.  Defs.' Mot. to Dismiss and for Summ. J. (mistakenly labeled "memorandum in

support") [Dkt. # 21] ("Defs.' Mot."); Defs.' Mem. in Supp. of Defs.' Mot. [Dkt. # 21] ("Defs.'

Mem.").  They took the position that the complaint should be dismissed under Federal Rule of

Civil Procedure 12(b)(6) because plaintiff, as a civilian, could not establish that the Army's decision substantially burdened his religious practice, and because requests for judicially-ordered enlistments are nonjusticiable.[1]   Defs.' Mem. at 1, 3.   In the alternative, defendants argued that they were entitled to summary judgment on all of plaintiff's claims.   *Id.*

On January 27, 2015, plaintiff responded to defendants' motion with a motion to take discovery pursuant to Federal Rule of Civil Procedure 56(d).   Pl.'s Mot. for Disc. [Dkt. # 22].   The matter was fully briefed, and the Court issued an order granting the motion in part and denying it in part.   Order (Feb. 3, 2015) [Dkt. # 25].   After the discovery was completed, plaintiff filed an opposition to defendants' motion to dismiss and for summary judgment, combined with a cross-motion for summary judgment, on March 21, 2015.   Pl.'s Cross-Mot. for Summ. J. [Dkt. # 33] ("Pl.'s Mot."); *see also* Pl.'s Mem. Opposing Defs.' Mot. and Supporting Pl.'s Mot. [Dkt. # 32]. Defendants filed a reply and cross-opposition on April 10, 2015, Defs.' Opp. to Pl.'s Mot. and Reply in Supp. of Defs.' Mot. [Dkt. # 37] ("Defs.' Reply"), and plaintiff filed a cross-reply on April 17, 2015.   Pl.'s Reply Mem. in Supp. of Pl.'s Mot. [Dkt. # 43] ("Pl.'s Reply").   The Court heard argument on the motions on April 29, 2015.

---

1      Defendants initially requested that the portion of the complaint they contend is nonjusticiable be dismissed pursuant to Rule 12(b)(1), *see* Defs.' Mot., but noted in their reply brief that a recent opinion from another court in this District indicates that a motion to dismiss for nonjusticiability should be considered under Rule 12(b)(6) instead.  *See* Defs.' Opp. to Pl.'s Cross-Mot. for Summ. J. and Reply in Supp. of Defs.' Mot. [Dkt. # 37] at 3 n.2, citing *Saint-Fleur v. McHugh*, No. 1:13-cv-01019 (APM), 2015 WL 1209908, at *3 (D.D.C. Mar. 17, 2015).

## REGULATORY BACKGROUND

### I.   Army Uniform and Grooming Regulations

#### A.  *Religious Headgear*

The Army's uniform regulations permit soldiers to wear religious apparel while in uniform, including religious "headgear," if the apparel is "neat and conservative" and it will not "interfere with the performance of military duties."   Army Regulation ("A.R.") 600-20 (Nov. 6, 2014), Regulatory App'x to Defs.' Mot. [Dkt. # 21-4, 26] ("A.R. 600-20") at A024.  Soldiers in uniform may wear religious headgear if:

*1.* The religious headgear is subdued in color . . . .

*2.* The religious headgear is of a style and size that can be completely covered by standard military headgear.

*3.* The religious headgear bears no writing, symbols, or pictures.

*4.* Wear of the religious headgear does not interfere with the wear or proper functioning of protective clothing or equipment.

\*       \*       \*

*6.* Religious headgear will not be worn in place of military headgear under circumstances when the wear of military headgear is required (for example, when the Soldier is outside or required to wear headgear indoors for a special purpose).

*Id.*  "Religious headgear that meets these criteria is authorized irrespective of the faith group from which it originates." *Id.*

Soldiers are not authorized to wear religious headgear that does not meet these requirements while in uniform unless they have received a religious accommodation.  *See id.* at A022.  It is the Army's policy to grant religious accommodation requests related to uniforms "unless accommodation will have an adverse impact on unit readiness, individual readiness, unit

cohesion, morale, good order, discipline, safety, and/or health," the factors that constitute "military necessity." *Id.*

### B. Hair

Under Army regulations, men's hair "must present a tapered appearance," and, when combed, may "not fall over the ears or eyebrows, or touch the collar, except for the closely cut hair at the back of the neck." A.R. 670-1 (Sept. 15, 2015, revised Sept. 24, 2015), Ex. 5 to Pl.'s Mot. [Dkt. # 34, 105] ("A.R. 670-1") at 5. "Males are not authorized to wear braids, cornrows, twists, dreadlocks, or locks while in uniform or in civilian clothes on duty," although they may wear wigs "to cover natural baldness or physical disfiguration." *Id.* Women are permitted to wear bangs and longer hair, subject to certain requirements, *id.*, and their "hair may be styled with braids, cornrows, or twists." *Id.* at 6. Women, but not men, are permitted to use cosmetics, "provided they are applied modestly and conservatively." *Id.*

Men are required to "keep their face[s] clean-shaven when in uniform, or in civilian clothes on duty." A.R. 670-1 at 5. Sideburns are permitted as long as they do not "extend below the bottom of the opening of the ear" and the length of individual hairs does not exceed one-eighth of an inch. *Id.* Mustaches are permitted as long as they are "neatly trimmed, tapered, and tidy." *Id.*

The Army makes exceptions to its hair-related grooming rules for medical reasons, *see* A.R. 670-1 at 5, and for "operational necessity."[2] Defs.' Objections and Resps. to Admiss. Propounded by Pl., Ex. 12 to Pl.'s Mot. [Dkt. # 34, 267] ("Defs.' Admiss.") at 4. Medical exemptions are usually related to dermatological conditions such as pseudofolliculitis barbae and

---

2       In addition, defendants acknowledge that "[t]he Army has approved religious grooming exceptions to wear beards for three other individuals . . . : an orthopedic surgeon, an anesthesiologist, and a chaplain." Defs.' Reply at 22 n.11.

acne keloidalis nuchae.  Pl.'s SOF ¶ 41; Defs.' SOF Resp. ¶ 41; *see also* Technical Bulletin 287,

Pseudofolliculitis of the Beard and Acne Keloidalis Nuchae (Dec. 10, 2014), Ex. AA to Defs.'

Reply [Dkt. # 37-2, 38] ("TB MED 287") at 4.  A doctor may authorize a temporary or permanent

"shaving profile," which permits the affected soldier to wear a beard.  TB MED 287 at 11–12.

Medically authorized beards are generally limited to one-quarter of an inch, although Army

regulations permit a physician to specify that a longer beard is necessary.  *Id.* at 11.

Army records indicate that at least 49,690 permanent shaving profiles and 57,616

temporary shaving profiles have been authorized since 2007.[3]  *See* Ex. 9 to Pl.'s Mot. [Dkt. # 34,

226–28].  Defendants state that these shaving profiles are subject to command review.  *See*

Stipulation in Lieu of R. 30(b)(6) Testimony, Ex. 10 to Pl.'s Mot. [Dkt. # 34, 230] ("Defs.' Stip.")

at 1.  Defendants do not dispute plaintiff's contention that the Army has deployed soldiers with

shaving profiles for operations in foreign countries and has allowed them to continue wearing their

beards during deployment.  Pl.'s SOF ¶ 54; Defs.' SOF Resp. ¶ 54.

*C.  Tattoos*

Army regulations authorize soldiers to wear tattoos subject to limitations with respect to

their size, placement, number, and content.  Ex. 5 to Pl.'s Mot. [Dkt. # 34, 110] at 10.  But the

Army has granted numerous exceptions and waivers to its tattoo policy.  For instance, when the

Army tightened its tattoo guidelines on March 31, 2014, it grandfathered in 197,102 soldiers with

---

3       The shaving profile data comes from the Army's "e-Profile" system.  Pl.'s SOF ¶ 48.  The
total numbers of temporary and permanent shaving profiles authorized since 2007 is likely higher
because e-Profile did not come into widespread use in the Army until 2011, and some temporary
profiles may not be reflected in the database even after that time.  Decl. of Philip M. Paternella,
Ex. 8 to Pl.'s Mot. [Dkt. # 34, 223–24] ¶¶ 3–6.

non-conforming tattoos.[4]   Defs.' Stip. at 2.   In addition, since November 2014, the Army has

approved at least 183 exceptions to the tattoo policy, including for tattoos with religious themes

(for example, images of crosses, biblical verses, and an image of Jesus Christ); tattoos related to

aspects of popular culture, such as movies, cartoon characters, and cars (for example, an image of

a vampire Mickey Mouse and a Star Wars caricature); tattoos that reflect cultural or ethnic heritage

(a family crest, a grandmother's surname, and Samoan tribal bands); and tattoos reflecting various

personal interests (such as images of dragons, words, and symbols).  Pl.'s SOF ¶¶ 63–67; Defs.'

SOF Resp. ¶¶ 63–67.  Recipients of these tattoo waivers have included prospective Army enlistees,

enlisted soldiers, and ROTC cadets.  Pl.'s SOF ¶ 68; Defs.' SOF Resp. ¶ 68.

## II.   The Reserve Officers' Training Corps

The mission of the ROTC "is to produce commissioned officers in the quality, quantity,

and academic disciplines necessary to meet active Army and reserve component requirements."

A.R. 145-1, Regulatory App'x to Defs.' Mot. [Dkt. # 21-4, 39] ("A.R. 145-1") at A037.  At Hofstra

University, the ROTC program seeks to "recruit, retain, and ultimately commission Second

Lieutenants in the US Army who are mentally, physically, and emotionally prepared to lead

American Soldiers in order to deter our enemies and, when necessary, fight and win our Nation['s]

wars."  Decl. of Lieutenant Colonel Daniel Cederman, Ex. B to Defs.' Mot. [Dkt. # 21-2, 7]

("Cederman Decl.") ¶ 4.

ROTC classes include "enrolled" cadets and "participating students."  Defs.' Statement of

Material Facts [Dkt. # 21-1] ("Defs.' SOF") ¶ 6; Pl.'s Resp. to Defs.' SOF [Dkt. # 32-14] ("Pl.'s

SOF Resp.") ¶ 6.  Enrolled cadets participate in classroom instruction, as well as training outside

---

4       The Army revised and relaxed its tattoo guidelines on April 10, 2015.  Notice of Revised
Regulation on Grooming and Appearance Standards [Dkt. # 42] at 1.

the classroom.  Defs.' SOF ¶ 6; Pl.'s SOF Resp. ¶ 6.  They may wear military uniforms during training, and they are subject to Army grooming standards during ROTC activities.  A.R. 145-1 at A067.  Participating students are limited to attending ROTC classroom instruction.  Cadet Command Pam 145-4, Regulatory App'x to Defs.' Mot. [Dkt. # 21-4, 111] ("C.C. Pam 145-4") at A109.  They are not authorized to wear uniforms, nor are they subject to Army grooming standards. *See id.*; *see also* Defs.' SOF ¶ 7; Pl.'s SOF Resp. ¶ 7.  Students who are not enrolled in ROTC may only attend Hofstra's military-science course during their first two years of college.  Pl.'s SOF ¶ 7; Defs.' SOF Resp. ¶ 7.

Enrolled cadets are either "contracted" or "non-contracted."  C.C. Pam 145-4 at A113. Non-contracted cadets are not members of the Army, Defs.' SOF ¶ 8; Pl.'s SOF Resp. ¶ 8, and they must contract with the Army as cadets before their junior year of college in order to continue participating in ROTC activities and to be eligible for ROTC benefits.  Pl.'s SOF ¶ 7; Defs.' SOF Resp. ¶ 7.  To be eligible to contract with the Army, enrolled cadets must either complete the "Basic Course," or they must attend the Leader's Training Course, or "Basic Camp," during the summer before their junior year of college.  *See* Army Reg. 145-1 at A069; Cederman Decl. ¶ 5. Enrolled cadets compete for a limited number of contracts.  *See* Cederman Decl. ¶ 7; 30(b)(6) Cederman Dep., Feb. 26, 2015, Ex. 1 to Pl.'s Mot. [Dkt. # 34, 31] ("Cederman Dep.") at 38.

Contracted cadets are members of the Army; they are required to enlist in the Army Reserve, and they agree to accept a commission in the Army if one is offered.  Defs.' SOF ¶¶ 8, 10; Pl.'s SOF Resp. ¶¶ 8, 10.  In addition, only contracted cadets may participate in the ROTC "Advanced Course," which includes the Military Science III and IV classes, and the Leadership Development and Assessment Course, a paid twenty-nine day session that "gives cadets the chance to practice what they have learned in the classroom, and introduces them to Army life 'in the

field.'"  Defs.' SOF ¶ 9; Pl.'s SOF Resp. ¶ 9; *see also* Cederman Decl. ¶¶ 3, 5.  Contracted ROTC cadets are also eligible to receive scholarships of up to $1,200 annually for books and expenses, and a $300–$500 per month tax-exempt spending allowance.  Pl.'s SOF ¶ 3; Defs.' SOF Resp. ¶ 3.

### III.    The Religious Freedom Restoration Act and Department of Defense Instruction 1300.17

"Congress enacted RFRA in 1993 in order to provide very broad protection for religious liberty."  *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014).  To this end, RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion" unless it can "demonstrate[] that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(a)–(b).[5]  RFRA further specifies that "the term 'government' includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States."  *Id.* § 2000bb-2(1).

Whether a government action substantially burdens a plaintiff's religious exercise is a question of law for a court to decide.  *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 247 (D.C. Cir. 2014).  "The term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A); *see also id.* § 2000bb-2(4).  If a plaintiff demonstrates the substantial burden to his religious belief, then the government bears the burden of showing that its policy furthers a compelling government interest by the least restrictive means.  *Id.* §§ 2000bb-1(b), 2000bb-2(3); *Hobby Lobby*, 134 S. Ct. at 2761.

---

5       Although the Supreme Court found RFRA unconstitutional as applied to the states, *City of Boerne v. Flores*, 521 U.S. 507, 533–36 (1997), the statute still applies to the federal government. *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 167 (D.C. Cir. 2003); *Henderson v. Kennedy*, 265 F.3d 1072, 1073 (D.C. Cir. 2001).

The Department of Defense expressly incorporated RFRA into its own regulations effective January 22, 2010.  It amended DoD Instruction ("DoDI") 1300.17, which addresses "Accommodation of Religious Practices Within the Military Services," as follows:

> In accordance with section 2000bb-1 of Title 42, United States Code . . . requests for religious accommodation from a military policy, practice, or duty that substantially burdens a Service member's exercise of religion may be denied only when the military policy, practice, or duty:
>
> (a) Furthers a compelling governmental interest.
>
> (b) Is the least restrictive means of furthering that compelling governmental interest.

DoDI 1300.17, Regulatory App'x to Defs.' Mot. [Dkt. # 21-4, 6] ("DoDI 1300.17") at A004.[6]

With respect to the Army, any requests that would require a waiver of grooming and appearance practices must be forwarded to the Secretary of the Army and must be resolved by an official no lower than the Deputy Chief of Staff, G-1.  *Id.* at A005.  Requests for accommodation of religious practices are to be "assessed on a case-by-case basis" and "considered based on [their] unique facts; the nature of the requested religious accommodation; the effect of approval or denial on the Service member's exercise of religion; and the effect of approval or denial on mission accomplishment, including unit cohesion."  *Id.*

### THE DECISION AT ISSUE IN THIS CASE:
### The Denial of Plaintiff's Request for a Religious Accommodation

Plaintiff "has long dreamed of serving his country," Pl.'s SOF ¶ 9, and he has explained that he wishes to enroll as a cadet in the Hofstra ROTC program so that he may compete for a

---

6      DoDI 1300.17 further provides that "[r]equests for religious accommodation from a military policy, practice, or duty that does **not** substantially burden a Service member's exercise of religion" are evaluated by balancing "the needs of the requesting Service member . . . against the needs of mission accomplishment."  DoDI 1300.17 at A004.  Requests for accommodation that fall under this balancing test may be denied "[o]nly if it is determined that the needs of mission accomplishment outweigh the needs of the Service member."  *Id.*

contract.  Pl.'s Reply at 1–2.  Plaintiff has participated in ROTC classes at Hofstra as an unenrolled student since his freshman year.  Pl.'s SOF ¶ 13; Defs.' SOF Resp. ¶ 13.  In April 2013, plaintiff requested a religious accommodation so that he could fully enroll in ROTC, and complete all of the training necessary to compete for a contract, while maintaining his unshorn hair, beard, and turban.  *See* Ex. O to Defs.' Mot. [Dkt. # 21-2, 62] at 2.   The Enrollment Officer of the Hofstra ROTC program denied plaintiff's request for an accommodation, stating that "[t]he Army whenever possible, makes all attempts to accommodate religious practices and belief but not when it has an adverse impact on readiness, unit cohesion, standards, health, safety or discipline."  *Id.* at 1.

After the initial denial, plaintiff continued to seek an accommodation.  In June 2013, the organization UNITED SIKHS sent a letter on plaintiff's behalf to the ROTC Department Chair at the time, Lieutenant Colonel ("LTC") David Daniel, urging him to approve a religious exemption for the plaintiff.  Ex. N to Defs.' Mot. [Dkt. # 21-2, 54–59].  LTC Daniel denied the request on August 16, 2013, stating that "the contracting of Cadets into the ROTC program who cannot comply with the wear and appearance and personal grooming standards of Army Regulation (AR) 670-1 is not permitted under AR 145-1," and that neither he nor U.S. Army Cadet Command had the authority to permit an exception to this policy.  Ex. M to Defs.' Mot. [Dkt. # 21-2, 51] at 1.  LTC Daniel further stated that it was "not legally permissible under AR 145-1 to grant religious exceptions to allow a Sikh Cadet to enroll in the ROTC program while maintaining his religious articles."  *Id.* at 1–2.

Plaintiff submitted a letter appealing LTC Daniel's decision on November 11, 2013.  Ex. H to Defs.' Mot. [Dkt. # 21-2, 34–39].  Plaintiff learned that this request was denied by Major General ("MG") Jefforey A. Smith in April 2014, Pl.'s SOF ¶ 17; Defs.' SOF Resp. ¶ 17, after the

amendments to DoDI 1300.17 took effect.  MG Smith stated that "ROTC units should not permit a student to enroll (contracted or non-contract) unless the student is willing to comply with Army policies, including AR 670-1." Ex. F to Defs.' Mot. [Dkt. # 21-2, 30].  He added that "[s]tudents who are not enrolled as cadets in the program may not apply for a religious accommodation," and that "[a]ny ROTC Cadet who applies for a religious accommodation must comply with Army policy unless and until the request is approved." *Id.*

On August 5, 2014, plaintiff's attorneys wrote again to MG Smith, and to defendants Lieutenant General ("LTG") James C. McConville and LTC Daniel Cederman. Ex. E to Defs.' Mot. [Dkt. # 21-2, 18–28].  On October 17, 2014, LTG McConville responded that he was "unable to approve or deny a waiver of Army uniform and grooming policy . . . because prospective cadets, applicants, and enlistees are not subject to the Army's uniform and grooming policy." Ex. C to Defs.' Mot. [Dkt. # 21-2, 13] at 1.  In other words, the Army took the position that it was unable to consider plaintiff's request for a religious accommodation that would enable him to enroll in ROTC because plaintiff was not yet enrolled in ROTC.

After plaintiff filed this lawsuit, the Army decided to process his accommodation request. Defs.' Opp. to Pl.'s Mot. for Prelim. Inj. at 1.  On December 19, 2014, plaintiff received a letter from LTG McConville denying the religious accommodation on substantive grounds.  Decision Notice; McConville Letter.

LTG McConville's letter stated that, after balancing "the facts of [plaintiff's] individual case" against considerations of "military necessity," the Army was denying the accommodation request on several grounds.  McConville Letter at 1.  McConville explained that "Army ROTC is the primary means of generating the officer leaders of the Army," and so "it is important that Cadets are inculcated into the Army and its values, training methods, and traditions in a way that

is reflective of what their future Soldiers will expect of them." *Id.* at 1–2.  Citing his "over thirty years of experience as a leader and commander of Soldiers," he determined that "[p]ermitting an obvious deviation from these standards in an officer training program" by granting plaintiff's requested accommodation "would, in the eyes of the Soldiers whom Cadets are being trained to lead, damage the esteem and credibility of ROTC and the officer corps in general." *Id.* at 2.  In the seven-page letter, McConville further explained that, in his view, granting plaintiff an accommodation would undermine the following critical interests:

- Unit Cohesion and Morale:   McConville stated that accommodating plaintiff's religious practices "will have an adverse impact on unit cohesion and morale because uniformity is central to the development of a bonded and effective fighting force that is capable of meeting the Nation's ever changing needs." *Id.*  He explained that "[u]niformity is a primary means by which we convert individuals into members of the Army," especially in ROTC. *Id.*  Since "[h]air and clothing are a very visible way that individuals express their identity," maintaining uniformity helps a soldier or cadet to develop "a willingness to submit his individuality to the larger organization." *Id.* at 2–3.  He further stated that uniformity "promotes cohesive bonds by instilling a common identity, provides visual evidence of mutual experience, and reinforces a sense of tradition." *Id.* at 3.  McConville concluded that granting an accommodation to plaintiff "would undermine the common Army identity we are attempting to develop in ROTC, and adversely impact efforts to develop cohesive teams," and would also "detract from the heritage that [McConville] view[s] as a vital component of soldierly strength." *Id.*

- Good Order and Discipline:   According to McConville, "[o]ne of the key ways the Army develops disciplined leaders is through ritualistic enforcement of uniform grooming standards." *Id.*  He explained that "[d]iscipline is the backbone of an efficient, cohesive, and effective fighting force," and that "[e]xperience has shown [him] that the even handed enforcement of grooming standards instills the self-discipline necessary for the military member to perform effectively." *Id.* at 4.  "Uniformity," he continued, "is a readily available means of instilling the practice of inspection and compliance that not only sharpens Soldiers, but also leaders." *Id.*  "Granting [plaintiff] an exception in a military officer training program would undercut this fundamental component of our program, and dramatically change the nature of how we train officers for the future needs of the Army." *Id.*  McConville warned that "[i]f officer training does not reflect Army training, the credibility of the officer corps will be called into

15

question." *Id.* at 5.  According to McConville, uniformity also promotes discipline "in a more subtle way because it helps to infuse Soldiers with a code of professional conduct that they will adhere to in combat." *Id.* at 4. "Uniformity helps to inhibit personal desires and impulses that may be antithetical to mission accomplishment." *Id.* at 5.  For all these reasons, McConville concluded that granting an accommodation to plaintiff "would drive a stark wedge between the officer corps, its training, and the standards and training methods that are employed by the enlisted Army." *Id.*

- <u>Individual and Unit Readiness</u>:  McConville stated that permitting plaintiff to enroll in ROTC with a religious grooming and uniform accommodation "would leave [him] unprepared to advance to the next phase of officer training by failing to emphasize uniformity." *Id.*  He stated that the accommodation "would have a detrimental impact on [plaintiff's] individual readiness" because "allowing [plaintiff] to continue in officer training without any emphasis on uniformity would leave [him] generally unprepared to lead Soldiers, viewed as an outsider by [his] peers, and trained in a manner that is wholly inconsistent with how we develop strong military officers." *Id.*  In addition, he stated that because plaintiff's accommodation would weaken "good order, discipline, the credibility of the officer corps, cohesion, and morale," it would also "undermine the overall readiness of the Army." *Id.* at 5–6.

- <u>Health and Safety</u>:   Referring to research that "shows that facial hair significantly degrades the protection factor of all approved protective masks," McConville stated that plaintiff's "degraded ability to seal a protective mask in training would not only subject [him] to risk during training, but, were [he] to enter the military service, leave [him] untrained in the proper wear and function of these potentially life saving measures." *Id.* at 6.  McConville noted that "there are some protective masks that are capable of providing protection to individual[s] who wear beards," but that those masks "are not standard Army issue." *Id.*  Given that "the Army operates on a premise of interchangeable parts," he concluded that it "simply is not feasible to provide [plaintiff] a special protective mask without undermining the Army's need for flexibility to meet operational contingencies." *Id.*  In addition, McConville noted that compliance with Army grooming standards is "[o]ne of the most important mechanisms for managing risk" because it facilitates "the ability to assess a Soldier's competency and attention to detail." *Id.*  "Disparate grooming standards mean that deficiencies are less capable of being identified, because quick impressions of competency to follow directions cannot be as readily made." *Id.*

In addition, McConville discussed "a number of individual factors" that were unique to plaintiff's case. *Id.*  First, he considered "the implication of this denial on [plaintiff's] ability to

practice [his] religion," and he concluded that since plaintiff was "not a member of the Army," he

was not subject to the Army's grooming and uniform requirements, and so he "remain[ed] free to

maintain [his] articles of faith." *Id.*  Second, McConville distinguished plaintiff's case from the

cases of other Sikhs who have been granted religious accommodations by the Army in the past,

noting that "[t]hose exceptions were granted after consideration of the requests on a case by case

basis based on the military necessity factors that existed at the time," and that the exceptions were

made for individuals who possessed "unique skills or professional credentials." *Id.*  Although

McConville was "empathetic to" plaintiff's desire to serve in Military Intelligence and was aware

of plaintiff's language skills, he "nonetheless [found] that military necessity in the ROTC training

environment would be adversely impacted by permitting an exception based on the specific facts"

of this case. *Id.* at 7.

Finally, McConville stated that he did "not view the issuance of temporary medical

exceptions to grooming standards as undercutting the Army's wholesale ability to enforce

grooming and appearance policies," noting that these exceptions are "subject to approval by

military commanders" and often limited in duration, and that a soldier with a medical grooming

exception is still "required to trim his beard as close to his face as possible." *Id.*  The medical

exceptions, he concluded, "are very different from the long term exception" plaintiff "request[ed]

for officer training." *Id.*  For all of those reasons, LTG McConville denied plaintiff's request for

a religious accommodation.

## STANDARD OF REVIEW

### I.    Motion to Dismiss

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (internal quotation marks omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  556 U.S. at 678.  And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id*. at 679.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id*., quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*.

When considering a motion to dismiss under Rule 12(b)(6), the complaint is construed liberally in plaintiff's favor, and the Court should grant plaintiff "the benefit of all inferences that can be derived from the facts alleged."  *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions.  *See id.*; *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice."  *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citations omitted).

## II.     Summary Judgment

"'The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion.'" *Sherwood v. Washington Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982).  In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary judgment, the non-moving party must "designate specific facts showing there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).  The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson*, 477 U.S. at 247–48.  A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary

judgment motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

### I.     Defendants' partial motion to dismiss on justiciability grounds is moot.

Defendants moved to dismiss the complaint in part, arguing that the Court does not have authority to grant some of the requested relief.  Defs.' Mem. at 1.  Plaintiff originally asked the Court to grant him "a temporary accommodation and provisional *enlistment* pending the final outcome of this case" and to issue a permanent injunction "enjoining Defendants from enforcing the Army's uniform and personal grooming standards" against him in a way that prevents him from "*enlist[ing]* and participat[ing] in ROTC."  *See* Compl., Request for Relief ¶¶ b–c (emphasis added).  Defendants argue that the request for "enlistment" is nonjusticiable because it "extends beyond enrollment as a cadet in ROTC" by seeking to place plaintiff directly in the Army as a contracted cadet.[7]  Defs.' Mem. at 17–18; *see also* Defs.' Reply at 3.

But the use of the term "enlistment" was somewhat ambiguous, and, in any event, the landscape of the case has shifted since the complaint was filed.  Plaintiff made it clear in his reply brief and at the hearing that he is simply seeking an order requiring defendants to permit him to *enroll* in ROTC with his articles of faith intact.  Plaintiff states that he "does not ask this Court to direct his enlistment in the Army or order the Army to make him a commissioned officer"; rather, "[h]e seeks only to compete, on an equal footing, with his peers for a contracted spot in ROTC."

---

[7]     In support of this position, defendants cite numerous cases in which courts found that challenges to military decisions relating to the enlisting or commissioning of personnel were nonjusticiable, including *Orloff v. Willoughby*, 345 U.S. 83 (1953), *Khalsa v. Weinberger*, 779 F.2d 1393 (9th Cir. 1986), *West v. Brown*, 558 F.2d 757 (5th Cir. 1977), and *Kreis v. Sec'y of Air Force*, 886 F.2d 1508 (D.C. Cir. 1989).  Defs.' Mem. at 18–21.

Pl.'s Reply at 1; *see also* Motions Hr'g Tr., Apr. 29, 2015 ("Hr'g Tr.") at 9.[8]  Furthermore, plaintiff

concedes that if even he earned an ROTC contract, defendants "would be under no obligation to

grant him a commission if his performance showed that he could not serve and lead."  Pl.'s Reply

at 4; *see also* Hr'g Tr. at 9.

Given that plaintiff does not seek enlistment in the Army, but only enrollment in ROTC,

the Court finds – and defendants agree – that the justiciability objection is moot.  *See* Hr'g Tr. at

28–31;[9] *cf. Larsen v. U.S. Navy*, 346 F. Supp. 2d 122, 127–28 (D.D.C. 2004) ("[T]he plaintiffs

seek to compete for a position without the Navy subjecting them to an allegedly unconstitutional

hiring practice.   And the court is well within its authority to adjudicate that.").   Therefore,

defendants' partial motion to dismiss will be denied.

## II. Defendants have conceded that the Army's denial of plaintiff's accommodation request substantially burdens plaintiff's religious exercise.

Defendants also moved to dismiss the complaint in full on the grounds that plaintiff could

not carry his burden to show that the Army had imposed a substantial burden on his religious

exercise.  Defs.' Mem. at 14.

RFRA applies only to government actions that "substantially burden a person's exercise of

religion."  42 U.S.C. § 2000bb-1(a); *Priests for Life*, 772 F.3d at 246.  A RFRA plaintiff's "beliefs

'must be sincere and the practice[] at issue must be of a religious nature.'"  *Kaemmerling v. Lappin*,

553 F.3d 669, 678 (D.C. Cir. 2008) (alteration in original), quoting *Levitan v. Ashcroft*, 281 F.3d

1313, 1320 (D.C. Cir. 2002).   "A substantial burden exists when government action puts

---

8       Citations to the hearing transcript refer to an unofficial version of the transcript.

9       In addition, the Court notes that any challenge by plaintiff relating to an ROTC contract or Army commission would not yet be ripe, and therefore would not be properly presented any event.

'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Id.*, quoting *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981); *accord Priests for Life*, 772 F.3d at 246.

There is no dispute that plaintiff's religious beliefs are sincerely held. But defendants initially argued in response to the complaint that plaintiff's religious practice was not burdened by any government action because he was still a civilian, and the Army's regulations did not apply to him. Defs.' Mem. at 16–17. Defendants further contended that a "substantial burden" is imposed under RFRA "'only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit . . . or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions.'" Defs.' Mem. at 15–16, quoting *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008).

But while this case was pending, the Army decided to process, and then to deny, plaintiff's request for a religious accommodation. *See* McConville Letter. Thus, as plaintiff clarified at oral argument, the specific government action that is now at issue in this case is that denial. Hr'g Tr. at 12 ("MS. WEAVER: We're saying that the denial of the accommodation is a violation of RFRA here."). Counsel for defendants conceded at the hearing that the Army is a government actor to which RFRA applies, *id.* at 35, and that the Army's denial of the religious accommodation applies to plaintiff, whether or not the Army's regulations do. *Id.* at 31–32. And defendants' counsel also conceded that enrollment in ROTC constitutes a government benefit.[10] *Id.* at 33–34 ("THE COURT: . . . [Do] you agree with me now that the denial of the accommodation has denied [plaintiff] a government benefit . . . ? MR. WILLIAMS: As to enrollment, yes, Your Honor.").

_____

10      Moreover, the record reflects numerous benefits that accompany enrollment in ROTC, such as the leadership training courses that are only available to enrolled cadets. *See* Cederman Decl. ¶ 5. For that reason, and because defendants have conceded the issue, the Court need not analyze this question under the "government benefit" standard that applies in this Circuit. *See, e.g.*, *Autor v. Pritzker*, 740 F.3d 176, 182–83 (D.C. Cir. 2014).

Therefore, there is no dispute that the Army's refusal to grant plaintiff the accommodation that would enable him to enroll in ROTC while maintaining his religious practice was a government action that required plaintiff "to choose between following the tenets of [his] religion and receiving a governmental benefit." *Navajo Nation*, 535 F.3d at 1070. The denial thus constitutes a "substantial burden" under RFRA, *see id.*; *see also Priests for Life*, 772 F.3d at 246, and defendants' motion to dismiss on that basis will be denied.

## III.   Defendants have not shown that the denial of a religious accommodation to plaintiff furthers the Army's compelling interests by the least restrictive means.

### A.   *RFRA's strict scrutiny standard applies to the Army.*

RFRA provides that the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). The government may impose a substantial burden "only if it demonstrates that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb-1(b). Through RFRA, Congress overturned the interpretation of the First Amendment the Supreme Court announced in *Employment Division v. Smith*, 494 U.S. 872 (1990), *see* 42 U.S.C. § 2000bb(a)(4), and it codified and reinstated "the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)."[11] *Id.* § 2000bb(b)(1); *see also Priests for Life*, 772 F.3d at 244.

---

11      In *Sherbert*, the Supreme Court held that, under this test, a state could not deny unemployment benefits to an employee who was fired for refusing to work on her Sabbath. 374 U.S. at 399, 408–09. In *Yoder*, the Court applied the test and upended a state law that required children to attend school until the age of sixteen as it applied to Amish children, whose religion "required them to focus on uniquely Amish values and beliefs during their formative adolescent years." *Hobby Lobby*, 134 S. Ct. at 2760, citing *Yoder*, 406 U.S. at 210–11, 234–36.

RFRA claims must be considered on an individual basis.  As the Supreme Court has emphasized, the statute "'requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person – the particular claimant whose sincere exercise of religion is being substantially burdened.'"  *Hobby Lobby*, 134 S. Ct. at 2779, quoting *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 430–31 (2006).  Accordingly, courts must "'loo[k] beyond broadly formulated interests' and . . . 'scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants.'"  *Id.* (alterations in original), quoting *O Centro*, 546 U.S. at 431.

RFRA applies to the "government," which is defined to include "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States."  42 U.S.C. § 2000bb-2(1).  So, on its face, the statute plainly applies to the U.S. Army.  And defendants acknowledge that Congress specifically intended RFRA to apply to the military.  Hr'g Tr. at 35; *see also* S. Rep. No. 103-111, at 12 (1993) ("Under the unitary standard set forth in [RFRA], courts will review the free exercise claims of military personnel under the compelling governmental interest test."); H.R. Rep. No. 103-88 (1993) ("Pursuant to the Religious Freedom Restoration Act, the courts must review the claims of prisoners and military personnel under the compelling governmental interest test.").

But the statute was enacted against a known backdrop of longstanding precedent involving judicial deference to military authorities charged with the management of military affairs.  The Supreme Court has made it clear that "[t]he military constitutes a specialized community governed by a separate discipline from that of the civilian," *Orloff v. Willoughby*, 345 U.S. 83, 94 (1953), and "[t]he complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments."  *Gilligan v.*

*Morgan*, 413 U.S. 1, 10 (1973).  *See also Orloff*, 345 U.S. at 93–94 ("[J]udges are not given the task of running the Army. . . .  Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters."); *and Gilligan*, 413 U.S. at 10 ("[I]t is difficult to conceive of an area of governmental activity in which the courts have less competence [than military affairs]. . . .  The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability.").

In enacting RFRA, Congress specifically acknowledged the importance of maintaining order and discipline within the military ranks, and it noted its expectation that courts would adhere to the tradition of judicial deference in matters involving both prisons and the armed forces.  *See* S. Rep. No. 103-111, at 10, 12.[12]  But it also expressed its clear understanding that the heightened standard of review would still apply in both contexts.  The House Report stated:

> Pursuant to the Religious Freedom Restoration Act, the courts must review the claims of prisoners and military personnel under the compelling governmental interest test.  Seemingly reasonable regulations based upon speculation, exaggerated fears or thoughtless policies cannot stand.  Officials must show that the relevant regulations are the least restrictive means of protecting a compelling governmental interest.  However, examination of such regulations in light of a higher standard does not mean the expertise and authority of military and prison officials will be necessarily undermined.  The Committee recognizes that religious liberty claims in the context of prisons and the military present far different problems for the operation of those institutions than they do in civilian settings.  Ensuring the safety and orderliness of penological institutions, as

---

12      "The courts have always recognized the compelling nature of the military's interest in these objectives in the regulations of our armed services.  Likewise, the courts have always extended to military authorities significant deference in effectuating these interests.  The committee intends and expects that such deference will continue under this bill."  S. Rep. No. 103-111, at 12.  The Senate Report also stated: "[T]he committee expects that the courts will consider the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."  *Id.* at 10.

well as maintaining discipline in our armed forces, have been recognized as governmental interests of the highest order.

H.R. Rep. No. 103-88.  And the Senate Report observed that "[t]he committee is confident that the bill will not adversely impair the ability of the U.S. military to maintain good order, discipline, and security."  S. Rep. No. 103-111, at 12.

This case appears to be the first to squarely present the question of how a court is supposed to incorporate traditional deference to the military into the RFRA strict scrutiny analysis.  But recently, the Supreme Court has applied the RFRA test in a situation where a similar sort of deference was due, and that opinion is instructive here.

In *Holt v. Hobbs*, 135 S. Ct. 853 (2015), the Court considered the grooming policy of the Arkansas Department of Corrections as applied to a Muslim inmate.  *Id.* at 859.  The policy prohibited inmates from growing beards for any reason other than medical necessity, *id.*, and an inmate sought and was denied a religious accommodation to grow a half-inch beard in accordance with his faith.  *Id.* at 861.  He brought a challenge under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, contending that the policy substantially burdened his religious exercise without justification.[13]  *Id.* at 859.  The religious exercise provision of RLUIPA "mirrors RFRA," and "allows prisoners 'to seek religious accommodations pursuant to the same standard as set forth in RFRA.'"  *Id.* at 860, quoting *O Centro*, 546 U.S. at 436.

---

13     RLUIPA is RFRA's "sister statute."  *Holt*, 135 S. Ct. at 859; *accord Hobby Lobby*, 134 S. Ct. at 2781.  It was enacted in response to *City of Boerne v. Flores*, 521 U.S. 507 (1997), where the Supreme Court held that Congress exceeded its powers under Section 5 of the Fourteenth Amendment when it applied RFRA to the states.  *Holt*, 135 S. Ct. at 860.  Congress enacted RLUIPA pursuant to its authority under the Spending and Commerce Clauses, and the statute governs, among other things, religious exercise by state prison inmates.  *Id.*; *see also* 42 U.S.C. § 2000cc-1.

The prison officials did not dispute that growing a beard was "a dictate of [the petitioner's] religious faith," and the Court found that the prison grooming policy substantially burdened his religious exercise.  *Id.* at 862.  Nevertheless, the prison officials contended that the grooming policy was the least restrictive means of furthering a compelling interest in "prison safety and security," *id.* at 863, because it prevented prisoners from concealing contraband in their beards, and from disguising their identities.  *Id.* at 863–64.  Citing the deference traditionally accorded to the judgments of prison officials, the District Court and the Eighth Circuit agreed.  *Id.* at 861.

The Supreme Court unanimously rejected the prison officials' contentions, reversing the courts below.  *Id.* at 867.  The Court noted first that the prison officials had asserted a "'broadly formulated interest,'" but that "RLUIPA, like RFRA, contemplates a 'more focused' inquiry."  *Id.* at 863, quoting *Hobby Lobby*, 134 S. Ct. at 2779.  The two statutes require the government "'to demonstrate that the compelling interest test is satisfied through application of the challenged law to . . . the particular claimant whose sincere exercise of religion is being substantially burdened.'"  *Id.*, quoting *Hobby Lobby*, 134 S. Ct. at 2779.  Thus, the *Holt* Court reiterated that under RLUIPA and RFRA, a court must "'scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants' and . . . 'look to the marginal interest in enforcing' the challenged government action in that particular context."  *Id.*, quoting *Hobby Lobby*, 134 S. Ct. at 2779 (alteration in original).  In accordance with that test, the Department of Corrections needed to show that the grooming policy, as applied specifically to the petitioner, furthered its compelling interests in the least restrictive way.  *Id.*

While it acknowledged the need to "respect [the] expertise" of prison officials, the Court concluded that it could not find "that denying petitioner a ½-inch beard actually furthers the Department's interest in rooting out contraband" without according the prison officials "a degree

of deference that is tantamount to unquestioning acceptance." *Id.* at 864.  The Supreme Court underscored that RLUIPA "does not permit such unquestioning deference," and that, like RFRA, it "'makes clear that it is the obligation of the courts to consider whether exceptions are required under the test set forth by Congress.'" *Id.*, quoting *O Centro*, 546 U.S. at 434.  The Court went on to observe that even if the prison officials could show that the beard policy furthered an interest in curtailing the circulation of contraband, they had "offered no sound reason why hair, clothing, and [medically-authorized] ¼-inch beards can be searched but ½-inch beards cannot." *Id.*

The *Holt* Court also found that, assuming the grooming policy advanced the assuredly compelling interest in "the quick and reliable identification of prisoners," it "still violate[d] RLUIPA as applied in the circumstances present[ed]" because there were less restrictive means available. *Id.* at 864–65.  The Court agreed with the petitioner that the Department of Corrections could require that inmates be photographed both with and without their beards so that guards could use both images when making an identification. *Id.* at 865.  And it noted that the Department of Corrections "already ha[d] a policy of photographing a prisoner both when he enters an institution and when his appearance changes at any time during his incarceration." *Id.* (citation and internal quotation marks omitted).

In addition, the Court observed that the Department of Corrections had failed to explain adequately why its grooming policy was "substantially underinclusive." *Id.* at 865.  The Court noted that "[a]lthough the Department [of Corrections] denied petitioner's request to grow a ½-inch beard, it permits prisoners with a dermatological condition to grow ¼-inch beards . . . even though both beards pose similar risks," and it found that this issue bore on the RLUIPA analysis. *Id.* at 865–66.

Finally, the Court emphasized that the courts below had incorrectly "deferred to these prison officials' mere say-so that they could not accommodate petitioner's request," and that RLUIPA "demands much more." *Id.* at 866. "Courts must hold prisons to their statutory burden, and they must not 'assume a plausible, less restrictive alternative would be ineffective.'" *Id.*, quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 824 (2000). The Court concluded by noting that while enforcement of RLUIPA "provides substantial protection for the religious exercise of institutionalized persons," it still "affords prison officials ample ability to maintain security." *Id.*

In the case before this Court, defendants contend that the heightened deference owed to military judgments requires the Court to grant their motion for summary judgment. *See* Defs.' Mem. at 22–32; Hr'g Tr. at 36–37. They argue that "[e]ach of the classic areas involving professional military judgments deserving of deference are implicated" in this case, including the composition, training, and equipping of the fighting force. Defs.' Reply at 14. They also assert that "[t]he Army's decision here is inherently more complex than the prison official's decision in *Holt*" because it relates to "a distinctly military matter, for which the Army's leadership is undeniably in best position, by virtue of its experience and expertise, to decide." *Id.* at 14–15.

Defendants direct the Court to the long line of cases predating RFRA that describe the nature of the deference that they contend is due here. *See, e.g.*, *Orloff*, 345 U.S. at 93–94; *Gilligan*, 413 U.S. at 10. They point in particular to *Goldman v. Weinberger*, 475 U.S. 503 (1986), in which the Supreme Court declined to apply strict scrutiny in the case of an Orthodox Jewish serviceman who claimed that the Air Force's prohibition on wearing "headgear," including yarmulkes, while

in uniform violated his rights under the First Amendment.  *Id.* at 504–07.  Citing the deference

owed to military judgments, the Court rejected his free exercise claim.[14]  *Id.* at 507–10.

But all of those cases predate RFRA, and the Court is bound to follow the guidance of *Holt*

when seeking to harmonize the necessary respect for military judgment with the dictates of the

statutory regime.  And here, when defendants urge the Court to look no further than the plain

language of LTG McConville's decision, *see, e.g.*, Defs.' Mem. at 29, they are asking the Court to

accord "a degree of deference that is tantamount to unquestioning acceptance," *see Holt*, 135 S.

Ct. at 864, which is not the proper function of a court in a RFRA case.[15]  *See id.*

Defendants also encourage the Court to stay its hand on the grounds that the military will

do a better job responding to social change on its own.  *See* Defs.' Reply at 15.  They point to the

fact that military commanders have been central to important policy changes that the services have

implemented in recent years, including the repeal of the ban on openly gay service members, and

voluntary changes to the policies on direct ground combat assignments for women.  *Id.* at 15–16.

"These examples," they maintain, "counsel against bold judicial intervention, and most

---

14      Defendants' pleadings initially suggested that RFRA's strict scrutiny standard did not even apply to the Army's decision here.  *See, e.g.*, Defs.' Mem. at 27 ("RFRA was never intended to, and did not in fact, alter the standard of review applied by the Supreme Court . . . to cases involving the military."); Defs.' Reply at 12 ("Congress did not displace *Goldman* deference with RFRA.").  But defendants' counsel acknowledged at the hearing that strict scrutiny does apply in this case. Hr'g Tr. at 35–36.

15      The *Goldman* case does not govern the Court's analysis here for the additional reason that, in *Goldman*, the Supreme Court expressly declined to apply the strict scrutiny standard articulated in *Sherbert* and *Yoder*, and instead reviewed the petitioner's Free Exercise claims under a "far more deferential" standard.  *Goldman*, 475 U.S. at 506–07.  But one of the "purposes" of RFRA is "to restore the compelling interest test as set forth in *Sherbert v. Verner* and *Wisconsin v. Yoder* and to guarantee its application in all cases where free exercise of religion is substantially burdened . . . by government."  42 U.S.C. § 2000bb(b)(1)–(2) (citations omitted).  Thus, unlike the *Goldman* Court, this Court is bound to review defendants' actions under the strict scrutiny standard.

importantly demonstrate that successful change requires military commanders to be central to the decision-making process." *Id.* at 16.

But the approach must be different in this case, because even if it involves an important matter of public policy and evolving social norms, Congress has already placed a thumb on the scale in favor of protecting religious exercise, and it has assigned the Court a significant role to play. *See Holt*, 135 S. Ct. at 859–60 ("Congress enacted RFRA in order to provide greater protection for religious exercise than is available under the First Amendment."), citing *Hobby Lobby*, 134 S. Ct. at 2760–61; *cf. Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005) ("RLUIPA is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens . . . .").

In sum, while the Court must credit the Army's assertions and give due respect to its articulation of important military interests, the Court may not rely on LTG McConville's "mere say-so." *Holt*, 135 S. Ct. at 866. Instead, it must consider whether an exception is required under the strict scrutiny test, and hold defendants to their burden of demonstrating that the denial of the limited accommodation sought in this case is the least restrictive means to advance the Army's compelling interest. *See Holt*, 135 S. Ct. at 864; *see also* 42 U.S.C. § 2000bb-1(b).

**B.      *Defendants have not demonstrated that denying an accommodation to plaintiff furthers the government's compelling interests.***

Defendants assert that "[t]he Army's decision to deny Plaintiff's request for a grooming accommodation while in an officer training program furthers compelling interests in maintaining a credible officer corps and an effective fighting force that is capable of meeting the Nation's defensive needs." Defs.' Mem. at 32; *see also* McConville Letter at 1 ("I am denying your request to wear unshorn hair, a beard, and a turban as an enrolled cadet in Hofstra University Army ROTC because the requested accommodation will adversely impact individual and unit readiness, unit

cohesion, morale, good order, discipline, health and safety within the Army ROTC program."). According to LTG McConville, "[u]niformity is a primary way the Army builds an effective fighting force" because "[i]t allows a strong team identity to be forged, distinguishes service members from the civilian population, reinforces notions of selfless service, and provides a routine that instills discipline in Soldiers and leaders, while connecting the Army to its past in a visible way."  McConville Letter at 1.  Defendants assert that "[t]he interest in maintaining an effective Army by developing a disciplined, well trained, credible, cohesively bonded, and reliable corps of officers in ROTC is undeniably compelling."  Defs.' Mem. at 32.

There can be no doubt that military readiness and the unit cohesion and discipline of the Army officer corps constitute highly compelling government interests.  *See* Hr'g Tr. at 26 ("[MS. WEAVER:] We all agree that unit cohesion is a compelling interest . . . ."); *see also* S. Rep. No. 103-111, at 12 ("The committee is confident that [RFRA] will not adversely impair the ability of the U.S. military to maintain good order, discipline, and security.  The courts have always recognized the compelling nature of the military's interest in these objectives in the regulations of our armed services."); H.R. Rep. No. 103-88 ("[M]aintaining discipline in our armed forces[] [has] been recognized as [a] government[] interest[] of the highest order.").

But RFRA "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person' – the particular claimant whose sincere exercise of religion is being substantially burdened."  *O Centro*, 546 U.S. at 430–31, quoting 42 U.S.C. § 2000bb-1(b); *accord Hobby Lobby*, 134 S. Ct. at 2779; *Holt*, 135 S. Ct. at 863.  Thus, the Court must determine whether defendants have proven that the decision to deny *this plaintiff* a religious accommodation that would enable him to enroll in ROTC actually furthers the compelling interests defendants have identified.  Moreover, "[w]here a regulation already

provides an exception from the law for a particular group, the government will have a higher burden in showing that the law, as applied, furthers the compelling interest." *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 472–73 (5th Cir. 2014), citing *Hobby Lobby*, 134 S. Ct. at 2781–82.

In this case, there is ample undisputed evidence that soldiers in all corners of the Army are permitted to maintain beards and to wear religious headgear while in uniform, as well as to deviate from the grooming standards in other ways.  And the Army has allowed several Sikhs to serve – albeit, in different circumstances than plaintiff – with accommodations for their turbans, beards, and unshorn hair.  So defendants cannot simply invoke general principles here – they must make the necessary heightened showing to justify the specific refusal to grant an exception to plaintiff.

The Court finds that defendants have not overcome this hurdle.

### 1. LTG McConville's Decision

LTG McConville's decision to deny an accommodation to plaintiff rested on his conclusion that permitting "an obvious deviation" from the uniform and grooming regulations in an officer training program would undermine:

- "Unit cohesion and morale," because it would "undermine the common Army identity we are attempting to develop in ROTC, and adversely impact efforts to develop cohesive teams," McConville Letter at 2–3;

- "Good order and discipline," because "the even handed enforcement of grooming standards instills the self-discipline necessary for the military member to perform effectively"; "[g]ranting [plaintiff] an exception in a military officer training program would undercut this fundamental component of [the] program, and dramatically change the nature of how we train officers for the future needs of the Army"; and "[i]f officer training does not reflect Army training, the credibility of the officer corps will be called into question," *id.* at 3–5;

- "Individual and unit readiness," because "allowing [plaintiff] to continue in officer training without any emphasis on uniformity would leave [him] generally unprepared to lead Soldiers, viewed as an outsider by [his] peers,

and trained in a manner that is wholly inconsistent with how we develop strong military officers," thereby weakening "good order, discipline, the credibility of the officer corps, cohesion, and morale," as well as military readiness in general, *id.* at 5–6; and

- Plaintiff's "health and safety," based on an Army study that shows that "facial hair significantly degrades the protection factor of all approved protective masks," and because compliance with Army grooming standards is "[o]ne of the most important mechanisms for managing risk" because it facilitates "the ability to assess a Soldier's competency and attention to detail," *id.* at 6.

McConville acknowledged that the Army had granted religious accommodations to Sikh soldiers in the past, but he differentiated those individuals because the exceptions were granted "based on the military necessity factors that existed at the time," and the soldiers were "selected to serve in positions requiring unique skills or professional credentials to meet the Army's operational needs."[16]  *Id.*  McConville also offered his view that issuing temporary medical exceptions to grooming standards did not undercut the Army's ability to enforce grooming and appearance policies in general because those exceptions are "subject to approval by military commanders" and often limited in duration, and still they require the recipient to "trim his beard as close to his face as possible."  *Id.* at 7.

Notwithstanding the undeniable importance of uniformity to military discipline, unit cohesion, and safety in general, these justifications for the Army's decision do not withstand strict scrutiny.

---

16    Although plaintiff speaks multiple languages, defendants state that "the Army is not actively using ROTC as a means of aggressively filling the needs Plaintiff perceives it has for the languages he can speak."  Defs.' Reply at 21; *see also* McConville Letter at 7 (noting that LTG McConville considered plaintiff's language skills).

2.   The Army has permitted numerous exceptions to its grooming and uniform policies.

Defendants' contention that denying plaintiff a religious accommodation furthers the stated compelling interests is undermined by the fact that the Army routinely grants soldiers exceptions to its grooming and uniform regulations.  *See Hobby Lobby*, 134 S. Ct. at 2781–82.

First, since 2007, the Army has permitted more than 100,000 service members to grow beards for medical reasons; it has authorized at least 49,690 permanent "shaving profiles," and at least 57,616 temporary ones.[17]  *See* Ex. 9 to Pl.'s Mot.  These soldiers with beards include not only enlisted men but officers bound to ensure that the men who serve under them are clean-shaven. *See id.*

Defendants argue that plaintiff's request for a grooming accommodation for his unshorn beard is different because soldiers with medically-authorized beards are required to trim them as short as an eighth of an inch.  Defs.' Reply at 18 n.4; *see also* Hr'g Tr. at 48–49.  Defendants also point out that commanders are empowered to require soldiers with medically-authorized beards to shave for reasons of operational necessity and safety.  *See* TB MED 287 at 12 ("[A] unit commander has the authority to require that a Soldier's beard be shaved if the unit is in, or about to enter, a situation where use of a protective mask is required."); *see also* Defs.' Mem. at 37.  In addition, defendants note that medical shaving profiles are often temporary, and that soldiers whose skin conditions are "permanent in nature and interfere[] with military duties" may face separation from the Army on that basis.  Defs.' Mem. at 35–37.  Finally, defendants argue that the Army's policy of granting shaving profiles for medical purposes ultimately strengthens the

---

17      In addition, "the Army does not always enforce grooming policies pertaining to beards when operational necessity requires."  Defs.' Admiss. at 4.

Army by increasing its diversity, given that the relevant skin conditions disproportionately affect African Americans.  Defs.' Reply at 18–19.

It is undisputed that there are differences between the religious accommodation plaintiff seeks for his beard and the shaving profiles the Army has granted.  But defendants have not carried their burden to show that permitting plaintiff's unshorn beard would undermine the Army's compelling interests any more than the medical beard accommodations the Army has provided, especially considering that the Army permits soldiers to grow beards longer than a quarter of an inch "if medically necessary."  *See* Defs.' Reply at 18 n.4.  And although some shaving profiles are classified as temporary, tens of thousands of them are "permanent," *see* Ex. 9 to Pl.'s Mot., and defendants have offered no evidence that any soldier has been separated on that basis.

Moreover, while soldiers who are granted shaving profiles may be required to shave by their commanders, the Army's own rules provide that this authority "should not [b]e used to require that a Soldier be clean shaven for maneuvers and other tactical simulations," but should be invoked only "when there is an actual need to wear the protective mask in a real tactical operation."[18]  TB MED 287 at 12.  Therefore, the fact that other shaving exceptions may be revocable does not support the outright denial of the accommodation sought here:  as an ROTC enrollee, or even as a contracted cadet, plaintiff would never encounter the "real tactical operation" that would permit a commander to require a soldier with a medically-necessary beard to shave.  *See* Hr'g Tr. at 40 ("MR. WILLIAMS:  A ROTC cadet would not be able to be called up.").

---

18      The Army Technical Bulletin on this issue also states that "[t]he existence of a beard does not prevent performance of most military duties" and that "the fact that a profile is awarded authorizing the growth of a beard should not ordinarily require any functional limitations requiring a change or limitation in the performance of military duties."  TB MED 287 at 12.

For the same reason, the concern about plaintiff's health and safety is misplaced, at least for the duration of his participation in ROTC.[19]

Finally, the Court notes that defendants have not claimed or shown that even one of the more than 100,000 soldiers who have been permitted to grow a beard since 2007 – including many who have served in deployed environments – has been ordered to shave it for any reason.

In sum, it is difficult to see how accommodating plaintiff's religious exercise would do greater damage to the Army's compelling interests in uniformity, discipline, credibility, unit cohesion, and training than the tens of thousands of medical shaving profiles the Army has already granted. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("It is established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.") (citation and internal quotation marks omitted); *accord O Centro*, 546 U.S. at 433; *cf. Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366–67 (3d Cir. 1999) (Alito, J.) ("[T]he Department has provided no legitimate explanation as to why the presence of officers who wear beards for medical reasons does not have [the same] effect [as] the presence of officers who wear beards for religious reason would. . . . We are at a loss to understand why religious exemptions threaten important city interests but medical exemptions do not."). Defendants have not claimed or shown that any of the soldiers and officers who have served with beards have been less disciplined, less credible, less socially integrated, or less well-trained than their clean-shaven colleagues. In addition, to the extent that the Army has also asserted an

---

19    The Court recognizes, of course, that ROTC is a training program designed to produce Army officers who might face "an actual need to wear the protective mask," TB MED 287 at 12, but, again, the question of whether the Army must accommodate plaintiff at that point is not yet ripe.

interest in diversity, that interest would plainly be furthered by permitting plaintiff's enrollment in ROTC.  *See* Defs.' Reply at 18–19; *see also* McConville Dep., Mar. 2, 2015, Ex. FF to Defs.' Reply [Dkt. # 37-3, 276–77] at 124–25 (noting previous statement by LTG McConville that "finding young minority officers now is key to diversi[ty] in the next generation of the Army's leaders").

Medically-based shaving profiles are not the only large-scale exception the Army makes to its grooming policies.  In March of 2014, the Army tightened its policies related to tattoos, but it grandfathered in nearly 200,000 soldiers with non-conforming tattoos – including officers who will be bound to enforce the policy in the future.[20]  *See* Defs.' Stip. at 2; A.R. 670-1 at 11.  The tattoos cover a wide range of personal expression, and they include religious iconography, symbols of cultural or ethnic heritage, images from popular culture, and more.  *See* Pl.'s SOF ¶¶ 64–67 (citing examples); Defs.' SOF Resp. ¶¶ 64–67; *see also supra* Regulatory Background Part I(C). The fact that the Army is able to tolerate so many idiosyncratic deviations from its grooming regulations further undermines LTG McConville's assertion that "the even handed enforcement of grooming standards" is critical to "instill[] the self-discipline necessary for the military member to perform effectively."  McConville Letter at 4; *see also Church of the Lukumi Babalu Aye*, 508 U.S. at 547; *O Centro*, 546 U.S. at 433.

Neither LTG McConville's decision nor defendants' pleadings say much about plaintiff's request to maintain his turban and unshorn hair.  LTG McConville's letter states that "[h]air and clothing are a very visible way that individuals express their identity," and that "[b]y eliminating

---

[20]     As noted above, *see supra* note 4, the Army relaxed its tattoo guidelines on April 10, 2015, *see* Notice of Revised Regulation on Grooming and Appearance Standards at 1, opening the door to even more variation within the ranks.

the social distinctions that different civilian attire implies, uniforms emphasize the professional equality of all military people."  McConville Letter at 2.  But it is undisputed that the Army's own regulations permit soldiers to wear yarmulkes and other religious headgear, *see* Defs.' Mem. at 7; A.R. 600-20 at A024; DoDI 1300.17 at A010; *see also supra* Regulatory Background Part I(A), and defendants do not contend that a turban would necessarily fail to satisfy the religious headgear rules.[21]  Moreover, although Army regulations require male soldiers to keep the hair on their heads cut short, defendants do not – and cannot – contend that plaintiff's unshorn hair, when tucked into a turban in accordance with religious precepts, would "fall over the ears or eyebrows, or touch the collar," or present an appearance that is anything other than "neat and conservative."  *See* A.R. 670-1 at 5.  In view of the vast number of exceptions to the grooming and uniform standards that the Army has granted, the Court finds that defendants have not shown that denying this plaintiff a religious accommodation would make him less credible, disciplined, or ready than the other officers and soldiers who similarly do not meet all of the requirements of uniformity.

Finally, defendants have not carried their burden to show that "the compelling interest test is satisfied through application of the challenged law 'to the person.'"  *See O Centro*, 546 U.S. at 430; *Hobby Lobby*, 134 S. Ct. at 2779; *Holt* 135 S. Ct. at 863.  LTG McConville's decision emphasizes the general importance of uniformity in cultivating and reflecting Army discipline.  McConville Letter at 4–5.  McConville explains that "[u]niformity is a key component of the learning process" for ROTC cadets because it is "a readily available means of instilling the practice of inspection and compliance that not only sharpens Soldiers, but also leaders."  *Id.* at 4.  He insists that "[u]niformity helps to inhibit personal desires and impulses that may be antithetical to mission

---

21     Indeed, the undisputed evidence in the record shows that Sikh servicemen have successfully adapted their turbans to meet the Army's operational requirements. *See, e.g.*, Kalsi Dep., Mar. 4, 201[5], Ex. 7 to Pl.'s Mot. [Dkt. # 34, 174] at 51–53.

accomplishment," noting that "[t]he obligations Soldiers undertake, risking life and well-being for the greater good, require[] dedication, selfless service, and discipline." *Id.* at 5. And he notes that compliance with Army grooming standards facilitates "the ability to assess a Soldier's competency and attention to detail." *Id.* at 6.

But the accommodation this plaintiff seeks does not stem from any lack of self-control, dedication, or attention to detail. To the contrary: plaintiff seeks an accommodation because he faithfully adheres to the strict dictates of his religion. So even if, in some cases, a soldier's failure to follow the Army's standards might signal a rebellious streak or reflect a lack of impulse control or discipline, LTG McConville's decision fails to grapple with the fact that any deviation from the rules on plaintiff's part flows from a very different source. And therefore, the decision lacks the individual assessment that is fundamental under RFRA.

3.   The Army has granted religious accommodations to other Sikh soldiers.

Defendants' contention that denying this plaintiff an accommodation advances the Army's compelling interests is further undermined by the undisputed fact that at least four Sikh men who served in the Army with tremendous success received similar accommodations.[22]  Corp. Simran Preet Singh Lamba enlisted in 2009, served as a medic, received a promotion to Corporal, and currently serves in the U.S. Army Individual Ready Reserve. Decl. of Simran Preet Singh Lamba [Dkt. # 32-11] ("Lamba Decl.") ¶¶ 4, 16, 19, 24. Maj. Kamaljeet Singh Kalsi is an Army doctor who served in Afghanistan, received a promotion to Major, and is currently serving in the Army Active Reserves. Kalsi Dep., Mar. 4, 201[5], Ex. 7 to Pl.'s Mot. [Dkt. # 34, 165, 184, 196] ("Kalsi Dep.") at 14–15, 91, 138–41. Capt. Tejdeep Singh Rattan is an active duty Army dentist who

---

22   Defendants acknowledge that "the Army has approved six religiously based uniform, personal appearance, and personal grooming practice exceptions since 2000." Defs.' Stip. at 1.

served in Afghanistan.  Rattan Dep., Mar. 3, 2015 [Dkt. # 32-7, 197, 208–09] at 43, 89–90, 93.

And Col. (Ret.) Gopal Singh Khalsa enlisted in the Army as a private in 1976, served in Military

Intelligence, served overseas, received numerous promotions, and eventually retired as a Colonel

in 2009.  Decl. of Gopal Singh Khalsa [Dkt. # 32-10] ("Khalsa Decl.") ¶¶ 2, 6, 8, 10–11, 14–16,

18, 20.  Each of these soldiers received an accommodation that permitted him to serve while

maintaining unshorn hair, an unshorn beard, and a turban.  And, notwithstanding the deviation

from the uniformity that is undeniably a core aspect of military life, each of them has earned

commendations and outstanding reviews:

- Corp. Lamba's superiors described him as "easily one of the most impressive Soldiers in the company," "an exceptional Soldier [who] possess[es] all the attributes . . . required to be an outstanding Army Officer," and "a tremendous Soldier, an invaluable member of [the] team, and [someone who had] an amazing impact on his peers and supervisors."  Lamba Decl. ¶ 19.  In addition, one of his Drill Sergeants noted that "[d]espite any spoken or unspoken stereotypes surrounding his enlistment in the United States Army, SPC Lamba displayed . . . intelligence, courage, and inner strength; enabling him to push forward with his training in a manner that would make seasoned Soldiers proud to have him on their team."  Ex. 5 to Lamba Decl. [Dkt. # 32-12, 38] at 8. Lamba also received an Army Commendation Medal in acknowledgment of his "exceptionally meritorious service," his "selfless service and dedication to duty," and the fact that "his actions [were in] keeping with the finest traditions of military service."  Lamba Decl. ¶ 23.

- Maj. Kalsi's superiors described his performance as "[t]ruly exceptional," stating that he "can be expected to excel in positions of leadership," and that "[h]e possesses absolutely unlimited potential as a leader, military officer, and physician."  Ex. 33 to Pl.'s Mot. [Dkt. # 32-7, 184]; Ex. 56 to Pl.'s Mot. [Dkt. # 32-8, 80].  Kalsi was awarded a Bronze Star for his service in Afghanistan. Kalsi Dep. at 130.

- Capt. Rattan's superiors believe that his "potential is unlimited as an Army Dental Officer and leader," and have described his performance as "exemplary," "tireless," "in keeping with the highest traditions of the . . . United States Army," "outstanding," and "extraordinary."  Ex. 36 to Pl.'s Mot. [Dkt. # 32-7, 241] at 002405; Ex. 7 to Rattan Dep. [Dkt. # 32-7, 233] at 2.  In addition, Rattan's commander stated that he had "done everything within his power to keep within the [grooming and uniform] regulation" and had "[gone] leaps and bounds beyond what others have had to do."  Defs.' Admiss. at 6.  The

commander further noted that "[t]he only struggle is that when some people get a first look, they are going to stereotype him," but "[t]hat is the good thing about having Rattan out there, to show that this is a proud individual, he knows what he is doing, and he is doing a phenomenal job." *Id.* Capt. Rattan has received numerous awards, including a NATO Medal and the Army Commendation Medal for his service. Rattan Dep. at 87–88.

- During more than three decades of Army service, Col. (Ret.) Khalsa received an enormous volume of praise and numerous promotions. In training in 1977, he was selected from among 600 peers as the Outstanding Soldier of the Cycle, Ex. B to Khalsa Decl. [Dkt. # 32-10, 14]; in Officer Candidate School, he was named the Distinguished Leadership Graduate, and was later inducted into the school's hall of fame, Khalsa Decl. ¶ 7; in 1998, after being promoted to Lieutenant Colonel, Khalsa was appointed Battalion Commander for the Reserves' 368th Military Intelligence Battalion, a position in which he commanded 700 soldiers, including commissioned officers, warrant officers, and enlisted soldiers, *id.* ¶ 16; he was repeatedly rated "Best Qualified" for promotion, *see, e.g.*, Ex. B to Khalsa Decl. [Dkt. # 32-10, 56, 58]; in 2003, he was promoted to full Colonel and became the Deputy Chief of Staff, G7 for Training for the 63rd Regional Readiness Command, a position that charged him with coordinating and resourcing all individual, unit, and professional development training for all U.S. Army Reserve units in Arizona, California, and Nevada, Khalsa Decl. ¶ 18; and he delayed his retirement at the Army's request to accept an appointment as Course Director for the Army's Company Team Leader Development Course, *id.* ¶ 19. Khalsa was praised for being "a total soldier who demonstrates mental and physical readiness and sets the highest example for his troops to follow," as having "unlimited potential," as "our best battalion commander, bar none," for being "held in the highest esteem by his superiors and subordinates alike," "a highly disciplined officer," "capable of commanding any brigade," and the "[b]est of the best." Ex. B to Khalsa Decl. [Dkt. # 32-10, 40, 50, 54, 56, 58].

Defendants point to undisputed facts that distinguish each of these soldiers from the plaintiff. *See* Defs.' Reply at 20–22. They note that Maj. Kalsi, Capt. Rattan, and Corp. Lamba each "joined the military in response to specialized programs that actively sought the unique skills these individuals possessed during a time of growing conflict," and all three served in medical roles in the Special Branches, which "focus on professional technical skills and less on the leadership of large teams of soldiers." *Id.* at 20–21 & n.5. Plaintiff, by contrast, wishes to become a Military Intelligence officer in the Basic Branches of the Army. *Id.* at 20.

Faced with the fact that Col. (Ret.) Khalsa served in Military Intelligence in the Basic Branches and had a long and distinguished career as an Army officer, defendants note that he was "commissioned and grandfathered under the prior regulatory system" that permitted religious accommodations for Sikhs.  *Id.* at 22 n.10; *see also* Khalsa Decl. ¶¶ 3, 9.  Also, according to defendants, "[t]he needs of the Army now are also far different than when other exceptions were granted."  *Id.* at 22.

Finally, defendants argue that "[t]he relative professional success" of Corp. Lamba, Maj. Kalsi, Capt. Rattan, and Col. (Ret.) Khalsa "validates the Army's decision-making process and its decision to grant accommodations in appropriate circumstances."  *Id.*

But despite the differences between plaintiff and Corp. Lamba, Maj. Kalsi, Capt. Rattan, and Col. (Ret.) Khalsa, the undisputed evidence in the record indicates that each of these men served – or are serving – with their articles of faith intact without any of the negative consequences that defendants predict would flow from granting a similar exception in this case.  The praise heaped on each man's service – including, in particular, for their discipline and leadership – stands in stark contrast to LTG McConville's conclusion that permitting plaintiff to maintain his articles of faith would undermine the quality of his training, unit cohesion and morale, military readiness, and the credibility of the officer corps.

Furthermore, the Army's own research stands in stark contradiction to LTG McConville's opinion.  The Army conducted an internal examination of the effect of Corp. Lamba's religious accommodation on his service, and the study concluded that "the Soldier's religious accommodations did not have a significant impact on unit morale, cohesion, good order, and discipline," M. Glenn Cobb & Thomas Rhett Graves, A Case Study of the Impact of Religious Accommodations on Initial Military Training (Oct. 2011) at 10, Ex. 51 to Pl.'s Mot. [Dkt. # 32-8,

43

57], and that it "had no significant impact on his own, or any other Soldier's, health and safety." *Id.* at vi.  The defendants point to no contrary empirical evidence.

Thus, instead of "validat[ing] the Army's decision-making process," Defs.' Reply at 22, the exemplary service records of the four Sikh soldiers with religious accommodations serve to highlight the flaws in the Army's analysis in this case.  Those soldiers had the chance to prove themselves, and that is all plaintiff is seeking here.  Defendants have no way of knowing whether plaintiff, too, might be qualified to serve because they have not yet even allowed him to enroll in ROTC.

In conclusion, defendants failed to come forward with any evidence to diminish the force of the evidence produced by plaintiff, as is their burden, *see Celotex*, 477 U.S. at 323–24, and they seem to suggest that LTG McConville's say-so is sufficient to justify the decision here.  *See* Hr'g Tr. at 56.  Notwithstanding his thirty-four years of experience in the Army, *see id.*, and his superior judgment about military matters, adopting his conclusion without more would entail abdicating the role that RFRA requires the Court to play.  Defendants have failed to sustain the heavy burden that applies when a governmental entity refuses to grant an exception to a policy already riddled with exceptions, and they have failed to satisfy their burden of demonstrating that the compelling government interests they cite are furthered by the unwavering application of Army policies to this plaintiff in this particular context.  Under these circumstances, and in light of the evidence presented here, the Court finds that it would require "a degree of deference that is tantamount to unquestioning acceptance," *Holt*, 135 S. Ct. at 864, to credit defendants' assertion that denying a religious accommodation to plaintiff while he enrolls in ROTC advances the Army's asserted compelling interests as applied to him.

C.    **Defendants have not shown that denying an accommodation to plaintiff is the least restrictive means of furthering their interests.**

The Court must next go on to apply the second prong of the RFRA test.  While the Court accords defendants a high level of deference in their identification of compelling military interests, it finds that it is well within its purview to hold that the Army's refusal to grant this plaintiff a religious accommodation is not the least restrictive means of advancing those interests.

"'The least-restrictive-means standard is exceptionally demanding,' and it requires the government to 'sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y].'"  *Holt*, 135 S. Ct. at 864 (alterations in original), quoting *Hobby Lobby*, 134 S. Ct. at 2780.  "'[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it.'"  *Id.* (alterations in original), quoting *Playboy Entm't Grp.*, 529 U.S. at 815.  Moreover, "[t]he very existence of a government-sanctioned exception to a regulatory scheme that is purported to be the least restrictive means can, in fact, demonstrate that other, less-restrictive alternatives could exist."  *McAllen Grace*, 764 F.3d at 475–76, citing, *inter alia*, *Hobby Lobby*, 134 S. Ct. at 2781–82.

Defendants contend that "there is no less restrictive means to promote and maintain teamwork, motivation, discipline, esprit de corps and image, within the context of an officer development program," than to deny a religious accommodation to plaintiff.  Defs.' Mem. at 43, citing *Bitterman v. Sec'y of Defense*, 553 F. Supp. 719, 725 (D.D.C. 1982).  Plaintiff's individual readiness, they argue, would be irretrievably undermined by allowing him "to continue in officer training without any emphasis on uniformity," because he would be "trained in a manner that is wholly inconsistent with how we develop strong military officers."   McConville Letter at 5.  Moreover, defendants point out that plaintiff, if qualified, would not receive a commission until 2017, and that "[t]he Army cannot decide now that it will simply find Plaintiff a branch within the

organization . . . where his accommodation may have some potentially lesser impact on the military necessity factors." Defs.' Mem. at 43; *see also* Defs.' Reply at 23. Finally, according to defendants, "[t]he fact remains Plaintiff would subject himself, his fellow soldiers, and his unit to greater risk by virtue of his wearing a beard in an environment with chemical or biological weapons." Defs.' Mem. at 44; *see also* Defs.' Reply at 23.

But the Court has already found that defendants have failed to show that if plaintiff's religious exercise were to be accommodated, his individual readiness will be diminished any more than the readiness of the tens of thousands of soldiers and officers who have received grooming and uniform accommodations for other reasons. Nor have defendants demonstrated that plaintiff's training would be devoid of "*any* emphasis on uniformity" by virtue of his accommodation, *see* McConville Letter at 5 (emphasis added), or that these concerns could not be advanced some other way. For example, the Army's letter granting an accommodation to Corp. Lamba stated that it was "[then-]SPC Lamba's responsibility to ensure his beard is well maintained and presents a neat and orderly appearance." Ex. 8 to Lamba Decl. [Dkt. # 32-13, 32] at 2; *see also id.* ("The current unit commander and all subsequent unit commanders of SPC Lamba will counsel SPC Lamba in writing to ensure he understands expectations. . . . Grooming exceptions to policy will be neat and well maintained at all times, to present a disciplined Soldierly appearance.").

Furthermore, although the Court does not doubt that the Army cannot anticipate at this time what its needs will be in 2017, that only serves to underscore the fact that a temporary accommodation is a less restrictive means here. As plaintiff points out, a temporary accommodation "would be especially workable" because it would give the Army "ample opportunity to determine whether [plaintiff's] articles of faith *actually* interfere with his performance," and would permit defendants to "observe Mr. Singh in action with his

accommodation as he competes with his peers for an ROTC contract." Pl.'s Reply at 21.  It would also permit defendants to troubleshoot any issues that might arise, including with respect to gas masks, as appropriate.[23]

Finally, the undisputed evidence shows that, in 2010, the Army granted Corp. Lamba a temporary accommodation that was virtually identical to the one sought by plaintiff here for the purpose of Lamba's "attendance at basic military training and military occupational school." Lamba Decl. ¶ 8.   Lamba's temporary accommodation included the proviso that the accommodation could not "be guaranteed at all times" and might "be revoked due to changed conditions," which no doubt served to protect many of the interests that defendants have asserted in this case.[24]  Id.  Defendants have not shown that the less restrictive alternative of a temporary

---

23      As LTG McConville himself acknowledged, "there are some protective masks that are capable of providing protection to individuals who wear beards," even though those masks "are not standard Army issue."  McConville Letter at 6.  In addition, plaintiff suggests that the Army could address any concerns related to gas masks by making use of the "Hard-to-Fit" program, an Army effort that has "provided masks to more than 1,150 warfighters and civilians (including a brigadier general and a command sergeant major)" who have not otherwise been able to "achieve a satisfactory fit."  Ex. 1 to 30(b)(6) Loudy Dep., Feb. 26, 2015, Ex. 1 to Pl.'s Mot. [Dkt. # 34, 75] ("Loudy Ex. 1") at 12; see also Pl.'s Reply at 21.  This program has created special masks for individuals, and in two cases, it obtained special masks from the United Kingdom.  Loudy Ex. 1 at 12.  Although, as an ROTC cadet, plaintiff would never encounter a real tactical situation in which a protective mask was required for his safety, see Hr'g Tr. at 40, LTG McConville's statement and this evidence further indicate that less restrictive means are available.  See Hobby Lobby, 134 S. Ct. at 2781 ("We do not doubt that cost may be an important factor in the least-restrictive-means analysis, but . . . [RFRA] may in some circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs.").

24      Furthermore, in 2013, the Army converted Corp. Lamba's temporary accommodation into an "indefinite" one, noting that the accommodation was still subject to revocation if required by military necessity, that Lamba should be prepared to comply with the Army's uniform and grooming standards "if directed to do so," and that any overseas deployment would "be scrutinized by [Lamba's] commander, as the wearing of a beard renders gas masks unsafe."  Ex. 8 to Lamba Decl. [Dkt. # 32-13, 31] at 1.

accommodation with similar conditions would be insufficient to protect the Army's interests here.[25]

In sum, defendants have has not carried the "'exceptionally demanding'" burden to "'sho[w] that [the Army] lacks other means of achieving its desired goal without imposing a substantial burden on [plaintiff's] exercise of religion.'" *See Holt*, 135 S. Ct. at 864 (first alteration in original), quoting *Hobby Lobby*, 134 S. Ct. at 2780. The relief plaintiff seeks – an accommodation that would permit him to enroll in ROTC with his articles of faith intact – would not require the Army to guarantee him a commission, or even a contract, and it stops far short of the permanent relief the Army has granted to tens of thousands of soldiers for medical and religious reasons. Moreover, because providing plaintiff with a temporary religious accommodation for the purpose of enrolling in ROTC, which could be revocable if necessary, is an available less restrictive means, the Army must employ that alternative. *See Holt*, 135 S. Ct. at 864 ("'[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it.'") (alteration in original), quoting *Playboy Entm't Grp.*, 529 U.S. at 815.

---

25      It is true that, in 2013, the Army stated that Lamba's initial accommodation was granted "during a period in which the Army insufficiently scrutinized such requests." Ex. 8 to Lamba Decl. [Dkt. # 32-13, 31] at 1. Nevertheless, Corp. Lamba's experience, as well as the experiences of the tens of thousands of soldiers with medical grooming accommodations and other religious accommodations, "demonstrate that other, less-restrictive alternatives could exist." *See McAllen Grace*, 764 F.3d at 475.

## CONCLUSION

For the foregoing reasons, the Court will deny defendants' motion to dismiss and for summary judgment, and it will grant plaintiff's cross-motion for summary judgment. A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE:  June 12, 2015